# DECLARACIÓN DE JOSÉ RIVAS DÍAZ

Yo, José Rivas Díaz, declaro bajo pena de perjurio conforme a 28 U.S.C. § 1746 que los siguientes hechos son verdaderos y correctos según mi conocimiento personal:

**INFORMACIÓN PERSONAL**

1. Mi nombre es José Rivas Díaz.
2. He vivido en los Estados Unidos durante muchos años. Trabajo en construcción y remodelación residencial.
3. Soy anciano ungido y líder religioso de mi congregación. Mi fe es una parte fundamental de mi vida. Dedico tiempo a enseñar la Biblia, ayudar a enfermos, asistir a familias necesitadas y realizar obras comunitarias y religiosas.
4. Antes de los acontecimientos descritos en esta declaración, nunca había sido arrestado. Había tenido algunas interacciones previas con la policía por asuntos de tránsito, pero siempre fueron encuentros normales en los que los oficiales explicaban el motivo de la parada y emitían una advertencia o una multa de tránsito.

**LOS HECHOS DEL 20 DE FEBRERO**

5. El 20 de febrero regresaba a mi casa después de una jornada de trabajo en construcción y remodelación en el condado de Habersham. Había trabajado todo el día y me dirigía a mi hogar para reunirme con mi familia.
6. Debido a la situación de muchos inmigrantes en Georgia y a mi deseo de cumplir la ley, revisaba las luces de mi vehículo con frecuencia. Por lo general, las revisaba casi todos los días antes de salir a trabajar.
7. Mientras conducía, observé una patrulla detrás de mí durante aproximadamente una milla. Posteriormente activó sus luces y me detuve inmediatamente al costado de la carretera.
8. El oficial me dijo que me había detenido debido a un problema con las luces de mi camioneta.
9. Aunque me sorprendió la explicación porque acostumbraba revisar mis luces regularmente, asumí que el oficial decía la verdad y pensé que una luz podría haberse quemado inesperadamente.

**LA LLEGADA DE LOS AGENTES ENMASCARADOS**

10. Después de hablar conmigo, el oficial regresó a su vehículo.
11. Pasaron aproximadamente tres o cuatro minutos. En lugar de regresar el mismo oficial, observé que varias personas se aproximaban a mi camioneta.

12. Eran aproximadamente cuatro individuos vestidos de oscuro y con máscaras negras que cubrían sus rostros, dejando visibles únicamente sus ojos.
13. Ver a varios hombres enmascarados acercándose a mi vehículo me causó miedo inmediato. No entendía quiénes eran ni qué pretendían hacer.
14. Antes de que pudiera comprender lo que estaba ocurriendo, los agentes abrieron la puerta de mi camioneta, me sacaron físicamente del vehículo y me colocaron esposas.
15. Yo no me resistí, no intenté escapar y no mostré ninguna conducta agresiva. Cooperé en todo momento.
16. Inmediatamente pedí permiso para llamar a mi esposa. Mi petición fue rechazada.
17. Poco después de ser esposado, una de las primeras preguntas que me hicieron fue si yo era ciudadano estadounidense o residente permanente legal.

**EL AMBIENTE DE INTIMIDACIÓN Y COACCIÓN**

18. Desde el momento en que fui sacado de mi vehículo, no sentí que tuviera libertad alguna para decidir si responder o no a las preguntas de los agentes.
19. Estaba esposado, rodeado por múltiples agentes y completamente bajo su control. Nadie me informó que podía permanecer en silencio o negarme a responder preguntas.
20. Fui trasladado a un lugar donde observé que agentes estaban reuniendo y procesando a otras personas detenidas.
21. Permanecí allí durante varias horas mientras los agentes continuaban recogiendo a más detenidos.
22. Durante ese tiempo observé que todas las personas detenidas eran hispanas y que conducían camionetas o vehículos de trabajo. En aproximadamente cinco o seis viajes, los agentes recogieron suficientes personas para llenar la camioneta. Éramos aproximadamente diez o doce detenidos. No observé que los agentes llevaran a la camioneta a ninguna persona que no fuera hispana. Por lo que vi personalmente, los hispanos que conducían vehículos de trabajo fueron el blanco de esa operación.
23. Escuché a agentes referirse a los detenidos como “ilegales” en lugar de llamarlos por sus nombres. También escuché comparaciones en las que los detenidos eran tratados como si fueran animales.
24. Como pastor y como persona de fe, escuchar a oficiales del gobierno hablar así sobre seres humanos me impactó profundamente y me hizo sentir que los detenidos no estaban siendo vistos como personas dignas de respeto.
25. Lo que más me alarmó fue observar cómo se comportaban los agentes durante el procesamiento de los detenidos.

