**Stills from Dash Cam with commentary**

**Analytical Note:** To illustrate the apparent pattern or practice, the most useful comparison begins with the final documented stop—where the officers' statements and conduct may support an inference that a desired number of immigration arrests or available transport capacity had been reached—and then returns to the first stop involving Jose Rivas Diaz. Considered as a whole, the repeated selection of ladder-equipped work vehicles, the apparent absence of an observable traffic offense before certain seizures, the collection and possible transmission of occupants' identification and location information, the rapid arrival of immigration personnel, and the counting and transfer of occupants present substantial evidence supporting further investigation into racial or ethnic profiling and coordinated immigration enforcement through traffic stops. The materials may support claims that state and local criminal-investigative powers were used to effect seizures lacking reasonable suspicion or probable cause, potentially giving rise to constitutional claims, false-imprisonment and related tort theories, and any other violations supported by the completed record. They may further support an inference that these stops operated as an impermissible shortcut for generating immigration arrests or removal statistics. Those conclusions remain subject to authentication, complete video review, identification of each participant, and discovery concerning selection criteria, communications, operational plans, arrest targets or performance metrics, training, authority, and the asserted legal basis for each stop and detention.




**Video:** AdamIvester_202602201951_3336-1
**Timestamp:** 19:51:25 (beginning of recording)

**Observation:** The recording begins while Sgt. Ivester is driving a patrol vehicle on a multi-lane highway at night in or near Baldwin. No target vehicle is identifiable, no emergency equipment is activated, and no traffic violation is visible in the opening frame. The recording does not depict events before 19:51:25 and therefore does not establish whether Sgt. Ivester had previously identified a vehicle of interest or observed a traffic violation.




**Timestamp:** 19:51:47

**Observation:** A work van with a ladder mounted on top is visible at a distance in the right lane. The patrol vehicle continues in the same direction. The video alone does not establish when Sgt. Ivester first noticed the van or the basis for any attention directed toward it.




**Timestamp:** 19:52:09

**Observation:** The ladder-equipped work van is traveling ahead in the right through lane. The patrol vehicle is positioned behind it in the same lane near a right-side merge or turn area. This frame is consistent with the patrol vehicle beginning to follow the van.

**Timestamp:** 19:53:27
**Observation:** Sgt. Ivester activates the patrol vehicle's blue emergency lights while traveling behind the ladder-equipped work van.






**Timestamp:** 19:53:41
**Observation:** Sgt. Adam Ivester initiates a radio transmission to dispatch and requests a “28,” providing the vehicle tag as CXN6511. The ladder-equipped work van remains ahead of the patrol vehicle in the right lane.




**Timestamp:** 19:54:14
**Observation:** The ladder-equipped work van and Sgt. Ivester's patrol vehicle are stopped on the right shoulder of the highway. The van is positioned ahead of the patrol vehicle. Before the vehicles stopped, Sgt. Ivester had transmitted tag CXN6511 to dispatch.




**Timestamp:** 19:54:42
**Observation:** Sgt. Ivester is approaching the driver's side of the stopped ladder-equipped work van. The van's rear lights appear illuminated. Based on counsel's review of the recording through this point, Sgt. Ivester does not state a reason for the stop, no apparent traffic violation is visible before activation of the patrol vehicle's blue lights, and the van does not touch the fog line until after those lights are activated. Instead, Ivester asks if the driver has his license and for the identification documents of the other occupants of the work van. The driver did not have a driver's license.




**Timestamp:** 19:55:45

**Observation:** Sgt. Ivester thanks the driver while standing at the driver's side of the stopped work van, apparently after receiving identification documents from occupants who possessed them. A separate screenshot of Ivester's phone concerning Jose Rivas Diaz reportedly shows an image of an identification document and a pinned location. Considered together, these materials may suggest that Ivester used a personal phone to transmit an occupant's identity and location to ICE; however, the recipient, transmission method, timing, and purpose are not established by this still alone and require corroboration through phone records, message content, metadata, and testimony.




**Timestamp:** 19:56:49
**Observation:** The recording captures a sound resembling a cellular telephone camera shutter. The source of the sound is not visible and cannot be determined from the recording alone. Confirmation would require evidence concerning Sgt. Ivester's personal telephone, including device records, image metadata, and testimony.