26. Después de la amenaza, los agentes cambiaron la manera de interrogarnos. Ya no se limitaron a hacer preguntas desde la puerta de la camioneta. Sacaban a los detenidos uno por uno, los obligaban a ponerse de rodillas afuera y, mientras permanecían de rodillas, les exigían sus datos personales. Esto se hizo incluso con detenidos que no habían intentado correr.
27. Cuando llegó mi turno, también me indicaron que me pusiera de rodillas. Debido al significado religioso que tiene para mí arrodillarme ante alguien, y porque realmente me dolían las piernas, pedí que me permitieran sentarme. Finalmente me permitieron responder sentado. Sin embargo, yo había visto cómo trataban a los demás y sabía que ellos controlaban la posición física en que cada persona debía permanecer mientras respondía.
28. Yo observé todo esto antes de ser interrogado. A medida que veía a los agentes obligar a otros detenidos a ponerse de rodillas y someterse a sus preguntas, entendí que no tolerarían resistencia ni desacuerdo.
29. Un episodio en particular me impresionó mucho. Un detenido de apellido Montes intentó proporcionar su apellido correctamente. Los agentes que lo interrogaban parecían no hablar español con fluidez y no comprendieron lo que él les decía.
30. En vez de intentar aclarar el malentendido, los agentes comenzaron a actuar como si el Sr. Montes estuviera mintiendo o intentando engañarlos.
31. Observé que la situación se volvió tensa y que los agentes se molestaron por una confusión que, desde mi perspectiva, existía porque ellos no comprendían bien el español.
32. Finalmente trajeron a otro oficial que hablaba mejor español. En lugar de aclarar el malentendido o disminuir la tensión, ese oficial comenzó a insultar al grupo en español. Lo escuché referirse a nosotros como “hijos de puta que están aquí ilegalmente”. Después advirtió que no tratáramos de engañarlos porque no sabíamos lo que nos podía pasar.
33. Los agentes no se referían a nosotros por nuestros nombres ni como personas. Repetidamente nos llamaban “ilegales”. También escuché que describían a los detenidos como animales. Para mí, esas expresiones mostraban desprecio hacia nosotros como hispanos y hacia nuestra dignidad como seres humanos.
34. Ver cómo los agentes acusaban de mentiroso a una persona simplemente porque ellos no entendían correctamente su apellido me hizo temer que cualquier respuesta que yo diera podría provocar enojo, acusaciones o represalias por parte de los agentes.