**Timestamp:** 19:59:18
**Observation:** A second uniformed local law-enforcement officer arrives at the scene and approaches the stopped work van. Counsel believes the officer is Logan Ivester, Sgt. Adam Ivester's brother and then-colleague. Counsel further understands that Logan Ivester was employed by the Baldwin Police Department at the time and later joined the Habersham County Police Department. The officer's identity, relationship, and employment history are not established by this still alone and should be confirmed through agency records, personnel records, dispatch records, and testimony.






**Timestamp:** 19:59:39
**Observation:** Sgt. Ivester directs or asks the driver to exit the work van, and the driver complies. Ivester then conducts a physical search of the driver's person. During the encounter, Ivester indicates that he is investigating whether the driver consumed alcohol. The driver states that he drank one beer, and Ivester states that he can smell alcohol. Ivester later asks the driver to submit to a breath test, and the driver declines consent.




**Timestamp:** 20:00:07
**Observation:** Multiple additional masked officers wearing tactical equipment are present at the stopped work van and pass near the two local officers. The still does not independently establish the additional officers' agencies or identities. No visible reaction in this frame establishes whether the local officers expected their arrival. The timing and manner of the arrival may warrant investigation into possible advance planning or coordination, but any prior communication, operational plan, or instruction from federal personnel must be confirmed through dispatch records, telephone and message records, location data, reports, and testimony.

**Timestamp:** 20:00:38

**Observation:** After a masked officer appears to inspect the work van, Sgt. Ivester states to the officer, “You got three in the back, one in the front.” The statement appears to describe the number and location of the van’s occupants. Whether Ivester was counting occupants for an immigration-related purpose, relaying information requested by another agency, or acting pursuant to prior coordination is not established by the recording and should be clarified through discovery, including testimony, communications, dispatch records, operational plans, and reports. Ivester goes on to say, “Only one of them in the back gave me a Mexican ID.” “The one in the back gave me a Guatemalan ID.” It is unclear whether Ivester was mixing up Guatemala with Mexico, or whether there were 2 separate ID’s (one from Guatemala, and one from Mexico).






**Timestamp:** 20:01:54
**Observation:** Sgt. Ivester discusses an earlier incident involving an approximately four-hour wait at a jail identified in counsel's review as Tampa. A second officer, believed by counsel to be Logan Ivester, says words to the effect of, "I bet you won't be doing that again." Sgt. Ivester responds that he was paid for 26 hours associated with the activity, including time during which he took a nap, and adds that he "ate some badass food, son."




**Timestamp:** 20:02:30
**Observation:** A uniformed local officer, believed by counsel to be Logan Ivester, is holding and looking at a cellular telephone during the stop. Counsel understands that Logan Ivester was employed by the Baldwin Police Department at the time. The still does not establish whether the device was personal or agency-issued, what information was accessed or transmitted, or with whom the officer communicated. Considered with evidence from other reviewed stops showing local officers using cellular telephones during encounters involving ICE, this image supports targeted discovery concerning work-related communications conducted on personal or agency devices, including messages, photographs, metadata, call records, location data, preservation practices, and communications with federal personnel. Whether any such communication furthered immigration enforcement rather than a criminal investigation remains to be established through discovery.




**Timestamp:** 20:02:35
**Observation:** Sgt. Ivester states to the officer believed by counsel to be Logan Ivester, "This is probably it." In context, the statement may refer to the number of persons being taken into federal custody or the capacity of a transport vehicle. The recording does not establish the statement's intended referent, whether any transport vehicle had reached capacity, the legal basis for the occupants' detention, or whether any occupant was suspected of criminal activity. Those issues should be clarified through testimony, federal and local arrest and transport records, communications, operational plans, and immigration charging documents.




**Timestamp:** 20:02:54
**Observation:** The uniformed local officer believed by counsel to be Logan Ivester again looks at a cellular telephone during the stop. The dash-camera view does not reveal the screen's contents, whether the device was personal or agency-issued, or whether the officer was reading or sending messages. Targeted discovery is needed concerning any work-related communications made or received on the device during the encounter, including messages, call records, photographs, metadata, recipients, preservation practices, and communications with local or federal personnel.