**LAS AMENAZAS Y EL TEMOR QUE ME OBLIGARON A RESPONDER**

35. Durante el procesamiento escuché al oficial que hablaba español advertir al grupo que no tratáramos de engañar a los agentes porque no sabíamos lo que nos podía pasar. Por el tono empleado, los insultos que acababa de utilizar y el trato que yo ya había observado, entendí esas palabras como una amenaza de maltrato o violencia si no respondíamos como ellos querían.
36. No interpreté esas palabras como un comentario casual. La amenaza ocurrió después de que los agentes se enfurecieron por el apellido del Sr. Montes, insultaron a los detenidos y comenzaron a sacar a las personas una por una para interrogarlas de rodillas.
37. En ese momento ya había observado a agentes enmascarados sacarme de mi vehículo, negarme una llamada telefónica, esposarme, rodear a los detenidos, obligar a otros hombres a ponerse de rodillas, acusar a personas de mentir, utilizar insultos y referirse a nosotros como “ilegales” y “animales”.
38. Además, antes de este arresto yo conocía reportes sobre personas que, según entendía, habían muerto durante encuentros con agentes migratorios. Ese conocimiento ya me había generado temor hacia este tipo de operaciones.
39. Cuando escuché al oficial advertir que nadie sabía lo que podía ocurrir si no cooperábamos, inmediatamente pensé en esos reportes y en la posibilidad de sufrir violencia grave si desobedecía o me negaba a responder preguntas.
40. Creí sinceramente que podían golpearme, maltratarme o incluso causarme la muerte y que yo no tenía ninguna protección efectiva en ese momento.
41. Estaba aislado de mi familia, incomunicado, rodeado por agentes armados y observando el trato que recibían otros detenidos. Bajo esas circunstancias, sentí que los agentes tenían control absoluto sobre mi seguridad y mi bienestar.
42. Mi temor era genuino y profundo.
43. Cuando los agentes me formularon preguntas sobre mi identidad, mis padres, mi esposa, mis hijos, mi lugar de nacimiento y otros asuntos personales, respondí porque tenía miedo de que me maltrataran si guardaba silencio o si consideraban que mi respuesta no era satisfactoria. Yo mismo había visto lo que ocurría cuando los agentes creían que una persona los estaba engañando.
44. No consideré que guardar silencio fuera una opción realista. Desde que negaron mi petición de llamar a mi esposa, decidí hablar lo menos posible porque creí que podían hacerme daño. Después de escuchar la amenaza y observar los interrogatorios de rodillas, entendí que negarme a proporcionar información podía provocar maltrato o violencia.
45. Mis respuestas fueron producto del miedo, la intimidación, las amenazas implícitas y el ambiente coercitivo que observé durante toda la operación.

46. DAÑOS EMOCIONALES Y PSICOLÓGICOS
47. Durante mi detención sentí miedo extremo.
48. También sufrí una gran angustia porque no podía comunicarme con mi esposa ni con mis hijos y no sabía cuándo volvería a verlos.
49. Recé continuamente pidiendo protección a Dios porque temía por mi seguridad.
50. Esta experiencia me causó un trauma emocional profundo que continúa afectándome hasta el día de hoy. Incluso hablar de estos acontecimientos sigue siendo difícil para mí.
51. Durante aproximadamente cuatro o cinco horas no recibí comida ni agua, aunque había trabajado todo el día, tenía mucha sed y tenía hambre. También necesitaba usar el baño, pero no lo pedí. Había observado cómo reaccionaban los agentes ante cualquier conducta que no les agradaba y temía ser maltratado si hacía una petición. Por ese miedo, soporté la necesidad hasta llegar a Atlanta.

**DECLARACIÓN FINAL**

52. Basándome en todo lo que observé personalmente —que todos los detenidos eran hispanos en vehículos de trabajo; que los agentes nos llamaban "ilegales" y "animales"; que insultaron al grupo; que acusaron al Sr. Montes de engañarlos por no comprender su apellido; que amenazaron con consecuencias desconocidas si no cooperábamos; y que sacaron a los detenidos uno por uno para interrogarlos de rodillas— creí que los agentes habían dirigido la operación contra trabajadores hispanos y que utilizaban el miedo, la humillación y el control físico para obligarnos a responder.
53. Creí que cualquier negativa podía provocar represalias graves contra mi persona.
54. Por esa razón respondí a las preguntas de los agentes.

Declaro bajo pena de perjurio conforme a las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Ejecutado el 8 día de Agosto de 2026.

Firma: /s/ Jose Rivas Diaz

**José Rivas Díaz**

**ENGLISH TRANSLATION**

**DECLARATION OF JOSE RIVAS DIAZ**

I, Jose Rivas Diaz, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following facts are true and correct based upon my personal knowledge:

**PERSONAL INFORMATION**

1. My name is Jose Rivas Diaz.
2. I have lived in the United States for many years. I work in residential construction and remodeling.

3. I am an anointed elder and religious leader of my congregation. My faith is a fundamental part of my life. I devote time to teaching the Bible, helping the sick, assisting families in need, and performing community and religious service.

4. Before the events described in this declaration, I had never been arrested. I had some prior interactions with law enforcement regarding traffic matters, but they were always routine encounters in which officers explained the reason for the stop and issued either a warning or a traffic citation.