**Timestamp:** 20:02:57
**Observation:** Shortly after the officer believed by counsel to be Logan Ivester checks a cellular telephone, Sgt. Adam Ivester states, "15." The recording does not establish what the number refers to. In context, it may refer to a count of persons detained or encountered that night, but that inference requires confirmation through testimony, communications, arrest and transport records, operational reports, and federal custody records.




**Timestamp:** 20:03:28
**Observation:** Sgt. Adam Ivester approaches the passenger side of the work van and appears to look inside while speaking to a masked federal agent standing beside him at the passenger door. Ivester can be heard saying, "driver, passenger, driver." The recording does not establish what the repeated terms meant. In context, the statement may reflect an inventory of the occupants and their seating positions being relayed directly to the federal agent, but that inference requires confirmation through testimony, federal and local communications, reports, and arrest and transport records.




**Timestamp:** 20:03:42
**Observation:** While standing near the passenger side of the work van and speaking with a masked federal agent, Sgt. Adam Ivester states words to the effect of, "They are all admitting illegals." The recording does not establish what questions were asked of the occupants, what each occupant said, or whether any statement concerned civil immigration status rather than criminal activity. Counsel's review of the current 287(g) spreadsheet does not show Habersham County, the Habersham County Sheriff's Office, the Baldwin Police Department, or the Baldwin City Police Department as listed Georgia 287(g) participants. Whether Sgt. Ivester had any 287(g), immigration-law, or federal task-force training sufficient to assess immigration status should be clarified through training records, agency agreements, personnel files, communications with ICE, reports, and testimony.




**Timestamp:** 20:03:54
**Observation:** Sgt. Adam Ivester and the masked federal agent standing near the passenger side of the work van discuss the number of occupants and vacillate between six and seven. During the exchange, Ivester turns away, spits, and laughs. The recording does not establish the purpose of the count or whether it related to transportation capacity, custody decisions, officer safety, or another operational concern. Plaintiff's sworn declaration, identified as Exhibit 1, reportedly states that the operation ended when the federal transport van was full and that the persons taken into custody were Hispanic occupants of work vans or work trucks. Counsel reports that laughter is also audible during the Jefferson City Slowpoke stop, which will be submitted as a separate exhibit. Any evidentiary relationship between the two incidents—including whether the laughter, counting, or conduct reflects a recurring practice—requires comparison of the recordings and corroboration through the declaration, arrest and transport manifests, custody records, communications, operational plans, reports, and testimony.




**Timestamp:** 20:04:33

**Observation:** Sgt. Adam Ivester asks the masked federal agent whether he wants the items Ivester is holding. The objects are not sufficiently visible in the still to identify them. In context, they may be identification documents previously obtained from the van's occupants, but that inference requires confirmation through the video sequence, body-camera footage, reports, property or document logs, federal records, and testimony.




**Timestamp:** 20:05:22
**Observation:** A voice believed by counsel to be Sgt. Adam Ivester states that there are seven occupants and that he had thought there were five. The statement continues the numerical or head-count discussion concerning persons associated with the work van. The recording does not independently establish the speaker's identity, the purpose of the count, or whether the count related to custody, transportation capacity, officer safety, or another operational concern. Those issues require clarification through enhanced audio review, testimony, arrest and transport records, communications, operational plans, and federal custody records.




**Timestamp:** 20:05:31
**Observation:** Additional law-enforcement personnel are present near the passenger side of the stopped work van. One officer wears a face covering and tactical equipment. Another officer, whose face is uncovered, wears a baseball cap and walks toward the passenger side of the van. The still does not establish either officer's identity or agency. Identification of the uncovered officer should be pursued through personnel rosters, assignment and deployment records, dispatch and CAD records, body-camera footage, reports, federal operation records, and testimony.




**Timestamp:** 20:05:47
**Observation:** Despite the number of officers present, no officer appears positioned at the van's front driver-side door immediately before an unidentified occupant exits through that door and runs into the travel lanes of Highway 365. Multiple officers then pursue the person across the active nighttime roadway. The recording also does not establish the person's identity, whether officers knew that identity before the pursuit, whether the person was suspected of criminal activity, or the asserted legal basis for local officers' participation in the apprehension. Those issues require clarification through all available video, CAD and dispatch records, reports, arrest and immigration records, communications, training and authorization records, and testimony.