**THE EVENTS OF FEBRUARY 20**

5. On February 20, I was returning home after a day of construction and remodeling work in Habersham County. I had worked all day and was heading home to be with my family.

6. Because of the situation of many immigrants in Georgia and my desire to comply with the law, I regularly checked the lights on my vehicle. I generally checked them almost every day before leaving for work.

7. While driving, I noticed a patrol vehicle behind me for approximately one mile. It then activated its lights, and I immediately pulled over to the side of the road.

8. The officer told me that he had stopped me because of a problem with the lights on my truck.

9. Although I was surprised by the explanation because I regularly checked my lights, I assumed the officer was telling the truth and thought that a light may have unexpectedly burned out.

**THE ARRIVAL OF THE MASKED AGENTS**

10. After speaking with me, the officer returned to his vehicle.

11. Approximately three or four minutes passed. Instead of the same officer returning, I observed several individuals approaching my truck.

12. There were approximately four individuals dressed in dark clothing and wearing black masks covering their faces, with only their eyes visible.

13. Seeing several masked men approaching my vehicle caused me immediate fear. I did not understand who they were or what they intended to do.

14. Before I could understand what was happening, the agents opened the door of my truck, physically removed me from the vehicle, and placed me in handcuffs.

15. I did not resist, attempt to flee, or display any aggressive behavior. I cooperated at all times.

16. I immediately asked for permission to call my wife. My request was denied.

17. Shortly after I was handcuffed, one of the first questions I was asked was whether I was a United States citizen or a lawful permanent resident.

**THE ATMOSPHERE OF INTIMIDATION AND COERCION**

18. From the moment I was removed from my vehicle, I did not feel that I had any freedom to decide whether to answer the agents' questions.

19. I was handcuffed, surrounded by multiple agents, and completely under their control. No one informed me that I could remain silent or refuse to answer questions.

20. I was transported to a location where I observed agents gathering and processing other detainees.

21. I remained there for several hours while agents continued picking up additional detainees.

22. During that time, I observed that all of the detainees were Hispanic and were driving trucks or work vehicles. In approximately five or six trips, the agents picked up enough people to fill the transport vehicle. There were approximately ten to twelve detainees. I did not observe the agents place any non-Hispanic individuals into the transport vehicle. Based on what I personally observed, Hispanics driving work vehicles were the target of that operation.

23. I heard agents refer to detainees as "illegals" rather than calling them by their names. I also heard comparisons in which detainees were treated as though they were animals.

24. As a pastor and a person of faith, hearing government officers speak that way about human beings deeply affected me and made me feel that the detainees were not being regarded as people deserving of respect.

25. What alarmed me most was observing how the agents behaved during the processing of detainees.

26. After the threat, the agents changed the manner in which they questioned us. They no longer asked questions from the door of the transport vehicle. They removed detainees one at a time,

required them to kneel outside, and while they remained kneeling, demanded their personal information. This was done even with detainees who had not attempted to flee.

27. When my turn came, I was also instructed to kneel. Because of the religious significance that kneeling has for me, and because my legs genuinely hurt, I asked to be allowed to sit. Eventually they allowed me to answer while seated. However, I had already seen how they treated others, and I knew they controlled the physical position in which each person was required to remain while answering questions.

28. I observed all of this before I was questioned. As I watched the agents force other detainees to kneel and submit to questioning, I understood that they would not tolerate resistance or disagreement.

29. One particular incident deeply impressed me. A detainee with the last name Montes attempted to provide his surname correctly. The agents questioning him did not appear to speak Spanish fluently and did not understand what he was telling them.

30. Instead of attempting to clarify the misunderstanding, the agents began behaving as though Mr. Montes were lying or trying to deceive them.

31. I observed that the situation became tense and that the agents became upset because of a misunderstanding that, from my perspective, existed because they did not adequately understand Spanish.

32. They eventually brought another officer who spoke better Spanish. Rather than clarifying the misunderstanding or reducing the tension, that officer began insulting the group in Spanish. I heard him refer to us as “sons of bitches who are here illegally.” He then warned us not to try to deceive them because we did not know what could happen to us.

33. The agents did not refer to us by our names or as persons. Repeatedly, they called us “illegals.” I also heard them describe detainees as animals. To me, those expressions demonstrated contempt toward us as Hispanics and toward our dignity as human beings.