**Timestamp:** 20:05:50
**Observation:** A voice, possibly Sgt. Adam Ivester's, exclaims, "Oh God," as multiple law-enforcement officers run from the shoulder into or across the active lanes of Highway 365. The driver and the remaining occupants of the work van appear to be left without an officer immediately attending them during the commencement of pursuit. Vehicle headlights are visible in the opposing lanes, and northbound traffic is also present on the officers' side of the divided highway. Audible sounds of pursuit can be discerned – it appears that Adam Ivester was pursuing them on foot based on the sound of running and the subsequent heavy breathing on the audio. The recording does not establish the speaker's identity or whether any officer remained outside the dash-camera's view to monitor the van or its occupants. Those issues should be clarified through synchronized dash-camera and body-camera footage, radio traffic, reports, and testimony. The unidentified agent in the baseball cap returns to the van shortly after the pursuit begins.






**Timestamp:** 20:06:30
**Observation:** A white passenger van pulls onto the shoulder and stops ahead of the ladder-equipped work van. The vehicle appears consistent with the white van described in Plaintiff’s sworn declaration, Exhibit 1, but its identity, agency affiliation, occupants, and function cannot be established from this still alone. No officer is visibly positioned at the work van’s driver-side door at this moment. The significance of that continued lack of visible coverage should be evaluated in conjunction with the subsequent video sequence and confirmed through the declaration, vehicle and assignment records, dispatch and location data, body-camera footage, reports, and testimony.




**Timestamp:** 20:07:05
**Observation:** Officers positioned near the passenger side of the work van appear to handle or prepare restraints resembling plastic zip ties. The still does not establish the precise nature of the objects, which officers possess them, whether the occupants had been formally placed in custody, or the intended basis and scope of any restraint. Those issues should be clarified through body-camera footage, reports, arrest and custody records, equipment logs, federal and local policies, and testimony.




**Timestamp:** 20:07:31
**Observation:** An off-screen speaker says, “Sorry, boss.” A second off-screen speaker, possibly Sgt. Adam Ivester, replies, “It’s okay,” and makes an additional statement appearing to refer to the number of persons present or encountered at one time. The recording does not establish either speaker’s identity or the precise wording and meaning of the numerical reference. Those matters should be clarified through enhanced audio review, synchronized body-camera footage, communications, reports, and testimony.




**Timestamp:** 20:07:50
**Observation:** Shortly after the preceding off-screen exchange, a second unidentified occupant exits through the same driver-side door used by the first occupant and runs across the active lanes of Highway 365. A uniformed officer, believed by counsel to be Logan Ivester but not yet confirmed, extends an object resembling a conducted-energy weapon toward the fleeing person and appears to deploy it across the roadway. Headlights from active traffic are visible in the vicinity. The recording does not establish the officer's identity, whether the device discharged or made contact, the fleeing person's identity, whether that person was suspected of criminal activity, or the asserted legal basis for the pursuit and force. Further review should include any use-of-force report, Taser download and cartridge records, body-camera footage, CAD and radio traffic, arrest and immigration records, medical records, agency policies, training records, supervisory review, and testimony.




**Timestamp:** 20:07:57
**Observation:** After the apparent conducted-energy-weapon deployment does not visibly stop the second fleeing person, the uniformed officer believed by counsel to be Logan Ivester begins crossing the two active northbound lanes of Highway 365 in apparent pursuit. Moving traffic and vehicle headlights remain visible. The first person who fled appears, from the broader video sequence, to have been apprehended; however, this dash-camera recording does not establish whether the second person was apprehended. The officer's identity, the result of the attempted deployment, each fleeing person's identity and disposition, and the asserted basis for pursuit should be confirmed through synchronized video, CAD and radio traffic, Taser records, arrest and custody records, reports, and testimony.




**Timestamp:** 20:08:07
**Observation:** The audio captures sounds that may reflect a physical struggle, together with audible groaning. The dash-camera view does not reveal the source of the sounds, the persons involved, whether force was used, or the reason for the groaning. Those issues require clarification through synchronized body-camera footage, use-of-force and arrest reports, medical and injury records, radio traffic, Taser records, photographs, and testimony.