34. Seeing the agents accuse someone of lying simply because they did not correctly understand his surname caused me to fear that any answer I gave could provoke anger, accusations, or retaliation by the agents.

## THE THREATS AND FEAR THAT COMPELLED ME TO ANSWER

35. During processing I heard the Spanish-speaking officer warn the group not to try to deceive the agents because we did not know what could happen to us. Given the tone used, the insults he had just made, and the treatment I had already observed, I understood those words as a threat of mistreatment or violence if we did not respond as they wanted.

36. I did not interpret those words as a casual comment. The threat occurred after the agents became angry regarding Mr. Montes's surname, insulted the detainees, and began removing people one by one to interrogate them while kneeling.

37. By that point, I had already observed masked agents remove me from my vehicle, deny me a telephone call, handcuff me, surround the detainees, force other men to kneel, accuse people of lying, use insults, and refer to us as "illegals" and "animals."

38. In addition, before this arrest I was aware of reports concerning individuals who, as I understood, had died during encounters with immigration agents. That knowledge had already caused me to fear these types of operations.

39. When I heard the officer warn that no one knew what might happen if we failed to cooperate, I immediately thought of those reports and the possibility of suffering serious violence if I disobeyed or refused to answer questions.

40. I genuinely believed that they could beat me, mistreat me, or even cause my death, and that I had no effective protection at that moment.

41. I was isolated from my family, unable to communicate, surrounded by armed agents, and observing the treatment received by other detainees. Under those circumstances, I felt the agents had complete control over my safety and well-being.

42. My fear was genuine and profound.

43. When agents asked questions about my identity, my parents, my wife, my children, my place of birth, and other personal matters, I answered because I was afraid that I would be mistreated if I remained silent or if they viewed my answers as unsatisfactory. I had personally witnessed what happened when agents believed a person was deceiving them.

44. I did not consider remaining silent to be a realistic option. Once they denied my request to call my wife, I decided to speak as little as possible because I believed they could harm me. After hearing the threat and observing the kneeling interrogations, I understood that refusing to provide information could result in mistreatment or violence.

45. My responses were the product of fear, intimidation, implied threats, and the coercive atmosphere I observed throughout the operation.

## EMOTIONAL AND PSYCHOLOGICAL HARM

46. During my detention, I experienced extreme fear.

47. I also suffered significant anguish because I could not communicate with my wife or my children and did not know when I would see them again.

48. I continuously prayed for God's protection because I feared for my safety.

49. This experience caused me profound emotional trauma that continues to affect me to this day. Even speaking about these events remains difficult for me.

50. For approximately four or five hours, I was not provided food or water, even though I had worked all day, was extremely thirsty, and was hungry. I also needed to use the restroom but did not ask. I had observed how the agents reacted to conduct they disliked and feared that I would be mistreated if I made a request. Because of that fear, I endured the need until arriving in Atlanta.

## FINAL DECLARATION

51. Based on everything I personally observed, including that all detainees were Hispanic workers in work vehicles; that the agents called us “illegals” and “animals”; that they insulted the group; that they accused Mr. Montes of deceiving them because they did not understand his surname; that they threatened unknown consequences if we failed to cooperate; and that they removed detainees one by one for questioning while kneeling, I believed the agents had targeted Hispanic workers and were using fear, humiliation, and physical control to compel us to answer.

52. I believed that any refusal could result in serious retaliation against me.

53. For that reason, I answered the agents’ questions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 8, 2026.

Signature: /s/ Jose Rivas Diaz

**Jose Rivas Diaz**

## CERTIFICATE OF TRANSLATION

## CERTIFICATE OF ACCURATE TRANSLATION

I, Joshua McCall, of The McCall Firm, hereby certify that:

I am competent to translate from Spanish into English. I translated the document entitled **"Declaración de José Rivas Díaz"** from Spanish into English. The foregoing translation is, to the best of my knowledge and ability, a true, complete, and accurate translation of the original Spanish document.

Executed on this 8th day of August, 2026.

Translator:

Joshua McCall The McCall Firm

Signature: Joshua McCall

Date: August 8, 2026