**Timestamp:** 20:08:27

**Observation:** Northbound vehicles appear to slow as they approach the roadside operation. No officer is visibly directing or controlling traffic at this moment. Officers remain concentrated near the passenger side of the work van, while no officer is visibly positioned at the driver-side door; no additional occupant exits during this interval. An officer gestures for the driver, who has remained standing near the patrol vehicle, to approach and appears to begin securing the driver with a flexible restraint resembling a plastic zip tie. The still does not establish the officer's identity, whether the driver was formally placed in custody, the asserted basis for restraint, or whether traffic-control measures existed outside the camera's view. Those issues should be clarified through synchronized video, CAD and radio traffic, arrest and custody records, use-of-force or restraint reports, operational plans, policies, and testimony. At app. 20:08:34, Adam Ivester indicates that one fugitive has run through or to the woods. At 20:08:54, a voice that seems to be Adam Ivester's can be heard boisterously laughing until 20:09:06.




**Timestamp:** 20:09:09
**Observation:** An off-screen voice appears to say, "This is pretty fun," or words to that effect. Background noise and audio interference prevent a reliable determination of the precise wording and the speaker's identity. The statement should be clarified through enhanced audio analysis, synchronized body-camera footage, identification of the persons present, and testimony.

**Timestamp:** 20:09:17
**Observation:** A voice identified by counsel as Sgt. Adam Ivester's states, "Let's go! Let's fucking go!" The recording does not permit a reliable determination of the speaker's tone or intended meaning. Considered with the laughter documented shortly beforehand, the statement may contribute to an apparently celebratory or carnivalesque tenor among some officers during the encounter; however, that characterization is an inference requiring confirmation through enhanced audio review, synchronized body-camera footage, identification of the speakers, and testimony.




**Timestamp:** 20:09:28
**Observation:** Several remaining occupants of the work van are positioned in a line on the shoulder near the passenger side, with each person's legs extending toward or alongside the next person. Officers stand nearby. The occupants appear to have their hands held behind their backs and may be secured with flexible restraints resembling plastic zip ties, although the still does not clearly show each restraint or establish when it was applied. At 20:09:33, Adam Ivester directs Logan Ivester to tell dispatch that they have two fugitives on foot, then says, "Goddamn!". Adam Ivester can be heard breathing as though from physical exertion or excitement. The officers' identities, the occupants' identities, the type and timing of the restraints, the asserted basis for custody, and the agency responsible for arranging and restraining the occupants should be confirmed through body-camera footage, arrest and custody records, restraint and transport logs, reports, photographs, policies, and testimony.




**Timestamp:** 20:10:11
**Observation:** The first person who fled appears to be escorted back toward the work van by an uncovered law-enforcement officer believed by counsel to be an ICE agent. Other officers remain near the passenger side of the van. At 20:10:27, Adam Ivester tells dispatch that no more units are needed. The still does not independently establish the escorting officer's identity or agency. Counsel's review indicates that federal personnel were masked earlier in the encounter while the visible local officers were not, and that at least one federal officer is uncovered by this point. The recording does not establish the reason for either masking or removal of the face covering, whether any written policy or operational directive governed that decision, or whether the practice was related to officer security. Those matters should be clarified through agency identification records, body-camera footage, operational plans, masking and identification policies, threat assessments, communications, reports, and testimony.




**Timestamp:** 20:10:43
**Observation:** With the second person who fled apparently still unaccounted for, Sgt. Adam Ivester states that the person ran toward "a hollow over there" and gestures toward an area away from the roadway. The dash-camera recording does not establish the person's precise location, whether officers continued searching that area, or whether the person was later apprehended. Those issues should be clarified through CAD and radio traffic, body-camera footage, search and arrest reports, location data, federal and local custody records, and testimony.




**Timestamp:** 20:11:23
**Observation:** Sgt. Adam Ivester requests that an officer be sent to a nearby roadway whose name sounds like "Blue Road." The precise road name is uncertain from the audio. The subsequent recording shows Ivester driving to that area and personnel from multiple local law-enforcement agencies participating in a search for the second person who fled. The recording reviewed to this point does not establish that person's identity, whether the person was suspected of criminal activity, the asserted legal basis for the multi-agency search, or the original basis for the stop. Those issues should be clarified through enhanced audio review, CAD and dispatch records, mutual-aid requests, agency rosters, body-camera and dash-camera footage, search and arrest reports, immigration records, communications, and testimony.

**Timestamp:** 20:11:50
**Observation:** Sgt. Adam Ivester states that "two of them" are "down there in the woods looking for one more." The statement indicates that two officers were searching the wooded area for the remaining person who fled. The recording does not identify the two searching officers, their agencies, the remaining person, or the asserted legal basis and operational scope of the search. Those matters should be clarified through CAD and radio traffic, agency rosters, body-camera footage, search reports, communications, and testimony. At 20:12:44, Adam Ivester can be heard laughing again. At 20:13:05, Adam Ivester discusses with Logan Ivester the circumstances of the 2nd fugitive. At about the 20:13:31 mark, the audio cuts off.




**Timestamp:** 20:23:15
**Observation:** A marked Alto Police vehicle is present at the search location near a wooded area. Additional law-enforcement officers are visible nearby. The still establishes Alto Police participation at this stage of the operation but does not identify the responding Alto personnel, when or by whom assistance was requested, the scope of their assignment, or the asserted legal basis for their participation in the search. Those issues should be clarified through CAD and dispatch records, mutual-aid requests, agency rosters, body-camera and dash-camera footage, search reports, communications, and testimony.

**Timestamp:** 20:36:02

**Observation:** An unidentified officer standing beside the marked Alto Police vehicle appears to use or wear optical equipment consistent with night-vision or other low-light viewing equipment while looking toward the wooded hollow previously identified by Sgt. Adam Ivester. The still does not establish the officer's identity or agency, the precise type or ownership of the equipment, whether it was actively operating, what area was searched, or whether the remaining person was located. Those issues should be clarified through agency rosters, equipment and deployment logs, CAD and radio traffic, body-camera footage, search reports, communications, and testimony.



**Timestamp:** 21:03:59
**Observation:** A vehicle positioned within or beside the wooded hollow uses bright exterior or mounted lights to illuminate the area where the second person was believed to have fled. The vehicle appears configured for search activity, but the still does not establish its agency, operator, ownership, equipment, or whether the search located the person. Those issues should be clarified through vehicle and equipment logs, CAD and radio traffic, agency rosters, deployment records, body-camera footage, search reports, location data, and testimony.






**Timestamp:** 21:07:55
**Observation:** Numerous law-enforcement personnel are gathered at the wooded search area, including officers whose uniforms appear to bear federal and sheriff's-office markings. A marked Baldwin Police vehicle labeled as a K-9 unit is present, supporting the inference that Baldwin Police supplied canine-search resources. The still does not identify each participating officer or agency, establish whether a canine was deployed, or establish the asserted criminal or other legal basis for the continuing search. Counsel's review of the publicly posted 287(g) spreadsheet does not show the Baldwin Police Department, Habersham County, or the Habersham County Sheriff's Office as listed participants. The agencies' respective roles, requests for assistance, canine deployment, asserted authority, and any immigration-related coordination should be clarified through CAD and dispatch records, mutual-aid requests, K-9 deployment and training records, agency agreements, personnel rosters, body-camera footage, search reports, communications, and testimony.

**Beginning of Separate Stop.** This section concerns a different dash-camera recording depicting an apparently separate stop on February 20, 2026. The recording begins at approximately 18:46:28, shortly after Sgt. Adam Ivester relinquished Jose Rivas Diaz to immigration authorities. The proximity in time suggests that this may have been Ivester's next stop. The vehicle is another work truck or van. Ivester appears to position his patrol vehicle behind it and activate his blue emergency lights shortly thereafter. The footage should be compared with the preceding stop to determine whether a recurring pattern is present, including whether Ivester initiated stops after observing work trucks or vans, particularly ladder-equipped vehicles, and whether an objective traffic violation occurred before each seizure.






**Timestamp:** 18:48:47
**Observation:** Sgt. Adam Ivester's patrol vehicle is positioned behind a work truck or van. The vehicle's visible exterior lights appear to be functioning, and the footage preceding activation of the patrol vehicle's emergency lights depicts no apparent traffic violation or other objective basis for the stop. The recording should be compared with the preceding work-van stop for evidence of a recurring pattern.

**Timestamp:** 18:50:16 (elapsed time 3:48)
**Observation:** Sgt. Adam Ivester is shown carrying identification documents from the work truck back toward his patrol vehicle. Screenshots from a separate exhibit regarding Plaintiff's stop concerning Ivester's personal cellular telephone depict identification documents photographed inside a vehicle and accompanied by a dropped-location pin; one screenshot bears an on-screen time of 10:22 and a message exchange asking, "Who's going to it," followed by "He's coming w/us," while the other shows a photographed Maryland identification card with the message, "This don't really look like the same dude." If those screenshots are authenticated, temporally connected to this or a comparable stop, and consistent with the other reviewed screenshot, they may suggest that Ivester carried occupants' identification documents to his patrol vehicle so that he could photograph and transmit the documents and location from his personal telephone to ICE or persons coordinating with ICE. The screenshots do not by themselves establish the date and time of capture, sender, recipient, device ownership, transmission method, relationship to this stop, or purpose of the communications. Those matters require targeted discovery, including production and forensic examination of the native images and messages, associated metadata, extraction reports, call and message records, cloud backups, recipient information, location data, preservation history, communications with ICE and other participating officers, and testimony. The 18:50:16 timestamp provides a baseline for comparing any authenticated phone activity with the approximately six-minute-and-thirty-nine-second interval before the masked officer's arrival at 18:56:55.



**Timestamp:** 18:56:55
**Observation:** A masked officer identified by counsel as an ICE agent arrives and approaches the driver's-side door of the work truck. The masked appearance and approach are consistent with the manner in which federal personnel appeared in the preceding recording. The interval between Ivester's return to his patrol vehicle with identification at approximately 18:50:16 and the officer's arrival is approximately six minutes and thirty-nine seconds. The still does not independently establish the arriving officer's identity, agency, reason for appearing, or whether advance communication or coordination occurred; those matters require confirmation through dispatch records, communications, reports, metadata, and testimony.



**Timestamp:** 18:58:04
**Observation:** The driver's-side door opens and an individual, apparently an occupant of the work truck, exits and runs from the scene. At this point in the recording, no officer has audibly identified a criminal offense allegedly committed by that individual. Sgt. Adam Ivester then moves his patrol vehicle and begins pursuing the fleeing person. The recording does not establish the person's identity, whether officers knew that identity before the pursuit, or the asserted legal basis for the pursuit.






**Timestamp:** 18:58:26
**Observation:** Sgt. Adam Ivester is pursuing the fleeing individual, who is visible running through the parking-lot area.

**Timestamp:** 18:58:34
**Observation:** Sgt. Adam Ivester has brought his patrol vehicle to a stop extremely close to the path where the fleeing individual was running in the parking lot. The positioning of the patrol vehicle appears intended to block or intercept the individual's route.



**Timestamp:** 19:00:34
**Observation:** The fleeing individual appears to have been apprehended and is being placed into an ICE vehicle.



**Timestamp:** 19:02:59
**Observation:** An ICE officer appears to leave the work truck belonging to the apprehended individuals in a parking lot near the location where the fleeing individual was arrested. The recording should be reviewed with related reports, towing records, inventory records, property documentation, and communications to determine whether the vehicle was secured, impounded, released to another person, or left unattended, and which agency assumed responsibility for it.



**Beginning of Separate Stop.** This page begins another dash-camera video depicting a stop at approximately 7:13 p.m. on February 20, 2026. Sergeant Adam Ivester is again following a work van equipped with ladders. Although the vehicle closely resembles the van involved in the later encounter in which two passengers fled, this is a separate stop that immediately preceded that incident. Ivester follows the van for some time without any apparent traffic violation and then activates his blue emergency lights to initiate the stop. At present, the visible sequence supplies no apparent basis for reasonable suspicion or probable cause and further supports examining whether Ivester repeatedly selected work vans or trucks carrying ladders for immigration-related stops.






**Timestamp:** 19:14:46
**Observation:** Sgt. Adam Ivester positions his patrol vehicle behind another ladder-equipped work van. The van's visible exterior lights appear to be functioning. The vehicle and positioning closely resemble the other stops depicted in this document. This still should be compared with the preceding and subsequent recordings to determine whether Ivester repeatedly selected similar work vehicles for attention or detention before any observable traffic violation or other lawful basis for a seizure appeared.

**Timestamp:** 19:17:50
**Observation:** Sgt. Adam Ivester is shown returning to his patrol vehicle. This point should be preserved as a timing marker in the chronology and compared with any later appearance of ICE personnel to estimate the interval between Ivester's return to the patrol vehicle and ICE's arrival at the stop.






**Timestamp:** 19:23:44
**Observation:** A white passenger van identified by counsel as an ICE vehicle arrives at the scene and pulls alongside the stopped ladder-equipped work van. The arriving van's agency affiliation is not independently established by the still and should be confirmed through vehicle records, dispatch and CAD records, location data, reports, communications, and testimony. The arrival occurs approximately five minutes and fifty-four seconds after Sgt. Adam Ivester's documented return to his patrol vehicle at 19:17:50.




**Timestamp:** 18:29:07
**Observation***: A black passenger car is traveling ahead of* Sgt. Adam *Ivester's patrol vehicle, with* Plaintiff's *Nissan pickup truck farther ahead. Ivester passes the black car and continues toward the Nissan. The two civilian vehicles appear to be maintaining approximately the same speed*, and the *Nissan's visible* exterior *lights appear illuminated* and functioning.




**Timestamp:** 18:29:53

**Observation:** Sgt. Adam Ivester pulls behind Plaintiff's Nissan pickup truck. The recording should be reviewed with the preceding sequence to determine why Ivester passed the black passenger car and directed his attention toward Plaintiff's vehicle.




**Timestamp:** 18:30:18
**Observation:** Sgt. Adam Ivester activates the patrol vehicle's blue emergency lights while traveling behind Plaintiff's Nissan pickup truck. All exterior lights visible on Plaintiff's vehicle *appear illuminated and functioning.*




**Timestamp:** Approximately 18:30:38–18:30:40
**Observation:** After Sgt. Adam Ivester activates the patrol vehicle's blue emergency lights, Plaintiff pulls onto the shoulder and stops. Plaintiff's right *turn signal is visibly illuminated and appears to be functioning.*




**Timestamp:** 18:31:02

**Observation:** According to Plaintiff, Sgt. Adam Ivester stated that the reason for the traffic stop was a malfunctioning light on Plaintiff's vehicle. Plaintiff's sworn declaration states: "The officer told me that he had stopped me because of a problem with the lights on my truck." *See* Ex. 1. The asserted reason should be compared with the preceding stills, which depict the Nissan's visible exterior lights and turn signal illuminated and apparently functioning.




**Timestamp:** ***18:31:41***
**Observation:** *Plaintiff* complies *with* Sgt. Adam *Ivester's request for information. Ivester* is shown *returning to his patrol vehicle with the information Plaintiff provided.* This timestamp furnishes a baseline for measuring the interval before immigration personnel appear.




**Timestamp:** *18:37:51*
**Observation:** An officer identified by counsel as *an ICE agent* approaches *from the passenger side of* Sgt. Adam Ivester's patrol vehicle. The still does not independently establish the officer's identity, agency, reason for appearing, or whether prior communication or coordination occurred. Those matters require confirmation through dispatch records, communications, reports, location data, and testimony.




**Timestamp:** ***18:38:38***
**Observation:** Multiple officers identified by counsel as *ICE agents are visible near the vehicles after emerging from a* white passenger van. *According to Plaintiff,* federal officers *later used that van to transport him and other* persons detained *that evening, with Plaintiff being the* first *person detained.* The officers' identities, agency affiliation, transport sequence, and asserted basis for Plaintiff's custody should be confirmed through vehicle records, dispatch and location data, federal custody and transport records, communications, reports, and testimony.




**Timestamp:** 18:37:15
**Observation:** A white passenger van identified by counsel as an ICE vehicle pulls behind Sgt. Adam Ivester's patrol vehicle. The van arrives approximately five minutes and thirty-four seconds after Ivester returned to his patrol vehicle with Plaintiff's information at 18:31:41. The vehicle's agency affiliation, occupants, reason for appearing, and any advance coordination should be confirmed through vehicle records, dispatch and CAD records, communications, location data, reports, and testimony.

In reference to the 08/18/2026 report on this incident from 02/20/2026: the driver's tire maintains contact with the fog line, driving on it for a brief moment as the patrol car nears his rear bumper.


Media Player
MOTOROLA SOLUTIONS
02/20/2026 18:30:01
M505-025604
0:01:44
0:11:29
AdamIvester_202602201828_3336-0