IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| M-J-M-A, an adult,<br><br>Petitioner,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"), et al.,<br><br>Respondents. | No. 6:25-cv-02011-MTK |

Evidentiary Hearing

FTR-RECORDED TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT JUDGE

December 3, 2025

APPEARANCES

FOR THE PETITIONER:

NELLY PAOLA GARCIA ORJUELA
Innovation Law Lab
333 S.W. 5th Avenue
Suite 200
Portland, OR 97204

FOR THE PETITIONER:

STEPHEN W. MANNING
Innovation Law Lab
333 S.W. 5th Avenue
Suite 200
Portland, OR 97204

FOR THE RESPONDENTS:

ARIANA N. GAROUSI
DOJ-USAO
Civil Division
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204

FOR THE RESPONDENTS:

THOMAS STEVEN RATCLIFFE
U.S. Attorney's Office
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204

TRANSCRIBER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, Oregon 97204
(503)326-8047

GENERAL INDEX


| | Page No. |
|---|---|
| December 2, 2025, Proceedings | 4 |
| Reporter's Certificate | 285 |


* * *

WITNESS INDEX


| For the Petitioner | Direct | Cross | Redirect | Re-Cross |
|---|---|---|---|---|
| M-J-M-A | 78 | 89 | | |
| Kelsey Provo | 109 | 115 | | |
| **For the Respondents** | **Direct** | **Cross** | **Redirect** | **Re-Cross** |
| D.R. | 121 | 163 | 166 | |
| C.M. | 169 | 200 | 212 | |
| J.B. | 220 | 258 | | |


* * *

(Tuesday, December 2, 2025, 9:35 a.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURTROOM DEPUTY CLERK: Please remain seated.

This United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai presiding.

Your Honor, now is the time set for an evidentiary hearing in Case 6:25-cv-2011-MTK. Case name is M-J-M-A versus Wamsley, et al.

Beginning with petitioner's counsel, please state your appearances for the record. Thank you.

MR. MANNING: Good morning, Your Honor. Stephen Manning for the petitioner.

MS. GARCIA ORJUELA: Good morning, Your Honor. Nelly Garcia Orjuela for petitioner.

THE COURT: All right.

MR. RATCLIFFE: Good morning, Your Honor. Tom Ratcliffe for the Government.

MS. GAROUSI: Good morning, Your Honor. Ariana Garousi for the Government.

THE COURT: All right. And our interpreters, would you be kind enough to introduce yourselves?

THE INTERPRETER: Yes, Your Honor. Hector Pichardo,

court-certified for the State of Oregon and the federal court.

THE INTERPRETER: And good morning, Your Honor. Jessica McBride, a federal court-certified interpreter in Spanish.

THE COURT: Thank you.

And I also understand the petitioner is present as well; is that right?

MR. MANNING: That's correct, Your Honor.

THE COURT: Okay. Counsel, thank you for making yourselves available today for this evidentiary hearing on a petition for writ of habeas corpus. I've had the chance to review plenty of the materials, and I understand that there were some last-minute issues that need to be resolved as well.

Ms. Garousi, there's been a motion for reconsideration of this evidentiary hearing; is that correct?

MS. GAROUSI: Your Honor, I wouldn't frame it necessarily as a motion to reconsider, more so --

THE COURT: Oh, it's an objection to the evidentiary hearing?

MS. GAROUSI: Yes, Your Honor.

THE COURT: Okay. Go ahead. Argue.

MS. GAROUSI: Your Honor -- you prefer us to sit. I apologize.

Your Honor, it's the Government's position that a challenge to an unlawful arrest does not sound in habeas, as we

pointed out in our return and our --

THE INTERPRETER: I'm sorry. If the interpreter could request that you speak a little more slowly. Thank you.

MS. GAROUSI: Yes, ma'am.

Your Honor, it's the Government's position that a challenge to an unlawful arrest does not sound in habeas. A petition for a writ of habeas corpus is a challenge to unlawful executive detention.

And a challenge to an arrest, the proper remedy for that would not be release from detention. It would be some sort of suppression or something else, but it's not release from detention. We cited a number of cases that support that argument as well.

And it's our position also that the proper action for this would be some sort of civil complaint, perhaps an FTCA claim, in which we would -- the Government would have more time to do discovery, take evidence, all of the things that come along with the timeline of a typical civil complaint.

THE COURT: Okay. Timeliness of your objection. This -- this evidentiary hearing has been set for a relatively meaningful amount of time. We've had at least two hearings, one in person, if not also one by way of a telephone conference, if I'm not mistaken.

Plenty of motions have also been filed, and responses to those motions. There was ample time prior to last night to

file such an objection. So help me understand why filing it at this late hour is -- is something I should even consider or -- consider for the purposes of determining that your objection's untimely or why it may, nevertheless, be considered at this stage.

MR. RATCLIFFE: Your Honor, could I address that?

THE COURT: Go ahead.

And will you be conducting examination and presentation of -- of arguments as well, Mr. Ratcliffe?

MR. RATCLIFFE: I will, Your Honor. I'm co-counsel in this case. And one of the things that opposing counsel and our team wanted to raise with the Court is our desire to avail ourselves of the Court's rules for young lawyers and the flexibility, so I don't mean to step in.

I'm the one who prepared the objection last night and filed it. Your Honor, we recognize that the objection is coming at the 11th hour. It may have actually been filed at the 11th hour yesterday, 11:00 p.m.-ish.

We're trying to make our record, Judge. We recognize that, in part, the arguments that we've -- or I should -- I should note that we would like to point out that the heart of the arguments that we're making about what we believe is the incompatibility between a habeas hearing on the Fourth Amendment versus a habeas hearing on release issues, those arguments are ones that we've already made in our briefs, as

the Court knows.

And the Court has had time to consider those and reject those. So we were simply reiterating those, along with making the additional point in the last paragraph about the extent to which the accelerated discovery in this case puts respondents, we believe, at an unfair disadvantage with respect to future civil liability that may arise from this case or that may be pursued.

So we're worried about, in part, the record in this case put together on an accelerated timeline being used for either issue preclusion or claim preclusion in the future.

THE COURT: Help me understand more about the nature of the acceleration of this timeline and how it may have deprived the Government in preparation for the evidentiary hearing today.

MR. RATCLIFFE: Well, Your Honor, if this were a case -- and, again, we're looking ahead toward future litigation in this case, not just on this issue -- not just on the Fourth Amendment issues that the Court is looking at. And we recognize and acknowledge that there is time for us to present -- and we do think we have reasonable, if not compelling, facts to present on the issue of the alleged Fourth Amendment violations.

Our concern, Your Honor, is the accelerated time frame, the lack of depositions, the lack of an opportunity to

brief issue, the lack of objections to evidentiary issues that may have come up --

THE COURT: What kinds of issues might you have anticipated would need to be briefed that have not been briefed?

MR. RATCLIFFE: Your Honor, there are a variety of concerns that we have about the scope of responsibility and the actions in this case. We would've liked more time, if this is going to be used against respondents in the future -- and I suspect there will be that attempt; we will resist it, as appropriate -- but we would've -- we believe, Your Honor, that there are privilege issues potentially.

There are evidentiary issues. There are issues of the discretionary function exception. There are, what I will call, general civil litigation issues involved in a Federal Tort Claims Act case and the contours of that and how the evidence should be presented and what can be adduced that we're concerned haven't been contemplated in this case.

And so, again, we're just concerned and making our record looking for the future.

THE COURT: And I appreciate that, I mean, you're making the record. But it is also an issue that you put squarely before me, so I do want to explore it and give it -- give it some full deliberation in the context of why we're here.

So the reason for my questions, and perhaps that also helps you make your record even -- even more fully than it might otherwise --

MR. RATCLIFFE: Your Honor, I suppose the remedy, I guess, on this issue, this objection that I apologize that I did not put in our motion last night, is I suppose the remedy could be that the Court could make a finding that the evidence and testimony in this case is only applicable to this habeas proceeding and cannot properly be used in future civil litigation, pure civil litigation -- I recognize that we have a civil caption here in this case -- but pure civil litigation when the issue is potential damages.

THE COURT: All right. I know that, as trial court judges, we tend to think we have broad authority to do anything we want, Mr. Ratcliffe. But that sounds pretty expansive and restricting of what otherwise would be an unsealed record here today. What authority do you think I have to restrict it in that way?

MR. RATCLIFFE: Judge, I would love an opportunity to brief that. I don't have an answer for you, other than what Mr. Manning and his team may -- may say later at some point, which is the All Writs Act. So, Judge, I don't have great authority for you. I'm sorry.

THE COURT: All right. It's a rare day when a party perhaps in your position is arguing for the broad -- the broad

spectrum of authority under the All Writs Act.

MR. RATCLIFFE: Understood, Your Honor. It's a different position for me. And this is sort of an upside down case, from my perspective as well, considering the burden's on the other side and I'm used to the criminal context.

THE COURT: Okay. Well, we've all seen stranger things.

You mentioned something about the -- I think you've indicated that you are prepared and witnesses are prepared to testify today?

MR. RATCLIFFE: Correct, Your Honor. And one of the things that we wanted to do, as a preliminary matter -- and I've discussed this with opposing counsel -- is let the Court know that we do have 11 officers here. They are, obviously, in the -- in the back of the courtroom, in the gallery, on that side and the other side.

I think we've -- at this point we've taken up all the seats. And I'm sure the spectators will appreciate when evidence starts and the separation of witness rule kicks in and they depart. But I wanted to let the Court know we have those 11 here.

I'm not saying that numbers alone matter. We do have -- and Mr. Manning and my co-counsel can address this -- we do have two issues with respect to two witnesses who are not here.

THE COURT: One was from Colorado, I think, and another -- another from an out-of-state --

MR. RATCLIFFE: Nebraska, K.K. And this is another thing we wanted to discuss preliminarily.

THE COURT: Yeah, we'll take that up as well. We have some housekeeping matters --

MR. RATCLIFFE: Yes.

THE COURT: -- to address, so --

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: -- we don't need to -- well, how about we -- we reserve that issue about witnesses and who -- who you weren't -- who you are not going to bring today in just a moment. But I do want to make sure that your objections to the -- to the evidentiary hearing, itself, we resolve. I want to give Mr. Manning an opportunity to respond as well.

MR. RATCLIFFE: Thank you, Your Honor.

THE COURT: All right. So you did mention that your witnesses are prepared to -- the ones who are here are prepared to testify. Is there something different about what kind of preparation they would have needed from you or counsel to -- to testify or be deposed in some other setting?

MR. RATCLIFFE: Sure, Your Honor. If we were doing this in a strict civil case, we would've had, of course, a full opportunity to explore through interrogatories, requests for admissions, and, of course, depositions.

I know that Mr. Manning and his team have not had -- certainly haven't had a chance to speak with our witnesses, but they also have not had a chance to even review reports because there aren't any reports. This is not like a criminal case where we have a case agent and reports are prepared and shared with the other side. So --

THE COURT: So if there aren't any reports, there's nothing to review on that front to prepare for any deposition?

MR. RATCLIFFE: No, Your Honor. I was simply suggesting that that's a way that opposing counsel is at a disadvantage here in terms of this hearing today.

But if we were doing the adversarial process and discovery, we would've, of course, had a full opportunity to explore everything in depositions beforehand to make sure that we have the full access -- we have full access to all the relevant information, again, in the context of a potential Federal Tort Claims Act case and the law and the privileges that apply there.

THE COURT: Okay. All right. But, as it stands now, you're not taking the position or representing to me that your clients are not prepared to testify today?

MR. RATCLIFFE: No, I'm not taking that position, Your Honor. We are prepared to go forward. I can tell you that we will have five or six witnesses, so -- just to give the Court a heads-up. And, of course, Mr. Manning and our team

have discussed the order of proof here and happy to address that when the Court would like.

THE COURT: All right. And I know that in your objection you cited to a Fifth Circuit opinion that provided for -- some guidance about whether to take evidentiary hearings in a similar context. Is there anything else that you wish to speak to on that case as it relates to your objection today?

MR. RATCLIFFE: There is not, Your Honor. And I will be candid with the Court, as always, but I'll offer this information up that my colleague, Sarah Feldman, who is in the courtroom today and is our deputy civil chief, she put together the legal issues in that brief. So, Your Honor, I haven't even read that case.

THE COURT: Okay. Well, since you say it so confidently and candidly, I guess I won't take you to task for not knowing anything about the case today.

MR. RATCLIFFE: Your Honor, I rely on -- I rely on great colleagues, like we all do.

THE COURT: All right. Well, since you have now thrown Ms. Feldman under the bus, where is she?

Is that you?

MS. FELDMAN: Here, Your Honor.

THE COURT: All right. Well, why don't you come up here and tell me why the Fifth Circuit opinion is somehow guiding or instructive and helpful in my determination of your

objection.

MS. FELDMAN: Your Honor, I apologize. I'm actually not prepared to speak to that. I would love the opportunity to further brief that issue, if the Court would allow that opportunity.

THE COURT: In terms of what the case says, what it means, how it should --

MS. FELDMAN: Yeah.

THE COURT: -- instruct the Court?

MS. FELDMAN: Yeah. I'm sorry. Ms. Garousi is pulling it up here for me.

(Whispered discussion, off the record, 9:50 a.m.)

MS. FELDMAN: Your Honor, I think the reason that we were citing that case was for the proposition that if there's an issue that can be resolved on -- if there is a pure legal issue and that is determinative of the outcome of this case, then that's what the Court should rule on without -- in the absence of an evidentiary -- without the need for an evidentiary hearing.

THE COURT: Are we in that same setting, though? I mean, are you contending that this is a purely legal argument?

MS. FELDMAN: I believe so, Your Honor, for the reason that Mr. Ratcliffe discussed earlier, that the issues to be addressed here have to do with petitioner's Fourth Amendment claim and potentially access to counsel claim, which --

THE COURT: Now, I -- well, since you are the one now speaking, but I suppose Mr. Ratcliffe may try to jump in, but I'll give you first crack at the question -- at the answer to the questions, which is, I mean, it appears to me that the Fourth Amendment unlawful -- unlawful detention or arrest is -- is in play in some way here because of how the facts have been presented.

But it also seems integrally entangled with the detention itself and --

MR. RATCLIFFE: Your Honor --

THE COURT: -- and how and when -- where are you drawing the line between the arrest and then the detention that I'm supposed to be, I guess, separating and sequestering from one another?

MR. RATCLIFFE: Judge, if I could jump on this grenade, with the Court's permission. I'm feeling particularly guilty that I caused Ms. Feldman to have to come up here on short notice.

THE COURT: Well, who else do you want to point the finger at so we can bring them up? I'm happy to call everybody up to offer up their thoughts today.

MR. RATCLIFFE: We can have a -- we can -- that would be a fun way to get me in the bad graces of everyone in our office.

THE COURT: You won't be invited to the holiday

party, Mr. Ratcliffe. I think at this point your invitation's been withdrawn.

MR. RATCLIFFE: Correct. Correct. Even though I'm on the planning committee, Your Honor, I'll be disinvited.

So, Judge, look, on the -- the legal issue that we're talking about here is -- is not, what I'll call, the substantive legal issue that the Court has in mind with respect to the Fourth Amendment and with respect to the right to counsel.

We are saying that there is a threshold legal issue, which is in a habeas case Fourth Amendment issues and right to counsel issues should not properly be considered. I recognize that that ship has sailed. That ship has sailed long ago, I believe, in this case based on the briefings that my co-counsel submitted.

And that's where we are now. Again, we are prepared to meet the challenge presented in this hearing today factually. We do believe that we have a perfectly reasonable story to tell about the conduct of the officers on the Fourth Amendment -- on the Fourth Amendment issue.

So it's a threshold issue that we're really talking about in terms of the Court having been able, in the past, to decide it on a -- on a legal matter of saying, "You know what, this Fourth Amendment issue, this set of issues, does not properly sound in habeas; therefore, I'm not going to consider

that." But, again, we recognize that that ship has sailed.

THE COURT: Okay. All right. Can we release Ms. Feldman?

MR. RATCLIFFE: I would love to release Ms. Feldman, Your Honor.

THE COURT: All right. You're welcome to go back.

MS. FELDMAN: Thank you, Your Honor.

MR. RATCLIFFE: Back to the cheap seats.

MS. FELDMAN: Yes.

THE COURT: And the case that I was referring to -- I referred to it as the Fifth Circuit case -- it's United States v. Tugwell. I think that was -- that was the only appellate case that really addressed this -- this issue that you provided.

Mr. Manning --

MR. MANNING: Thank you, Your Honor.

THE COURT: -- your position on this objection to the evidentiary hearing.

MR. MANNING: We would have three responses, Your Honor. First, we think it's late. Second, it raises issues that, I think, have already been raised. Is that -- am I echoing here?

THE COURT: You're not echoing, but I'm having maybe a bit of a difficult time catching -- catching -- the sound is -- there's something about the sound that's making it

difficult for me to take it all in. Let's try again.

MR. MANNING: We have three responses. The first, it is late. Second, it is -- restates issues that have already been addressed in the case, been brought up in the case in our -- so we don't see that it's -- it does anything new. And the third, just on the substance of it, we think it's wrong.

The arrest -- we're not challenging -- we agree that the petitioner has other remedies for an unlawful arrest. Those are in addition to what she's doing now. She's challenging her detention, and she can do that under the habeas statute.

When this habeas petition was filed, there's no doubt she was in detention. Under the -- if we can't challenge her detention --

THE COURT: Now, in the petition claim one is for violation of the Fourth Amendment for unreasonable seizure.

MR. MANNING: Correct, Your Honor. If we can't challenge the context -- and we think the way that the immigration statute was written and the way that the Fourth Amendment and the Fifth Amendment operate together in the context here is that the arrest and detention merge and that they're indistinguishable.

Fourth Amendment claims can be brought in the context of challenging an unlawful detention when those Fourth Amendment claims run into and are the basis for the continuing

detention of an individual past the moment of arrest.

THE COURT: Well, is there ever an appropriate distinction between a Fourth Amendment violation and an unlawful detention?

MR. MANNING: I don't know outside of the immigration context, Your Honor. I know here the -- what we would -- what we think the -- what 8 U.S.C. 1357 says is they blend the concepts. And we think the Fourth Amendment and the Fifth Amendment in the context here also will blend.

When the Government is operating -- our allegations, which we intend to prove today, is that they arrested here without -- they stopped her, detained her, arrested her without any probable cause.

The Government needs to have two levels of probable cause to make a warrantless arrest: Probable cause to believe that she was unlawfully in the United States, and probable cause to believe separately that she was a flight risk and that they would not have been able to obtain a warrant in time.

Both of those have to -- both of those have to be proven. Neither one of those -- that statute was not followed. They did not follow that law. We think that's also a violation of the Fourth Amendment.

And because of that -- because of that, she was -- that moment of that -- of that arrest merges exactly with their detention. Under the -- the way that we understand the

Government's position is that she can't complain about any violations of her Fourth Amendment the moment of arrest.

But we're actually complaining about the context that it took place in 'cause if we can't do that, then under the Government's position, the Government could arrest anyone and then figure out the reason for detention later. And that can't be the case because if that is the case, then there's no purpose or point --

THE COURT: Well, what about the argument that -- well, let's accept for the moment that it can't be the case, but it is not a matter that habeas can take up.

MR. MANNING: I don't know that that's -- if that's the hypothetical that we can't -- if we cannot -- if the hypothetical is that we can't address a Fourth Amendment violation in the habeas context, I don't think -- we are challenging her unlawful detention.

And they arrested her in violation of her Fourth Amendment rights, but they also arrested her in violation of her statutory rights. And her statutory rights merge with the detention scheme, the Immigration and Nationality detention scheme.

So they can't -- we don't see a way that they can be meaningfully separated. Any argument that could sound in Fourth Amendment equally sounds in the Fifth Amendment or in her statutory claim. So we don't see how they can be actually

meaningfully separated.

THE COURT: Okay. Any response to the arguments about maybe the prejudice to future litigation by conducting an evidentiary hearing?

MR. MANNING: I mean, the facts are the facts, Your Honor. I don't know that the facts would develop or change over time. We're ready to proceed. We are, Your Honor -- we are going to request permission from the Court -- we want the Court to hear the evidence today.

Part of our case is -- is that -- as we've stated in our papers, is that DHS threw this unlawful dragnet over Woodburn, Oregon, on October 30th. And part of our case is to show that the petitioner was not the only one that -- that this -- she's not the only one that this happened to.

So we are going to seek permission from the Court to allow this case to proceed -- to allow some supplementing of the allegations and then to allow this case to proceed as a class action, to challenge what we think is an ongoing scheme to -- to violate the statutory and constitutional rights of Oregonians in order to achieve what we think is this mass deportation scheme.

THE COURT: How or when were you going to proceed with a motion for certification?

MR. MANNING: Your Honor, we would -- we just received the discovery -- we received some discovery earlier

last week. The day after Thanksgiving, we received some additional discovery.

We -- we are ready to file our motions by December 16th based on the information that we received and additional information we've -- that -- we have an exhibit that the Government has -- their chief of the Border Patrol has made statements since the filing of this case indicating that they're going to continue doing what they've been doing.

And we think that this will be necessary for a remedy for the petitioner, herself, to -- in order to protect her rights.

THE COURT: And is it a class action in the context of habeas or a class action through some other vehicle?

MR. MANNING: Your Honor, we think a class can be brought in both. There -- we think there's probably two classes that we would bring forward. But we would, as part of our supplement to the -- we would be moving to supplement under Rule 15(d).

THE COURT: So you wouldn't -- you would not be seeking a final resolution of this petition until the class action has been addressed and resolved?

MR. MANNING: That's correct, Your Honor.

THE COURT: Okay.

MR. MANNING: We would ask the Court to hear the evidence today 'cause our motion to -- it's a discretionary

motion to supplement under 15(d). So in the event that the Court denies that motion --

THE COURT: Right. I know we're now talking about a motion to amend or to supplement and to pursue a class action, but let's confine it to the issue of the objection or any additional response to the objection for the evidentiary hearing today.

MR. MANNING: I don't, Your Honor. I think the facts are the facts. And I don't think additional time is going to develop those facts any further.

THE COURT: Okay. Well, I think, Mr. Ratcliffe, you've been handed an opportunity to renew an argument that you suggested earlier. Do you want to respond?

MR. RATCLIFFE: Your Honor, on the issue of potential class certification and -- and proceeding there --

THE COURT: Well, I'm not taking -- I'm not taking up motions and objections to the class action issue. But, I mean, I think you've now received some confirmation that additional litigation is unfolding. And that, I think, seems to buttress your argument about whether an evidentiary hearing is appropriate in -- today.

MR. RATCLIFFE: Your Honor, we have met and conferred regarding the potential class certification and the motion to supplement --

THE COURT: So it is -- so you were already apprised

of the possibilities before coming in and arguing the objection today?

MR. RATCLIFFE: Correct, Your Honor.

THE COURT: Okay.

MR. RATCLIFFE: We'll oppose that at the time. But, to your point, I think part of what -- I'm sorry -- to the Court's point, part of what the Court may be getting at is this idea that the facts today, as I said earlier, could be used in another proceeding.

We think, Your Honor, that the facts -- and I've already sort of suggested this -- but we think the facts that we are prepared to adduce here will demonstrate not only that the officers were reasonable and acted within the Fourth Amendment with respect to the petitioner's arrest, but that there is -- I'm not sure what the other examples are that opposing counsel wants to point to, whether -- wants to point to, whether it's other folks who were in the van that day or whether it's more broadly, everything that's happening in Oregon, and newspaper stories and Truth Social posts, et cetera.

But we think, Your Honor, that when the Court finishes this evidentiary hearing, the Court will be in a position to understand that this is not an appropriate vehicle for injunctive relief, class certification, or anything else because the facts are limited to this case, we believe, in

which the officers did act reasonably and defensively under the Fourth Amendment and the relevant statutes.

THE COURT: All right. Thank you.

The objection is respectfully overruled. And we'll proceed with the evidentiary hearing today. On at least -- and for a couple of reasons. One, the timeliness, recognizing that it -- you do need to make your record, and filing it when you did was an appropriate way to make the record.

But for the purposes of being able to manage litigation and to consider objections generally, they need to be timely, whether they be made live in court at the time that an objectionable evidentiary issue is raised.

Contextually, in this matter the objection to the evidentiary hearing could have been raised on several occasions well before the day of the hearing, if not the 11th hour before the day of the hearing. For that reason alone, I would overrule the objection.

The issues associated with the petition and the claims made there are -- are intertwined. And so the idea of separating this -- the specific sequence of incidents out may be difficult at this stage for me to fully comprehend and appreciate, particularly in the context of any legal arguments.

And, for that reason, the evidentiary hearing and understanding how they may have flowed, either -- either smoothly and organically or not, is going to be helpful in

appreciating what legal arguments have salience and what legal arguments may not.

For those reasons, the evidentiary hearing is going to be -- today's hearing will be valuable and, I think, critical to my -- my assessment of both the fact and law.

I do agree that context, in the context of what is happening on the ground, is also going to be important for me to understand in understanding the legal arguments both parties will be making -- making today and in the coming days when written arguments will be invited.

MR. RATCLIFFE: Understood, Your Honor.

THE COURT: All right. So that was the way we say "hello" in court. Be prepared for a long day, if this is any indication of what we ought to expect. I will also be here tomorrow, although I have other matters, including some criminal matters with your other colleagues.

Are they in court today? Maybe I can call them up as well.

MR. RATCLIFFE: I don't know, Your Honor. I'm happy to cede the microphone to anyone else who you'd like to call up.

THE COURT: But, in any event, if and to the extent that we need to proceed into a second day, I think we'll be able to make some accommodations. I -- I want to try to finish up the evidentiary hearing before having to reset a different

date somewhere down the road.

I think we have many witnesses who are -- who are here, and so the idea of calling them back in another month just seems unworkable. So let's see how much we can get through. My -- my intent is to get through all of it today and -- and then -- and then we can also even take up argument at a different time if we can get the evidentiary -- the evidence set in today's hearing.

All right. There was one -- one of the preliminary issues was the question -- the question of using initials for witnesses. I understand the parties have conferred on this; is that right?

MR. RATCLIFFE: Yes, Your Honor. We have an agreement on that. We're willing to -- both sides are willing to do that, as well as using the petitioner's title as petitioner instead of -- certainly instead of her name. We recognize that the caption does show her initials, and for good reason.

THE COURT: All right. Well, perhaps -- I'd like those good reasons to be stated on the record because I think there -- for my part, there is public interest that I have to weigh against privacy concerns in determining whether people can proceed by way of initials. So let me hear from both of you.

Mr. Manning, perhaps you can go first as to why --

why you believe it's appropriate for the petitioner to proceed by way of the title "petitioner" as well as the initials alone.

MR. MANNING: Your Honor, we understand that the Court has entered an order, and I may be mistaken on this. We had -- we requested the ability to proceed anonymously, and we set forth the facts in our -- in our papers because of the -- one, she is intending to seek asylum in the United States.

Two, there's -- her -- because of the nature of the case and the facts that we're going to be discussing, there is the risk of adverse consequences to her that outweigh the public interest in her actual identity.

Most of the paperwork that we're filing is on the public record. My apologies to the interpreter for speaking so quickly. Most of the -- everything we have filed is on the public record, on the public docket.

The only thing that we are asking to keep off the -- the -- to keep -- preserve her -- her anonymous nature is the use of her initials or her -- or by "petitioner." Her identity has been given to the Government, so the Government is aware of who she is.

THE COURT: So am I to understand that your request for maintaining anonymity is for the purposes of seeking asylum?

MR. MANNING: No. To protect -- to protect her because it would be an -- it would be an unwarranted and -- it

would be -- she is at risk of -- she's -- I can't remember the standard right now that the Ninth Circuit has set forth in a case, and we've cited it in our papers.

We think we satisfied that standard. She, herself -- like, if her name is known in the public, there is -- we've experienced in other cases, Your Honor, where the respondents themselves have used that identity, published that identity, made vindictive statements in the public as a way of retribution. And so we've asked to be able to proceed anonymously.

THE COURT: Okay. And the Government has no objection to petitioner proceeding anonymously or by way of initials and -- and the title "petitioner"?

MR. RATCLIFFE: Your Honor, we're completely on board with that. With respect to the issue Mr. Manning just mentioned, I'm not aware of the other cases he's referring to where he's using the term "respondents." I don't know if he's using that term to refer to the exact parties in this case who are on the other side of the caption.

But my concern is I want to make sure the record is clear that we're not at all acknowledging the accuracy of Mr. Manning's characterization that in other cases respondents have made statements about Section 2241 habeas petitioners in retribution, as he said.

But, Your Honor, we agree that there are perfectly

reasonable reasons. And we believe what's good for the goose is good for the gander. I'm happy to address that more specifically with respect to our witnesses.

THE COURT: Please, because it -- this is also a matter of public interest and -- and our courts are still publicly accessible. And so the idea of maintaining anonymity of parties is always a concern for me. So help me understand what that balancing is that I need to take into account.

MR. RATCLIFFE: Your Honor, yes, we recognize that. We recognize there's a public interest here. Certainly, there's a public interest in -- in an open proceeding and in the adversarial process that we all benefit from by having a federal court system that works the way it does, that works effectively.

We're not talking about anonymity, Your Honor, with respect to our witnesses. We are instead asking that their initials be used in place of their names. We are concerned -- and I'm sure the Court can take judicial notice of the fact that federal agents, especially those involved in immigration enforcement, have in recent years -- plural, not just this year -- but have been the subject of doxing or threats and other challenges to their safety that have -- that have caused those agencies, that are with whom those agents are connected, and others, to expend resources to protect those folks and their families.

So that's what we're trying to do here, Your Honor, is -- certainly, they're not -- we're not asking that they testify behind a screen. We're not asking that they testify wearing a balaclava or some sort of mask. We just don't want their names in the record or in the paper, as opposed to their initials.

THE COURT: I'll allow the petitioner and witnesses that the Government has identified as federal agents, particularly federal agents for ICE, to -- to be referred to by their initials here in the courtroom and on the record.

I do find that it is appropriate, under these circumstances, that the balancing between the need for -- for sort of public accessibility of a record and -- and the open -- the openness required in confirming the integrity and credibility of our courts is -- is measured against that of the need for individual safety, and that privacy is important to maintain here.

I do want to make it clear that the references will be to initials, but there will be no restrictions, unless raised in some other way and for some other reason, for descriptions of the nature of their work title, location, geography.

You can raise those as individual matters to take up with the Court if it's appropriate under the -- under the rules of evidence. But initials are not going to be a basis for

ambiguity with respect to the work that is being performed that is relevant for testifying here -- here on this record.

MR. RATCLIFFE: Your Honor, we agree. We're not asking for further redactions from the record or to use intentionally vague terms or anything else. I do want to go back to one thing that the Court mentioned.

We do have witnesses from Customs and Border Protection as well, and so we're asking that they benefit from the same ruling. I know the Court mentioned ICE in its -- in its comments a moment ago.

And, Judge, then with respect to swearing in of the witness, I want to -- we would like to confirm that the officers and witnesses can be sworn in stating only their initials. I realize that may be part and parcel of what we're talking about here, but it is unusual; and I wanted to raise this issue now in case the Court has a problem.

THE COURT: I think it's appropriate to talk about methodology here. And, yes, when a witness is called and the person's administered the oath, rather than providing full name, first, last, and spelling, the initials, the first -- initial of the first name, any middle initials, and last initial will be required, and nothing more at this time.

MR. RATCLIFFE: Thank you, Your Honor.

THE COURT: And it also extends to CBP.

MR. RATCLIFFE: Thank you.

THE COURT: Okay. I did note there was a motion to compel and responses filed. Have those matters been resolved, Mr. Manning?

MR. MANNING: Your Honor, they've been resolved to a certain degree. We don't think it's going to, at this point in time, prevent any -- from this hearing taking place. We do intend to come back to -- we're working out -- we're having some conversations.

We spoke recently. We're intending to speak again. We think we're owed additional production, and we're trying to work that out informally with opposing counsel. And if we can't do that, Your Honor, then we will come to the Court.

THE COURT: Okay. So at this stage of our -- of the proceedings, you don't -- we don't need to address any discovery matters that had been raised in that motion to compel?

MR. MANNING: I --

THE COURT: In other words, will there be an argument that you didn't get something that's going to somehow derail the evidentiary hearing today?

MR. MANNING: That -- there's one thing that we didn't get that we -- if it were to come up today, we would probably -- I think may come up, we're going to probably object to, Your Honor. I can mention that.

THE COURT: What's that thing?

MR. MANNING: Their -- we're interested in why the van was stopped in the first place. We're -- and if there was some targeting information about the van itself, about a passenger in the van. We would've -- we think that's within our request for production why -- things that could've led to her arrest.

That wasn't produced. And so if that were to come up today in any of the Government's witnesses --

THE COURT: Well, I suspect you're going to ask a witness?

MR. MANNING: I don't know that we would. We've been told that there isn't anything.

THE COURT: Okay. Well, I suspect I might ask a witness --

MR. RATCLIFFE: Your Honor, we're happy -- we are prepared to present evidence on why this van was stopped. We have advised Mr. Manning that we don't have any -- there aren't any things in our files about why the van was stopped.

We're demonstrating that it was a target because it didn't become an object of interest to law enforcement until that morning at roughly 5:30 a.m. So --

THE COURT: Okay. And how about we take up these matters when the evidence -- when people begin to testify. I will be excluding witnesses, so to discuss the nature of testimony now isn't -- isn't -- isn't the most timely.

MR. RATCLIFFE: Fair enough, Your Honor.

THE COURT: All right. But I'm not hearing that there's anything about the motion to compel that needs to be addressed before we begin calling witnesses?

MR. MANNING: That's correct, Your Honor.

THE COURT: All right. All right. I don't have any other housekeeping matters. I think everything else that I have on my list can be best left to grilling the attorneys on argument and -- and so how about we start with opening statements, if any.

And then, Mr. Manning, you can call your first witness.

Opening statements.

Well, let me ask: Are there any other housekeeping matters?

MR. RATCLIFFE: Yes, Your Honor. I believe there are a couple of issues with respect to witnesses that we'd like -- I think Mr. Manning would like to be heard on and we'd like to be heard on as well.

As a preview, the issue that I think Mr. Manning wants to be heard on relates to two witnesses who are not here, who he believes fall within the scope of the Court's order. My co-counsel's prepared to address that. And we have made arrangements, if necessary -- and I know this is not ideal for the Court -- but if necessary, we made arrangements for the

witness who is in Nebraska to testify today by video, if needed.

The other witness is local. However, Judge, before that, I would like to ask the Court for permission to -- to tell two of our guests in the back of the room that they don't need to stay. The witnesses -- and we've discussed this with Mr. Manning and Ms. Garcia -- the witnesses are identified by their initials: C, as in Charlie; H, as in hotel, and witness M, as in Mary; C, as in Charlie.

We believe, Your Honor, that although arguably within the scope of the Court's order -- and that's why they're here -- we believe that they're not necessary. And I believe, as I said, opposing counsel has agreed also that they do not need the testimony of those two folks.

THE COURT: Mr. Manning.

MR. MANNING: That's correct, Your Honor. So C.H., which is witness -- respondents' witness list number three. And if I understand, the M.C. is the additional witnesses number one, the ICE assistant field office director. If that's the case -- who is the declarant in this matter -- we have -- we have no questions for them, Your Honor.

THE COURT: Tell me again: Who was C.H.? What is their position? What is their -- what responsibilities were they fulfilling during any of the relevant times associated with the petitioner's claims?

Mr. Manning.

MR. MANNING: My understanding is C.H. is an ICE supervisory detention and deportation officer. And my understanding that M.C. --

THE COURT: And is that person based here in the Portland facility?

MR. MANNING: I don't know that, Your Honor.

THE COURT: Okay. Ms. Garousi.

MS. GAROUSI: No, Your Honor. He's based in Denver.

THE COURT: Okay. And -- and this person was originally named, but now -- as a potential witness because why?

MS. GAROUSI: The Government believed that this witness was within the scope of your order regarding arresting officers needing to be present.

MR. RATCLIFFE: He was in Portland at the time, Your Honor, not on scene during the arrest.

THE COURT: But he was also a supervisory officer?

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: Did he provide any direction, any instructions in conducting the arrests --

MR. RATCLIFFE: No.

THE COURT: -- at Woodburn?

MR. RATCLIFFE: No, Your Honor. Not that we're aware of.

THE COURT: All right. And does that -- does that synchronize with your understanding, Mr. Manning?

MR. MANNING: It does, Your Honor. We also think that any information that C.H. would have we would be able to obtain from the other witnesses. So we -- so we -- we don't actually think questioning of him under oath is necessary.

THE COURT: And then -- and was -- was C.H. at the -- at the facility here in Portland when the -- when the people who were detained, including the petitioner, were brought from Woodburn?

Anyone?

Ms. Garousi.

MS. GAROUSI: Yes, Your Honor. C.H. was in Oregon when petitioner was arrested. Petitioner -- I'm sorry -- C.H. was not a part of the arrest team, is just the supervisor of the arrest team. It's my understanding that C.H. also then was at the ICE facility, but did not have anything to do with petitioner's arrest or detention.

THE COURT: So what does it mean to be the supervisor of the arrest team, but play no role in conducting or observing or directing the arrest team's activities both on the site in Woodburn or at the facility in Portland?

MR. RATCLIFFE: Your Honor, we believe it's an indication of the -- the extent to which those professional officers have discretion and autonomy to act and, like -- like

many of us, have the good judgment to go to supervisors when necessary.

THE COURT: Okay. What about M.C.? What position were they filling at the time of the events associated with the petitioner's arrest and detention?

MS. GAROUSI: Your Honor, M.C. was our declarant who -- was our declarant. M.C. was not in Portland, does not work in Portland, I believe works in Seattle, so was our declarant who accessed information in an immigration database to provide a declaration in this case, had --

THE COURT: What was the declaration content, subject matter?

MS. GAROUSI: The declaration content -- let me pull the --

MR. RATCLIFFE: Your Honor, it was essentially an explanation of the -- the -- a brief explanation of the history -- the immigration history of the petitioner and then noting what authority she was held under.

And then there was a second declaration that M.C. submitted later on, which was -- I think, in substance, was one or two sentences about the authority under which the petitioner had been held. I think at that point she had been released.

So with great deference to M.C. -- and I know he's here and is going to listen carefully to what I'm about to say -- we believe, Your Honor, that he was -- because he was

not on scene and because he provided information after the arrest to the Court, we believe that his declaration was a compilation of basic information in the ICE record system that was needed to fill in the blanks in this case at the very beginning.

But, in terms of substance, knowledge of the arrest or involvement in the arrest or involvement in detention and, certainly, no -- we don't believe that exists, and certainly no involvement in the issue of alleged deprivation of right to counsel that is also before the Court.

THE COURT: Okay. Anything else, Mr. Manning?

MR. MANNING: No, Your Honor. The -- for -- we're referring to M.C. by initials. I would just note his identity is in the public record. He is the declarant in the case. But we don't have any -- when we first spoke to the Court and this hearing was scheduled, the Government had not yet filed their return.

So we did not yet know what was going to be in the declaration, and so we had indicated we wanted to be able to speak to -- to question the declarant. The two declarations that the --

THE COURT: In which document is the declaration?

MR. MANNING: So the first declaration is Document 26. And then the second one is like --

MR. RATCLIFFE: Your Honor, that's a supplement --

the declaration is a supplement to our return, ECF 25; and then the declaration filed independently at, as Mr. Manning said, ECF 26. Sorry to interrupt.

THE COURT: And, I'm sorry, you said ECF number which, Mr. Ratcliffe?

MR. RATCLIFFE: 26 is the declaration. It supports 25, which was our return.

MR. MANNING: And then the second declaration is ECF -- 34?

MS. GARCIA ORJUELA: Yes.

THE COURT: From M.C.?

MR. MANNING: That's correct, Your Honor.

THE COURT: I'm reading the first declaration from -- I think it's 26 now. Yes.

Both parties agree that the petitioner was released without imposition of any conditions?

MR. MANNING: We do, Your Honor, yes.

MS. GAROUSI: Yes, Your Honor.

THE COURT: And, Mr. Manning, it's your position that any of the material testified to in the declaration is not in dispute?

MR. MANNING: That's correct, Your Honor.

THE COURT: And, Ms. Garousi, are you contending that M.C. made this declaration based on personal firsthand knowledge?

MS. GAROUSI: Your Honor, it was knowledge gathered from the databases. The declarant --

THE COURT: Was it knowledge that M.C. gathered from databases? Part of my concern, and I've observed in past proceedings, the use of passive voice has -- has been frustrating because I'm unable to determine who did what, who knew what, and how information was actually obtained. And so any time I see passive voice or any time somebody uses passive voice, it's -- it brings up some red flags for me.

MS. GAROUSI: Your Honor, I think we have the people who gathered that information on which M.C. based his declaration in the court with us today that will likely testify.

THE COURT: And M.C. is based locally?

MS. GAROUSI: No, Your Honor. Well, Seattle.

MR. RATCLIFFE: Your Honor, paragraph two does note that he was making that declaration based on his personal and professional knowledge obtained from various records and systems maintained by ICE in the regular course of business.

THE COURT: Okay. All right. Counsel, I'll allow M.C. to be released from this hearing, not C.H. If you'd -- and I think you indicated C.H. was in Colorado?

MS. GAROUSI: Yes, Your Honor.

THE COURT: Well, if you'd like to take their testimony out of turn, I'm happy to accommodate that as -- as

you wish. But, given that this person has been described as a supervisor, I expect to have some information about what they knew and how they knew it and what instruction and direction was provided to the -- to the team that they were supervising that conducted the raid at Woodburn.

And while there may be other corroborating testimony, that will be helpful in completing a better record of what, in fact, happened in this case.

MR. RATCLIFFE: Understood, Your Honor.

THE COURT: And you're welcome to take them out of order, if you'd like, if that makes it easier for them to get back to -- back to home.

MR. RATCLIFFE: Your Honor, as the Court might imagine, given that we were expecting or hoping at least to release M.C. -- I'm sorry -- C.H., C.H. is not someone who's -- we have planned to incorporate into our presentation. We are happy to reconsider our plans in consultation with Mr. Manning, as well as the Court, if necessary, at the end of today or the beginning of tomorrow, however far we get, based on the other witnesses and evidence that has been presented.

THE COURT: Okay. Great.

All right. Anything else with respect to witnesses? I know there were the other witnesses that the Government indicated they do not believe were within the scope of my order and so did not bring them.

I might first ask if, Mr. Manning, you have any objections to what it is that they described about these witnesses.

MR. MANNING: We do, Your Honor. We've communicated those to our opposing counsel. K.K. and -- is -- 's name appears on many of the documents --

THE COURT: K.K. and who?

MR. MANNING: K.K.

THE COURT: So we're just talking about one person right now, K.K.?

MR. MANNING: There's -- there's two that we -- K.K. and C.S.W.

Is that correct?

MS. GAROUSI: Yeah.

MR. MANNING: We think K.K. needs to -- we think K.K. falls within the Court's -- scope of the Court's order. And K.K. has vital and critical information that we would like to -- we would like to -- we have questions for.

THE COURT: And is this a person who can attend by video?

MS. GAROUSI: Yes, Your Honor.

THE COURT: All right. And who is the other person? C.S.W.?

MR. MANNING: Yes, Your Honor. C.S.W. appears in the documents -- so both K.K. and C.S.W., their names appear in the

documents related to -- we think, are the critical documents in the Government's case relating to the deprivation of liberty.

THE COURT: Okay. And the Government indicates that it was likely an error that C.S.W.'s name was placed on the I-213 due to the processing officer -- the processing officer's actions. If so, what would be the relevance of C.S.W.'s testimony?

MR. MANNING: We appreciate that from the Government -- from the -- from the Government's position, the counsel's position. There isn't any evidence to support that. There's no declaration from C.S.W. We do think that that error -- which is described as an error, we think it's actually more fundamental towards what actually transpired in the production of the paperwork here.

THE COURT: Production of discovery?

MR. MANNING: Production of the -- sorry -- the -- there was an arrest, and then there was a whole bunch of paperwork that DHS produced in the course of -- after the arrest to justify -- this is our position -- justify the detention.

And the -- their method for creating that paperwork, we think, bears on the Fifth Amendment claims regarding her -- the petitioner's deprivation of liberty and her detention. And so we would like to -- we would like to question to make sure, from C.S.W., why it is that --

THE COURT: Okay. And C.S.W. is located here in Portland?

MS. GAROUSI: Yes, Your Honor.

THE COURT: All right. You'll need to make -- you'll need to make sure that they are available to testify. I'll allow counsel to confer to determine what time that might need to be.

MR. RATCLIFFE: Understood, Your Honor. I will notify that witness now. We've been in touch earlier today to put her on notice of the possible need to be here.

THE COURT: All right. And with respect to K.K., I'll allow that -- that witness to appear by video. And I'm sure we'll have to figure out how to get that set up. And so we might need to take that up at least after the lunch break, so we can get the technology -- technology set up in the courtroom for that.

All right. So, to confirm, C.H., C.S.W., and K.K. will need to be available to testify. K.K., allowed to testify by video. C.H., I think, is here and present, will remain. And C.S.W. will be called in to testify live. I'll allow the parties, again, to confer about when that is workable.

I -- I don't know who is going to be called up in whose case in chief, but I encourage the parties to work fluidly in trying to help witnesses finish their testimony at a time that makes the most sense and is efficient for both the

Court and for you. So expect -- expect me to allow leeway in getting this record completed and not having people wait unnecessarily if they don't have to.

MR. RATCLIFFE: And, Your Honor, after a witness testifies and we have agreement from opposing counsel that they do not believe the person needs to be recalled, may we allow them, at their discretion, to come into the court and watch the rest of the evidence?

THE COURT: Let's -- let's see how it goes. I'll entertain a motion to excuse witnesses when they're completed. And if it looks like they're not likely going to be called on some rebuttal case, then I'm certainly willing to entertain it.

MR. RATCLIFFE: Fair enough, Your Honor. And I should note it's my understanding that these proceedings are being made available electronically to remote users of the court system. We -- the Government appreciates that. I believe we have agency counsel listening in, so to speak, from around the country.

I do want to make sure that the witnesses here in court understand that the exclusion applies not only to the proceeding in person, but also prevents them from listening in remotely until such time as the Court indicates that they can.

THE COURT: Thank you for being complete on that point. Yes. I am ordering exclusion of witnesses. I have not formally done that. And so, to the extent that anybody may be

a witness, has been identified as a witness on either of the party's lists, cannot listen in remotely during live testimony or any testimony and, frankly, any other proceedings after we're completed with our housekeeping matters, which is another way of saying, "How are you?" in court.

It takes a while to get through some of these things. And so witnesses may not -- may not participate by listening in remotely. Additionally, anyone listening remotely may not communicate with witnesses who have not been excused from testimony.

The opportunity to provide our court proceedings publicly and remotely is -- is something that's important to ensure, again, transparency. I want to -- I want to be able to trust that that transparency will be honored by honoring the need for ensuring the sanctity and separateness of our -- of the witnesses' testimony to come only from their own -- their own memories and understandings of the events, not somebody else's.

MR. RATCLIFFE: And, Your Honor, if -- if you would indulge me, I recognize, in hearing the Court's description, that I have not advised the witnesses, and so I want to do that now and make it perfectly clear that they are not allowed to discuss their testimony with each other.

So they can't chat with someone who has already been through the -- the fun process of testifying about what that

person discussed or testified to in court.

THE COURT: Thank you.

I -- I join and otherwise adopt Mr. Ratcliffe's admonition. So anyone who is going to be a witness needs to eliminate any interest, desire to confer with one another after somebody's been excused. If somebody hasn't even been excused, talking about your testimony, even now, is not appropriate because you've been named as witnesses.

You may not discuss your testimony with anyone who has yet to testify or has completed their testimony until you've been also excused. It's absolutely important for me to ensure that -- that -- that this record is not tainted by post hoc considerations. And if I do find that this -- this order has been violated, sanctions will likely follow.

All right. Any other -- anything else that we need to -- to button up, Mr. Ratcliffe?

MR. RATCLIFFE: I don't think so. I think we are through the process of determining how everyone is. And the Government is fine, Your Honor.

THE COURT: All right. Mr. Manning, anything else?

MR. MANNING: I have a question about the exhibits, Your Honor, whether -- there are 20 exhibits: 19 from the petitioner, one from the Government. We agree on -- the Government -- the parties have stipulated to the admissibility of --

THE COURT: Of everything but 112 and 117; is that right?

MR. MANNING: That's correct, Your Honor.

THE COURT: All right. Do you want to take those up now or when the time comes?

MR. MANNING: I -- if we could take those up now, Your Honor.

THE COURT: All right. I don't have copies of these exhibits.

MS. GARCIA ORJUELA: May I approach?

THE COURT: You may.

And then, to confirm, Exhibits 101 through 111 and 113 through 116 and then 118 and 119, parties agree, can be received, Mr. Ratcliffe?

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: And, Mr. Manning, it's your proposed list, so I assume --

MR. MANNING: That's correct.

THE COURT: -- yes as well?

MR. MANNING: That's correct, Your Honor.

THE COURT: Those -- those stated exhibit numbers -- exhibits are received.

(Petitioner's Exhibit Nos. 101-111, 113-116, 118, and 119 received.)

THE COURT: The two remaining are -- to address are

112 and 117. And this is petitioner's exhibit list.

Was there an exhibit list that the Government was offering? Or will you take up documents as witnesses come up?

MR. RATCLIFFE: Your Honor, we did submit an exhibit list this morning electronically. It is one exhibit, and there is no disagreement about it. It is the full video, unredacted, the same exhibit -- that's from the body-worn camera.

And that's the same exhibit as petitioner is offering as Exhibit No. 1. However, they have provided only an excerpt. And they have, for good reason, blurred some folks in that. So --

THE COURT: I'm sorry. They did what?

MR. RATCLIFFE: Blurred the faces --

THE COURT: Oh, blurred. Okay.

MR. RATCLIFFE: -- of uninvolved parties.

So our exhibit is the longer, unredacted version, Your Honor. We have no disagreement on that with opposing counsel.

THE COURT: All right. How long is that video?

MR. RATCLIFFE: Your Honor, I believe it's about 20 minutes total. And we are undecided about whether we want to play the portion in court after the excerpt that is -- that petitioner is going to present. So we'll make that decision later, Your Honor.

It may be something that we just refer the Court to,

to review in chambers, if necessary. We believe that it corroborates certain testimony that we will have regarding other events of the traffic stop.

THE COURT: Okay. And I note that this is stipulated; is that right, Mr. Manning? This is Respondents' Exhibit 1?

MR. MANNING: That's correct, Your Honor.

THE COURT: All right. So Respondents' Exhibit 1 is received.

(Respondents' Exhibit No. 1 received.)

THE COURT: All right. And 112, this is a -- it's described as a Truth Social post. It is June 15th, 2025, at 5:43 p.m. The author is President Donald Trump?

MR. MANNING: That's correct, Your Honor.

THE COURT: And the objection is hearsay?

MR. RATCLIFFE: Correct, Your Honor.

THE COURT: I'll hear from you first then. Go ahead.

MR. RATCLIFFE: Your Honor, this is an out-of-court statement by a party who's -- by someone who is not a party to this matter. We don't believe it fits the party opponent exception. We're not sure --

THE COURT: He's the executive -- head of the executive branch.

MR. RATCLIFFE: He's not in the caption, Your Honor. He is not a party to this matter.

THE COURT: So you have to be in the caption to be a statement by a party opponent?

MR. RATCLIFFE: Your Honor, this is perhaps a law school question here or maybe a law school --

THE COURT: Should we call up Ms. Feldman again?

MR. RATCLIFFE: If Ms. Zusman were here, I would call her, Your Honor. I think she would have entertaining and insightful things to say about this.

Your Honor, we're just -- we're trying to follow the rules here and protect respondents' interests. We do believe that this is hearsay.

THE COURT: Mr. Manning.

MR. MANNING: Your Honor, we think it's an official government record, that there's no question of its authenticity --

THE COURT: I mean -- I mean, it's a posting on Truth Social. How is that an official government record?

MR. MANNING: The Government has -- our -- our understanding is the Department of Justice has taken the position that President Trump's tweets or Twitter feed was an official government statement, official government records.

THE COURT: And who's taking that position?

MR. MANNING: The Department -- the U.S. Department of Justice.

THE COURT: Okay.

MR. MANNING: There's -- we understand that the statements that he makes on Truth -- Truth Social, the social media post, are intended as official government statements. So we think it is an official government statement, an official government record, so it is an exception to the hearsay rule.

THE COURT: All right. The objection's overruled. 112 is received, at the very least, on the basis that, while not named in the caption, President Donald Trump, as the head of the executive branch, like a CEO associated with other -- affiliated with claims made against other -- other officers within -- within an institution, entity, or corporation, would have very real bearing on -- on -- on establishing facts relevant to this case and is admissible.

(Petitioner's Exhibit No. 112 received.)

THE COURT: 119?

MR. RATCLIFFE: 117, I believe, Your Honor?

THE COURT: Yes, 117. Declaration of petitioner in support of the petition for the writ.

MR. RATCLIFFE: Your Honor, again, we -- we offer a hearsay objection. We believe that this is a standard fare at this time.

THE COURT: I'm sorry. What was that?

MR. RATCLIFFE: We believe that this is a standard fare. I'm sorry. This is a conventional hearsay objection, a conventional analysis here, instead of the previous issue.

Your Honor, I want to let the Court know that we did contemplate with Mr. Manning and Ms. Garcia -- in fact, we offered to stipulate to the declaration of petitioner in lieu of testimony in order to expedite the hearing.

They have, for, I'm sure, good reasons -- and I don't dispute them -- decided to present the testimony of petitioner. I recognize that credibility is something that the Court needs and wants to assess.

But because it is an out-of-court statement being offered for the truth of the matter asserted and being offered by a party on her behalf, we think it falls squarely within the hearsay exception.

The fact that she is going to testify -- apparently going to testify, we don't believe, changes that. In fact, it's our understanding that she's going to testify to the same substance of this declaration.

THE COURT: All right. Mr. Manning.

MR. MANNING: Your Honor, we -- the petitioner's document here is signed under oath, produced for the Court, filed in the course of proceedings in this case. She'll be testifying today. We -- she will be covering most of the information contained in her declaration.

THE COURT: Is there something in the declaration she would not be testifying about?

MR. MANNING: There may be some items, Your Honor,

that she may not testify to, only in the -- for the Court's -- for timing purposes. But we anticipate she will be covering most everything.

We will -- we intend to ask her to -- that anything that we do not cover, whether the information contained in her declaration is true and correct.

THE COURT: So, I mean, ultimately, you're going to ask her to endorse the declaration while she's on the stand and be subject to cross-examination of that?

MR. MANNING: That's correct, Your Honor.

THE COURT: Okay. So the objection is sustained. It is hearsay. And, as such a time comes that the petitioner does testify and you ask her those questions, then we can take up the matter of -- this document is sort of demonstrative of her testimony. We can consider it then if --

MR. MANNING: Thank you, Your Honor.

THE COURT: You're welcome to renew offering that exhibit at another appropriate time.

MR. MANNING: Thank you, Your Honor.

THE COURT: All right. I think we've exhausted housekeeping matters.

Mr. Ratcliffe, is there something else that you're hoping to address?

MR. RATCLIFFE: No, Your Honor.

THE COURT: Are you -- are you functionally trying

to -- to put into place avoiding an evidentiary hearing altogether by filibustering the beginning of the hearing with housekeeping matters?

MR. RATCLIFFE: Your Honor, no. And we would love to get started so that we can hopefully finish by the end of the day.

THE COURT: Okay. Let's -- let's get under way.

Mr. Manning, nothing else?

MR. MANNING: Nothing else from petitioner.

THE COURT: I read the briefs. How about a brief opening statement to just set -- set my orientation on -- on what you expect the testimony to show. Again, briefly, because the testimony, itself, will -- will speak for itself.

MR. RATCLIFFE: And, Your Honor, could we excuse our witnesses before --

THE COURT: Yes. Thank you for that.

Anyone who has been named as a witness in this case needs to step out. And my admonition about speaking with one another about the case remains true and in effect until you are released from testifying.

MR. RATCLIFFE: Your Honor, may I have a quick moment to pull two of them back, at least on this floor?

THE COURT: Why don't we do this: Let's take a five, ten-minute break. And then we'll come back and take up the opening statements and begin testimony. That way you all get a

chance to reseat yourselves.

MR. RATCLIFFE: Thank you, Your Honor.

MR. MANNING: Thank you, Your Honor.

(Recess taken, 10:49 a.m. - 11:02 a.m.)

THE COURT: Please be seated.

THE COURTROOM DEPUTY CLERK: This United States District Court is back in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT: All right. Mr. Manning, opening statement.

MR. MANNING: Yes, Your Honor. Thank you.

May it please the Court.

OPENING STATEMENT

MR. MANNING: The petitioner has two witnesses today whom we intend to call in this order: The petitioner and then Ms. Kelsey Provo. We have a very limited set of exhibits. What we intend to show with these two witnesses and the simple set of exhibits is that the respondents, Department of Homeland Security, set up an entire scheme to arrest and detain en masse, without probable cause, and then deport people.

Now, in our papers we call it a dragnet. And we intend to show that DHS threw a net over Woodburn, Oregon, on October 30th, 2025. And the Constitution and the statute prohibit dragnets, right? They're the antithesis of our concept of freedom.

And so we intend to show that DHS was not intending to follow the law that day, that they wanted to arrest people, detain people, and deport people, people exactly like petitioner; and that they wanted to do it really fast, before any lawyers could get involved, because they didn't want the law involved, is what we're going to show.

In our testimony and evidence today from our two witnesses and our exhibits, we'll show that on October 30th, 2025, Thursday morning, like many Oregonians, the petitioner was going to work. She was the passenger in a commuter van traveling through downtown Woodburn, Oregon, on a very typical morning, until it wasn't.

And our testimony and evidence is going to show that the van was suddenly completely surrounded by vehicles from the Department of Homeland Security, front, back, and side. There was nowhere it could go. That agents shattered the window without giving any of the passengers inside the van time to comply.

We'll show that the agents -- while everyone inside the van stayed calm, it was the agents that escalated the scene, that the passengers are in plain view. Their hands are in plain view. And everyone's actually quite calm but for the agents.

What we aren't going to show you, because -- and you're not going to hear this, Your Honor -- is you're not

going to hear any of the agents say, "I'm an immigration officer authorized to execute arrests, and I've arrested you because I believe you are in the United States unlawfully."

And, Your Honor, you're not going to hear that because, as we will show, none of them said that. The petitioner and all the passengers in the van are handcuffed and detained. After the petitioner was transported, we will show, to the Portland ICE field office, there were pro bono lawyers from the Equity Corps of Oregon, who were there to provide her legal advice and counsel.

We will show that she was given such a brief window to be able to speak with one of those lawyers. They asked for ten minutes. They got 60 seconds. We're going to show that -- our facts that we need for the petitioner to win. She has multiple theories of her case, and we intend to show that she can win on almost all of them. And, with that, we're ready to proceed.

THE COURT: Thank you.

Mr. Ratcliffe.

MR. RATCLIFFE: Thank you, Judge.

OPENING STATEMENT

MR. RATCLIFFE: Your Honor, you've already heard me indicate that we believe that we will be able to present evidence that will show that the actions of the officers in this case are very different than those that Mr. Manning and

petitioner believe took place.

We are prepared to show Your Honor that the agents complied with the relevant federal statute, with the relevant federal regulations, with the relevant federal policy. And, of course, since all of those things have to be consistent with constitutional law and reasonable suspicion and probable cause, we believe we can demonstrate that throughout this process, Your Honor, that reasonable suspicion existed.

It ripened. It became stronger and stronger. And at some point probable cause existed, depending on where you believe the inquiry should happen in time. We believe that we can demonstrate that the arrest -- the investigatory stop, the investigatory detention, and the eventual decision to arrest the petitioner were all consistent with the laws and policies that I mentioned.

And I, just briefly, Your Honor, want to point out which laws and policies we're relying on. First of all, Title 8 of the United States Code Section 1357(a)(2), the second clause of that, provides that employees -- "An officer or employee shall have -- of the United States Government shall have the power without a warrant" -- and then this is jumping to the second clause of Subsection 2 -- "to arrest an alien in the United States if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be

obtained for his arrest."

Your Honor, that "reason to believe" incorporates, through other policies -- at least an ICE policy incorporates explicitly the Terry standard.

THE COURT: Now, I know we'll get into argument down the road, but -- and I appreciate that you've cited the statute that you'll -- one of the statutes you'll be referring to. "Reason to believe" is one of the many important phrases in that clause you just read. I think one of the other of which, I think, includes something about flight risk?

MR. RATCLIFFE: Correct, Your Honor.

THE COURT: And so I -- I expect then that there'll be evidence that you'll be eliciting that establishes that -- that those who were detained on that day presented a flight risk justifying such an arrest under 8 U.S.C. 1357(a)(2)?

MR. RATCLIFFE: Correct, Your Honor. And we -- and the -- and the second part of that is important in that they're allowed to make that arrest upon reason to believe that the alien is in the United States without authority, and they're allowed to do that without -- make an arrest without a warrant if they believe the alien is likely to escape before a warrant can be obtained for their arrest.

So we're not talking -- this statute doesn't incorporate flight risk as you and I might think of it in terms of --

THE COURT: Right.

MR. RATCLIFFE: -- the Bail Reform Act, but just in terms of whether a warrant could be obtained in the moment.

Your Honor, the other -- the code of federal regulation, again, that applies -- or that does apply in this case, at least one of them is 8 CFR Section 287.8. And then we go to Subsection B, as in boy, which is interrogation and detention not amounting to arrest.

Subsection 2 says, "If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is or is attempting to be engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning."

Your Honor, as I indicated, although this doesn't expressly refer to Terry, there's another policy that does. We believe that this is incorporating, certainly, the principles of -- of the seminal Supreme Court case known as Terry and a Terry stop.

The other provision, Your Honor, that we are prepared to demonstrate that the agents acted consistently with is Subsection (c)(2)(i) and (ii). And I'll just read those. These are general -- conduct of arrest, general provisions.

(i), "An arrest shall be made only when the designated immigration officer has reason to believe that the

person to be arrested has committed an offense against the United States or is an alien illegally in the United States."

(ii), "A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."

THE COURT: And what's -- what's the evidence you expect to elicit that would establish that the -- the people who were arrested and detained would likely escape if a -- prior to a warrant being obtained?

MR. RATCLIFFE: Well, Your Honor, I believe that we only need to show, with respect to petitioner, not the other folks in the van --

THE COURT: You're right. That's correct.

MR. RATCLIFFE: But with respect to petitioner, Your Honor, we believe that the fact that she -- well, first of all, let's take this -- after, we believe, as I said, that reasonable suspicion is created, ripens, grows; and that there is then, at that point, probable cause for the arrest.

That's a whole set of other issues and other facts, we believe, supporting that. But with respect to then the decision to arrest without a warrant, we believe that, among other things, the officers will say that they had ample probable cause to conclude that the petitioner was in the United States without lawful authority based on the totality of

the circumstances that they encountered when they -- when they -- when they interacted with the folks in this van, including the fact that petitioner not only refused to identify herself, which, as the Court knows from the criminal context, allows a Terry stop to continue for a reasonable period of time in order to get someone identified, but the fact that petitioner was telling everyone else, "Don't say anything. Remain silent. Don't talk to them."

That's not -- we're not seeking to hold her invocation of her own rights against her. We're talking about the fact that she became an advocate in that vehicle, among those group of folks, to say, "Don't talk to them. And, by the way, I'm not going to tell you who I am."

THE COURT: Well, was she --

MR. RATCLIFFE: And --

THE COURT: -- suggesting or advising anybody in that van to do something contrary to the law when she advised them not to talk?

MR. RATCLIFFE: That's on interesting issue in that -- because -- Your Honor, my initial reaction to that is because officers have an obligation -- at that point in the stop, they have an obligation to identify the folks, in part to determine if those folks have outstanding warrants, even putting aside the immigration issues, they have an obligation to identify folks.

To interfere with that -- I realize I'm using a loaded term -- but to say to folks -- to say to the other people, "Don't talk to them. Don't say anything," we believe, is interfering with a process that the officers have to go through in an orderly, reasoned way. Now --

THE COURT: If she were a -- if she were a licensed lawyer in the state of Oregon, would she be subject to that same sort of, I guess, argument that she was interfering?

MR. RATCLIFFE: Your Honor, I don't have an answer for that. That's an interesting question, but --

THE COURT: I think we're in agreement that if somebody doesn't give you their identification or doesn't speak, then -- then the government agents can take reasonable measures to determine identity, including detaining them, taking them to a facility that you can put somebody.

I'm not sure there's going to be much disagreement about if you don't want to give your ID, you don't have to, but agents would be authorized to be able to -- to identify you by using reasonable means to do so. What -- I know we're getting into argument. Maybe you will get away with no evidentiary hearing --

MR. RATCLIFFE: It's an upside-down world, Your Honor, as I said, this whole case.

THE COURT: That's right. We've seen stranger things.

But the -- but here's my thought about this, is the idea that one can suffer a consequence for exercising a recognized right seems to undermine the notion that it is even recognized as a right, the right not to say anything.

And -- and even the idea of telling somebody what they're lawfully allowed to do could be a violation also seems to undermine that very right that every one of us in this country have.

MR. RATCLIFFE: Your Honor, it's -- I do want to get back to the issue of why they believe that they needed to do a warrantless arrest. But it's important, I think, to make a distinction here between the right to remain silent that we all enjoy, as the Court has indicated, and the right to remain silent in the context of someone already being fully identified by law enforcement, and law enforcement knowing that that person does not have any active warrants and that that person is going to exercise their Fifth Amendment right for whatever period they want to.

I am -- I want to be careful that I'm not saying that petitioner committed a crime by encouraging the folks in that van not to identify themselves or not to speak with law enforcement. What I'm saying is that that, along with other factors that I'll mention in a minute, we believe, is an indication that she was a potential flight risk -- I'm going to use that term loosely -- but that a warrantless arrest was

justified there because if they were to -- first of all, if they were to release her and let her go, there's no idea -- they have no idea at that point who she is.

There's no way to go get a warrant. It would be a John Doe or a Jane Doe warrant. And then they would have to find her again. And, of course, not even knowing who she is, it's impossible to do.

But the other thing, Your Honor, that we believe that the facts will show in this case is that there were several things that happened during that traffic stop, including after -- some of them after the period of the video that opposing counsel has offered as Exhibit 1.

And essentially, Judge, there were three different instances where other folks in that van either tried to flee or did flee. And so when you pull over -- our belief is, Judge, if you pull over a van like that -- there is reasonable suspicion; there's probable cause.

If you've got somebody, as the Court will hear, in the very initial stages, who's moving from one of the back seats to the very back seat and has his phone and looks like he's maybe trying to get out that back door and has to be stopped by an officer who goes around back, that's -- that's one indication that people are trying to get out of there, which we believe also adds to the reasonable suspicion about whether the folks, as a group, were maybe undocumented or maybe

the people who were trying to flee had warrants themselves, specific criminal warrants.

But the second thing that happened, Your Honor -- and this is after the petitioner was taken out and was in, we believe, investigatory detention --

THE COURT: Can I remove -- I know we should get to the evidence, but I do want to make sure I understand the sequence of events as the Government understands them. Was -- what was the reasonable suspicion for the stop in the first instance? What will the evidence say that there was reasonable -- I'm assuming that there would've needed to have been -- there would have needed to be reasonable suspicion for stopping the vehicle?

MR. RATCLIFFE: Yes, Your Honor. So the reasonable suspicion, we believe, we can demonstrate through various facts. I think the most important one is that officers saw a man who matched -- who appeared to be -- I don't want to say matched the description because that's -- that's unfair, I think, to the officers.

They observed a man in the early morning hours, roughly 5:30, get into this van and begin driving it. They ran the plates on that van and determined or concluded at the time that the registered owner of that vehicle is someone who had -- who had a history -- whose history was in ICE databases indicating that they were someone who was not a U.S. citizen,

at the very least --

THE COURT: The van's owner --

MR. RATCLIFFE: Correct. The registered owner.

THE COURT: And the database indicated that it was somebody who was not authorized to be in the United States?

MR. RATCLIFFE: No, no. I'm saying it's someone who had a -- who was in an ICE database as someone who was not a U.S. citizen. We're not asserting that they -- we're able to conclude that that person did not have status then, but two things: That they were in an ICE database indicating that they were not a U.S. citizen, and that there was some sort of criminal history or at least arrest history for that person.

THE COURT: But you didn't know what status they had from this database such that they were not a United States citizen?

MR. RATCLIFFE: Correct.

THE COURT: Other than that they were not a United States citizen, there was no other information in this ICE database about their -- their legal status?

MR. RATCLIFFE: Your Honor, I want to be careful here to let the officers speak for themselves.

THE COURT: Okay.

MR. RATCLIFFE: I first spoke with all of these officers yesterday, okay? I don't want to misstate the evidence.

THE COURT: Okay.

MR. RATCLIFFE: But that also the person who they saw get in this van and begin driving it was someone who they -- who had already been on their radar as a -- I'm going to use this term loosely -- but as a target of their investigation that morning.

So someone who's on their radar, they think that person looks like one of our targets, just got in that van. Let's run the plates. Person has an immigration background of some sort. Person has a criminal history of some sort.

And then this van, with no markings on it, at roughly 5:30 in the morning goes to several different locations, apartments, picks people up. You're going to hear the officers, some of whom work in border areas, say that that made them concerned about what was happening.

It was too early for kids to be in that van going to school. Maybe it was people going to work, but maybe it was people going to work in the agricultural area where the officers knew they were operating. And in that area --

THE COURT: So it seemed that, from what you've described, there would've been reasonable suspicion perhaps to stop before he went anywhere else, other than get into the vehicle?

MR. RATCLIFFE: Well, Your Honor --

THE COURT: So they could've stopped -- they could've

stopped the van with just him in it.

MR. RATCLIFFE: I'll take it, Judge. But they -- they let the facts develop more.

THE COURT: Okay.

MR. RATCLIFFE: You're also going to hear, Your Honor, to be fair to the officers, that they believed that -- at least one of them believed that there was reasonable suspicion after the second stop of this van; but there were officers in three vehicles, all in communication using a speakerphone and a conference call essentially.

And they weren't in the right position at that point to begin a traffic stop. So that van went to a third location and picked up people or dropped off people. I think one of the officers would say that he couldn't tell, from his vantage point, whether people were getting in or out of the van.

But this noncommercial vehicle, with no markings on it, early in the morning gave the officers a variety of concerns. And I realize, Judge, that at first blush this may sound fantastical; but one of the concerns they had was: Are there people in that van being taken as victims in a forced labor situation?

Are there people in that van who are being trafficked, perhaps transported with -- with their consent, like sometimes happens in chain sort of sequential transporting of folks from the border, who may not have status, up through

the United States and into the interior?

Or -- and maybe the most likely scenario, but still one that gave them concern about the legality and the status of those folks is, because we're in an agricultural area, are these folks who are getting in this van at 5:30 in the morning undocumented, which would be consistent with what the training and experience of these officers shows them, especially in Arizona, that folks who are undocumented often don't have money for their own vehicle.

They're often -- don't have a license, so they're -- they need to share rides, in the way that this was happening. And, certainly, they may be going altogether to a place where they can work without -- without proper permission, okay? So --

THE COURT: I remember when I used to work in Salem and I lived in Eugene, there was a setup called the van pool. Appellate judges, Supreme Court justices, attorneys for the State, all would get into a parking lot -- a van parked at a parking lot at 5:30 in the morning and then drive up to Salem every day and back.

MR. RATCLIFFE: Well, I'll tell you, Your Honor, I strongly suspect that the driver of that vehicle either had a commercial driver's license or did not have a criminal record. And what the officers here --

THE COURT: Well, you don't know all of the Court of

Appeals judges then, do you?

MR. RATCLIFFE: What the officers here knew, Your Honor, is this is very unlikely to be a commercial vehicle, not just because it doesn't have markings on it advertising, "Hey, come and -- come and pay $20 to go to the airport," or whatever we normally see vans doing; but because, again, they concluded that the registered owner of that vehicle, who they admittedly didn't know for sure was the driver, but the registered owner of that van is someone who had some sort of criminal history.

Therefore, they thought this is not a legitimate ride-share service. This isn't -- I shouldn't say "legitimate." This is an impromptu ride-share service that is consistent with what else I've described. So those things, Your Honor, we believe that gave them probable -- I'm sorry -- reasonable suspicion.

And if I could just briefly go back to preview the evidence for you then on the flight risk 'cause I know that's how we started this. The two other things that happened during the traffic stop and after folks were out, including the petition, in -- in Terry custody, for lack of a better term, are that one of the people who was taken out of the van was put in one of the other vehicles.

This was a -- I think there were two U.S. government law enforcement vehicles and one rental vehicle because we had

people from out of the area.

But a gentleman was put in one of the law enforcement vehicles, handcuffed behind his back, in the back seat of that vehicle, and at some point jumped into the front seat when no one else was in the car, and was trying to get out using his hands behind his back to open the door sideways and started accidentally honking the horn of that car.

That made the officers think, first of all, is this a diversionary tactic? Are -- is this somebody trying to get our attention so that other folks can flee? And then, of course, Judge, we have -- one of the folks who was taken out of that van actually does take off running.

You're going to hear him referred to as a runner. I don't know his name off the top of my head. We're not going to use it anyway. But he took off down the street, and they had to chase him.

So, Your Honor, when you're -- we believe that the evidence will show that when you're an officer in that situation, doing immigration enforcement, concerned about whether someone is properly in the United States, and you have someone who's refusing to identify themselves, and you've got this kind of -- these kinds of shenanigans going on, with people trying to get out of the van too quickly, jumping into and trying to get out of a police officer's front seat and running away, that's an indication -- along with the fact that

you don't know who this person is, later identified as the petitioner -- that's an indication that there's no time to get an arrest warrant.

THE COURT: Okay. Thank you.

Mr. Manning.

MR. MANNING: Your Honor, we're prepared to begin with our -- calling our first witness, but I also don't want to waive an opportunity to, I think -- to comment on the -- the legal conversation.

THE COURT: I --

MR. MANNING: I can reserve that for later.

THE COURT: I invited -- I invited more argument than would be appropriate in opening statement, so the fault is mine. I'll accept that responsibility, but let's take -- let's start with testimony. You'll have the chance to argue at the close of the evidence.

MR. MANNING: Thank you, Your Honor.

We would call the petitioner.

THE COURT: If the petitioner can please come up to the witness stand, and the courtroom deputy will swear you in.

MS. GARCIA ORJUELA: Your Honor, may I approach to deliver a copy of the --

THE COURT: You may.

THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***M-J-M-A***

Was thereupon called as a witness on behalf of the Petitioner; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please be seated. Please state your initials for the record.

THE WITNESS: M-J-M-A.

THE COURT: Thank you.

Mr. Manning.

MR. MANNING: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MANNING

Q. Good morning, ma'am.

A. Good morning.

Q. Could you tell me how old you are today?

A. 45.

Q. Where do you live?

A. Woodburn.

MR. RATCLIFFE: Your Honor, could the microphone be moved closer to the witness so --

THE COURT: Yes.

MR. RATCLIFFE: -- we can hear the Spanish?

THE COURT: Let's do that.

THE WITNESS: Okay.

BY MR. MANNING
Q. It's normal to be nervous.
Could you tell me where -- where do you live today?
A. Woodburn.
Q. Is that Woodburn, Oregon?
A. Yes.
Q. And I'd like to ask you about October 30th, 2025. Could you tell me -- maybe start from when you woke up that morning -- what happened?
A. I got up at 4:30 a.m., as I do every day. I prepared my lunch, and I -- and I got ready myself to go and to get my ride organized. They came by for me about 5:30, more or less.
Q. Who came by for you?
A. Well, a driver. I don't know.
Q. Where were you going?
A. To work.
Q. And so then what happened?
A. Then he continued on the -- on the route, and he picked up another person.
Q. Is your -- is your understanding that other people were also going to work?
A. There were already people there, but I'm recounting from when I got in.
Q. And so then what happened?
A. We went by and picked up another person. And he went --

he drove on about maybe three or four minutes, and he turned at a corner. All of a sudden, he noticed that some lights had come on behind. And he thought it was the police, and so he moved over to the edge.

Q. So, ma'am, I'm going to show you a video.

MR. RATCLIFFE: Petitioner's Exhibit No. 1?

MR. MANNING: Your Honor, this is Petitioner's Exhibit No. 1. This comes from the -- the body-worn camera of an officer who will be testifying today, Officer C. -- C.M. I'm going to advance -- the sound begins at the two-minute mark when the officer steps out of the vehicle, so I'm just going to advance it there, unless there's an objection from opposing counsel.

MR. RATCLIFFE: No objection.

(Video recording played in open court, 11:34 a.m. - 11:39 a.m.)

BY MR. MANNING

Q. Ma'am, from your -- in your experience, is that -- does that video accurately depict what happened that morning?

A. It doesn't show my feelings or my opinion.

Q. Does it show, in your opinion -- sorry -- in your experience, do you think that video accurately shows the actions that took place?

A. There is more yet.

Q. And we may have an opportunity to see the rest of the

video. But, up until that moment, do you -- does that video, in your experience, show an accurate depiction of what happened?
A. Yes, it did happen. But I -- I felt very impotent. They never identified themselves to us.
Q. Ma'am, when the -- you were the one sitting in the van; is that right?
A. Yes.
Q. When the van door opened, can you tell me what you were feeling?
MR. RATCLIFFE: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: Fear.
BY MR. MANNING
Q. Why?
A. Because, at first, we -- we thought it was the police. But then other agents came up, and they surrounded the van. And they were pointing the lights at us.
Q. And why were you afraid?
A. We knew that there was, like, a -- like, a -- like, a dragnet or -- like, of detentions.
Q. And then what happened?
A. I remained paralyzed at the moment because we didn't have any -- any aid. I tried to dial 9-1-1.
Q. Why did you try to call 9-1-1?

A. We thought that they would be helping us.
Q. Why did you think that?
A. Because we did not know who it was who were detaining us and the reason why.
Q. And so what happened?
A. Yes. Then the patrol came up -- three patrol cars came up, but no one got out of the car.
Q. When the -- when you first saw one of the agents, could you describe to me what they looked like?
A. I got scared. I really am not able to describe them.
Q. And why were you scared?
A. Because then I thought that they were the immigration.
Q. What were they dressed like?
A. Like normal clothing.
Q. Did they have things on their faces?
A. No.
Q. The officers?
A. They did.
Q. So what were the -- the agents, what were the agents dressed like?
A. They had, like, a uniform, but I don't know what type of uniform it was.
Q. And were their faces visible?
A. No.
Q. Why not?

A. Their face was covered.
Q. What was it covered with?
A. I don't know. Like a mouth covering or --
Q. And so then what happened?
A. So then they arrested us and put us in front of the businesses.
Q. And then what happened?
A. And they were speaking amongst themselves. I imagine they were talking about who it was that was going to take which ones of us.
Q. And then what happened?
A. Well, they got me into a truck, like a -- an enclosed truck.
Q. And then what happened?
A. So they attempted to secure the safety belt on me, but it was not working. So I just went on without a safety belt.
Q. And then what happened?
A. They took us out behind the mall. And then there were also quite a few trucks out there also with people that they had detained also.
Q. And then what happened?
A. They took photos of me. And they were asking me if I was the person who appeared there.
Q. And then what happened?
A. They got me out of the truck. And they tried to get me up

into a smaller bus.
Q. And then what happened?
A. So I -- since there were only men there, I guess that they told them that they were only going to be taking men there.
Q. And where did they take you?
A. They returned me to another truck with another lady who was there in that truck.
Q. And then where did they take you?
A. To Portland, right here.
Q. Did they take you to the ICE office here in Portland?
A. I don't know if it was that, but I imagine it was.
Q. And then what happened?
A. They removed the handcuffs from us, and they put us into these small cells.
Q. And then what happened?
A. And then they began calling us out one by one to ask for our information.
Q. And were you able to leave that cell?
A. No.
Q. Were you able to leave the building you were in?
A. No.
Q. And so then what happened?
A. Well, then I waited for my turn, until they began talking to me and filling out forms, which is when they took my fingerprints.

Q. And then what happened?
A. They told me that I had to sign something.
Q. Did you know what that was?
A. Not really because they didn't have a -- I don't speak English. And so then I asked them to read it to me because, anyhow, without my glasses I'm unable to read anything.
Q. And so then what happened?
A. They told me that if I signed to exit voluntarily, I would be getting out a lot sooner.
Q. And did they say what would happen if you didn't sign it?
A. Then it was going to be taking a longer period of time.
Q. Did you ask for a lawyer?
A. No.
Q. Did you -- when the -- after the agents spoke with you, did you know there was a lawyer waiting for you?
A. No.
Q. And did you want to see a lawyer?
A. Yes.
Q. And did you explain that to the officer?
A. They asked me -- they asked me if I had a lawyer, and I told them that I had -- no and that I had not -- that I had not contacted one as yet.
Q. But did you say that you wanted to contact one?
A. No.
Q. After that, what happened?

A. At a few minutes before they took us to Tacoma, they asked -- they told me to -- to enter a room and that I was going to be talking to the attorneys.
Q. And how did you feel when you had a chance to speak with the lawyers?
A. A little hope.
Q. And so then what happened?
A. I spoke to the attorneys just a little. And then, after that, they came to pick me up.
Q. And that was the agents that came to take you?
A. Ah --
Q. Let me clarify my question.
So when you were speaking with the lawyers, this -- how did the meeting with the lawyers end?
A. They asked me if I wanted them to represent me.
Q. And was there an agent that came into the room?
A. Well, they came in. They told -- they told us it was time. I don't know if it was -- if they were agents.
Q. And were they telling you it was time for you to go?
A. Yes, already.
Q. Just one moment, ma'am.
MR. MANNING: One moment, Your Honor.
BY MR. MANNING
Q. Ma'am, there is a document in front of you. And I think I might even be able to put it on the computer screen.

Is that showing on -- do you see a white document on your computer screen, ma'am?

A. Yes.

Q. And then I think in the purple folder in front of you, there's a little yellow sticker like this that says 116 on it, 1-1-6 -- I'm sorry -- 1-1 -- excuse me -- 117.

A. Is it 117?

MS. GARCIA ORJUELA: Yes.

BY MR. MANNING

Q. It's 117.

Now, this is a -- this document indicates it's from you. It's written in English. And then it's also signed by you. So I'm just going to scroll down --

THE COURT: Mr. Manning, I'm looking over my -- my sidebar here, and the document that the petitioner is looking at does not appear to be 117. Why don't you come up and confirm.

BY MR. MANNING

Q. I'm going to turn to page 117. I'm going to ask you to look at this document. I'm going to leaf through the pages. I'm going to come to this page here. And I'm going to ask you: Is that your -- are those your initials?

A. Yes.

Q. And did you put your initials there?

A. Yes.

Q. Okay. And is everything that you stated in this declaration, is this all true and correct?
A. Yes.
MS. GARCIA ORJUELA: Your Honor, we would move to admit Exhibit 117 that is before the Court, as petitioner has stated as her declaration.
THE COURT: Mr. Ratcliffe.
MR. RATCLIFFE: Same objection, Your Honor, of hearsay.
THE COURT: Received. 117 is received.
(Petitioner's Exhibit No. 117 received.)
MR. MANNING: Your Honor, we have no further questions at this time.
THE COURT: Mr. Ratcliffe, will you be conducting the cross?
MR. RATCLIFFE: My co-counsel will be, Your Honor. And, again, we ask the Court's permission for the leeway offered to --
THE COURT: Oh, yes.
MR. RATCLIFFE: -- young lawyers.
THE COURT: That's fine. You can -- you can tag team.
Ms. Garousi.
MS. GAROUSI: Yes, Your Honor.
THE COURT: And how long do you anticipate your

cross --

MS. GAROUSI: Ten minutes maybe.

THE COURT: All right. After we complete the petitioner's testimony, we'll -- we'll talk about the break for lunch and then the remainder of the day's calendar.

Ms. Garousi, go ahead.

THE INTERPRETER: Your Honor, first, by your leave, Your Honor, if we may switch, the interpreters may.

THE COURT: I -- everybody can tag team. How's that?

CROSS-EXAMINATION

BY MS. GAROUSI

Q. Good morning, ma'am.

A. Good morning.

Q. Ma'am, in your declaration did you state that you intend to apply for asylum?

A. Uh-huh. Yes.

Q. And do you intend to apply for asylum?

A. Yes.

Q. And when did you decide you were going to apply for asylum?

A. When this happened to me, because now just --

THE INTERPRETER: And the interpreter needs to clarify.

THE WITNESS: -- because I don't feel safe with, like, the agents, like, out the way that they're wandering. I

need protection.

BY MS. GAROUSI

Q. Ma'am, when you say when this happened to you, are you referring to the arrest?

A. Yes.

Q. Ma'am, I'm not asking you for the contents of your asylum application or what you'll be claiming there. I'm just curious: When did the events that gave rise to your application, when did those occur?

A. October 30th.

Q. Ma'am, was there anything that occurred in Mexico that gave rise to your asylum claim?

A. I plead the Fifth Amendment.

THE COURT: I didn't hear the answer.

THE WITNESS: The Fifth Amendment. I plead the Fifth Amendment.

MR. RATCLIFFE: Are you looking for a response from the Government, Your Honor?

THE COURT: I'm waiting for somebody to trigger my involvement.

MR. RATCLIFFE: Your Honor, the witness is being asked about information that she has already provided as part of her asylum application. I know that my co-counsel --

(Whispered discussion, off the record, 12:01 p.m.)

MR. RATCLIFFE: -- I'm sorry -- information that she

has intended that she is going to provide that is not reasonably something that can subject her to criminal liability because we understand that her asylum is based on a reasonable fear of persecution in her home country.

And her -- we believe that her refusal to provide that information here, in a civil proceeding -- sorry -- is inappropriate. And unless there's a showing -- and we're happy to have an evidentiary proffer of this -- unless there's a showing that the information and the facts that give her reasonable fear of return to Mexico somehow implicate criminal conduct, then we believe that it's inappropriate for her to assert a Fifth Amendment right in response to that question; and that it is completely fair for us to explore on cross-examination, going to her credibility.

THE COURT: I've never thought about the scope of the Fifth Amendment implications here. Perhaps you can educate me. Is there anything about potential criminal conduct in another country, that is not necessarily criminal here, that would allow someone to plead the Fifth?

MR. RATCLIFFE: Your Honor, may I have a moment to confer with my learned co-counsel, who knows immigration law --

THE COURT: You're not -- are you going to call --

MR. RATCLIFFE: -- hundreds of ways better than I.

THE COURT: You're not going to call Ms. Feldman again, are you?

MR. RATCLIFFE: No, Your Honor.

THE COURT: All right.

MR. RATCLIFFE: May I have a moment, Judge?

THE COURT: Yes.

(Whispered discussion, off the record, 12:03 p.m. - 12:04 p.m.)

MR. RATCLIFFE: Your Honor, this is another law school exam, perhaps, or at least fact pattern. Judge, in order to pursue an asylum claim, one has to show either a fear of past persecution -- past persecution or a reasonable fear of future persecution.

The witness has testified, if I understand it correctly, that the basis for her anticipated asylum application is her fear of agents in this country based on what happened during the arrest in this case. That's one thing we want to understand by asking her these questions --

THE COURT: And I'm generally inclined to agree with you. So what I want to try to identify is how we navigate potential barriers to understanding terms that might be the problem, as opposed to -- as opposed to answering the questions specifically around asylum.

So -- and so I also want to offer this, is that I'm not inclined to anticipate the idea of pleading the Fifth Amendment under this context, Mr. Manning, unless you can help me understand there's a good reason why.

MR. MANNING: No, Your Honor. So --

THE COURT: And, frankly, I suspect that the understanding of terms -- I mean, I think most laypeople who haven't gone to law school, and perhaps for some of us who have, there may be a difficulty in appreciating the difference between habeas and asylum.

I mean, they both implicate certain concerns. And I -- I just don't know what this witness is talking about, and that bears some further just -- further questioning, if that's possible. But let's try to take care of this issue about the Fifth Amendment because I'm not -- I'm not sure, again, it plays a role here.

MR. MANNING: The --

THE COURT: But go ahead.

MR. MANNING: I'm sorry.

THE COURT: No, go ahead.

MR. MANNING: The -- I mean, we think the petitioner didn't understand the question; and, as a result, she is -- she has Fifth Amendment rights, but we don't think that that's -- she's intending to answer the question for that -- she -- we think she understood a different question.

We also -- I mean, we did not object to that question at the time. But now that the Government has explained a little bit more, we actually object on relevance. The --

THE COURT: The reason -- the fact of applying for

asylum or the reason for asylum?

MR. MANNING: We would think the reason for asylum -- all that information's going to go before the immigration service. There is -- there's strong confidentiality protections that apply to that information. We don't think it's -- we don't think it's relevant.

We understand that she testified today that she was afraid of the officers or -- that's one way to interpret what she said -- or that, because of what happened, she needed to have some kind of protection in place with the immigration service, which is another way to interpret what she said.

So we don't understand -- we understand her testimony not to -- to be invoking the -- she did invoke the Fifth Amendment, but we don't think she understood the context of the question. If I were asking her questions, which I'm not, about her claim for asylum, I actually probably would never use the word "asylum" because I think that's a legal term. I would actually explore the facts; but we don't think the facts are relevant, of what took place in Mexico.

THE COURT: And I'm not really sure Ms. Garousi was going to dive deeply into the asylum application. I kind of read this as just simply trying to establish some -- some basic understandings. Maybe I'm wrong, but -- but I also agree that the facts of her applying for asylum, I'm not -- I don't understand to be central to the legal considerations here.

So I'm afraid that we're getting -- we're jumping into a hole that perhaps we ought to back out and see if we can redirect, just to -- to get moving to the discussion that I think you'd like to explore with -- with the petitioner.

Ms. Garousi.

MS. GAROUSI: Your Honor, my reason for the questionings was to explore credibility with this witness. Petitioner has said things that -- she said that no one identified themselves in reference to the officers. If this was typical civil litigation, we would've had the opportunity to explore credibility more widely.

And these topics would've been fair game if this was a deposition. This is our -- so this is our opportunity to explore credibility with this witness.

THE COURT: Well, where are you going to go with the questions on asylum? What was --

MS. GAROUSI: Your Honor, as you pointed out, I'm not trying to get into the substance of her claims. I just have some questions about when -- timing, when this -- the events gave rise to her claim.

THE COURT: When the events in Mexico potentially -- purported events in Mexico gave -- occurred?

MS. GAROUSI: Yes, Your Honor, if any events in Mexico gave rise to her claim.

THE COURT: Okay. Well, your client has invoked the

Fifth. I need to resolve that at this point. Do you need to speak with your client about whether there's something else going on that I'm not aware of, perhaps you're not aware of, and whether the petitioner understands what this means, before I make a ruling about the appropriate invocation?

MR. MANNING: We would appreciate that opportunity, Your Honor.

THE COURT: Okay. All right. Let's go ahead and break. That way you'll have an opportunity to speak with your client. I do want to make it very clear she is still on the stand and a witness. And the exclusion admonitions apply.

I know it's a touchy issue because you're -- she's also your client and -- and a named party, so she has the right to speak with you. But I do want to caution you about limiting the scope of your discussions before she finishes answering these questions about asylum so we can make sure we don't unnecessarily trip over our own feet.

MR. MANNING: Understood, Your Honor.

THE COURT: All right. Mr. Ratcliffe.

MR. RATCLIFFE: Your Honor, I was just going to ask if we could take five minutes here, have -- allow counsel to have the discussion, and then come back. I don't believe that we have a lengthy cross-examination planned. I do think it makes sense to get through this witness' testimony before lunch.

However, part of the reason, I will acknowledge, that I am proposing this alternative is that I do think there is a reasonable danger here that if given the entire lunch hour, petitioner may have many other things that she needs to discuss with her lawyer; and that they may need to, as a result of the inquiries she makes, get into information that, unfortunately, may guide her cross-examination now that they've a sense of where we're going with this.

THE COURT: All right.

MS. GARCIA ORJUELA: Your Honor, we would like to offer, if it would be okay for opposing counsel, we can do the clarification through a couple of questions to make sure that she understands what the questioning from Ms. Garousi was.

THE COURT: All right. Let's do this in real time. I'm interested in trying to get through this because this isn't really the reason we're here to understand the -- the facts alleged in the petition for habeas.

Did you want to ask questions, Counsel?

MS. GARCIA ORJUELA: Yes, Your Honor.

THE COURT: And I'm not sure your microphone's on. Can you tap it --

MS. GARCIA ORJUELA: Oh.

THE COURT: -- to make sure?

MS. GARCIA ORJUELA: Can you hear me now?

THE COURT: Yes.

MS. GARCIA ORJUELA: Okay. Sorry. I was a little further away.

BY MS. GARCIA ORJUELA

Q. Okay. (Speaking Spanish) --

THE COURT: So let's make sure we have -- I'm open to being flexible, but I need --

MS. GARCIA ORJUELA: Oh, I'm sorry. I'm sorry.

THE COURT: -- I need to know in advance --

MS. GARCIA ORJUELA: My brain just --

THE COURT: No, no.

MS. GARCIA ORJUELA: I'm sorry. I'm --

THE COURT: So --

MS. GARCIA ORJUELA: I will -- I will speak in English --

THE COURT: Hold on.

MS. GARCIA ORJUELA: -- from now on.

THE COURT: Hold on.

I'm not opposed, as long as we have a translator interpreting what's going on --

THE INTERPRETER: Your Honor, there are two of us, if I may break in.

THE COURT: Yeah, now we're adding another variable. I'm not sure I can -- I've never -- I've never been capable of handling more than two or three things at once, so --

MS. GARCIA ORJUELA: I apologize, Your Honor.

THE COURT: But, actually, I might -- I'll take you up at the invitation. Let's do this, because I really want this witness to understand the question. And if in the native language it is easier for her to understand the question, then I think we can also get more meaningful responses.

Now, I know this is very unconventional, so if there's anything you want to state on the record, Mr. Ratcliffe, you're welcome to do so.

MR. RATCLIFFE: Your Honor, my only concern is with the transcript, but I have just now looked around the room and realized that we must be recording this.

THE COURT: We're on FTR.

MR. RATCLIFFE: On FTR. Thank you. So I don't think it creates a burden for the court reporter at this point. There may be a transcript prepared eventually. But we have no objection, Your Honor.

THE COURT: Okay. Counsel, can you pronounce your last name for me?

MS. GARCIA ORJUELA: Garcia Orjuela.

THE COURT: Orjuela?

MS. GARCIA ORJUELA: Yes.

THE COURT: And I want to make sure I'm pronouncing -- Garcia Orjuela?

MS. GARCIA ORJUELA: Garcia makes it easier. That's fine.

THE COURT: Well, I -- well, I'm never going to cut my name short, so I don't expect you to either.

So, Ms. Garcia Orjuela --

MS. GARCIA ORJUELA: Correct.

THE COURT: -- I'd like for you to be sure, to make it clear on this record, before you ask a question, to state your name, so it's clear on the record who it is that's speaking. And then -- then we'll have a -- we'll be able to differentiate between the question and then the answer a little bit better for -- for the record in the future. Okay?

MS. GARCIA ORJUELA: Okay. Correct, Your Honor. Thank you.

THE COURT: All right.

MS. GARCIA ORJUELA: I appreciate the opportunity.

THE COURT: So what I'll -- I'm going to do is allow you to ask the question in Spanish, but I want to advise the petitioner not to answer the question until I've heard the translation of the question into English. That way counsel will also have an opportunity to object to the question before the answer is made.

Once I have both the Spanish -- the question in both Spanish and English and there's no objection, then I'll ask the petitioner to respond. We'll see how this goes.

All right. Ms. Garcia Orjuela.

MS. GARCIA ORJUELA: Correct, Your Honor. Nelly

Garcia Orjuela for petitioner.

BY MS. GARCIA ORJUELA

Q. Ma'am, we're going to be speaking about your petition for asylum. You have stated that you have fear of return -- you have stated that you are fearful of returning to Mexico. Yes or no?

A. Yes.

Q. Did something happen in Mexico which caused you to fear returning there?

A. Yes.

Q. How long ago did that happen?

A. It was about 20 years ago.

MS. GARCIA ORJUELA: Does that answer your question?

MS. GAROUSI: Yeah, that's it. That's it.

THE INTERPRETER: That will be all. Thank you very much.

THE COURT: Thank you, Counsel, and our interpreters for assisting in this way.

All right. Ms. Garousi, did you have any more questions for the petitioner?

MS. GAROUSI: Just a few follow-up questions.

BY MS. GAROUSI

Q. Ma'am, do you need a second?

A. No, it's okay.

Q. Thank you for sharing your answers with us.

Ma'am, were you issued a B-2 visa?
A. I plead the Fifth Amendment.
THE COURT: Based on my discussions with the attorneys, Petitioner, I have found that it is not appropriate to be able to plead the Fifth Amendment in response to the question about whether you were issued a particular kind of visa. You're required to answer the question.
THE WITNESS: Yes.
BY MS. GAROUSI
Q. Ma'am, when did you last enter on that B-2 visa?
A. In January.
Q. Do you remember what date in January?
A. No.
Q. How many times had you previously entered the United States on that B-2 visa?
A. I don't know. Very few. Barely at all.
Q. Would you say more than five times?
A. Well, yeah.
Q. Would you say more than ten times?
A. Well, it was -- I honestly don't know exactly.
Q. That's okay.
Ma'am, at any time that you entered the United States on your B-2 visa, did you express a fear of return to your home country?
A. No.

MS. GAROUSI: No further questions, Your Honor.

THE COURT: Redirect.

MR. MANNING: No, Your Honor.

THE COURT: All right. Petitioner, you can retake your seat.

It's 12:20 now. Let's break for the lunch hour and continue at 12:30. The courtroom will be closed, locked, so you're welcome to leave anything that you'd like to leave here. We'll open back up about 15 minutes before starting.

Anything we need to take up before we break?

Yes, I -- yeah, you catched me. I -- I replayed it in my head. I meant to say 1:30.

MR. RATCLIFFE: 1:30.

THE COURT: There's nothing that can be done in nine minutes, so -- so 12:20 to 1:30. And the courtroom will be locked. If you'll come back 15 minutes before, it'll be reopened. Thank you, Counsel.

MR. RATCLIFFE: Thank you, Your Honor.

THE COURTROOM DEPUTY CLERK: We're in recess.

* * *

(Noon Recess taken at 12:21 p.m.)

***AFTERNOON SESSION***

(Open court, 1:42 p.m.:)

THE COURTROOM DEPUTY CLERK: Please remain seated.

The United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT: All right. Good afternoon.

It's my -- my convention for people to remain seated when I'm being gaveled in. I get that lawyers have -- have a hard time breaking habits. And I don't want you to get into trouble with any of my colleagues by getting used to me. But -- but, at least as far as it goes for -- for my proceedings, you may remain seated when I'm coming in and also as you're addressing arguments before me.

MR. RATCLIFFE: We'll try to control our enthusiasm, Your Honor.

THE COURT: Well, if I -- if I get any messages from my colleagues about what kind of bad habits I'm -- I'm bringing up from Eugene, I'm -- I'll take responsibility. You can blame it on me.

All right. So I did hear something before coming in that there was -- I know K.K. was going to be appearing by video, and then there was a representation that they're coming in tomorrow. But let's make sure that we're all on the same page because I wasn't sure I was yet ready to give up my -- my day tomorrow, my hearings, but -- so talk to me.

MS. GAROUSI: Your Honor, I think we were thinking that we weren't going to be able to get through everyone today

and that we would have K.K. appear via WebEx tomorrow, given our witnesses order.

THE COURT: All right. And I understand the -- counsel to be conferring. Is that with respect to the scheduling of matters or --

MS. GARCIA ORJUELA: What we were comparing before Your Honor came on, it was regarding our next witness, Ms. Provo.

THE COURT: Okay.

MS. GARCIA ORJUELA: And we -- for efficiency and to make the hearing more expeditious, we were going to stipulate on her -- on the declaration that has been submitted as Exhibit -- I believe it's 116 -- yes -- to speak for itself instead of her testimony. And she's present in case Your Honor would like to have some exchange with her or have some questions for her as well.

THE COURT: Did you say 115?

MS. GARCIA ORJUELA: 116.

THE COURT: Okay.

MS. GARCIA ORJUELA: It's also on the docket, on ECF 15, if that makes it easier.

THE COURT: Okay. Yeah, I had that here.

How long would her direct testimony end up taking if she were going to be doing so in person?

MS. GARCIA ORJUELA: We were going to be very, very

brief, but as we understand there is a pressing time for other witnesses --

THE COURT: I certainly do want to manage time, but I also want to make sure that we have a full record. And it's always been my experience that having in-person testimony is helpful for understanding, you know, the three-dimensional context of human interactions.

So at least from -- I mean, don't do it for my benefit, although I'll tell you when I don't have time any more for it. At this stage I think I -- I mean, if one of the claims is also in some way related to evidence associated with the deprivation of counsel and how that might relate to the detention, I think it would helpful for me to hear.

But I suspect you'll also have cross to engage in as well; is that right?

MR. RATCLIFFE: Well, Your Honor, we -- we were prepared to abandon our very brief cross if we were able to proceed instead doing a stipulation to her declaration. I will note that it's at least 22 paragraphs long. I don't have it right in front of me. I know the Court was looking at it earlier. So I would estimate that we're going to spend at least a half an hour if we go with live testimony.

THE COURT: Okay. Well, is there -- is --

MR. RATCLIFFE: We don't dispute the facts, Your Honor. That's why we're willing to stipulate to the

declaration.

THE COURT: And -- all right. So Ms. Provo's testimony, is she going to be testifying to essentially the very same things that are in the declaration?

MS. GARCIA ORJUELA: That is correct, Your Honor.

THE COURT: All right.

MR. RATCLIFFE: And, Your Honor, I'm sorry, I should say we do dispute one of the facts. At the end there's an allegation that the ICE agent who was involved in the alleged deprivation of right to counsel of petitioner, also at the end when Ms. Provo was attempting to meet with another client, that that same ICE agent also cut that meeting short.

That's the only fact we dispute. We're prepared to offer testimony on that from our own witness, from that ICE agent, but just to let the Court know.

THE COURT: Well, let's take Ms. Provo's testimony in person. You know, I've indicated to everybody here that declarations were not going to be enough. And while I'm not going to impute anything else other than that which I've already mentioned on the record, what's good for the goose is good for the gander.

I think that was something you said earlier, Mr. Ratcliffe.

MR. RATCLIFFE: Yes, Your Honor. I can't believe I said that, but I did.

THE COURT: Yeah. Well, it stuck in my head. So let's -- let's make it true then and just keep on going the way we've been going.

So go ahead and call your next witness.

MS. GARCIA ORJUELA: Okay. Your Honor, we would like to call Ms. Kelsey Provo as a witness.

THE COURT: Ms. Provo, please come up to the witness stand.

And when you approach the -- get into the stand, the courtroom deputy will swear you in.

THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***KELSEY PROVO***

Was thereupon called as a witness on behalf of the Petitioner; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS: Kelsey Lynn Provo. Provo is P, as in Peter, r-o-v, as in victor, o.

THE COURT: Thank you.

Mr. Manning or Ms. Garcia Orjuela.

DIRECT EXAMINATION

BY MS. GARCIA ORJUELA

Q. Good afternoon, Ms. Provo. Can you state -- can you tell the Court: What do you do for work?

A. I'm a lawyer.

Q. What kind of attorney?

A. I practice primarily immigration law.

Q. How long have you been an attorney?

A. A little over 11 years.

Q. Where do you practice?

A. I work at a nonprofit called Innovation Law Lab.

Q. What is your main area geographically of practice?

A. I practice removal defense before the Executive Office for Immigration Review, EOIR. And I also represent clients before the U.S. Citizenship and Immigration Services, as well as the federal district court and the Ninth Circuit Court of Appeals.

Q. What are your responsibilities as an attorney within Law Lab?

A. So at Law Lab I am an associate legal director. So I supervise and mentor lawyers. I also represent clients before the agencies and the courts that I just mentioned.

Q. Okay. On October 30th what was -- how was your work day starting?

A. So when I was on my way into work, I received messages -- I think around 8:15 is when I was checking my phone on my way

into work -- that there had been a large immigration -- ICE sweep in the Woodburn and surrounding areas.

And when I got into the office, I joined a team -- an internal team call at about 8:30 where we were discussing how lawyers from our team and a team we partner with might respond.

Q. And what -- what happened after that call?

A. So after that call, I prepared to go to the Portland ICE office and to meet my colleague, Natalie Lerner, to try to provide a know-your-rights orientation, legal screenings, and possibly offer representation to the people that we are -- believed had been detained that day and who were being detained at the Portland ICE office.

Q. Around what time did you arrive approximately at the Portland ICE office?

A. So Natalie Lerner and I arrived at the Portland ICE office at about 10:05 in the morning.

Q. And did you access the building right away?

A. So we approached the building, but the doors were locked to the public. And there was a little buzzer, so we rang the buzzer and waited for someone to come out to speak with us.

Q. And how long did you wait?

A. Maybe like 60 seconds or less.

Q. And who came out?

A. What appeared to me to be a security guard came out.

Q. What did the security guard tell you?

A. He wanted to know why we were there. And so I let him know that we were attorneys, that we were aware that ICE had detained multiple community members that morning, and that we wanted to speak with the acting field office director, Officer Jeffrey Chan, so that we could provide group orientations, know-your-rights -- know-your-rights orientation, legal screenings, and potentially offer people representation.
Q. Did the security guard let you in at that time?
A. No. He had us wait outside. And he said he would go inside and check and that he would be back.
Q. Did the officer come back?
A. Yes. He came back, and he told us that Officer Chan was not in the building. So then I asked him if we could speak with whoever was in charge in Officer Chan's absence.
Q. Did you ask for the officer's name?
A. I did not. Oh, the -- the security guard or the officer?
Q. Yes. Correct. I apologize.
A. I asked -- either Natalie or I asked for his name, but he would not give us his name.
Q. Did he say why not?
A. He said for safety concerns he was not to give his name.
Q. And you were still outside at this time, correct?
A. Yes.
Q. How many times did you ask the security guard for access?
THE COURT: Can you repeat the question?

BY MS. GARCIA ORJUELA
Q. How many times did you ask the security guard for access?
A. Okay. I'm trying -- it has been a little while, so I'm trying to remember. We asked to speak with Officer Chan, to have access to the people detained. The security guard came back and said he wasn't there.
I asked to speak with the officer in charge in his absence. The security guard went back to presumably investigate that. When the security guard came back, he said that we would need G-28 forms for everyone we wanted to speak to.
At that point I provided him with a list of the names of the people that we knew had been detained that morning. And I asked if we could speak with that list of people and also anyone else who wasn't on that list, but who was being held at the facility.
He reiterated that we must have signed G-28s for the people we wanted to see. So at that point I provided him with the signed G-28s that Natalie Lerner and I had prepared with the 28 people that we knew had been detained that morning. He went back inside the building. We were made to wait outside. And then he came back, and that's when we were permitted to access the building.
Q. How long would you estimate this interaction lasted?
A. I think from the initial ringing the buzzer until we were

permitted to enter the -- physically enter the building, it was about 25 minutes.

Q. And how many people were you able to see that day?

A. Just 11.

Q. Were you immediately allowed to go into a room for -- to do those interviews?

A. So somewhat. I mean, we entered the building. We had a conversation with the security guard about the number of lawyers that we wanted to have in the building and what -- how many rooms we would be able to access, whether we would be able to meet with people in groups to streamline and to provide more efficient know-your-rights information.

And we were taken back to the visitation area probably within five to ten minutes of getting inside the building. And then once we were in the one visitation room we were permitted to use, I don't believe we saw our first potential client until about 11:00. So arrived at 10:05, and about 11 o'clock was when we were able to meet with the first person.

Q. How many people did you speak to before petitioner?

A. We spoke with three people. Petitioner was the fourth person that we spoke to.

Q. Were you alone in the visitation room?

A. On one side of the glass or the clear partition was myself and Natalie Lerner, my colleague. On the other side was

petitioner. And except for when I entered the room and left and then entered again and left, we were alone in the room.

Q. Let's move to the time you met with petitioner. How long did you meet with her?

A. So she was brought into the room. I think we had a few minutes with her before an officer came into the room on the side that petitioner was on to say that we needed to end the meeting because they were in the process of transferring her -- or they were going to be transferring her.

Q. At that time had you been able to do a full assessment with her?

A. No.

Q. In your experience, what would've been able -- what would you have been able to do if you had more time?

A. Well, I would've liked to first review any arrest warrant, any charging document, any custody determination or paperwork that the Government had justifying her arrest and her detention.

I would've liked to speak with her in-depth about her entry, about her current status, about potential pathways she might have to challenge her detention, to challenge her arrest, and to obtain a lawful immigration status.

I would've also liked to have more time to advise her as to her rights, her rights in speaking with ICE officers, her right to have an attorney present, those due process rights, as

well as her statutory rights under the INA, and then to orient her to what was going to happen in the process so that she would understand the next steps and what her options might be to fight her case.

Q. And did you request any of the documents that you mentioned, the arrest warrant, the notices, to the ICE officer?

A. So at the conclusion of all of our meetings, we requested all of the documents for everyone that we had spoken to, but we were not provided with those documents.

MS. GARCIA ORJUELA: No further questions, Your Honor.

THE COURT: Thank you.

Mr. Ratcliffe.

MR. RATCLIFFE: Yes.

CROSS-EXAMINATION

BY MR. RATCLIFFE

Q. Good afternoon, Ms. Provo.

A. Hi.

Q. Good afternoon again.

A. Good afternoon.

Q. You understand, from having watched the proceedings, that the Court has accepted your declaration in this case; is that correct?

A. Yes.

Q. Or at least that you have submitted, as part of the file,

a declaration in this case?
A. That's correct.
Q. Under oath?
A. Yes.
Q. And I'd like to clarify. In paragraph 15 of that declaration, at one point you write that the ICE officer brought you into the room at approximately 12:00 p.m.; and after only a few minutes, the ICE officer interrupted your meeting to tell you that the meeting would be cut short because they had to transfer the petitioner out of the facility. Do you remember that?
A. Yes.
Q. But it wasn't only a few minutes, was it?
A. From when the officer brought her into the room and then came back in to tell us that the meeting needed to end because they were going to transfer her, I believe it was only a few minutes, yes.
Q. Well, further down in your -- in the same paragraph of your declaration, you wrote, "In total, we were able to meet with petitioner for only about ten minutes."
A. Yes. So the officer came in to tell us that they needed to cut the meeting because they were going to transfer her. I asked the officer for more time and explained that we weren't yet finished advising her. The officer said we couldn't have any more time.

I then asked the officer, "Could we just have ten more minutes?" The officer said, "You can have 60 seconds." He left the room. We had another minute or two or three, so approximately ten minutes total, to speak with her before they then came and took her out of the room to transfer her.

THE COURT: So he didn't come back after 60 seconds, but it was --

THE WITNESS: He gave us --

THE COURT: -- longer?

THE WITNESS: -- a few more -- yeah, it wasn't exactly 60. We had a little bit more than 60 seconds.

THE COURT: Okay.

MR. RATCLIFFE: No further questions, Your Honor.

THE COURT: Redirect.

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. Thank you.

Is Ms. Provo excused?

MS. GARCIA ORJUELA: Yes, Your Honor.

THE COURT: All right.

MS. GARCIA ORJUELA: We will not recall her.

THE COURT: Ms. Provo, that means you're welcome to stay in the courtroom --

THE WITNESS: Thank you.

THE COURT: -- or leave, if you wish.

THE WITNESS: Thank you. Have a nice day.

THE COURT: Any other witnesses?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. Could you also check your microphone? I'm not sure it's picking up. Or you might need to move it closer.

MS. GARCIA ORJUELA: Yeah. I'm going to change the location. I think it's not as powerful as Mr. Manning's.

Is that better?

THE COURT: I think it is, yes.

MS. GARCIA ORJUELA: Okay.

THE COURT: Thank you.

MR. RATCLIFFE: Your Honor, before we call our witnesses, it occurred to me at the lunch hour that we should put the Court on notice and opposing counsel on notice of one of the legal theories that we're going to be using. May I do that now?

THE COURT: Please. Go ahead.

MR. RATCLIFFE: So, Your Honor, we want to rely on the so-called collective knowledge doctrine, which is that when officers are doing -- when multiple officers are doing an investigation, for purposes of assessing reasonable suspicion or probable cause or the reasonableness of an arrest, the knowledge of all the officers is imputed to everyone else, even if they're not communicating.

We believe in this case, Your Honor, the evidence

will show that the officers were communicating, at least largely were communicating. I mentioned earlier that they were operating with a group call and a cell phone on speakerphone in the various cars.

But there may be times when counsel may try to make the point that some of the information that we believe adds to reasonable suspicion and probable cause was not known to the rest of the team.

Your Honor, the authority for that is -- I have an -- various authority, Your Honor, but let me give you the most on point, I think, is United States v. Bernard, 623 F.2d 551. That's at 560 through 61, a Ninth Circuit case from 1980.

And the quick explanation is, Your Honor, the doctrine known as the collective knowledge or source doctrine -- collective knowledge or source doctrine was applied, quote, "regardless of any -- whether any information giving rise to probable cause was actually communicated to the officer conducting the stop, search, or arrest."

Your Honor, that was a quotation that is a bit cleaned up. There were brackets in there. I didn't read those.

But then the other sentence I wanted to make the Court aware of from that case is, quote, "The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an

investigation. Sometimes his authority to arrest a suspect is based on facts known only to his superior or associates."

THE COURT: All right. Mr. Manning, Ms. Garcia Orjuela, do you want to respond? I mean, a notice at this point, it -- I don't want to take up deep argument; but if there's some objection to -- to that invocation of that theory of the case, this is your time to make a record.

MR. MANNING: Your Honor, we think it would -- we don't think it -- no. I mean, we would like to -- we would like to respond, but in the context of argument as opposed to at this point in time to delay the presentation of the --

THE COURT: Okay.

MR. MANNING: -- Government.

THE COURT: All right. Is there any other particular legal significance for providing notice of proceeding on this theory?

MR. RATCLIFFE: No, Your Honor. Just a question of getting ahead of this in case it comes up and the Court were to be surprised.

THE COURT: All right. Thank you very much.

Your first witness, Mr. Ratcliffe.

MR. RATCLIFFE: Your Honor, the Government called D, as in David; R, as in Robert, those initials.

THE COURT: D.R., if you'd be kind enough to come up to the witness stand over here, take the stand, and the

courtroom deputy will swear you in.

THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***D.R.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: And please state your first and last initials for the record.

THE WITNESS: D.R.

THE COURT: Okay. Be seated.

Mr. Ratcliffe.

DIRECT EXAMINATION

BY MR. RATCLIFFE

Q. Good afternoon, Officer. Could you tell us where you're employed?

A. I'm employed with Immigration and Customs Enforcement in Denver, Colorado.

Q. And what's your position or title?

A. I'm a deportation officer.

Q. And how long have you been a deportation officer?

A. For two years.

Q. Did you work for the same agency before that?

A. I did.

Q. What was your position then?

A. I was an enforcement and removal assistant.
Q. And how long did you do that?
A. Roughly two years as well.
Q. In mid-October, were you asked or did you volunteer to come to Portland to assist with operations here?
A. I was asked to come here.
Q. Roughly when did you arrive and -- and how long did you end up staying, even though that may overlap with the events in this case?
A. I was here for roughly five weeks.
Q. Starting -- starting mid-October?
A. Yeah. Yeah, October 12th.
Q. And could you move the microphone a little closer, if possible, or move yourself up? Thank you.
A. Is this better?
Q. Yes.
A. Oh, very good.
Q. Could you tell us generally: What was the purpose of your assignment to the Portland Metro area?
A. To assist with street arrests.
Q. And --
THE COURT: It was to what?
THE WITNESS: Assist with street arrests.
THE COURT: Okay.

BY MR. RATCLIFFE
Q. And what does that mean?
A. It means to conduct enforcement actions for the Enforcement and Removal Operations Division of ICE.
Q. And were you assigned to something called Team 7 in your -- during your time here?
A. I was.
Q. And roughly how many people were on Team 7?
A. It varied, but between nine and 12.
Q. I'd like to direct your attentions to October 30th -- direct your attention to October 30th of this year. Were you working that day?
A. I was.
Q. Where did you and your colleagues decide you were going to muster or meet up that morning?
A. Some location north of Woodburn, Oregon.
Q. And roughly what time did things start that morning? What time did you get there at least?
A. We got there probably around 4:45, 5 o'clock, maybe earlier.
Q. And what, if anything, was going to guide your enforcement activities that day in terms of information or intelligence?
A. Well, we would get intelligence from the field office, target packages, things to that effect.
Q. Tell us what -- just in general, what is a target package?

A. It can be as simple as a name and an address and, you know, basic immigration violations or suspected criminal violations.

Q. Suspected criminal violations by someone with an immigration history or someone who's not a United States citizen?

A. That is correct.

Q. And do you recall, on the morning of October 30th. Whether your team was guided by information and target packages? Or were you without that sort of baseline information that day?

A. As far as I remember, we were given some intelligence to go to various addresses throughout Woodburn that had an immigration nexus.

THE COURT: An immigration what?

THE WITNESS: Nexus.

THE COURT: What does that mean?

THE WITNESS: It's a --

MR. RATCLIFFE: If I could, Your Honor, may I try to clarify with questions?

THE COURT: Well, I mean, first, I'm just interested in what -- we're talking about a two-phrase term, "immigration nexus." Tell me what that means when you use it.

THE WITNESS: So when -- when I use the term "immigration nexus," it means that there's some sort of

connection between immigration law, which I enforce, and where we may find those subjects or those targets.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. And did the events that we're going to talk about today, did those start with your first sort of activity or operation that morning on October 30th?

A. It was the first activity we were doing that morning, yes.

Q. All right. So if we start talking about --

THE COURT: So I -- so hold on a second.

I'm having a hard time understanding. So please make sure you're speaking clearly and loudly enough so the microphone picks up, Agent D.R. And I know there was a little bit of talking over one another, and that's fine. We don't have a court reporter to -- to stop you, though, which also means I want to make sure our record, however, which is audio recorded, will be as -- as complete and thorough as it -- as it -- as it needs to be for the -- for this case.

MR. RATCLIFFE: Understood, Your Honor.

THE COURT: Thank you.

BY MR. RATCLIFFE

Q. Did the events that led to the arrest of petitioner start with your and your team's first activity that day?

A. It was the first activity.

Q. All right. So if we start in the morning then to -- to

start your day, we're not missing anything. We're going to be talking about your first enforcement operations that day; is that correct?

A. Yes.

Q. Okay. To set the scene generally for us -- and I'm not going to ask you to use initials because -- or names at this point, but can you give us a sense of how many officers or agents were working directly with you and in how many vehicles that morning?

A. There were roughly five officers and agents with me. And we were divided between -- between three and four vehicles.

Q. And where did you first report to that morning as part of your investigation?

A. As part of the investigation, we started at an apartment complex.

Q. And do you know what city that was in?

A. It was -- it was in the Woodburn area.

Q. And when you say an apartment complex, just to orient everyone, are we talking about a high rise, low-rise apartments? Can you give us a sense of the scene in terms of what these apartments were?

A. It was -- there were several apartment buildings, roughly two to three stories each.

Q. And were you riding with anyone that day?

A. I was with another officer, an ICE officer.

Q. Can you give us that officer's initials?
A. J.A.
Q. And what did you and J.A. do when you first got to the apartment complex? Were you involved in investigative activity?
A. We began running license plates that were in plain view in the apartment complex.
THE COURT: Why did you identify that apartment complex as a location to run license plates?
THE WITNESS: That came from the intelligence passed down from the field office.
THE COURT: The intelligence what? I didn't catch that. Intelligence?
THE WITNESS: From the field office.
THE COURT: Oh, intelligence from the field office. And the field office is where?
THE WITNESS: In Portland.
THE COURT: Okay.
BY MR. RATCLIFFE
Q. Is it fair to say that it's your understanding that one of the targets you were sent out to look for that day lived in that apartment complex?
A. Yes.
Q. And so when you arrived at the apartment complex and you started running plates, what was the purpose of that?

A. To try to tie a vehicle to the potential target.

THE COURT: And what was unique about this potential target that the intelligence from the field office provided to you?

THE WITNESS: We didn't have a vehicle, so we needed to try to identify a vehicle in order for us to follow the target or locate the target.

THE COURT: Did you have a -- you had the target's name?

THE WITNESS: I don't remember the details of the target package that we received.

THE COURT: So you don't remember if -- if the target package included a name of an individual?

THE WITNESS: I don't remember the name, if we were given one.

THE COURT: Any individual? Any name?

THE WITNESS: I believe there was a name, but I can't remember the target package or the details exactly.

THE COURT: All right. How -- how would you have been able to otherwise connect an individual with a license plate?

THE WITNESS: Well, we would have had that in the intelligence.

THE COURT: The name?

THE WITNESS: A name.

THE COURT: And anything else?

THE WITNESS: Description, criminal background.

THE COURT: And do you know what the criminal background was of this individual?

THE WITNESS: I don't remember.

BY MR. RATCLIFFE

Q. So at some point that morning, did -- and I'm sorry. Let me back up.

I can't remember if I asked you: How many vehicles were you and the officers operating in?

A. Three or four.

Q. Okay. And were -- sorry, go ahead.

A. Those were the ones that we were immediately with at that apartment complex.

Q. Understood.

And how were you and your fellow officers, in this three- or four-vehicle sort of unit, communicating?

A. We had a joint telephone call where it was essentially a conference call. Each car would have a phone on speaker.

Q. At some point, around 5:30 that morning, did a white van come onto the radar in some way and get the interest of your enforcement team?

A. Yes.

Q. Can you tell us how?

A. The -- another officer, who was more embedded into the

apartment complex, watched the van come into the apartment complex and pick up a person or multiple people -- I can't remember the details of it -- from what we suspected our target was housed in.

Q. And in terms of what you remember -- and there will be other testimony -- but in terms of what you remember, did you learn anything else at that point about the van or why it got on the radar of your colleagues?

A. So somebody in our team ran the plates, and at that point we discovered that the van was registered to somebody who had both an immigration nexus and a criminal history.

THE COURT: I need to explore because you're using terms that might be very familiar with people in law enforcement, but not for me. You used the term "nexus -- immigration nexus." And I think you earlier said something about immigration nexus means some sort of connection to immigration and maybe some -- some other -- some other component. What are those some other connections that create a nexus?

THE WITNESS: They would be -- they had some sort of interaction with an immigration official or an immigration agency in the past.

THE COURT: Okay.

THE WITNESS: So they either, you know -- I don't want to give too many examples, but they had some sort of

contact or record with an immigration agency.

THE COURT: And that could be at a border?

THE WITNESS: It could be at a border.

THE COURT: And -- or it could be having some kind of a hearing?

THE WITNESS: It could be an immigration hearing.

THE COURT: And what was typical of the kinds of connections that come up and -- and -- and create a nexus for the purposes of -- of identifying targets?

THE WITNESS: They would -- you know, they would -- they would have some sort of record in an immigration system.

THE COURT: Okay. All right.

BY MR. RATCLIFFE

Q. When you use the term "immigration nexus," is that a term that you would apply to someone who is a United States citizen either by birth or by naturalization?

A. No, unless they immigrated to the United States and did naturalize.

Q. Thank you.

THE COURT: So say -- I want to make sure I understood. So someone who immigrated to the United States and naturalized would have an immigration nexus?

THE WITNESS: Yes.

THE COURT: All right. And by that same token, I presume then that an immigration nexus would be, well, created

or triggered if they were not a naturalized U.S. citizen but were here in the country legally?

THE WITNESS: I'm sorry. Can you say that again, sir?

THE COURT: Yeah. So somebody who isn't a naturalized citizen but was here legally, that would also create an immigration nexus?

THE WITNESS: Yes.

THE COURT: Okay. And -- well, go ahead, Mr. Ratcliffe.

BY MR. RATCLIFFE

Q. Were you able to observe the van picking anyone up?

A. I personally did not.

Q. And why is that? Where was your vehicle?

A. We were located at a different area in the apartment complex.

Q. And after the vehicle got on the radar and after you learned that apparently the registered owner of that vehicle had an immigration nexus and, as you mentioned, a possible criminal history, what happened next?

A. One of the officers who observed the van began following the van and calling out directions of travel so that other officers could close the gap, so to say, and assist with a potential traffic stop.

Q. And did you --

THE COURT: I want to make sure I follow the sequence. The plates were run on this white van; is that right?

THE WITNESS: Yes.

THE COURT: And the plates are what triggered the immigration nexus?

THE WITNESS: The plates came back to a registered owner who had both immigration nexus and criminal.

THE COURT: Okay. Did -- were -- was there some ID of the owner of the vehicle at that time, when -- when you saw the van move into the apartment complex?

THE WITNESS: Was there an ID of the --

THE COURT: Were you able to identify the owner by sight or by whatever descriptive characteristics?

THE WITNESS: Personally, no.

THE COURT: Did anyone else in the team do so?

THE WITNESS: I can't speak for them. I don't know.

THE COURT: Okay. So it was identified by plates only?

THE WITNESS: That is what draw -- that's what drew our curiosity to the van.

THE COURT: Okay.

MR. RATCLIFFE: Your Honor, we'll have other evidence on this issue as well.

THE COURT: All right. And is this -- is this part

of the discovery issue about the -- the content of this intelligence -- or this target package --

MR. MANNING: Yes, Your Honor.

THE COURT: -- that is in -- that might be ongoing -- it might be an ongoing dispute --

MR. RATCLIFFE: Your Honor --

THE COURT: -- that we have to resolve?

MR. RATCLIFFE: -- my understanding is that there was an operational name for the group of -- for the -- for the operation that brought agents from around the country to Portland. And that operational name was put into reports --

THE COURT: When you say "operational name," are we talking about a person or --

MR. RATCLIFFE: No, I'm sorry. Operation Fortifying the Border is used generally to describe this movement of officers to the Portland area during mid to late October.

THE COURT: All right.

MR. RATCLIFFE: And opposing counsel has asked for information indicating whether Operation Fortifying the Border somehow was connected to or whether there was a plan or connection in advance to the petitioner's arrest. And it's our belief, Your Honor, and our position that -- that petitioner got on the radar not in connection with any intelligence or any information that was provided in connection with Operation Fortifying the Border, but instead through happenstance in the

investigation that we're talking about the very beginnings of now.

THE COURT: Well, without knowing what the parameters of Operation Fortifying the Border are, how -- how can the petitioner know that?

MR. RATCLIFFE: Well, Your Honor, I'll let my co-counsel speak to the exact request for production at issue here. It is, I believe, more technical than maybe I've described it. But --

THE COURT: We can probably save that for after this witness is done. I don't know if he needs to sit up here for, I'm sure, the duration of our conversation. Let's get back to testimony.

MR. RATCLIFFE: Understood.

THE COURT: And then we can return to this because it sounds to me like that's a -- that's another -- another issue we'll take up in the course of this litigation.

BY MR. RATCLIFFE

Q. Did the van make more stops?

A. I didn't witness any. I did hear over the phone call that we were having that it -- it made a stop, at least to pick up somebody.

THE COURT: Did the target that you went to the apartment complex for come out and enter the vehicle?

THE WITNESS: I don't remember who -- who the target

was at the time.

THE COURT: I mean, was there any sort of chatter on -- on the conference call that the target that the intelligence package identified entered the vehicle? Nothing like that, that you remember?

THE WITNESS: I don't remember anything to that effect.

MR. RATCLIFFE: We'll have other evidence on this, Your Honor.

THE COURT: Okay. Will the target package be part of the evidence?

MR. RATCLIFFE: Your Honor, there -- there will be testimony about the information -- there will be testimony about it. I'm not sure at what level of detail we'll have that.

THE COURT: Okay. Does the target package -- I presume it exists, since we're talking about it, so --

MR. RATCLIFFE: Your Honor --

THE COURT: -- does the U.S. Attorney's Office have access to it?

MR. RATCLIFFE: No, Your Honor. The term "target package" does suggest that there is maybe a document or a paper or an envelope or something. That's a very loose term, sort of like "immigration nexus." It's a term of art that really can mean, in my experience, Your Honor, a set of information, a set

of addresses, names, et cetera, that were used and run through or tested on any given day and that were not memorialized.

THE COURT: We are a civilization based on recordkeeping. The idea of memory and oral history is something that I'm not sure we're necessarily committed to by -- by practice or memorization. So I certainly presume there's going to be some documents to help establish and confirm what this target -- or this target package would've comprised.

MR. RATCLIFFE: Your Honor, it's -- I think what we're going to demonstrate is that this was just the first step in a series of steps that led to the petitioner and the van being identified, the petitioner's -- the van that she was traveling in.

So it's not our contention -- it's never been our contention that the petitioner was a target or was part of any target package. And so --

THE COURT: But what if I were to find that the basis upon which this target package was executed lacked reasonable suspicion? I mean, I'm -- and I'm not suggesting that I'm -- I've made that finding. I don't have evidence of this. But this ambiguity, this -- this sort of technical speak, you know, suggests something -- that there's something more than what now you're explaining to me doesn't exist.

I mean, if there is no package, there are no

documents -- there may be some protocols, but I'd like to know what those specific protocols are so I can even determine -- I can determine why they even went to this particular apartment complex to trigger this particular operation. I mean, it seems to me that having reasonable suspicion does matter at that stage, doesn't it?

MR. RATCLIFFE: Your Honor, I would suggest if this were -- if we were doing a motion to suppress hearing -- I think the analogy may be is if we were presenting our case in chief at trial, that this is the kind of thing that we would discuss with the Court at a Rule 29.

We're at the very beginning of the presentation of our evidence. I have not asserted that this agent -- that this witness will be able to provide all the information that the Court is interested in, and I hope that we can just come back to that at some point.

THE COURT: Fair enough. I'll put a pin in it. How's that?

MR. RATCLIFFE: Thank you, Your Honor.

THE COURT: All right. But I can't guarantee I won't ask you more questions, D.R., so -- but do your -- you know, take your best shot, and we'll see how quickly we can get through D.R.'s testimony.

MR. RATCLIFFE: Your Honor, the questions that you may come up with along the way may be disappointing, but I'm

trying to fill in as many blanks as I can with this witness as we move through.

THE COURT: I'll also offer part of my concern is that I don't want to get through all of the witnesses, not ask questions, but then be left at the very end with a -- I didn't get anything to help me understand the landscape. So the reason I'm asking questions now -- I can appreciate that they could be far too early, and you have -- you have a theory of how you want to present the narrative.

But since I don't know what that looks like going forward, I'm trying to fill in the blanks before I don't have the opportunity to have witnesses to come back and answer those questions for me. So I will try to -- I'll try to restrain myself a bit.

MR. RATCLIFFE: Understood, Your Honor.

BY MR. RATCLIFFE

Q. Approximately how many minutes was it between when the white van got on your team's radar and the time that you understood that a traffic stop was going to be attempted on it?

A. No more than ten, I don't think.

Q. And how far do you believe the van had traveled from the -- from the time it, as I said, sort of got on the radar as a vehicle of interest and the traffic stop actually taking place?

A. A couple miles.

Q. And am I correct that the officer who decided to initiate the traffic stop is the officer whose initials are J, as in John, and B, as in bravo?
A. That is correct.
Q. I'd like to talk to you about what happened during the traffic stop. Where did your vehicle end up during the traffic stop?
A. In front of the van.
Q. And what did you do then to assist with the stop after your vehicle was at a standstill?
A. I got out of my vehicle and proceeded to the passenger side of the vehicle that we had stopped. I then looked into the van, using my flashlight because it was dark, and I saw multiple people in the van.
Q. At this point, knowing what you knew about the apparent information regarding the registered owner of the van and the fact that the day -- the time of day it was, and then encountering this vehicle with multiple people inside, did you have concerns about what was maybe going on with this van in terms of either illegal activity or victims?
A. So when I was able to shine my light in and see multiple people in the van, this is a very common thing to come across in human trafficking or some kind of forced labor. And I was concerned that the people in the van were potential victims.
Q. And why is that? Why is it a common thing in human

trafficking to find people at a van -- in a van at that hour?

A. They're often placed under duress because of their immigration status and -- and held -- well, forced to work or, you know, used for labor exploitation purposes.

Q. So you had concerns about whether these folks were being -- whether there was someone engaging in forced labor taking these folks somewhere at that hour?

A. Yes.

THE COURT: Is -- is one of ICE's charges to investigate human trafficking?

THE WITNESS: It is one of the missions of DHS.

THE COURT: All right. Was there anything in the target package that indicated that the person that you were looking for or hoping to identify was in any way associated with an immigration nexus that would have brought up concerns about trafficking humans?

THE WITNESS: Other than the fact that the potential target -- potential target was an immigration violator with some sort of criminal nexus, it leads me to believe, as an officer, that they might -- there's potential for them to be involved in human trafficking.

THE COURT: Now, in these -- in these packages, does it provide the factors that make up the nexus?

THE WITNESS: If they have that information.

THE COURT: All right. So it could be as -- just a

simple -- simple statement that there's an immigration nexus; and that, alone, would -- would give you concern for trafficking?

THE WITNESS: If we know the immigration nexus, what the immigration nexus is, is what we would find in the target package.

THE COURT: And I just want to confirm: Was there anything in this target package that -- that identified the target as someone associated with or -- or for which you might have reasonable suspicion about trafficking other people?

THE WITNESS: Unfortunately, I don't recall the details of the target package.

THE COURT: In what form did you -- did you see this target package? Or is it conveyed to you orally?

THE WITNESS: It can be conveyed to me orally.

THE COURT: Well, was this one conveyed to you orally?

THE WITNESS: I believe, but I don't really recall the details.

THE COURT: So you wouldn't know whether you read a memo that was a target package or received instructions orally about what -- what comprised this target package on this -- on this day?

THE WITNESS: I don't think I did. We get a lot of target packages through these kinds of operations. It's hard

for me to keep track of.

THE COURT: Did you review anything in preparation for your testimony today?

THE WITNESS: I reviewed some of the information that I had.

THE COURT: What information is it that you have?

THE WITNESS: I -- I did not have anything in a physical or electronic --

THE COURT: You did not have --

THE WITNESS: -- format.

THE COURT: -- anything that was physical or electronic?

THE WITNESS: Correct.

THE COURT: So what did you review? I thought I heard you say that you reviewed anything that you had.

THE WITNESS: Yeah. It was a -- just if I had had anything from that day, a communication, you know -- you know, e-mails, that kind of thing, I would've looked at them in preparation for this testimony to see what I --

THE COURT: Did you look at them?

THE WITNESS: I did not have anything in electronic format.

THE COURT: Okay. Well, did you have anything in paper format -- physical paper format?

THE WITNESS: No.

THE COURT: So I just want -- I need to loop back. I just need to understand whether you reviewed anything in preparation for your testimony today. And I heard you say that you didn't review anything in digital format. Did I hear correctly?

THE WITNESS: I reviewed my records to see if I had anything in digital format.

THE COURT: Okay. Okay. And did you have anything in digital format to review?

THE WITNESS: Nothing.

THE COURT: Okay. I'm not trying to make this any harder, but I'm not sure I'm following the responses. I just need to know: Have you reviewed anything in preparation for your testimony today? Whether it's in digital format, in paper format, any kind of format, did you review something to prepare for your testimony today?

THE WITNESS: I reviewed the body cam footage --

THE COURT: Okay.

THE WITNESS: -- from the event.

THE COURT: The body cam footage -- well, you may not have seen it, but some body cam footage that showed the contact with the van?

THE WITNESS: Yes.

THE COURT: All right. And did you review anything else?

THE WITNESS: Some policies.

THE COURT: Okay. And which policies did you review?

THE WITNESS: An ICE policy regarding vehicle stops and detention of aliens.

THE COURT: Okay. Anything else?

It's important for me to have a complete record, and that's why I follow up with "Is there anything else?" So I really want to make sure that later, if you say that you reviewed something else, but you didn't tell me now --

THE WITNESS: Right.

THE COURT: -- that becomes a credibility problem. And I'd rather not have a credibility problem here.

THE WITNESS: I -- I would prefer not to have a credibility problem as well.

THE COURT: I'm on board with you. So is there anything else that you reviewed?

THE WITNESS: Anything that I reviewed, I would've handed over in discovery. I -- I did review the text message string that I believe is part of the -- the --

THE COURT: Did you say text string?

THE WITNESS: I believe there's a text message string.

THE COURT: Okay.

THE WITNESS: Yeah.

THE COURT: Between you and who?

THE WITNESS: I'm included on it. I did not, you know --

THE COURT: You didn't initiate it, but you're included on it?

THE WITNESS: Correct.

THE COURT: All right. And so what is -- what was the purpose of this text string?

THE WITNESS: It was just one of the formats that we communicated in.

THE COURT: On that day, on October 30th?

THE WITNESS: Yes.

THE COURT: Okay. What did -- did it include other members of the team?

THE WITNESS: Yes.

THE COURT: Team 7?

THE WITNESS: It included Team 7.

THE COURT: Okay. All right. Go ahead, Mr. Ratcliffe.

MR. RATCLIFFE: Produced in discovery, Your Honor.

THE COURT: Thank you.

BY MR. RATCLIFFE

Q. What was your understanding of the area where you were operating in terms of one of the common vocations or professions of folks who live in the Woodburn area?

A. That it's often agricultural workers and manual laborers.

Q. And based on your training and experience, did your encountering a van with multiple people in it at this hour in the morning, in an agricultural area, give you any concerns or lead you to believe -- lead you to any possible conclusions about what was happening that might be relevant to your job?

A. It appeared to me that they might be going to work, whether that's -- whether or not they have authorization to do that or not, or whether or not they're doing that under duress. Generally, criminal activity happens under the cover of darkness.

Q. And in your training and experience, is it -- are -- is agricultural work one of the work -- one of the types of work, at least in areas that are agricultural communities, that people without status or permission to work legally end up doing in order to get by?

A. That is a -- a common activity that they do to get by.

THE COURT: Did you see any other people getting into the vehicle wearing anything or -- that suggested agricultural work or having any tools in hand?

THE WITNESS: I did not witness anybody get into the van.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. Tell us what happened during the traffic stop with the driver of the vehicle.

A. As far as I recall, the contact officer gave several commands. The driver refused to comply with the commands and --

THE COURT: And what command was it?

THE WITNESS: Commands to open the window.

THE COURT: Okay. And how much time do you give somebody to comply with the command to open a window?

THE WITNESS: It's circumstantial. There's no set time.

THE COURT: Okay. Do the policies suggest some -- some direction?

THE WITNESS: Not to my awareness.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. What happened as a result of -- did the driver comply with those demands, requests?

A. The driver did not comply.

Q. Was he given, as far as you remember, at least two warnings to open the window?

A. At least two.

Q. And what eventually happened?

A. We proceeded to -- well, the contact officer proceeded to break the window, unlock the door, and order the driver out of the vehicle.

Q. What are -- what goes into a decision like that, to break

a window, if there's a driver who's been pulled over in a traffic stop who is not complying by, for example, opening the window or opening the door?

A. Well, they're not being compliant with a lawful order.

Q. And what is the danger?

A. Well, they could potentially run us over if they're still in the driver seat. And vehicles are -- they can be deadly.

Q. And, by the way, what were you wearing that day? What type of uniform, if any?

A. I was wearing a tactical vest with police markings and my badge displayed, as well as police markings on the back of me.

THE COURT: And when you say "police markings," can you be more specific? What police markings?

THE WITNESS: It is a placard that indicated I was police.

THE COURT: So it actually said the word "police"?

THE WITNESS: Yes, sir.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. So did you go over to the passenger-side door on the -- on the back area of the van, those doors that open up to allow people in and out?

A. I would -- I would float back and forth between the passenger -- the front passenger and the rear passenger doors, so I could get a better view on all the occupants in the

vehicle.
Q. And why was it important to get a view of the occupants of the vehicle?
A. There were multiple occupants in the vehicle, so many that we were outnumbered by the number of occupants. And I could not see their hands at the time, and that is a safety concern for me as an officer.
Q. And did you hear your fellow officers giving instructions?
A. I did hear instructions, yes.
Q. Did you give any instructions?
A. I told the passengers to -- I -- in my limited Spanish, I told them to show me their hands.
Q. And what were your fellow officers saying, what instructions? I skipped over that part.
A. He told them to exit and to show them our -- or to show us their hands.
Q. And are you thinking of a specific officer who speaks Spanish?
A. Yes.
Q. And is that -- are those officer's initials C.M.?
A. Yes.
Q. So did you have a chance to -- when you were standing by the doors on the passenger side, did you have a chance to determine whether the folks -- what language the folks in the van were speaking?

A. I heard Spanish.
Q. Did you participate in bringing folks out of the van?
A. I did.
Q. And were they put in handcuffs?
A. They were.
Q. Why is that?
A. For officer safety.
Q. Can you be more specific?
A. Certainly. We gave several commands for the individuals in the vehicle to show us their hands and to exit the vehicle, and they were resistant to that. They did not comply very quickly or in any form or fashion. So I could not see anybody's hands, which is a concern for me as an officer.
So when we did decide to pull them out of the vehicle, we placed them in handcuffs because we did not know what level of compliance we were dealing with once they got out of the vehicle.
Q. At some point after people were out of the van, did someone take off running?
A. Yes.
Q. Tell us about that.
A. We were -- we had the individuals from the van sat down along a wall. And we moved -- other officers on scene moved two of those individuals in cuffs into a vehicle. At the same time I was moving another subject into the vehicle that I had

been occupying before.

And, as I loaded that individual into the back of our vehicle, I heard a horn honking and some yelling. I turned to look at the horn honking and other commotion and looked back at my vehicle and saw that the individual who had been cuffed and had loaded into my vehicle had got himself out of the vehicle and began fleeing down the street, at which point I took chase.

Q. Did you catch him?

A. I did.

THE COURT: He was handcuffed?

THE WITNESS: Yes.

THE COURT: And by -- at this point was everyone handcuffed?

THE WITNESS: Yes.

THE COURT: All right.

BY MR. RATCLIFFE

Q. Did you later learn what the cause was of the honking in the other vehicle?

A. Yes. I learned, once I returned, that the individuals in that vehicle were attempting to get into the front seat and escape.

Q. I think you may have said "individuals." Do you mean one person or two people?

A. There were two people in that vehicle. And from what the other officers had told me, both of them were attempting to

escape.

Q. And at this point, as things are developing, and you had heard honking in another vehicle and the -- one of the folks who you were in charge of ended up taking off and running, what did that tell you, if anything, about what might be going on with this group of people?

A. That this group of people did not want to be involved in law enforcement or engaged with by law enforcement.

Q. And did you think that maybe the honking was designed to be a distraction to allow one of them to escape?

MS. GARCIA ORJUELA: Objection. Leading.

THE COURT: Sustained.

BY MR. RATCLIFFE

Q. What concerns did you have as a result of your -- did you have concerns about whether there was more going on here than you first understood when you approached the scene, based on what happened with the honking and the attempted escape?

A. So my experience at the time was we have honking from another vehicle after a history of noncompliance from all the individuals in the vehicle. So there was -- there was no compliance inside the van. We gave them commands. They did not comply.

We pulled them out. They were in cuffs. And -- and then there was commotion. And it seemed to me to be a concerted effort to divide us, to divide the officers'

attention, and create an opportunity for others to flee, which one did attempt to flee.

Q. And what did that concern about a team effort -- or a "concerted effort," I think is your word -- what did that do in terms of your suspicions about whether there was illegal activity afoot, for lack of a better term?

A. It made me suspicious that they were attempting to evade law enforcement and engaging with us.

THE COURT: Did you hear any of other -- well, when you heard the horn honking -- and I think you said you saw the person you had placed in your vehicle run; is that right?

THE WITNESS: Yes.

THE COURT: Did you happen to see any of the other people who were detained in handcuffs sitting on the ground move?

THE WITNESS: I did not. I was focused on the runner.

THE COURT: Okay. And after that particular incident, did any of your colleagues describe seeing any of the people sitting on the ground in handcuffs move when they -- when the horn -- when the horn was honking?

THE WITNESS: I didn't hear about anything other than --

THE COURT: Okay. Did you -- did you hear any of the people sitting on the ground talking with one another, either

before or after the horn went honking?

THE WITNESS: I can't remember. Oh, I wasn't really over in that area any longer. I had taken my individual to my vehicle. I had stepped away from that lineup. So they were out of earshot at that point for me.

THE COURT: All right. Mr. Ratcliffe.

BY MR. RATCLIFFE

Q. At that point, based on the information available to you, what concerns, if any, did you have about whether the people in that van were -- because they had given you indication that they were trying to evade law enforcement, what concern did you have about everyone and their status in terms of whether they were legally in the United States?

A. I had concern that since the driver was -- we had identified the driver as being an immigration violator, that the other individuals in the van were immigration violators as well.

Q. Well, let me ask you -- you identified the driver or you identified the registered owner of that van?

A. Oh, we had stopped the van. And we identified the driver, and he -- he came back with arrestable immigration violation.

Q. Okay. Meaning on the scene, after he was taken out of the van?

A. Yes.

Q. I'm sorry. I misunderstood. So could you tell us again,

because I interrupted you, tell us what information led you to be concerned about the immigration status of the folks in the van.

A. They were -- they were not -- they were not complying to commands in English. They weren't communicating in English. And they -- I'm sorry. I'm losing my train of thought. So --

Q. That's fine. And the --

A. -- my main concerns is that they -- they had been in a van with an immigration nexus, and they were resistant to immigration enforcement. We had identified ourselves as immigration, and they were refusing to comply with us. And --

THE COURT: And when you say they were refusing to comply, what were they doing?

THE WITNESS: They were not showing me their hands.

THE COURT: They weren't showing hands? Where were their hands?

THE WITNESS: They were, you know, hiding behind seats, in their --

THE COURT: Okay. And that would be evident on the body cam?

THE WITNESS: I believe it is evident on body cam.

THE COURT: Okay. And what else were they doing that you believe was noncompliant?

THE WITNESS: They -- we asked them to produce identification. They refused to do that. We asked them to

exit the vehicle. They refused to do that.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. And so, just to clear up the testimony again -- I apologize if I created this confusion -- you and your colleagues determined on scene, after the traffic stop, that the -- what did you conclude about the driver after you got him out and identified him?

A. That he was an immigration violator and needed to be arrested.

THE COURT: Was he the registered owner of the vehicle?

THE WITNESS: I don't recall.

THE COURT: Would that have been confirmed or determined at the time of the stop?

THE WITNESS: I did not run those checks, so --

THE COURT: Okay. Did somebody -- do you know if somebody did?

THE WITNESS: Somebody on our team, yes.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. Can you tell us what Mobile Fortify is?

A. Mobile Fortify is an application that we use on our government phones to identify individuals who have an immigration nexus.

Q. And how does it work, roughly, basically?
A. You use facial recognition.
Q. So it's a database that allows you to use your mobile phone; hold it up to the face of someone who is a potential immigration violator; and then, using facial recognition technology, they try -- the application tries to identify that person quickly?
A. Yes.
Q. Is it -- in terms of the tools you use to identify someone, the whole spectrum, tell us where that falls and what other tools you and your colleagues use to identify someone.
A. So we use Mobile Fortify, and then we use another system called UPAX. And we can run names and dates of birth, passport numbers, that kind of identifiable information to get anything immigration related and criminal related.
THE COURT: What databases does the Mobile Fortify use to be able to conduct facial recognition?
THE WITNESS: I'm not certain on the technical aspects of it.
THE COURT: Okay.
BY MR. RATCLIFFE
Q. Is it a -- is Mobile Fortify essentially a triage application that allows you on scene, if you don't have an identifying -- if you don't have an ID from someone, to try to, as I said, triage when it comes to identifying who a person is?

A. Yes.
THE COURT: And what's the rate of identification with Mobile Fortify?
THE WITNESS: I -- I can't speak to that number.
BY MR. RATCLIFFE
Q. Does Mobile Fortify, when it is used, does it produce on the screen for the user a percentage level of confidence, with respect to the person who is trying to be identified, and the match that the system thinks it's made for that person?
A. I haven't used it enough to give a good answer on that.
Q. Okay. And you all, of course, have at your disposal as well fingerprint collection systems, correct?
A. Yes.
Q. And are those typically done -- are fingerprints typically taken these days using an optical system, not the old days of ink and rollers?
A. Optical system, yes.
Q. And are optical systems available in the field, or is that something that's done at an office?
A. At an office.
THE COURT: Before we get too far along in -- in Mr. Ratcliffe's testimony, although I suppose your comeback will be, "Well, I haven't gotten very far" --
MR. RATCLIFFE: Your Honor, I was about to turn to my co-counsel and ask whether she had anything else and was going

to --

THE COURT: All right. Well --

MR. RATCLIFFE: -- pass the witness.

THE COURT: Then before we -- before -- well, at the risk of creating another line of questions that Mr. Ratcliffe may want to ask you, there was a line of questioning about the bases for reasonable suspicion. And I want to make sure I understood. Did you say that one of the things that you consider is whether somebody speaks English or not?

THE WITNESS: Yes, if they don't respond to commands in English.

THE COURT: So if they don't respond to commands in English, then what do you -- what conclusion do you draw from that?

THE WITNESS: It's an -- it's an indication to me, as an immigration officer, that they are -- they have a potential to -- to not have status in the United States or to at least some sort of immigration status.

THE COURT: And is that -- does that satisfy the -- your understanding of reasonable suspicion?

THE WITNESS: It is merely a factor.

THE COURT: Okay. Among other factors?

THE WITNESS: Yes, sir.

THE COURT: And what if they speak English with an accent?

THE WITNESS: That wouldn't be a factor to me.

THE COURT: That would not be considered a factor?

THE WITNESS: Not to me.

THE COURT: Okay. To other officers?

THE WITNESS: I can't speak for other officers.

THE COURT: Well, are there policies that provide some guidance on this?

THE WITNESS: No, as far as I know.

THE COURT: Okay. Go ahead, Mr. Ratcliffe.

BY MR. RATCLIFFE

Q. We were talking earlier about the attempts to escape and maybe the distractions and the team effort. Did those things raise any concerns in your mind with respect to the other people on scene who were not involved, as far as you know, in creating a distraction, if that's what they were doing, or in attempting to escape? In other words, did that history raise your concerns about the other folks on scene and what they might do or not do?

A. Yeah. So it's -- it's been pretty well reported, and it's been my experience while in the Portland area, that oftentimes people who are not involved in the arrest like to show up at the arrest and attempt to distract the officers conducting an arrest and enforcement action.

So, as an officer, I had concerns that there were -- there was potential for civilian population to show up and try

to interfere with our enforcement activity.
Q. I asked you a confusing question, and I apologize.
A. Okay.
Q. What I was trying to get at is, for the -- of the folks you removed from the van --
A. Mm-hmm.
Q. -- who were out and in some form of custody, did you have concerns about what they might do or not do, based on the other experience that you had with people in the van who did the other things that we were talking about?
A. Absolutely.
Q. Can you explain?
A. I -- I was concerned that, while it's not guilt by association, it is, in fact, indicative of, you know, them potentially communicating and conducting a concerted effort for everybody who we were in contact with to try and evade our arrest or our -- you know, evade our attention.
MR. RATCLIFFE: No further questions, Your Honor.
THE COURT: Mr. Manning, Ms. Garcia Orjuela?
MS. GARCIA ORJUELA: I will take it, Your Honor.
THE COURT: All right. And double-check the mic, make sure that it's --
MS. GARCIA ORJUELA: Yeah, I'm --
(Whispered discussion, off the record, 2:58 p.m.)
MS. GARCIA ORJUELA: Is this one better?

THE COURT: Yeah, I think so.

MS. GARCIA ORJUELA: Okay. I think it's the mic.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA

Q. Okay. You established that you have been, in total, working with ICE for four years, correct?

A. Roughly.

Q. You mentioned that you speak some level of Spanish, correct?

A. It's very rudimentary.

Q. What certifications do you have?

A. I attended a -- what is it called? -- a deportation Spanish program as part of my academy as a law enforcement officer, as a deportation officer.

Q. You mentioned that the driver was not the target, correct?

A. I don't believe that I mentioned that.

Q. Was the driver the target of the operation?

A. The operation --

Q. The operation that you conducted on October 30th.

A. I -- I don't remember the target package or the exact target information.

MS. GARCIA ORJUELA: Okay. Your Honor, may I approach to deliver the evidence packet?

THE COURT: You may.

THE WITNESS: Is this being delivered to me?

THE COURT: Yes.

THE WITNESS: Okay.

THE COURT: And there may be questions that she'll refer to the -- the documents in that package.

THE WITNESS: Okay.

MS. GARCIA ORJUELA: That is correct, Your Honor. Thank you.

BY MS. GARCIA ORJUELA

Q. May I please turn your attention to Exhibit 102. You can see it on the screen, whatever is easier for you.

This -- do you recognize this text thread?

A. Yes.

Q. Were you part of this text thread?

A. Yes.

Q. Can you tell me if the address there was the address of the apartment complex that you were on -- on October 30th?

A. I don't remember exactly the addresses that we were at.

Q. Okay. Was that text on the morning that you were performing the operation?

A. Yes.

Q. There is a comment that says, "Target rich here." What does that mean to you?

A. To me that means that we had run multiple license plates in that target apartment area, and we identified several vehicles with registered owners who had either a criminal or

immigration nexus.

THE COURT: How many?

THE WITNESS: I couldn't speak to an exact number, but it was multiple.

BY MS. GARCIA ORJUELA

Q. Why did you choose a white van?

A. It was actively moving at the time.

Q. Okay. May I turn now your attention to Exhibit 109.

Have you ever seen a document like this before?

A. Yes.

Q. Can you turn to page two?

On the third paragraph, the -- from the -- the third line starting from the bottom, can you read -- after it starts "consensual encounter, the subject proceeded to" -- can you read that, please.

A. The last sentence here?

Q. The last sentence, correct. The two last sentences.

A. Would you like me to read it aloud?

Q. Yes, please. Read it into the mic.

A. "The subject proceeded to comply with commands, but would not give her ID or name. Subject was advised she was under arrest for immigration violations."

MS. GARCIA ORJUELA: Thank you. No further questions, Your Honor.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. RATCLIFFE

Q. Do you know who wrote that?

A. I don't know who wrote that.

Q. Do you know if the person who wrote that was on scene?

A. I don't think that they were, but I don't know.

THE COURT: What -- how would you know from reading this report that they -- that -- that you don't think that they were on the scene?

THE WITNESS: Well, I don't know who wrote this, so I don't know if they were on scene or not. But my experience was not that.

THE COURT: Your experience was not what?

THE WITNESS: That the -- well, that everybody complied --

THE COURT: Okay.

THE WITNESS: -- immediately.

THE COURT: Anything else, Mr. Ratcliffe?

MR. RATCLIFFE: No, Your Honor.

THE COURT: All right. And anything else from my questions?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. Is this witness going to be excused, Mr. Ratcliffe?

MR. RATCLIFFE: From the Government's perspective,

yes, Your Honor.

THE COURT: All right. Ms. Garcia Orjuela, any --

MS. GARCIA ORJUELA: Yes, Your Honor.

THE COURT: He can be excused?

MS. GARCIA ORJUELA: Yeah, he can be excused.

THE COURT: All right. So, Agent D.R., you are free to leave the courthouse. You're welcome to stay in the courtroom. However, I need to advise you, as I advised earlier, you cannot discuss your testimony with anybody who has been named as a witness and who might testify.

If you do, you run the risk of having me strike your testimony and -- and prevent others from testifying, and that won't be a good outcome. So please, I think it's to everyone's advantage and yours, in particular, to not share your testimony with anybody until this case is resolved. Okay?

THE WITNESS: I understand.

THE COURT: Thank you, sir.

THE WITNESS: Thank you.

THE COURT: You can leave that there. And you're certainly welcome to go when you're ready.

THE WITNESS: Thank you.

THE COURT: All right.

MR. RATCLIFFE: Your Honor, the Government calls C.M.

THE COURT: C.M.?

MR. RATCLIFFE: Correct.

THE COURT: All right. Thank you.

MS. GARCIA ORJUELA: Your Honor, could I please briefly ask for a bathroom break?

THE COURT: Yes. Let's take -- let's take ten minutes, and we'll return in just a few. Thank you.

MR. RATCLIFFE: Thank you, Your Honor.

(Recess taken, 3:05 p.m. - 3:17 p.m.)

THE COURTROOM DEPUTY CLERK: Court is back in session.

THE COURT: Next witness.

MR. RATCLIFFE: Your Honor, the Government calls C.M.

THE COURT: Please come up to the witness stand, and the courtroom deputy will swear you in.

THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***C.M.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please be seated.

Speak into the microphone, and please state your first and last initials for the record.

THE WITNESS: C.M.

DIRECT EXAMINATION

BY MR. RATCLIFFE

Q. Good afternoon. Could you tell us where you're employed?

A. United States Border Patrol.

Q. What's your position there?

A. I am a Border Patrol agent.

Q. How long have you been a Border Patrol agent?

A. Approximately seven years.

Q. And what did you do before that?

A. I worked for the Miami Dade Police Department in Miami, Florida.

Q. For how long?

A. Approximately three years.

Q. And let me just -- as additional background, do you speak Spanish?

A. Yes, I do.

Q. And how did you come about your Spanish?

A. I'm half Cuban.

Q. And so did you speak it growing up?

A. Yes. I grew up speaking Spanish.

Q. And where are you based?

A. In Tucson, Arizona.

Q. And did you come to Portland -- when did you come to Portland for the operation that we're going to talk about today?

A. October 23rd.
Q. How long were you in the Portland area?
A. Approximately 15 days.
Q. And what was the purpose of your coming here on a temporary assignment?
A. To assist ICE with their immigration operations.
Q. And on October 30th, were you working with a group of other officers, and roughly how many, that morning?
A. Approximately ten other officers.
Q. And as it relates to specifically the vehicle stop we're going to talk about, how many officers were involved approximately in the stop of that -- that van?
A. Are you referring to the agents -- how many officers pulled over the vehicle?
Q. Correct.
A. Or just on scene at the time?
Q. How many were involved in pulling it over?
A. Involved in pulling it over would be two.
Q. In how many vehicles?
A. One -- one vehicle, two officers. And more agents, officers, showed up after the vehicle was already pulled over.
Q. Okay. So on scene, right after it was pulled over, roughly how many officers were there?
A. Roughly five.
Q. Okay. And so is that the -- that group of five, is -- are

those the folks you were working with most closely that morning as you -- as you started your day?
A. Yes.
Q. And where did you all go to begin your investigative duties that day?
A. These are predetermined by the group supervisor (indiscernible) location.
Q. And where was that?
A. Somewhere within the Woodburn area.
Q. Was it -- what kind of -- was it a residential area?
A. No.
Q. It where did you first go then?
A. After the meeting?
Q. Yes. Sorry.
A. After the initial meeting, we went into the Woodburn area. It was residential.
Q. Was it an apartment complex?
A. Yes.
Q. And were you riding with another officer?
A. I was riding with another BPA agent.
Q. Can you give us the initials of that person?
A. A.W.
Q. And were you communicating with other officers on the team; and if so, how?
A. Yes, I was. We were on a -- one large group phone call.

Q. On speakerphone?
A. Yes.
Q. Approximately what time that morning did a white van sort of come onto the radar for your investigative team?
A. Approximately 5:00, 5:00 a.m.
Q. And did you personally observe the van --
A. Yes.
Q. -- at the beginning?
A. Yes, I did.
Q. Can you tell us how that unfolded, what you learned?
A. Yes. My partner, A.W., and I were backed into a parking space within the apartment complex. And we noticed the van drive past us.
Q. And how did this van -- how had it been identified and -- in terms of something that was of interest to your investigative team?
A. Someone within the team observed the van, as well as myself, making frequent stops within the apartment complex.
Q. And did you learn that someone had run the plates -- had run the plates for the van?
A. At that time of seeing it stop frequently within the apartment complex, not as of yet.
Q. Okay. Did you see someone come out of an apartment building and get into and drive the van?
A. No, I did not.

Q. Did someone tell you on the group call that someone had come out and gotten in the van and that that person was of interest?
A. Yes.
Q. What did you -- what do you remember learning?
A. I remember learning that the white van was making frequent stops within the apartment complex, and someone else would've seen -- observed somebody get into the van. And they were going to go and run the tag for the van.
Q. And do you remember anything about the -- what the interest was regarding the person who got in to drive the van?
A. That they were an adult.
Q. Okay. Did you then learn that the van stopped at different locations?
A. Yes, I did.
Q. Roughly how many stops do you recall it made?
A. From my knowledge of the van, three.
Q. And can you describe the van? Did it have any markings on it?
A. No. It was a plain white van.
Q. And based on your training and experience, was that significant; and if so, why?
A. Yes, it was. In my training and experience, this is something that I see back in Tucson, that people will use unmarked vehicles to keep low profile. Or if it's not an

official business, they have no branding to put on the van.
Q. And can you tell us what your experience is with van pools?
A. Yes. Within the patrol, we do have van pools. And we use these van pools to travel to long distances. A lot of us live within the city areas, and our stations are close to the border. We will meet up at one location and get into a singular van to drive down to the station.
Q. And so what about this van and the stops it was making was different than a van pool?
A. When we're in a van pool, we all meet up at one central location. And we all park our individual vehicles at that one location and get into one van down to the station. This -- our van pools are also rental vehicles. So it could be mini vans, Honda Odyssey.
Q. And I want to go back to something you said in terms of the significance of the lack of markings. Can you explain a little bit more about what you meant by that?
A. Lack of markings, because of the van -- in my experience, down in Tucson, I've seen these kind of vans be used for transporting large number of persons, especially done by people who might do agricultural work or anything of that nature.
And as well as they -- the no markings -- normally I've seen vans like that, that do transport, shuttle businesses from an airport, they have markings and logos. They would want

people to see the name of their business to conduct more business.

Q. Are you aware of whether the van stopped at apartments or also houses?

A. Both.

Q. So at this point let's talk about what you knew before you were aware that anyone had made a decision to do a traffic stop. Okay?

A. Okay.

Q. What did you know -- what factors, if any, were suspicious to you about the situation, the van, and the time of day?

A. It was still really early in the morning, approximately 5:00 a.m. in the morning, still dark out. Other members of the team say they observed adults getting into the vehicle. To me, it seems off at that time, unless they're going to travel two hours away and working really far away, to be getting into a van that early, as well as it being adults. If it was kids, maybe. But really early for -- for school or daycare.

Q. And what did you know, if anything, about the area you were in, in terms of one of the -- the main opportunities for people to be employed in that area?

A. Nothing at the moment. Not at the moment.

THE COURT: So say the question. I didn't hear you.

THE WITNESS: My question, sir?

THE COURT: Repeat the question, if you don't mind.

MR. RATCLIFFE: I asked in an awkward way, Your Honor. I was trying to get at what he knew at the time about the area where he was doing his investigation in terms of opportunities for people to work and where people may have worked in that area, the type of work.

THE WITNESS: It was relayed to me, before we even got to the area, it's a large area for agricultural work.

BY MR. RATCLIFFE

Q. And so, knowing that, what else about the van and its activities were you either concerned about or suspicious of?

A. Just the fact that it was going from place to place. I did see it stop twice within the apartment complex, as well as the knowledge from my other teammates when they saw it stop at a residential residence. All that built up that it seemed a little off to me, especially during the time of the day.

THE COURT: And when you describe "off," I want to make sure I understand what that means. "Off," in terms of reasonable suspicion that -- that a crime was afoot or "off" -- "off" for some other reason?

THE WITNESS: "Off" due to the time it was occurring, being so early in the morning. I assumed whether -- if it was going to be children, it was a little early for school. If it was adults, if they're loading up into a van, going stop to stop, it seemed a little off to me. Just from my training and experience, the people who get into van pools or even taking a

public bus, they go to one central location to go to their destination, sir.

THE COURT: Then the fact that it seemed off to you, what about that -- I mean, did anything about that give you some reasonable suspicion that there was something illegal going on?

THE WITNESS: Not at that moment.

THE COURT: What was that?

THE WITNESS: Not at that moment.

THE COURT: Okay. So I'm drilling a little bit into just wanting to understand what "off" meant. "Off" as in odd or unusual, not part of what you would've typically expected to see in your work or where you lived in Arizona?

THE WITNESS: I've seen this type of activity living in Arizona.

THE COURT: Okay. And were you able -- I mean, did that kind of activity -- were you able to make a connection between what those -- what people were doing with -- in that kind of activity in Arizona?

THE WITNESS: At that moment that we're at, at the story, Your Honor, not yet.

THE COURT: Okay. Mr. Ratcliffe.

BY MR. RATCLIFFE

Q. Did you learn from any of your fellow officers at that time that they had concerns about whether there was illegal

activity involved with that van; and if so, what did you learn?
A. I learned that potentially they could be agricultural workers getting picked up, going to go work.
Q. And in your training and experience, is agricultural work -- what -- let me rephrase that.
In your training and experience, what kind of work are people who do not have status in the United States or permission to work often end up -- what do they often end up turning to, to make a living?
A. Agricultural work.
Q. And -- and other types?
A. And construction work, jobs that pay cash under the table.
Q. And so then, knowing what area you were in, in terms of an agricultural area, and the time of day it was and this van and where it was going, did you -- were you able to formulate any theories about what might be going on with the folks in that van and whether they might have had status or not?
A. Yes. It begins to build my suspicion.
Q. Okay. Let's talk about the traffic stop. Do you recall who made the decision among your team members to initiate a traffic stop?
A. Yes.
Q. Who was that? Initials only.
A. J.B.
Q. Understood. I think we all know who you mean.

By the way, did you have a body-worn camera that day?
A. Yes, I did.
Q. And did you activate it as part of the traffic stop?
A. Yes, I did.
MR. RATCLIFFE: The Court has already seen part of that video. I'm not going to play it now, for time purposes.
BY MR. RATCLIFFE
Q. Can you tell us what happened with the driver of the van as officers approached and then soon after, what you saw?
A. As I exited my vehicle and approached the van, I saw A.W. and J.B. communicating with the driver, asking him to lower the window. From the time they were asking to lower the window, from what I could see, the driver was being noncompliant. And they broke the window.
Q. And why was it important for the driver to be compliant? What was the concern, if any?
A. Vehicle stops are dangerous. You want to go ahead and get ahold of the driver, make sure that he's unable to drive off in the vehicle. At that point it makes it a deadly weapon, so you do want to make sure you gain control of the driver of the vehicle.
Q. Did you go around then -- after initially being near the front of the vehicle, did you go around to the passenger side and the doors on the passenger side?
A. Yes, I did.

Q. Did you hear something then from your fellow officers who were still dealing with the driver?
A. Yes, I did.
Q. What did you hear?
A. He is 15.
Q. And what does that mean?
A. 15, to me, is a ten code used by the Border Patrol, which means an arrestee.
Q. And do you know why he was arrested?
A. At that moment, no. I just heard a 15.
Q. All right. What did you see inside the van in terms of who was in there and what was happening?
A. Upon seeing to the van, I saw there were several individuals spread out amongst the rows in the van. Some were on phones. That was about it.
Q. And what did you say, if anything, to the folks in the van?
A. Identified myself in Spanish.
Q. And, by the way, what were you wearing that day?
A. I was in plain clothes with a marked Border Patrol-issued plate carrier.
Q. You said plate carrier?
A. Yes.
Q. Is that a form of a ballistic vest?
A. Yes.

Q. And after you identified yourself, did you begin communicating with the folks in the van in Spanish?
A. Yes, I did.
Q. And at that point when you -- were you able to determine whether the folks in the van were speaking Spanish or English?
A. They were speaking Spanish.
Q. And at that snapshot in time then, once you got to the van, realized that you were dealing with a group of folks who were speaking Spanish and that there had been some failure to comply by the driver, did you have concerns about what might be involved or what might be afoot in terms of what was happening with those people?
A. Yes.
Q. What were those concerns?
A. I believe they could've been a part of either alien smuggling or transportation of aliens.
Q. And tell us a little bit more about that, the difference between the two and -- and your -- based on your training and experience, why you thought that either of those things could be happening.
A. In my training and experience, I've been a part of many vehicle stops where the driver could also be an illegal alien transporting illegal aliens further into the United States. I've also been on many cases where the people in the vehicle could be being trafficked as well.

Q. And did you learn, while you were still standing there by the van, what eventually -- or why the driver was placed under arrest?
A. For not having status in the United States to remain her legally.
Q. And so when you learned that the driver of this van is someone who did not have status, what did that tell you, along with the other facts that you knew about to that point, about, again, what might have been going on with the folks in that van?
A. It raised my suspicion to believe that the other subjects in the van could possibly be illegal as well.
Q. And why is that? What about the -- the prospect that this van was a legitimate transport service changed when you learned this information about the driver having been arrested?
A. In my experience, even back in Tucson, a company -- a legitimate company's not going to hire somebody who doesn't have status to work in the United States.
Q. And so, therefore, you concluded this was not a legitimate transport service or a commercial transport service?
A. Correct.
Q. And, again, I want to make sure the distinction is clear on the record between the crimes that are colloquially known as alien smuggling and alien trafficking. Can you give us that distinction so the -- the record is clear?

A. Yes. For alien smuggling, I view it -- I look at it as people want to be smuggled. So someone who's being smuggled, they probably paid a fee to be entered into the United States. And the powers that be on -- in -- wherever they're from, they're organizing, they're smuggling, they pay them a fee to have them smuggled to wherever it is they want to go. So it's a choice that they make, that they want to be smuggled.

Q. Including further into the interior of the United States?

A. Yes. In my experience, I've seen where people are -- may cross the border on foot. They are picked up by a vehicle, taken to a stash house. From that stash house, they're taken to their final destination of wherever it is they may want to go.

Q. And in your training and experience, is it also -- would it also be perfectly reasonable to encounter folks who were being smuggled this far from the border with Mexico?

A. Yes.

Q. Now tell us, if you could, about trafficking, alien trafficking.

A. Trafficking would be the person's being taken from one place to another against their will.

Q. And what about forced labor?

A. That as well, too. Forced labor, definitely, because the fees from when -- my experience, when I've interviewed persons that are being smuggled or trafficked into the United States,

there's fees to cross into the United States. And these fees are significant. And sometimes the subjects do not have the money to pay for it, so they have to work to pay off these fees.

Q. So they become essentially indentured servants?

A. Yes.

Q. And is that one of the possibilities that you were concerned about with the folks in this van, that they were perhaps being --

MS. GARCIA ORJUELA: Objection. Speculation.

THE COURT: Overruled.

Go ahead. And finish with the question.

BY MR. RATCLIFFE

Q. Is that one of the concerns that you were worried about, that the folks in this van could've been part of an operation to -- for forced labor purposes?

A. Yes.

Q. I want to go on now to talk about a little bit of your interaction -- a little bit more of your interaction with the folks in the van.

I think you said you identified yourself in Spanish as a Border Patrol officer; is that correct?

A. Yes.

Q. And just so that the record is clear, even though I realize that there's not a court reporter at this point, could

you tell us what term you used in Spanish? Could you tell us the Spanish term?

A. Yes, (speaking Spanish).

Q. What were you trying to get the people in the van to do or not do during your interaction with them while they were still inside?

A. So at that -- at that moment I introduced myself as immigration, and I asked them if they had any credentials on them.

Q. And were you and your other -- or your fellow officers also seeking compliance in terms of officer safety issues from the folks?

A. Yes. Definitely from the moment learning that the driver was being noncompliant, the window had to be broken, my immediate concern at that point was safety. Due to it being a (indiscernible) van, I wanted to go ahead and get the subjects out of the van. As well as it being dark, I wanted to put them in a lit area so I could go ahead and ensure that, you know, I'm safe and they're safe.

Q. Were you and other officers telling people to show you their hands?

A. Yes.

Q. And what's the purpose of that?

A. Hands can kill. If I can't see them, I don't know what you're doing behind that seat.

Q. Did people do what you wanted to do [sic] in terms of showing you their hands?
A. No.
Q. Do you recall the petitioner in this case saying anything during your interaction with her, either to you or to the other passengers; and if so, what?
A. Yes. When I asked everybody for their credentials, the petitioner stated in Spanish to not answer.
Q. And did everybody -- did anybody in the rest of the van answer? Did they follow her instruction?
A. They followed her instruction.
Q. By not answering?
A. Yes.
Q. Did that now -- in the timeline, did that change your level of concern or suspicions about what was going on with those -- as I refer to them in -- I'm trying to use a respectful term here, but I keep using this folksy term as -- of "folks," no pun intended. But did that -- what did that make you think about the people in the van?
A. It definitely raised my suspicion that they potentially could be illegally present in the United States.
Q. And why did the petitioner saying that raise your suspicions about the other people in the van, saying, "Don't talk"?
A. She's speaking for them. So they might all be in the same

category or same situation as far as immigration terms.
Q. What is your experience in encounters like this where you, as an immigration officer, are interacting with someone who understands that you're asking about their status and whether they have legal status in the United States? How does that normally work if someone you're interacting with does have status versus how does it go if they don't have status?
A. In my experience, if they have status, they love to show it. They -- they almost want to make it a joke to say that they have status here. They want to flash their -- their visas or whatever it is, that they're proud to have the status to be in the U.S.
Q. And what are some of the reasons that you've experienced that -- that motivate that response?
A. That motivate that response from them?
Q. Yeah. Why do people -- why are people happy or eager to show their status when they're interacting with you as a Border Patrol officer?
A. That they're proud to have that status, that it's not easy to get, that they're proud to have it. And as well as, you know, to prove us wrong, that we have assumed that they don't have status, and they're glad to show that they do have the status.
Q. I want to be careful not to ask you about the petitioner deciding not to identify herself. I'm not talking about that

issue. But on the issue of petitioner telling other people in the van, "Don't talk," what, if anything, did that make you concerned about regarding her status or her possible involvement in criminal activity?
A. It can be -- in my experience, when somebody's speaking for the rest of the group, as far as in an immigration situation, it could show signs of being, like, a ringleader or what I would call a handler.
Q. What do you mean by that?
A. A handler is someone -- in my experience, you come across a stash house, a house filled with migrants waiting to be transported to the next destination, that house might have a caretaker, somebody who's in charge, who's calling the shots.
Q. And so that was one of the things that you were concerned about here, is whether she was a ringleader of either criminal activity or trafficking?
A. Correct.
Q. Are people who you interact with in your professional duties sometimes afraid or scared of the interaction that you're having with them?
A. Yes.
Q. Tell us how that manifests itself and how it does or does not affect the ability of the people you're interacting with to offer up either their name or their identification or their status.

A. I think with some people, as far as immigration goes, that they're nervous to talk to immigration, especially if they're not in the right status. They fear being deported, being arrested. And those things, they -- they could be -- have fear that they don't want to answer my questions, because of fear of incriminating themselves further.

Q. Now, despite that fear, I'd like you to talk about what your experience is with people who may be fearful, but do actually have status. What do they end up doing?

A. They comply. They will show me their documents, tell me their name.

Q. Did you and your fellow officers need to identify everyone in that vehicle for a reason other than determining whether they were in the country legally or illegally?

A. For any other reason besides determining their alienage?

Q. In terms of other reasons that you need to identify folks during a traffic stop.

A. Yes. They could potentially have a warrant.

Q. Being another criminal -- a criminal violation pending against them that would require you, as an officer, to take them into custody on something not related to immigration?

A. Yes, it could be. They could have a felony warrant.

THE COURT: Is there any immigration regulations or statutes that obligate immigrants to provide paperwork upon -- upon request by a law enforcement agent?

THE WITNESS: Immigrants, sir -- Your Honor?

THE COURT: Immigrants, yes.

MR. RATCLIFFE: Your Honor, do you mean -- I think the concern may be with the term "immigrants," being unclear whether those are folks who have become naturalized or those are folks who do have status, those are folks who don't have status.

THE COURT: Well, given that many of them would appear as an immigration nexus in some of these databases, I -- it's any one of them. And you can break it down. You can tell me if there are certain classes of immigrants with different statuses that are obligated under -- under -- under immigration regulations, statutes, United States Codes, that require them, obligate them to provide documentation upon law enforcement request, if they have it.

THE WITNESS: I am aware that -- in that instance we talked about, Your Honor, that if -- they're supposed to have their immigration documents on them. So if they do have some sort of status to be -- remain in the United States legally, they do have to have those documents with them in case they are asked to provide those documents to prove their --

THE COURT: Okay. So it's a general understanding by yourself and -- as -- are you from Immigration and Customs Enforcement?

THE WITNESS: I'm a Border Patrol agent.

THE COURT: Border Patrol.

THE WITNESS: Yeah.

THE COURT: -- that you're -- that, upon request, somebody would need to provide -- would be obligated under the law to provide their documents?

THE WITNESS: Yes.

THE COURT: Okay. Okay.

BY MR. RATCLIFFE

Q. Approximately how long did it go on that you and your fellow officers were trying to get people to comply by either showing their hands or getting out of the van or both?

A. Until we got compliance from the --

Q. Yes.

A. I'll say less than five minutes.

Q. And did the petitioner eventually get out?

A. Yes.

Q. And were you involved in either assisting her out of the vehicle or taking her into custody; if so, how?

A. Yes. I did assist in removing her from the vehicle.

Q. And tell us about that.

A. I gave several commands to -- in Spanish to get out of the vehicle, ample time to adhere to my request. At that point I needed -- my concern was growing that there was many people in the back that I couldn't see what they were doing. It was dark outside. So I wanted to have everybody out of the vehicle.

The petitioner refused to get out of the vehicle, so we go -- we -- me and D.M. assist her out of the vehicle.
Q. Did her refusal to come out of the vehicle add to your suspicions about what was possibly in her background in terms of either a warrant or her not having status in the United States?
A. Yes.
Q. Why is that?
A. When I -- when I asked for her name or her credentials -- when I asked for her credentials and asked in Spanish, she said that she doesn't want -- doesn't want to talk. I then said that -- in Spanish, "That's okay. You don't have to talk, but I need you to get out of the van."
Q. And did she comply immediately with that?
A. No.
Q. Did you pass her off to another officer after you helped her or took her out of the vehicle?
A. Yes.
Q. What did you do next?
A. I continued to instruct the fellow persons in the van to exit the van.
Q. Did something else happen then after the folks had gotten out of the van in terms of an incident with the nearby Jeep?
A. Yes.
Q. Tell us about that, please.

A. After we finished moving all the persons out of the van, I went to my vehicle to begin clearing out the back seat. While I was clearing out the back seat, I heard A.W. yelling my name. And he yelled my name again.

As I ran over to him, he was telling me that one of the -- the -- the detainees was trying to climb out of the back seat of the Jeep and into the front seat. When I got to the Jeep, that specific individual was in the middle, between the front and the back seat, trying to get into the front seat while handcuffed.

Q. Did that create any concerns for you; and if so, what?

A. Yes, that this person was trying to escape.

Q. Did that create any concerns for you about the other people who had been in the van and what their status might be?

A. Yes.

Q. Tell us more.

A. Yes. So, in my experience, those who have a chance to flee when under -- facing immigration consequences, they have taken the chance to -- to run away.

Q. So at that point, again, as a sort of slice of time, did that person trying to flee give you additional concerns about what might have been going on with the petitioner in terms of either a criminal background or her not having status in the United States?

A. Yes, it did. It definitely raised it for the petitioner

and everyone else in the group.

Q. And was that in part because you had already been suspicious that she might be a ringleader, as somebody who was trying to exert control over --

MS. GARCIA ORJUELA: Objection.

BY MR. RATCLIFFE

Q. -- the other folks?

MS. GARCIA ORJUELA: Speculation.

BY MR. RATCLIFFE

Q. Did you --

THE COURT: I didn't rule.

MR. RATCLIFFE: Sorry.

THE COURT: The basis for that objection is overruled.

Go ahead.

BY MR. RATCLIFFE

Q. You can answer the question.

A. Yes, it did.

Q. Did something else happen --

THE COURT: So I -- were all the other people from -- that were removed from the van already handcuffed and on the ground after, I think, the people in the Jeep were -- were honking the horn?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. And I think there was one other

person who -- who ran?

THE WITNESS: Yes.

THE COURT: Okay. During the honking of the horn or that other person running, did anyone else that had been removed from the van, who were handcuffed and sitting on the ground, try to get up and run?

THE WITNESS: I don't know, sir.

THE COURT: You don't know because why?

THE WITNESS: When -- while I was assisting to extract -- help extract the person trying -- in the Jeep, I was told that somebody else ran away. I then got in my vehicle and drove to help apprehend that person that ran away.

THE COURT: And was that the person that was running from D.R.'s --

THE WITNESS: D.R.?

THE COURT: Yeah, I have D.R.

MR. RATCLIFFE: Our first witness today.

THE WITNESS: The witness here before me, yes.

THE COURT: Okay. So was there only one person who ran?

THE WITNESS: Yes.

THE COURT: Okay. And then the two people were in the Jeep -- there were two people in the Jeep and one other person that might have -- that ran?

THE WITNESS: Yes.

THE COURT: Okay. And then the other remaining people, did you hear anything -- see anything or hear anything at the time that the horn was honking and this other person was running that led you to believe that they -- that they were also trying to move and get up and run?

THE WITNESS: I didn't observe that, Your Honor.

THE COURT: And did you hear anything after -- after that stop and incident about anybody else trying to get up and run, including the petitioner?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Please go ahead.

BY MR. RATCLIFFE

Q. The judge already indicated this, but let's be clear: Was there another person then who took off running?

A. Are you referring to the person that -- that I got in my vehicle to go help apprehend?

Q. Yes.

A. Yes.

Q. So after that happened, did that change your concerns with respect to the other folks in the group, including the petitioner, in terms of what might be their status or whether they had warrants?

A. Yes, it did.

Q. It did -- it increased those concerns?

A. Yes, it did.

Q. Do you know whether the petitioner ever offered her name or identity on scene?
A. No.
Q. I'm sorry. You don't know or -- or she did not?
A. She did not.
Q. Was there a difference in how the other passengers of the van acted while they were in the van and had been told, "Don't talk," versus after everyone was out of the van?
A. Yes, there was a difference.
Q. What was that?
A. Once the petitioner was out of the van, everyone else complied. Everyone got off on their own power, and even -- one of the last subjects even handed me his credential.
Q. And when you say "his credential," was it a Border Crossing Card?
A. I don't remember.
Q. Okay. A credential of some -- an identification of some sort?
A. Yes.
Q. And so the other folks -- is it your understanding that the other people were -- were willing and did identify themselves?
A. Yes.
Q. And, just to be clear, the entire time that you were on scene, is it your understanding that petitioner refused to give

her name?
A. Yes.
Q. And were you involved in the transport of the petitioner in this case?
A. No, I was not.
Q. What did -- what did you do in terms of leaving the scene? Where did you go next?
A. Once I left the scene, I still had custody of the subject that ran away. And we met up at another location for transport.
Q. Were there other vehicles waiting there to receive the folks who you had taken into custody?
A. Yes.
Q. And that was nearby?
A. Yes, it was nearby.
Q. And then did those vehicles, the transport vehicles, take people to the ICE office in Portland?
A. Our subjects, no.
Q. Where did your subjects go?
A. The transport vans were full, so we self-transported.
Q. I'm sorry. The transport vans did take some people to the ICE office in Portland; is that right?
A. Yeah.
Q. But not -- sorry. Go ahead.
A. Yes, it did. It was a central location where other teams

met at this location for transport. Transport was full, so my team had to self-transport.

Q. To the ICE office in Portland?

A. Yes.

Q. And did you have any interaction with the petitioner at the ICE office in Portland?

A. Yes, I did.

Q. Can you tell us about that?

A. Yes. While in the facility, I was asked if I would go ahead and ask if I can get her name one more time while she was in the cell.

Q. What happened?

A. I had them open the cell. I peeked my head in and asked for her name. I was given a blank stare. And I said, "Okay," and closed the cell door.

Q. Just to be clear, did you ask her her name in Spanish?

A. Yes.

Q. Did you have any other interactions with her?

A. No.

Q. Is it -- do you understand how she was eventually identified that day? Do you know how she was eventually identified?

A. It would be an assumption.

Q. Fair enough.

MR. RATCLIFFE: If I could have a moment, Your Honor,

to confer with co-counsel.

(Whispered discussion, off the record, 3:58 p.m. - 3:59 p.m.)

MR. RATCLIFFE: No further questions, Your Honor.

THE COURT: Thank you.

Counsel.

MS. GARCIA ORJUELA: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA

Q. You stated that you had worked for Border Patrol for over seven years, correct?

A. Yes.

Q. And you're a native Spanish speaker, correct?

A. Yes.

Q. And you said that you are based normally in Tucson, Arizona?

A. Yes, Tucson.

Q. Okay. And you have only been in the -- in Oregon for this particular operation for 15 days, correct?

A. Yes.

Q. What was the name of the operation?

A. Operation Portland Safe.

THE COURT: Say that one more time. I --

THE WITNESS: Operation Portland -- Operation Portland Safe.

THE COURT: Okay. Thank you.

MS. GARCIA ORJUELA: Thank you.

BY MS. GARCIA ORJUELA

Q. On October 30th, were you getting a target package?

A. No.

Q. How did you choose to stop the van or choose the area that you were stationed?

A. It's not my choice.

THE COURT: Actually, it's okay to move closer to the mic now.

THE WITNESS: It was not my choice.

THE COURT: Thank you.

BY MS. GARCIA ORJUELA

Q. Whose choice was it?

A. The choice would come from command staff.

Q. Do you know the name or initials of the command staff?

A. Do we have a list that I --

THE COURT: I -- is there a list of the names that you can provide the witness to identify the initials?

MR. RATCLIFFE: Yes, Your Honor. If I may approach.

THE COURT: You may.

THE WITNESS: C.H.

BY MS. GARCIA ORJUELA

Q. Are you familiar with the Oregon territory at all?

A. No.

Q. Are you familiar with agricultural work?
A. With?
Q. Agricultural work.
A. In -- yes, I am.
Q. So you know that usually agricultural workers leave early in the morning to work in the fields, correct?
A. Yes.
Q. Why was that suspicious for you to see adults in an agricultural work area?
A. Suspicious?
Q. Why was that suspicious for you? Why was that off?
A. Why was it off? Because of the time, the area, and what I saw.
Q. Okay. This was an agricultural area, correct?
A. That's what I was told.
Q. Okay. What, in specific, on your training illustrated the suspicions that you have described on your testimony?
A. In my training?
Q. Yes.
A. I've seen this type of -- of situation before.
Q. Did you receive specific training on reasonable suspicion?
A. Yes.
Q. And you stated that you were the officer wearing the body cam, correct?
A. Yes.

MS. GARCIA ORJUELA: Your Honor, I'm going to turn the attention to the Exhibit 101.

(Whispered discussion, off the record, 4:02 p.m. - 4:03 p.m.)

MS. GARCIA ORJUELA: We're having tech issues.

BY MS. GARCIA ORJUELA

Q. Okay. Do you recognize this video?

A. Yes.

Q. This is your body cam video, correct?

A. Yes, it is.

Q. And this placed you at the arrest of petitioner October 30th, correct?

A. Yes.

Q. I'm going to move forward to when the stop is played.

Was there a reason why the volume was off during this time?

A. Yes. The body cams have a two-minute delay where there's no sound. The sound always come on two minutes after the button is pressed.

Q. Okay. All right. So you were parked on the side of the vehicle; is that correct?

A. Yes.

Q. Was -- there was a vehicle on the front of the van, correct?

A. Yes.

Q. So the van was not able to move around, correct?
A. From what I remember.
Q. And we're going to play.
(Video recording played in open court, 4:04 p.m.)
BY MS. GARCIA ORJUELA
Q. Did you have a warrant for an arrest of petitioner at that time?
A. No.
Q. Did you know the identity of petitioner at that time?
A. No.
Q. Did you know the identity of any of the passengers in that van?
A. No.
Q. Did you have any targets that you were pursuing in that van?
A. No.
MS. GARCIA ORJUELA: Let's play.
(Video recording played in open court, 4:04 p.m.)
BY MS. GARCIA ORJUELA
Q. Okay. Can you please identify -- I guess it's a little -- I have (indiscernible) -- identify the officers by their initials that are on the -- on the screen.
A. Yeah. It's going to be A.W. in the green.
Q. Mm-hmm.
A. And J.B. next to him.

Q. Okay. Can you tell what's on J.B.'s arm?
A. J.B.'s arm?
Q. Yes, the one in black.
A. I can't see his arms.
Q. Okay.

(Video recording played in open court, 4:05 p.m.)

BY MS. GARCIA ORJUELA

Q. How much time did happen since they yelled (speaking Spanish) and the crash of the window?
A. I would be guesstimating.
Q. Do you want me to play that again?
A. You can.

THE COURT: I think the video record can be --

MS. GARCIA ORJUELA: Okay.

THE COURT: -- used for timing.

BY MS. GARCIA ORJUELA

Q. All right. Let's move forward to the -- to when you are on the other side.

Okay. Can you tell me who the -- again, for initials -- who the officer is on this side?
A. D.B.
Q. D.B.

At this time did you know any of the identities or have confirmed any targets in this van?
A. No.

Q. Let's fast-forward.
(Video recording played in open court, 4:06 p.m.)
BY MS. GARCIA ORJUELA
Q. Was that you who stated (speaking Spanish)?
A. Yes.
Q. Okay. At that time was the driver already out?
A. I can't speak to that.
Q. Okay. I'm just going to skip forward.
(Video recording played in open court, 4:07 p.m.)
BY MS. GARCIA ORJUELA
Q. Did you hear petitioner saying that she was -- she was necessitating an attorney at that time?
A. Yes.
Q. What was your response to that?
A. What I said on the video was "I believe she wants an attorney or a lawyer."
Q. And what did you do after that?
A. I continued with commands.
Q. And what did you tell your other fellow officers?
A. That she wants a lawyer.
Q. Okay.
(Video recording played in open court, 4:08 p.m.)
BY MS. GARCIA ORJUELA
Q. That was you speaking just now?
A. Yes.

Q. What do you mean by "Just take her"?
A. She doesn't want to identify herself. We need to be able to identify her.
Q. Does that mean arresting her?
A. No.
Q. What does that mean?
A. That means we need to get her out so we can identify her.
Q. Okay. All right.
(Whispered discussion, off the record, 4:08 p.m.)
BY MS. GARCIA ORJUELA
Q. Okay. So this is when you were pulling her out of the vehicle.
(Video recording played in open court, 4:09 p.m.)
BY MS. GARCIA ORJUELA
Q. You placed handcuffs on her at that time, correct?
A. I did not.
Q. Did your colleague place handcuffs on her at that time?
A. I did not view that.
Q. Do you know if she was handcuffed at the time?
A. At this time?
Q. Yes.
A. At this time in the video, no, she's not handcuffed.
(Video recording played in open court, 4:09 p.m.)
BY MS. GARCIA ORJUELA
Q. When was she handcuffed then?

A. I can't speak to that. I didn't view her getting handcuffed.
Q. Okay. Did you see petitioner after that in the -- on site?
A. Yes, on site.
Q. Where?
A. Sitting on the ground.
Q. Okay. And after that, you stated that you left to pursue another person, correct?
A. Yes.
Q. And it was not until you were at the Portland office that you interacted with petitioner again, correct?
A. Correct.
Q. And you have stated that the fear of people incriminating themselves would give rise to reasonable suspicion for you to arrest them, correct?
A. Is that what I --
Q. Was that your testimony?
MR. RATCLIFFE: Objection. Misstating the evidence.
THE COURT: Repeat the question.
MS. GARCIA ORJUELA: Let me rephrase.
BY MS. GARCIA ORJUELA
Q. You heard petitioner assert her right to remain silent, correct?
A. Yes.

Q. Would --

THE COURT: And I -- hold on. I just want to make sure that -- since we don't have a court reporter, I'm trying to play somewhat of a role in making sure that everything's picked up on the microphone.

What was your response to that question?

THE WITNESS: Yes.

THE COURT: Okay.

MR. RATCLIFFE: Your Honor, we object again. Misstating the evidence. He did not testify that she heard -- that he heard the petitioner invoking her right to silence.

THE COURT: Okay. What do you understand that the video discloses or reveals, describes what it is she said, if anything?

MR. RATCLIFFE: Your Honor, I know opposing counsel has characterized it at some point as her asking for a lawyer, but I didn't hear that on the video. Perhaps I'm not focusing in on the proper part of it. I --

THE COURT: So I just want to parse this out. I'm not sure I've heard on the video anything in English indicating something about wanting to remain silent. But this witness, who has credibly testified that he understands and speaks Spanish, has already described her saying that she asked for a lawyer.

So if the -- if the objection is that -- that she

actually asked for a lawyer, but didn't ask to -- or -- or exercise her right to remain silent, then I -- then I think the answer's something for us to talk about.

MR. RATCLIFFE: I think that, Your Honor, the testimony was that he interpreted her as lawyering up or wanting a lawyer based on the answers that she was giving or not giving. I don't believe that the evidence is that she invoked her right to counsel.

THE COURT: All right. C.M. --

THE WITNESS: Yes.

THE COURT: -- those are your initials --

THE WITNESS: Yes.

THE COURT: -- Agent C.M., I thought I heard, but please correct me and -- and the record and make it clear, did you say that you heard her in this video saying she wanted a lawyer?

THE WITNESS: In this video I did hear her say "abogado."

THE COURT: Okay. All right. Did you hear her at any time indicate that she was invoking her right to remain silent?

THE WITNESS: She was saying to the rest of the van (speaking Spanish), "Don't answer."

THE COURT: Okay. All right. I don't want to have us get caught up in sort of a legal consideration about what

invocation means. But if somebody wants to cross and direct Agent C.M. about what he's just testified to, then let's stick with the language that this witness has used.

Was there anything else that, Mr. Ratcliffe, you wanted to --

MR. RATCLIFFE: No, Your Honor.

THE COURT: -- clarify about this?

MR. RATCLIFFE: No. I appreciate your clearing it up. Thank you, Judge.

THE COURT: Thank you.

Counsel, you may proceed.

BY MS. GARCIA ORJUELA

Q. You asked her to see her documents during this encounter, correct?

A. Yes, her credentials.

Q. At any point you did not -- during this arrest, you did not have a warrant for petitioner, correct?

A. No.

Q. How many other officers were wearing body cams?

A. None.

Q. You were the only one?

A. To my knowledge.

MS. GARCIA ORJUELA: No further questions, Your Honor.

THE COURT: Mr. Ratcliffe.

MR. RATCLIFFE: Yes, Your Honor, briefly.
Oh, may I confer with co-counsel?
THE COURT: You may.
MR. RATCLIFFE: Thank you.
(Whispered discussion, off the record, 4:14 p.m.)

REDIRECT EXAMINATION

BY MR. RATCLIFFE
Q. Officer, you were asked on cross-examination whether you were given a target package. Do you remember that question?
A. Yes.
Q. I think your answer -- what is your answer to were you given a target package?
A. For that morning of October 30th, no.
Q. And why not?
Were the target packages something that your agency received?
A. No. Those come from ICE.
Q. And when you say they come from ICE, are you saying ICE were the folks who were generating those?
A. Yes.
THE COURT: Are you -- but you weren't -- you weren't advised or briefed on what the target package was?
THE WITNESS: For this morning, my team did not have a target package --
THE COURT: Okay.

THE WITNESS: -- for this area.

THE COURT: All right. And I've heard testimony about a Team 7. Is that what you're talking about?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. And that was about -- about ten officers, agents?

THE WITNESS: About.

THE COURT: Okay. And when -- when you conducted this investigation and stop, what -- what was your understanding that you were supposed to be doing that morning? How -- how -- what was communicated to you about what -- what your objective, your mission was?

THE WITNESS: That we were going to be working in the Woodburn area. And this involves encountering people that have an immigration interest to immigration, as well as finding new potential targets as well.

THE COURT: And what does it mean to find potential targets? How are targets identified?

THE WITNESS: They can be identified by vehicles, having consensual encounters with persons.

THE COURT: All right. And on this date you weren't aware of any particular target, a named target, in any target package?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Mr. Ratcliffe.

BY MR. RATCLIFFE
Q. I'd like to ask you about the time index shown on the video. Does it show 08:31, meaning 8:30 in the morning?
A. I believe so.
Q. Is that correct?
A. No.
Q. Do you have an explanation -- and you've testified -- what time approximately did this happen?
A. Approximately 5:30 a.m.
Q. And do you have an explanation for why the time index is off?
A. No, I don't.
Q. Ms. Garcia asked you questions about how long -- or asked you a question at least -- about how long is shown on the video between the command in Spanish to open the window and the time the window was broken. Do you recall that question?
A. Yes, I do.
Q. Are you aware, based on your memory of the day, whether there were previous commands given to the driver to either open the window or open the door before that one captured on the video?
A. Yes, 'cause they were already standing there.
Q. And did they give commands before that, is the question.
MS. GARCIA ORJUELA: Objection, Your Honor. Speculation.

THE COURT: Overruled.

BY MR. RATCLIFFE

Q. Are you aware if they gave commands before that?

A. I did hear it, yes.

MR. RATCLIFFE: Nothing further, Your Honor. Thank you.

THE COURT: All right. Thank you.

Is this witness excused, Mr. Ratcliffe?

MR. RATCLIFFE: Yes, Your Honor, from the Government's perspective.

THE COURT: Any objections, Ms. Garcia Orjuela?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. Officer C.M., you're free to go. Your testimony will no longer be required or -- or asked for. So you're welcome to stay in the courtroom. You may also leave. However, under no circumstances are you to discuss your testimony with anybody who has not yet testified. Okay?

THE WITNESS: Okay, sir.

THE COURT: All right. Thank you, sir.

THE WITNESS: Thank you.

MR. RATCLIFFE: Your Honor, does that admonition extend until the conclusion of these -- this hearing?

THE COURT: Yeah. I think I was less clear the last time. I might have indicated to D.R. you can't talk to anybody for the rest of his life, so -- so let me make it clear to both

D.R. and C.M.

Once this record is closed and -- and counsel will notify you of when this record is closed -- you'll be relieved of the -- the requirement to not share your testimony with anybody. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

MR. RATCLIFFE: The Government calls J.B., Your Honor.

THE COURT: All right. And before we do that, let's check -- so you're free to go. You're fine to move on out.

Scheduling, I give the Government credit for calling my bluff and bringing in nine witnesses.

MR. RATCLIFFE: More than that, Your Honor, but yes.

THE COURT: Or -- and then some. It wasn't a bluff, but you definitely served it up in large -- in large order. But I do need to be -- I need to check in on timing here and also check in with petitioner's counsel. I mean, some of this testimony may be repetitive.

And I'm not sure how much more than the body cam images might -- from now live testimony might shed light on the situation. So I bring that to everyone's attention to think about what we might need to do if we'd like to try to move the case along.

But you both know your case better than I do, which

is the reason why I'm asking lots of questions to get educated on what's happening.

So I want to drop that for a moment, and then I need to also share with you some scheduling challenges. While I'm available tomorrow up until noon, we don't have an interpreter, not tomorrow. And so that raises a question if there are other witnesses that require it or, for that matter, the petitioner has -- has been -- has been provided the interpreting services.

If we -- if interpreting services are required, then the next available dates are in December: December 18th and the 19th, both in the afternoon. So I need to first inquire about interpreting services and -- and how we -- how we might be able to proceed tomorrow through noon. We also have officers that are coming from abroad, out of state, and so I -- I'd like to try to accommodate that as well.

MR. RATCLIFFE: Your Honor, I want to make sure I understand. The Court's certified interpreter, who's normally -- who's a full-time employee, Andre Knaebel, is not available. Is that your understanding?

THE COURT: He is not either. We've -- we've explored all our options, and so we don't have an interpreter tomorrow.

MR. RATCLIFFE: And then --

THE COURT: But we -- graciously, I think we've been able to keep our current interpreters longer than scheduled; is

that correct? Or were --

THE INTERPRETER: Not yet, Judge, but --

THE COURT: Okay. So we're taking our current interpreters to the maximum time. They're not available tomorrow. Neither is Mr. Knaebel. So we're -- we're having to look into December 18th if --

MR. RATCLIFFE: Your Honor --

THE COURT: Yeah.

MR. RATCLIFFE: -- can I raise another issue? Two -- two questions, both motivated by the same concern for government resources and these witnesses, their -- their convenience.

Question one is, can we go late tonight -- how late can we go tonight? I suppose that's the question. Question two is, can we continue tomorrow with telephonic translation services?

THE COURT: Okay.

THE COURTROOM DEPUTY CLERK: No.

THE COURT: No to --

THE COURTROOM DEPUTY CLERK: Andre said no.

THE COURT: No to the -- not to the telephonic?

THE COURTROOM DEPUTY CLERK: It's too -- no.

THE COURT: Okay.

THE COURTROOM DEPUTY CLERK: Not tomorrow.

THE COURT: All right. So the report back from

Mr. Knaebel is that we are not able to provide those interpreting services. But before you go any further into that question, it looks like petitioner's counsel might have some insights.

MS. GARCIA ORJUELA: Yes, Your Honor. We might be able to solve this. We would be waiving interpretation in order for this case to proceed tomorrow.

THE COURT: All right. With that waiver in place, then I think we can proceed tomorrow. I -- I do have up until 6:00 p.m. today to keep going.

MR. RATCLIFFE: Great.

THE COURT: So -- so if we can keep things moving along and -- and -- as you can see, I -- my -- I think I took out all my questions on D.R., so he bore the brunt of it all.

So you can let everyone else, Agent D.R., know that -- that you absorbed the impact.

But I think that -- that it helped me understand more of the lay of the land, as -- as -- as some of these things, which are frankly, you know, unknown to most everyone else other than law enforcement, to help me understand the environment in which we're working on these issues. So we might -- we might be able to move a little quicker, so let's see how it goes.

Mr. Manning and Ms. Garcia Orjuela, there wasn't -- you're done with your case in chief; isn't that correct?

MR. MANNING: Yes, Your Honor.

THE COURT: All right. So it'll be cross-examination of any of the remaining witnesses.

All right. Let's proceed with our -- our next respondents' witness.

MR. RATCLIFFE: Your Honor, the Government calls J.B. And I will go retrieve him.

(Whispered discussion, off the record, 4:24 p.m.)

THE COURTROOM DEPUTY CLERK: Please be seated and speak into the microphone.

THE WITNESS: Yes, ma'am.

Your Honor.

THE COURT: If you don't mind raising your right hand, and the courtroom deputy will swear you in.

***J.B.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your first and last initials for the record.

THE WITNESS: J, as in Juliet; B, as in bravo.

THE COURT: Go ahead.

DIRECT EXAMINATION

BY MR. RATCLIFFE

Q. Good afternoon, sir. Where are you employed?

A. The actual place is -- is ICE, but I am out of the Denver field office.
Q. And what's your position with ICE?
A. I'm a deportation officer assigned to the Fugitive Operations Unit.
Q. How long have you been a deportation officer?
A. Five years.
Q. Did you have law enforcement experience before that?
A. No. I came from the military.
Q. How long were you in the military, and where did you -- what position did you have?
A. I was in 12 years. I was in the Air Force. I spent six as a firefighter and then six in special operations, special warfare.
Q. And you said you're based in Denver now with ICE?
A. Yes, sir.
Q. And did you come to Portland in mid to late October as part of an enforcement operation?
A. Yes, sir.
Q. Did you volunteer for that, or were you told to come?
A. It was volun-told.
Q. Understood.
What was the purpose of your coming to Portland?
A. We received the e-mail that said that we're going to be doing at-large enforcement.

Q. What does that mean?
A. That means finding, locating, and targeting people that are undocumented here in the Portland, Oregon, or Washington area.
Q. I'd like to direct your attention to October 30th of this year and that morning. Can you tell us what you did in terms of your personal preparations for operations that morning?
A. Well, prior to that, we were -- when we first got to Oregon, we started looking at our enforcement application and start trying to target -- find targets in the Portland area, whether that's going to be Beaverton, Salem, Hillsboro, basically all over Oregon.
And then that morning we actually got up really early, and then we staged outside of -- of the area. And then that's when they told us where we were going to be going that morning. And so we already had -- some of us had pre -- pre-knowledge of, like, other targets that were in the area.
Q. And tell us what you mean by that. How did you accumulate or acquire that knowledge?
A. Through system checks. So we have different applications that we are -- that we are purview of. And so they have high possibility rates of where they're going to be in that area, and so you use that.
Or you use another one where people are recently arrested; and when they roll their fingerprints, that comes

back to us with their -- basically their biometrics. And then you run that to find out if they've ever been encountered before. And then you start using your systems to start, like, locating where they're at.

Q. And when you say whether they've been encountered before, do you mean by immigration officials?

A. Yes, that, or local law enforcement. So on your rap sheet, it'll say what country of citizenship you are. But even if it says that, you still have to do your immigration checks because sometimes they will not be correct. And it might say MX on it, where it stands for Mexico; but they might be from, like, Honduras or other -- other countries.

Q. So did you come up with a list of formal or informal targets for your team to work with on October 30th?

A. Yes. I had had a list, but not 'til that morning where we're told where we're going, where I actually had to pull that list from, of where -- like, of that page of targets that I had at the time.

Q. Tell us what your target list looked like, what it was comprised of, whether it was a printout, et cetera.

A. Yeah, it was a -- it was a printout. But I also have, like, pictures in my phone of either driver's license or the last time they were encountered by immigration, whether that's like a VR or reinstate or maybe their NTA photo.

Q. Stop. You used several different terms that --

A. Oh, sorry.
Q. -- I'm going to pause you.
When you say a VR, what does that mean?
A. Sorry. A voluntary return.
Q. And tell --
A. So --
Q. Yeah, tell us the context. So if someone is a voluntary return, what does that mean?
A. So if they've ever been encountered by Border Patrol -- not so recently, we've gotten the authority to do voluntary returns, or VRs. And so what happens is that -- every encounter that they have with -- with ICE or Border Patrol, there's going to be a picture associated with that encounter.
So you're going to take that picture, and then that's how you're going to reference if that's them or not. And then once they're brought into custody, you're going to use the fingerprints.
Q. I want to remind you that there is interpretation going on.
A. Yeah.
Q. And I have a look that I've just gotten that may indicate that you're going a little fast.
A. Sorry.
Q. I want to understand. When you say a voluntary return, does that mean someone who has -- who is not in the country

with proper status, who has voluntarily agreed to leave the United States?

A. Yes. It is an agreement between the individual and Border Patrol. So a lot of times they get caught on -- on the border. And instead of them getting either an expedited removal or a notice to appear, an NTA, they agree to a voluntary return. But they still have to have a picture and their fingerprints taken. And so they usually go back to their country the next day.

Q. And so if someone has a history in your -- your immigration databases showing that they have voluntarily removed themselves from the country, what, if anything, can you conclude if there's no entry of them re-entering the United States through proper channels and they're found in the United States?

A. When you do your checks, even if they have a voluntary return, you run their name and date of birth. And it will come back if they have any claims, as such -- maybe they have, like, a pending visa or they have a pending -- some kind of application for, like, possibly a LPR, lawful permanent resident, like a green card or something.

So it's not -- just because they have a VO, or voluntary return, doesn't mean that they're illegal. We still have to do all of our checks. Sorry.

Q. Okay. I start asking you, and I'm not sure if I got

enough information on this, about what your formal or informal targeting packages might look like.

I know you mentioned it could be photos on your phone. I think you mentioned it could be printouts. Is there more to it than that?

A. No. For -- for this operation, it was live targeting. So we didn't have something called, like, an FOW, which is a field office worksheet. At best, you'll have what we call baseball cards, which will have the target's photo on it and then possibly an FBI number or last time that they were removed or just all the information on that individual.

But the -- the turn-out rate for this operation was -- was incredibly fast because you didn't know where you were going the next day. And so what happened was --

THE COURT: When you say "turn-out rate," what does that mean?

THE WITNESS: Because you're trying to -- if you went after one target, then you would have to take them all the way back to the office and then return. And so we were trying -- the reason why we had different -- like, you had a processing team; you had an arrest team -- is for fast turnover, so you could get more targets.

THE COURT: Okay. So -- so turn-out rate means --

THE WITNESS: Just -- just a faster -- for you to go on to the -- to the next target. That's what I meant.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. Turn-around rate maybe?

A. Yeah, turn-around rate. Yeah.

Q. Okay.

THE COURT: And in this case, on October 30th, in the Woodburn area, you didn't have a --

THE WITNESS: A baseball card.

THE COURT: -- these cards or memos. It was -- it was an oral instruction about what was going to happen?

THE WITNESS: It was -- it was a -- you, as an officer, making all your checks and double-checking all your work to make sure that this person is undocumented.

THE COURT: And when you say "this person," who was it that you understood that that person was as a target?

THE WITNESS: Well, you have -- so, for instance, like if you -- during your checks beforehand, right -- so, like, one of our apps, it's called Elite. And so it tells you how many people are living in this area and what's the likelihood of them actually being there.

So you do your checks on that person, right, as -- all immigration checks. And you go, "Okay. There's a 90 percent chance that they live there." So you go there, and then you start running other checks on -- maybe there's a possibility of other people living in that apartment and such

because the thing is --

THE COURT: So, I mean, do you have a -- do you have, like, a list of names that you're looking for or --

THE WITNESS: If you generated one, yes.

THE COURT: All right. And in this incident, in Woodburn on October 30th, what were you -- what were you working off of to identify targets?

THE WITNESS: Either an Elite lead.

THE COURT: Elite lead?

THE WITNESS: Elite lead.

THE COURT: As in E-l-i-t-e?

THE WITNESS: Yep, Elite, E-l-i-t-e.

THE COURT: Okay. So tell me --

THE WITNESS: That's -- that's an immigration system that -- it's basically a map of the United States. It's kind of like Google Maps. And then you -- you'll be like, "All right. In this area it's heavily -- the likelihood of -- of -- of this individual living," right? So if it's --

THE COURT: When you say "this individual," what do you mean by that?

THE WITNESS: Well, multiple -- so if there's an apartment complex, it will say, "Hey, based on, you know, them listing this address through court records or something, a lot of people live here." You know, it'll have, like, their A-Number or if they've ever been encountered by immigration.

THE COURT: So I think I've heard the term "immigration nexus."

THE WITNESS: Yeah, like an --

THE COURT: Is that what -- is that kind of -- so this Elite -- this Elite lead kind of identifies people with immigration connections?

THE WITNESS: Yes. Right.

THE COURT: All right. And where does all that data get pulled from?

THE WITNESS: It pulls from all kinds of sources. Like, it was -- it's a newer app that was actually given to us in ICE.

THE COURT: Okay. And then you can use that to sort of zoom in or zoom out to identify the potential --

THE WITNESS: You're --

THE COURT: -- number of people that --

THE WITNESS: You're going to --

THE COURT: -- that kind of get identified in this app and then -- and then you go to those populations?

THE WITNESS: Yeah. You're going to go to a more dense population rather than -- like, if there's like one pin at a house and the likelihood of them actually living there is like 10 percent, you're -- you're not going to go there.

THE COURT: And does this Elite lead provide you a percentage likelihood of people --

THE WITNESS: Yes, the likelihood of them living there or them being there, sir.

THE COURT: Okay. And do you know how that is generated?

THE WITNESS: I don't know how that's generated.

THE COURT: Okay.

THE WITNESS: Because the baseball cards that we were given from our intel team, we still have to double-check that work. And even then, it was not accurate.

THE COURT: Okay.

THE WITNESS: So you're talking about an intel team that they would generate targets for us, and sometimes the person would be a lawful permanent resident. And they're not arrestable, unless you have conviction docs or something. So even some of the information they gave us was not good at the time.

THE COURT: Is that generally speaking or on October 30th?

THE WITNESS: No, generally speaking.

THE COURT: Okay.

THE WITNESS: So that's why we went away from some baseball cards, unless we already -- but the issue was, the night before, we didn't know where we were going. We knew where we were staging at that morning, but we didn't know we were going to Woodburn.

THE COURT: Okay. And are you -- how do you find the -- sort of the success rate or positive find rate of this Elite lead app -- or this Elite app compared to the conventional baseball card method?

THE WITNESS: What do you mean?

THE COURT: Well, I mean, is it a -- I mean, does it turn out -- is the turn-around or the -- or the results in --

THE WITNESS: Well --

THE COURT: -- in target acquisition higher with the -- the app?

THE WITNESS: The app could say 100 percent, and it's wrong. The person doesn't live there. And so it's not accurate. It's -- it's a tool that we use that gives you a probability, but there's never -- there's no such thing as 100 percent.

THE COURT: So you still have to do your checks?

THE WITNESS: You still have to do your checks.

THE COURT: Okay.

THE WITNESS: You can't rely on one system that says this person is 100 percent there and they're illegal. You still do your checks.

THE COURT: All right. Thank you.

BY MR. RATCLIFFE

Q. So the morning of October 30th, did you generate some informal targets for --

A. Yep.
Q. -- your team?
A. Yes, sir. I had a -- about a page and a half of photos with names.
Q. A page and a half represents how many photos?
A. I can't even tell you.
Q. Are we talking about, like, a -- like school photos we get when we were kids, where there'd be, like, you know --
A. No, they're -- they're small, just with a name, if they have the A-Number or a FINS number, which is -- the FINS number is assigned to that person, which is a fingerprint, so that we can easily access them in our databases when we do contact them.
Q. And just so we're clear here, when you say a A-Number, you're talking about an alien number that is assigned to someone who has contact with immigration authorities throughout their life?
A. At some point, yes, sir, that's been assigned.
Q. So, by the way, before we go on, you said you had about 1.5 pages -- or maybe 1.5 pages of informal leads or targets for that day. Did you keep those -- that -- that paper or the papers that you generated during your time working in Oregon?
A. I did have it while working in Oregon. But when I left, no.
Q. When you went back to Denver?

A. I tossed it because I work in Denver. I don't work in Oregon.
Q. And was it okay for you to toss it?
A. Yes, because if I put it in the A-File, it's just going to have pictures of different people. It means nothing to the deportation officer that's actually handling the case.
THE COURT: Could you actually reproduce that one and a half pages from the search terms that you used?
THE WITNESS: I just copy and pasted it and printed it, so it's not saved on a desktop or anything, just because -- again, the reason for it is because in the 213, if I had to write it, it would have the probable cause of how I actually contacted that person through -- through some kind of lead that I had. But since we weren't generating our own two thirteens or an arrest narrative, it was never put in there.
BY MR. RATCLIFFE
Q. And, again, just to be clear, a 213 is an arrest narrative or a --
A. Arrest affidavit.
THE COURT: Okay.
BY MR. RATCLIFFE
Q. Well --
THE COURT: Is it --
BY MR. RATCLIFFE
Q. -- is it --

THE COURT: -- for an administrative warrant? Is it --

THE WITNESS: Administrative arrest.

MR. RATCLIFFE: Well --

THE COURT: Okay.

BY MR. RATCLIFFE

Q. Let me ask you a question. There's something called an I-200, which is an arrest warrant, correct?

A. Correct.

Q. An administrative arrest warrant, correct?

A. Yes, sir.

Q. There's also something called an I-213. And that -- you've referred to it as an affidavit, but let me be clear. It's not under oath, is it?

A. No.

Q. And is that commonly referred to as an arrest report or an arrest record?

A. More of a record, arrest record.

(Whispered discussion, off the record, 4:39 p.m.)

BY MR. RATCLIFFE

Q. My learned co-counsel, who knows much more about immigration law than I do, is showing me that Petitioner's Exhibit 109, which is an I-213, has a title at the top of it, which says "Record of Deportable/Inadmissible Alien." Is that familiar to you?

A. Yes, very.
Q. All right. So we've got three terms now for an I-213, but basically it's an arrest report?
A. Yes.
Q. Versus an I-200 is an administrative arrest warrant?
A. Correct.
Q. Okay. So let's get back to talking about the morning of October 30th. You talked about the informal targets, for lack of a better term -- it's not a great term; it seems to carry some -- some connotations with it -- but people you were interested in contacting --
THE COURT: And -- excuse me, but the people that you were interested in contacting are on this one-and-a-half pages?
THE WITNESS: Yes.
THE COURT: Okay. All right.
BY MR. RATCLIFFE
Q. Did one of those -- tell us how one of those people of interest or targets ended up being connected in your investigation to a white van that we're going to talk about in this case?
A. Yeah. So that morning I went into the parking lot. I drove in there, and I was looking at multiple doors that were associated with those apartments. A male came out, got into a van. And then that's when I asked -- 'cause we were all on speakerphone with -- with some of the team.

And I asked, "Hey, can you run this -- this tag?" And he said, "Yeah." He ran it, said the name out loud. I was like, "I think I have that guy on my -- on my list." I looked. And I go, "Yep, there's the picture. I believe that's the guy. It matches the same description and the photo."

He got in a van. I set up for a takeaway. He leaves while these checks are still being completed again, just to double-check. And at that time, that's when the -- the guy who was running the checks was like, "This guy has a VR, a voluntary return." And --

THE COURT: And the person -- was this -- this wasn't -- was this the driver of the white van or --

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: The -- who I believed was the registered owner of the white van.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. So you learned that the person who was the registered owner of the white van had in their history a voluntary return?

A. Yes, sir.

Q. And -- but if you were correct that the person who is the registered owner of that van was actually back in the United States and maybe even using that van, the fact that they had voluntarily returned at some point to their country of

origin, yet were back, was that -- were back in the United States, was that meaningful to you?
A. Yes, because he had the car registered after his voluntary return. So that means he came back at some point. And through system checks, it showed that he has no pending applications or approved applications. So he is undocumented.
Q. And was there other information that you learned through this license plate -- license plate check about the registered owner in terms of any criminal history?
A. There was a rap sheet that he put -- or on that, it said Mexico on it. And I believe he had an assault charge.
Q. But you don't know -- do you recall if there was a -- simply a charge or there was a record of a conviction?
A. I don't -- I don't remember the -- I can't recall the actual -- if he was convicted.
Q. But you don't know for sure?
A. I cannot -- no.
Q. By the way, roughly what time was it that you spotted this van?
A. It was early in the morning. It was probably 5:30 to 6:00.
Q. So you used a term a couple minutes ago, and I'm not sure I can remember it, but I think you indicated that after you saw the van, you were ready to head out and follow it?
A. Yes, sir. Yeah, for the, yeah, takeaway.

And so the issue we had at the time was the rest of the team wasn't set up. And so when he left, I had to follow on my own until the rest of the team could catch up to me. And at that time he made his first initial stop. I had to pass him, turn around to keep eyes on, and then he proceeded to two other stops, which I saw more individuals enter the van.

Q. Based on your training and experience, what were you concerned -- or what did you suspect might have been going on as a result of the information you had at this point in the narrative?

A. At this time, through experience that the -- whenever you're picking up other individuals that early in the morning, it's -- it's either human smuggling or human trafficking, but you don't know until you make contact. Or -- or it could be just you harboring people that are here illegally in the United States.

Q. And --

A. And -- oh, sorry.

Q. Sorry. Go ahead. Why is that?

A. And the reason for that is, even in Denver, what they do is they all go to the same job site. A lot of them don't have a driver's license, and they don't want to get encountered by local police when they don't have a driver's license. So they have somebody take them.

Q. And, in your experience, at least in Denver, do the folks

who are in this position -- I'll say it that way -- also have access to their own cars?
A. I mean, more than likely, they don't have anything registered to them.
THE COURT: In your experience, would you expect that people who may be -- may be trafficked would exhibit different kinds of behavior when brought into vehicles than somebody who's voluntarily getting into vehicles?
THE WITNESS: No, because a lot of them are actually pretty nonhostile of getting forced into a vehicle, someone being trafficked, because they don't have an ID on them. Usually they -- the person who's actually trafficking people actually have a lot of control over them.
THE COURT: Okay.
THE WITNESS: And so them not being compliant is very dangerous for yourselves and their family.
THE COURT: Okay.
BY MR. RATCLIFFE
Q. So at this point -- I may have lost track -- how many times did you or your team see the van stop and pick up people?
A. I saw it stop three times.
Q. And were you able to view it close enough -- closely enough so that you could see, perhaps to Judge Kasubhai's question, the demeanor or sort of attitude of the people who were getting in the van? Were you that close to determine

whether they were happy-go-lucky or whether they were sort of, you know, marching off to do what they were told?
A. I was close enough to -- to actually see them, but -- because I can -- I can see that there were individuals getting into the van, but people's posture doesn't really tell you much, whether they're willing or -- that early in the morning, I don't think people are going to be hopping and skipping into a van.
Q. Fair enough.
A. But, again, like, that's the part of the investigative detention, because there are key elements of human trafficking, like they're not going to have their ID on them; they're told not to talk to people. These are key elements.
Q. Did the van have any markings or writings on it?
A. No, not -- not that I can recall, no.
Q. And was that significant for your investigation?
A. Yep.
Q. Can you tell us why?
A. Because if it says "transport" or it says, like, some kind of farm company, then, yeah, they're just going to work and it's a transport van. But if it's unmarked, it's -- it's suspicious in nature.
It's because -- it's the same activity that you would see in Denver, when everybody's going to work in a -- in a working van and then when you stop it and they're all like,

"Yes, I'm here without status."
Q. Was there anything unusual about the windows of the van?
A. They were tinted. But whenever you'd open the door, it would turn on the interior light, and you could see silhouettes of people getting into the van.
Q. And were you aware at this point, having -- am I correct that at that point you'd been working in the Portland Metro area for a couple weeks?
A. Aware?
Q. Had you been working in the Portland Metro area --
A. Oh.
Q. -- for a couple weeks at that time?
A. Yes. Yes.
Q. The question I was starting to ask then is were you aware, based on your experience here in the northwest and in Oregon specifically, what kind of jobs are available to people in the Woodburn area who might not have legal status?
A. We were informed that it was mostly agricultural down in Woodburn.
Q. And is that consistent with -- tell us about your experience in Denver with people who are working sort of off the grid, or perhaps without status and the jobs that they're able to get, versus folks who are properly documented and have official permission to work.
A. So most of the jobs you're going to see with undocumented

individuals with no -- like, no status at all, no driver's license, is typically going to be either construction or roofing, one of those kind of labors. And then people with work permission, you're going to see them do, like, Uber driving or Uber Eats, DoorDash, stuff like that. But there's not a set, like, occupation, so to say.

Q. Understood.

So are you the person who decided to pull over the vehicle, the van?

A. Yes.

Q. I'd like you to take a moment and think about that moment in time and what you knew. And I'm not asking you to remember everything you've testified about, but can you describe for the judge what you believed at that moment led you to have reasonable suspicion that there may have been a crime afoot or that the folks in the van may not have had legal status?

A. Yeah. So if you're looking at the totality of the circumstances, it's -- the RO already has immigration --

THE COURT: RO?

THE WITNESS: Registered owner. Sorry.

THE COURT: Okay.

THE WITNESS: -- registered owner already has immigration history. People are being -- going into a van early in the morning. With all that and -- being able to identify those key factors is what gave us RS at that time.

THE COURT: And when you say "RS" -- wait, wait, don't tell -- wait.

THE WITNESS: Oh, sorry.

THE COURT: -- reasonable suspicion, right?

THE WITNESS: You're -- you got it.

THE COURT: All right. All right. So you're talking about the registered owner and what else?

THE WITNESS: Well, that's -- we're -- so we were -- we were planning on stopping the van, but the team wasn't ready at the time -- whenever he first left. And so that's why -- by the time that the team was ready, he already made three stops. And when you see more people get in the vehicle, it's -- it's very suspicious. You don't know if that's a stash house, again. You don't know if it's human trafficking or smuggling or --

THE COURT: So multiple stops also contributed to your --

THE WITNESS: Yes.

THE COURT: -- the reasonable -- the reasonable suspicion basis?

THE WITNESS: Yes, sir.

BY MR. RATCLIFFE

Q. Tell us about how the traffic stop was effectuated, the stop itself, and then we'll talk about what happened after.

A. Okay. Once he made it out onto the main road, I had my

other -- we had BP ready, and I had the vehicle that J.A. was in. And so we set up. I activated my lights. There were only two vehicles in our unit that actually have red and blue lights with sirens. So it's myself and J.A. are the only ones. All the other vehicles were rentals, so we had to make the stop.

So I -- I activated my lights and sirens. He did not pull over initially. J.A. went into a walking position in the -- in front of the vehicle. And then that's when BP went up beside it on the left-hand side of the vehicle.

Q. What did you do and where did you go when you got out of your vehicle after the van stopped?

A. I was met at the window with BP.

Q. When you say "met at the window," you're talking about you met your colleague, BP, at the driver-side window of the van?

A. Yes, sir.

Q. And what happened there?

A. He was noncompliant. He rolled up the window. He started reaching around, was not complying with the orders of Border Patrol agents. And so that's when we decided -- we don't know what he's going to be reaching for. He's not compliant. So there's a -- there's a danger to the officer if you're not complying.

Even if he would've -- if he would've reached up and just showed us an ID, that's complying. But you reaching around for -- we don't know -- maybe -- possibly a weapon. We

could see people in the back. They're reaching around. And so at that time I heard Border Patrol go, "Hey, bust the window." I had my glove on my --
Q. Let me stop you for a second.
A. Yep.
Q. That's a lot of information. Let me back up.
You said he rolled up the window. Is it your testimony then that when you approached the van's window was down, but the driver actually put it up?
A. That I can recall, yeah, it was up by the time I got there.
Q. And then --
THE COURT: Well, do you know if it was down at any time before?
THE WITNESS: I don't know because it was already up. So I don't -- I just --
THE COURT: Okay.
BY MR. RATCLIFFE
Q. And did you or your colleague give the driver any commands or instructions?
A. Yes.
Q. Can you tell us what you said and --
A. They were telling him to roll down the window in both English and Spanish, and he wasn't complying.
Q. And approximately how many times was this command given?

A. It was multiple times. It was repeated.
Q. And if you can give us a ballpark idea, recognizing that this was a while ago, but could you give us a ballpark idea of how long it was between your or your colleague's first instruction to the officer -- or to the driver to roll down the window and when you took the action to break the window?
A. I can't give you a time frame. It was -- it was -- it was a couple of seconds.
Q. But with multiple commands in between?
A. Yes.
Q. Tell us about breaking the window and what happened to you.
A. So I had my -- I had a glove on the right hand. I didn't have a glove on the left hand. I grabbed my window punch, pressed it against the window. It didn't work the first time. I put more pressure. My hand went straight through the window, cut my hand severely.
At that time, that's when I rolled out of -- out of the way so Border Patrol could handle it, so I could check my hand for how badly damaged it was. And I then put on my tactical glove, which I was bleeding through the tactical glove at that time.
Q. So at that point did you want to continue helping your colleagues?
A. I did.

Q. And so where did you go?
A. I went to -- back to the -- to support the other officer in the sliding door on the passenger side of the vehicle.
Q. And what did you perceive was going on -- what did you see or hear was going on inside the van in terms of people complying or not complying with directions?
A. So when they opened the door, they were yelling, "Hands," in both English and Spanish, "Manos." And they weren't complying. They were still reaching around. The petitioner was already on the phone. Other people were reaching around, on their phone.
One of the gentlemen at some point actually jumped to the back seat to -- it appeared like he was going to escape out of the back hatch of the door -- the two double doors in the back. He started jumping that way.
Q. So let me stop you there.
You're saying someone who was not in the very back seat of the van, but was in a seat in front of that in some way, put himself -- after the traffic stop and after the doors were opened, put himself into the very back seat of the van?
A. Yes, sir.
Q. And you were concerned that he was --
A. He was -- he was fleeing. I was -- I was worried he was going to start to flee because what reasonable action would you have to jump to the back seat of a van?

Q. So what did you do in response to that?
A. I went to the back hatch. I opened the back doors. He was already on the phone calling somebody. And so I took the phone from him.
Q. Why was it -- was it a concern of yours that people were making phone calls during this stop?
A. So it is concerning because one of the tactics that they -- people here, when they get arrested, they try to call family or the activist groups to come out to try to agitate or harass us or even assault us. One of my first arrests, they almost ran us over.
Q. So were you concerned that if the folks who were in the van were notifying people who were going to come to the area that there could be a crowd control problem?
A. Yes, sir. And we were already outnumbered.
Q. What do you mean by that?
A. There was only a couple agents, when you have multiple individuals that you suspect that are undocumented.
THE COURT: When you say "couple," there were, what, four?
THE WITNESS: Of us?
THE COURT: Yeah.
THE WITNESS: Let's see. There's -- two, three, four -- five of us.
THE COURT: Okay. All right.

THE WITNESS: And so, like, you want to have the ratio of two-to-one when you do the arrest.

THE COURT: And how many -- how many people were --

THE WITNESS: In the van?

THE COURT: -- were detained from the -- from the van?

THE WITNESS: I believe seven. Seven individuals.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. So during the time while you were observing the interactions with people in the van and your colleagues, as well as interacting with the gentleman whose phone you took, what did you determine about the language that they were speaking in the van?

A. They were only speaking Spanish. And we tried to talk to them in both English and Spanish. And so some of them were talking after we -- either during the encounter or after we were pulling them out.

Q. So what did the fact that the folks in the van were only speaking Spanish indicate to you, if anything, about what else might be going on that raised your suspicions?

A. Well, that kind of confirmed whether it's -- it's human smuggling or human trafficking or you harboring people that are not supposed to be here in the United States because they're here undocumented.

And with the -- the guy who jumped in the front -- or the back seat, that was a major concern because that's the flight risk. If we -- if we would've got them all out of the van, uncuffed, the likelihood of them running is very, very high.
Q. And did you learn -- while you were still at the van and people were getting out or not getting out, did you learn what happened to the driver, who your colleagues had been dealing with?
A. I didn't hear it, whether they were clear with the driver or not.
Q. Okay. Did you interact with the petitioner while she was still in the van or --
A. Not when -- not that I can recall, not 'til they started pulling her out. And then that's when I finally made contact with the petitioner.
Q. And what do you mean by that? How did you -- what were you doing?
A. So we were applying handcuffs to everybody. And so when she came out of the van, she was very noncompliant. We're telling her to put her hands behind her back. She wouldn't do it. She wanted to keep staying on the phone. She was gripping the phone as hard as she could.
We're telling her to drop it, drop it. She wouldn't. And then, finally, we got -- we got her in handcuffs and then

sat her on the -- on the sidewalk with the rest of the individuals.

Q. Do you know what happened to her phone during the process of her being put in handcuffs?

A. I think she dropped it at some point because whenever we sat her down, she didn't have her phone anymore.

Q. What happened with respect to a horn honking in one of the other --

A. Oh.

Q. -- cars?

A. So I turned off my vehicle 'cause I've had it before -- my vehicle's not caged. So once we start putting people in different vehicles so that we can contain them until follow-on officer arrived, in that time we were still doing field interviews.

So we're asking the mandatory questions that we have to, "What citizen -- or what country are you a citizen of? Or if you have any documents, any medical issues, any children." During the time that I put three people in my vehicle, the guy that was in my back driver seat jumped to the front and started -- he was honking the horn because he was trying to escape.

So his handcuffs were behind his back. His -- or his leg kept hitting the horn while he was trying to turn his body to try to reach my handle to try to get out the front seat.

And during that time, in that struggle, I ran back to my vehicle, started trying to move him to my back seat. At that same time, that's when I hear, "Oh, we have a runner." But I was still dealing with my guy. I know the Border Patrol agent that was with me, he ran back to go try to catch up with the -- the guy that escaped out of another vehicle.

Q. So what did the combination of your -- the horn honking on your car at the same time as someone took off running tell you or raise concerns in your mind about?

A. That they're all trying to escape our -- our custody.

Ever since the beginning of not complying, the guy tried to jump out the back of the van, and then him jumping to the front seat of my vehicle and then another guy that's in another vehicle trying to dart out of another vehicle, the likelihood of them escaping is very, very high. It's -- they've already exhibited it multiple times.

Q. What concerns, if any, did you have then about petitioner and whether she had a warrant or whether she was in the United States without permission?

A. During the time that we were conducting interviews, she was telling other people, "Don't answer questions. Don't answer questions." There wasn't an ID found on her. These are --

Q. Was not an ID found on her?

A. (No audible response.)

Q. Okay.
A. No.
Q. Sorry. Go on.
A. Oh. And so these are all just things that -- people that are undocumented, this is the tactic that you use, which they don't carry an ID on them, so when you do stop them, even though they are your target, they'll still not have an ID on them so that you can't positively ID them through an ID and -- and they stay quiet. It's a tactic that's very commonly used. And it's been told -- told to them on multiple occasions.

MR. RATCLIFFE: If I could have a moment, Your Honor.

BY MR. RATCLIFFE

Q. Did you or your colleagues attempt to identify the petitioner on scene using the Mobile Fortify application?
A. Yes, sir. Before that actually happened, there was somebody else in the party that -- in their -- in the petitioner's party, that actually said that they're all going to work and they're all from Mexico. So we knew that before our other colleague was on scene, which is the Customs and Border Patrol.

They showed up and were like, "Hey, what can I do? I'm going to go Fortify -- Mobile Fortify this -- the petitioner." And so before we left the scene, it was known that there was two possible hits for her identity.
Q. And your colleague from CBP who attempted to do this

identification, are her initials M.K.?

A. I -- yes.

Q. And so, now that you have, still at the scene, the petitioner not identified, but there are two, as you said, potential hits or matches in the Mobile Fortify system, what, if anything, did that lead you to believe existed in terms of your authority for an arrest?

A. Well, with a possible hit of her -- her identity and then another person saying that they're all from Mexico, that was -- that was justified for the investigative detention and the arrest.

Q. Are you familiar with the -- well, strike that.

Why did you decide to make a warrantless arrest?

A. Because there was a high likelihood of escape. Because if I have to write a 200 on the petitioner, what name would I have put? She's not giving us a name. She's not giving us an address of where she lives. So there's no way -- there's no way to go locate this person again in the future. So if I can secure a warrant, she would not live there anymore.

MR. RATCLIFFE: No further questions, Your Honor.

THE COURT: Before we proceed, I neglected to check in with our interpreters if you were able to stay until 6 o'clock.

THE INTERPRETER: Yes, Your Honor.

THE COURT: All right. But let's also take a break.

In about ten minutes, we'll come back with cross-examination.

How long do you anticipate your cross-examination to take?

MS. GARCIA ORJUELA: I will attempt to be as brief as I can, Your Honor, but I would estimate 25 minutes.

THE COURT: Okay.

MS. GAROUSI: Your Honor --

THE COURT: Ms. Garousi.

MS. GAROUSI: -- will -- does the Court intend to proceed after --

THE COURT: Well -- so if I take ten minutes, it'll put us at 5:15. And when we return, we got 25. That puts us at 5:45-ish. So I think we -- I also want to check in with you and take care of some housekeeping matters, so we can conclude at 6:00. What are your other witnesses -- who are your other witnesses --

MR. RATCLIFFE: That's, I think --

THE COURT: -- that are lined up?

MR. RATCLIFFE: -- what we're getting at, Your Honor. We have another witness, a short witness, who did travel from out of town. We were hoping to put him on today. That's the witness whose initials are B.W., regarding some paperwork that was prepared in this case. So we're hoping to squeeze in him as -- him in as well, if we could.

THE COURT: And this person's live?

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: In person?

MR. RATCLIFFE: Yes.

THE COURT: And when you say a short amount of time, how much would you say?

MS. GAROUSI: Your Honor, we anticipate no more than 15 or 20 minutes of questions.

THE COURT: Okay. Well, that does put us beyond the 6 o'clock hour. And while I might be willing to stay 'til midnight, I don't -- I don't think that should be subjected on anybody else. But we should take -- I do need to give everyone a break, though.

Mr. Manning, were you going to say something?

MR. MANNING: I was just going to say with the witness B.W., we anticipate probably some extensive cross-examination, Your Honor.

THE COURT: Okay. Okay. So I -- even if we start at 5:45, it might -- we might not actually finish then until 7:00. And I'm -- or at least 6:45, and I'm not sure I can -- I can keep everybody that late.

MR. RATCLIFFE: Understood, Your Honor. That makes sense.

THE COURT: And you'll be able to make arrangements -- is it W?

MR. RATCLIFFE: B.W.

THE COURT: B.W.

MR. RATCLIFFE: And, yes, we will give him the good news that he has another night in Portland on the U.S. Government's dime.

THE COURT: All right. And where -- which state is he in -- from?

MS. GAROUSI: Ah --

MR. RATCLIFFE: Nebraska?

THE WITNESS: Iowa.

MR. RATCLIFFE: Iowa.

MS. GAROUSI: Yes, Your Honor. A lot of states at play here.

THE COURT: They looked at you.

THE WITNESS: Yeah, Iowa. He's from Iowa, sir.

THE COURT: He's from Iowa. Well, then I'd say Oregon's a treat.

All right. Let's -- let's take a -- let's take the break, ten minutes. We'll return with the cross-examination.

So, sir, you're free to step down, move about, but please do not discuss your testimony with anyone who has already testified or anyone who has yet to testify. My order excluding witnesses remains in place.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you, sir.

MR. RATCLIFFE: Thank you, Your Honor.

(Recess taken, 5:08 p.m. - 5:19 p.m.)

THE COURTROOM DEPUTY CLERK: The United States District Court for the District of Oregon is back in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT: Thank you.

Mr. Ratcliffe, you were done with direct?

MR. RATCLIFFE: Correct.

THE COURT: Thank you.

Ms. Garcia Orjuela, please --

MS. GARCIA ORJUELA: That's correct.

THE COURT: -- proceed.

MS. GARCIA ORJUELA: Thank you, Your Honor.

Let me just move the mic, yeah.

All right. That's good?

THE COURT: Yes, please.

MS. GARCIA ORJUELA: Okay. Perfect.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA

Q. Okay. So you mentioned that you have been with ICE Denver for over five years, correct?

A. Yes.

Q. And you said you were volun-told to come to an operation here. What operation were you coming for?

A. I can't tell what operation. I -- I don't even know what operation it was.

Q. It did not have a name?
A. I'm sure it did. I just wasn't aware of it because it doesn't really matter what the operation is called. An at-large arrest is an at-large arrest.
Q. Okay.
THE COURT: I didn't hear that last part.
THE WITNESS: I said, "An at-large arrest is an at-large arrest." It doesn't matter what operation it is.
BY MS. GARCIA ORJUELA
Q. Okay. What do you mean, "volun-told"? What does that mean to you?
A. So I had two days before that we were supposed to leave. And they were like, "Hey, do you want to go?" And I was like, "No," because I had personal things going on in my life: My son's birthday, closing on a house. And then they were like, "Well, you kind of have to go." And I was like, "Fine. I'll go, just so I can get this done, so that I can be home for the holidays."
Q. Okay. And how long were you stationed in Portland?
A. Less than 30 days, because it took two days to travel here and then left a day before the actual close date because we were supposed to have an admin day of turning in our stuff and just to have, like, a turnover of just returning gear and stuff.
Q. And for this at-large arrest operation, as you call it,

did you have a target goal of a set number of arrests?
A. Not in writing.
Q. Were those numbers given to you orally?
A. Yes.
Q. How many arrests was your target?
A. Supposedly eight.
Q. Eight --
A. Per team.
Q. Per team?
A. Yes, ma'am.
Q. And was that over the 30 days?
A. No.
Q. Daily?
A. Per day.
Q. Per day?
A. Yeah.
Q. Did you comply with this quota?
MR. RATCLIFFE: Objection to characterizing it as a quota.
THE WITNESS: Yeah.
MR. RATCLIFFE: Misstating the evidence.
THE COURT: Overruled.
Go ahead.
THE WITNESS: Did I comply with it? I made as -- as many arrests as I could, as long as it was lawful.

BY MS. GARCIA ORJUELA
Q. Okay.
THE COURT: So if I understood your testimony, was it eight or 13 a day?
THE WITNESS: Eight.
THE COURT: Eight. Okay.
THE WITNESS: Eight.
THE COURT: All right. So eight a day. And were you able to meet those expectations over the course of those 30 days?
THE WITNESS: Sometimes.
THE COURT: Okay.
BY MS. GARCIA ORJUELA
Q. Out of a week, how many times did you meet that expectation?
A. I can't say.
Q. You don't remember?
A. No.
Q. Okay. Let's move to October 30th. You were one of the arresting officers, correct?
A. Yes.
Q. And can you tell me: Where was petitioner when the other people were running away?
A. I believe she was still on the sidewalk. Actually, I was still moving people to -- to vehicles, so I -- I don't even

know where she was.
Q. Who was the agent that put handcuffs on her?
A. Me.
Q. So you did not know where she was?
A. The last place I left her was sitting with the rest of the individuals on the sidewalk.
Q. Okay. So she was sitting on the sidewalk while the other persons were running away, correct?
A. I -- I can't tell you.
Q. Okay. You were the one that made this list for the arrests, correct?
A. For --
Q. For the target.
A. Sure.
Q. Okay. Was the driver one of the targets?
A. I can't tell you because when I cut my hand, I -- I rolled out of the way to check my -- my injuries. Now, could he have been one of the guys in the vehicle? Possibility. But I didn't get to ID anybody -- like, positively ID anybody 'cause when we did our -- our field interviews, that's when people were confirming, "Yes, I'm here in the United States without any status, and I'm from Mexico." So --
Q. But any of the people in the car confirmed to be the target that you were looking for?
A. I don't know.

THE COURT: Before we took the break, I thought you had testified -- and correct me if I'm wrong -- that -- that the -- there was a person who got into the car at the -- or the van at the parking lot, and when you ran --

THE WITNESS: That I believed was the registered owner of the vehicle, yes, sir.

THE COURT: Okay. And were you not able to confirm that person was the registered owner of the vehicle at the -- when you stopped the van?

THE WITNESS: The -- I could not positively ID the person at the -- in the front seat of the van as the registered owner because I didn't have his ID.

THE COURT: Okay.

THE WITNESS: Because I've -- we've had it before where it looks like the target, but it isn't. We -- everybody on the team thinks it's the target; and it's the identical twin brother, so you can't confirm. Or they have a -- they have an ID; they show you an ID; and it's a fake ID. So you don't get a 100 percent ID until you roll the fingerprint.

THE COURT: Okay.

BY MS. GARCIA ORJUELA

Q. Did you ever confirm the identity?

A. No. Of --

Q. Of --

A. -- of the driver?

Q. Of the driver.
A. We eventually did, but I did not.
Q. Okay. Who did?
A. One of my colleagues.
Q. And did one of your colleagues state whether he was not -- he was or wasn't the target?
A. I can't tell you. I don't know.
Q. Okay. You're aware that you usually have to fill out reports, correct, during the course of your work?
A. What reports?
Q. Do you generate reports over the course of your work?
A. After an arrest?
Q. After an arrest.
A. Yeah.
Q. Okay. May I turn your attention -- there's a folder on that table -- yes, thank you --
A. Mm-hmm.
Q. -- to Exhibit 10 -- I'm sorry, I cannot read my -- 110. I'm sorry.
A. 110. Okay.
Q. Do you recognize that -- that document?
A. Yes.
Q. What is it?
A. It's a scratch 213 -- or it's a -- sorry. It's a -- basically a field interview form.

Q. And did you fill that form?
A. No.
Q. Who did it?
A. Don't know. I -- because -- the reason for it is because I was -- I was mostly concerned about my hand. Like --
Q. Did you provide information to inform this -- the contents of this form?
A. Well, I didn't fill it out, so --
Q. Your initials are listed under the text that says "Arrest Team Number 7"; is that correct?
A. I don't know. It's redacted. It either says J.B., J.A.

THE COURT: Do you have an unredacted copy --

MS. GARCIA ORJUELA: I do have an unredacted copy I can --

THE COURT: Okay. Then why don't you go ahead and -- you can approach and show the witness the unredacted copy to confirm your question.

BY MS. GARCIA ORJUELA
Q. Let me ask this question again.

Under "Arrest Team Number 7," is your name written in this form?
A. Yes.
Q. You were one of the arresting officers, correct?
A. I was on scene arresting people, yes.
Q. Okay. Now let's turn to form -- I mean, Document 109.

A. Okay.
Q. Do you recognize this document?
A. It's a 213.
Q. What is usually on a 213?
A. Just -- well, various information. Name, FBI number, their -- their address, picture --
Q. There's -- there's usually a narrative about the arrest and -- and other causes, correct?
A. Yep.
Q. Did you provide information to instruct the -- the -- I mean, the contents of this form?
A. I didn't write it.
Q. Who did?
A. To the best of my knowledge, our SDDOs would write it.
THE COURT: Did you say RS?
THE WITNESS: Oh, sorry. The supervisor detention and deportation officers, so our bosses, like our supervisors.
THE COURT: Oh, "our SDOs"?
THE WITNESS: SDDO.
THE COURT: SDDO. Okay.
THE WITNESS: Yes, sir.
BY MS. GARCIA ORJUELA
Q. Okay. Did you provide information about the arrest to your supervisor? Yes or no.
A. That we arrested people, yes.

Q. Do you provide the narrative of how the arrest happened?
A. They ask us questions of what they don't know at the time.
Q. Was your supervisor with you at the time of the arrest?
A. He got there late.
Q. Did you relate to your supervisor, who signed this form, what transpired during the arrest and the investigation beforehand?
A. Ah --
Q. Yes or no.
A. I can't -- I can't, like, really pinpoint it, but we give him a brief synopsis of what happened. But it's really hard to explain chaos at a time of arrest.
Q. Did you explain to him your reasonable suspicions for stopping the car?
A. I don't know, because we were already -- he already has the confidence in all of us that we've run our checks.
Q. Okay. You have mentioned several times that you were very concerned about human trafficking, correct?
A. Human smuggling, human trafficking, and transporting people that are here illegally.
Q. Okay. I can give you a couple minutes. Is there any contents on this report on the arrest, on the record and the encounter, that speaks to human trafficking?
A. No.
Q. Would that be something that you would flag to your

supervisor?
A. If we believed it. But, again, we didn't suspect human trafficking after somebody already made the statement that they're all going to work and they're all from Mexico. So that kind of cancels out human trafficking. But transporting people here illegally, yes.
Q. Okay. And they -- you were saying they were all going to work and they were from Mexico. You never heard petitioner say that, correct?
A. No.
Q. And yet you put the handcuffs on her, correct?
A. Yes, because of flight risk.
Q. Why did you assess she was a flight risk?
A. Because the -- the driver being noncompliant and the guy jumping into the back seat. And then, later on, multiple people started trying to escape.
Q. Did she try to escape?
A. I would say --
Q. Yes or no.
A. Well, you don't know 'til they actually do escape.
Q. Did she try to escape?
A. Ah --
Q. Yes or no.
A. No.
MS. GARCIA ORJUELA: Thank you, Your Honor. No

further questions.

THE COURT: Redirect?

MR. RATCLIFFE: No, Your Honor.

THE COURT: Can this witness be excused?

MR. RATCLIFFE: Yes.

THE COURT: Any objections?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. Officer J.B., you are free to go. You're excused. However, the admonition, the order about discussing your testimony with anybody else who has yet to testify or who has testified remains in place until the record is closed. So --

THE WITNESS: Yes, sir.

THE COURT: -- so please continue to comply with that.

THE WITNESS: Okay.

THE COURT: Thank you very much.

THE WITNESS: Do you want your copy --

THE COURT: You can leave that right there, and we'll gather it up.

Have a good day.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. Well, it always happens this way. We're close, but are we close enough? If -- if you -- if you all can legitimately and reasonably confirm that this last

witness could be completed in 30 minutes, I'd be happy to oblige.

MR. RATCLIFFE: Your Honor, we sent him away -- sorry --

THE COURT: Oh.

MR. RATCLIFFE: -- at the break.

THE COURT: All right. Well, I appreciate the efficiency.

All right. So let's -- I take it there aren't any other witnesses that could be lined up to -- to work through the next 30 minutes? And I don't want things to be forced since we're taking such a deliberate approach to this record, so that's fine. We can talk about other housekeeping matters before we finish up today.

MR. RATCLIFFE: Judge, we are -- again, based on the conversation we had before the break, we sent everybody home, anticipating that we wouldn't have more time, so yes.

THE COURT: All right. So how many other witnesses do you have? I think we have -- we've gone through three of the officers, their testimony. And then I know we have a video from -- a video -- video testimony tomorrow.

MR. RATCLIFFE: Correct. We are prepared to put on -- or we were planning to put on two more -- three more witnesses. And then there is the issue of the witness whose testimony we've arranged by video.

There's also the -- the issue of C.W., whose name was mistakenly inserted onto the 213 in this case. She's a local person. So I think that takes us then to five potential witnesses and maybe six then if we want to put on quick testimony regarding the alleged deprivation of counsel issue. So I have other questions, but I'll let the Court, obviously, guide the discussion. Sorry.

THE COURT: Sure. So you have questions for me or --

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: Let's put them on the table.

MR. RATCLIFFE: I was just going to say that -- so this morning we talked about C.H., who was someone who Mr. Manning and Ms. Garcia believed we could -- I think, believed we could cut loose. But the Court learned that C.H. was a supervisor.

THE COURT: Right.

MR. RATCLIFFE: And even though we advised the Court that C.H. was not on scene, the Court asked us to keep him here. We're wondering if we can allow him to go back home.

THE COURT: Yeah, let's revisit that. Part of -- the reason was because it was -- I mean, he's a -- the person was the supervisor. And given that some of -- some of these decisions may or may not have been coming from supervisory positions, I wasn't yet ready and comfortable allowing release if we already have this person available.

But at this stage, I think with Agent J.B.'s testimony, you know, I'm not sure that another supervisor with any other capacity might offer more. But the two of you know -- know what may or may not be in play.

So, Mr. Manning, your thoughts on C.H.?

MR. MANNING: Your Honor, we had originally understood that C.H. would not have been necessary. But from the testimony today, we understand that C.H. was --

THE COURT: I'm not sure the mic is picking up. Can you tap the --

MR. MANNING: How's that?

How's that?

THE COURT: That's better. Okay. That's good.

MR. MANNING: So we originally did not think C.H. would be necessary 'cause we thought we could get the -- that the other -- we understood his testimony might be duplicative. But at this point in time, we do not think that is so.

THE COURT: Okay.

MR. MANNING: Our understanding from D.R. or --

THE COURT: D.R. was our first witness.

MR. MANNING: -- our second -- the --

THE COURT: And --

MR. MANNING: -- the Border Patrol with the body cam witness was --

THE COURT: C.M.

MR. MANNING: -- C.M. Thank you -- that it was C.H. that was developing the package, the target package.

THE COURT: Okay.

MR. MANNING: And so that seems to be very critical to our understanding, and so we -- I don't -- we would -- we would like to understand more about the targeting package. We think that's --

THE COURT: Okay. So the scope of your inquiry would be regarding the target package, not the stop itself?

MR. MANNING: That's correct, Your Honor.

THE COURT: All right.

MR. RATCLIFFE: Your Honor, I'm surprised by this because counsel did not ask J.B. any questions about the targeting package, who put to together. I thought our testimony on that issue was clear. I think C.M. testified earlier that he did not receive target packages. Those were something that CBP did not receive.

But this issue could've been explored with J.B. if it needed to, if any testimony from C.H., this witness who we'd like to send home, was necessary. But that wasn't done.

THE COURT: And I think I asked some questions about the target package. I mean, there was quite a bit of information about, I mean, these baseball cards and -- and other -- and other developments; and this was sort of an open target operation, where they were using this Elite -- I have to

refresh my -- Elite app to identify people based on some kind of database.

So I think -- so, with that in play, what else would you be inquiring then from C.H. if what -- what J.B. testified to about how he developed the package -- and -- or the -- whatever it is that we're calling it, the information used to conduct their -- their operations that morning?

MR. MANNING: Just my recollection of the testimony is, Your Honor, it was that he did not actually say it was J.B. He said it was C.H. That is the only reason why --

THE COURT: "He" being who? J -- C.M.?

MS. GARCIA ORJUELA: It was -- excuse me. I have to find it. M.P.? Yes.

MR. MANNING: He was the second witness, Your Honor.

THE COURT: Yeah, that was C.M. And that was the -- the officer in the back who -- and I'm not going to call you, so you don't have to -- you don't have to sneak out of here fast -- but the officer in the back from Customs and Border Patrol?

MR. MANNING: That's correct, Your Honor.

THE COURT: Yeah. All right.

MR. MANNING: And so we -- and it is absolutely true that we would -- we don't want to request duplicate testimony. But our recollection of that officer's testimony was that it was C.H. that was developing the target package that was at

play here. We understand that J.B. testified about that, but J.B. was not the one who the other officer mentioned.

THE COURT: All right.

MR. RATCLIFFE: Again, Your Honor, I'm not sure why this wasn't explored on cross-examination of J.B. They had the opportunity to inquire.

THE COURT: J.B., I note you're sitting in the back. Have you discussed your testimony with anybody since the time you stepped off the witness stand?

THE WITNESS: No, sir.

THE COURT: All right. Please come back up to the -- to the witness stand.

THE WITNESS: Yes, sir.

THE COURT: I'd like to avoid having C.H. called up -- or C.H. called. And let's see what we can -- we can develop with Officer J.B.

You're still under oath, sir?

THE WITNESS: Yes, sir.

MR. MANNING: May I proceed, Your Honor?

THE COURT: Please go ahead.

FURTHER EXAMINATION

BY MR. MANNING

Q. Okay. Could you describe to me your interactions on developing the target package with C.H., the officer known in this case as C.H.?

A. Ah --

THE COURT: Do you know who C.H. is?

THE WITNESS: Yes, of course. Yes, Your Honor.

What do you mean by interaction with the supervisor?

BY MR. MANNING

Q. The -- could you describe to me how -- you had indicated in your testimony that you had developed a target package?

A. Yes.

Q. And did you develop it -- that target package on your own?

A. Yes.

Q. And did you develop that target package at all in conjunction with the individual known as C.H.?

A. No. I don't need a supervisor to explain to me if someone's undocumented or to confirm. I have the training and knowledge and experience to figure out if someone's undocumented here in the United States.

MR. MANNING: I have no other questions on this, Your Honor.

THE COURT: Under other circumstances or scenarios, would supervisors provide some more defined target package, other than just simply giving you instructions to go and --

THE WITNESS: If -- if he was given a target package from, like, our intel team, then, yes, he would disseminate it. But that day there was no target packages that were ever disseminated because at that point we were too far in the

operation that we weren't receiving target packages any more. And so we had to develop our own targets.

THE COURT: Okay.

MR. MANNING: I don't have any other questions for this witness.

THE COURT: Mr. Ratcliffe.

MR. RATCLIFFE: No, Your Honor.

THE COURT: Thank you. You're released again. This time you might want to leave.

THE WITNESS: Okay, sir.

THE COURT: No.

MR. RATCLIFFE: And tell C.H. to go with you. I'm kidding. I'm kidding.

THE COURT: All right. I don't think C.H.'s testimony would be necessary under the circumstances.

MR. MANNING: We're fine with that, Your Honor.

THE COURT: Okay.

MR. RATCLIFFE: So, Your Honor, if we can move on to talk about a couple other witnesses. We have -- I know the Court expressed some concern earlier about not wanting to repeat information, not wanting to have too many witnesses and too much testimony. We have two witnesses, A.W. and J.A., who, of course, are here. The Court saw them this morning.

THE COURT: And J.A. is listed on the 109 -- on Exhibit 109 as 1 of the arresting officers?

MR. RATCLIFFE: Correct. Correct.

We have those two officers here, who we are not planning on putting on. We're, obviously, making them available if the petitioner has a rebuttal case to make. But we are raising this issue to find out if we can get any agreement and at least cut A.W. free so that he can go back to somewhere outside Oregon. I don't remember where.

THE COURT: Mr. Manning.

MR. MANNING: Thank you, Your Honor.

We essentially have three questions for A.W., just to --

THE COURT: Okay. Three questions?

MR. MANNING: I can't imagine that we would have more than five questions, but three at a minimum.

THE COURT: All right. Well, I take it that A.W. is still here because he was sent -- sent back to a hotel room or somewhere else?

MS. GAROUSI: Yes, Your Honor.

MR. RATCLIFFE: He was told he could leave. I'm not sure if he's in our office or if he's decided to go to Pioneer Square and look at the Christmas tree.

THE COURT: I -- and so if he's still in Portland --

MR. RATCLIFFE: Oh, yes.

THE COURT: Yeah. Right. If he was easy to reach in the next five minutes, then maybe -- maybe we could try to get

that done. But I'm -- I'm no longer -- I don't want to be engaged in fantastical thinking, so --

MR. RATCLIFFE: I can step out and call him, Your Honor.

THE COURT: You're entertaining my fantastical thinking.

You want to say something, Mr. Manning.

MR. MANNING: Your Honor, I mean, we -- the three questions we have, in the video we see that -- we now understand A.W. had a body -- there was another -- he was another officer. We think there is a -- we see -- in the video it looks like he had a body -- body-worn camera as well. We want to know did he have a body-worn camera --

THE COURT: Okay. So you just want to know if A.W. had a body cam and if --

MR. MANNING: And if it was activated.

THE COURT: -- and if it were activated?

MR. MANNING: That's right.

MR. RATCLIFFE: He's told us that he did not. He did have a body cam. He did not activate it. There is no footage. We have -- and we've advised opposing counsel that there is no further body-worn camera footage before today.

THE COURT: Is there something different about having A.W. testify under oath to that point or -- or can -- can we also accept the representations of -- of Assistant U.S.

Attorney --

MR. MANNING: I can accept that representation here in court, Your Honor.

THE COURT: Okay. A.W. then not necessary?

MR. MANNING: Not by us at this time, Your Honor.

THE COURT: All right. Okay. A.W. -- J.A., again, is -- is initialed on Exhibit 109. Are you -- or do you want to ask questions of J.A.?

MS. GARCIA ORJUELA: Yes, Your Honor.

THE COURT: Okay. So J.A. -- J.A. needs to stay.

MS. GAROUSI: Your Honor, just to clarify, are you referring to Exhibit --

THE COURT: I might be referring to a different number. Maybe it's 110.

MS. GAROUSI: 110, the scratch --

THE COURT: Yes, it's 110.

MS. GAROUSI: Okay. Thank you, Your Honor.

THE COURT: Yeah. Thank you.

All right.

MR. RATCLIFFE: Understood, Your Honor.

THE COURT: All right. So C.H. and A.W. can also be released. If you can advise them of the order excluding witnesses and the requirements for that until the record is closed tomorrow.

MR. RATCLIFFE: Understood.

THE COURT: All right. So we still have C.S.W. and K.K.

MR. RATCLIFFE: Correct. K.K. arranged by video. C.S.W., we will ask her to return tomorrow.

THE COURT: And then J.A. --

MR. RATCLIFFE: And J.A. and then the other folks who we were already planning to put on in our -- our case in chief.

THE COURT: So are you thinking five total?

MR. RATCLIFFE: I think that -- hold on. Let me do some math here, Your Honor.

(Whispered discussion, off the record, 5:46 p.m.)

THE COURT: So we have from 9:00 ideally to 12:00, but we can squeeze out an additional hour at 1:00 if we need four hours. But, you know, I --

MR. RATCLIFFE: Great. I think that the pace can pick up tomorrow, since these folks were not -- were generally not involved in the arrest, not in the level of detail of the three witnesses today.

THE COURT: All right. All right. And, Mr. Manning, Ms. Garcia Orjuela, are you anticipating any rebuttal for tomorrow?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: Okay. All right. So we may very well be able to get the record closed and talk about next steps. I understand that this case may be evolving into a motion for

class certification. So we'll talk about how we take up briefing on that going forward as well.

Any other housekeeping matters that we need to check in on before you can go your way?

MR. RATCLIFFE: No, Your Honor. Thank you for your time.

THE COURT: You're very welcome.

MR. MANNING: Not by us, Your Honor.

THE COURT: Okay. All right. So tomorrow we will be talking about briefing schedules and just trying to make sure then we get argument in, in an appropriate way, and then talk about what we do with the record that we do have now going forward.

I would like to -- just -- most of today, I mean, involves at least the Fourth Amendment violation of the unlawful arrest claim, claim number one. And I know that it will -- you know, it transitions into the detention.

One of the things that I remember asking Ms. Garousi the last time is why was -- why was M-J-M-A, the petitioner, released from the facility. I think at that time you said you had not yet been able to discuss the reasons that she was released from detention from -- from the Tacoma facility. Do you have any better understanding as to why she now has been released?

MR. RATCLIFFE: Your Honor, those decisions and the

discussions that went into them are between our office and counsel for ICE. And we consider those privileged communications.

THE COURT: Okay. Well, I imagine we -- well, we'll revisit that, but not today. I think it probably requires maybe further discussion, but -- but let's leave that for another time.

All right. I won't open any more cans of worms at 5:50. So let's -- let's call it good. We can go off the record. Counsel, thank you for your courtesies and -- and patience. I know it sometimes is unconventional for having a judge ask questions. I don't, frankly, think it ought to be.

But I appreciate, again, your willingness to roll with it. It helped educate me in a way that I also think helped me understand the context much better, especially for the -- for the subsequent witnesses.

MR. RATCLIFFE: That is the silver lining, Your Honor, as far as we're concerned in this case. With an evidentiary hearing we are educating the Court and the public, knowing that Ms. Bernstein was here, may still be here, about what happened in this case.

THE COURT: All right. Thank you, all counsel. I'll see you tomorrow at 9 o'clock. We'll continue with the taking of testimony then.

MR. MANNING: Thank you, Your Honor.

MS. GARCIA ORJUELA: Thank you, Your Honor.

MR. RATCLIFFE: Thank you, Judge.

* * *

(Court adjourned, 12-2-25 at 5:49 p.m.)

C E R T I F I C A T E

M-J-M-A v. Wasmley, et al.

Case No. 6:25-cv-02011-MTK

Evidentiary Hearing

December 2, 2025

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the FTR-recorded proceedings in the above-entitled cause. Where (indiscernible) has been indicated, the audio file was unable to be heard due to simultaneous crosstalk, fast speaking, mumbling, or other room noises overriding what was being said. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

Official Court Reporter Signature Date: 12/17/2025
Oregon CSR No. 14-0427 CSR Expiration Date: 6/30/2026

**MR. MANNING: [105]** 4/14 5/8 18/16 18/19 19/2 19/17 20/5 21/12 22/5 22/24 23/14 23/22 23/24 24/8 29/3 29/24 34/4 34/17 34/21 35/1 35/11 36/5 37/16 38/2 38/7 39/3 41/12 41/23 42/8 42/12 42/17 42/22 45/4 45/8 45/11 45/15 45/24 46/8 46/16 50/21 51/3 51/6 51/18 51/20 53/7 53/14 54/13 54/18 54/23 55/1 56/18 56/25 57/10 57/16 57/19 58/9 59/3 59/11 59/14 77/6 77/11 77/17 78/10 80/7 86/22 88/12 93/1 93/13 93/15 93/17 94/2 96/6 96/18 103/3 120/8 120/13 134/3 220/1 256/14 272/6 272/11 272/14 272/19 272/21 272/23 273/1 273/4 273/10 274/8 274/14 274/20 274/22 275/19 276/17 277/4 277/16 278/9 278/13 279/8 279/16 279/18 280/2 280/5 282/8 283/25

**MR. RATCLIFFE: [229]** 4/19 7/6 7/10 8/16 9/6 10/4 10/19 11/2 11/11 12/3 12/7 12/9 12/16 12/22 13/9 13/22 14/8 14/17 16/10 16/15 16/22 17/3 18/4 18/8 24/14 24/22 25/3 25/5 27/11 27/19 28/13 30/14 31/9 33/3 33/23 33/25 35/15 36/1 36/16 38/16 38/19 38/22 38/24 39/23 40/15 41/25 42/6 43/16 44/9 44/13 47/8 48/4 48/13 49/19 50/17 51/15 52/4 52/13 52/15 52/20 53/16 53/18 53/24 54/3 54/6 55/16 55/19 55/23 57/24 58/4 58/14 58/21 59/2 61/20 61/22 63/11 63/16 64/2 65/11 65/15 66/15 66/19 67/9 67/22 68/9 70/14 71/3 71/6 71/16 71/20 71/23 72/2 72/24 73/2 73/5 74/21 75/2 78/19 78/22 80/6 80/14 81/11 88/8 88/16 88/20 90/17 90/21 90/25 91/20 91/23 92/1 92/3 92/7 96/20 99/9 99/13 103/13 103/18 104/12 106/16 106/24 107/7 107/24 115/14 117/13 118/12 118/18 120/17 120/22 124/19 125/19 133/23 134/6 134/8 134/14 134/18 135/6 135/14 136/8 136/12 136/18 136/21 137/10 138/7 138/19 138/24 139/15 146/19 159/24 160/3 162/18 166/19 166/25 167/23 167/25 168/6 168/11 176/1 179/5 190/3 194/12 195/17 199/25 200/4 201/20 208/19 209/9 209/15 210/4 211/6 211/8 212/1 212/4 215/5 215/9 215/21 216/8 216/14 217/16 217/23 218/7 218/9 219/11 220/6 234/4 253/11 254/20 255/17 255/19 256/1 256/3 256/21 256/25 257/2 257/8 257/10 257/25 258/7 260/18 260/21 269/3 269/5 270/3 270/6 270/15 270/22 271/9 271/11 271/17 273/12 275/4 277/7 277/12 277/18 278/1 278/19 278/23 279/3 279/19 280/20 280/25 281/3 281/6 281/9 281/15 282/5 282/25 283/17 284/2

**MS. FELDMAN: [8]** 14/22 15/2 15/8 15/10 15/13 15/22 18/7 18/9

**MS. GARCIA ORJUELA: [76]** 4/16 42/10 51/10 77/21 87/8 88/4 97/10 97/19 97/22 97/24 98/1 98/7 98/9 98/11 98/13 98/16 98/25 99/19 99/21 99/24 100/4 100/11 100/14 100/25 101/13 105/6 105/10 105/18 105/20 105/25 107/5 108/5 115/10 117/15 117/18 117/20 118/2 118/6 118/10 153/11 162/20 162/23 162/25 163/2 163/22 164/6 165/23 166/22 167/3 167/5 168/2 184/10 194/5 194/8 200/7 201/2 203/1 203/5 204/17 205/14 208/21 211/23 214/24 215/12 219/5 255/4 258/10 258/12 258/16 265/13 268/25 269/7 274/12 280/9 281/22 284/1

**MS. GAROUSI: [36]** 4/21 5/16 5/20 5/22 6/4 38/9 38/13 39/13 40/6 40/13 42/18 43/1 43/10 43/15 43/23 45/14 45/21 47/3 88/24 89/2 95/6 95/17 95/23 101/14 101/21 103/1 104/24 255/7 255/9 256/6 257/7 257/11 278/18 280/11 280/15 280/17

**THE COURT: [670]**

**THE COURTROOM DEPUTY CLERK: [20]** 4/5 59/6 77/24 78/5 103/19 103/25 108/11 108/17 121/2 121/8 168/8 168/14 168/20 218/18 218/20 218/22 218/24 220/9 220/19 258/2

**THE INTERPRETER: [9]** 4/25 5/2 6/2 89/7 89/22 98/20 101/15 218/2 254/24

**THE WITNESS: [231]** 78/7 78/24 81/13 89/24 90/15 102/8 108/20 117/8 117/10 117/23 117/25 121/10 122/23 124/16 124/18 124/24 127/10 127/14 127/17 128/5 128/10 128/14 128/17 128/22 128/25 129/2 129/5 130/20 130/24 131/3 131/6 131/10 131/23 132/3 132/8 133/4 133/7 133/12 133/15 133/17 133/20 135/25 136/6 141/11 141/17 141/24 142/4 142/11 142/15 142/18 142/24 143/4 143/7 143/10 143/13 143/16 143/21 143/25 144/6 144/10 144/17 144/19 144/23 145/1 145/3 145/10 145/13 145/17 145/21 145/24 146/1 146/5 146/8 146/11 146/14 146/16 147/20 148/5 148/8 148/12 149/14 149/17 152/11 152/14 154/12 154/16 154/22 155/2 156/14 156/17 156/21 156/24 157/13 157/16 157/19 158/18 159/4 160/10 160/15 160/21 160/23 161/1 161/3 161/5 161/8 163/25 164/2 164/5 165/3 166/10 166/14 166/17 167/16 167/18 167/21 168/23 175/24 176/6 176/20 177/7 177/9 177/14 177/20 190/1 190/16 190/25 191/2 191/6 194/24 195/2 195/7 195/9 195/15 195/18 195/21 195/25 196/6 196/10 200/24 201/11 201/22 209/7 210/10 210/12 210/17 210/22 212/23 213/1 213/4 213/7 213/13 213/19 213/24 215/18 215/20 216/6 220/11 220/21 226/17 226/24 227/8 227/11 227/16 228/4 228/8 228/10 228/12 228/14 228/21 229/3 229/7 229/10 229/15 229/17 229/20 230/1 230/5 230/7 230/11 230/19 230/21 231/5 231/8 231/11 231/17 231/19 233/9 234/3 235/14 236/13 236/15 239/9 239/15 242/20 242/22 243/3 243/5 243/8 243/18 243/21 248/15 248/21 248/23 249/1 249/4 249/7 257/9 257/14 257/23 259/7 260/20 260/24 261/5 261/7 261/11 263/5 263/10 263/14 266/16 266/19 266/21 269/13 269/16 269/18 269/22 275/10 275/13 275/18 276/3 276/22 277/10

**$**

**$20 [1]** 75/5

**'**

**'cause [8]** 21/4 23/25 75/18 214/22 235/24 251/11 262/19 272/15

**'s [1]** 45/5

**'til [4]** 223/15 250/14 256/9 268/20

**/**

**/s/Lindsey [1]** 285/21

**0**

**0427 [1]** 285/23

**08:31 [1]** 214/3

**1**

**1-1 [1]** 87/6

**1-1-6 [1]** 87/6

**1.5 [2]** 232/20 232/20

**10 [1]** 264/18

**10 percent [1]** 229/23

**100 percent [4]** 231/11 231/15 231/20 263/19

**1000 [3]** 2/13 2/18 2/22

**101 [2]** 51/12 203/2

**101-111 [1]** 51/23

**102 [1]** 164/9

**109 [7]** 3/10 165/8 234/23 265/25 277/24 277/25 280/7

**10:05 [1]** 113/17

**10:05 in [1]** 110/16

**10:49 [1]** 59/4

**11 [4]** 11/14 11/21 109/9 113/4

**11 o'clock [1]** 113/18

**110 [5]** 264/18 264/20 280/14 280/15 280/16

**111 [2]** 51/12 51/23

**112 [5]** 51/1 52/1 53/11 55/7 55/14

**113 [1]** 51/13

**113-116 [1]** 51/23

**115 [2]** 3/10 105/17

**116 [5]** 51/13 51/23 87/5 105/13 105/18

**117 [12]** 51/1 52/1 55/16 55/17 87/6 87/7 87/10 87/16 87/19 88/5 88/10 88/11

**118 [2]** 51/13 51/23

**119 [3]** 51/13 51/24 55/15

**11:00 [1]** 113/17

**11:00 p.m.-ish [1]** 7/18

**11:02 [1]** 59/4

**11:34 a.m [1]** 80/15

**11:39 [1]** 80/16

**11th [3]** 7/17 7/18 26/15

**12 [2]** 123/9 221/12

**12-2-25 [1]** 284/4

**12/17/2025 [1]** 285/22

**121 [1]** 3/12

**1**

**12:00 [1]** 281/12
**12:00 p.m [1]** 116/7
**12:01 p.m [1]** 90/24
**12:03 p.m [1]** 92/5
**12:04 [1]** 92/6
**12:20 now [1]** 103/6
**12:20 to [1]** 103/15
**12:21 [1]** 103/21
**12:30 [1]** 103/7
**12th [1]** 122/12
**13 [1]** 261/4
**1357 [3]** 20/7 62/18 63/15
**14-0427 [1]** 285/23
**15 [12]** 23/18 24/1 103/9 103/16 105/21 116/5 170/3 180/5 180/7 180/10 200/19 256/7
**15th [1]** 53/12
**163 [1]** 3/12
**166 [1]** 3/12
**169 [1]** 3/13
**16th [1]** 23/4
**18th [2]** 217/10 218/6
**19 [1]** 50/22
**1980 [1]** 119/12
**19th [1]** 217/11
**1:00 if [1]** 281/13
**1:30 [3]** 103/12 103/13 103/15
**1:42 [1]** 103/24

**2**

**20 [4]** 50/22 52/20 101/12 256/7
**200 [6]** 2/5 2/9 3/13 234/8 235/5 254/15
**2025 [9]** 1/18 3/3 4/1 53/12 59/23 60/9 79/7 285/6 285/22
**2026 [1]** 285/23
**212 [1]** 3/13
**213 [10]** 46/5 233/11 233/17 234/12 234/23 235/2 264/24 266/3 266/4 271/2
**22 [1]** 106/19
**220 [1]** 3/14
**2241 [1]** 30/23
**23rd [1]** 170/1
**25 [6]** 42/1 42/7 113/2 255/5 255/12 284/4
**258 [1]** 3/14
**26 [4]** 41/24 42/3 42/6 42/14
**28 [2]** 112/10 112/20
**285 [1]** 3/4
**287.8 [1]** 64/6
**28s [2]** 112/17 112/19
**29 [1]** 138/11
**2:58 p.m [1]** 162/24

**3**

**30 [5]** 259/20 260/11 261/9 270/1 270/11
**301 [1]** 2/22
**30th [25]** 22/12 59/23 60/8 79/7 90/10 109/22 123/10 123/11 124/8 125/7 146/10 163/19 164/16 170/7 201/4 203/12 212/13 222/5 223/14 227/6 228/6 230/18 231/24 235/8 261/19
**326-8047 [1]** 2/23
**333 [2]** 2/5 2/9
**34 [1]** 42/9
**3:05 [1]** 168/7
**3:17 [1]** 168/7
**3:58 p.m [1]** 200/2
**3:59 [1]** 200/3

**4**

**45 [1]** 78/16
**4:02 p.m [1]** 203/3
**4:03 [1]** 203/4
**4:04 p.m [2]** 204/4 204/18
**4:05 p.m [1]** 205/6
**4:06 p.m [1]** 206/2
**4:07 p.m [1]** 206/9
**4:08 p.m [2]** 206/22 207/9
**4:09 p.m [2]** 207/13 207/23
**4:14 p.m [1]** 212/5
**4:24 p.m [1]** 220/8
**4:30 a.m [1]** 79/10
**4:39 p.m [1]** 234/19
**4:45 [1]** 123/19

**5**

**5 o'clock [1]** 123/19
**503 [1]** 2/23
**551 [1]** 119/11
**560 [1]** 119/12
**5:00 [1]** 172/5
**5:00 a.m [2]** 172/5 175/13
**5:08 [1]** 258/1
**5:15 [1]** 255/12
**5:19 [1]** 258/1
**5:30 [2]** 70/21 79/12
**5:30 a.m [2]** 35/21 214/9
**5:30 in [3]** 72/12 74/5 74/19
**5:30 that [1]** 129/20
**5:30 to [1]** 237/20
**5:43 p.m [1]** 53/13
**5:45 [1]** 256/18
**5:45-ish [1]** 255/13
**5:46 p.m [1]** 281/11
**5:49 [1]** 284/4
**5:50 [1]** 283/9
**5th [2]** 2/5 2/9

**6**

**6 o'clock [2]** 254/23 256/9
**6/30/2026 [1]** 285/23
**60 [5]** 61/13 110/22 117/2 117/6 117/11
**60 seconds [1]** 117/11
**600 [2]** 2/14 2/18
**61 [1]** 119/12
**623 [1]** 119/11
**6:00 [2]** 237/21 255/15
**6:00 p.m [1]** 219/10
**6:25-cv-02011-MTK [2]** 1/7 285/4
**6:25-cv-2011-MTK [1]** 4/10
**6:45 [1]** 256/19

**7**

**78 [1]** 3/9
**7:00 [1]** 256/18

**8**

**8047 [1]** 2/23
**89 [1]** 3/9
**8:15 is [1]** 109/25
**8:30 in [1]** 214/3
**8:30 where [1]** 110/4

**9**

**9 o'clock [1]** 283/23
**9-1-1 [2]** 81/24 81/25
**90 percent [1]** 227/23
**97204 [5]** 2/6 2/10 2/14 2/19 2/22
**9:00 ideally [1]** 281/12
**9:35 [1]** 4/1
**9:50 a.m [1]** 15/12

**A**

**a.m [11]** 4/1 15/12 35/21 59/4 59/4 79/10 80/15 80/16 172/5 175/13 214/9
**A.W [15]** 171/22 172/11 179/10 193/3 204/23 277/22 278/6 278/10 278/15 279/10 279/14 279/24 280/4 280/6 280/21
**abandon [1]** 106/17
**ability [2]** 29/5 188/23
**able [54]** 17/22 20/18 26/9 27/24 30/9 39/4 41/19 49/13 61/12 61/23 67/18 71/8 82/10 84/18 84/20 86/25 100/8 102/5 104/25 106/17 113/3 113/10 113/10 113/18 114/10 114/13 114/14 116/19 128/20 132/12 133/13 138/14 140/21 158/17 177/16 177/17 178/15 181/4 204/1 207/2 217/13 217/25 219/1 219/6 219/22 239/22 241/23 242/24 254/22 256/23 261/9 263/7 281/24 282/21
**abogado [1]** 210/18
**about [237]** 7/22 8/4 8/9 8/12 9/7 11/8 12/10 12/11 12/19 14/5 14/16 17/6 17/19 17/22 18/25 21/1 21/3 21/9 22/3 24/3 24/20 30/23 31/15 33/15 33/17 35/3 35/3 35/18 35/22 36/3 36/9 40/3 40/21 40/24 44/2 45/2 45/9 47/21 49/25 50/7 50/21 52/6 52/20 52/21 54/8 56/24 58/10 58/18 58/19 63/10 66/10 67/17 68/1 69/24 71/19 72/15 74/3 76/19 79/7 79/12 80/1 83/9 89/4 90/22 91/15 91/17 93/8 93/10 94/15 95/19 96/2 96/5 96/14 96/16 101/3 101/12 102/6 103/9 104/15 110/4 110/16 113/2 113/8 113/17 113/18 114/19 114/20 114/20 116/20 124/22 125/5 125/9 126/2 126/19 128/2 130/7 130/16 134/1 134/13 135/1 136/13 136/14 136/17 140/5 140/15 140/19 141/5 141/16 142/10 142/22 147/5 151/21 153/5 153/15 154/3 154/5 154/22 155/9 155/12 156/2 157/7 159/24 160/6 161/11 161/17 162/8 162/10 169/17 169/24 170/11 173/10 174/9 174/18 175/6 175/11 175/19 176/3 176/9 176/10 177/4 177/4 177/25 178/16 178/19 180/15 181/10 181/17 182/8 182/8 182/13 182/15 183/18 183/22 184/8 184/14 184/18 186/15 186/19 186/23 187/4 187/24 187/25 188/3 188/15 189/7 190/17 191/20 192/4 192/25 193/13 193/21 196/8 199/8 209/21 210/3 210/25 211/2 211/7 213/3 213/3 213/5 213/5 213/7 213/11 214/2 214/13 214/14

**A**


**about... [50]** 216/23 217/12 226/1 227/10 230/11 232/3 232/7 232/15 232/19 234/21 235/7 235/8 235/19 237/8 241/2 241/20 242/11 242/13 243/7 243/23 243/24 244/13 246/11 249/13 249/20 252/9 252/17 255/1 257/19 265/5 266/7 266/23 267/18 269/9 270/13 271/12 273/6 273/13 273/21 273/23 274/5 275/1 277/19 277/20 279/23 281/24 282/1 282/10 282/12 283/20
**above [1]** 285/12
**above-entitled [1]** 285/12
**abroad [1]** 217/14
**absence [3]** 15/18 111/14 112/8
**absolutely [3]** 50/11 162/11 274/22
**absorbed [1]** 219/16
**academy [1]** 163/13
**accelerated [3]** 8/5 8/10 8/24
**acceleration [1]** 8/13
**accent [1]** 160/25
**accept [4]** 21/10 77/14 279/25 280/2
**accepted [1]** 115/22
**access [12]** 13/15 13/15 15/25 110/17 111/24 112/2 112/5 112/23 113/10 136/20 232/12 239/2
**accessed [1]** 40/9
**accessibility [1]** 32/13
**accessible [1]** 31/6
**accidentally [1]** 76/7
**accommodate [2]** 43/25 217/15
**accommodations [1]** 27/24
**account [1]** 31/8
**accumulate [1]** 222/18
**accuracy [1]** 30/21
**accurate [3]** 81/2 230/9 231/13
**accurately [2]** 80/19 80/22
**achieve [1]** 22/20
**acknowledge [2]** 8/20 97/1
**acknowledging [1]** 30/21
**acquire [1]** 222/19
**acquisition [1]** 231/9
**across [2]** 140/22 188/10
**act [7]** 9/16 10/22 11/1 13/17 26/1 39/25 64/2
**acted [3]** 25/13 64/21 197/7
**acting [1]** 111/4
**action [10]** 6/14 22/18 23/12 23/13 23/21 24/4 24/17 161/23 246/6 247/24
**actions [5]** 9/8 46/6 61/24 80/23 123/3
**activate [2]** 179/3 279/20
**activated [4]** 244/2 244/6 279/16 279/17
**active [1]** 68/16
**actively [1]** 165/7
**activist [1]** 248/9
**activities [3]** 39/21 123/22 176/10
**activity [17]** 125/6 125/8 125/23 125/24 127/5 140/20 147/9 147/16 154/6 162/1 177/14 177/17 177/19 178/1 188/4 188/16 240/23
**actual [4]** 29/11 221/1 237/15 259/21
**actually [42]** 7/17 15/2 21/3 21/25 39/6 43/7 46/12 46/13 60/22 76/12 93/24 94/16 94/18 99/1 119/17 139/23 149/16 189/9 201/9 210/1 222/13 223/16 227/20 229/11 229/22 233/6 233/7 233/12 236/23 239/9 239/12 239/13 240/3 244/3 245/9 247/12 253/15 253/17 256/18 261/24 268/20 274/9
**add [1]** 192/3
**adding [1]** 98/22
**addition [1]** 19/9
**additional [11]** 8/4 23/2 23/5 24/6 24/9 24/18 34/10 37/18 169/14 193/21 281/13
**Additionally [1]** 49/8
**address [16]** 7/6 11/23 12/8 14/1 21/14 31/2 34/14 36/23 51/25 57/23 124/1 164/15 164/15 228/23 254/17 266/6
**addressed [5]** 15/24 18/13 19/4 23/21 36/4
**addresses [3]** 124/13 137/1 164/17
**addressing [1]** 104/11
**adds [2]** 69/24 119/6
**adduce [1]** 25/12
**adduced [1]** 9/17
**adhere [1]** 191/22
**adjourned [1]** 284/4
**admin [1]** 259/22
**administered [1]** 33/19
**administrative [4]** 234/1 234/3 234/10 235/5
**admissibility [1]** 50/24
**admissible [1]** 55/13
**admissions [1]** 12/25
**admit [1]** 88/5
**admittedly [1]** 75/8
**admonition [4]** 50/4 58/18 215/21 269/9
**admonitions [1]** 96/11
**adopt [1]** 50/3
**adult [2]** 1/5 173/12
**adults [4]** 175/14 175/17 176/23 202/8
**advance [4]** 80/10 80/12 98/8 134/21
**advantage [1]** 167/14
**adversarial [2]** 13/12 31/12
**adverse [1]** 29/10
**advertising [1]** 75/5
**advice [1]** 61/10
**advise [4]** 100/16 114/23 167/8 280/22
**advised [8]** 35/17 49/21 66/17 165/21 167/8 212/22 271/17 279/21
**advising [2]** 66/16 116/24
**advocate [1]** 66/11
**affect [1]** 188/23
**affidavit [2]** 233/19 234/13
**affiliated [1]** 55/10
**afoot [4]** 154/6 176/18 181/11 242/15
**afraid [4]** 81/19 94/8 95/1 188/19
**after [67]** 23/1 41/1 46/18 47/14 48/4 49/3 50/5 52/22 61/7 65/17 69/11 69/11 70/4 73/8 75/20 85/14 85/25 86/8 89/3 110/6 110/7 116/8 117/6 132/17 132/17 135/10 140/9 151/18 153/19 154/18 155/1 155/22 157/6 157/7 165/13 170/21 170/22 171/13 171/15 179/9 179/22 181/1 192/16 192/22 193/1 194/22 196/7 196/7 196/19 197/8 203/18 206/17 208/3 208/8 226/18 237/3 237/23 243/24 244/11 247/19 247/19 249/17 249/17 255/10 264/12 264/13 268/3
**afternoon [10]** 103/23 104/4 109/3 115/17 115/19 115/20 121/15 169/3 217/11 220/25
**again [45]** 8/17 9/19 13/16 17/16 18/1 19/1 34/9 37/22 47/21 49/13 54/5 55/19 58/12 64/5 69/6 75/7 88/17 91/25 93/11 114/2 115/19 132/3 155/25 157/4 182/9 182/22 193/4 193/20 205/11 205/19 208/12 209/9 233/11 233/17 236/7 240/10 243/14 254/18 265/19 268/2 270/15 275/4 277/8 280/6 283/13
**against [10]** 9/9 28/22 32/15 55/10 64/12 65/1 66/10 183/21 189/20 246/15
**agencies [2]** 31/23 109/21
**agency [5]** 48/17 121/23 130/22 131/1 212/15
**agent [19]** 13/5 86/16 107/9 107/12 107/15 125/13 138/13 167/6 169/6 169/7 171/20 189/25 190/25 210/13 211/2 219/15 252/5 262/2 272/1
**agents [30]** 31/19 31/23 32/8 32/9 60/16 60/19 60/20 60/23 61/1 62/2 64/21 67/13 67/18 81/17 82/8 82/19 82/19 85/14 86/10 86/18 89/25 92/14 126/8 126/10 134/10 170/13 170/20 213/6 244/19 248/17
**agitate [1]** 248/9
**ago [6]** 17/13 33/10 101/11 101/12 237/22 246/3
**agree [10]** 19/7 27/6 30/25 33/3 42/15 50/23 51/13 92/17 94/23 225/6
**agreed [2]** 37/13 225/1
**agreement [5]** 28/14 48/5 67/11 225/3 278/6
**agricultural [19]** 72/18 74/4 146/25 147/3 147/12 147/13 147/18 174/22 176/7 178/2 178/4 178/10 178/14 202/1 202/3 202/5 202/9 202/14 241/18
**Ah [5]** 86/11 257/7 267/8 268/22 276/1
**ahead [28]** 5/21 7/7 8/17 53/17 89/6 93/14 93/16 96/8 108/4 118/17 120/18 129/12 132/9 146/17 161/9 179/17 184/12 185/16 185/18 194/15 196/11 198/24 199/10 220/22 238/19 260/23 265/15 275/20
**ahold [1]** 179/18
**aid [1]** 81/24
**Air [1]** 221/12
**airport [2]** 75/6 174/25
**al [3]** 1/9 4/11 285/3
**alien [14]** 62/22 62/23 63/19 63/21 64/12 65/2 181/15 181/22 182/24 182/24 183/1 183/18 232/15 234/25
**alienage [1]** 189/15
**aliens [3]** 145/4 181/16 181/23
**all [212]** 4/18 4/23 6/17 10/13 10/22 10/24 11/1 11/6 11/17 12/17 13/15 13/19 14/3 14/18 14/19 14/23 18/2 18/6 19/1 26/3 27/12 28/5 28/9 28/19 30/21 31/12 36/2 36/6 36/6 39/1 43/20 44/22 45/22 47/4 47/11 47/17 50/15 50/20 51/4 51/8 52/19 53/8 53/11 55/6

A

**all... [168]** 56/17 57/20 58/25 59/9 61/6 61/16 62/5 62/14 62/17 65/17 68/12 69/1 71/23 73/9 74/18 74/25 76/8 80/2 88/2 89/3 92/2 94/3 96/8 96/19 97/9 97/14 100/13 100/24 101/15 101/19 102/16 103/4 104/4 104/18 104/21 105/3 107/2 107/6 115/7 115/8 117/16 117/19 118/3 118/23 120/3 120/14 120/20 125/9 125/25 128/19 131/12 131/24 133/25 134/17 138/14 138/20 139/4 141/12 141/25 144/24 146/6 146/17 149/25 152/15 153/19 155/6 159/11 160/2 162/21 166/20 166/23 167/2 167/6 167/22 168/1 171/4 174/11 174/12 176/14 178/25 180/11 186/25 193/1 194/20 201/24 203/20 205/17 207/8 210/9 210/19 210/24 213/2 213/21 215/7 215/13 215/19 216/7 216/10 217/21 218/25 219/8 219/14 219/14 220/2 220/4 222/12 225/24 226/11 226/18 227/12 227/12 227/22 228/5 228/16 229/8 229/8 229/10 231/22 235/2 235/15 235/24 238/21 240/25 242/1 242/24 243/6 243/6 244/4 248/25 250/3 252/10 253/4 253/17 253/18 254/9 254/25 257/5 257/17 258/14 261/8 267/16 268/4 268/4 268/7 269/8 269/23 269/25 270/7 270/9 270/18 273/11 274/21 275/3 275/11 276/11 277/14 278/15 280/6 280/19 280/21 281/1 281/19 281/19 281/23 282/9 283/8 283/22 283/22
**allegation [1]** 107/9
**allegations [2]** 20/10 22/17
**alleged [5]** 8/22 41/9 97/17 107/9 271/5
**allow [17]** 15/4 22/16 22/16 22/17 32/7 43/20 47/6 47/12 47/20 48/1 48/6 91/19 96/21 100/15 149/21 153/10 271/19
**allowed [6]** 47/18 49/22 63/18 63/20 68/6 113/5
**allowing [1]** 271/24
**allows [3]** 66/5 158/3 158/23
**almost [3]** 61/16 187/9 248/11
**alone [6]** 11/22 26/16 29/2 113/23 114/2 142/2
**along [10]** 6/18 8/3 68/22 76/25 138/25 151/23 159/21 182/7 216/24 219/13
**aloud [1]** 165/18
**already [37]** 7/25 18/21 19/3 24/25 25/11 49/24 61/22 68/14 72/4 79/22 86/20 90/22 107/20 170/21 179/5 194/2 194/21 196/13 206/6 209/23 214/22 222/16 230/22 242/18 242/22 243/11 245/15 247/10 248/3 248/15 252/16 257/21 267/15 267/15 268/3 271/25 281/7
**also [76]** 5/6 6/14 6/22 6/24 9/22 10/1 13/3 16/8 20/9 20/21 21/18 27/7 27/14 28/6 31/4 33/24 37/13 38/18 39/3 39/16 41/10 48/21 50/11 68/6 69/24 72/2 73/5 77/7 79/21 83/19 83/19 83/20 87/12 92/22 93/22 94/23 96/13 99/5 100/19 104/10 105/20 106/4 106/11 106/14 107/10 107/12 109/14 109/20 112/14 114/23 118/3 125/15 132/6 139/3 174/14 175/4 181/22 181/24 183/14 183/15 185/11 196/5 215/15 216/18 217/4 217/13 223/21 234/12 239/1 243/16 254/25 255/13 271/1 279/25 280/21 283/14
**alternative [1]** 97/2
**although [5]** 27/15 37/10 64/15 106/9 159/22
**altogether [2]** 58/2 74/12
**always [6]** 14/9 31/7 106/5 119/25 203/18 269/23
**am [14]** 18/21 29/21 48/24 66/13 68/19 82/10 97/2 109/19 140/1 169/6 190/16 202/4 221/1 241/6
**ambiguity [2]** 33/1 137/22
**amend [1]** 24/4
**Amendment [40]** 7/24 8/19 8/23 15/24 16/5 17/8 17/11 17/20 17/20 17/24 19/16 19/20 19/20 19/23 19/25 20/3 20/8 20/9 20/22 21/2 21/14 21/18 21/24 21/24 25/14 26/2 46/22 68/17 90/13 90/15 90/16 91/12 91/16 92/24 93/11 93/19 94/14 102/2 102/5 282/15
**among [4]** 65/22 66/11 160/22 178/20
**amongst [2]** 83/8 180/14
**amount [2]** 6/21 256/4
**amounting [1]** 64/8
**ample [3]** 6/25 65/23 191/22
**analogy [1]** 138/9
**analysis [1]** 55/25
**Andre [2]** 217/18 218/20
**anonymity [3]** 29/22 31/6 31/15
**anonymous [1]** 29/17
**anonymously [3]** 29/5 30/10 30/12
**another [53]** 12/2 12/2 12/3 16/14 25/9 28/3 49/4 50/5 57/18 58/19 64/16 79/19 79/25 84/6 84/6 91/17 92/7 94/11 98/22 107/11 117/3 125/14 126/25 129/25 135/16 135/16 151/25 153/3 153/19 154/25 158/12 160/5 171/19 171/20 183/21 189/19 192/16 196/14 198/9 208/9 218/9 222/24 252/6 252/13 252/14 252/14 254/9 255/20 257/3 272/2 279/10 279/11 283/7
**answer [21]** 10/20 16/3 67/9 90/14 93/20 100/9 100/17 100/20 101/13 102/7 139/12 159/10 186/8 186/10 189/5 194/17 210/23 212/11 212/11 252/21 252/22
**answer's [1]** 210/3
**answering [3]** 92/20 96/15 186/12
**answers [2]** 101/25 210/6
**anticipate [6]** 57/2 88/25 92/23 255/2 256/6 256/15
**anticipated [2]** 9/4 92/13
**anticipating [2]** 270/17 281/20
**antithesis [1]** 59/24
**any [133]** 13/4 13/7 13/8 20/13 21/1 21/23 22/2 24/5 24/10 26/22 27/13 27/22 33/21 34/6 34/14 35/8 35/17 35/18 36/6 36/10 36/14 37/24 38/20 38/20 39/4 41/15 42/16 42/20 43/8 43/8 45/1 46/10 49/3 49/3 50/5 50/15 60/5 60/17 61/1 62/24 68/16 81/24 81/24 95/23 101/19 102/22 104/8 104/14 106/9 114/15 114/16 114/16 115/5 116/25 118/1 119/16 119/16 120/14 128/16 128/16 134/23 134/23 135/20 136/2 137/2 137/16 141/14 144/11 144/15 147/3 147/4 147/17 147/19 149/9 150/10 151/12 154/9 154/13 154/19 154/19 154/24 155/3 155/9 161/13 167/2 173/18 175/10 177/24 178/15 179/16 185/8 189/15 189/23 190/10 193/11 193/13 199/5 199/18 204/11 204/14 205/23 205/24 210/20 211/16 213/22 213/22 215/11 219/2 220/3 225/18 237/9 240/14 245/13 245/19 251/18 251/18 251/18 252/17 262/22 262/23 267/21 269/6 270/9 272/3 273/13 273/19 277/1 277/4 278/5 281/20 282/3 282/23 283/8
**anybody [15]** 48/25 66/16 147/20 167/9 167/15 186/9 196/8 215/17 215/24 216/5 256/11 262/19 262/19 269/10 275/8
**anybody's [1]** 151/13
**anyhow [1]** 85/6
**anymore [2]** 251/6 254/19
**anyone [15]** 21/5 27/20 39/11 49/8 50/4 50/9 58/17 112/15 126/24 132/12 133/16 175/7 195/4 257/20 257/21
**anything [76]** 10/14 14/6 14/16 19/5 25/24 33/5 35/12 36/3 39/17 41/11 44/22 50/15 50/20 57/4 66/7 67/3 68/4 85/6 90/11 91/17 99/7 103/8 103/10 107/19 123/21 126/1 129/1 130/7 136/6 139/6 141/12 142/8 143/2 143/7 143/11 143/15 143/17 143/21 143/23 144/2 144/4 144/7 144/8 144/13 144/24 145/5 145/7 145/16 145/17 147/18 153/5 154/22 158/14 159/25 166/18 166/20 173/10 174/22 175/19 177/4 180/16 186/4 188/2 196/2 196/2 196/2 196/7 209/14 209/20 211/4 225/12 233/10 239/3 241/2 249/20 254/6
**anyway [1]** 76/15
**anywhere [1]** 72/22
**apartment [26]** 126/14 126/18 126/22 127/4 127/7 127/8 127/22 127/24 129/14 130/1 130/1 132/15 133/11 135/24 138/3 164/16 164/24 171/17 172/12 172/18 172/22 172/23 173/7 176/12 227/25 228/22
**apartments [5]** 72/13 126/20 126/21 175/3 235/23
**apologies [1]** 29/13
**apologize [7]** 5/23 10/5 15/2 98/25 111/17 157/5 162/2
**app [7]** 229/11 229/19 231/3 231/3 231/10 231/11 274/1
**apparent [1]** 140/15
**apparently [2]** 56/13 132/18
**Appeals [2]** 75/1 109/16
**appear [6]** 45/25 47/12 87/16 105/1 190/9 225/6
**appearances [2]** 1/19 4/13
**appeared [5]** 70/17 83/23 110/24

**A**

**appeared... [2]** 147/6 247/13
**appearing [1]** 104/19
**appears [3]** 16/4 45/6 45/24
**appellate [2]** 18/12 74/17
**applicable [1]** 10/8
**application [11]** 90/7 90/9 90/23 92/14 94/21 157/23 158/6 158/23 222/9 225/20 253/14
**applications [3]** 222/20 237/5 237/6
**applied [1]** 119/16
**applies [2]** 48/20 64/5
**apply [8]** 13/18 64/5 89/15 89/17 89/19 94/5 96/11 131/15
**applying [3]** 93/25 94/24 250/19
**appreciate [11]** 9/21 11/18 26/22 46/8 63/6 96/6 100/14 139/7 211/8 270/7 283/13
**appreciates [1]** 48/16
**appreciating [2]** 27/1 93/5
**apprehend [2]** 195/12 196/16
**apprised [1]** 24/25
**approach [7]** 51/10 77/21 108/9 163/23 201/20 265/16 270/12
**approached [5]** 110/18 153/16 179/9 179/10 245/8
**appropriate [15]** 9/11 20/2 24/21 25/23 26/8 29/1 32/11 32/24 33/17 50/7 57/18 77/13 96/5 102/4 282/11
**approved [1]** 237/6
**approximately [16]** 110/13 116/7 117/4 139/17 169/8 169/13 170/3 170/9 170/12 172/3 172/5 175/12 191/9 214/8 214/9 245/25
**apps [1]** 227/18
**are [224]** 7/25 9/6 9/12 9/13 9/13 9/14 11/9 11/9 11/14 11/24 12/12 12/18 12/18 12/18 13/5 13/21 13/23 15/20 15/21 16/1 16/11 17/10 17/16 17/16 19/9 19/25 21/15 22/5 22/7 22/8 22/15 23/3 24/9 25/12 25/15 25/25 26/19 26/19 27/17 28/2 28/2 28/14 29/16 30/19 30/25 31/5 31/16 31/17 31/23 31/23 32/25 35/15 36/14 36/16 36/21 37/7 42/23 44/16 46/1 47/5 48/14 49/5 49/22 50/17 50/22 51/22 51/25 51/25 52/21 55/3 57/25 57/25 58/19 60/21 60/21 61/3 61/6 61/25 62/2 64/20 64/23 69/23 73/19 73/22 73/22 74/4 74/5 74/8 75/22 76/9 78/15 87/22 90/3 90/17 91/22 91/25 94/18 95/15 98/20 101/5 107/4 109/17 110/10 118/20 118/20 126/19 130/18 133/5 134/12 135/4 137/3 137/25 138/2 140/2 147/11 147/13 148/25 149/7 150/17 150/20 153/2 159/14 159/14 159/18 160/16 161/6 161/21 167/6 169/21 170/13 170/25 171/6 174/6 174/14 175/3 178/7 179/17 182/23 183/9 183/10 183/25 184/2 187/3 187/13 187/16 188/18 190/5 190/6 190/6 190/11 190/12 190/20 190/23 196/15 200/15 201/24 202/1 204/22 205/17 210/11 212/18 212/21 213/18 214/18 215/3 215/16 217/6 217/9 217/10 217/14 219/1 219/19 220/25 222/3 222/21 222/21 222/24 223/8 227/19 231/1 232/7 235/13 236/7 238/15 239/1 239/9 240/7 240/11 240/13 241/16 241/21 241/23 242/8 242/23 244/4 248/18 249/23 251/17 252/23 253/4 253/5 253/7 254/1 254/4 254/12 255/15 255/15 255/18 255/22 265/9 267/20 269/8 269/24 270/15 270/22 277/23 278/2 278/5 280/7 280/11 281/8 281/20 283/1 283/19
**area [48]** 72/18 72/19 74/4 76/1 109/12 113/13 122/19 126/17 132/15 134/16 146/22 146/24 147/3 149/21 155/3 161/20 164/24 170/2 171/9 171/10 171/15 175/19 175/21 176/3 176/5 176/7 176/7 178/13 178/14 185/18 201/6 202/9 202/12 202/14 213/1 213/14 222/4 222/10 222/14 222/17 222/22 227/7 227/19 228/17 241/8 241/10 241/17 248/13
**areas [4]** 72/14 110/2 147/13 174/6
**aren't [5]** 13/4 13/7 35/17 60/24 270/9
**arguably [1]** 37/10
**argue [2]** 5/21 77/15
**arguing [2]** 10/25 25/1
**argument [16]** 6/13 15/21 21/9 21/23 24/12 24/20 28/6 34/18 36/9 63/5 67/8 67/20 77/12 120/5 120/10 282/11
**arguments [11]** 7/9 7/20 7/22 7/25 22/2 26/22 27/1 27/2 27/8 27/10 104/11
**ARIANA [2]** 2/12 4/21
**arise [1]** 8/7
**Arizona [6]** 74/8 169/22 177/13 177/15 177/19 200/16
**arm [2]** 205/1 205/2
**arms [1]** 205/4
**around [21]** 48/18 69/22 92/21 99/10 109/25 110/13 123/19 129/20 134/10 179/22 179/23 204/1 227/3 227/4 231/7 238/5 244/18 244/25 245/1 247/9 247/10
**arranged [2]** 270/25 281/3
**arrangements [3]** 36/24 36/25 256/24
**arrest [102]** 5/25 6/6 6/9 16/5 16/12 19/7 19/8 19/21 20/1 20/15 20/24 21/2 21/5 25/14 35/6 38/17 39/15 39/16 39/18 39/20 39/21 40/5 41/2 41/6 41/7 46/17 46/19 59/19 60/2 62/12 62/13 62/22 63/1 63/15 63/18 63/20 63/22 64/8 64/23 64/24 65/3 65/19 65/22 68/11 68/25 71/12 77/3 90/4 92/15 114/15 114/17 114/21 115/6 118/22 119/18 120/1 125/22 134/21 161/21 161/22 161/23 162/17 165/22 182/3 203/11 204/6 208/16 211/16 226/21 233/15 233/17 233/19 234/3 234/8 234/10 234/16 234/17 234/18 235/3 235/5 249/2 254/7 254/11 254/13 259/4 259/4 259/7 259/8 259/25 264/12 264/13 265/9 265/20 266/7 266/23 267/1 267/3 267/6 267/12 267/22 281/17 282/16
**arrestable [2]** 155/21 230/14
**arrested [17]** 20/11 20/12 21/17 21/18 39/14 61/2 62/24 65/1 65/9 83/5 157/10 180/9 182/15 189/4 222/25 248/8 266/25
**arrestee [1]** 180/8
**arresting [7]** 38/14 119/25 207/4 261/20 265/23 265/24 277/25
**arrests [9]** 38/21 61/2 122/20 122/23 248/10 260/1 260/5 260/25 262/11
**arrive [2]** 110/13 122/7
**arrived [4]** 110/15 113/17 127/24 251/14
**art [1]** 136/24
**articulable [1]** 64/10
**as [275]** 5/6 5/13 5/17 5/25 6/13 7/9 7/25 9/10 10/13 11/4 11/12 12/5 12/15 13/19 14/7 14/9 18/11 22/10 22/17 23/16 25/8 27/17 28/15 28/15 28/15 28/25 29/2 29/2 30/8 30/24 32/5 32/8 32/23 33/8 36/19 36/20 37/8 37/8 37/9 37/9 37/13 38/11 42/2 43/25 43/25 44/1 44/13 44/18 44/18 46/12 48/22 49/1 50/8 51/19 52/3 52/8 52/9 53/12 55/3 55/8 57/12 58/17 61/5 63/24 64/7 64/15 64/18 65/17 66/4 67/23 68/4 68/13 69/12 69/18 69/25 70/8 71/7 72/4 72/5 73/20 76/13 77/1 78/2 78/4 79/10 85/22 88/5 88/6 90/22 92/20 92/20 93/18 94/22 95/17 97/5 98/18 98/18 104/9 104/9 104/11 105/12 105/16 106/1 106/14 108/6 108/14 108/16 108/20 108/21 109/15 109/15 109/17 114/24 114/25 115/1 115/25 118/7 118/7 119/14 120/10 120/23 120/23 121/5 121/7 122/3 124/1 124/1 124/12 124/12 125/17 125/17 125/17 125/17 125/18 126/12 126/14 127/9 132/19 133/24 139/1 139/1 139/1 139/22 139/22 140/2 140/3 141/19 141/25 142/9 145/14 148/1 148/1 148/15 148/18 148/18 149/11 149/11 150/7 151/13 152/2 153/2 153/14 155/15 155/16 156/10 158/25 159/11 160/15 161/8 161/8 161/14 161/14 161/24 163/13 163/13 163/14 167/8 167/10 168/17 168/19 169/14 170/10 171/2 171/2 172/17 172/17 172/22 174/23 174/23 175/17 175/17 176/12 176/12 177/11 179/3 179/9 179/10 181/25 182/12 182/23 183/1 183/23 184/22 185/7 185/17 185/17 186/16 186/17 187/1 187/1 187/3 187/17 187/20 187/20 188/6 188/6 189/1 189/1 189/20 190/9 190/23 193/5 193/20 194/3 209/16 210/5 213/15 213/15 213/16 217/15 219/13 219/18 219/18 219/18 220/16 220/18 220/21 220/21 221/13 221/17 225/18 227/11 227/15 227/21 228/11 231/14 234/13 234/16 238/9 249/11 249/12 250/23 250/23 252/8 254/4 255/4 255/4 255/24 255/24 259/25 260/18 260/24 260/24 260/25 260/25 260/25 263/11 275/25 276/12 277/25 279/12 282/2 282/23 283/18 283/18
**aside [1]** 66/24
**ask [43]** 23/24 35/9 35/13 36/14 37/4 45/1 57/4 57/8 57/13 79/7 84/16 85/12 87/19 87/21 88/17 96/20 97/18 100/6 100/16 100/22 111/15 111/24 112/2 126/6 138/21 139/4 155/18 159/25

## A


**ask... [15]** 160/6 168/3 187/24 199/10 199/16 210/1 214/2 234/7 241/14 265/19 267/2 273/13 280/8 281/4 283/12
**asked [43]** 30/9 61/12 85/5 85/20 85/20 86/2 86/15 90/22 111/13 111/18 111/18 112/4 112/7 112/14 116/23 117/1 122/4 122/6 129/9 134/18 156/24 156/25 162/2 176/1 185/8 186/7 190/21 192/9 192/10 192/10 199/9 199/13 209/23 210/1 211/13 212/8 214/13 214/13 215/14 235/24 236/1 271/18 273/21
**asking [20]** 29/16 31/16 32/2 32/3 33/4 33/8 83/22 90/6 92/16 94/15 139/7 179/11 179/12 187/4 209/16 217/1 225/25 242/12 251/16 282/18
**aspect [1]** 119/25
**aspects [1]** 158/19
**assault [2]** 237/11 248/10
**assert [2]** 91/12 208/23
**asserted [2]** 56/10 138/13
**asserting [1]** 71/8
**assess [2]** 56/8 268/13
**assessing [1]** 118/21
**assessment [2]** 27/5 114/10
**assigned [5]** 123/5 221/4 232/11 232/15 232/18
**assignment [2]** 122/19 170/5
**assist [8]** 122/5 122/20 122/23 132/23 140/9 170/6 191/19 192/2
**assistant [3]** 37/19 122/1 279/25
**assisting [3]** 101/18 191/17 195/9
**associate [1]** 109/19
**associated [9]** 26/18 37/24 40/4 55/9 106/11 141/14 142/9 224/13 235/23
**associates [1]** 120/2
**association [1]** 162/14
**assume [1]** 51/17
**assumed [2]** 176/21 187/21
**assuming [1]** 70/11
**assumption [1]** 199/23
**asylum [23]** 29/7 29/23 89/15 89/17 89/20 90/6 90/12 90/23 91/3 92/9 92/13 92/21 93/6 94/1 94/1 94/2 94/16 94/17 94/21 94/24 95/16 96/16 101/4
**attempt [5]** 9/10 154/2 161/22 253/13 255/4
**attempted [4]** 83/15 139/19 153/17 253/25
**attempting [6]** 64/11 107/11 152/20 152/25 154/7 161/16
**attempts [1]** 161/11
**attend [1]** 45/19
**attended [1]** 163/12
**attention [10]** 76/10 123/11 154/1 162/17 164/9 165/8 203/2 216/22 222/5 264/15
**attentions [1]** 123/10
**attitude [1]** 239/24
**attorney [7]** 109/6 109/8 109/17 114/25 206/12 206/16 280/1
**Attorney's [2]** 2/17 136/19
**attorneys [6]** 36/8 74/17 86/3 86/8 102/4 111/2
**audible [1]** 252/25
**audio [2]** 125/16 285/13
**authenticity [1]** 54/15
**author [1]** 53/13
**authorities [1]** 232/16
**authority [13]** 10/14 10/17 10/23 11/1 40/18 40/21 63/19 65/25 119/9 119/10 120/1 224/10 254/7
**authorization [1]** 147/7
**authorized [3]** 61/2 67/18 71/5
**autonomy [1]** 39/25
**avail [1]** 7/12
**available [13]** 5/10 47/5 47/18 48/15 155/8 159/18 217/5 217/10 217/19 218/4 241/16 271/25 278/4
**Avenue [5]** 2/5 2/9 2/13 2/18 2/22
**avoid [1]** 275/14
**avoiding [1]** 58/1
**aware [19]** 29/19 30/16 38/24 96/3 96/3 111/2 119/23 119/25 175/3 175/7 190/16 213/22 214/18 215/3 241/6 241/9 241/14 259/2 264/8
**awareness [1]** 148/12
**away [15]** 67/20 76/25 98/2 110/17 155/4 175/16 175/16 193/19 195/11 195/12 198/9 230/21 261/23 262/8 270/3
**awkward [1]** 176/1


## B


**B-2 [4]** 102/1 102/10 102/15 102/23
**B.W [4]** 255/22 256/15 256/25 257/1
**back [99]** 11/15 18/6 18/8 28/3 33/6 34/7 37/5 44/12 44/12 58/22 58/24 59/7 60/15 68/10 69/19 69/20 69/21 69/22 74/20 75/17 76/3 76/3 76/6 95/2 96/22 103/9 103/16 111/10 111/11 111/12 112/6 112/8 112/9 112/21 112/22 113/13 116/15 117/6 129/8 133/7 135/12 138/15 139/12 144/1 149/11 149/21 149/23 152/2 152/4 155/21 168/8 173/24 174/16 182/16 191/24 193/2 193/3 193/6 193/9 218/25 223/1 225/8 225/18 226/19 232/25 235/7 236/23 237/1 237/1 237/4 245/1 245/6 247/2 247/13 247/14 247/15 247/17 247/20 247/25 248/2 248/2 250/2 250/21 251/20 251/23 252/1 252/2 252/5 252/12 255/1 258/3 268/15 271/19 274/16 274/18 275/7 275/11 278/6 278/16
**backed [1]** 172/11
**background [6]** 72/9 129/2 129/4 169/14 192/4 193/23
**bad [2]** 16/23 104/15
**badge [1]** 149/11
**badly [1]** 246/20
**Bail [1]** 64/2
**balaclava [1]** 32/4
**balancing [2]** 31/8 32/12
**ballistic [1]** 180/24
**ballpark [2]** 246/2 246/3
**Barely [1]** 102/16
**barriers [1]** 92/19
**baseball [6]** 226/8 227/8 230/7 230/22 231/4 273/23
**based [32]** 17/14 23/4 38/5 38/9 42/24 43/11 43/14 43/17 44/19 64/10 65/25 91/3 92/14 102/3 120/2 137/3 147/1 153/16 155/8 162/8 169/21 173/21 181/18 200/15 210/6 214/18 221/15 228/22 238/7 241/15 270/15 274/1
**baseline [1]** 124/10
**bases [1]** 160/7
**basic [3]** 41/3 94/22 124/2
**basically [6]** 158/1 222/12 223/1 228/15 235/3 264/25
**basis [7]** 19/25 32/25 55/7 92/13 137/18 194/13 243/20
**bathroom [1]** 168/3
**be [346]**
**bearing [1]** 55/12
**bears [2]** 46/22 93/9
**Beaverton [1]** 222/11
**became [2]** 62/9 66/11
**because [108]** 13/3 16/6 20/23 20/23 21/7 25/25 28/20 29/6 29/8 29/25 31/4 35/19 38/11 40/25 41/1 43/6 50/8 56/9 58/12 60/5 60/24 61/3 61/5 66/20 66/21 69/1 70/18 74/4 75/4 75/6 75/25 81/16 81/23 82/3 82/12 85/4 85/5 89/21 89/24 91/3 93/11 94/9 94/17 96/12 97/15 99/2 104/22 114/8 116/9 116/15 116/22 119/24 126/6 130/12 135/15 140/13 141/2 151/15 155/10 156/1 174/19 183/23 189/5 194/2 195/8 202/12 223/10 225/22 226/13 226/17 228/1 230/7 233/1 233/4 233/10 233/11 237/3 239/9 239/11 240/4 240/11 240/19 240/23 245/15 247/24 248/7 249/24 250/2 251/5 251/21 254/14 254/14 259/2 259/14 259/20 259/21 262/16 263/12 263/14 265/4 265/4 267/15 268/12 268/14 271/21 273/13 276/25 278/16
**become [3]** 35/20 184/5 190/5
**becomes [1]** 145/11
**been [110]** 5/14 6/20 6/24 7/17 9/4 9/18 16/6 17/2 17/22 18/21 19/4 19/4 20/18 23/8 23/21 24/12 26/14 29/19 31/21 34/2 34/4 34/15 35/11 40/22 40/22 43/5 44/1 44/20 47/9 49/1 49/9 49/24 50/6 50/6 50/8 50/11 50/14 58/17 70/12 72/4 72/21 78/3 95/12 98/23 105/12 106/5 108/3 108/15 109/8 110/1 110/11 112/3 112/13 112/20 114/10 114/13 114/14 121/6 121/21 128/20 137/15 149/1 152/1 152/5 156/8 157/14 161/19 161/20 163/5 167/10 168/18 169/7 172/14 181/9 181/15 181/21 181/24 182/9 182/15 184/15 193/14 193/22 194/2 195/4 197/7 200/18 217/8 217/8 217/24 220/17 221/6 223/2 223/5 224/9 228/25 232/18 238/8 241/7 241/10 242/15 250/8 253/10 258/19 262/18 271/23 272/7 273/18 282/21 282/23 285/12
**before [73]** 1/16 9/23 25/1 26/15 26/15 27/25 36/4 37/3 41/10 58/15 60/4 62/25 63/21 65/5 72/22 86/1 88/5 94/3 96/4 96/15 96/24 100/6 100/19 103/9 103/10 103/16 104/11 104/18 105/6 109/13 109/14 109/20 113/20 114/6 117/4 118/12 121/23 139/11 152/1

## B


**before... [34]** 155/1 159/21 160/4 160/4 165/9 169/9 175/6 176/6 195/18 202/20 214/20 214/23 215/3 216/10 219/2 221/8 223/3 223/5 230/23 232/19 245/14 251/11 253/15 253/18 253/23 254/21 259/12 259/21 263/1 263/14 270/14 270/16 279/22 282/4
**beforehand [3]** 13/14 227/17 267/7
**began [5]** 84/16 84/23 127/6 132/21 152/7
**begin [10]** 35/23 36/4 58/25 70/21 72/3 73/12 77/6 171/4 181/1 193/2
**beginning [7]** 4/12 41/5 44/19 58/2 138/12 172/8 252/11
**beginnings [1]** 135/1
**begins [2]** 80/10 178/18
**behalf [6]** 56/11 78/2 108/14 121/5 168/17 220/16
**behavior [1]** 239/7
**behind [9]** 32/3 76/3 76/6 80/3 83/18 156/17 185/25 250/21 251/23
**being [52]** 8/10 26/9 33/1 48/15 48/23 56/9 56/10 64/11 65/10 68/14 73/20 73/22 90/21 98/6 104/6 110/11 112/15 137/13 141/6 149/4 155/15 163/25 175/17 176/21 179/13 179/22 181/25 183/2 183/16 183/20 183/25 184/9 185/14 185/15 185/17 188/7 189/3 189/3 189/19 190/4 227/20 230/2 235/18 236/7 239/11 239/15 242/23 242/24 251/4 268/14 274/11 285/15
**belief [2]** 69/15 134/22
**believe [90]** 7/22 8/6 9/11 15/22 17/14 17/18 20/15 20/17 25/25 29/1 31/1 36/16 37/10 37/12 37/12 39/23 40/8 40/25 41/2 41/8 44/24 48/6 48/17 52/20 53/1 53/20 54/10 55/16 55/20 55/23 56/14 61/3 61/23 62/1 62/7 62/11 62/11 62/23 63/2 63/8 63/18 63/21 64/17 64/25 65/4 65/11 65/16 65/17 65/21 65/22 67/3 68/10 68/23 69/8 69/24 70/5 70/15 75/15 76/17 91/5 91/11 96/22 105/13 107/24 113/16 116/16 118/25 119/6 128/17 135/8 139/21 141/19 142/18 145/19 145/21 147/4 156/21 156/23 163/16 181/15 182/11 196/4 206/15 210/7 214/4 236/4 237/11 249/7 254/6 261/24
**believed [10]** 38/13 73/6 73/7 110/11 236/15 242/14 263/5 268/2 271/13 271/14
**believes [1]** 36/22
**below [1]** 285/9
**belt [2]** 83/15 83/16
**benefit [3]** 31/12 33/8 106/9
**Bernard [1]** 119/11
**Bernstein [1]** 283/20
**beside [1]** 244/9
**besides [1]** 189/15
**best [4]** 36/8 138/22 226/8 266/14
**better [14]** 44/7 75/21 91/23 100/10 118/8 122/15 149/25 154/6 162/25 216/25 235/9 272/13 282/23 283/15
**between [23]** 7/23 16/12 20/3 32/12 68/12 93/6 100/9 123/9 125/1 126/11 126/11 139/17 145/25 149/23 177/18 181/18 182/23 193/8 214/15 225/3 246/4 246/9 283/1
**beyond [1]** 256/8
**biometrics [1]** 223/1
**birth [3]** 131/16 158/13 225/17
**birthday [1]** 259/15
**bit [13]** 18/24 93/24 100/10 117/11 119/19 125/14 139/14 174/18 177/10 181/17 184/18 184/19 273/22
**black [1]** 205/3
**blame [1]** 104/16
**blank [1]** 199/14
**blanks [3]** 41/4 139/1 139/11
**bleeding [1]** 246/21
**blend [2]** 20/7 20/9
**blue [1]** 244/3
**bluff [2]** 216/13 216/15
**blurred [3]** 52/10 52/13 52/14
**blush [1]** 73/18
**board [2]** 30/14 145/15
**body [22]** 52/7 80/9 144/17 144/20 144/21 156/20 156/21 179/1 202/23 203/9 203/17 211/19 216/20 251/24 272/23 279/10 279/12 279/12 279/13 279/15 279/20 279/22
**body-worn [6]** 52/7 80/9 179/1 279/12 279/13 279/22
**bono [1]** 61/8
**border [35]** 23/6 33/7 72/14 73/25 131/2 131/3 134/15 134/19 134/25 135/4 169/4 169/6 169/7 174/7 180/7 180/20 183/10 183/16 184/22 187/17 190/25 191/1 197/14 200/10 224/9 224/12 225/3 225/4 244/18 245/2 246/19 252/4 253/20 272/23 274/18
**bore [1]** 219/14
**bosses [1]** 266/17
**both [26]** 20/19 20/19 23/15 27/5 27/8 28/14 28/23 39/21 42/15 45/25 47/25 93/7 100/21 100/21 130/11 133/8 152/25 175/5 191/11 215/25 216/25 217/11 218/10 245/23 247/8 249/16
**bottom [1]** 165/13
**boy [1]** 64/7
**BP [4]** 244/1 244/8 244/12 244/14
**BPA [1]** 171/20
**brackets [1]** 119/20
**brain [1]** 98/9
**branch [2]** 53/23 55/9
**branding [1]** 174/1
**bravo [2]** 140/3 220/21
**break [18]** 47/14 58/24 89/4 96/9 98/21 103/6 103/10 148/23 148/25 168/3 190/10 246/6 254/25 256/12 257/18 263/1 270/6 270/16
**breaking [2]** 104/7 246/11
**brief [11]** 9/1 10/20 14/12 15/4 40/16 58/10 61/11 106/1 106/17 255/4 267/11
**briefed [3]** 9/4 9/5 212/22
**briefing [2]** 282/2 282/10
**briefings [1]** 17/14
**briefly [6]** 58/12 62/16 64/14 75/17 168/3 212/1
**briefs [2]** 7/25 58/10
**bring [5]** 12/12 16/20 23/16 44/25 216/22
**bringing [3]** 104/15 151/2 216/13
**brings [1]** 43/9
**broad [3]** 10/14 10/25 10/25
**broadly [1]** 25/18
**broke [1]** 179/14
**broken [2]** 185/14 214/16
**brother [1]** 263/17
**brought [11]** 19/4 19/23 23/15 39/9 114/5 116/7 116/14 134/10 141/15 224/16 239/7
**brunt [1]** 219/14
**build [1]** 178/18
**building [11]** 84/20 110/17 110/18 111/13 112/21 112/23 113/1 113/7 113/9 113/15 172/24
**buildings [1]** 126/22
**built [1]** 176/14
**bunch [1]** 46/17
**burden [1]** 99/14
**burden's [1]** 11/4
**bus [3]** 14/20 84/1 177/1
**business [4]** 43/19 174/1 175/1 175/2
**businesses [2]** 83/6 174/24
**bust [1]** 245/2
**button [2]** 50/16 203/19
**buttress [1]** 24/19
**buzzer [3]** 110/19 110/20 112/25


## C


**C.H [35]** 37/16 37/22 38/2 39/4 39/7 39/13 39/14 39/16 43/21 43/22 44/15 44/15 47/17 47/19 201/22 271/12 271/14 271/18 272/5 272/7 272/8 272/14 273/1 273/19 274/4 274/10 274/25 275/14 275/15 275/24 275/25 276/2 276/12 277/12 280/21
**C.H.'s [1]** 277/14
**C.M [18]** 3/13 80/10 150/20 167/23 167/24 168/11 168/16 168/23 210/9 210/13 211/2 215/13 216/1 272/25 273/1 273/15 274/11 274/15
**C.S.W [11]** 45/12 45/23 45/24 45/25 46/11 46/25 47/1 47/17 47/20 281/1 281/4
**C.S.W.'s [2]** 46/4 46/6
**C.W [1]** 271/1
**caged [1]** 251/12
**calendar [1]** 89/5
**call [35]** 9/15 16/20 17/6 27/17 27/20 36/11 54/5 54/6 59/15 59/21 73/10 77/18 81/25 91/22 91/24 108/4 108/6 110/4 110/6 110/7 118/12 119/3 129/18 129/19 135/20 136/3 171/25 173/1 188/8 226/8 248/8 259/25 274/16 279/3 283/9
**called [23]** 33/18 47/20 47/22 48/11 74/16 78/2 108/14 109/11 118/19 120/22 121/5 123/5 158/13 163/12 168/17 220/16 226/7 227/18 234/7 234/12 259/3 275/14 275/15
**calling [9]** 28/3 36/4 77/7 84/16 132/22 188/13 216/12 248/3 274/6
**calls [5]** 167/23 168/11 216/8 220/6 248/6
**calm [2]** 60/20 60/22
**cam [11]** 144/17 144/20 144/21 156/20

## C


**cam... [7]** 156/21 202/24 203/9 216/20 272/23 279/15 279/20
**came [27]** 79/12 79/13 81/17 82/6 82/6 86/9 86/10 86/16 86/17 105/7 110/23 110/24 111/12 112/5 112/9 112/22 114/6 116/15 116/21 117/5 127/10 133/7 155/21 221/9 235/23 237/4 250/20
**camera [6]** 52/7 80/9 179/1 279/12 279/13 279/22
**CAMILLA [1]** 1/8
**cams [2]** 203/17 211/19
**can [181]** 9/17 11/23 13/23 15/15 16/20 16/22 16/22 18/2 19/10 19/23 21/11 21/22 21/25 23/14 27/17 28/4 28/6 28/7 28/23 28/25 31/18 32/23 33/13 34/24 36/8 36/11 45/19 47/15 48/22 51/13 57/13 57/15 58/5 61/16 62/7 62/12 62/25 63/22 65/5 67/13 67/15 68/2 70/6 70/15 74/13 76/10 77/11 77/19 78/22 81/9 88/21 88/21 89/9 91/2 91/16 92/24 95/2 96/16 97/11 97/21 97/24 98/23 99/5 99/17 103/4 103/14 104/16 109/3 109/3 111/25 117/2 124/1 126/7 126/20 127/1 129/24 132/3 135/4 135/10 135/15 136/24 138/2 138/3 138/15 138/22 139/1 139/7 142/15 149/7 149/12 151/8 157/22 158/13 162/12 164/9 164/15 165/11 165/13 165/14 167/4 167/5 167/19 171/21 172/10 173/18 174/2 174/17 179/8 182/24 185/24 188/5 190/10 190/10 194/17 199/8 199/10 201/19 204/20 205/1 205/12 205/13 205/19 207/7 213/19 218/9 218/13 218/14 218/15 219/9 219/12 219/13 219/15 222/6 225/12 229/13 232/12 236/1 237/23 240/4 240/4 240/15 240/18 242/13 245/10 245/22 246/2 250/14 251/13 253/21 254/18 255/5 255/14 256/19 256/19 259/17 259/17 261/22 265/14 265/16 267/21 269/4 269/19 269/25 270/13 271/19 272/9 275/15 275/15 277/18 278/5 278/6 279/3 279/24 279/24 280/2 280/21 280/22 281/13 281/15 282/4 283/9
**can't [40]** 19/13 19/17 21/1 21/4 21/6 21/10 21/13 21/14 21/22 30/1 34/12 49/24 107/24 128/17 129/9 130/2 133/17 138/20 155/2 159/4 161/5 185/24 205/4 206/7 208/1 215/24 231/19 232/6 237/14 246/7 253/8 258/24 261/16 262/9 262/16 263/17 264/7 267/10 267/10 278/13
**cancels [1]** 268/5
**candid [1]** 14/9
**candidly [1]** 14/15
**cannot [7]** 10/9 21/13 49/2 119/25 167/9 237/17 264/18
**cans [1]** 283/8
**capable [1]** 98/23
**capacity [1]** 272/3
**caption [6]** 10/11 28/17 30/19 53/24 54/1 55/8
**captured [1]** 214/20
**car [9]** 76/5 76/7 82/7 129/19 237/3 252/8 262/23 263/3 267/14
**card [4]** 197/15 225/21 227/8 231/4
**cards [5]** 226/9 227/9 230/7 230/22 273/23
**care [2]** 93/10 255/14
**careful [3]** 68/19 71/20 187/24
**carefully [1]** 40/24
**caretaker [1]** 188/13
**carrier [2]** 180/21 180/22
**carry [2]** 235/9 253/6
**cars [4]** 82/6 119/4 239/2 251/10
**case [95]** 4/10 4/10 7/11 8/5 8/7 8/10 8/17 8/18 9/8 9/16 9/18 10/8 10/11 11/4 12/23 13/4 13/5 13/17 14/7 14/13 14/16 15/6 15/14 15/16 17/11 17/14 18/10 18/11 18/13 19/4 19/4 21/7 21/7 21/10 22/10 22/12 22/16 22/17 23/7 25/25 29/9 30/3 30/18 33/16 37/20 40/10 41/4 41/14 44/8 46/2 47/23 48/12 55/13 56/20 58/17 58/19 61/15 61/25 64/6 64/18 67/23 69/9 92/15 105/14 115/4 115/22 116/1 118/25 119/12 119/23 120/7 120/18 122/9 125/18 138/9 167/15 186/4 190/20 198/4 216/24 216/25 219/7 219/25 227/6 233/6 235/20 255/23 271/2 275/25 278/4 281/7 281/25 283/18 283/21 285/4
**cases [5]** 6/12 30/6 30/16 30/22 181/24
**cash [1]** 178/12
**catch [4]** 127/12 152/8 238/3 252/5
**catched [1]** 103/11
**catching [2]** 18/24 18/24
**category [1]** 187/1
**caught [2]** 210/25 225/4
**cause [16]** 20/13 20/15 20/15 20/17 59/20 62/6 62/10 65/19 65/24 69/17 118/22 119/7 119/17 152/17 233/12 285/12
**caused [3]** 16/17 31/22 101/8
**causes [1]** 266/8
**caution [1]** 96/14
**CBP [3]** 33/24 253/25 273/17
**cede [1]** 27/20
**cell [5]** 84/18 119/3 199/11 199/13 199/15
**cells [1]** 84/14
**central [4]** 94/25 174/11 177/1 198/25
**CEO [1]** 55/9
**certain [5]** 34/5 53/2 93/7 158/18 190/11
**certainly [13]** 13/2 28/16 31/10 32/2 41/8 41/8 48/12 64/17 74/12 106/3 137/6 151/9 167/20
**Certificate [1]** 3/4
**certification [5]** 22/23 24/15 24/23 25/24 282/1
**certifications [1]** 163/11
**certified [4]** 5/1 5/3 217/17 285/17
**certify [1]** 285/9
**cetera [3]** 25/20 137/1 223/20
**CFR [1]** 64/6
**chain [1]** 73/24
**challenge [10]** 5/25 6/6 6/7 6/9 17/17 19/13 19/18 22/18 114/21 114/21
**challenges [2]** 31/22 217/4
**challenging [4]** 19/7 19/10 19/24 21/16
**chambers [1]** 53/1
**Chan [3]** 111/5 111/12 112/4
**Chan's [1]** 111/14
**chance [11]** 5/11 13/2 13/3 59/1 77/15 86/4 150/22 150/23 193/17 193/19 227/23
**change [4]** 22/7 118/6 186/14 196/19
**changed [1]** 182/14
**changes [1]** 56/14
**channels [1]** 225/14
**chaos [1]** 267/12
**characteristics [1]** 133/14
**characterization [1]** 30/22
**characterized [1]** 209/16
**characterizing [1]** 260/18
**charge [6]** 111/14 112/7 153/4 188/13 237/11 237/13
**charges [1]** 141/9
**charging [1]** 114/16
**Charlie [2]** 37/8 37/9
**chase [2]** 76/16 152/7
**chat [1]** 49/24
**chatter [1]** 136/2
**cheap [1]** 18/8
**check [14]** 111/10 118/3 162/21 216/11 216/17 216/18 230/8 236/8 237/8 246/19 254/21 255/13 262/17 282/3
**checking [2]** 109/25 227/12
**checks [17]** 157/16 222/20 223/9 225/16 225/24 227/12 227/17 227/21 227/22 227/24 231/16 231/17 231/21 236/7 236/9 237/5 267/16
**chief [6]** 14/11 23/6 47/23 138/10 219/25 281/7
**children [2]** 176/22 251/18
**choice [5]** 183/7 201/8 201/11 201/14 201/15
**choose [3]** 165/6 201/6 201/6
**Christmas [1]** 278/21
**Circuit [6]** 14/4 14/24 18/11 30/2 109/16 119/12
**circumstances [6]** 32/12 66/1 215/16 242/18 276/19 277/15
**circumstantial [1]** 148/8
**cited [4]** 6/12 14/4 30/3 63/6
**citing [1]** 15/14
**citizen [11]** 70/25 71/8 71/11 71/15 71/18 124/6 131/15 132/1 132/6 251/17 251/17
**citizenship [2]** 109/15 223/8
**city [2]** 126/16 174/6
**civil [13]** 2/13 6/15 6/18 8/7 9/15 10/9 10/10 10/11 10/11 12/23 14/11 91/6 95/10
**civilian [1]** 161/25
**civilization [1]** 137/3
**claim [13]** 6/16 8/11 15/25 15/25 19/15 21/25 90/12 92/9 94/16 95/20 95/24 282/16 282/16
**claiming [1]** 90/7
**claims [11]** 9/16 13/17 19/23 19/25 26/19 37/25 46/22 55/10 95/18 106/11 225/18

C


**clarification [1]** 97/12
**clarify [6]** 86/12 89/23 116/5 124/20 211/7 280/11
**class [11]** 22/18 23/12 23/13 23/14 23/20 24/4 24/15 24/17 24/23 25/24 282/1
**classes [2]** 23/16 190/11
**clause [3]** 62/19 62/22 63/9
**cleaned [1]** 119/20
**clear [22]** 30/21 32/18 49/22 96/10 100/6 100/7 113/24 157/4 182/22 182/25 184/24 196/13 197/24 199/16 210/14 215/23 215/25 232/14 233/17 234/13 250/10 273/15
**clearing [3]** 193/2 193/3 211/8
**clearly [1]** 125/12
**client [6]** 95/25 96/2 96/10 96/13 107/11 113/17
**clients [3]** 13/21 109/14 109/20
**climb [1]** 193/6
**close [9]** 77/16 132/23 174/6 239/22 239/25 240/3 259/21 269/24 269/24
**closed [7]** 103/7 199/15 216/2 216/3 269/12 280/24 281/24
**closely [2]** 171/1 239/22
**closer [4]** 78/20 118/5 122/13 201/9
**closing [1]** 259/15
**clothes [1]** 180/20
**clothing [1]** 82/14
**co [12]** 7/10 11/23 17/14 36/23 88/16 90/23 91/21 135/7 159/25 200/1 212/2 234/21
**co-counsel [11]** 7/10 11/23 17/14 88/16 90/23 91/21 135/7 159/25 200/1 212/2 234/21
**co-counsel's [1]** 36/23
**code [3]** 62/18 64/4 180/7
**Codes [1]** 190/13
**colleague [8]** 14/10 110/8 113/25 207/17 244/14 245/19 253/19 253/25
**colleague's [1]** 246/4
**colleagues [15]** 14/18 27/16 104/8 104/15 123/14 130/8 154/19 157/6 158/11 246/24 249/11 250/8 253/13 264/4 264/5
**collection [1]** 159/12
**collective [3]** 118/19 119/14 119/15
**colloquially [1]** 182/23
**Colorado [3]** 12/1 43/22 121/18
**combination [1]** 252/7
**come [58]** 6/17 9/2 14/23 16/17 34/7 34/12 34/22 34/23 35/7 48/7 49/16 52/3 58/24 75/5 75/5 77/19 80/3 87/16 87/21 96/22 103/16 108/7 110/20 111/11 117/6 120/24 122/5 122/6 129/21 130/1 131/8 135/24 138/15 138/25 139/12 140/22 168/12 169/17 169/23 169/23 172/4 172/23 173/2 188/10 192/3 201/15 203/18 212/17 212/18 221/17 221/20 223/13 225/17 248/9 248/13 255/1 258/22 275/11
**comeback [1]** 159/22
**comes [6]** 51/5 57/12 80/8 120/18 158/25 222/25
**comfortable [1]** 271/24
**coming [11]** 7/17 25/1 27/9 104/10 104/18 104/20 170/4 217/14 221/23 258/23 271/23
**command [6]** 148/4 148/7 201/15 201/16 214/15 245/25
**commands [16]** 148/2 148/2 148/5 151/9 153/21 156/5 160/10 160/12 165/20 191/21 206/18 214/19 214/23 215/3 245/19 246/9
**comment [2]** 77/8 164/21
**comments [1]** 33/10
**commercial [3]** 74/23 75/3 182/20
**committed [3]** 65/1 68/20 137/5
**committee [1]** 17/4
**common [4]** 140/22 140/25 146/23 147/16
**commonly [2]** 234/16 253/9
**commotion [2]** 152/4 153/24
**communicate [1]** 49/9
**communicated [4]** 45/4 119/17 146/9 213/11
**communicating [9]** 118/24 119/1 119/2 129/17 156/5 162/15 171/23 179/11 181/2
**communication [2]** 73/9 143/17
**communications [1]** 283/3
**communities [1]** 147/13
**community [1]** 111/3
**commuter [1]** 60/10
**company [2]** 182/16 240/20
**company's [1]** 182/17
**compared [1]** 231/3
**comparing [1]** 105/6
**compel [3]** 34/2 34/16 36/3
**compelling [1]** 8/22
**compilation [1]** 41/3
**complain [1]** 21/1
**complaining [1]** 21/3
**complaint [2]** 6/15 6/18
**complete [4]** 48/23 89/3 125/17 145/6
**completed [6]** 48/2 48/10 49/4 50/10 236/7 270/1
**completely [3]** 30/14 60/14 91/13
**completing [1]** 44/7
**complex [22]** 126/15 126/18 127/4 127/7 127/9 127/22 127/24 129/14 130/1 130/2 132/16 133/11 135/24 138/4 164/16 171/17 172/12 172/18 172/22 173/7 176/12 228/22
**complexity [1]** 119/24
**compliance [4]** 151/16 153/21 185/11 191/12
**compliant [4]** 149/4 179/15 239/15 244/20
**complied [3]** 62/3 166/15 197/12
**comply [17]** 60/18 148/2 148/7 148/15 148/17 151/11 153/22 156/11 156/13 165/20 181/10 189/10 191/10 192/14 260/17 260/24 269/14
**complying [10]** 149/2 156/4 244/18 244/22 244/24 245/24 247/6 247/6 247/9 252/11
**component [1]** 130/18
**comprehend [1]** 26/21
**comprised [3]** 137/9 142/22 223/20
**computer [2]** 86/25 87/2
**concept [1]** 59/25
**concepts [1]** 20/8
**concern [22]** 8/24 30/20 31/7 43/4 74/3 99/9 139/3 142/2 150/6 151/13 154/3 155/11 155/14 179/16 185/15 186/15 190/4 191/23 218/10 248/5 250/2 277/20
**concerned [18]** 9/18 9/19 31/17 72/15 76/19 140/24 156/2 162/13 176/10 184/8 188/3 188/14 238/8 247/22 248/12 265/5 267/18 283/18
**concerning [1]** 248/7
**concerns [29]** 9/7 28/22 73/18 73/19 93/7 111/21 140/19 141/5 141/15 147/3 153/14 153/15 155/9 156/8 161/13 161/17 161/24 162/8 177/25 181/10 181/14 184/14 193/11 193/13 193/21 196/19 196/24 252/9 252/17
**concerted [3]** 153/25 154/4 162/15
**conclude [5]** 65/24 71/9 157/7 225/13 255/14
**concluded [3]** 70/22 75/7 182/19
**conclusion [3]** 115/7 160/13 215/22
**conclusions [1]** 147/4
**conditions [1]** 42/16
**conduct [8]** 17/19 64/23 91/11 91/17 123/3 158/17 175/1 274/7
**conducted [3]** 44/5 163/19 213/8
**conducting [9]** 7/8 22/3 38/21 39/20 88/14 119/18 161/22 162/15 252/20
**confer [6]** 47/6 47/21 50/5 91/21 200/1 212/2
**conference [4]** 6/23 73/10 129/19 136/3
**conferred [2]** 24/22 28/11
**conferring [1]** 105/4
**confidence [2]** 159/7 267/16
**confidentiality [1]** 94/4
**confidently [1]** 14/15
**confine [1]** 24/5
**confirm [12]** 33/12 47/17 51/12 87/17 137/8 142/7 263/7 263/17 263/22 265/17 269/25 276/14
**confirmation [1]** 24/18
**confirmed [4]** 157/14 205/24 249/22 262/23
**confirming [2]** 32/14 262/21
**conformed [1]** 285/16
**confusing [1]** 162/2
**confusion [1]** 157/5
**conjunction [1]** 276/12
**connect [1]** 128/20
**connected [3]** 31/23 134/20 235/18
**connection [6]** 125/1 130/16 134/21 134/23 134/24 177/17
**connections [3]** 130/18 131/8 229/6
**connotations [1]** 235/10
**consensual [2]** 165/14 213/20
**consent [1]** 73/23
**consequence [1]** 68/2
**consequences [2]** 29/10 193/18
**consider [8]** 7/2 7/3 8/2 17/25 26/10 57/15 160/9 283/2
**consideration [1]** 210/25
**considerations [2]** 50/13 94/25
**considered [3]** 7/4 17/12 161/2
**considering [1]** 11/4
**consistent [5]** 62/5 62/14 74/6 75/14 241/20

C


**consistently [1]** 64/21
**Constitution [1]** 59/23
**constitutional [2]** 22/19 62/6
**construction [2]** 178/12 242/2
**consultation [1]** 44/17
**contact [10]** 85/23 131/1 144/21 148/1 148/22 162/16 232/12 232/16 238/14 250/15
**contacted [2]** 85/22 233/13
**contacting [2]** 235/11 235/13
**contain [1]** 251/13
**contained [2]** 56/22 57/5
**contemplate [1]** 56/2
**contemplated [1]** 9/18
**contending [2]** 15/21 42/23
**content [3]** 40/11 40/13 134/1
**contention [2]** 137/15 137/16
**contents [4]** 90/6 265/6 266/11 267/22
**context [23]** 9/24 11/5 13/16 14/6 19/18 19/21 19/23 20/6 20/9 21/3 21/15 23/12 26/22 27/6 27/6 66/4 68/14 92/24 94/14 106/7 120/10 224/7 283/15
**Contextually [1]** 26/13
**continue [7]** 23/8 66/5 103/7 218/15 246/23 269/14 283/23
**continued [3]** 79/18 192/20 206/18
**continuing [1]** 19/25
**contours [1]** 9/16
**contrary [1]** 66/17
**contributed [1]** 243/16
**control [5]** 104/12 179/20 194/4 239/13 248/14
**convenience [1]** 218/12
**convention [1]** 104/5
**conventional [3]** 55/24 55/25 231/4
**conversation [4]** 77/9 113/8 135/12 270/16
**conversations [1]** 34/8
**conveyed [3]** 142/14 142/15 142/16
**convicted [1]** 237/15
**conviction [2]** 230/14 237/13
**copies [1]** 51/8
**copy [6]** 77/22 233/9 265/12 265/13 265/16 269/18
**corner [1]** 80/2
**corporation [1]** 55/11
**Corps [1]** 61/9
**corpus [2]** 5/11 6/7
**correct [103]** 5/8 5/15 11/11 17/3 17/3 19/17 23/22 25/3 36/5 37/16 42/12 42/22 45/13 51/3 51/18 51/20 53/7 53/14 53/16 57/6 57/10 63/11 63/16 65/14 71/3 71/16 88/2 100/4 100/11 100/25 107/5 111/17 111/22 115/23 116/2 124/7 126/3 140/1 140/4 143/13 146/5 159/12 163/6 163/9 163/15 164/6 165/17 167/25 170/15 182/21 184/22 188/17 200/11 200/13 200/19 202/6 202/14 202/24 203/9 203/12 203/21 203/24 204/1 207/15 208/9 208/12 208/13 208/16 208/24 210/14 211/14 211/17 214/5 218/1 219/25 223/10 234/8 234/9 234/10 235/6 236/22 241/6 258/7 258/10 258/20 261/20 262/8 262/11 263/2 264/9 265/10 265/23 266/8 267/18 268/9 268/11 270/22 273/10 274/20 278/1 278/1 281/3 285/10
**correctly [2]** 92/13 144/5
**corroborates [1]** 53/2
**corroborating [1]** 44/6
**could [92]** 6/3 7/6 10/7 10/7 16/15 21/5 21/23 25/8 26/14 51/6 58/14 60/5 60/16 64/3 68/6 75/17 78/15 78/19 79/3 79/7 82/8 96/21 111/5 111/13 112/14 117/1 118/3 121/15 122/13 122/18 124/19 131/2 131/3 131/4 131/6 132/23 139/8 141/25 149/6 149/25 150/5 151/12 155/25 168/2 169/3 174/14 178/2 179/13 181/19 181/22 181/25 182/12 183/18 184/25 185/1 185/18 186/21 188/7 189/4 189/18 189/22 189/22 199/25 226/3 226/4 226/22 231/11 233/7 238/3 238/14 239/23 241/4 245/1 246/3 246/19 246/19 248/14 250/23 253/11 255/24 260/25 262/17 263/10 270/1 270/10 271/13 271/14 272/15 275/23 276/6 278/19 278/25
**could've [6]** 35/5 72/25 72/25 181/15 184/15 273/18
**couldn't [4]** 73/14 116/24 165/3 191/24
**counsel [59]** 4/12 5/9 7/10 7/11 11/13 11/23 12/20 13/10 15/25 17/9 17/12 17/14 25/16 34/11 37/13 41/10 43/20 45/5 47/6 48/5 48/17 52/18 61/10 69/12 80/13 88/16 90/23 91/21 96/21 97/11 97/18 99/17 100/18 101/17 103/17 105/4 106/12 107/10 118/14 119/5 134/18 135/7 159/25 200/1 200/6 209/15 210/8 211/11 212/2 216/2 216/18 219/3 234/21 271/5 273/13 279/21 283/2 283/10 283/22
**counsel's [2]** 36/23 46/10
**countries [1]** 223/12
**country [15]** 48/18 68/8 91/4 91/18 92/14 102/24 132/2 134/10 189/14 223/8 224/25 225/8 225/12 236/25 251/17
**couple [12]** 26/6 36/17 97/12 139/25 237/22 241/8 241/12 246/8 248/17 248/19 267/21 277/19
**course [17]** 12/23 12/25 13/13 13/25 43/19 46/18 56/20 62/5 69/6 76/10 135/17 159/11 261/9 264/9 264/11 276/3 277/23
**court [115]** 1/1 1/17 4/4 4/6 5/1 5/1 5/3 7/12 8/1 8/2 8/19 10/7 10/13 11/13 11/20 13/25 14/2 14/9 15/4 15/9 15/17 17/7 17/22 22/9 22/9 22/15 23/24 24/2 25/7 25/21 25/22 26/11 27/13 27/17 29/4 31/13 31/18 32/24 33/6 33/9 33/16 34/12 36/25 37/4 41/2 41/10 41/15 43/12 44/13 44/18 48/1 48/7 48/16 48/20 48/22 49/5 49/11 50/1 52/22 52/25 53/18 56/1 56/7 56/9 56/19 59/7 59/12 64/18 66/4 68/13 69/18 74/17 74/25 80/15 88/5 99/14 103/24 104/1 106/20 107/15 109/4 109/16 109/16 115/22 118/14 119/23 120/18 125/15 138/11 138/15 168/8 179/5 184/25 204/4 204/18 205/6 206/2 206/9 206/22 207/13 207/23 209/3 228/23 255/9 258/3 271/6 271/14 271/17 271/18 277/20 277/23 280/3 283/19 284/4 285/22
**Court's [11]** 7/13 16/16 25/7 36/22 37/11 45/16 45/16 49/20 57/1 88/17 217/17
**court-certified [2]** 5/1 5/3
**courtesies [1]** 283/10
**courthouse [2]** 2/21 167/7
**courtroom [14]** 11/15 14/11 32/10 47/16 77/20 103/7 103/15 108/10 117/22 121/1 167/8 168/13 215/15 220/14
**courts [3]** 31/5 32/15 109/21
**cover [2]** 57/5 147/9
**covered [2]** 83/1 83/2
**covering [3]** 56/21 57/2 83/3
**crack [1]** 16/3
**crash [1]** 205/9
**create [6]** 130/18 131/8 132/7 154/1 193/11 193/13
**created [3]** 65/18 131/25 157/5
**creates [1]** 99/14
**creating [3]** 46/21 160/5 161/15
**credential [3]** 197/13 197/14 197/17
**credentials [5]** 185/8 186/7 192/9 192/10 211/15
**credibility [9]** 32/15 56/7 91/14 95/7 95/11 95/14 145/11 145/12 145/14
**credibly [1]** 209/22
**credit [1]** 216/12
**crime [3]** 68/20 176/18 242/15
**crimes [1]** 182/23
**criminal [30]** 11/5 13/4 27/16 66/4 70/2 71/12 72/10 74/23 75/10 91/2 91/10 91/17 91/18 124/2 124/4 129/2 129/3 130/11 132/20 133/8 141/19 147/9 158/15 164/25 188/4 188/15 189/19 189/19 193/23 237/9
**critical [4]** 27/5 45/17 46/1 273/4
**cross [27]** 3/8 3/8 3/11 3/11 57/9 88/15 89/1 89/10 91/14 96/23 97/7 106/14 106/17 115/15 163/3 183/10 184/1 200/8 211/1 212/8 220/2 255/1 255/2 256/16 257/18 258/17 275/5
**cross-examination [16]** 57/9 89/10 91/14 96/23 97/7 115/15 163/3 200/8 212/8 220/2 255/1 255/2 256/16 257/18 258/17 275/5
**Crossing [1]** 197/15
**crosstalk [1]** 285/14
**crowd [1]** 248/14
**CRR [2]** 2/21 285/21
**CSR [4]** 2/21 285/21 285/23 285/23
**Cuban [1]** 169/18
**cuffed [1]** 152/5
**cuffs [2]** 151/24 153/23
**curiosity [1]** 133/21
**curious [1]** 90/8
**current [3]** 114/20 217/25 218/3
**custody [9]** 75/21 114/16 162/7 189/21 191/18 198/8 198/12 224/16 252/10
**Customs [6]** 1/9 33/7 121/17 190/23 253/19 274/18

C
**cut [8]** 100/1 107/12 116/9 116/22 246/17 262/16 271/14 278/6
**cv [3]** 1/7 4/10 285/4

D
**D.B [2]** 205/21 205/22
**D.M [1]** 192/2
**D.R [15]** 3/12 120/24 121/4 121/10 125/13 138/21 167/6 195/15 195/16 215/24 216/1 219/14 219/15 272/19 272/20
**D.R.'s [2]** 138/23 195/14
**Dade [1]** 169/10
**Daily [1]** 260/13
**damaged [1]** 246/20
**damages [1]** 10/12
**danger [3]** 97/3 149/5 244/21
**dangerous [2]** 179/17 239/16
**dark [4]** 140/13 175/13 185/17 191/24
**darkness [1]** 147/10
**dart [1]** 252/14
**data [1]** 229/8
**database [8]** 40/9 71/4 71/7 71/10 71/14 71/19 158/3 274/2
**databases [7]** 43/2 43/4 70/24 158/16 190/9 225/11 232/12
**date [7]** 28/1 102/12 213/21 225/17 259/21 285/22 285/23
**dates [2]** 158/13 217/10
**David [1]** 120/23
**day [52]** 10/24 23/1 25/17 26/15 26/16 27/13 27/23 58/6 60/2 63/14 74/20 79/10 104/23 109/22 110/11 113/3 117/25 123/12 123/22 124/11 125/23 126/1 126/2 126/24 127/21 137/2 140/17 140/17 142/23 143/17 146/10 149/8 171/2 171/5 175/11 176/15 178/14 179/1 180/19 199/21 214/18 225/9 226/14 232/21 259/21 259/22 260/14 260/15 261/4 261/8 269/21 276/24
**day's [1]** 89/5
**daycare [1]** 175/18
**days [10]** 27/9 159/15 159/15 170/3 200/19 259/12 259/20 259/20 260/11 261/10
**deadly [2]** 149/7 179/19
**dealing [5]** 151/16 180/2 181/8 250/8 252/4
**December [8]** 1/18 3/3 4/1 23/4 217/10 217/10 218/6 285/6
**December 16th [1]** 23/4
**December 18th [2]** 217/10 218/6
**decide [5]** 17/23 89/19 123/14 151/14 254/13
**decided [5]** 56/6 140/1 242/8 244/19 278/20
**deciding [1]** 187/25
**decision [6]** 52/23 62/13 65/22 148/25 175/7 178/20
**decisions [2]** 271/23 282/25
**declarant [7]** 37/20 40/6 40/7 40/9 41/14 41/20 43/2
**declaration [36]** 40/10 40/11 40/13 40/19 41/2 41/19 41/22 41/23 42/1 42/2 42/6 42/8 42/13 42/20 42/24 43/12 43/17 46/11 55/17 56/3 56/16 56/22 56/23 57/6 57/8 88/2 88/6 89/14 105/12 106/18 107/1 107/4 115/22 116/1 116/6 116/19
**declarations [2]** 41/20 107/18
**deep [1]** 120/5
**deeply [1]** 94/21
**defense [1]** 109/13
**defensively [1]** 26/1
**deference [1]** 40/23
**defined [1]** 276/20
**definitely [5]** 183/23 185/13 186/20 193/25 216/16
**degree [1]** 34/5
**delay [2]** 120/11 203/17
**deliberate [1]** 270/12
**deliberation [1]** 9/24
**deliver [2]** 77/22 163/23
**delivered [1]** 163/25
**demands [1]** 148/16
**demeanor [1]** 239/24
**demonstrate [6]** 25/12 62/7 62/12 64/21 70/15 137/11
**demonstrating [1]** 35/19
**demonstrative [1]** 57/14
**denies [1]** 24/2
**dense [1]** 229/21
**Denver [11]** 38/9 121/18 221/1 221/15 232/25 233/1 238/20 238/25 240/24 241/21 258/19
**depart [1]** 11/20
**Department [6]** 54/19 54/23 54/23 59/18 60/15 169/10
**depending [1]** 62/10
**depict [1]** 80/19
**depiction [1]** 81/2
**deport [2]** 59/20 60/3
**Deportable [1]** 234/24
**Deportable/Inadmissible [1]** 234/24
**deportation [10]** 22/21 38/3 121/20 121/21 163/12 163/14 221/4 221/6 233/6 266/17
**deported [1]** 189/3
**deposed [1]** 12/21
**deposition [2]** 13/8 95/13
**depositions [3]** 8/25 12/25 13/14
**deprivation [6]** 41/9 46/2 46/23 106/12 107/10 271/5
**deprived [1]** 8/14
**depth [1]** 114/19
**deputy [6]** 14/11 77/20 108/10 121/1 168/13 220/14
**derail [1]** 34/19
**describe [9]** 82/9 82/10 134/15 154/19 173/18 176/16 242/13 275/23 276/6
**described [9]** 44/1 45/2 46/12 53/12 72/21 75/14 135/9 202/17 209/23
**describes [1]** 209/13
**description [4]** 49/20 70/18 129/2 236/5
**descriptions [1]** 32/21
**descriptive [1]** 133/14
**designated [2]** 64/25 65/4
**designed [1]** 153/9
**desire [2]** 7/12 50/5
**desktop [1]** 233/10
**despite [1]** 189/7
**destination [3]** 177/2 183/12 188/12
**detail [2]** 136/14 281/17
**details [5]** 128/10 128/18 130/3 142/12 142/19
**detain [3]** 59/19 60/3 64/14
**detained [14]** 20/12 39/9 61/7 63/14 65/9 83/20 110/11 110/11 111/3 112/5 112/13 112/20 154/14 249/5
**detainees [1]** 193/6
**detaining [2]** 67/14 82/3
**detention [36]** 6/8 6/10 6/12 16/5 16/9 16/12 19/10 19/13 19/14 19/21 19/24 20/1 20/4 20/25 21/6 21/16 21/20 21/20 38/3 39/18 40/5 41/7 46/20 46/23 62/13 64/8 70/5 106/13 114/18 114/21 145/4 240/11 254/10 266/16 282/17 282/22
**detentions [1]** 81/21
**determination [2]** 14/25 114/16
**determinative [1]** 15/16
**determine [10]** 43/6 47/6 66/23 67/14 138/2 138/3 150/24 181/4 239/25 249/13
**determined [3]** 70/22 157/6 157/15
**determining [5]** 7/3 28/22 50/18 189/13 189/15
**develop [7]** 22/6 24/10 73/3 275/16 276/9 276/11 277/2
**developed [2]** 274/5 276/7
**developing [4]** 153/2 273/2 274/25 275/24
**developments [1]** 273/24
**DHS [5]** 22/11 46/18 59/22 60/1 141/11
**dial [1]** 81/24
**did [353]**
**didn't [42]** 34/19 34/22 35/20 60/5 71/13 75/8 81/23 85/4 85/10 90/14 93/18 117/6 119/20 127/12 128/5 135/20 139/5 144/4 145/9 146/3 154/22 175/23 194/11 196/6 208/1 209/17 210/1 226/7 226/13 227/7 230/23 230/24 246/13 246/15 250/10 251/6 259/6 262/19 263/12 265/8 266/12 268/2
**difference [4]** 93/5 181/17 197/6 197/9
**different [20]** 11/3 12/19 27/25 28/7 61/25 69/13 72/12 93/21 132/15 173/14 174/10 190/11 222/20 223/25 226/20 233/5 239/6 251/13 279/23 280/13
**differentiate [1]** 100/9
**difficult [3]** 18/24 19/1 26/21
**difficulty [1]** 93/5
**digital [4]** 144/4 144/7 144/9 144/14
**digitally [1]** 285/17
**dime [1]** 257/4
**dimensional [1]** 106/6
**direct [13]** 3/8 3/11 78/11 105/23 109/1 121/13 123/10 123/11 169/1 211/1 220/23 222/5 258/6
**directing [1]** 39/21
**direction [3]** 38/20 44/3 148/11
**directions [2]** 132/22 247/6
**directly [1]** 126/8
**director [4]** 1/8 37/19 109/19 111/4
**disadvantage [2]** 8/6 13/11

D

**disagreement [3]** 52/6 52/17 67/16
**disappointing [1]** 138/25
**discloses [1]** 209/13
**discovered [1]** 130/10
**discovery [11]** 6/17 8/5 13/13 22/25 22/25 23/2 34/15 46/15 134/1 145/18 146/19
**discretion [2]** 39/25 48/7
**discretionary [2]** 9/14 23/25
**discuss [10]** 12/4 35/24 49/23 50/9 97/4 138/11 167/9 215/16 257/20 282/21
**discussed [6]** 11/13 14/1 15/23 37/6 50/1 275/8
**discussing [3]** 29/9 110/4 269/10
**discussion [15]** 15/12 90/24 92/5 95/3 96/22 162/24 200/2 203/3 207/9 212/5 220/8 234/19 271/7 281/11 283/6
**discussions [3]** 96/15 102/3 283/1
**disinvited [1]** 17/4
**displayed [1]** 149/11
**disposal [1]** 159/11
**dispute [6]** 42/21 56/6 106/24 107/8 107/13 134/5
**disseminate [1]** 276/23
**disseminated [1]** 276/25
**distances [1]** 174/5
**distinction [4]** 20/3 68/12 182/22 182/25
**distract [1]** 161/22
**distraction [2]** 153/10 161/15
**distractions [1]** 161/12
**district [12]** 1/1 1/2 1/17 2/21 4/6 4/6 59/7 104/1 104/1 109/16 258/3 258/3
**dive [1]** 94/21
**diversionary [1]** 76/9
**divide [2]** 153/25 153/25
**divided [1]** 126/11
**DIVISION [3]** 1/3 2/13 123/4
**do [221]** 6/17 8/21 9/23 10/14 10/17 11/12 11/14 11/22 11/24 12/13 14/18 15/24 16/19 17/18 19/10 21/4 24/13 26/7 27/6 28/15 32/1 32/11 32/18 33/5 33/7 34/6 34/12 37/13 39/17 42/17 44/24 45/4 46/11 48/6 48/19 49/21 50/13 51/4 54/10 57/5 58/23 60/4 63/20 66/17 67/19 68/6 68/9 68/10 69/7 70/7 75/1 78/17 78/23 79/3 79/10 80/22 81/1 87/1 88/25 89/17 96/1 96/10 96/14 96/23 97/2 97/11 97/14 99/2 99/8 100/15 101/23 102/12 106/3 106/8 107/8 109/4 109/4 109/10 113/6 114/10 114/14 116/10 118/15 120/4 122/2 124/8 126/16 127/3 129/3 133/16 138/21 139/21 140/9 147/7 147/16 148/6 148/10 152/22 154/4 156/25 157/1 157/17 160/13 160/13 161/18 161/18 162/8 162/8 163/11 164/11 166/3 166/5 167/11 169/9 169/14 169/16 173/5 173/10 173/16 174/4 174/22 174/24 175/7 178/7 178/8 178/19 179/20 180/9 184/2 185/4 185/5 186/1 186/1 186/4 187/16 187/22 188/9 189/8 189/9 190/3 190/6 190/18 190/20 192/19 197/1 198/6 199/20 199/21 201/16 201/17 203/7 205/11 206/17 207/1 207/19 209/12 212/9 214/7 214/10 214/16 214/17 216/10 216/17 216/23 216/25 219/9 223/6 223/9 224/10 225/16 225/24 227/21 228/2 228/2 228/19 230/3 231/1 231/5 231/16 231/17 231/21 232/12 234/22 237/12 238/20 238/25 240/2 242/4 244/10 245/13 248/1 248/16 249/2 250/17 250/21 251/3 253/6 253/21 253/25 255/2 256/11 257/20 259/10 259/13 264/11 264/21 265/12 265/13 266/2 267/1 268/20 269/18 270/19 272/17 276/2 276/4 280/7 281/9 282/12 282/12 282/22
**docket [2]** 29/15 105/20
**docs [1]** 230/14
**doctrine [4]** 118/19 119/14 119/15 119/15
**document [15]** 41/22 41/23 56/19 57/14 86/24 87/1 87/11 87/15 87/20 114/16 136/22 165/9 264/21 265/25 266/2
**documentation [1]** 190/14
**documented [1]** 241/23
**documents [18]** 45/6 45/25 46/1 46/1 52/3 115/5 115/8 115/9 137/7 138/1 164/4 189/10 190/18 190/20 190/21 191/5 211/13 251/18
**Doe [2]** 69/5 69/5
**does [57]** 5/25 6/6 17/24 19/5 28/17 31/13 39/1 39/1 39/3 39/19 40/7 43/16 57/12 64/5 64/16 68/16 76/12 80/18 80/21 81/1 87/16 101/13 123/2 124/17 136/16 136/19 136/22 138/5 141/22 158/1 158/16 159/6 159/6 160/19 164/22 180/6 187/5 187/6 187/7 188/22 188/22 207/4 207/6 213/17 214/3 215/21 222/1 224/3 224/8 224/25 226/15 229/8 229/24 231/6 255/9 256/8 259/10
**doesn't [17]** 63/23 64/15 67/12 67/12 75/4 80/20 137/24 138/6 182/17 192/11 192/11 207/2 225/23 231/12 240/5 259/3 259/8
**doing [27]** 12/22 13/12 19/9 23/8 23/8 75/6 76/19 105/24 106/18 118/20 118/20 125/8 138/8 147/8 147/15 156/13 156/22 161/15 176/3 177/18 185/25 189/9 191/24 213/10 221/25 250/18 251/14
**DOJ [1]** 2/12
**DOJ-USAO [1]** 2/12
**don't [184]** 7/14 10/20 10/22 12/10 14/23 19/5 20/5 21/12 21/15 21/22 21/25 22/6 24/8 24/9 27/19 30/17 32/4 34/5 34/14 34/14 35/11 35/17 36/6 37/5 38/7 39/5 41/8 41/15 47/22 48/3 50/17 51/8 53/20 56/5 56/14 58/23 66/7 66/8 66/12 67/3 67/3 67/9 67/17 67/17 70/17 71/24 74/8 74/10 74/25 76/14 77/1 77/7 79/14 82/21 83/3 84/11 85/4 86/18 87/16 89/24 93/8 93/19 94/5 94/6 94/12 94/14 94/18 94/24 96/16 96/22 99/13 100/2 102/16 102/20 104/7 106/8 106/9 106/19 106/24 113/16 120/5 120/9 125/14 128/10 128/12 128/14 129/5 130/24 133/17 135/11 135/25 136/6 137/21 139/4 139/10 139/11 139/20 142/11 142/18 142/24 157/13 158/23 158/24 160/10 160/12 163/16 163/20 164/17 166/4 166/6 166/6 166/8 166/10 166/11 175/25 185/24 186/23 187/7 187/21 188/2 189/5 190/6 192/12 195/7 195/8 197/4 197/7 197/16 209/3 210/7 210/23 210/24 214/12 217/5 217/21 220/13 230/5 233/1 237/12 237/14 237/14 237/16 238/14 238/21 238/22 238/23 239/3 239/11 240/7 243/2 243/13 243/14 244/19 244/25 245/15 245/16 252/21 252/21 253/6 256/10 256/10 258/24 261/17 261/25 262/25 263/18 264/7 265/4 265/11 265/15 267/2 267/15 268/20 270/11 273/5 274/17 274/17 274/23 276/13 277/4 277/14 278/7 279/1 283/12
**Donald [2]** 53/13 55/8
**done [11]** 48/25 103/14 135/11 159/14 159/19 174/21 219/25 258/6 259/17 273/20 279/1
**door [12]** 69/21 76/6 81/9 148/23 149/3 149/20 199/15 214/20 241/3 247/3 247/7 247/14
**DoorDash [1]** 242/5
**doors [9]** 110/18 149/21 149/24 150/23 179/24 235/22 247/14 247/19 248/2
**double [5]** 162/21 227/12 230/8 236/8 247/14
**double-check [3]** 162/21 230/8 236/8
**double-checking [1]** 227/12
**doubt [1]** 19/12
**down [21]** 11/3 28/1 63/5 67/22 76/15 87/13 116/18 127/11 151/22 152/7 174/8 174/13 174/20 190/10 241/18 245/9 245/13 245/23 246/5 251/6 257/19
**downtown [1]** 60/11
**doxing [1]** 31/21
**dragnet [3]** 22/11 59/21 81/21
**dragnets [1]** 59/24
**draw [2]** 133/20 160/13
**drawing [1]** 16/12
**dressed [2]** 82/13 82/20
**drew [1]** 133/20
**drilling [1]** 177/10
**drive [6]** 74/19 172/13 172/24 173/11 174/8 179/18
**driver [44]** 74/22 75/9 79/14 147/25 148/2 148/15 148/17 148/23 149/1 149/7 155/14 155/15 155/18 155/20 157/7 163/15 163/17 179/8 179/11 179/13 179/15 179/18 179/20 180/2 181/10 181/22 182/2 182/6 182/15 185/13 206/6 214/19 236/12 244/14 245/9 245/19 246/5 250/8 250/10 251/20 262/15 263/25 264/1 268/14
**driver's [5]** 74/23 223/22 238/22 238/23 242/1
**driver-side [1]** 244/14
**driving [3]** 70/21 72/3 242/5
**drop [3]** 217/3 250/24 250/24
**dropped [2]** 73/13 251/5
**drove [3]** 80/1 195/12 235/22

**D**

**due [5]** 46/5 114/25 176/20 185/15 285/13
**duly [5]** 78/3 108/15 121/6 168/18 220/17
**duplicate [1]** 274/23
**duplicative [1]** 272/16
**duration [1]** 135/12
**duress [2]** 141/2 147/8
**during [30]** 37/24 38/17 49/2 69/10 75/19 92/15 123/6 134/16 140/5 140/6 147/24 176/15 185/5 186/5 189/17 195/3 203/15 211/13 211/16 227/17 232/22 248/6 249/10 249/17 251/3 251/19 252/1 252/20 264/9 267/6
**duties [2]** 171/5 188/19

**E**

**E-l-i-t-e [2]** 228/11 228/12
**e-mail [1]** 221/24
**e-mails [1]** 143/18
**each [3]** 49/23 126/23 129/19
**eager [1]** 187/16
**earlier [14]** 15/23 22/25 24/13 25/8 47/9 106/21 107/22 119/2 123/20 130/15 161/11 167/9 273/16 277/20
**early [15]** 70/20 72/16 73/17 139/8 175/12 175/17 175/18 176/21 176/22 202/5 222/14 237/20 238/12 240/6 242/24
**earshot [1]** 155/5
**easier [5]** 44/11 99/4 99/24 105/21 164/10
**easily [1]** 232/12
**easy [2]** 187/19 278/24
**Eats [1]** 242/5
**ECF [5]** 42/1 42/3 42/4 42/9 105/20
**echoing [2]** 18/22 18/23
**edge [1]** 80/4
**educate [2]** 91/16 283/14
**educated [1]** 217/1
**educating [1]** 283/19
**effect [3]** 58/19 123/24 136/7
**effectively [1]** 31/14
**effectuated [1]** 243/23
**efficiency [2]** 105/10 270/8
**efficient [2]** 47/25 113/12
**effort [5]** 153/25 154/3 154/4 161/12 162/15
**eight [7]** 260/6 260/7 261/4 261/5 261/6 261/7 261/8
**either [33]** 8/11 26/24 26/24 49/1 69/14 74/22 92/9 100/2 111/18 130/24 131/16 140/20 154/25 164/25 176/10 181/15 181/19 186/5 188/15 188/24 191/10 191/17 192/5 193/23 214/19 217/20 223/22 225/5 228/8 238/13 242/2 249/17 265/11
**electronic [3]** 143/8 143/12 143/21
**electronically [2]** 48/15 52/5
**elements [2]** 240/11 240/13
**elicit [1]** 65/8
**eliciting [1]** 63/13
**eliminate [1]** 50/5
**Elite [12]** 227/18 228/8 228/9 228/10 228/12 229/5 229/5 229/24 231/3 231/3 273/25 274/1
**else [53]** 6/11 14/6 16/19 25/24 27/20 33/5 36/7 41/11 44/22 50/15 50/20 57/22 58/8 58/9 66/7 72/22 75/14 76/5 96/2 107/19 112/15 118/23 129/1 130/7 133/16 144/25 145/5 145/7 145/9 145/16 156/22 159/25 166/18 166/20 173/7 176/9 192/22 194/1 194/19 195/4 195/11 196/8 197/11 211/4 219/15 219/19 243/7 249/20 253/16 256/11 269/10 274/3 278/17
**else's [1]** 49/18
**embedded [1]** 129/25
**employed [5]** 121/16 121/17 169/3 175/21 220/25
**employee [2]** 62/20 217/18
**employees [1]** 62/19
**en [1]** 59/19
**enclosed [1]** 83/12
**encounter [7]** 165/14 183/15 211/13 224/12 224/13 249/17 267/23
**encountered [7]** 66/1 223/2 223/5 223/23 224/9 228/25 238/22
**encountering [3]** 140/18 147/2 213/14
**encounters [2]** 187/2 213/20
**encourage [1]** 47/23
**encouraging [1]** 68/20
**end [15]** 44/18 58/5 86/14 105/23 107/8 107/10 114/7 116/15 122/8 139/5 140/6 147/14 178/8 178/8 189/9
**ended [2]** 153/4 235/18
**endorse [1]** 57/8
**enforce [1]** 125/1
**enforcement [34]** 1/9 31/20 35/20 68/15 68/15 68/22 75/25 76/2 76/19 121/17 122/1 123/3 123/4 123/21 126/2 129/22 130/14 153/8 153/8 154/8 155/11 156/10 161/23 162/1 163/13 189/25 190/14 190/24 219/20 221/8 221/18 221/25 222/9 223/7
**engage [1]** 106/14
**engaged [3]** 64/11 153/8 279/2
**engaging [2]** 141/6 154/8
**English [16]** 85/5 87/12 98/14 100/18 100/22 156/5 156/5 160/9 160/11 160/13 160/24 181/5 209/20 245/24 247/8 249/16
**enjoy [1]** 68/13
**enough [15]** 4/24 36/1 48/13 107/18 120/24 125/12 138/17 159/10 199/24 226/1 239/22 239/23 240/3 240/9 269/24
**ensure [3]** 49/13 50/12 185/18
**ensuring [1]** 49/15
**entangled [1]** 16/8
**enter [6]** 86/2 102/10 113/1 113/1 135/24 238/6
**entered [8]** 29/4 102/14 102/22 113/7 114/1 114/2 136/4 183/3
**entering [1]** 225/13
**entertain [2]** 48/10 48/12
**entertaining [2]** 54/7 279/5
**enthusiasm [1]** 104/12
**entire [3]** 59/19 97/3 197/24
**entitled [1]** 285/12
**entity [1]** 55/11
**entry [2]** 114/20 225/13
**envelope [1]** 136/23
**environment [1]** 219/21
**EOIR [1]** 109/14
**equally [1]** 21/24
**Equity [1]** 61/9
**ERO [1]** 1/9
**error [3]** 46/4 46/12 46/12
**escalated [1]** 60/20
**escape [19]** 62/25 63/21 65/5 65/9 152/21 153/1 153/10 153/17 161/11 161/16 193/12 247/13 251/22 252/10 254/14 268/16 268/17 268/20 268/21
**escaped [1]** 252/6
**escaping [1]** 252/15
**especially [6]** 31/19 74/7 174/21 176/15 189/2 283/15
**essentially [8]** 40/15 69/13 73/10 107/3 129/18 158/22 184/5 278/10
**establish [3]** 65/8 94/22 137/7
**established [1]** 163/5
**establishes [1]** 63/13
**establishing [1]** 55/12
**estimate [3]** 106/21 112/24 255/5
**et [6]** 1/9 4/11 25/20 137/1 223/20 285/3
**et al [1]** 4/11
**et cetera [3]** 25/20 137/1 223/20
**EUGENE [3]** 1/3 74/16 104/16
**evade [4]** 154/7 155/11 162/16 162/17
**even [38]** 7/2 10/2 10/2 13/3 14/12 17/3 28/6 50/6 50/7 66/23 68/3 68/5 69/6 86/25 118/23 122/8 138/2 138/3 176/6 176/25 182/16 184/24 197/12 197/13 223/8 225/16 230/9 230/15 232/6 236/24 238/20 244/23 248/10 253/6 256/17 258/24 261/25 271/17
**event [3]** 24/1 27/22 144/19
**events [12]** 40/4 49/17 53/3 70/8 90/8 95/19 95/21 95/22 95/23 122/8 125/5 125/22
**eventual [1]** 62/13
**eventually [7]** 99/15 148/21 182/2 191/15 199/20 199/21 264/2
**ever [9]** 20/2 165/9 197/1 223/2 224/9 228/25 252/11 263/22 276/24
**every [5]** 68/7 74/20 79/10 119/25 224/11
**everybody [12]** 16/20 89/9 107/17 162/16 166/14 186/7 186/9 191/25 250/19 256/20 263/15 270/16
**everybody's [1]** 240/24
**everyone [19]** 16/23 50/18 60/19 66/7 104/25 112/10 115/8 118/23 126/19 152/12 155/12 189/12 194/1 197/8 197/11 197/12 219/15 219/19 256/11
**everyone's [3]** 60/22 167/13 216/22
**everything [8]** 13/14 25/18 29/14 36/7 51/1 57/3 88/1 242/13
**everything's [1]** 209/4
**evidence [36]** 6/17 9/17 10/7 11/19 22/9 23/25 28/8 32/25 35/16 35/23 44/20 46/10 48/8 60/7 60/13 61/24 63/13 65/7 70/7 70/10 71/25 75/18 76/18 77/16 106/11 118/25 133/23 136/8 136/11 137/21 138/13 163/23 208/19 209/10 210/7 260/21
**evident [2]** 156/19 156/21
**evidentiary [31]** 1/14 4/9 5/10 5/15

## E


**evidentiary... [27]** 5/18 6/20 8/14 9/1 9/13 12/14 14/5 15/18 15/19 18/18 22/4 24/6 24/20 25/22 26/5 26/12 26/14 26/23 27/3 27/25 28/7 34/20 58/1 67/20 91/8 283/19 285/5
**evolving [1]** 281/25
**exact [4]** 30/18 135/7 163/20 165/3
**exactly [6]** 20/24 60/3 102/20 117/11 128/18 164/17
**exam [1]** 92/8
**examination [25]** 7/8 57/9 78/11 89/10 91/14 96/23 97/7 109/1 115/15 121/13 163/3 166/1 169/1 200/8 212/6 212/8 220/2 220/23 255/1 255/2 256/16 257/18 258/17 275/5 275/21
**examined [5]** 78/3 108/15 121/6 168/18 220/17
**example [1]** 149/2
**examples [2]** 25/15 130/25
**except [2]** 65/3 114/1
**exception [4]** 9/14 53/21 55/5 56/12
**excerpt [2]** 52/9 52/22
**exchange [1]** 105/15
**excluding [3]** 35/24 257/22 280/22
**exclusion [3]** 48/20 48/24 96/11
**excuse [5]** 48/10 58/14 87/6 235/12 274/12
**excused [11]** 49/9 50/6 50/6 50/11 117/17 166/24 167/4 167/5 215/8 269/4 269/9
**execute [1]** 61/2
**executed [1]** 137/19
**executive [5]** 6/8 53/22 53/23 55/9 109/13
**exercise [2]** 68/17 210/2
**exercising [1]** 68/2
**exert [1]** 194/4
**exhausted [1]** 57/20
**exhibit [31]** 23/5 51/21 51/23 52/1 52/2 52/4 52/5 52/7 52/8 52/9 52/16 53/6 53/8 53/10 55/14 57/18 69/12 80/6 80/8 88/5 88/11 105/13 164/9 165/8 203/2 234/23 239/6 264/18 277/25 280/7 280/12
**Exhibit 1 [1]** 69/12
**Exhibit 10 [1]** 264/18
**Exhibit 101 [1]** 203/2
**Exhibit 102 [1]** 164/9
**Exhibit 109 [3]** 165/8 277/25 280/7
**Exhibit 117 [1]** 88/5
**Exhibit No [1]** 52/9
**exhibited [1]** 252/16
**exhibits [8]** 50/21 50/22 51/9 51/12 51/22 59/16 59/18 60/8
**exist [1]** 137/24
**existed [3]** 62/8 62/10 254/6
**exists [3]** 41/8 119/23 136/17
**exit [5]** 85/8 150/15 151/10 157/1 192/21
**exited [1]** 179/10
**expansive [1]** 10/15
**expect [9]** 27/14 44/2 48/1 48/1 58/12 63/12 65/8 100/2 239/5
**expectation [1]** 261/15
**expectations [1]** 261/9
**expected [1]** 177/12
**expecting [1]** 44/14
**expedite [1]** 56/4
**expedited [1]** 225/5
**expeditious [1]** 105/11
**expend [1]** 31/24
**experience [41]** 74/7 80/18 80/22 81/2 106/5 114/13 136/25 147/1 147/11 153/18 161/20 162/9 166/11 166/13 173/21 173/23 174/2 174/19 176/25 178/4 178/6 181/19 181/21 182/16 183/9 183/14 183/24 187/2 187/8 188/5 188/10 189/8 193/17 221/8 238/7 238/11 238/25 239/5 241/15 241/21 276/15
**experienced [2]** 30/6 187/13
**Expiration [1]** 285/23
**explain [6]** 85/19 162/12 174/17 267/12 267/13 276/13
**explained [2]** 93/23 116/23
**explaining [1]** 137/24
**explanation [5]** 40/16 40/16 119/13 214/7 214/10
**explicitly [1]** 63/4
**exploitation [1]** 141/4
**explore [10]** 9/23 12/24 13/14 91/13 94/18 95/4 95/7 95/11 95/14 130/12
**explored [3]** 217/21 273/18 275/5
**express [1]** 102/23
**expressed [1]** 277/20
**expressly [1]** 64/16
**extend [1]** 215/22
**extends [1]** 33/24
**extensive [1]** 256/15
**extent [4]** 8/5 27/22 39/24 48/25
**extract [2]** 195/10 195/10
**eyes [1]** 238/5


## F


**F.2d [1]** 119/11
**face [2]** 83/1 158/4
**faces [3]** 52/13 82/15 82/23
**facial [3]** 158/2 158/5 158/17
**facility [10]** 38/6 39/8 39/17 39/22 67/15 112/16 116/10 199/9 282/20 282/22
**facing [1]** 193/18
**fact [21]** 27/5 31/18 44/8 56/2 56/13 56/14 65/16 66/3 66/6 66/11 76/25 92/8 93/25 107/13 140/17 141/17 162/14 176/11 177/3 236/24 249/19
**factor [3]** 160/21 161/1 161/2
**factors [5]** 68/23 141/23 160/22 175/10 242/25
**facts [30]** 8/22 16/6 22/5 22/5 22/6 24/8 24/9 24/10 25/8 25/10 25/11 25/25 29/6 29/9 55/12 61/14 64/10 65/20 69/9 70/16 73/3 91/9 94/18 94/18 94/24 97/16 106/24 107/8 120/2 182/8
**factually [1]** 17/18
**failure [1]** 181/9
**fair [9]** 36/1 48/13 73/6 91/13 95/12 127/20 138/17 199/24 240/9
**fake [1]** 263/18
**fall [1]** 36/22
**falls [3]** 45/16 56/11 158/10
**familiar [5]** 130/13 201/24 202/1 234/25 254/12
**families [1]** 31/25
**family [2]** 239/16 248/9
**fantastical [3]** 73/19 279/2 279/5
**far [18]** 44/19 104/9 124/12 139/8 139/21 148/1 148/18 159/21 159/23 161/8 161/14 175/16 183/16 187/1 188/6 189/1 276/25 283/18
**fare [2]** 55/20 55/24
**farm [1]** 240/20
**fashion [1]** 151/12
**fast [7]** 60/4 206/1 224/22 226/13 226/21 274/18 285/14
**fast-forward [1]** 206/1
**faster [1]** 226/24
**fault [1]** 77/13
**FBI [2]** 226/10 266/5
**fear [14]** 81/13 91/4 91/10 92/9 92/10 92/14 101/4 101/8 102/23 189/3 189/4 189/5 189/7 208/14
**fearful [2]** 101/5 189/8
**federal [13]** 5/1 5/3 9/15 13/17 31/13 31/19 32/8 32/9 62/3 62/4 62/4 64/4 109/16
**fee [2]** 183/3 183/5
**feed [1]** 54/20
**feel [2]** 86/4 89/24
**feeling [2]** 16/16 81/10
**feelings [1]** 80/20
**fees [4]** 183/24 184/1 184/1 184/4
**feet [1]** 96/17
**Feldman [7]** 14/10 14/20 16/17 18/3 18/4 54/5 91/24
**fellow [10]** 129/16 150/8 150/13 177/24 180/1 185/10 189/12 191/10 192/20 206/19
**felony [1]** 189/22
**felt [1]** 81/4
**few [10]** 83/19 86/1 101/21 102/16 114/5 116/8 116/13 116/16 117/10 168/5
**field [16]** 1/8 37/19 61/8 111/4 123/23 127/11 127/14 127/15 127/16 128/3 159/18 221/2 226/7 251/14 262/20 264/25
**fields [1]** 202/6
**Fifth [21]** 14/4 14/24 18/11 19/20 20/8 21/24 46/22 68/17 90/13 90/15 90/15 91/12 91/16 91/19 92/23 93/11 93/19 94/13 96/1 102/2 102/5
**fight [1]** 115/4
**figure [3]** 21/6 47/13 276/15
**file [5]** 7/1 23/3 115/25 233/4 285/13
**filed [9]** 6/24 7/16 7/17 19/12 29/14 34/2 41/16 42/2 56/20
**files [1]** 35/18
**filibustering [1]** 58/2
**filing [4]** 7/1 23/7 26/7 29/12
**fill [6]** 41/4 139/1 139/11 264/8 265/1 265/8
**filled [1]** 188/11
**filling [2]** 40/4 84/24
**final [2]** 23/20 183/12
**finally [2]** 250/15 250/25
**find [14]** 32/11 50/13 69/6 125/2 137/18 141/1 142/5 213/17 222/10 223/2 231/1 231/2 274/13 278/5

## F


**finding [4]** 10/7 137/21 213/15 222/2
**fine [9]** 50/19 88/21 99/25 125/14 156/7 216/11 259/16 270/13 277/16
**finger [1]** 16/20
**fingerprint [3]** 159/12 232/11 263/19
**fingerprints [5]** 84/25 159/14 222/25 224/17 225/7
**finish [6]** 27/24 47/24 58/5 184/12 256/18 270/14
**finished [2]** 116/24 193/1
**finishes [2]** 25/22 96/15
**FINS [2]** 232/10 232/10
**firefighter [1]** 221/13
**first [57]** 16/3 18/20 19/2 28/25 33/20 33/20 33/21 35/2 36/11 41/15 41/23 42/13 45/1 53/17 62/17 65/16 69/1 70/9 71/23 73/18 76/8 77/7 78/3 81/16 82/8 89/7 108/15 113/16 113/18 114/15 120/21 121/6 121/9 124/21 125/6 125/8 125/23 125/24 126/2 126/12 127/3 137/11 153/16 168/18 168/22 171/12 195/17 217/11 220/17 220/19 222/8 238/4 243/10 246/4 246/15 248/10 272/20
**firsthand [1]** 42/24
**fits [1]** 53/20
**five [17]** 13/24 58/23 96/21 102/17 113/14 122/10 126/10 170/24 170/25 191/14 221/7 248/24 258/20 271/3 278/14 278/25 281/8
**flag [1]** 267/25
**flags [1]** 43/9
**flash [1]** 187/10
**flashlight [1]** 140/13
**flee [9]** 69/14 69/15 70/1 76/10 154/1 154/2 193/18 193/21 247/24
**fleeing [2]** 152/7 247/23
**flexibility [1]** 7/14
**flexible [1]** 98/6
**flight [9]** 20/17 63/10 63/14 63/24 68/24 75/18 250/3 268/12 268/13
**float [1]** 149/23
**floor [1]** 58/22
**Florida [1]** 169/11
**flowed [1]** 26/24
**fluidly [1]** 47/24
**focused [1]** 154/16
**focusing [1]** 209/17
**folder [2]** 87/4 264/15
**folks [61]** 25/17 31/24 37/14 52/10 65/13 66/2 66/12 66/22 66/23 66/25 67/2 68/20 69/14 69/25 73/25 74/4 74/5 74/8 75/20 76/10 76/11 141/5 141/7 146/24 150/24 150/24 151/2 153/3 156/2 161/17 162/4 171/1 178/16 180/16 181/2 181/5 181/8 182/9 183/15 184/8 184/15 184/20 185/12 186/18 189/16 190/5 190/6 190/6 192/22 194/7 196/20 197/20 198/12 212/19 238/25 241/23 242/16 248/12 249/19 281/6 281/16
**folksy [1]** 186/17
**follow [12]** 20/21 50/14 54/9 60/2 101/21 128/6 133/1 145/7 186/10 237/24 238/2 251/13
**follow-on [1]** 251/13
**follow-up [1]** 101/21
**followed [2]** 20/20 186/11
**following [3]** 4/3 132/21 144/12
**follows [5]** 78/4 108/16 121/7 168/19 220/18
**foot [1]** 183/10
**footage [5]** 144/17 144/20 144/21 279/20 279/22
**Force [1]** 221/12
**forced [9]** 73/20 140/23 141/3 141/6 183/22 183/23 184/16 239/10 270/11
**foregoing [1]** 285/9
**form [11]** 142/13 151/12 162/7 180/24 264/25 265/1 265/7 265/21 265/25 266/11 267/5
**formal [2]** 223/13 226/1
**formally [1]** 48/25
**format [10]** 143/10 143/22 143/24 143/24 144/4 144/7 144/9 144/14 144/15 144/15
**formats [1]** 146/8
**forms [2]** 84/24 112/10
**formulate [1]** 178/15
**forth [3]** 29/6 30/2 149/23
**Fortify [11]** 157/22 157/23 158/12 158/16 158/22 159/3 159/6 253/14 253/22 253/22 254/5
**Fortifying [4]** 134/14 134/19 134/25 135/4
**forward [9]** 13/23 23/16 139/11 203/14 205/17 206/1 206/8 282/2 282/13
**found [4]** 102/4 225/14 252/22 252/24
**four [8]** 80/1 126/11 129/11 129/17 163/6 248/20 248/24 281/14
**four-vehicle [1]** 129/17
**fourth [25]** 7/23 8/19 8/22 15/24 16/5 17/8 17/11 17/19 17/20 17/24 19/16 19/19 19/23 19/24 20/3 20/8 20/22 21/2 21/14 21/17 21/24 25/13 26/2 113/21 282/15
**FOW [1]** 226/7
**frame [3]** 5/16 8/25 246/7
**frankly [4]** 49/3 93/2 219/19 283/12
**free [6]** 167/6 215/13 216/11 257/19 269/8 278/6
**freedom [1]** 59/25
**frequent [2]** 172/18 173/6
**frequently [1]** 172/21
**front [23]** 13/8 60/15 76/4 76/24 83/5 86/24 87/4 106/20 140/8 149/24 152/20 179/23 193/7 193/9 193/9 203/23 244/8 247/18 250/1 251/20 251/25 252/13 263/11
**frustrating [1]** 43/6
**FTCA [1]** 6/15
**FTR [4]** 1/15 99/12 99/13 285/11
**FTR-RECORDED [2]** 1/15 285/11
**Fugitive [1]** 221/4
**fulfilling [1]** 37/24
**full [13]** 9/24 12/23 13/13 13/15 13/15 33/19 52/6 106/4 108/18 114/10 198/20 199/1 217/18
**full-time [1]** 217/18
**fully [3]** 10/2 26/21 68/14
**fun [2]** 16/23 49/25
**function [1]** 9/14
**functionally [1]** 57/25
**fundamental [1]** 46/13
**further [25]** 15/4 24/10 33/4 88/12 93/9 93/9 98/2 103/1 115/10 116/18 117/13 162/18 165/23 181/23 183/8 189/6 200/4 211/23 215/5 219/2 254/20 269/1 275/21 279/22 283/6
**future [10]** 8/7 8/11 8/17 9/9 9/20 10/9 22/3 92/11 100/10 254/18


## G


**G-28 [1]** 112/10
**G-28s [2]** 112/17 112/19
**gain [1]** 179/20
**gallery [1]** 11/15
**game [1]** 95/12
**gander [2]** 31/2 107/21
**gap [1]** 132/23
**GARCIA [20]** 2/4 4/17 37/7 56/2 99/19 99/23 99/24 100/3 100/24 101/1 108/23 120/4 162/19 167/2 214/13 215/11 219/24 258/9 271/13 281/20
**GAROUSI [15]** 2/12 4/22 5/14 15/10 38/8 39/12 42/23 88/23 89/6 94/20 95/5 97/13 101/19 255/8 282/18
**gather [1]** 269/20
**gathered [3]** 43/1 43/3 43/11
**gave [16]** 73/17 74/3 75/15 90/8 90/12 95/20 95/22 95/24 117/8 148/1 151/9 153/21 191/21 215/3 230/15 242/25
**gaveled [1]** 104/6
**gear [1]** 259/23
**general [6]** 2/24 9/15 64/23 64/23 123/25 190/22
**generally [9]** 26/10 92/17 122/18 126/5 134/15 147/9 230/17 230/19 281/16
**generate [3]** 230/12 231/24 264/11
**generated [4]** 228/4 230/4 230/5 232/22
**generating [2]** 212/19 233/14
**gentleman [2]** 76/2 249/12
**gentlemen [1]** 247/12
**geographically [1]** 109/12
**geography [1]** 32/22
**get [104]** 16/23 28/4 28/5 28/7 34/19 34/22 44/11 44/19 47/13 47/15 49/6 58/5 58/7 58/25 60/5 63/5 66/6 67/20 68/9 69/4 69/21 69/23 70/6 70/21 72/3 72/22 74/18 76/5 76/9 76/23 76/24 77/2 79/11 83/25 95/3 95/18 96/24 97/6 97/15 99/5 104/6 104/7 104/14 104/25 108/9 123/18 123/23 129/21 135/12 138/22 139/4 139/6 142/24 147/15 147/16 147/20 149/25 150/2 152/20 158/14 159/21 162/4 172/24 173/8 174/7 174/13 176/2 176/25 179/17 185/4 185/16 187/20 191/10 191/15 191/21 192/1 192/13 193/9 195/6 196/5 196/8 199/10 207/7 210/25 217/1 225/4 226/22 229/9 229/18 232/7 235/7 238/22 241/23 243/12 248/8 251/25 259/17 262/19 263/18 272/15 278/5 278/25 281/24 282/11
**getting [26]** 25/7 48/2 67/19 73/15 74/5 85/9 95/1 104/8 113/14 120/18 147/17 175/14 175/16 178/3 191/11

## G


**getting... [11]** 201/4 208/1 225/5 239/8 239/10 239/25 240/4 241/5 250/7 250/7 255/19
**give [38]** 9/23 9/24 12/15 13/24 16/3 67/12 67/17 91/9 104/22 111/19 111/21 119/10 126/7 126/20 127/1 130/25 142/2 147/3 148/6 150/10 159/10 165/21 171/21 177/4 182/24 193/21 197/25 208/15 214/23 216/12 245/19 246/2 246/3 246/7 256/11 257/2 267/10 267/21
**given [22]** 29/19 44/1 44/14 61/11 97/3 105/1 124/12 128/15 137/2 148/18 155/10 190/8 199/14 212/9 212/12 214/19 229/11 230/8 245/25 260/3 271/22 276/22
**gives [1]** 231/13
**giving [8]** 60/17 119/17 150/8 210/6 210/7 254/16 254/16 276/21
**glad [1]** 187/22
**glass [1]** 113/24
**glasses [1]** 85/6
**glove [5]** 245/3 246/13 246/14 246/21 246/21
**go [102]** 5/21 7/7 13/23 18/6 28/25 33/5 40/1 53/17 60/16 64/7 67/4 69/2 69/4 75/5 75/17 79/11 86/19 89/6 93/14 93/16 94/3 95/15 96/8 106/22 108/4 110/7 111/9 113/5 118/17 124/13 129/12 132/9 146/17 149/20 161/9 167/20 171/4 171/12 173/9 174/16 177/1 177/1 178/3 179/17 179/22 179/23 183/6 183/13 184/12 184/18 185/16 185/18 187/7 191/9 192/1 194/15 196/11 196/16 198/7 198/19 198/24 199/9 215/14 216/11 218/13 218/14 219/2 220/7 220/22 225/8 226/24 227/22 227/23 229/19 229/20 229/23 232/19 236/4 238/19 238/21 240/1 244/10 245/2 247/1 252/5 253/3 253/22 254/18 259/13 259/16 259/17 260/23 265/15 269/9 271/19 275/20 276/21 277/12 278/6 278/20 282/4 283/9
**goal [1]** 260/1
**goes [8]** 48/9 69/22 72/12 100/23 104/9 148/25 189/1 219/23
**going [183]** 9/9 12/12 17/25 22/8 22/15 22/22 23/8 24/9 26/25 27/3 27/7 29/9 32/25 34/5 34/19 34/23 35/9 40/24 41/18 47/22 48/11 50/4 52/23 56/13 56/14 56/15 57/7 60/6 60/10 60/13 60/24 60/25 61/1 61/4 61/13 66/13 67/16 68/17 68/24 72/4 72/13 72/16 72/17 72/18 73/5 74/12 76/13 76/14 76/22 79/15 79/21 80/5 80/10 80/12 83/9 84/4 85/11 86/3 87/13 87/19 87/19 87/20 87/21 87/21 89/19 91/1 91/14 91/22 91/24 94/3 94/21 95/15 96/3 96/20 97/8 98/19 100/1 100/15 101/3 104/19 104/25 105/11 105/24 105/25 106/21 107/3 107/18 107/19 108/2 108/3 114/9 115/2 116/16 116/22 118/6 118/15 123/14 123/21 125/5 126/1 126/6 137/7 137/11 139/10 139/19 140/19 147/6 153/5 153/15 159/25 166/23 169/24 170/11 173/9 175/15 176/11 176/22 176/23 177/6 178/3 178/15 178/16 179/6 182/9 182/17 186/15 193/22 203/1 203/14 204/3 204/23 206/8 213/13 219/10 221/24 222/11 222/15 222/15 222/22 223/16 224/2 224/13 224/14 224/15 224/16 224/18 224/22 226/14 227/10 229/17 229/20 229/23 230/23 230/25 233/4 235/19 238/8 240/7 240/12 240/20 240/24 241/25 242/2 242/4 242/23 244/20 247/4 247/5 247/13 247/24 248/13 249/21 253/17 253/22 256/13 256/14 259/14 268/4 268/7 271/11 274/16 282/2 282/12
**gone [2]** 93/4 270/19
**good [36]** 4/14 4/16 4/19 4/21 5/2 28/17 28/20 31/1 31/2 40/1 52/10 56/5 78/13 78/14 89/12 89/13 92/25 104/4 107/20 107/21 109/3 115/17 115/19 115/20 121/15 122/17 159/10 167/13 169/3 220/25 230/15 257/2 258/14 269/21 272/13 283/9
**Google [1]** 228/16
**goose [2]** 31/1 107/20
**got [46]** 61/13 69/18 72/8 76/21 79/10 79/11 79/23 82/7 82/10 83/12 83/25 110/3 123/19 127/3 130/7 132/17 134/23 139/18 139/22 140/11 151/16 152/6 157/7 173/11 176/7 181/7 191/12 193/7 195/11 196/15 197/12 222/8 222/13 225/25 235/2 235/23 236/6 243/5 244/10 245/10 250/3 250/25 250/25 255/12 263/3 267/4
**gotten [5]** 159/23 173/2 192/22 224/10 224/21
**government [46]** 4/20 4/22 6/16 8/14 20/10 20/14 21/5 23/6 29/19 29/19 30/11 32/8 38/13 41/16 44/23 46/3 46/9 48/16 50/19 50/23 50/24 52/2 54/14 54/17 54/18 54/21 54/21 55/3 55/4 55/5 62/20 67/13 70/8 75/24 90/18 93/23 114/17 120/13 120/22 157/24 167/23 168/11 216/8 216/12 218/11 220/6
**Government's [10]** 5/24 6/5 21/1 21/5 35/8 46/2 46/9 166/25 215/10 257/4
**grabbed [1]** 246/14
**graces [1]** 16/23
**graciously [1]** 217/24
**great [7]** 10/22 14/18 40/23 44/21 219/11 235/9 281/15
**green [2]** 204/23 225/21
**grenade [1]** 16/16
**grew [1]** 169/20
**grid [1]** 241/22
**grilling [1]** 36/8
**gripping [1]** 250/22
**ground [7]** 27/7 154/14 154/20 154/25 194/22 195/6 208/7
**group [16]** 66/12 69/25 111/5 119/3 134/9 153/6 153/7 170/7 170/25 171/6 171/25 173/1 181/8 188/6 194/1 196/20
**groups [2]** 113/11 248/9
**growing [2]** 169/19 191/23
**grows [1]** 65/18
**guarantee [1]** 138/20
**guard [10]** 110/24 110/25 111/8 111/16 111/24 112/2 112/5 112/8 112/9 113/8
**guess [6]** 10/5 14/15 16/13 67/8 84/3 204/20
**guesstimating [1]** 205/10
**guests [1]** 37/5
**guidance [2]** 14/5 161/7
**guide [3]** 97/7 123/21 271/7
**guided [1]** 124/9
**guiding [1]** 14/25
**guilt [1]** 162/13
**guilty [1]** 16/17
**guy [11]** 236/3 236/4 236/8 236/9 250/1 251/19 252/4 252/6 252/11 252/13 268/14
**guys [1]** 262/18


## H


**habeas [17]** 5/11 5/25 6/6 6/7 7/23 7/24 10/8 17/11 17/25 19/10 19/12 21/11 21/15 23/13 30/23 93/6 97/17
**habits [2]** 104/7 104/15
**had [161]** 5/11 6/21 8/2 12/23 13/1 13/2 13/3 13/13 29/5 34/15 40/10 40/22 40/22 41/16 41/19 65/23 70/1 70/23 70/24 71/7 71/13 72/4 73/19 74/22 75/9 75/25 76/15 80/2 82/21 83/20 85/2 85/20 85/21 85/21 85/21 86/4 95/10 102/14 105/22 110/1 110/11 111/2 111/9 112/13 112/19 112/20 113/7 114/5 114/10 114/14 114/17 115/8 116/10 117/3 117/11 124/13 128/8 128/22 129/18 130/10 130/20 130/25 132/19 133/8 139/21 140/12 141/5 143/5 143/15 143/16 143/16 144/6 151/22 151/25 152/5 152/6 152/6 152/25 153/2 154/11 155/3 155/4 155/10 155/14 155/14 155/20 156/8 156/10 159/25 161/24 162/9 164/23 164/25 172/14 172/19 172/19 173/1 175/7 177/25 178/17 181/9 185/8 185/14 192/22 193/14 194/2 195/4 196/22 197/7 198/8 198/12 199/2 199/13 200/10 222/16 222/16 223/15 223/15 223/16 223/17 226/20 226/20 226/21 232/3 232/19 233/11 233/14 236/20 236/25 237/3 237/11 238/1 238/2 238/4 238/9 241/10 242/16 243/25 244/1 244/1 244/5 245/3 246/13 246/13 250/8 251/11 252/18 259/12 259/14 263/2 263/14 270/16 272/6 275/5 276/6 276/7 277/2 279/10 279/12 279/15 282/21
**half [6]** 106/22 169/18 232/3 232/5 233/8 235/13
**hand [14]** 77/25 108/12 121/3 147/19 168/15 220/14 244/9 246/13 246/14 246/16 246/17 246/20 262/16 265/5
**handcuffed [11]** 61/6 76/3 152/10 152/13 193/10 194/21 195/5 207/19 207/22 207/25 208/2
**handcuffs [13]** 84/13 151/4 151/15 154/14 154/20 207/15 207/17 250/19

H

**handcuffs... [5]** 250/25 251/4 251/23 262/2 268/11
**handed [3]** 24/12 145/18 197/13
**handle [2]** 246/19 251/25
**handler [2]** 188/8 188/10
**handling [2]** 98/24 233/6
**hands [16]** 60/21 76/6 150/6 150/12 150/16 151/10 151/13 156/14 156/15 156/16 185/21 185/24 186/2 191/11 247/7 250/21
**happen [12]** 62/11 81/4 85/10 101/8 101/11 115/2 154/13 192/22 194/19 205/8 214/8 227/10
**happened [52]** 22/14 44/8 69/10 70/3 75/19 79/9 79/17 79/24 80/19 81/3 81/22 82/5 83/4 83/7 83/11 83/14 83/17 83/21 83/24 84/2 84/12 84/15 84/22 85/1 85/7 85/25 86/7 89/21 90/3 92/15 94/9 110/6 132/20 140/5 147/24 148/15 148/21 153/17 179/8 196/19 199/12 226/14 243/24 244/16 246/11 250/8 251/3 251/7 253/15 267/1 267/11 283/21
**happening [9]** 25/18 27/7 72/15 74/11 147/5 180/12 181/11 181/20 217/2
**happens [4]** 73/24 147/9 224/11 269/23
**happenstance [1]** 134/25
**happy [11]** 14/1 16/20 27/19 31/2 35/15 43/25 44/17 91/7 187/16 240/1 270/1
**happy-go-lucky [1]** 240/1
**harass [1]** 248/10
**harboring [2]** 238/15 249/23
**hard [5]** 104/7 125/11 142/25 250/23 267/11
**harder [1]** 144/12
**has [85]** 6/20 8/2 17/7 17/13 17/13 18/1 19/8 23/6 23/6 23/21 29/4 29/19 30/2 30/11 32/8 33/16 37/13 43/5 43/5 44/1 44/20 45/17 49/1 49/24 50/10 50/10 50/14 54/18 54/19 58/17 59/14 61/14 62/23 64/9 64/25 65/1 65/4 68/13 69/12 69/20 69/21 72/9 72/10 88/5 90/22 91/1 92/9 92/12 93/19 93/23 95/8 95/25 96/13 105/12 112/3 115/22 134/18 167/9 179/5 209/16 209/22 209/23 211/3 215/17 217/8 217/8 217/8 224/25 225/1 225/10 232/16 234/23 236/9 237/5 242/18 242/22 257/3 257/20 257/21 267/15 269/10 269/11 278/4 282/23 285/12
**hasn't [1]** 50/6
**hatch [2]** 247/14 248/2
**have [414]**
**haven't [6]** 9/18 13/2 14/12 93/4 159/10 159/23
**having [31]** 17/22 18/23 27/25 31/12 34/7 48/2 78/3 106/5 108/15 115/21 121/6 125/11 131/4 135/21 138/5 147/19 167/11 168/18 182/4 182/15 188/20 192/5 193/23 203/5 213/20 218/5 220/17 241/6 275/14 279/23 283/11
**he [128]** 30/24 36/22 38/16 38/18 38/20 40/25 40/25 41/1 41/14 43/17 53/25 55/2 62/23 72/22 73/14 76/15 79/18 79/18 79/25 80/1 80/1 80/2 80/3 80/3 111/1 111/9 111/9 111/9 111/10 111/12 111/12 111/18 111/20 111/21 111/21 112/6 112/9 112/17 112/20 112/22 117/3 117/6 117/8 135/11 148/18 150/15 152/10 155/21 155/21 155/22 157/9 157/11 167/4 167/5 176/2 176/3 180/5 180/9 193/4 193/5 209/10 209/11 209/22 210/5 217/20 219/14 236/2 236/2 236/6 236/6 237/3 237/4 237/5 237/6 237/10 237/11 237/15 238/2 238/4 238/5 243/10 243/11 243/25 244/6 244/17 244/17 244/17 244/23 244/23 245/7 245/24 247/13 247/15 247/22 247/23 247/23 247/23 248/2 251/21 251/21 251/24 252/5 257/3 257/6 262/17 264/5 264/6 267/4 267/15 273/16 274/5 274/9 274/10 274/11 274/14 276/22 276/23 278/6 278/16 278/19 278/19 278/24 279/10 279/12 279/13 279/19 279/19 279/20
**he's [19]** 30/16 30/17 30/17 38/9 40/23 53/22 53/24 69/21 179/18 211/2 244/20 244/20 257/14 257/15 271/21 278/20 278/20 278/22 279/19
**head [7]** 53/22 55/8 76/14 103/12 108/1 199/13 237/24
**heads [1]** 13/25
**heads-up [1]** 13/25
**hear [38]** 22/9 23/24 28/23 53/17 60/25 61/1 61/4 69/18 72/13 73/5 76/13 78/22 90/14 97/24 104/18 106/13 135/20 144/4 150/8 150/9 154/9 154/22 154/24 175/23 180/1 180/4 196/2 196/2 196/7 206/11 209/17 210/17 210/19 215/4 247/5 250/10 252/3 259/6
**heard [24]** 36/18 36/19 36/21 61/22 100/17 143/15 144/3 151/1 152/3 153/3 154/10 180/10 193/3 208/23 209/10 209/11 209/20 210/13 210/15 213/2 229/1 245/2 268/8 285/13
**hearing [44]** 1/14 4/10 5/10 5/15 5/19 6/20 7/23 7/24 8/15 12/14 13/11 15/19 17/17 18/18 22/4 24/7 24/20 25/22 26/5 26/14 26/15 26/16 26/23 27/3 27/4 27/25 28/8 34/6 34/20 36/2 41/16 43/21 49/20 56/4 58/1 58/2 67/21 105/11 131/5 131/6 138/8 215/22 283/19 285/5
**hearings [3]** 6/21 14/5 104/23
**hearsay [8]** 53/15 54/11 55/5 55/20 55/24 56/12 57/12 88/9
**heart [1]** 7/21
**heavily [1]** 228/17
**Hector [1]** 4/25
**held [5]** 4/3 40/18 40/22 112/15 141/3
**hello [1]** 27/13
**help [11]** 7/1 8/12 31/7 47/24 92/24 137/7 139/6 195/10 195/12 196/16 219/20
**helped [4]** 192/16 219/17 283/14 283/15
**helpful [5]** 14/25 26/25 44/7 106/6 106/13
**helping [2]** 82/1 246/23
**helps [1]** 10/2
**her [175]** 19/10 19/13 20/12 20/12 20/12 21/2 21/16 21/17 21/17 21/18 21/19 21/19 21/25 23/10 28/16 28/17 29/8 29/10 29/11 29/17 29/17 29/18 29/18 29/18 29/24 30/5 35/6 46/22 46/23 47/10 54/7 56/11 56/22 57/4 57/5 57/8 57/13 57/14 61/9 61/15 66/9 66/10 66/10 69/2 69/2 69/6 88/6 90/23 91/2 91/3 91/4 91/5 91/5 91/9 91/11 91/14 92/13 92/14 92/16 94/12 94/15 94/16 94/24 95/18 95/20 95/24 97/5 97/7 99/4 105/12 105/14 105/15 105/16 105/23 106/18 114/4 114/6 114/8 114/9 114/11 114/17 114/17 114/19 114/19 114/20 114/21 114/21 114/23 114/24 114/24 114/24 115/1 115/2 115/3 115/4 116/14 116/16 116/22 116/24 117/4 117/5 117/5 117/20 165/21 182/4 186/5 186/10 186/11 188/3 188/3 191/17 191/18 191/19 192/2 192/3 192/4 192/5 192/9 192/9 192/10 192/16 192/17 192/17 193/23 197/1 198/1 199/10 199/14 199/16 199/16 199/18 207/1 207/3 207/4 207/7 207/7 207/11 207/15 207/17 208/1 208/23 209/11 209/16 209/23 210/2 210/5 210/8 210/15 210/17 210/19 210/20 211/13 211/13 211/15 250/15 250/21 250/21 250/21 250/24 250/25 251/1 251/3 251/4 251/6 251/6 252/22 252/24 253/24 254/1 254/8 254/8 262/2 262/5 268/11 281/4
**here [111]** 9/25 10/11 10/16 11/14 11/21 11/25 12/18 13/11 14/1 14/22 14/24 15/11 15/24 16/6 16/17 17/6 18/22 19/21 20/6 20/9 20/11 25/12 27/14 28/3 31/10 32/1 32/10 32/17 33/2 33/2 33/15 33/18 36/21 37/12 38/5 39/8 40/24 46/14 47/1 47/10 47/19 48/19 54/4 54/6 54/10 55/25 56/19 68/12 71/20 74/24 75/2 84/9 84/10 87/15 87/21 91/6 91/16 91/18 93/12 94/25 96/21 97/3 97/16 103/8 105/22 107/17 120/25 122/5 122/6 122/10 123/6 132/2 132/6 135/8 135/11 145/12 153/15 164/21 165/16 170/4 186/17 187/10 188/15 195/18 216/17 222/3 228/24 232/14 238/15 241/1 241/15 248/8 249/24 249/25 257/12 258/23 259/20 262/21 267/20 268/6 271/19 274/17 275/1 276/16 277/23 278/2 278/16 280/2 281/10 283/20 283/20
**here's [1]** 68/1
**herself [5]** 23/10 30/4 66/4 187/25 207/2
**Hey [6]** 75/5 228/22 236/1 245/2 253/21 259/13
**Hi [1]** 115/18
**hiding [1]** 156/17
**high [5]** 126/19 222/21 250/5 252/15 254/14
**higher [1]** 231/9
**Hillsboro [1]** 222/11

**H**

**him [30]** 39/6 73/1 76/13 76/16 111/1 111/13 112/12 112/18 152/8 157/7 157/8 179/11 193/5 204/25 220/7 238/5 245/23 248/4 252/2 252/12 255/21 255/23 255/24 257/2 267/11 267/13 270/3 271/18 271/19 279/3
**himself [3]** 152/6 247/19 247/20
**hire [1]** 182/17
**his [33]** 10/21 13/1 41/2 41/13 43/11 43/17 63/1 69/20 73/14 76/3 76/5 76/6 76/14 111/18 111/19 111/21 112/7 120/1 120/2 176/3 197/13 197/14 205/4 215/25 237/3 238/4 251/23 251/23 251/23 251/23 251/24 263/12 272/16
**history [18]** 40/17 40/17 70/24 70/24 71/12 71/12 72/10 75/10 124/5 130/11 132/20 137/4 153/19 161/16 225/10 236/20 237/9 242/23
**hit [1]** 254/8
**hits [2]** 253/24 254/5
**hitting [1]** 251/24
**hmm [3]** 162/6 204/24 264/17
**hoc [1]** 50/13
**hold [7]** 66/9 98/15 98/17 125/10 158/4 209/2 281/9
**hole [1]** 95/2
**holiday [1]** 16/25
**holidays [1]** 259/18
**home [7]** 44/12 91/4 102/23 259/17 270/16 271/19 273/20
**Homeland [2]** 59/18 60/15
**Honda [1]** 174/15
**Honduras [1]** 223/12
**honestly [1]** 102/20
**honking [17]** 76/7 152/3 152/4 152/17 153/3 153/9 153/17 153/18 154/10 154/21 155/1 194/23 195/3 196/3 251/7 251/21 252/7
**Honor [350]**
**HONORABLE [5]** 1/16 4/7 59/7 104/2 258/4
**honored [1]** 49/14
**honoring [1]** 49/14
**hope [2]** 86/6 138/15
**hopefully [1]** 58/5
**hoping [5]** 44/14 57/23 141/14 255/21 255/23
**hopping [1]** 240/7
**horn [14]** 76/7 152/3 152/4 154/10 154/21 154/21 155/1 194/23 195/3 196/3 251/7 251/21 251/24 252/7
**hotel [2]** 37/8 278/16
**hour [13]** 7/2 7/17 7/18 26/15 97/3 103/6 106/22 118/13 141/1 141/7 147/2 256/9 281/13
**hours [3]** 70/20 175/16 281/14
**house [8]** 183/11 183/11 188/11 188/11 188/12 229/22 243/13 259/15
**housed [1]** 130/4
**housekeeping [9]** 12/6 36/7 36/14 49/4 57/21 58/3 255/14 270/13 282/3
**houses [1]** 175/4
**how [130]** 8/13 9/16 12/10 15/7 16/6 16/11 21/25 22/22 26/24 28/4 35/22 36/9 43/7 44/3 47/13 48/9 49/5 50/18 52/19 54/17 58/10 75/19 78/15 86/4 86/14 88/25 92/18 100/23 101/11 102/14 105/23 106/12 109/8 109/22 110/4 110/21 111/24 112/2 112/24 113/3 113/9 113/20 114/3 121/21 122/2 122/7 123/8 126/7 126/8 128/19 128/19 129/9 129/16 129/24 135/4 135/4 138/22 139/9 139/17 139/21 148/6 158/1 165/2 166/7 169/7 169/12 169/17 170/2 170/8 170/11 170/13 170/17 170/19 170/23 171/24 172/10 172/14 172/14 173/16 187/5 187/7 188/22 188/22 191/9 191/18 197/6 199/20 199/21 201/6 205/8 211/19 213/11 213/11 213/18 214/13 214/14 216/20 217/12 217/12 218/13 219/23 221/6 221/10 222/18 224/15 227/19 230/3 230/5 231/1 232/5 233/12 235/17 239/19 243/23 245/25 246/4 246/20 249/3 249/3 250/17 255/2 256/5 259/19 260/5 261/14 267/1 270/18 274/5 276/6 282/1
**How's [4]** 89/9 138/18 272/11 272/12
**however [8]** 37/3 44/19 52/9 97/1 125/16 167/8 215/16 269/9
**huh [1]** 89/16
**human [17]** 106/7 140/23 140/25 141/10 141/21 238/13 238/13 240/11 243/14 249/22 249/23 267/18 267/19 267/19 267/23 268/2 268/5
**humans [1]** 141/16
**hundreds [1]** 91/23
**hypothetical [2]** 21/13 21/14

**I**

**I'd [16]** 28/19 79/7 100/5 116/5 123/10 138/1 140/5 145/12 189/7 214/2 217/15 222/5 242/11 257/15 270/1 275/14
**I'll [30]** 14/9 16/3 17/4 17/6 32/7 43/20 47/5 47/12 47/20 48/9 53/17 64/22 68/23 73/2 74/21 77/14 99/1 100/15 100/22 104/16 106/9 135/6 138/17 139/3 139/13 191/14 239/1 259/16 271/6 283/22
**I'm [173]** 6/2 6/23 7/10 7/15 10/23 11/5 11/18 11/22 13/22 15/2 15/10 16/13 16/16 16/20 17/3 17/25 18/23 24/16 24/16 25/6 25/15 27/19 30/16 31/2 31/18 36/2 39/14 40/24 42/4 42/13 43/6 43/25 44/15 47/12 48/12 52/12 55/22 55/24 56/5 61/1 66/13 67/1 67/16 68/19 68/22 68/24 70/11 71/6 72/4 75/15 79/22 80/5 80/10 80/12 85/6 87/6 87/13 87/14 87/19 87/19 87/20 87/21 87/21 90/6 90/7 90/19 90/25 92/17 92/22 93/11 93/11 93/15 94/15 94/20 94/23 94/24 95/1 95/17 96/3 97/15 97/20 98/5 98/7 98/7 98/11 98/11 98/18 98/23 99/22 100/1 100/15 104/6 104/10 104/15 104/15 104/16 107/7 107/18 109/5 112/3 112/3 118/4 118/6 121/17 121/20 124/21 125/11 126/5 129/7 132/3 134/14 135/12 136/14 137/5 137/20 137/20 137/20 138/25 139/7 139/11 144/11 144/12 144/12 145/15 146/1 155/25 156/6 156/6 158/18 162/23 169/18 177/10 179/6 185/19 186/16 187/25 190/25 197/4 198/21 203/1 203/14 206/8 209/3 209/17 209/19 216/20 217/1 217/4 221/4 224/2 225/25 237/22 241/1 242/12 253/22 256/19 256/19 259/2 262/21 262/22 263/2 264/18 264/19 272/2 272/9 273/12 274/16 275/4 277/12 277/13 278/19 279/1 279/1
**I've [28]** 5/11 11/13 25/10 43/4 61/2 75/14 91/15 98/23 98/23 100/17 107/17 107/19 135/8 137/21 174/20 174/24 177/14 181/21 181/24 183/9 183/24 202/20 209/20 213/2 224/21 229/1 251/11 263/14
**I-200 [2]** 234/8 235/5
**I-213 [4]** 46/5 234/12 234/23 235/2
**ICE [47]** 1/9 32/9 33/9 37/19 38/2 39/17 41/3 43/19 61/8 63/3 70/24 71/7 71/10 71/19 84/10 107/9 107/12 107/14 110/1 110/7 110/12 110/14 110/15 111/2 114/24 115/6 116/6 116/8 123/4 126/25 145/3 163/6 170/6 198/17 198/22 199/3 199/6 212/17 212/18 212/18 221/1 221/3 221/15 224/12 229/12 258/19 283/2
**ICE's [1]** 141/9
**ICE/ERO [1]** 1/9
**ID [22]** 67/17 133/9 133/12 158/24 165/21 239/11 240/12 244/24 252/22 252/24 253/6 253/7 253/8 253/8 262/19 262/19 263/10 263/12 263/18 263/18 263/18 263/19
**idea [12]** 25/8 26/19 28/3 31/6 68/2 68/5 69/2 69/3 92/23 137/4 246/2 246/3
**ideal [1]** 36/24
**ideally [1]** 281/12
**identical [1]** 263/16
**identifiable [1]** 158/14
**identification [6]** 67/12 156/25 159/2 188/24 197/17 254/1
**identified [30]** 32/8 37/7 49/1 66/6 68/14 77/1 81/5 95/9 133/18 136/4 137/13 142/8 155/15 155/18 155/19 155/20 156/10 157/8 159/8 164/24 172/14 180/18 181/1 184/21 199/21 199/22 213/18 213/19 229/18 254/4
**identifies [1]** 229/5
**identify [30]** 66/3 66/22 66/25 67/18 68/21 76/21 92/18 127/8 128/6 133/13 141/14 157/24 158/6 158/9 158/11 187/25 189/12 189/16 197/21 201/19 204/20 204/21 207/2 207/3 207/7 228/7 229/14 242/25 253/13 274/1
**identifying [3]** 131/9 158/24 158/25
**identities [1]** 205/23
**identity [12]** 29/11 29/18 30/7 30/7 41/13 67/14 197/2 204/9 204/11 253/24 254/8 263/22
**ii [2]** 64/22 65/3
**illegal [9]** 140/20 154/5 177/5 177/25 181/22 181/23 182/12 225/23 231/20
**illegally [7]** 64/13 65/2 186/21 189/14 238/15 267/20 268/6
**illustrated [1]** 202/16

**I**

**images [1]** 216/21
**imagine [5]** 44/14 83/8 84/11 278/13 283/4
**immediate [1]** 185/15
**immediately [4]** 113/5 129/13 166/17 192/14
**immigrants [5]** 189/24 190/1 190/2 190/4 190/11
**immigrated [2]** 131/17 131/21
**immigration [99]** 1/8 19/19 20/5 21/20 31/19 40/9 40/17 61/1 64/9 64/13 64/25 65/4 66/24 72/9 76/19 82/12 91/21 94/3 94/10 109/7 109/14 109/15 110/1 114/22 121/17 124/2 124/5 124/14 124/15 124/22 124/25 125/1 130/11 130/15 130/16 130/17 130/21 130/21 131/1 131/6 131/11 131/14 131/22 131/25 132/7 132/19 133/6 133/8 136/24 141/3 141/15 141/18 142/1 142/4 142/5 155/15 155/16 155/21 156/2 156/9 156/10 156/11 157/9 157/25 158/5 158/15 160/16 160/18 165/1 165/22 170/6 185/8 187/1 187/3 188/6 189/1 189/2 189/21 189/23 190/9 190/12 190/18 190/23 193/18 213/15 213/15 223/6 223/9 223/23 225/11 227/22 228/14 228/25 229/2 229/6 232/16 234/22 242/18 242/23
**impact [1]** 219/16
**implicate [2]** 91/10 93/7
**implications [1]** 91/16
**important [11]** 27/7 32/16 49/12 50/11 63/8 63/17 68/11 70/16 145/6 150/2 179/15
**imposition [1]** 42/16
**impossible [1]** 69/7
**impotent [1]** 81/4
**impromptu [1]** 75/13
**impute [1]** 107/19
**imputed [1]** 118/23
**INA [1]** 115/1
**Inadmissible [1]** 234/24
**inappropriate [2]** 91/7 91/11
**incident [4]** 154/19 192/23 196/8 228/5
**incidents [1]** 26/20
**inclined [2]** 92/17 92/23
**include [1]** 146/12
**included [4]** 128/13 146/1 146/4 146/16
**includes [1]** 63/10
**including [9]** 27/15 39/9 66/3 67/14 69/10 75/20 183/8 196/9 196/20
**incompatibility [1]** 7/23
**incorporate [2]** 44/16 63/24
**incorporates [2]** 63/2 63/3
**incorporating [1]** 64/17
**increased [1]** 196/24
**incredibly [1]** 226/13
**incriminating [2]** 189/6 208/14
**indentured [1]** 184/5
**independently [1]** 42/2
**index [4]** 3/1 3/7 214/2 214/10
**indicate [4]** 61/23 210/20 224/21 249/20
**indicated [15]** 11/9 41/19 43/22 44/24 64/15 68/13 71/4 107/17 141/13 149/14 196/13 215/24 237/23 276/6 285/13
**indicates [3]** 46/3 48/22 87/11
**indicating [5]** 23/7 70/25 71/10 134/19 209/20
**indication [8]** 27/14 39/24 68/24 69/23 76/25 77/2 155/10 160/15
**indicative [1]** 162/14
**indiscernible [4]** 171/7 185/16 204/21 285/12
**indistinguishable [1]** 19/22
**individual [17]** 20/1 32/16 32/23 128/13 128/16 128/20 129/4 152/2 152/5 155/3 174/12 193/8 225/3 226/11 228/18 228/19 276/12
**individuals [17]** 151/9 151/22 151/24 152/19 152/22 153/20 155/16 157/24 180/14 238/6 238/12 240/4 242/1 248/18 249/7 251/2 262/6
**indulge [1]** 49/20
**inform [1]** 265/6
**informal [5]** 223/13 226/1 231/25 232/20 235/8
**informally [1]** 34/11
**information [56]** 13/16 14/10 23/4 23/5 35/3 39/4 40/9 41/1 41/3 43/7 43/11 44/2 45/17 56/22 57/5 71/18 84/17 90/22 90/25 91/6 91/9 94/5 97/6 113/12 119/6 119/16 123/22 124/9 124/11 134/19 134/24 136/13 136/25 138/14 140/16 141/24 143/4 143/6 155/8 156/1 158/14 163/21 182/15 226/1 226/11 230/15 237/7 238/9 245/6 265/6 266/5 266/10 266/23 273/23 274/6 277/21
**information's [1]** 94/3
**informed [1]** 241/18
**initial [7]** 33/21 33/22 66/20 69/19 112/25 171/15 238/4
**initialed [1]** 280/7
**initially [2]** 179/22 244/7
**initials [37]** 28/10 28/17 28/23 29/2 29/18 30/13 31/17 32/6 32/10 32/19 32/25 33/14 33/20 33/21 37/8 41/13 78/6 87/22 87/24 120/23 121/9 126/6 127/1 140/2 150/20 168/22 171/21 178/23 201/16 201/19 204/22 205/20 210/11 220/20 254/1 255/22 265/9
**initiate [3]** 140/1 146/3 178/20
**injunctive [1]** 25/24
**injuries [1]** 262/17
**ink [1]** 159/16
**Innovation [3]** 2/4 2/8 109/11
**inquire [2]** 217/11 275/6
**inquiries [1]** 97/6
**inquiring [1]** 274/4
**inquiry [2]** 62/11 273/8
**inserted [1]** 271/2
**inside [10]** 60/17 60/19 111/10 112/21 113/14 140/18 153/21 180/11 185/6 247/5
**insightful [1]** 54/8
**insights [1]** 219/4
**instance [3]** 70/10 190/16 227/16
**instances [1]** 69/14
**instead [8]** 28/16 28/16 31/16 55/25 105/14 106/18 134/25 225/5
**institution [1]** 55/11
**instruct [3]** 15/9 192/20 266/10
**instruction [5]** 44/3 186/10 186/11 227/10 246/5
**instructions [8]** 38/21 142/21 150/8 150/9 150/10 150/14 245/20 276/21
**instructive [1]** 14/25
**integrally [1]** 16/8
**integrity [1]** 32/14
**intel [3]** 230/8 230/11 276/23
**intelligence [12]** 123/22 123/23 124/12 127/10 127/12 127/13 127/15 128/3 128/23 134/2 134/23 136/4
**intend [11]** 20/11 34/7 57/4 59/15 59/17 59/22 60/1 61/15 89/14 89/17 255/9
**intended [3]** 55/3 91/1 186/18
**intending [4]** 29/7 34/9 60/1 93/20
**intent [1]** 28/5
**intentionally [1]** 33/5
**interact [2]** 188/18 250/12
**interacted [2]** 66/2 208/12
**interacting [5]** 187/3 187/6 187/17 188/23 249/12
**interaction [9]** 112/24 130/21 184/19 184/19 185/5 186/5 188/19 199/5 276/4
**interactions [4]** 106/7 199/18 249/11 275/23
**interest [14]** 28/21 29/11 31/5 31/10 31/11 35/20 50/5 129/21 139/23 172/15 173/3 173/11 213/15 235/18
**interested [6]** 35/1 97/15 124/21 138/15 235/11 235/13
**interesting [2]** 66/19 67/10
**interests [1]** 54/10
**interfere [2]** 67/1 162/1
**interfering [2]** 67/4 67/8
**interior [3]** 74/1 183/8 241/4
**internal [1]** 110/4
**interpret [2]** 94/8 94/11
**interpretation [2]** 219/6 224/18
**interpreted [1]** 210/5
**interpreter [7]** 5/3 6/2 29/13 89/22 217/5 217/17 217/21
**interpreters [6]** 4/23 89/8 101/17 217/25 218/4 254/22
**interpreting [5]** 98/19 217/8 217/9 217/12 219/2
**interrogation [1]** 64/7
**interrogatories [1]** 12/24
**interrupt [1]** 42/3
**interrupted [2]** 116/8 156/1
**intertwined [1]** 26/19
**interview [1]** 264/25
**interviewed [1]** 183/24
**interviews [4]** 113/6 251/15 252/20 262/20
**introduce [1]** 4/24
**introduced [1]** 185/7
**investigate [2]** 112/9 141/10
**investigation [11]** 72/5 118/21 120/1 126/13 126/14 135/1 176/3 213/9 235/19 240/16 267/6
**investigative [6]** 127/4 171/4 172/4

I

investigative... [3] 172/16 240/10 254/10
investigatory [3] 62/12 62/13 70/5
invitation [1] 99/2
invitation's [1] 17/1
invited [4] 16/25 27/10 77/12 77/12
invocation [4] 66/10 96/5 120/6 211/1
invoke [1] 94/13
invoked [2] 95/25 210/8
invoking [3] 94/13 209/11 210/20
involved [18] 9/15 31/19 60/5 60/6 107/9 127/4 141/21 153/7 161/14 161/21 170/11 170/17 170/18 178/1 181/11 191/17 198/3 281/17
involvement [5] 41/7 41/7 41/9 90/20 188/4
involves [2] 213/14 282/15
Iowa [5] 257/9 257/10 257/14 257/14 257/15
is [553]
ish [2] 7/18 255/13
isn't [10] 35/12 35/25 35/25 35/25 46/10 75/12 97/15 132/5 219/25 263/15
issue [46] 8/11 8/18 8/22 9/1 9/22 10/5 10/12 12/11 15/4 15/15 15/16 17/5 17/7 17/10 17/20 17/21 17/24 18/13 24/5 24/14 24/17 26/12 30/15 33/16 36/20 41/9 55/25 66/19 68/10 93/10 96/12 133/24 134/1 135/7 135/16 188/1 188/1 218/9 230/22 238/1 270/24 271/1 271/5 273/15 273/18 278/5
issued [3] 102/1 102/6 180/20
issues [26] 5/13 7/24 8/19 9/1 9/3 9/12 9/13 9/13 9/15 11/24 14/12 15/23 17/11 17/12 17/24 18/21 19/3 26/18 28/10 36/17 65/20 66/24 185/11 203/5 219/21 251/18
it [517]
it'll [5] 103/16 220/2 223/8 228/24 255/11
it's [137] 5/18 5/24 6/5 6/11 6/14 10/24 11/2 17/21 18/11 18/20 19/5 19/6 23/25 25/17 25/18 29/1 32/24 33/17 34/5 39/16 39/23 42/14 42/19 43/9 46/12 48/14 50/11 51/16 52/20 53/11 54/13 54/16 56/15 67/22 68/9 68/11 69/7 71/6 79/2 87/10 87/11 87/12 87/12 91/11 94/6 94/6 96/12 100/7 101/24 103/6 104/5 105/13 105/20 106/4 106/19 118/4 118/7 124/18 127/20 134/21 136/24 137/10 137/15 137/15 142/25 144/14 145/6 146/25 148/8 158/3 159/9 160/15 160/15 161/19 161/19 161/19 162/13 162/22 163/2 163/10 167/13 173/25 176/7 183/6 187/19 190/10 190/22 201/8 201/9 204/20 204/23 218/22 225/22 227/18 228/15 228/15 228/17 228/18 229/11 231/11 231/12 231/13 231/13 233/4 233/10 234/14 235/3 235/9 238/13 238/13 240/21 240/21 240/21 240/21 240/23 240/23 242/18 243/12 243/12 243/14 244/4 249/22 249/22 252/15 253/9 253/10 263/16 263/16 263/18 264/24 264/24 264/24 265/11 266/3 267/11 280/14 280/16
items [1] 56/25
its [4] 33/9 33/10 54/14 176/9
itself [9] 12/14 16/9 35/3 58/13 58/13 105/13 188/22 243/24 273/9

J

J.A [14] 127/2 127/3 244/1 244/4 244/7 265/11 277/22 277/24 280/6 280/8 280/10 280/10 281/5 281/6
J.B [18] 3/14 178/24 179/11 204/25 216/8 220/6 220/15 265/11 269/8 273/13 273/18 274/4 274/9 275/1 275/2 275/5 275/7 275/16
J.B.'s [3] 205/1 205/2 272/1
Jane [1] 69/5
January [2] 102/11 102/12
Jeep [7] 192/23 193/7 193/8 194/22 195/10 195/23 195/23
Jeffrey [1] 111/5
Jessica [1] 5/3
job [2] 147/5 238/21
jobs [4] 178/12 241/16 241/22 241/25
John [2] 69/5 140/3
join [1] 50/3
joined [1] 110/3
joint [1] 129/18
joke [1] 187/9
judge [24] 1/17 7/19 10/19 10/22 16/15 17/5 33/11 37/3 61/20 69/13 69/15 73/2 73/18 76/11 92/3 92/8 196/13 211/9 218/2 239/23 242/14 270/15 283/12 284/2
judges [3] 10/14 74/17 75/1
judgment [1] 40/1
judicial [1] 31/18
Juliet [1] 220/21
jump [4] 16/2 16/15 247/25 252/12
jumped [4] 76/4 247/12 250/1 251/20
jumping [6] 62/21 76/23 95/1 247/15 252/12 268/15
June [1] 53/12
June 15th [1] 53/12
just [108] 8/18 8/18 9/19 12/12 13/24 19/6 22/24 28/4 30/15 31/20 32/4 39/15 41/13 45/9 52/25 54/9 58/11 62/16 63/9 64/2 64/22 72/8 73/1 75/4 75/17 80/12 83/16 86/8 86/21 87/13 89/21 90/7 93/8 93/9 94/22 95/3 95/18 96/20 98/9 99/10 101/21 107/15 108/2 109/21 113/4 117/1 120/17 123/25 124/21 126/18 137/11 138/15 141/25 142/7 143/16 144/1 144/2 144/12 146/8 157/4 168/5 169/14 170/16 176/11 176/24 177/11 180/10 184/24 197/24 199/16 206/8 206/24 207/1 209/2 209/19 211/2 224/21 225/22 226/11 226/24 226/24 232/9 232/14 233/4 233/9 233/10 233/17 236/7 238/15 240/20 244/24 245/16 253/4 256/14 258/13 259/2 259/17 259/23 259/23 266/5 271/11 274/8 276/21 278/10 279/14 280/11 282/10 282/14
Justice [2] 54/19 54/24
justices [1] 74/17
justified [2] 69/1 254/10
justify [2] 46/19 46/19
justifying [2] 63/15 114/17

K

K.K [17] 12/3 45/5 45/7 45/8 45/10 45/11 45/15 45/15 45/17 45/25 47/11 47/17 47/18 104/19 105/1 281/2 281/3
KASUBHAI [5] 1/16 4/7 59/8 104/2 258/4
Kasubhai's [1] 239/23
keep [14] 29/16 29/17 108/2 143/1 173/25 186/17 217/25 219/10 219/12 232/21 238/5 250/22 256/20 271/18
Kelsey [5] 3/10 59/16 108/6 108/13 108/20
kept [1] 251/24
key [3] 240/11 240/13 242/25
kicks [1] 11/19
kidding [2] 277/13 277/13
kids [3] 72/16 175/17 232/8
kill [1] 185/24
kind [33] 4/24 12/19 76/22 94/10 94/21 102/6 104/15 109/6 120/24 131/4 138/10 140/23 143/18 144/15 158/14 171/10 174/20 177/17 177/19 178/6 225/19 228/15 229/4 229/5 229/18 233/13 240/19 241/16 242/3 249/22 259/16 268/5 274/1
kinds [6] 9/3 76/22 131/7 142/25 229/10 239/7
Knaebel [3] 217/18 218/5 219/1
knew [15] 43/7 44/3 44/3 72/19 75/2 81/20 112/13 112/20 140/15 175/6 176/2 182/8 230/23 242/12 253/18
know [156] 10/13 11/14 11/20 13/1 14/3 17/23 20/5 20/6 21/12 22/6 24/3 27/19 30/17 33/9 35/11 36/24 38/7 40/23 41/18 44/23 47/22 56/1 63/5 67/19 70/6 71/13 74/25 75/8 75/18 76/14 77/1 79/14 82/3 82/21 83/3 84/11 85/3 85/15 86/18 90/23 93/8 96/12 98/8 99/6 102/16 102/20 104/19 106/6 106/20 107/15 107/17 110/9 111/1 111/2 111/6 111/6 113/12 124/2 125/13 126/16 129/3 130/24 131/10 133/17 135/5 135/11 137/22 138/1 138/21 139/10 141/4 142/4 142/20 143/17 143/17 144/13 146/2 151/15 156/17 157/17 161/8 161/14 162/14 162/17 166/3 166/4 166/5 166/6 166/7 166/10 166/11 175/10 175/19 178/25 180/9 185/18 185/24 187/21 195/7 195/8 197/1 197/4 199/21 201/16 202/5 204/9 204/11 205/23 207/19 209/15 216/25 219/15 219/19 226/3 226/13 228/22 228/24 230/3 230/5 230/23 230/24 232/8 237/12 237/16 238/14 240/2 243/13 243/14 244/19 244/25 245/13 245/15 251/3 252/4 258/24 262/1 262/4 262/25 264/7 265/4 265/11 267/2 267/15 268/20 270/20 272/2 272/4 272/4 276/2 277/19 279/13 279/14 281/14 282/16 282/17 283/11
know-your-rights [4] 110/9 111/6 111/6 113/12
knowing [8] 14/16 68/15 69/6 135/3

**K**

**knowing... [4]** 140/15 176/9 178/13 283/20
**knowledge [16]** 41/6 42/25 43/1 43/3 43/18 118/19 118/23 119/14 119/15 173/17 176/13 211/22 222/17 222/19 266/14 276/15
**known [9]** 30/5 64/18 119/7 119/14 120/2 182/23 253/23 275/24 276/12
**knows [4]** 8/1 66/4 91/21 234/21

**L**

**Lab [5]** 2/4 2/8 109/11 109/18 109/19
**labor [7]** 73/21 140/23 141/4 141/6 183/22 183/23 184/16
**laborers [1]** 146/25
**labors [1]** 242/3
**lack [8]** 8/25 8/25 9/1 75/21 154/6 174/17 174/19 235/8
**lacked [1]** 137/19
**lady [1]** 84/6
**land [1]** 219/18
**landscape [1]** 139/6
**language [4]** 99/4 150/24 211/3 249/13
**large [12]** 110/1 171/25 174/21 176/7 216/16 216/16 221/25 259/4 259/4 259/7 259/8 259/25
**largely [1]** 119/2
**last [25]** 5/13 6/25 7/15 8/4 10/6 23/1 33/20 33/21 99/18 102/10 108/18 121/9 165/16 165/17 165/17 168/22 197/13 215/23 220/20 223/23 226/10 259/6 262/5 269/25 282/19
**last-minute [1]** 5/13
**lasted [1]** 112/24
**late [9]** 7/2 18/20 19/3 134/16 218/13 218/13 221/17 256/20 267/4
**later [9]** 10/21 21/6 40/20 52/24 77/1 77/11 145/8 152/17 268/15
**law [39]** 2/4 2/8 13/17 20/21 27/5 35/20 54/3 54/4 60/2 60/6 62/6 62/24 66/17 68/15 68/15 68/21 75/25 76/2 91/21 92/7 93/4 109/7 109/11 109/17 109/19 125/1 130/13 153/8 153/8 154/8 155/11 163/13 189/25 190/14 191/5 219/20 221/8 223/7 234/22
**lawful [6]** 65/25 114/22 149/4 225/20 230/13 260/25
**lawfully [1]** 68/6
**laws [2]** 62/14 62/17
**lawyer [14]** 67/7 85/12 85/15 85/17 85/20 97/5 109/5 206/16 206/20 209/16 209/24 210/1 210/6 210/16
**lawyering [1]** 210/5
**lawyers [12]** 7/13 60/5 61/8 61/12 86/5 86/13 86/14 88/20 104/6 109/20 110/5 113/9
**lay [1]** 219/18
**laypeople [1]** 93/3
**lead [10]** 147/4 147/4 228/8 228/9 228/10 229/5 229/24 231/3 233/13 254/6
**Leading [1]** 153/11
**leads [2]** 141/19 232/20
**leaf [1]** 87/20
**learn [9]** 130/7 152/17 172/19 173/13 177/24 178/1 182/1 250/6 250/7
**learned [11]** 91/21 132/18 152/19 172/10 178/2 182/6 182/14 234/21 236/19 237/7 271/14
**learning [3]** 173/5 173/6 185/13
**least [29]** 6/21 26/5 44/14 47/14 55/7 58/22 63/3 64/6 71/1 71/12 73/7 92/8 104/9 106/8 106/19 106/22 115/25 119/1 123/18 135/21 147/13 148/18 148/20 160/17 214/14 238/25 256/19 278/6 282/15
**leave [16]** 84/18 84/20 89/7 103/8 103/8 117/24 167/7 167/19 202/5 215/16 225/1 259/12 269/19 277/9 278/19 283/6
**leaves [1]** 236/6
**leaving [1]** 198/6
**led [6]** 35/5 125/22 137/12 156/1 196/4 242/14
**leeway [2]** 48/1 88/17
**left [15]** 36/8 114/1 114/2 117/3 139/5 198/8 208/8 232/23 238/2 243/10 244/9 246/14 253/23 259/21 262/5
**left-hand [1]** 244/9
**leg [1]** 251/24
**legal [25]** 14/12 15/15 15/21 17/5 17/7 17/10 17/23 26/22 27/1 27/1 27/8 61/10 71/19 77/9 94/17 94/25 109/19 110/9 111/6 118/15 120/15 187/5 210/25 241/17 242/16
**legality [1]** 74/3
**legally [7]** 132/2 132/6 147/14 155/13 182/5 189/14 190/19
**legitimate [5]** 75/11 75/13 182/14 182/17 182/19
**legitimately [1]** 269/25
**lengthy [1]** 96/23
**Lerner [4]** 110/8 110/15 112/19 113/25
**less [5]** 79/12 110/22 191/14 215/23 259/20
**let [31]** 11/13 11/20 28/23 36/14 40/13 56/1 69/2 71/21 73/3 86/12 107/15 111/1 111/8 119/10 129/7 135/6 155/18 169/14 178/5 208/21 215/25 219/15 234/7 234/13 245/4 245/6 247/16 258/13 265/19 271/6 281/9
**let's [53]** 19/1 21/10 24/5 28/4 48/9 48/9 58/7 58/7 58/23 65/17 72/9 77/14 77/14 78/23 93/10 96/8 97/14 98/5 99/2 103/6 104/21 107/16 108/2 108/2 114/3 135/12 168/4 168/4 175/6 178/19 196/13 204/17 205/17 206/1 211/2 216/10 219/22 220/4 235/7 248/23 254/25 257/17 257/17 257/17 261/19 265/25 270/9 271/10 271/20 275/15 283/6 283/9 283/9
**level [6]** 136/14 151/16 159/7 163/8 186/15 281/17
**levels [1]** 20/14
**liability [2]** 8/7 91/2
**liberty [2]** 46/2 46/23
**license [12]** 74/10 74/23 127/6 127/9 128/20 164/23 223/22 237/8 237/8 238/22 238/23 242/2
**licensed [1]** 67/6
**lieu [1]** 56/3
**life [3]** 215/25 232/17 259/14
**light [4]** 119/24 140/21 216/21 241/4
**lights [5]** 80/2 81/18 244/2 244/3 244/6
**like [131]** 7/21 13/4 14/2 14/18 27/20 28/19 30/5 33/12 36/17 36/18 36/18 37/4 39/25 39/25 41/24 43/24 44/11 45/17 45/18 46/24 46/24 48/11 55/9 60/3 60/9 69/16 69/20 72/8 73/24 79/7 81/20 81/20 81/20 81/21 82/9 82/13 82/14 82/20 82/21 83/3 83/12 87/5 89/25 89/25 95/4 97/10 100/5 103/8 105/15 108/5 110/22 116/5 120/9 120/10 123/10 135/16 136/5 136/24 138/1 139/10 140/5 148/25 161/21 165/9 165/18 174/24 187/2 188/7 189/7 214/2 216/23 217/15 219/3 222/5 222/17 223/3 223/12 223/17 223/19 223/22 223/24 225/18 225/20 225/21 226/2 226/7 226/20 227/17 227/18 228/3 228/16 228/16 228/24 229/3 229/11 229/21 229/21 229/23 232/7 232/7 232/8 236/3 236/9 240/10 240/12 240/19 240/25 242/1 242/4 242/5 242/6 242/11 247/13 249/1 253/21 259/13 259/13 259/15 259/16 259/23 262/19 263/15 265/5 266/17 267/10 273/6 273/20 275/14 276/23 279/12 282/14
**liked [4]** 9/8 114/15 114/19 114/23
**likelihood [8]** 227/20 228/17 229/22 229/25 230/1 250/4 252/15 254/14
**likely [10]** 43/12 46/4 48/11 50/14 62/25 63/21 65/5 65/9 74/2 239/3
**limited [3]** 25/25 59/16 150/11
**limiting [1]** 96/14
**Lindsey [2]** 2/21 285/21
**line [4]** 16/12 160/5 160/6 165/13
**lined [2]** 255/18 270/10
**lineup [1]** 155/4
**lining [1]** 283/17
**list [18]** 36/8 37/17 51/17 52/1 52/2 52/5 112/12 112/14 112/15 201/17 201/18 223/13 223/15 223/17 223/19 228/3 236/3 262/10
**listed [2]** 265/9 277/24
**listen [2]** 40/24 49/2
**listening [4]** 48/17 48/21 49/7 49/8
**listing [1]** 228/23
**lists [1]** 49/2
**lit [1]** 185/18
**litigation [10]** 8/18 9/15 10/10 10/10 10/11 22/3 24/19 26/10 95/10 135/17
**little [24]** 6/3 86/6 86/8 87/5 93/24 98/1 100/9 109/9 110/19 112/3 117/11 122/13 125/13 174/18 176/15 176/22 176/24 177/10 181/17 184/18 184/19 204/20 219/22 224/22
**live [15]** 26/11 47/20 49/2 78/17 79/3 106/22 146/24 174/5 216/21 226/6 227/23 228/24 231/12 254/19 255/25
**lived [3]** 74/16 127/21 177/13
**lives [1]** 254/17
**living [7]** 177/14 178/9 227/19 227/25 228/18 229/22 230/1
**loaded [3]** 67/2 152/2 152/6
**loading [1]** 176/23
**local [4]** 37/3 223/7 238/23 271/2

## L

**locally [1]** 43/14
**locate [2]** 128/7 254/18
**located [2]** 47/1 132/15
**locating [2]** 222/2 223/4
**location [13]** 32/21 73/12 118/7 123/16 127/9 171/7 174/7 174/12 174/13 177/1 198/9 198/25 199/1
**locations [2]** 72/12 173/14
**locked [3]** 103/7 103/16 110/18
**logos [1]** 174/25
**long [28]** 17/13 27/13 52/19 88/25 98/18 101/11 105/23 106/19 109/8 110/21 112/24 114/3 121/21 122/2 122/7 169/7 169/12 170/2 174/5 191/9 214/13 214/14 221/6 221/10 246/4 255/2 259/19 260/25
**longer [7]** 52/16 85/11 117/9 155/3 215/14 217/25 279/1
**look [10]** 17/5 87/20 127/21 143/20 152/4 183/1 218/6 224/21 226/2 278/21
**looked [8]** 82/9 99/10 140/12 143/18 152/4 223/19 236/3 257/13
**looking [13]** 8/17 8/19 9/20 87/14 87/15 90/17 106/20 141/14 222/9 228/3 235/22 242/17 262/24
**looks [7]** 48/11 69/20 72/8 139/10 219/3 263/15 279/12
**loop [1]** 144/1
**loose [2]** 136/23 271/14
**loosely [2]** 68/25 72/5
**losing [1]** 156/6
**lost [1]** 239/19
**lot [14]** 74/18 74/19 85/9 142/24 174/5 225/4 228/23 235/21 238/21 239/9 239/13 245/6 257/11 263/4
**lots [1]** 217/1
**loud [1]** 236/2
**loudly [1]** 125/12
**love [5]** 10/19 15/3 18/4 58/4 187/8
**low [2]** 126/19 173/25
**low-rise [1]** 126/19
**lower [2]** 179/11 179/12
**LPR [1]** 225/20
**lucky [1]** 240/1
**lunch [7]** 47/14 79/11 89/5 96/25 97/3 103/6 118/13
**Lynn [1]** 108/20

## M

**M-J-M-A [7]** 1/5 3/9 4/10 78/1 78/7 282/19 285/3
**M.C [15]** 37/18 38/4 40/3 40/6 40/7 40/19 40/23 41/13 42/11 42/24 43/3 43/11 43/14 43/21 44/15
**M.K [1]** 254/1
**M.P [1]** 274/13
**ma'am [20]** 6/4 78/13 80/5 80/18 81/6 86/21 86/24 87/2 89/12 89/14 90/3 90/6 90/11 101/3 101/23 102/1 102/10 102/22 220/11 260/10
**made [30]** 7/25 23/6 26/11 26/19 30/8 30/23 36/23 36/25 42/24 48/15 55/10 64/24 72/14 76/8 100/20 112/21 135/21 137/21 154/7 159/9 173/16 175/7 178/20 238/4 243/11 243/25 250/15 260/24 262/10 268/3
**mail [1]** 221/24
**mails [1]** 143/18
**main [4]** 109/12 156/8 175/20 243/25
**maintain [1]** 32/17
**maintained [1]** 43/19
**maintaining [2]** 29/22 31/6
**major [1]** 250/2
**make [67]** 7/19 10/2 10/7 12/13 13/14 20/15 26/7 26/8 27/24 30/20 32/18 46/24 47/4 47/5 48/19 49/22 52/23 63/18 63/20 68/11 70/7 96/5 96/10 96/16 97/12 97/23 98/5 99/22 100/5 104/21 105/11 106/4 108/2 119/5 119/22 120/7 125/11 125/16 131/20 133/1 135/19 141/23 144/11 145/8 160/7 162/22 176/17 177/17 178/9 179/18 179/20 182/22 183/7 186/19 187/9 188/2 209/2 210/14 215/25 217/16 227/13 238/14 244/5 254/13 256/23 278/4 282/10
**makes [9]** 44/11 47/25 55/2 96/24 97/6 99/24 105/21 179/19 256/21
**making [16]** 5/9 7/22 8/4 9/19 9/22 18/25 27/9 27/9 43/17 172/18 173/6 174/9 209/4 227/12 248/6 278/3
**male [1]** 235/23
**mall [1]** 83/18
**man [2]** 70/17 70/20
**manage [2]** 26/9 106/3
**mandatory [1]** 251/16
**manifests [1]** 188/22
**MANNING [47]** 2/8 4/15 10/21 11/23 12/15 13/1 13/25 18/15 28/25 30/15 34/3 35/17 36/11 36/18 36/20 37/7 37/15 38/1 39/2 41/11 42/2 42/19 44/17 45/1 50/20 51/16 53/5 54/12 56/2 56/17 58/8 59/9 61/25 77/5 78/9 87/14 92/24 108/23 120/3 162/19 219/24 256/13 271/13 272/5 278/8 279/7 281/19
**Manning's [2]** 30/22 118/7
**Manos [1]** 247/8
**manual [1]** 146/25
**many [44]** 28/2 40/1 45/6 60/9 63/8 97/4 102/14 111/24 112/2 113/3 113/10 113/20 123/8 126/7 126/8 129/9 130/25 139/1 139/17 150/4 165/2 170/8 170/11 170/13 170/17 170/19 170/23 173/16 181/21 181/24 190/8 191/23 211/19 227/19 232/5 239/19 245/25 249/3 249/3 260/5 260/25 261/14 270/18 277/21
**map [1]** 228/15
**Maps [1]** 228/16
**marching [1]** 240/2
**mark [1]** 80/11
**marked [1]** 180/20
**markings [13]** 72/11 73/16 75/4 149/10 149/11 149/12 149/13 173/18 174/17 174/19 174/23 174/25 240/14
**Mary [1]** 37/9
**mask [1]** 32/4
**mass [1]** 22/20
**masse [1]** 59/20
**match [1]** 159/9
**matched [2]** 70/17 70/18
**matches [2]** 236/5 254/5
**material [1]** 42/20
**materials [1]** 5/12
**math [1]** 281/10
**matter [16]** 11/12 11/22 17/23 21/11 26/13 31/5 37/20 40/12 53/20 53/25 56/10 57/14 138/5 217/7 259/3 259/8
**matters [16]** 12/6 27/15 27/16 32/23 34/2 34/15 35/23 36/7 36/15 49/4 57/21 58/3 105/5 255/14 270/13 282/3
**maximum [1]** 218/4
**may [93]** 7/4 7/17 8/7 8/8 8/13 9/2 10/21 10/21 16/2 25/7 26/20 26/24 27/2 29/4 33/14 34/23 44/6 48/6 48/25 49/7 49/7 49/8 50/9 51/10 51/11 52/25 56/25 57/1 58/21 59/12 64/13 73/18 73/25 74/12 77/21 77/23 80/25 89/8 89/8 91/20 92/3 93/5 97/4 97/5 97/7 98/21 99/15 104/10 118/15 119/5 119/5 122/8 124/19 125/2 138/1 138/9 138/25 138/25 144/20 152/22 160/6 163/22 163/24 164/3 164/9 165/8 176/4 183/9 183/12 189/8 190/4 201/20 201/21 211/11 212/2 212/3 215/15 216/19 224/21 239/6 239/6 239/19 242/15 242/16 264/15 271/23 271/23 272/4 272/4 275/19 281/23 281/25 283/20
**maybe [36]** 18/23 22/3 27/17 54/4 67/20 69/21 69/25 69/25 72/17 72/17 74/2 79/8 80/1 89/2 94/23 110/22 123/19 130/17 135/8 136/22 140/19 153/9 161/12 175/18 223/24 225/18 227/3 227/24 232/20 236/24 244/25 271/4 278/25 278/25 280/14 283/6
**McBride [1]** 5/3
**me [140]** 7/1 8/12 9/23 11/3 13/20 14/24 15/11 16/4 16/23 19/1 26/21 27/7 28/23 31/7 31/7 36/14 37/22 40/13 43/9 48/1 49/20 50/11 61/22 78/15 79/3 79/8 79/12 81/9 82/9 83/12 83/15 83/22 83/22 83/25 83/25 84/6 84/24 85/2 85/5 85/8 85/20 85/20 86/2 86/9 86/12 86/15 86/15 87/6 89/21 91/16 92/25 97/24 99/18 103/11 104/8 104/11 104/17 104/23 106/13 106/20 110/24 118/13 119/10 124/23 126/10 129/8 130/14 135/16 137/24 138/5 139/6 139/13 141/19 142/15 143/1 145/6 145/9 147/6 149/11 150/7 150/12 151/13 152/25 153/24 154/7 155/5 155/18 156/14 160/15 161/1 161/3 163/25 164/15 164/23 165/18 167/11 169/14 175/14 176/6 176/15 176/24 178/5 180/7 189/10 189/10 190/11 192/2 193/5 195/18 197/13 205/11 205/19 208/21 210/14 215/25 219/17 219/20 228/13 234/7 234/13 234/22 235/12 238/3 245/4 245/6 247/16 252/5 258/13 261/22 262/3 263/2 265/19 271/8 274/12 275/23 276/6 276/13 281/9 283/14 283/15
**mean [66]** 7/14 9/21 15/21 16/4 22/5 24/17 39/19 54/16 54/16 57/7 93/3 93/7 93/17 93/22 106/8 106/10 113/7 120/4 120/9 123/2 124/17 124/21 136/2 136/25 137/20 137/25 138/4

M

**mean... [39]** 152/22 164/22 177/4 177/16 178/25 180/6 188/9 190/3 207/1 207/4 207/6 213/17 216/18 222/1 222/18 223/6 224/3 224/8 224/25 225/23 226/16 228/2 228/20 231/5 231/6 231/6 239/3 248/16 250/17 259/10 259/11 265/25 266/11 271/21 273/22 273/23 276/4 279/8 282/14
**meaning [2]** 155/22 214/3
**meaningful [3]** 6/21 99/5 237/2
**meaningfully [2]** 21/23 22/1
**means [19]** 15/7 67/19 96/4 117/21 123/3 124/23 124/25 125/16 130/16 164/23 176/17 180/8 207/7 211/1 222/2 226/23 233/5 237/4 285/11
**meant [4]** 103/12 174/18 177/11 226/25
**measured [1]** 32/15
**measures [1]** 67/14
**media [1]** 55/3
**medical [1]** 251/18
**meet [12]** 17/17 107/11 110/8 113/11 113/18 114/4 116/19 123/15 174/7 174/11 261/9 261/14
**meeting [9]** 86/14 107/12 114/8 116/9 116/9 116/15 116/22 171/13 171/15
**meetings [1]** 115/7
**members [4]** 111/3 146/13 175/13 178/20
**memo [1]** 142/21
**memorialized [1]** 137/2
**memories [1]** 49/17
**memorization [1]** 137/6
**memory [2]** 137/4 214/18
**memos [1]** 227/9
**men [2]** 84/3 84/4
**mention [3]** 12/17 34/24 68/23
**mentioned [18]** 11/8 30/16 33/6 33/9 62/15 107/20 109/21 115/6 119/2 132/19 163/8 163/15 163/16 226/3 226/4 258/19 267/17 275/2
**mentor [1]** 109/20
**merely [1]** 160/21
**merge [2]** 19/21 21/19
**merges [1]** 20/24
**message [2]** 145/18 145/21
**messages [2]** 104/14 109/24
**met [7]** 24/22 114/3 198/9 199/1 244/12 244/13 244/14
**method [2]** 46/21 231/4
**methodology [1]** 33/18
**Metro [3]** 122/19 241/7 241/10
**Mexico [16]** 90/11 91/10 94/19 95/21 95/22 95/24 101/5 101/8 183/16 223/11 237/11 253/18 254/9 262/22 268/4 268/8
**Miami [2]** 169/10 169/10
**mic [6]** 162/21 163/2 165/19 201/10 258/13 272/9
**microphone [8]** 27/20 78/19 118/4 122/13 125/13 168/21 209/5 220/10
**microphone's [1]** 97/20
**mid [4]** 122/4 122/11 134/16 221/17
**mid to [2]** 134/16 221/17
**mid-October [2]** 122/4 122/11
**middle [2]** 33/21 193/8
**midnight [1]** 256/10
**might [62]** 9/3 10/3 35/13 44/13 45/1 47/6 47/14 63/24 86/25 92/19 99/1 106/12 110/5 114/21 115/3 118/4 130/13 134/4 134/5 141/20 142/9 147/5 147/6 153/5 161/18 162/8 167/10 174/22 178/16 178/17 181/10 181/11 182/9 186/25 188/12 193/14 193/22 194/3 195/24 196/21 215/24 216/21 216/21 216/23 217/12 219/3 219/5 219/22 219/22 223/10 223/11 226/2 238/8 241/17 249/21 256/9 256/18 256/18 272/3 272/16 277/9 280/13
**migrants [1]** 188/11
**miles [1]** 139/25
**military [2]** 221/9 221/10
**mind [5]** 17/7 161/13 175/25 220/13 252/9
**mine [1]** 77/14
**mini [1]** 174/14
**minimum [1]** 278/14
**minute [6]** 5/13 58/24 68/23 80/11 117/3 203/17
**minutes [32]** 52/21 61/13 80/1 86/1 89/2 96/21 103/9 103/15 103/16 113/2 113/14 114/6 116/8 116/13 116/17 116/20 117/2 117/4 139/17 168/5 191/14 203/18 237/22 255/1 255/5 255/11 256/7 257/18 267/21 270/1 270/11 278/25
**missing [1]** 126/1
**mission [1]** 213/12
**missions [1]** 141/11
**misstate [1]** 71/24
**Misstating [3]** 208/19 209/10 260/21
**mistaken [2]** 6/23 29/4
**mistakenly [1]** 271/2
**misunderstood [1]** 155/25
**Mm [3]** 162/6 204/24 264/17
**Mm-hmm [3]** 162/6 204/24 264/17
**mobile [11]** 157/22 157/23 158/3 158/12 158/16 158/22 159/3 159/6 253/14 253/22 254/5
**modern [1]** 119/24
**moment [28]** 12/13 20/1 20/24 21/2 21/10 33/10 58/21 64/3 81/1 81/23 86/21 86/22 91/20 92/3 175/22 175/22 177/7 177/9 177/20 180/10 185/7 185/13 199/25 217/3 242/11 242/11 242/14 253/11
**money [2]** 74/8 184/3
**month [1]** 28/3
**more [70]** 5/17 6/3 6/16 8/12 9/8 10/2 25/18 31/2 33/22 46/13 73/3 77/12 79/12 80/24 93/24 95/11 98/24 99/5 101/19 102/17 102/19 105/11 106/9 113/11 114/14 114/23 116/23 116/25 117/2 117/10 117/11 129/25 135/8 135/19 137/23 138/21 139/20 149/13 151/8 153/15 170/20 174/18 175/1 181/17 184/19 193/16 199/10 200/23 216/14 216/20 219/17 226/5 226/22 229/20 234/18 234/21 238/6 239/3 243/12 246/16 256/6 270/17 270/23 270/23 272/3 273/6 276/20 277/1
278/13 283/8
**morning [64]** 4/14 4/16 4/19 4/21 5/2 35/21 52/5 60/9 60/12 70/20 72/6 72/12 73/17 74/5 74/19 78/13 78/14 79/9 80/19 89/12 89/13 110/16 111/3 112/13 112/20 123/15 123/17 124/8 125/7 125/8 125/25 126/9 126/12 129/7 129/20 147/3 164/18 170/8 171/1 172/3 175/12 175/13 176/21 202/6 212/13 212/23 213/10 214/3 222/6 222/7 222/13 222/16 223/15 230/24 231/24 235/7 235/21 237/20 238/12 240/6 242/24 271/12 274/7 277/23
**most [14]** 29/12 29/14 35/25 47/25 56/21 57/3 70/16 74/2 93/3 119/10 171/1 219/19 241/25 282/14
**mostly [2]** 241/18 265/5
**motion [15]** 5/14 5/17 10/6 22/23 23/25 24/1 24/2 24/4 24/23 34/1 34/15 36/3 48/10 138/8 281/25
**motions [4]** 6/24 6/25 23/3 24/17
**motivate [2]** 187/14 187/15
**motivated [1]** 218/10
**mouth [1]** 83/3
**move [22]** 88/4 114/3 118/5 122/13 122/14 133/11 139/2 154/15 154/20 196/5 201/9 203/14 204/1 205/17 216/11 216/23 219/22 252/2 257/19 258/13 261/19 277/18
**moved [4]** 78/20 80/4 151/23 151/23
**movement [1]** 134/15
**moving [8]** 23/17 69/19 95/3 151/25 165/7 193/1 219/12 261/25
**Mr. [84]** 7/9 10/15 10/21 11/23 12/15 13/1 13/25 15/23 16/2 17/1 18/15 24/11 28/25 30/15 30/22 34/3 35/17 36/11 36/18 36/20 37/7 37/15 38/1 39/2 41/11 42/2 42/5 42/19 44/17 45/1 50/3 50/16 50/20 51/14 51/16 53/5 54/12 56/2 56/17 57/22 58/8 59/9 61/19 61/25 77/5 78/9 87/14 88/7 88/14 92/24 96/19 99/8 107/23 108/23 115/13 118/7 120/3 120/21 121/12 132/10 146/18 155/6 159/22 160/5 161/9 162/19 166/18 166/24 177/22 211/4 211/25 213/25 215/8 218/5 219/1 219/24 256/13 258/6 271/13 272/5 277/6 278/8 279/7 281/19
**Mr. Knaebel [2]** 218/5 219/1
**Mr. Manning [45]** 10/21 11/23 12/15 13/1 13/25 18/15 28/25 30/15 34/3 35/17 36/11 36/18 36/20 37/7 37/15 38/1 39/2 41/11 42/2 42/19 44/17 45/1 50/20 51/16 53/5 54/12 56/2 56/17 58/8 59/9 61/25 77/5 78/9 87/14 92/24 108/23 120/3 162/19 219/24 256/13 271/13 272/5 278/8 279/7 281/19
**Mr. Manning's [2]** 30/22 118/7
**Mr. Ratcliffe [33]** 7/9 10/15 15/23 16/2 17/1 24/11 42/5 50/16 51/14 57/22 61/19 88/7 88/14 96/19 99/8 107/23 115/13 120/21 121/12 132/10 146/18 155/6 160/5 161/9 166/18 166/24 177/22 211/4 211/25 213/25 215/8 258/6 277/6
**Mr. Ratcliffe's [2]** 50/3 159/22

M

**Ms. [46]** 5/14 14/20 15/10 16/17 18/3 18/4 37/7 38/8 39/12 42/23 54/5 54/6 56/2 59/16 88/23 89/6 91/24 94/20 95/5 97/13 100/3 100/24 101/19 105/8 107/2 107/11 107/16 108/6 108/7 108/23 109/3 115/17 117/17 117/21 120/4 162/19 167/2 214/13 215/11 219/24 255/8 258/9 271/13 281/20 282/18 283/20
**Ms. Bernstein [1]** 283/20
**Ms. Feldman [6]** 14/20 16/17 18/3 18/4 54/5 91/24
**Ms. Garcia [13]** 37/7 56/2 100/3 100/24 108/23 162/19 167/2 214/13 215/11 219/24 258/9 271/13 281/20
**Ms. Garcia Orjuela [1]** 120/4
**Ms. Garousi [13]** 5/14 15/10 38/8 39/12 42/23 88/23 89/6 94/20 95/5 97/13 101/19 255/8 282/18
**Ms. Kelsey [2]** 59/16 108/6
**Ms. Provo [7]** 105/8 107/11 108/7 109/3 115/17 117/17 117/21
**Ms. Provo's [2]** 107/2 107/16
**Ms. Zusman [1]** 54/6
**MTK [3]** 1/7 4/10 285/4
**much [13]** 28/4 67/16 101/16 120/20 148/6 205/8 216/20 234/21 240/6 256/5 269/17 277/22 283/15
**multiple [20]** 61/15 111/3 118/20 130/2 140/14 140/18 140/21 147/2 150/4 164/23 165/4 228/21 235/22 243/16 246/1 246/9 248/17 252/16 253/10 268/15
**mumbling [1]** 285/14
**must [2]** 99/11 112/17
**MUSTAFA [5]** 1/16 4/7 59/7 104/2 258/4
**muster [1]** 123/15
**MX [1]** 223/11
**my [162]** 10/1 11/4 11/23 14/10 14/25 17/14 27/5 27/5 28/5 28/5 28/21 29/13 30/20 36/8 36/22 38/2 38/3 39/16 43/4 44/24 48/14 58/11 58/18 66/20 68/1 76/14 79/10 79/11 80/20 80/20 84/23 84/24 85/6 86/12 87/14 87/14 88/16 90/19 90/23 91/21 95/6 98/9 99/9 100/2 102/3 103/12 104/5 104/5 104/8 104/9 104/15 104/22 104/22 104/23 106/5 106/8 108/1 109/24 109/25 109/25 110/8 113/25 134/8 135/6 136/25 139/3 140/11 140/13 140/21 144/6 148/12 149/10 150/11 152/5 152/6 153/18 155/3 155/3 156/6 156/8 159/24 161/20 163/13 166/11 166/20 172/11 173/17 173/23 174/19 175/24 176/13 176/24 178/18 179/10 181/21 182/11 182/16 183/9 183/24 185/14 186/20 187/8 188/5 188/10 189/5 191/22 191/23 193/2 193/3 193/4 193/17 195/11 196/15 199/1 199/13 201/8 201/11 202/18 211/22 212/23 216/13 219/13 219/14 223/22 234/21 236/3 236/3 238/3 243/25 244/2 244/6 245/3 245/3 246/13 246/14 246/16 246/17 246/19 246/20 248/10 251/11 251/11 251/19 251/20 251/25 252/2 252/2 252/4 252/13 257/21 259/14 259/14 262/16 262/17 262/17 264/4 264/18 265/5 266/14 274/1 274/8 279/5
**myself [7]** 79/11 113/24 139/14 172/18 180/18 185/7 244/4

N

**name [51]** 4/10 28/16 30/5 33/20 33/21 45/5 46/4 76/14 99/18 100/2 100/7 108/18 108/18 111/15 111/18 111/19 111/21 124/1 128/9 128/13 128/14 128/16 128/17 128/24 128/25 134/9 134/11 134/12 165/21 175/1 188/24 189/11 192/9 193/3 193/4 197/1 198/1 199/10 199/14 199/16 200/21 201/16 225/17 232/9 236/2 254/15 254/16 259/1 265/20 266/5 271/1
**named [7]** 38/11 50/8 55/8 58/17 96/13 167/10 213/22
**names [10]** 31/17 32/5 45/25 112/12 126/6 137/1 158/13 201/18 228/3 232/4
**narrative [6]** 139/9 233/15 233/17 238/10 266/7 267/1
**Natalie [5]** 110/8 110/15 111/18 112/19 113/25
**Nationality [1]** 21/20
**native [2]** 99/3 200/13
**naturalization [1]** 131/16
**naturalize [1]** 131/18
**naturalized [4]** 131/22 132/1 132/6 190/5
**nature [7]** 8/12 29/8 29/17 32/21 35/24 174/22 240/22
**navigate [1]** 92/18
**near [1]** 179/22
**nearby [3]** 192/23 198/14 198/15
**Nebraska [3]** 12/3 37/1 257/8
**necessarily [3]** 5/17 91/18 137/5
**necessary [13]** 23/9 36/24 36/25 37/12 39/6 40/2 44/18 53/1 272/7 272/15 273/20 277/15 280/4
**necessitating [1]** 206/12
**need [54]** 5/13 9/4 12/10 15/18 26/7 26/10 27/23 31/8 32/12 32/16 34/14 37/6 37/14 47/4 47/5 47/6 47/10 47/14 47/18 49/15 50/15 61/14 65/12 74/11 90/1 96/1 96/1 97/5 98/6 98/8 101/23 103/10 112/10 118/4 130/12 144/1 144/2 144/13 167/8 189/12 189/16 191/4 192/13 207/2 207/7 216/17 216/17 216/23 217/3 217/11 256/11 276/13 281/13 282/3
**needed [14]** 12/20 37/2 41/4 68/10 70/11 70/12 94/9 114/7 116/15 116/21 128/5 157/9 191/23 273/19
**needing [1]** 38/15
**needs [12]** 20/14 36/3 45/15 48/6 50/4 56/7 58/18 89/22 97/4 125/18 135/11 280/10
**neglected [1]** 254/21
**Neither [2]** 20/20 218/5
**NELLY [3]** 2/4 4/16 100/25
**nervous [2]** 79/2 189/2
**net [1]** 59/22
**never [10]** 81/5 91/15 94/16 98/23 98/23 100/1 137/15 231/14 233/15 268/8
**nevertheless [1]** 7/4
**new [2]** 19/5 213/15
**newer [1]** 229/11
**news [1]** 257/3
**newspaper [1]** 25/19
**next [17]** 105/7 108/4 115/3 132/20 168/10 188/12 192/19 198/7 204/25 217/10 220/4 225/8 226/14 226/25 270/11 278/25 281/24
**nexus [29]** 124/14 124/16 124/23 124/25 130/11 130/14 130/15 130/16 130/19 131/8 131/14 131/22 131/25 132/7 132/19 133/6 133/8 136/24 141/15 141/19 141/23 142/1 142/4 142/5 156/9 157/25 165/1 190/9 229/2
**nice [1]** 117/25
**night [5]** 6/25 7/15 10/6 230/23 257/3
**nine [3]** 103/14 123/9 216/13
**Ninth [3]** 30/2 109/16 119/12
**Ninth Circuit [3]** 30/2 109/16 119/12
**no [181]** 1/7 3/2 13/9 13/22 19/12 21/7 29/24 30/11 32/19 37/21 38/9 38/22 38/24 39/20 41/8 41/8 41/12 43/15 46/11 52/6 52/9 52/17 53/10 54/14 55/14 57/24 58/4 67/20 69/2 69/3 69/4 71/6 71/6 71/18 72/11 73/16 76/4 77/2 80/6 80/8 80/14 82/7 82/16 82/24 84/19 84/21 85/13 85/16 85/21 85/24 88/11 88/12 92/1 93/1 93/16 95/8 98/10 98/10 99/15 100/22 101/6 101/24 102/13 102/25 103/1 103/3 111/9 114/12 115/10 117/13 117/15 118/2 120/9 120/17 131/17 133/15 134/14 136/21 137/25 137/25 139/20 143/25 148/8 153/20 161/8 162/18 165/23 166/19 166/22 171/11 172/25 173/20 174/1 174/23 180/10 186/3 186/18 192/15 196/10 197/3 198/5 198/18 199/19 200/4 201/5 201/25 203/18 204/8 204/10 204/13 204/16 205/25 207/5 207/22 211/6 211/8 211/18 211/23 212/13 212/17 213/24 214/6 214/12 215/12 215/14 215/16 218/18 218/19 218/20 218/21 218/22 221/9 225/13 226/6 230/19 231/14 232/9 232/24 234/15 237/5 237/17 239/9 240/15 240/15 242/1 242/1 242/1 252/25 253/2 254/17 254/17 254/20 256/6 259/14 260/12 261/18 263/23 265/2 266/24 267/9 267/24 268/10 268/19 268/23 268/24 268/25 269/3 269/7 275/10 276/13 276/17 276/24 277/7 277/11 279/1 279/20 279/21 281/22 282/5 285/4 285/23
**noises [1]** 285/15
**noncommercial [1]** 73/16
**noncompliance [1]** 153/19
**noncompliant [6]** 156/23 179/13 185/14 244/17 250/20 268/14
**none [2]** 61/5 211/20
**nonhostile [1]** 239/10
**nonprofit [1]** 109/11
**noon [3]** 103/21 217/5 217/13
**normal [2]** 79/2 82/14
**normally [5]** 75/6 174/23 187/6 200/15

## N

**normally... [1]** 217/18
**north [1]** 123/16
**northwest [1]** 241/15
**Nos [1]** 51/23
**not [373]**
**note [8]** 7/21 34/1 41/13 43/16 48/14 53/4 106/19 275/7
**nothing [10]** 13/8 33/22 58/8 58/9 103/14 136/4 144/10 175/22 215/5 233/5
**notice [8]** 16/18 31/18 47/10 118/14 118/14 120/4 120/15 225/6
**noticed [2]** 80/2 172/12
**notices [1]** 115/6
**notify [2]** 47/9 216/3
**notifying [1]** 248/13
**noting [1]** 40/18
**notion [1]** 68/3
**now [59]** 4/7 4/9 13/19 14/19 16/1 16/1 17/16 19/9 19/15 24/3 24/18 30/2 33/16 35/25 38/11 42/14 45/10 47/9 49/22 50/7 51/5 51/6 59/21 63/5 67/5 87/11 89/21 93/23 97/7 97/24 98/16 98/22 99/6 99/10 103/6 104/2 118/16 135/2 137/23 139/7 141/22 145/9 165/8 179/6 183/18 184/18 186/14 189/7 201/10 206/24 216/21 221/15 235/2 254/3 262/17 265/25 279/9 282/12 282/23
**nowhere [1]** 60/16
**NTA [2]** 223/24 225/6
**number [23]** 6/12 37/17 37/19 42/4 113/8 150/5 159/4 165/3 174/21 226/10 228/25 229/16 232/10 232/10 232/10 232/14 232/15 260/1 265/10 265/20 266/5 280/14 282/16
**numbers [4]** 11/22 51/21 158/14 260/3

## O

**o'clock [5]** 113/18 123/19 254/23 256/9 283/23
**oath [7]** 33/19 39/6 56/19 116/3 234/14 275/17 279/24
**object [6]** 34/23 35/20 93/22 93/24 100/19 209/9
**objection [36]** 5/18 6/19 7/1 7/15 7/16 10/5 14/4 14/7 15/1 18/17 24/5 24/6 25/1 26/4 26/13 26/17 30/12 53/15 55/20 55/24 57/11 80/13 80/14 81/11 88/8 99/16 100/22 120/6 153/11 184/10 194/5 194/13 208/19 209/25 214/24 260/18
**objection's [2]** 7/3 55/6
**objectionable [1]** 26/12
**objections [7]** 9/1 12/13 24/17 26/10 45/2 215/11 269/6
**objective [1]** 213/12
**obligate [2]** 189/24 190/14
**obligated [2]** 190/12 191/4
**obligation [3]** 66/21 66/22 66/24
**oblige [1]** 270/2
**observe [3]** 132/12 172/6 196/6
**observed [6]** 43/4 70/20 132/21 172/17 173/8 175/14
**observing [2]** 39/20 249/10
**obtain [3]** 20/18 39/5 114/22
**obtained [8]** 43/7 43/18 63/1 63/22 64/3 65/3 65/6 65/10
**obviously [3]** 11/14 271/6 278/3
**occasions [2]** 26/14 253/10
**occupants [4]** 149/25 150/2 150/4 150/5
**occupation [1]** 242/6
**occupying [1]** 152/1
**occur [1]** 90/9
**occurred [3]** 90/11 95/22 118/13
**occurring [1]** 176/20
**October [31]** 22/12 59/23 60/8 79/7 90/10 109/22 122/4 122/11 122/12 123/10 123/11 124/8 125/7 134/16 146/10 163/19 164/16 170/1 170/7 201/4 203/12 212/13 221/17 222/5 223/14 227/6 228/6 230/18 231/24 235/8 261/19
**October 12th [1]** 122/12
**October 23rd [1]** 170/1
**October 30th [25]** 22/12 59/23 60/8 79/7 90/10 109/22 123/10 123/11 124/8 125/7 146/10 163/19 164/16 170/7 201/4 203/12 212/13 222/5 223/14 227/6 228/6 230/18 231/24 235/8 261/19
**odd [1]** 177/11
**Odyssey [1]** 174/15
**off [45]** 15/12 29/16 73/13 76/12 76/14 76/15 90/24 92/5 151/19 153/4 162/24 175/15 176/15 176/16 176/17 176/18 176/19 176/20 176/24 177/3 177/11 177/11 179/18 184/3 192/16 196/14 197/12 200/2 202/11 202/12 203/3 203/15 207/9 212/5 214/11 220/8 228/7 234/19 240/2 241/21 251/11 252/8 275/9 281/11 283/9
**offense [2]** 64/12 65/1
**offer [11]** 14/9 16/21 55/19 92/22 97/11 107/14 110/10 111/7 139/3 188/24 272/3
**offered [6]** 56/3 56/10 56/10 69/12 88/18 197/1
**offering [3]** 52/3 52/8 57/17
**office [32]** 1/8 2/17 16/24 37/19 61/8 84/10 109/13 110/3 110/8 110/12 110/14 110/15 111/4 123/23 127/11 127/14 127/15 127/16 128/3 136/19 159/19 159/20 198/17 198/22 199/3 199/6 208/11 221/2 226/8 226/19 278/20 283/1
**officer [79]** 38/3 38/18 46/5 61/2 62/19 64/9 64/13 64/25 65/4 69/22 76/18 80/9 80/10 80/11 85/19 111/4 111/11 111/12 111/14 111/16 112/4 112/7 114/6 115/6 116/6 116/8 116/14 116/21 116/23 116/24 117/1 117/2 119/18 119/25 121/15 121/20 121/21 126/25 126/25 129/25 140/1 140/2 141/20 148/1 148/22 150/7 150/17 151/7 151/13 160/16 161/24 163/14 163/14 171/19 184/22 185/11 187/3 187/18 189/20 192/16 202/23 205/20 212/8 215/13 221/4 221/6 227/12 233/6 244/21 246/5 247/2 251/14 269/8 274/16 274/18 275/2 275/16 275/24 279/11
**officer's [6]** 46/5 76/24 111/15 127/1 150/20 274/24
**officers [74]** 11/14 17/19 25/13 26/1 33/13 38/15 39/25 55/10 61/24 65/23 66/21 67/4 70/16 70/19 71/21 71/24 72/14 72/19 73/6 73/9 73/14 73/17 74/7 74/24 75/2 76/8 82/17 94/8 95/9 114/24 118/20 118/20 118/23 119/1 126/7 126/10 129/10 129/16 132/21 132/23 134/16 150/8 150/13 151/23 152/25 161/4 161/5 161/22 170/8 170/9 170/11 170/13 170/20 170/21 170/23 171/23 177/24 179/9 180/1 185/10 185/20 189/12 191/10 204/21 206/19 211/19 213/6 217/14 261/20 265/23 266/17 270/20 277/25 278/2
**officers' [1]** 153/25
**official [11]** 54/13 54/17 54/21 54/21 55/3 55/4 55/4 130/21 174/1 241/24 285/22
**officials [1]** 223/6
**often [6]** 74/8 74/10 141/2 146/25 178/8 178/8
**oftentimes [1]** 161/20
**oh [22]** 5/18 52/14 88/19 97/22 98/7 111/16 122/17 127/15 155/2 155/20 212/2 224/1 238/18 241/11 243/3 251/9 252/3 253/4 266/16 266/18 270/5 278/23
**okay [242]** 5/9 5/21 6/19 11/6 13/19 14/14 18/2 22/2 23/23 24/11 25/4 30/11 34/1 34/13 35/13 35/22 38/8 38/10 40/3 41/11 43/20 44/21 46/3 47/1 52/14 53/4 54/25 57/11 58/7 71/22 71/24 72/1 73/4 74/13 77/4 78/24 88/1 95/25 96/8 97/11 98/1 98/4 99/17 100/10 100/11 101/24 102/21 105/9 105/19 105/22 106/23 108/5 109/22 112/3 117/12 118/10 120/12 121/11 122/24 125/3 126/5 127/18 129/12 130/23 131/12 132/9 133/9 133/18 133/22 136/10 136/16 143/23 144/8 144/8 144/11 144/18 145/2 145/5 145/23 146/12 146/17 147/22 148/6 148/10 148/13 149/18 154/18 154/24 155/22 156/19 156/22 157/2 157/17 157/20 158/20 159/11 160/22 161/4 161/9 162/3 163/2 163/5 163/22 164/2 164/5 164/18 165/8 166/16 167/15 170/22 170/25 172/23 173/13 175/8 175/9 177/10 177/16 177/22 178/19 190/22 191/7 191/7 192/12 194/25 195/3 195/19 195/22 196/1 196/11 197/17 199/14 200/18 201/1 201/9 202/14 202/16 203/7 203/20 204/20 205/1 205/5 205/14 205/19 206/6 206/8 206/21 207/8 207/11 208/3 208/8 209/8 209/12 210/19 210/24 212/25 213/5 213/8 213/25 215/17 215/18 216/5 218/3 218/17 218/23 225/25 226/23 227/1 227/5 227/22 228/13 229/13 230/3 230/6 230/10 230/20 231/1 231/18 233/3 233/20 234/5 235/7 235/15 236/14 236/17 239/14 239/17 242/21 243/25 245/17 248/25 249/8 250/12 253/1 255/6 256/8 256/17 256/17 258/16

# O

**okay... [44]** 258/19 259/5 259/10 259/19 261/2 261/6 261/12 261/19 262/7 262/10 262/15 263/7 263/13 263/20 264/3 264/8 264/15 264/20 265/15 265/25 266/1 266/20 266/23 267/17 267/21 268/7 269/16 272/13 272/18 273/3 273/8 275/23 277/3 277/10 277/17 278/12 279/14 280/4 280/6 280/10 280/17 281/23 282/9 283/4
**old [2]** 78/15 159/15
**once [12]** 98/24 100/21 113/15 151/16 152/19 181/7 197/11 198/8 216/2 224/16 243/25 251/12
**one [135]** 6/22 6/22 7/11 7/15 11/11 12/1 16/1 16/14 19/15 20/20 22/13 22/14 26/6 28/9 28/9 29/7 33/6 34/21 37/19 40/20 41/24 45/9 50/5 50/23 52/5 58/18 61/12 63/7 63/8 63/9 64/6 68/2 68/7 69/19 69/23 70/16 72/8 73/7 73/13 73/19 74/3 75/22 75/23 75/25 76/2 76/5 76/11 81/6 82/7 82/8 84/16 84/16 85/22 85/23 86/21 86/22 92/9 92/15 94/8 95/8 106/10 107/8 113/15 113/24 116/6 118/14 125/14 127/20 128/15 132/21 141/9 141/11 142/16 146/8 146/23 147/12 147/12 152/22 153/3 153/10 154/2 154/25 160/8 162/25 170/20 170/20 171/25 174/7 174/11 174/12 174/13 175/20 177/1 183/20 184/7 184/14 188/14 190/10 193/5 194/25 195/19 195/23 197/12 199/10 200/23 205/3 211/21 214/20 218/13 222/24 226/18 227/18 228/4 229/21 231/19 233/7 235/13 235/17 235/17 242/3 247/12 248/7 248/10 249/2 251/7 261/19 262/10 262/15 262/18 264/4 264/5 265/23 275/2 282/16 282/18
**ones [5]** 7/25 12/18 83/9 129/13 244/4
**ongoing [3]** 22/18 134/4 134/5
**only [34]** 10/8 18/12 22/13 22/14 25/12 29/16 33/13 48/20 49/16 52/9 57/1 64/24 65/12 66/3 84/3 84/4 99/9 107/13 116/8 116/13 116/16 116/20 120/2 133/19 178/23 195/19 200/18 211/21 244/2 244/4 248/17 249/15 249/19 274/10
**open [27]** 4/4 31/11 32/13 76/6 80/15 98/5 103/9 103/24 148/5 148/7 148/19 149/21 199/13 204/4 204/18 205/6 206/2 206/9 206/22 207/13 207/23 214/15 214/19 214/20 241/3 273/24 283/8
**opened [4]** 81/9 247/7 247/20 248/2
**opening [10]** 36/9 36/13 58/11 58/25 59/9 59/13 61/21 77/13 149/2 149/3
**openness [1]** 32/14
**operate [1]** 19/20
**operating [5]** 20/10 72/19 119/3 129/10 146/23
**operation [30]** 125/6 134/10 134/14 134/19 134/24 135/4 138/4 163/17 163/18 163/19 164/19 169/24 184/15 200/19 200/21 200/22 200/24 200/24 221/18 226/6 226/12 258/22 258/23 258/24 258/25 259/3 259/8 259/25 273/23 277/1
**operational [3]** 134/9 134/11 134/12
**operations [10]** 1/9 122/5 123/4 126/2 142/25 170/6 221/5 221/13 222/7 274/7
**opinion [4]** 14/4 14/24 80/20 80/21
**opponent [2]** 53/20 54/2
**opportunities [2]** 175/20 176/4
**opportunity [20]** 8/25 10/19 12/15 12/24 13/13 15/3 15/5 24/12 49/11 77/8 80/25 95/10 95/13 96/6 96/9 100/14 100/19 139/12 154/1 275/6
**oppose [1]** 25/5
**opposed [5]** 32/5 92/20 92/20 98/18 120/10
**opposing [16]** 7/11 11/13 13/10 25/16 34/11 37/13 45/5 48/5 52/17 69/12 80/13 97/11 118/14 134/18 209/15 279/21
**optical [3]** 159/15 159/17 159/18
**options [2]** 115/3 217/21
**oral [2]** 137/4 227/10
**orally [5]** 142/14 142/15 142/17 142/21 260/3
**order [25]** 14/1 22/20 23/10 29/4 36/22 37/11 38/14 44/11 44/24 45/16 50/14 56/4 59/15 66/6 92/9 105/2 128/6 147/15 148/23 149/4 216/16 219/7 257/21 269/9 280/22
**ordering [1]** 48/24
**orderly [1]** 67/5
**orders [1]** 244/18
**OREGON [26]** 1/2 2/22 4/7 5/1 22/12 25/19 39/13 59/22 60/11 61/9 67/7 79/5 104/2 123/16 200/18 201/24 222/3 222/9 222/12 232/22 232/23 233/2 241/15 258/3 278/7 285/23
**Oregon's [1]** 257/16
**Oregonians [2]** 22/20 60/9
**organically [1]** 26/25
**organized [1]** 79/12
**organizing [1]** 183/5
**orient [2]** 115/1 126/18
**orientation [3]** 58/11 110/9 111/6
**orientations [1]** 111/5
**origin [1]** 237/1
**original [1]** 285/16
**originally [3]** 38/11 272/6 272/14
**ORJUELA [16]** 2/4 4/17 99/19 99/20 99/23 100/3 100/24 101/1 108/23 120/4 162/19 167/2 215/11 219/24 258/9 281/20
**other [163]** 10/20 11/5 11/16 12/21 13/6 19/8 23/13 25/15 25/17 27/15 27/16 30/6 30/16 30/19 30/22 31/22 32/20 32/20 34/18 36/7 36/14 37/3 39/5 44/6 44/19 44/23 45/22 49/3 49/23 50/15 53/3 55/9 55/10 55/10 63/3 63/9 64/4 64/20 65/12 65/20 65/20 65/23 67/2 68/22 69/8 69/14 71/17 71/18 72/22 75/19 75/23 76/10 79/20 81/17 97/4 106/1 107/19 113/25 118/1 119/22 120/14 130/6 130/17 130/17 130/18 132/22 133/23 136/8 141/17 142/10 146/12 147/17 151/23 152/4 152/18 152/25 154/9 154/13 154/22 155/16 158/11 160/22 161/4 161/5 161/13 161/16 161/17 162/8 162/10 170/8 170/9 171/23 175/13 176/13 176/19 178/11 182/8 182/11 185/10 185/20 186/5 186/23 188/1 189/13 189/15 189/16 193/13 194/7 194/20 194/25 195/4 195/23 196/1 196/3 196/20 197/6 197/20 197/21 198/11 198/25 199/18 205/18 206/19 211/19 217/6 219/20 222/17 223/12 223/12 227/24 227/25 237/7 238/6 238/12 244/1 244/5 247/2 247/10 251/8 252/21 253/19 255/15 255/15 261/22 262/7 266/8 270/10 270/13 270/18 271/6 272/3 272/16 273/24 273/24 275/2 276/17 276/19 276/21 277/4 277/19 281/6 282/3 285/14
**others [3]** 31/24 154/1 167/12
**otherwise [4]** 10/3 10/16 50/3 128/20
**ought [3]** 27/14 95/2 283/12
**our [137]** 4/23 6/1 6/1 6/14 7/12 7/12 7/19 7/25 8/24 9/19 10/6 13/2 13/25 14/11 16/23 19/5 20/10 22/10 22/11 22/12 23/3 23/17 23/25 29/6 29/6 30/3 31/3 31/5 31/16 32/15 34/13 35/5 35/18 37/5 40/6 40/7 40/8 42/1 42/7 44/16 44/17 45/5 46/19 49/4 49/11 49/15 52/16 54/18 54/18 56/15 58/14 59/21 59/24 60/7 60/7 60/8 60/13 61/14 69/15 72/8 76/9 77/7 77/7 84/17 95/13 95/13 96/17 101/17 104/12 105/2 105/7 106/17 107/14 110/5 113/16 115/7 118/12 125/16 130/3 130/9 133/21 134/21 134/22 135/12 137/15 137/15 138/9 138/13 150/15 152/2 157/19 157/23 162/1 162/16 162/17 162/17 174/6 174/12 174/13 195/17 198/18 217/21 217/25 218/3 220/4 220/4 222/9 225/24 227/18 230/8 232/12 233/14 244/3 252/10 252/10 253/19 254/22 259/22 262/20 262/20 266/14 266/17 266/18 267/16 272/19 272/20 272/21 273/5 273/14 274/24 276/23 277/2 278/20 281/7 281/7 283/1
**ourselves [2]** 7/13 156/10
**out [123]** 6/1 7/21 12/2 21/6 26/20 34/7 34/11 43/25 44/10 47/13 53/18 56/9 58/18 62/16 69/21 69/23 70/4 73/15 75/20 75/22 76/1 76/5 76/11 76/23 76/24 80/11 82/7 83/18 83/19 83/25 84/16 84/24 85/9 89/25 95/2 95/17 110/20 110/23 110/24 116/10 117/5 127/21 132/22 135/24 140/11 148/23 149/22 151/2 151/14 151/16 151/18 152/6 153/23 155/5 155/22 157/8 162/7 172/23 173/2 175/13 180/14 185/17 191/11 191/15 191/17 191/21 191/25 192/1 192/2 192/3 192/13 192/17 192/23 193/1 193/2 193/3 193/6 197/8 197/11 206/6 207/7 207/11 209/19 216/11 217/14 219/14 221/1 223/2 226/12 226/15 226/23 229/14 231/7 235/23 236/2 237/24 243/25 244/10 246/18 246/18 247/13 248/9 249/18 250/3 250/7 250/7 250/15 250/20 251/25 252/6 252/12

**O**

**out... [12]** 252/14 255/21 261/14 262/17 264/8 265/8 268/5 274/17 276/15 278/5 279/3 281/13
**outcome [2]** 15/16 167/13
**outnumbered [2]** 150/5 248/15
**outside [7]** 20/5 111/9 111/22 112/21 191/25 222/14 278/7
**outstanding [1]** 66/23
**outweigh [1]** 29/10
**over [35]** 22/7 22/11 59/22 69/15 69/16 80/4 87/14 96/17 109/9 120/25 125/14 135/20 145/18 149/1 149/6 149/20 150/14 155/3 170/14 170/17 170/18 170/21 170/22 193/5 194/4 200/10 222/12 239/13 242/8 244/7 248/11 258/20 260/11 261/9 264/11
**overlap [1]** 122/8
**overriding [1]** 285/15
**overrule [1]** 26/17
**overruled [7]** 26/4 55/6 81/12 184/11 194/14 215/1 260/22
**owed [1]** 34/10
**own [12]** 49/16 49/17 66/10 74/9 96/17 107/14 197/12 233/14 238/3 239/2 276/9 277/2
**owner [22]** 70/23 71/2 71/3 75/7 75/9 132/18 133/8 133/10 133/13 140/16 155/19 157/11 236/16 236/20 236/23 237/9 242/20 242/22 243/7 263/6 263/8 263/12
**owners [1]** 164/25

**P**

**p.m [31]** 53/13 90/24 92/5 92/6 103/21 103/24 116/7 162/24 168/7 168/7 200/2 200/3 203/3 203/4 204/4 204/18 205/6 206/2 206/9 206/22 207/9 207/13 207/23 212/5 219/10 220/8 234/19 258/1 258/1 281/11 284/4
**p.m. [1]** 7/18
**pace [1]** 281/15
**package [42]** 123/25 128/11 128/13 128/18 134/2 136/4 136/10 136/16 136/22 137/8 137/17 137/19 137/25 141/13 142/6 142/8 142/12 142/14 142/21 142/22 163/20 164/4 201/4 212/9 212/12 212/22 212/24 213/23 273/2 273/2 273/6 273/9 273/14 273/22 274/5 274/25 275/24 276/7 276/9 276/11 276/20 276/22
**packages [9]** 123/24 124/10 141/22 142/25 212/15 226/2 273/16 276/24 277/1
**packet [1]** 163/23
**page [8]** 3/2 87/19 87/21 104/22 165/11 223/17 232/3 232/5
**pages [5]** 87/20 232/20 232/20 233/8 235/13
**paid [1]** 183/3
**PAOLA [1]** 2/4
**paper [6]** 32/5 136/22 143/24 143/24 144/14 232/21
**papers [5]** 22/11 29/6 30/3 59/21 232/22
**paperwork [7]** 29/12 46/14 46/18 46/21 114/16 189/24 255/22
**paragraph [5]** 8/4 43/16 116/5 116/18 165/12
**paragraphs [1]** 106/19
**paralyzed [1]** 81/23
**parameters [1]** 135/3
**parcel [1]** 33/14
**park [1]** 174/12
**parked [2]** 74/18 203/20
**parking [5]** 74/18 74/19 172/11 235/21 263/4
**parse [1]** 209/19
**part [38]** 7/20 8/9 22/10 22/12 23/16 25/6 25/7 28/21 33/14 39/15 43/4 63/17 66/22 90/22 97/1 115/25 126/12 126/14 133/25 136/10 137/16 139/3 145/19 150/14 163/13 164/13 177/12 179/3 179/5 181/15 181/21 184/15 194/2 209/18 221/18 240/10 259/6 271/20
**participate [2]** 49/7 151/2
**particular [8]** 102/6 120/14 138/3 138/4 154/18 167/14 200/19 213/22
**particularly [3]** 16/16 26/22 32/9
**parties [10]** 27/8 28/11 30/18 31/7 42/15 47/21 47/23 50/24 51/13 52/15
**partition [1]** 113/24
**partner [2]** 110/5 172/11
**party [11]** 10/24 17/1 53/19 53/19 53/20 53/25 54/2 56/11 96/13 253/16 253/17
**party's [1]** 49/2
**pass [3]** 160/3 192/16 238/4
**passed [1]** 127/10
**passenger [11]** 35/4 60/10 140/11 149/20 149/24 149/24 149/24 150/23 179/23 179/24 247/3
**passenger-side [1]** 149/20
**passengers [7]** 60/17 60/21 61/6 150/11 186/6 197/6 204/11
**passive [3]** 43/5 43/8 43/8
**passport [1]** 158/13
**past [7]** 17/22 20/1 43/4 92/10 92/10 130/22 172/13
**pasted [1]** 233/9
**pathways [1]** 114/20
**patience [1]** 283/11
**patrol [24]** 23/6 82/6 82/6 169/4 169/6 169/7 174/4 180/7 180/20 184/22 187/18 190/25 191/1 200/10 224/9 224/12 225/4 244/19 245/2 246/19 252/4 253/20 272/23 274/19
**Patrol-issued [1]** 180/20
**pattern [1]** 92/8
**pause [1]** 224/2
**pay [5]** 75/5 178/12 183/5 184/3 184/3
**peeked [1]** 199/13
**pending [4]** 189/19 225/19 225/19 237/5
**people [152]** 28/22 35/23 39/8 43/10 48/2 59/20 60/2 60/3 60/3 60/3 65/8 67/3 69/23 70/1 72/13 72/17 72/18 73/13 73/13 73/15 73/20 73/22 75/22 76/1 76/23 79/20 79/22 83/19 104/5 110/10 111/7 112/5 112/13 112/14 112/18 112/20 113/3 113/11 113/20 113/21 123/8 130/2 130/13 140/14 140/18 140/22 140/24 141/1 142/10 147/2 147/14 147/17 149/22 151/18 152/23 152/24 153/6 153/7 154/14 154/20 154/25 155/9 161/14 161/21 162/9 173/24 174/21 175/1 175/21 176/4 176/4 176/25 177/18 178/7 181/12 181/24 183/2 183/9 185/4 185/20 186/1 186/19 186/23 187/16 187/16 188/1 188/18 188/23 189/1 189/8 191/10 191/23 193/14 194/20 194/22 195/22 195/23 196/2 197/21 198/17 198/21 208/14 213/14 222/2 222/24 227/19 227/25 228/24 229/5 229/16 229/25 233/5 235/10 235/12 235/17 238/15 239/6 239/12 239/20 239/24 240/7 240/13 241/5 241/16 241/21 242/3 242/23 243/12 245/1 247/5 247/10 248/5 248/8 248/13 249/3 249/11 249/23 250/7 251/12 251/19 252/21 253/4 261/23 261/25 262/20 262/23 265/24 266/25 267/20 268/5 268/16 274/1
**people's [1]** 240/5
**Per [4]** 260/8 260/9 260/14 260/15
**perceive [1]** 247/4
**percent [6]** 227/23 229/23 231/11 231/15 231/20 263/19
**percentage [2]** 159/7 229/25
**Perfect [1]** 258/16
**perfectly [4]** 17/18 30/25 49/22 183/15
**performed [1]** 33/1
**performing [1]** 164/19
**perhaps [17]** 6/15 10/1 10/25 28/19 28/25 54/3 72/21 73/23 91/16 92/8 93/4 95/2 96/3 184/9 209/17 239/23 241/22
**period [4]** 66/5 68/18 69/11 85/11
**permanent [2]** 225/20 230/13
**permission [11]** 16/16 22/8 22/15 37/4 74/13 88/17 147/14 178/8 241/24 242/4 252/19
**permitted [3]** 112/22 113/1 113/16
**persecution [4]** 91/4 92/10 92/10 92/11
**person [80]** 6/22 38/5 38/10 44/1 45/9 45/19 45/22 48/6 48/21 50/1 64/11 64/14 65/1 65/5 68/16 68/16 71/9 71/12 72/2 72/8 72/9 72/10 77/1 79/19 79/25 83/23 105/24 106/5 107/17 113/19 113/22 130/2 134/13 141/13 152/23 154/11 158/7 158/25 159/8 159/9 166/5 171/21 173/2 173/11 193/12 193/21 195/1 195/4 195/10 195/12 195/13 195/19 195/24 196/3 196/14 196/15 208/9 227/13 227/14 227/15 227/21 230/13 231/12 231/20 232/11 233/13 236/11 236/19 236/22 239/12 242/8 254/9 254/18 256/2 263/3 263/8 263/11 271/3 271/21 271/25
**person's [3]** 33/19 183/20 255/25
**personal [4]** 42/24 43/17 222/7 259/14
**personally [3]** 132/13 133/15 172/6
**persons [6]** 174/21 183/24 192/20 193/1 213/20 262/8
**perspective [3]** 11/4 166/25 215/10
**Peter [1]** 108/21
**petition [10]** 5/11 6/7 19/12 19/15

P

**petition... [6]** 23/20 26/18 55/18 75/21 97/17 101/3
**petitioner [116]** 1/6 2/3 2/7 3/8 4/15 4/17 5/6 19/8 22/13 23/10 28/16 29/1 29/2 29/18 30/12 30/13 32/7 39/9 39/14 39/14 40/17 40/21 42/15 50/23 52/8 52/23 55/17 56/3 56/6 57/12 58/9 59/14 59/15 60/4 60/9 61/6 61/7 61/14 62/1 62/14 65/12 65/15 65/24 66/3 66/7 68/20 70/4 77/2 77/18 77/19 78/3 87/15 88/5 93/17 95/4 95/8 96/4 97/4 100/17 100/23 101/1 101/20 102/4 103/4 107/10 108/15 113/20 113/21 114/1 114/3 114/7 116/10 116/20 125/22 134/22 135/5 137/12 137/16 186/4 186/8 186/22 187/24 188/1 191/15 192/1 193/22 193/25 196/9 196/21 197/1 197/11 197/25 198/3 199/5 203/11 204/6 204/9 206/11 208/3 208/12 208/23 209/11 211/17 217/7 247/9 250/12 250/16 252/17 253/14 253/23 254/4 254/15 261/22 268/8 278/4 282/19
**petitioner's [22]** 4/12 15/24 25/14 28/15 37/25 39/18 40/5 46/23 51/23 52/1 55/14 56/18 80/6 80/8 88/11 89/4 134/21 137/13 216/18 219/3 234/23 253/17
**Petitioner's Exhibit [3]** 80/6 80/8 234/23
**petitioners [1]** 30/23
**phone [19]** 69/20 109/25 119/3 129/19 135/20 158/4 171/25 223/22 226/4 247/10 247/11 248/3 248/4 248/6 249/12 250/22 250/23 251/3 251/6
**phones [2]** 157/24 180/15
**photo [3]** 223/24 226/9 236/5
**photos [5]** 83/22 226/3 232/3 232/5 232/7
**phrase [1]** 124/22
**phrases [1]** 63/8
**physical [3]** 143/8 143/11 143/24
**physically [1]** 113/1
**Pichardo [1]** 4/25
**pick [5]** 86/9 130/2 135/21 239/20 281/16
**picked [6]** 73/13 79/18 79/25 178/3 183/10 209/5
**picking [4]** 118/4 132/12 238/12 272/9
**picks [2]** 72/13 125/13
**picture [5]** 224/13 224/14 225/7 236/4 266/6
**pictures [2]** 223/22 233/5
**pin [2]** 138/17 229/21
**pinpoint [1]** 267/10
**Pioneer [1]** 278/20
**placard [1]** 149/14
**place [20]** 21/4 31/17 34/6 35/2 58/1 62/1 74/12 80/23 94/10 94/19 139/24 176/11 176/11 183/21 207/17 219/8 221/1 257/22 262/5 269/11
**placed [7]** 46/4 141/2 151/15 154/11 182/2 203/11 207/15
**plain [5]** 60/21 60/22 127/6 173/20 180/20
**plan [1]** 134/20
**planned [2]** 44/16 96/23
**planning [5]** 17/4 243/9 270/23 278/3 281/7
**plans [1]** 44/17
**plate [5]** 128/21 180/21 180/22 237/8 237/8
**plates [13]** 70/22 72/9 127/6 127/9 127/25 130/9 133/2 133/5 133/7 133/18 164/23 172/19 172/20
**play [12]** 16/6 39/20 52/22 179/6 204/3 204/17 205/11 209/4 257/12 272/4 274/3 275/1
**played [10]** 80/15 203/14 204/4 204/18 205/6 206/2 206/9 206/22 207/13 207/23
**plays [1]** 93/12
**plead [5]** 90/13 90/15 91/19 102/2 102/5
**pleading [1]** 92/23
**please [39]** 4/5 4/12 31/4 59/5 59/12 77/19 77/24 78/5 78/6 103/25 108/7 108/11 108/17 108/18 118/17 121/2 121/8 125/11 164/9 165/15 165/19 167/13 168/2 168/12 168/14 168/20 168/21 192/25 196/11 204/20 210/14 220/9 220/19 257/20 258/9 258/15 269/14 275/11 275/20
**plenty [2]** 5/12 6/24
**plural [1]** 31/20
**point [67]** 7/21 8/4 10/21 11/17 16/19 17/1 21/8 25/6 25/7 25/16 25/16 34/5 40/22 48/24 62/10 62/16 65/19 66/21 69/3 73/11 73/15 76/4 96/1 99/14 112/12 112/18 116/6 119/6 119/11 120/5 120/11 126/7 129/7 129/20 130/7 130/9 138/16 140/15 151/18 152/7 152/12 153/2 155/5 155/8 175/6 179/19 181/4 182/8 184/25 185/15 191/22 193/20 209/16 211/16 232/18 236/25 237/4 238/9 239/19 241/6 241/7 246/23 247/12 251/5 272/17 276/25 279/24
**pointed [2]** 6/1 95/17
**pointing [1]** 81/18
**police [12]** 76/24 80/3 81/16 119/24 149/10 149/11 149/12 149/13 149/15 149/16 169/10 238/23
**policies [7]** 62/14 62/17 63/3 145/1 145/2 148/10 161/6
**policy [4]** 62/4 63/3 64/16 145/3
**pool [3]** 74/16 174/10 174/11
**pools [5]** 174/3 174/4 174/5 174/14 176/25
**population [2]** 161/25 229/21
**populations [1]** 229/19
**portion [1]** 52/22
**Portland [45]** 2/6 2/10 2/14 2/19 2/22 38/6 38/16 39/8 39/22 40/7 40/8 47/2 61/8 84/9 84/10 110/7 110/12 110/14 110/15 122/5 122/19 127/17 134/11 134/16 161/20 169/23 169/24 170/2 198/17 198/22 199/3 199/6 200/22 200/24 200/25 208/11 221/17 221/23 222/3 222/10 241/7 241/10 257/3 259/19 278/22
**position [28]** 5/24 6/5 6/14 10/25 11/3 13/20 13/22 18/17 21/1 21/5 25/23 37/23 40/3 42/19 46/9 46/10 46/19 54/20 54/22 73/11 121/19 121/25 134/22 169/5 221/3 221/11 239/1 244/7
**positions [1]** 271/24
**positive [1]** 231/2
**positively [3]** 253/8 262/19 263/10
**possibilities [2]** 25/1 184/7
**possibility [3]** 222/22 227/25 262/18
**possible [8]** 47/10 93/10 122/14 132/19 147/4 188/3 253/24 254/8
**possibly [6]** 110/10 182/12 192/4 225/20 226/10 244/25
**post [3]** 50/13 53/12 55/3
**post hoc [1]** 50/13
**posting [1]** 54/16
**posts [1]** 25/19
**posture [1]** 240/5
**potential [25]** 10/12 13/16 24/14 24/23 38/11 68/24 91/17 92/19 113/17 114/20 128/1 128/2 132/24 140/24 141/17 141/18 141/20 158/4 160/16 161/25 213/16 213/17 229/14 254/5 271/3
**potentially [9]** 9/12 15/25 95/21 111/7 149/6 162/15 178/2 186/20 189/18
**power [2]** 62/21 197/12
**powerful [1]** 118/7
**powers [1]** 183/4
**practice [5]** 109/7 109/10 109/12 109/13 137/6
**pre [2]** 222/16 222/17
**pre-knowledge [1]** 222/17
**preclusion [2]** 8/11 8/11
**predetermined [1]** 171/6
**prefer [2]** 5/22 145/13
**prejudice [1]** 22/3
**preliminarily [1]** 12/4
**preliminary [2]** 11/12 28/9
**preparation [6]** 8/14 12/20 143/2 143/19 144/3 144/13
**preparations [1]** 222/7
**prepare [2]** 13/8 144/15
**prepared [25]** 7/15 11/9 11/9 12/18 12/18 13/5 13/21 13/23 15/3 17/16 25/12 27/13 35/16 36/23 62/2 64/20 77/6 79/10 99/15 106/17 107/13 110/7 112/19 255/23 270/22
**present [13]** 5/6 8/21 8/22 35/16 38/15 47/19 52/23 56/6 61/23 105/14 114/25 139/9 186/21
**presentation [4]** 7/9 44/16 120/11 138/12
**presented [5]** 9/17 16/7 17/17 44/20 63/14
**presenting [1]** 138/9
**preserve [1]** 29/17
**President [3]** 53/13 54/20 55/8
**presiding [4]** 4/8 59/8 104/3 258/4
**pressed [2]** 203/19 246/15
**pressing [1]** 106/1
**pressure [1]** 246/16
**presumably [1]** 112/8
**presume [3]** 131/25 136/17 137/6
**pretty [3]** 10/15 161/19 239/10
**prevent [2]** 34/6 167/12
**prevents [1]** 48/21

P


**preview [2]** 36/20 75/17
**previous [2]** 55/25 214/19
**previously [1]** 102/14
**primarily [1]** 109/7
**principles [1]** 64/17
**printed [1]** 233/9
**printout [2]** 223/20 223/21
**printouts [1]** 226/4
**prior [3]** 6/25 65/10 222/8
**privacy [2]** 28/22 32/16
**privilege [1]** 9/12
**privileged [1]** 283/2
**privileges [1]** 13/17
**pro [1]** 61/8
**pro bono [1]** 61/8
**probability [1]** 231/14
**probable [15]** 20/13 20/14 20/15 20/16 59/20 62/6 62/10 65/19 65/24 69/17 75/15 118/22 119/7 119/17 233/12
**probably [11]** 23/15 34/23 34/23 94/16 113/14 123/19 135/10 183/3 237/20 256/15 283/5
**problem [6]** 33/16 92/20 145/11 145/12 145/14 248/14
**proceed [21]** 22/7 22/16 22/17 22/22 26/5 27/23 28/23 29/1 29/5 30/9 61/17 106/18 211/11 217/13 219/7 219/9 220/4 254/21 255/10 258/11 275/19
**proceeded [6]** 140/11 148/22 148/22 165/14 165/20 238/5
**proceeding [8]** 10/9 24/15 25/9 30/12 31/11 48/21 91/6 120/15
**proceedings [12]** 1/15 3/3 4/3 34/14 43/5 48/14 49/3 49/11 56/20 104/10 115/21 285/11
**process [10]** 13/12 31/12 49/25 50/18 62/7 67/4 114/8 114/25 115/2 251/3
**processing [3]** 46/5 46/5 226/20
**produce [2]** 156/24 159/6
**produced [4]** 35/7 46/18 56/19 146/19
**production [6]** 34/10 35/5 46/14 46/15 46/16 135/7
**professional [3]** 39/24 43/18 188/18
**professions [1]** 146/24
**proffer [1]** 91/8
**profile [1]** 173/25
**program [1]** 163/13
**prohibit [1]** 59/24
**pronounce [1]** 99/17
**pronouncing [1]** 99/23
**proof [1]** 14/1
**proper [6]** 6/9 6/14 74/13 209/18 225/1 225/14
**properly [5]** 10/9 17/12 17/25 76/20 241/23
**proposed [1]** 51/16
**proposing [1]** 97/2
**proposition [1]** 15/14
**prospect [1]** 182/13
**protect [5]** 23/10 29/24 29/24 31/24 54/10
**protection [3]** 33/8 90/1 94/10
**protections [1]** 94/5
**protocols [2]** 138/1 138/2
**proud [3]** 187/11 187/19 187/20
**prove [3]** 20/11 187/21 190/21
**proven [1]** 20/20
**provide [25]** 38/20 40/10 49/11 61/9 91/1 91/5 110/9 111/5 113/11 138/14 141/23 161/6 189/24 190/14 190/21 191/4 191/5 201/19 219/1 229/24 265/6 266/10 266/23 267/1 276/20
**provided [12]** 14/4 18/14 41/1 44/4 52/9 90/22 112/12 112/18 115/9 128/3 134/24 217/8
**provides [1]** 62/19
**providing [2]** 33/19 120/15
**provision [1]** 64/20
**provisions [1]** 64/23
**Provo [13]** 3/10 59/16 105/8 107/11 108/6 108/7 108/13 108/20 108/20 109/3 115/17 117/17 117/21
**Provo's [2]** 107/2 107/16
**public [15]** 28/21 29/11 29/13 29/15 29/15 30/5 30/8 31/5 31/10 31/11 32/13 41/14 110/19 177/1 283/19
**publicly [2]** 31/6 49/12
**published [1]** 30/7
**pull [8]** 40/13 58/22 69/15 69/16 151/14 223/16 242/8 244/7
**pulled [6]** 149/1 153/23 170/14 170/21 170/22 229/9
**pulling [6]** 15/11 170/17 170/18 207/11 249/18 250/15
**pulls [1]** 229/10
**pun [1]** 186/18
**punch [1]** 246/14
**pure [3]** 10/10 10/11 15/15
**purely [1]** 15/21
**purple [1]** 87/4
**purported [1]** 95/22
**purpose [7]** 21/8 122/18 127/25 146/7 170/4 185/23 221/23
**purposes [9]** 7/3 26/9 29/22 57/2 118/21 131/9 141/4 179/6 184/16
**pursue [3]** 24/4 92/9 208/8
**pursued [1]** 8/8
**pursuing [1]** 204/14
**purview [1]** 222/21
**put [42]** 8/10 9/22 10/6 14/11 47/10 58/1 67/15 75/22 76/2 83/5 84/13 86/25 87/24 118/14 134/11 138/17 151/4 174/1 185/17 233/4 233/15 237/10 245/9 246/16 246/20 247/19 247/20 250/21 251/4 251/19 254/16 255/12 255/21 256/8 262/2 268/11 270/22 270/23 271/4 271/10 273/14 281/7
**puts [2]** 8/5 255/12
**putting [3]** 66/24 251/12 278/3


Q


**question [52]** 16/3 28/10 28/10 41/20 46/24 50/21 54/4 54/14 67/10 86/12 91/12 93/18 93/20 93/21 93/22 94/15 99/3 99/4 100/6 100/9 100/16 100/17 100/18 100/19 100/21 101/13 102/6 102/7 111/25 120/17 162/2 175/23 175/24 175/25 184/12 194/17 208/20 209/6 212/9 214/14 214/16 214/23 217/6 218/13 218/14 218/14 219/3 234/7 239/24 241/14 265/17 265/19
**questioned [1]** 64/11
**questioning [5]** 39/6 64/14 93/9 97/13 160/6
**questionings [1]** 95/7
**questions [57]** 10/1 16/4 37/21 45/18 57/13 88/13 92/16 92/20 94/15 95/16 95/19 96/16 97/12 97/18 101/20 101/21 103/1 105/16 115/10 117/13 124/20 138/21 138/24 139/5 139/7 139/13 160/5 162/18 164/3 165/24 166/21 189/5 200/4 211/23 214/13 217/1 218/10 219/14 251/16 252/21 252/22 254/20 256/7 267/2 269/1 271/6 271/8 273/13 273/21 276/17 277/4 278/10 278/12 278/14 279/9 280/8 283/12
**quick [3]** 58/21 119/13 271/4
**quicker [1]** 219/22
**quickly [5]** 29/14 76/23 138/22 151/12 158/7
**quiet [1]** 253/9
**quite [3]** 60/22 83/19 273/22
**quota [2]** 260/17 260/19
**quotation [1]** 119/19
**quote [2]** 119/16 119/23


R


**r-o-v [1]** 108/21
**radar [9]** 72/4 72/7 129/21 130/8 132/17 134/23 139/18 139/22 172/4
**raid [1]** 44/5
**raise [12]** 7/12 32/23 33/15 77/24 108/11 121/2 161/13 161/16 168/14 186/22 218/9 252/9
**raised [9]** 18/21 26/12 26/14 32/20 34/15 182/11 186/20 193/25 249/21
**raises [2]** 18/20 217/6
**raising [2]** 220/13 278/5
**ran [14]** 70/21 130/9 193/5 195/1 195/11 195/12 195/20 195/24 198/9 236/2 248/11 252/1 252/5 263/4
**rang [1]** 110/19
**rap [2]** 223/7 237/10
**rare [1]** 10/24
**RATCLIFFE [35]** 2/17 4/20 7/9 10/15 15/23 16/2 17/1 24/11 42/5 50/16 51/14 57/22 61/19 88/7 88/14 96/19 99/8 107/23 115/13 120/21 121/12 132/10 146/18 155/6 160/5 161/9 166/18 166/24 177/22 211/4 211/25 213/25 215/8 258/6 277/6
**Ratcliffe's [2]** 50/3 159/22
**rate [8]** 159/2 226/12 226/15 226/23 227/3 227/4 231/2 231/2
**rates [1]** 222/22
**rather [3]** 33/19 145/12 229/21
**ratio [1]** 249/2
**re [3]** 3/8 3/11 225/13
**Re-Cross [2]** 3/8 3/11
**re-entering [1]** 225/13
**reach [2]** 251/25 278/24
**reached [1]** 244/23
**reaching [6]** 244/18 244/20 244/24 245/1 247/9 247/10
**reaction [1]** 66/20
**read [14]** 14/13 58/10 63/9 64/22 85/5 85/6 94/22 119/20 142/20 165/13 165/15 165/18 165/19 264/18

**R**


**reading [2]** 42/13 166/7
**ready [11]** 22/7 23/3 61/16 79/11 104/22 167/20 237/24 243/9 243/11 244/1 271/24
**real [2]** 55/12 97/14
**realize [4]** 33/14 67/1 73/18 184/25
**realized [2]** 99/11 181/8
**really [20]** 17/21 18/13 60/4 82/10 85/4 94/20 97/16 99/2 136/24 142/18 145/8 155/2 175/12 175/16 175/18 222/13 240/5 259/3 267/10 267/11
**rear [1]** 149/24
**reason [35]** 10/1 15/13 15/23 21/6 26/16 26/23 28/18 32/20 52/10 62/23 63/2 63/8 63/18 64/25 65/4 82/4 92/25 93/25 94/1 94/2 95/6 97/1 97/16 139/7 176/19 189/13 189/15 203/15 217/1 226/20 233/11 238/20 265/4 271/21 274/10
**reasonable [42]** 8/21 17/18 25/13 31/1 62/6 62/8 64/10 65/18 66/5 67/13 67/19 69/16 69/24 70/9 70/11 70/12 70/14 72/21 73/7 75/16 91/3 91/10 92/10 97/3 118/21 119/7 137/19 138/5 142/10 160/7 160/20 176/18 177/5 183/15 202/21 208/15 242/15 243/4 243/19 243/19 247/24 267/13
**reasonableness [1]** 118/22
**reasonably [3]** 26/1 91/2 269/25
**reasoned [1]** 67/5
**reasons [8]** 26/6 27/3 28/20 31/1 56/5 187/13 189/16 282/21
**rebuttal [3]** 48/12 278/4 281/20
**recall [15]** 117/20 124/8 142/11 142/18 148/1 157/13 173/16 178/19 186/4 214/16 237/12 237/14 240/15 245/10 250/14
**recalled [1]** 48/6
**receive [4]** 198/11 202/21 273/16 273/17
**received [20]** 22/25 22/25 23/1 23/4 24/18 51/14 51/22 51/24 53/9 53/10 55/7 55/14 88/10 88/10 88/11 109/24 128/11 142/21 212/16 221/24
**receiving [1]** 277/1
**recent [1]** 31/20
**recently [3]** 34/9 222/24 224/10
**recess [5]** 59/4 103/19 103/21 168/7 258/1
**recognition [3]** 158/2 158/5 158/17
**recognize [15]** 7/16 7/19 8/20 10/10 17/12 18/1 28/17 31/9 31/10 49/20 56/7 164/11 203/7 264/21 266/2
**recognized [2]** 68/3 68/4
**recognizing [2]** 26/6 246/2
**recollection [2]** 274/8 274/24
**reconsider [2]** 5/17 44/17
**reconsideration [1]** 5/15
**record [74]** 4/13 7/19 8/9 9/20 9/22 10/2 10/16 15/12 26/7 26/8 28/20 29/13 29/15 30/20 32/5 32/10 32/13 33/2 33/4 41/3 41/14 44/7 48/2 50/12 54/14 54/17 55/5 74/23 78/6 90/24 92/5 99/7 100/6 100/7 100/10 106/4 107/20 108/19 120/7 121/9 125/16 131/1 131/11 145/6 162/24 168/22 182/23 182/25 184/24 200/2 203/3 205/13 207/9 210/14 212/5 216/2 216/3 220/8 220/20 234/17 234/18 234/18 234/19 234/24 237/13 267/22 269/11 270/12 280/23 281/11 281/24 282/12 283/10 285/10
**recorded [3]** 1/15 125/17 285/11
**recording [10]** 80/15 99/11 204/4 204/18 205/6 206/2 206/9 206/22 207/13 207/23
**recordkeeping [1]** 137/4
**records [4]** 43/18 54/21 144/6 228/23
**recounting [1]** 79/22
**red [2]** 43/9 244/3
**redacted [1]** 265/11
**redactions [1]** 33/4
**redirect [9]** 3/8 3/11 95/3 103/2 117/14 165/25 166/1 212/6 269/2
**refer [5]** 30/18 52/25 64/16 164/4 186/16
**reference [2]** 95/9 224/15
**references [1]** 32/18
**referred [5]** 18/11 32/9 76/13 234/13 234/16
**referring [9]** 18/10 30/16 41/13 63/7 90/4 170/13 196/15 280/12 280/13
**Reform [1]** 64/2
**refresh [1]** 274/1
**refusal [2]** 91/5 192/3
**refused [6]** 66/3 148/2 156/25 157/1 192/1 197/25
**refusing [3]** 76/21 156/11 156/12
**regarding [12]** 24/23 38/14 46/22 53/2 105/7 140/16 145/3 173/11 188/3 255/22 271/5 273/9
**regardless [1]** 119/16
**registered [23]** 70/23 71/3 75/7 75/9 130/10 132/18 133/7 140/16 155/19 157/11 164/25 236/16 236/19 236/23 237/3 237/8 239/4 242/20 242/22 243/7 263/5 263/8 263/11
**regular [1]** 43/19
**regulation [2]** 62/25 64/5
**regulations [3]** 62/4 189/23 190/13
**reinstate [1]** 223/24
**reiterated [1]** 112/17
**reiterating [1]** 8/3
**reject [1]** 8/3
**relate [2]** 106/12 267/5
**related [5]** 46/1 106/11 158/15 158/15 189/21
**relates [3]** 14/7 36/21 170/10
**relating [1]** 46/2
**relatively [1]** 6/20
**relayed [1]** 176/6
**release [8]** 6/10 6/11 7/24 18/2 18/4 44/15 69/2 271/24
**released [9]** 40/22 42/15 43/21 58/20 277/8 280/22 282/20 282/22 282/24
**relevance [3]** 46/6 81/11 93/24
**relevant [11]** 13/16 26/2 33/2 37/24 55/13 62/3 62/3 62/4 94/6 94/19 147/5
**relief [1]** 25/24
**relieved [1]** 216/3
**rely [4]** 14/17 14/17 118/18 231/19
**relying [1]** 62/17
**remain [14]** 4/5 47/19 66/8 68/12 68/13 103/25 104/5 104/10 182/4 190/19 208/23 209/21 210/2 210/20
**remainder [1]** 89/5
**remained [1]** 81/23
**remaining [3]** 51/25 196/1 220/3
**remains [3]** 58/19 257/22 269/11
**remedies [1]** 19/8
**remedy [4]** 6/9 10/4 10/6 23/9
**remember [34]** 30/1 74/15 102/12 112/4 116/11 124/12 128/10 128/12 128/14 128/18 129/5 129/9 130/3 130/5 130/6 135/25 136/5 136/6 148/18 155/2 163/20 164/17 173/5 173/6 173/10 197/16 204/2 212/9 237/14 237/23 242/12 261/17 278/7 282/18
**remind [1]** 224/18
**remote [1]** 48/15
**remotely [5]** 48/22 49/2 49/8 49/8 49/12
**removal [5]** 1/9 109/13 122/1 123/4 225/5
**remove [1]** 70/6
**removed [6]** 84/13 162/5 194/21 195/5 225/12 226/10
**removing [1]** 191/19
**renew [2]** 24/12 57/17
**rental [2]** 75/25 174/14
**rentals [1]** 244/5
**reopened [1]** 103/17
**repeat [4]** 111/25 175/25 208/20 277/21
**repeated [1]** 246/1
**repetitive [1]** 216/19
**rephrase [2]** 178/5 208/21
**replayed [1]** 103/11
**report [6]** 126/12 166/8 218/25 234/16 235/3 267/22
**reported [1]** 161/19
**reporter [5]** 99/14 125/15 184/25 209/3 285/22
**Reporter's [1]** 3/4
**reports [8]** 13/3 13/4 13/5 13/7 134/11 264/9 264/10 264/11
**represent [3]** 86/15 109/14 109/20
**representation [4]** 104/20 110/10 111/7 280/2
**representations [1]** 279/25
**representing [1]** 13/20
**represents [1]** 232/5
**reproduce [1]** 233/7
**request [11]** 6/3 22/8 29/21 35/5 115/5 135/7 189/25 190/15 191/3 191/22 274/23
**requested [2]** 29/5 115/7
**requests [2]** 12/24 148/16
**require [3]** 189/20 190/13 217/7
**required [5]** 32/14 33/22 102/7 215/14 217/9
**requirement [1]** 216/4
**requirements [1]** 280/23
**requires [1]** 283/5
**reseat [1]** 59/1
**reserve [2]** 12/11 77/11
**reset [1]** 27/25
**residence [1]** 176/14
**resident [2]** 225/21 230/13

R


**residential [3]** 171/10 171/16 176/14
**resist [1]** 9/10
**resistant [2]** 151/11 156/9
**resolution [1]** 23/20
**resolve [3]** 12/14 96/1 134/7
**resolved [6]** 5/13 15/15 23/21 34/2 34/4 167/15
**resources [2]** 31/24 218/11
**respect [21]** 8/6 11/24 17/7 17/8 25/14 30/15 31/3 31/16 33/1 33/11 36/17 44/22 47/11 65/12 65/15 65/21 105/4 159/8 161/13 196/20 251/7
**respectful [1]** 186/17
**respectfully [1]** 26/4
**respond [8]** 12/15 24/13 100/23 110/5 120/4 120/10 160/10 160/12
**respondents [13]** 1/10 2/11 2/16 3/11 8/6 9/9 30/6 30/17 30/22 59/18 121/6 168/18 220/17
**respondents' [6]** 37/17 53/5 53/8 53/10 54/10 220/5
**response [11]** 22/2 24/6 90/17 91/12 102/5 187/14 187/15 206/14 209/6 248/1 252/25
**responses [6]** 6/24 18/19 19/2 34/2 99/5 144/12
**responsibilities [2]** 37/23 109/17
**responsibility [3]** 9/7 77/14 104/16
**rest [11]** 48/8 80/25 119/8 186/9 188/6 210/22 215/25 238/1 238/3 251/1 262/5
**restates [1]** 19/3
**restrain [1]** 139/13
**restrict [1]** 10/17
**restricting [1]** 10/16
**restrictions [1]** 32/19
**result [5]** 93/18 97/5 148/15 153/14 238/9
**results [1]** 231/7
**retake [1]** 103/4
**retribution [2]** 30/9 30/24
**retrieve [1]** 220/7
**return [22]** 6/1 41/17 42/1 42/7 91/10 101/4 102/23 135/15 168/5 224/4 224/8 224/24 225/6 225/17 225/23 226/19 236/10 236/20 237/4 255/12 257/18 281/4
**returned [3]** 84/6 152/19 236/25
**returning [3]** 101/5 101/9 259/23
**returns [1]** 224/11
**reveals [1]** 209/13
**review [14]** 5/12 13/3 13/8 53/1 109/14 114/15 143/2 143/14 144/4 144/9 144/15 144/24 145/2 145/18
**reviewed [9]** 143/4 143/15 144/2 144/6 144/13 144/17 145/9 145/16 145/17
**revisit [2]** 271/20 283/5
**rich [1]** 164/21
**ride [3]** 75/12 75/13 79/11
**ride-share [2]** 75/12 75/13
**rides [1]** 74/11
**riding [3]** 126/24 171/19 171/20
**right [190]** 4/18 4/23 5/7 10/13 10/24 12/17 13/19 14/3 14/19 14/23 17/8 17/11 18/2 18/6 24/3 26/3 27/12 28/9 28/12 28/19 30/2 36/2 36/6 36/6 39/1 41/9 43/20 44/22 45/10 45/22 47/4 47/11 47/17 50/15 50/20 51/2 51/4 51/8 52/19 53/5 53/8 53/11 55/6 56/17 57/20 59/9 59/24 64/1 65/14 67/24 68/3 68/4 68/4 68/7 68/12 68/13 68/17 73/11 77/24 81/7 84/9 89/3 91/12 92/2 96/8 96/13 96/19 97/9 97/14 100/13 100/24 101/19 103/4 104/4 104/18 105/3 106/15 106/20 107/2 107/6 107/10 108/11 110/17 114/25 117/16 117/19 118/3 120/3 120/14 120/20 121/2 125/9 125/25 128/19 131/12 131/24 133/3 133/25 134/17 138/20 141/12 141/25 144/24 145/10 146/6 146/17 152/15 154/11 155/6 160/2 162/21 166/20 166/23 167/2 167/6 167/22 168/1 168/14 170/22 180/11 189/3 198/22 203/20 205/17 207/8 208/23 209/11 210/2 210/8 210/9 210/19 210/20 210/24 213/2 213/21 215/7 215/13 215/19 216/7 216/10 218/25 219/8 220/2 220/4 220/13 227/17 227/21 228/5 228/17 228/18 229/7 229/8 231/22 235/2 235/15 243/4 243/6 243/6 246/13 248/25 254/25 257/5 257/17 258/14 261/8 269/8 269/19 269/23 270/7 270/9 270/18 271/16 273/11 274/21 275/3 275/11 277/14 278/15 278/24 279/18 280/6 280/19 280/21 281/1 281/19 281/19 281/23 282/9 283/8 283/22
**rights [15]** 21/18 21/19 21/19 22/19 23/11 66/10 93/19 110/9 111/6 111/6 113/12 114/24 114/24 114/25 115/1
**ringing [1]** 112/25
**ringleader [3]** 188/7 188/15 194/3
**ripened [1]** 62/9
**ripens [1]** 65/18
**rise [8]** 90/8 90/12 95/20 95/24 119/17 126/19 126/19 208/15
**risk [13]** 20/17 29/10 30/1 63/10 63/15 63/24 68/24 75/18 160/5 167/11 250/3 268/12 268/13
**RMR [2]** 2/21 285/21
**RO [2]** 242/18 242/19
**road [3]** 28/1 63/6 243/25
**Robert [1]** 120/23
**role [3]** 39/20 93/12 209/4
**roll [5]** 222/25 245/23 246/5 263/19 283/13
**rolled [4]** 244/17 245/7 246/18 262/16
**rollers [1]** 159/16
**roofing [1]** 242/3
**room [18]** 2/22 37/5 86/2 86/16 99/10 113/5 113/15 113/23 114/1 114/2 114/5 114/6 116/7 116/14 117/3 117/5 278/16 285/15
**rooms [1]** 113/10
**roughly [17]** 35/21 70/21 72/11 122/3 122/7 122/10 123/8 123/17 126/10 126/22 158/1 163/7 170/8 170/23 170/24 173/16 237/18
**route [1]** 79/18
**rows [1]** 180/14
**RS [3]** 242/25 243/1 266/15
**rudimentary [1]** 163/10
**rule [7]** 11/19 15/17 23/18 55/5 119/23 138/11 194/11
**Rule 15 [1]** 23/18
**rules [3]** 7/13 32/24 54/10
**ruling [2]** 33/9 96/5
**run [22]** 19/25 72/9 127/9 133/2 137/1 149/6 154/11 157/16 158/13 164/23 167/11 172/19 172/20 173/9 193/19 195/6 196/5 196/9 223/2 225/17 236/1 267/16
**runner [3]** 76/13 154/17 252/3
**running [16]** 76/12 76/25 127/6 127/25 151/19 153/4 195/4 195/13 196/4 196/14 227/24 236/9 250/4 252/8 261/23 262/8


S


**S.W [5]** 2/5 2/9 2/13 2/18 2/22
**safe [5]** 89/24 185/19 185/19 200/22 200/25
**safety [9]** 31/22 32/16 83/15 83/16 111/21 150/6 151/7 185/11 185/15
**said [51]** 25/8 30/24 37/13 42/2 42/4 61/5 65/17 67/23 94/9 94/11 95/8 95/8 107/22 107/25 111/9 111/21 112/6 112/9 116/24 117/2 130/15 139/22 149/16 152/22 154/10 158/25 174/16 180/22 184/21 192/10 192/11 199/14 200/15 206/15 209/13 218/20 221/15 221/24 232/19 236/2 236/2 237/10 245/7 245/22 253/17 254/4 258/22 259/7 274/10 282/20 285/15
**sailed [3]** 17/13 17/13 18/1
**Salem [3]** 74/15 74/19 222/11
**salience [1]** 27/1
**same [22]** 15/20 33/9 52/7 52/8 56/15 67/8 88/8 104/21 107/4 107/12 116/18 121/23 131/24 151/24 186/25 187/1 218/10 236/5 238/21 240/23 252/3 252/8
**sanctions [1]** 50/14
**sanctity [1]** 49/15
**Sarah [1]** 14/10
**sat [3]** 151/22 251/1 251/6
**satisfied [1]** 30/4
**satisfy [1]** 160/19
**save [1]** 135/10
**saved [1]** 233/10
**saw [17]** 70/16 72/2 82/8 113/16 133/10 140/13 152/5 154/10 176/13 179/9 179/10 180/13 202/13 237/23 238/6 239/21 277/23
**say [79]** 10/21 14/14 27/12 40/25 54/8 61/1 65/23 66/7 66/12 67/2 67/2 67/3 68/4 70/10 70/17 72/14 73/14 75/12 85/10 85/23 90/3 102/17 102/19 103/12 105/17 107/8 111/20 114/7 126/18 127/20 131/20 132/3 132/23 134/12 143/15 144/3 145/8 145/20 149/12 156/12 160/8 175/14 175/23 180/16 187/9 191/14 197/14 200/23 210/15 210/17 212/18 223/5 223/8 223/10 224/3 224/24 226/15 227/14 228/19 228/22 231/11 232/14 239/1 242/6 243/1 244/13 248/19 256/4 256/5 256/13 256/14 257/15 261/16 266/15 268/8 268/18 271/11 274/9

S

**say... [1]** 279/7
**saying [19]** 11/22 17/10 17/23 49/5 68/19 68/22 71/6 150/13 186/4 186/22 186/23 206/11 209/23 210/15 210/22 212/18 247/17 254/9 268/7
**says [12]** 15/6 20/7 64/9 87/5 164/21 223/9 231/19 234/24 240/19 240/19 265/9 265/11
**scared [3]** 82/10 82/11 188/19
**scenario [1]** 74/2
**scenarios [1]** 276/19
**scene [27]** 38/17 41/1 60/21 126/5 126/20 151/23 153/16 155/22 157/6 158/23 161/14 161/17 166/5 166/9 166/11 170/16 170/22 197/2 197/25 198/6 198/8 253/14 253/19 253/23 254/3 265/24 271/18
**scheduled [2]** 41/16 217/25
**schedules [1]** 282/10
**scheduling [3]** 105/5 216/12 217/4
**scheme [5]** 21/20 21/21 22/18 22/21 59/19
**school [8]** 54/4 54/4 72/17 92/8 93/4 175/18 176/22 232/7
**scope [9]** 9/7 36/22 37/11 38/14 44/24 45/16 91/15 96/15 273/8
**scratch [2]** 264/24 280/15
**screen [6]** 32/3 86/25 87/2 159/7 164/10 204/22
**screenings [2]** 110/9 111/7
**scroll [1]** 87/13
**SDDO [2]** 266/19 266/20
**SDDOs [1]** 266/14
**SDOs [1]** 266/18
**search [2]** 119/18 233/8
**seat [26]** 69/20 76/3 76/4 76/24 103/5 149/7 152/20 185/25 193/2 193/3 193/7 193/7 193/9 193/9 247/13 247/18 247/18 247/20 247/25 250/2 251/20 251/25 252/2 252/13 263/11 268/15
**seated [10]** 4/5 59/5 78/5 103/25 104/5 104/10 108/17 121/11 168/20 220/9
**seats [4]** 11/18 18/8 69/20 156/18
**Seattle [3]** 1/8 40/8 43/15
**second [16]** 18/20 19/3 27/23 40/19 41/24 42/8 62/18 62/22 63/17 70/3 73/8 101/23 125/10 245/4 272/21 274/14
**seconds [6]** 61/13 110/22 117/2 117/6 117/11 246/8
**Section [3]** 30/23 62/18 64/6
**secure [2]** 83/15 254/19
**security [12]** 59/19 60/15 110/24 110/25 111/8 111/16 111/24 112/2 112/5 112/8 112/9 113/8
**see [56]** 19/5 21/22 21/25 28/4 43/8 48/9 75/6 80/25 85/17 87/1 95/2 100/23 112/18 113/3 138/22 140/21 142/13 143/19 144/6 147/17 150/6 151/12 154/13 164/10 172/23 173/24 175/1 176/12 177/13 179/13 180/11 185/24 191/24 196/2 202/8 205/4 208/3 211/13 219/13 219/23 239/20 239/23 240/3 240/4 240/24 241/4 241/25 242/4 243/12 245/1 247/4 248/23 275/15 279/9 279/11 283/23
**seeing [3]** 154/19 172/21 180/13
**seek [2]** 22/15 29/7
**seeking [4]** 23/20 29/22 66/9 185/11
**seemed [5]** 72/20 153/24 176/14 176/24 177/3
**seems [9]** 16/8 24/19 28/4 68/3 68/6 138/4 175/15 235/9 273/4
**seen [11]** 11/6 67/24 144/21 165/9 173/8 174/20 174/24 177/14 179/5 183/9 202/20
**seizure [1]** 19/16
**self [2]** 198/20 199/2
**self-transport [1]** 199/2
**self-transported [1]** 198/20
**seminal [1]** 64/18
**send [1]** 273/20
**sense [6]** 47/25 96/24 97/7 126/7 126/20 256/22
**sent [5]** 127/21 270/3 270/16 278/16 278/16
**sentence [3]** 119/22 165/16 165/17
**sentences [2]** 40/21 165/17
**separated [2]** 21/23 22/1
**separately [1]** 20/17
**separateness [1]** 49/15
**separating [2]** 16/13 26/20
**separation [1]** 11/19
**sequence [3]** 26/20 70/8 133/2
**sequential [1]** 73/24
**sequestering [1]** 16/13
**series [1]** 137/12
**servants [1]** 184/5
**served [1]** 216/16
**service [7]** 75/12 75/13 94/4 94/11 182/14 182/20 182/20
**services [6]** 109/15 217/8 217/9 217/12 218/16 219/2
**session [6]** 4/7 59/7 103/23 104/2 168/9 258/3
**set [23]** 4/9 6/20 17/24 28/8 29/6 30/2 47/13 47/15 58/11 58/11 59/16 59/18 59/19 65/20 126/5 136/25 136/25 148/8 236/6 238/2 242/6 244/2 260/1
**setting [2]** 12/21 15/20
**setup [1]** 74/16
**seven [4]** 169/8 200/11 249/7 249/7
**several [11]** 26/14 69/9 72/12 126/22 148/1 151/9 164/24 180/13 191/21 223/25 267/17
**severely [1]** 246/17
**shall [4]** 62/20 62/20 64/24 65/3
**share [6]** 74/11 75/12 75/13 167/14 216/4 217/4
**shared [1]** 13/5
**sharing [1]** 101/25
**shattered [1]** 60/16
**she [114]** 14/11 14/20 19/10 19/13 20/16 20/17 20/23 21/1 29/7 29/20 30/1 30/4 40/18 40/22 54/7 56/13 56/21 56/23 57/1 57/2 60/10 61/11 61/14 61/15 65/16 66/11 66/14 66/17 67/6 67/6 67/7 67/8 68/24 69/3 69/6 90/22 90/25 91/1 93/18 93/18 93/20 93/21 94/7 94/7 94/9 94/9 94/11 94/13 94/14 95/8 96/10 96/13 96/15 97/4 97/6 97/13 105/24 107/3 114/5 114/20 115/2 137/13 159/25 165/21 188/15 192/10 192/11 192/14 194/3 197/4 197/5 199/10 199/20 199/21 206/11 206/11 206/15 206/20 207/2 207/19 207/25 209/10 209/13 209/23 209/25 210/6 210/7 210/15 210/20 210/22 250/12 250/20 250/20 250/21 250/22 250/22 250/23 250/24 251/5 251/6 252/18 252/18 252/20 254/17 254/19 261/24 262/1 262/4 262/7 268/13 268/17 268/21 282/21 282/23
**she'll [2]** 56/20 164/3
**she's [14]** 19/9 19/9 22/14 30/1 56/15 57/8 93/20 96/12 105/14 186/25 207/22 254/16 254/16 271/2
**shed [1]** 216/21
**sheet [2]** 223/8 237/10
**shenanigans [1]** 76/22
**shine [1]** 140/21
**ship [3]** 17/13 17/13 18/1
**short [6]** 16/18 100/2 107/12 116/9 255/20 256/4
**shot [1]** 138/22
**shots [1]** 188/13
**should [15]** 7/2 7/20 7/21 9/17 15/7 15/17 17/12 48/14 54/5 62/11 70/6 107/7 118/13 256/10 256/11
**shouldn't [1]** 75/12
**show [42]** 22/13 28/17 58/12 59/17 59/22 60/1 60/6 60/8 60/13 60/19 60/24 61/5 61/7 61/11 61/13 61/15 61/24 62/2 65/12 69/9 76/18 80/5 80/20 80/21 81/2 92/9 119/1 150/12 150/15 150/15 151/10 161/21 161/25 185/20 187/8 187/17 187/22 188/7 189/10 214/3 263/18 265/16
**showed [5]** 144/21 170/21 237/5 244/24 253/21
**showing [9]** 87/1 91/7 91/9 156/14 156/15 186/2 191/11 225/11 234/22
**shown [2]** 214/2 214/14
**shows [2]** 74/7 80/22
**shuttle [1]** 174/24
**sic [1]** 186/1
**side [20]** 11/5 11/16 11/16 13/6 30/19 60/15 113/24 113/25 114/7 140/12 149/20 150/23 179/23 179/24 203/20 205/18 205/20 244/9 244/14 247/3
**sidebar [1]** 87/15
**sides [1]** 28/14
**sidewalk [4]** 251/1 261/24 262/6 262/7
**sideways [1]** 76/6
**sight [1]** 133/14
**sign [2]** 85/2 85/10
**signature [4]** 285/16 285/16 285/17 285/22
**signed [7]** 56/19 85/8 87/12 112/17 112/19 267/5 285/17
**significance [2]** 120/15 174/17
**significant [3]** 173/22 184/2 240/16
**signing [1]** 285/9
**signs [1]** 188/7
**silence [1]** 209/11
**silent [7]** 66/8 68/12 68/14 208/23 209/21 210/2 210/21
**silhouettes [1]** 241/4
**silver [1]** 283/17

**S**


**similar [1]** 14/6
**simple [4]** 59/17 124/1 142/1 142/1
**simply [5]** 8/3 13/9 94/22 237/13 276/21
**simultaneous [1]** 285/14
**since [16]** 14/14 14/19 16/1 23/7 62/5 84/3 136/17 139/10 155/14 205/8 209/3 233/14 252/11 270/12 275/8 281/16
**singular [1]** 174/8
**sir [35]** 132/4 149/17 160/23 167/17 175/24 177/2 190/1 195/7 215/18 215/19 220/25 221/16 221/19 230/2 232/3 232/18 234/11 236/21 237/25 243/21 244/15 247/21 248/15 253/15 257/14 257/19 257/24 263/6 266/21 269/13 275/10 275/13 275/17 275/18 277/10
**sirens [2]** 244/4 244/6
**sit [2]** 5/22 135/11
**site [4]** 39/21 208/4 208/5 238/21
**sitting [9]** 81/6 154/14 154/20 154/25 195/5 208/7 262/5 262/7 275/7
**situation [7]** 73/21 76/19 175/11 187/1 188/7 202/20 216/22
**six [4]** 13/24 221/12 221/13 271/4
**skip [1]** 206/8
**skipped [1]** 150/14
**skipping [1]** 240/7
**slice [1]** 193/20
**sliding [1]** 247/3
**slowly [1]** 6/3
**small [2]** 84/14 232/9
**smaller [1]** 84/1
**smoothly [1]** 26/25
**smuggled [6]** 183/2 183/2 183/6 183/7 183/16 183/25
**smuggling [8]** 181/16 182/24 183/1 183/5 238/13 243/14 249/23 267/19
**snapshot [1]** 181/7
**sneak [1]** 274/17
**so [460]**
**so-called [1]** 118/19
**social [5]** 25/19 53/12 54/17 55/2 55/2
**solve [1]** 219/6
**some [123]** 5/13 6/10 6/15 9/24 10/21 12/6 12/21 14/5 16/6 22/16 22/25 23/1 23/13 24/18 27/15 27/24 32/4 32/20 32/20 34/8 35/3 43/9 44/2 48/12 49/6 52/10 56/25 62/10 69/11 71/11 72/10 72/10 72/14 75/10 76/4 80/2 93/4 93/9 94/10 94/22 94/22 95/19 105/15 105/15 106/11 119/6 120/6 123/16 124/12 124/25 129/7 129/20 129/21 130/16 130/17 130/17 130/17 130/18 130/20 130/25 131/4 131/11 133/9 137/7 138/1 138/16 140/23 141/19 143/4 144/21 145/1 148/10 148/11 151/18 152/3 160/18 161/7 162/7 163/8 176/19 177/5 180/14 181/9 187/13 189/1 190/9 190/18 197/17 197/17 198/21 209/16 216/15 216/18 217/4 219/3 219/18 222/16 225/19 230/15 230/21 231/24 232/18 233/13 235/10 235/10 235/25 236/25 237/4 240/19 247/12 247/18 249/16 251/5 255/14 255/22 256/15 271/22 271/22 273/21 274/1 276/20 277/20 281/10
**somebody [31]** 43/8 49/17 50/6 67/12 67/15 68/5 69/18 71/5 76/9 90/19 130/9 130/10 132/5 135/22 148/7 157/17 157/18 157/19 160/9 173/8 182/17 188/13 191/4 194/3 195/11 211/1 238/24 239/7 248/3 253/16 268/3
**somebody's [2]** 50/6 188/5
**somehow [4]** 14/24 34/19 91/10 134/20
**someone [46]** 44/15 49/24 53/19 66/6 68/14 70/23 70/25 71/6 71/7 72/3 72/7 75/9 76/20 76/21 91/19 110/20 124/4 124/5 131/15 131/21 141/6 142/9 151/19 158/4 158/10 158/11 158/24 172/17 172/19 172/23 173/1 173/1 173/7 182/7 183/2 187/3 187/6 188/10 224/7 224/25 225/10 232/16 239/10 247/17 252/8 271/12
**someone's [2]** 276/14 276/15
**something [50]** 6/11 7/2 11/8 12/19 18/25 34/19 49/12 52/25 56/7 56/23 57/22 63/10 66/17 85/2 91/2 96/2 101/8 104/18 107/22 123/5 130/15 136/23 137/5 137/23 137/23 144/15 145/9 159/19 172/15 173/24 174/16 177/5 180/1 189/21 192/22 194/19 209/21 210/3 212/15 225/21 226/7 228/23 230/14 234/7 234/12 256/13 267/25 273/17 279/7 279/23
**sometimes [8]** 73/24 120/1 184/2 188/19 223/10 230/12 261/11 283/11
**somewhat [2]** 113/7 209/4
**somewhere [5]** 28/1 141/7 171/9 278/7 278/17
**son's [1]** 259/15
**soon [1]** 179/9
**sooner [1]** 85/9
**sorry [49]** 6/2 10/23 15/10 25/6 39/14 42/3 42/4 44/15 46/16 52/12 55/22 55/24 75/15 80/21 87/6 90/25 91/6 93/15 98/1 98/7 98/7 98/11 107/7 129/7 129/12 132/3 134/14 155/25 156/6 171/14 194/12 197/4 198/21 198/24 224/1 224/4 224/23 225/24 238/18 238/19 242/20 243/3 253/3 264/18 264/19 264/24 266/16 270/4 271/7
**sort [38]** 6/11 6/15 11/3 25/11 32/4 32/13 57/14 67/8 71/11 72/10 72/10 73/24 75/10 124/10 124/25 125/6 129/17 130/16 130/20 130/25 131/11 136/2 136/23 137/22 139/22 141/19 160/18 172/3 190/19 193/20 197/18 210/25 229/13 231/2 239/24 240/1 241/21 273/24
**sound [10]** 5/25 6/6 17/25 18/24 18/25 21/23 73/19 80/10 203/18 203/18
**sounds [3]** 10/15 21/24 135/16
**source [2]** 119/14 119/15
**sources [1]** 229/10
**space [1]** 172/12
**Spanish [39]** 5/4 78/22 98/4 100/16 100/21 100/22 150/11 150/18 151/1 163/8 163/13 169/15 169/17 169/20 180/18 181/2 181/5 181/6 181/9 184/21 185/1 185/2 185/3 186/8 191/21 192/10 192/12 199/16 200/13 205/9 206/4 209/23 210/23 214/15 245/24 247/8 249/15 249/16 249/20
**speak [43]** 6/3 13/2 14/7 15/3 34/9 41/20 48/17 58/13 61/12 67/13 68/21 71/21 85/4 86/4 96/2 96/9 96/14 98/13 105/13 110/20 111/4 111/13 112/4 112/7 112/10 112/14 113/20 114/19 117/4 133/17 135/7 137/22 159/4 160/24 161/5 163/8 165/3 168/21 169/14 169/19 206/7 208/1 220/10
**speaker [2]** 129/19 200/13
**speakerphone [4]** 73/10 119/3 172/1 235/25
**speaking [28]** 16/2 29/13 58/18 83/8 86/13 98/4 100/8 101/3 114/24 125/12 150/25 169/20 181/5 181/6 181/9 185/3 186/25 188/5 205/8 206/4 206/24 210/23 230/17 230/19 249/14 249/15 249/20 285/14
**speaks [4]** 150/17 160/9 209/22 267/23
**special [2]** 221/13 221/13
**specific [10]** 26/20 64/10 70/2 138/2 149/13 150/17 151/8 193/8 202/16 202/21
**specifically [4]** 31/3 92/21 170/10 241/16
**spectators [1]** 11/18
**spectrum [2]** 11/1 158/10
**Speculation [3]** 184/10 194/8 214/25
**spell [1]** 108/18
**spelling [1]** 33/20
**spend [1]** 106/21
**spent [1]** 221/12
**spoke [7]** 34/9 41/15 71/23 85/14 86/8 113/21 113/22
**spoken [1]** 115/8
**spotted [1]** 237/18
**spread [1]** 180/14
**Square [1]** 278/21
**squarely [2]** 9/23 56/11
**squeeze [2]** 255/23 281/13
**staff [2]** 201/15 201/16
**stage [6]** 7/5 26/21 34/13 106/10 138/6 272/1
**staged [1]** 222/14
**stages [1]** 69/19
**staging [1]** 230/24
**stand [10]** 57/8 77/20 96/11 108/8 108/9 120/25 120/25 168/12 275/9 275/12
**standard [5]** 30/2 30/4 55/20 55/23 63/4
**standing [3]** 150/22 182/1 214/22
**stands [2]** 13/19 223/11
**standstill [1]** 140/10
**stare [1]** 199/14
**start [17]** 36/9 77/15 79/8 123/17 125/6 125/9 125/22 125/25 126/1 222/10 223/3 223/3 225/25 227/24 247/24 251/12 256/17
**started [13]** 58/5 75/19 76/6 126/14 127/25 171/2 222/9 244/17 247/15 250/14 251/21 252/2 268/16

**S**

**starting [6]** 103/9 109/23 122/11 122/11 165/13 241/14
**starts [2]** 11/19 165/13
**stash [4]** 183/11 183/11 188/11 243/13
**state [17]** 4/12 5/1 12/2 67/7 74/18 78/6 89/14 99/7 100/6 108/18 109/3 121/8 168/21 217/14 220/19 257/5 264/5
**stated [13]** 22/10 28/20 51/21 88/1 88/6 101/4 101/5 186/8 200/10 202/23 206/4 208/8 208/14
**statement [12]** 53/19 54/2 54/21 55/4 56/9 58/11 59/10 59/13 61/21 77/13 142/1 268/3
**statements [8]** 23/7 30/8 30/23 36/10 36/13 55/2 55/3 58/25
**states [62]** 1/1 1/17 2/21 4/6 18/11 20/16 29/7 59/6 61/3 62/18 62/20 62/23 62/24 63/19 64/12 64/13 65/2 65/2 65/25 71/5 71/14 71/18 74/1 76/20 102/15 102/22 104/1 119/11 124/5 131/15 131/17 131/21 155/13 160/17 169/4 178/7 181/23 182/4 182/18 183/3 183/8 183/25 184/1 186/21 187/5 190/13 190/19 192/6 193/24 225/2 225/14 225/15 228/15 236/24 237/2 238/16 249/24 252/19 257/11 258/2 262/21 276/16
**stating [1]** 33/13
**station [2]** 174/8 174/13
**stationed [2]** 201/7 259/19
**stations [1]** 174/6
**status [47]** 71/9 71/13 71/19 73/25 74/3 114/20 114/22 141/3 147/14 155/12 156/2 160/17 160/18 178/7 178/17 182/4 182/7 182/18 187/4 187/5 187/7 187/7 187/8 187/10 187/11 187/17 187/19 187/22 187/23 188/3 188/25 189/3 189/9 190/6 190/7 190/19 192/5 193/14 193/23 196/21 225/1 241/1 241/17 241/22 242/1 242/16 262/22
**statuses [1]** 190/12
**statute [7]** 19/11 19/19 20/20 59/23 62/3 63/6 63/23
**statutes [4]** 26/2 63/7 189/24 190/13
**statutory [5]** 21/19 21/19 21/25 22/19 115/1
**stay [8]** 37/6 117/22 167/7 215/15 253/9 254/22 256/9 280/10
**stayed [1]** 60/20
**staying [2]** 122/8 250/22
**stenographic [1]** 285/11
**step [5]** 7/14 58/18 137/11 257/19 279/3
**STEPHEN [2]** 2/8 4/14
**stepped [2]** 155/4 275/9
**steps [4]** 80/11 115/3 137/12 281/24
**STEVEN [1]** 2/17
**stick [1]** 211/2
**sticker [1]** 87/5
**still [33]** 31/5 74/2 96/10 111/22 149/6 175/12 175/13 180/2 182/1 185/5 198/8 223/9 225/7 225/23 230/8 231/16 231/17 231/21 236/7 247/9 250/6 250/13 251/14 252/4 253/7 254/3 261/24 261/25 275/17 278/16 278/22 281/1 283/20
**stipulate [3]** 56/3 105/11 106/25
**stipulated [2]** 50/24 53/5
**stipulation [1]** 106/18
**stop [55]** 53/3 62/12 64/19 66/5 66/22 69/10 70/9 72/22 73/8 73/12 75/20 119/18 125/15 132/24 135/21 139/19 139/23 140/2 140/6 140/7 140/9 147/24 149/2 157/6 157/15 170/10 170/12 172/21 175/8 176/12 176/13 176/23 176/24 178/19 178/21 179/3 189/17 196/8 201/6 203/14 213/9 223/25 238/4 239/20 239/21 240/25 243/23 243/24 244/5 245/4 247/16 247/19 248/6 253/6 273/9
**stopped [13]** 20/12 35/2 35/16 35/18 69/22 72/25 73/1 140/12 155/20 173/13 175/3 244/11 263/9
**stopping [3]** 70/13 243/9 267/14
**stops [11]** 135/19 145/3 172/18 173/7 173/16 174/9 179/17 181/22 238/6 243/11 243/16
**stories [2]** 25/19 126/23
**story [2]** 17/19 177/21
**straight [1]** 246/16
**stranger [2]** 11/6 67/24
**streamline [1]** 113/11
**street [4]** 76/15 122/20 122/23 152/7
**strict [1]** 12/23
**strike [2]** 167/11 254/12
**string [4]** 145/19 145/20 145/22 146/7
**strong [1]** 94/4
**stronger [2]** 62/9 62/9
**strongly [1]** 74/22
**struggle [1]** 252/1
**stuck [1]** 108/1
**stuff [3]** 242/5 259/22 259/24
**subject [10]** 31/21 40/11 57/9 67/7 91/2 151/25 165/14 165/20 165/21 198/8
**subjected [1]** 256/10
**subjects [7]** 125/2 182/11 184/2 185/16 197/13 198/18 198/19
**submit [1]** 52/4
**submitted [4]** 17/15 40/20 105/12 115/25
**Subsection [4]** 62/22 64/7 64/9 64/22
**subsequent [1]** 283/16
**substance [5]** 19/6 40/20 41/6 56/16 95/18
**substantive [1]** 17/7
**success [1]** 231/2
**such [11]** 7/1 48/22 57/12 61/11 62/24 63/15 71/14 225/18 227/25 231/14 270/12
**sudden [1]** 80/2
**suddenly [1]** 60/14
**suffer [1]** 68/2
**suggest [3]** 136/22 138/7 148/10
**suggested [3]** 24/13 25/11 147/18
**suggesting [3]** 13/10 66/16 137/20
**suggests [1]** 137/23
**Suite [4]** 2/5 2/9 2/14 2/18
**superior [1]** 120/2
**supervise [1]** 109/20
**supervising [1]** 44/4
**supervisor [14]** 39/15 39/19 44/2 171/6 266/16 266/24 267/3 267/5 268/1 271/15 271/22 272/2 276/4 276/13
**supervisors [3]** 40/1 266/17 276/20
**supervisory [3]** 38/3 38/18 271/23
**supplement [7]** 23/17 23/17 24/1 24/4 24/24 41/25 42/1
**supplementing [1]** 22/16
**support [4]** 6/12 46/10 55/18 247/2
**supporting [1]** 65/21
**supports [1]** 42/6
**suppose [5]** 10/4 10/6 16/2 159/22 218/14
**supposed [6]** 16/13 190/17 213/10 249/24 259/12 259/22
**Supposedly [1]** 260/6
**suppress [1]** 138/8
**suppression [1]** 6/11
**Supreme [2]** 64/18 74/17
**sure [63]** 11/18 12/13 12/22 13/14 25/15 30/20 31/18 46/24 47/5 47/13 48/19 53/21 56/5 67/16 70/7 75/8 93/11 94/20 96/16 97/12 97/20 97/23 98/5 98/23 99/22 100/5 104/21 104/22 106/4 118/4 125/12 125/16 131/20 133/1 135/12 136/14 137/5 144/12 145/8 160/7 162/22 176/17 179/18 179/20 182/22 209/3 209/4 209/20 216/20 217/16 225/25 227/13 237/16 237/22 256/19 259/2 262/14 271/8 272/2 272/9 275/4 278/20 282/10
**surprised [2]** 120/19 273/12
**surrounded [2]** 60/14 81/17
**surrounding [1]** 110/2
**suspect [10]** 9/10 35/9 35/13 74/22 93/2 106/14 120/1 238/8 248/18 268/2
**suspected [3]** 124/2 124/4 130/3
**suspicion [29]** 62/6 62/8 64/10 65/18 69/17 69/24 70/9 70/12 70/15 72/21 73/8 75/16 118/21 119/7 137/20 138/5 142/10 160/7 160/20 176/18 177/5 178/18 182/11 186/20 202/21 208/15 242/15 243/4 243/20
**suspicions [7]** 154/5 186/15 186/23 192/4 202/17 249/21 267/13
**suspicious [9]** 154/7 175/10 176/10 194/3 202/8 202/10 202/11 240/22 243/13
**sustained [2]** 57/11 153/12
**swear [5]** 77/20 108/10 121/1 168/13 220/14
**swearing [1]** 33/11
**sweep [1]** 110/2
**switch [1]** 89/8
**sworn [6]** 33/13 78/3 108/15 121/6 168/18 220/17
**synchronize [1]** 39/2
**synopsis [1]** 267/11
**system [13]** 31/13 41/3 48/16 131/11 158/12 159/9 159/15 159/17 222/20 228/14 231/19 237/5 254/5
**systems [4]** 43/19 159/12 159/18 223/3

**T**

**table [3]** 178/12 264/16 271/10

**T**


**Tacoma [2]** 86/1 282/22
**tactic [3]** 76/9 253/5 253/9
**tactical [3]** 149/10 246/21 246/21
**tactics [1]** 248/7
**tag [4]** 88/21 89/9 173/9 236/1
**tainted [1]** 50/12
**take [62]** 6/17 12/5 14/5 14/15 19/1 21/11 28/6 31/8 31/18 32/23 35/22 43/24 44/10 47/14 51/4 51/6 52/3 57/13 58/23 58/24 65/17 67/13 73/2 76/12 77/14 83/9 84/5 84/8 84/10 86/10 93/10 96/21 99/1 103/10 104/16 107/16 120/5 120/25 135/17 138/22 151/19 162/20 168/4 168/4 189/20 198/16 198/21 207/1 224/14 226/18 238/24 242/11 254/25 255/3 255/11 255/14 256/11 257/17 257/17 270/9 278/15 282/1
**takeaway [2]** 236/6 237/25
**taken [21]** 11/17 54/19 59/4 70/4 73/20 75/22 76/11 103/21 113/13 155/3 155/22 159/15 168/7 183/11 183/11 183/20 193/19 198/12 225/8 258/1 285/10
**takes [2]** 49/6 271/3
**taking [18]** 13/20 13/22 24/16 24/16 34/6 54/22 67/15 84/4 85/11 105/23 139/23 141/7 153/4 176/25 191/18 218/3 270/12 283/23
**talk [32]** 33/17 66/8 66/12 66/18 67/3 89/4 104/23 125/5 140/5 169/24 170/11 175/6 178/19 184/18 186/24 188/2 189/2 189/7 192/11 192/12 197/8 210/3 215/24 235/19 240/13 243/24 249/15 270/13 277/19 281/24 282/1 282/11
**talked [3]** 190/17 235/8 271/12
**talking [34]** 17/6 17/21 24/3 31/15 33/15 45/9 50/7 63/23 66/10 83/9 84/23 86/3 93/8 124/22 125/9 125/14 126/2 126/19 134/13 135/1 136/17 154/25 161/11 162/10 187/25 213/3 230/11 232/7 232/15 235/7 243/6 244/13 249/17 282/10
**tap [2]** 97/21 272/10
**target [79]** 35/19 72/5 123/24 123/25 124/9 128/1 128/3 128/7 128/7 128/11 128/12 128/18 130/3 134/2 135/23 135/25 136/3 136/10 136/16 136/21 137/8 137/8 137/16 137/17 137/19 141/13 141/18 141/18 142/5 142/8 142/9 142/12 142/14 142/21 142/22 142/25 163/15 163/17 163/20 163/21 164/21 164/24 201/4 212/9 212/12 212/15 212/22 212/24 213/22 213/22 213/22 222/10 223/19 226/18 226/25 227/15 231/9 253/7 260/1 260/5 262/13 262/24 263/15 263/16 264/6 273/2 273/9 273/16 273/22 273/25 274/25 275/24 276/7 276/9 276/11 276/20 276/22 276/24 277/1
**target's [2]** 128/8 226/9
**targeting [6]** 35/3 222/2 226/2 226/6 273/6 273/14
**targets [22]** 72/8 125/2 127/21 131/9 204/14 205/24 213/16 213/18 213/18 222/10 222/17 223/14 223/17 226/22 228/7 230/12 231/25 232/20 235/8 235/18 262/15 277/2
**task [1]** 14/15
**team [54]** 7/12 10/21 13/1 13/25 39/15 39/16 39/20 44/4 88/22 89/9 110/3 110/4 110/5 110/5 119/8 123/5 123/8 124/9 129/22 130/9 133/16 146/13 146/15 146/16 154/3 157/19 161/12 171/24 172/4 172/16 172/17 175/14 178/20 199/2 212/23 213/3 223/14 226/21 226/21 230/8 230/11 232/2 235/25 238/2 238/3 239/20 243/9 243/11 260/8 260/9 263/16 265/10 265/20 276/23
**team's [3]** 39/21 125/23 139/18
**teammates [1]** 176/13
**teams [1]** 198/25
**tech [1]** 203/5
**technical [3]** 135/8 137/22 158/18
**technology [3]** 47/15 47/15 158/6
**telephone [2]** 6/22 129/18
**telephonic [2]** 218/15 218/21
**tell [74]** 13/23 14/24 17/19 37/5 37/22 66/13 73/14 74/21 78/15 79/3 79/8 81/9 106/9 109/3 110/25 116/9 116/15 116/21 121/15 122/18 123/25 124/23 129/24 145/9 147/24 151/21 153/5 155/25 156/1 157/22 158/10 164/15 169/3 172/10 173/1 174/2 179/8 181/17 182/7 183/18 185/1 185/1 188/22 189/10 190/10 191/20 192/25 193/16 199/8 205/1 205/19 206/19 222/6 222/18 223/19 224/5 224/7 228/13 232/6 235/17 240/5 240/18 241/20 243/2 243/23 245/22 246/11 252/8 258/24 261/22 262/9 262/16 264/7 277/12
**telling [10]** 66/7 68/5 86/19 185/20 188/1 193/5 245/23 250/21 250/24 252/21
**tells [1]** 227/18
**temporary [1]** 170/5
**ten [16]** 58/24 61/13 89/2 102/19 113/14 116/20 117/1 117/4 139/20 168/4 170/9 180/7 213/5 255/1 255/11 257/18
**ten-minute [1]** 58/24
**tend [1]** 10/14
**term [25]** 30/17 30/18 67/2 68/25 72/5 75/21 94/17 124/22 124/24 130/14 131/14 131/14 136/21 136/23 136/24 154/6 185/1 185/2 186/17 186/17 190/4 229/1 235/9 235/9 237/22
**terms [43]** 13/11 15/6 17/22 33/5 41/6 63/24 64/3 92/19 93/3 123/22 126/20 130/5 130/6 130/13 140/20 146/23 154/5 155/12 158/9 172/15 174/16 175/20 176/3 176/17 178/13 180/11 181/11 185/11 186/1 187/1 189/16 192/4 192/23 193/22 196/21 198/6 222/6 223/25 233/8 235/2 237/9 247/5 254/6
**territory [1]** 201/24
**Terry [6]** 63/4 64/16 64/18 64/19 66/5 75/21
**tested [1]** 137/2
**testified [20]** 42/20 50/1 78/4 92/12 94/7 108/16 121/7 168/19 209/22 211/2 214/7 215/17 220/18 242/13 257/21 263/2 269/11 273/15 274/4 275/1
**testifies [1]** 48/5
**testify [24]** 11/10 12/19 12/21 13/21 32/3 32/3 35/23 37/1 43/13 47/5 47/18 47/18 47/20 50/10 56/13 56/14 56/15 57/1 57/13 167/10 209/10 257/21 269/11 279/24
**testifying [8]** 33/2 49/25 56/21 56/24 58/20 80/9 107/3 167/12
**testimony [80]** 10/8 35/25 37/14 43/25 44/6 46/7 47/24 49/2 49/3 49/10 49/16 49/23 50/7 50/9 50/10 53/2 56/4 56/6 57/15 58/12 58/13 58/25 60/7 60/13 77/15 89/4 94/12 96/24 105/14 105/23 106/5 106/22 107/3 107/14 107/16 130/6 135/13 136/13 136/13 138/23 143/3 143/19 144/3 144/14 144/16 157/4 159/22 167/9 167/12 167/14 202/17 208/18 210/5 213/2 215/14 215/17 216/4 216/19 216/21 245/8 257/20 261/3 269/10 270/20 270/21 270/25 271/5 272/2 272/8 272/16 273/15 273/19 274/8 274/23 274/24 275/8 276/7 277/15 277/22 283/24
**text [8]** 145/18 145/20 145/21 146/7 164/11 164/13 164/18 265/9
**than [36]** 10/2 10/20 33/19 61/25 71/17 72/22 77/12 91/23 98/24 102/17 102/19 107/19 117/11 135/8 137/23 139/20 141/17 153/15 154/23 174/10 189/13 191/14 216/14 216/20 216/25 217/25 219/20 226/5 229/21 234/22 239/3 239/7 256/6 259/20 276/21 278/14
**thank [85]** 4/13 5/5 5/9 6/3 12/16 18/7 18/16 26/3 33/23 33/25 48/23 50/2 57/16 57/19 58/16 59/2 59/3 59/11 61/18 61/20 77/4 77/17 78/8 78/10 99/13 100/12 101/15 101/17 101/25 103/17 103/18 108/22 115/12 117/16 117/23 117/25 118/11 120/20 122/14 125/20 131/19 138/19 146/20 164/7 165/23 167/17 167/18 167/21 168/1 168/5 168/6 200/5 200/7 201/1 201/2 201/12 211/9 211/10 212/4 215/5 215/7 215/19 215/20 216/7 231/22 257/24 257/25 258/5 258/8 258/12 264/16 268/25 269/17 269/22 273/1 277/8 278/9 280/17 280/18 282/5 283/10 283/22 283/25 284/1 284/2
**Thanksgiving [1]** 23/1
**that [1615]**
**that's [112]** 5/8 13/10 15/17 17/16 18/25 20/21 21/12 21/12 23/22 25/18 32/1 34/19 35/4 36/5 37/11 37/16 37/19 41/25 42/12 42/22 49/12 51/3 51/18 51/20 52/7 52/8 53/7 53/14 57/10 65/14 65/20 66/9 66/19 67/10 67/24 69/22 69/22 70/18 70/18 75/18 76/25 77/2 88/21 92/15 93/9 93/19 94/8 94/17 99/24 100/7 101/14 101/14 102/21 106/25 107/13 112/22 116/2 119/12 125/14 133/20 135/16 135/16

T


**that's... [50]** 136/23 145/7 147/7 156/7 159/19 161/15 192/12 202/15 218/14 222/11 222/15 223/23 224/14 224/15 226/25 228/14 228/14 230/5 230/21 232/18 233/6 235/24 236/4 236/8 240/10 243/8 243/10 243/13 244/8 244/19 244/24 245/6 246/18 250/2 250/15 252/3 252/13 253/9 255/17 255/21 258/10 258/14 262/20 270/13 272/13 272/13 273/7 273/10 274/20 279/18

**their [98]** 16/21 20/24 23/6 31/16 31/17 31/22 31/25 32/5 32/5 32/10 32/21 33/13 35/1 37/8 37/23 37/23 41/16 43/24 45/25 46/21 47/24 48/7 49/16 49/16 49/23 50/10 60/21 63/22 67/12 68/17 71/19 71/19 72/4 72/5 72/7 73/23 74/9 82/15 82/23 83/1 141/2 150/6 150/12 150/16 151/10 155/12 156/14 156/16 156/18 170/6 175/1 177/1 183/12 183/21 185/21 186/2 186/7 187/4 187/10 187/10 187/17 188/24 188/24 188/24 189/10 189/11 189/15 190/18 190/21 191/5 191/11 193/14 196/21 197/12 204/21 218/11 218/11 222/25 223/1 223/1 223/24 225/7 225/8 225/17 228/24 232/17 236/20 236/25 239/2 239/16 240/12 247/11 253/16 266/6 266/6 270/20 274/7 274/7

**them [107]** 16/20 27/17 28/3 37/21 44/10 44/11 44/25 48/7 48/21 56/6 58/22 61/5 61/16 64/6 66/8 66/12 66/17 67/3 67/14 67/15 69/11 70/8 72/15 73/7 74/3 74/7 75/15 82/10 84/4 85/5 85/21 86/15 133/17 141/20 143/18 143/20 150/12 150/15 150/15 151/14 151/15 152/25 153/10 153/21 153/23 156/24 156/25 162/14 183/5 183/6 185/5 185/8 185/9 185/17 185/24 186/16 186/25 187/15 188/20 189/20 189/21 190/8 190/10 190/13 190/14 190/18 190/20 199/13 208/16 224/15 225/5 225/13 226/18 227/20 228/22 229/22 230/1 230/2 232/12 232/13 238/21 238/24 239/4 239/9 239/11 239/13 239/15 240/3 240/12 242/4 249/16 249/16 249/18 250/3 250/4 251/13 252/15 253/6 253/6 253/8 253/8 253/10 271/10 277/23 278/3 280/22 283/1

**themselves [12]** 30/7 68/21 70/1 71/21 76/21 81/5 83/8 95/9 189/6 197/22 208/15 225/12

**then [183]** 15/17 16/12 21/4 21/6 21/7 22/17 28/6 28/6 33/11 34/12 36/11 39/7 39/16 40/17 40/19 41/24 42/1 42/8 46/17 48/12 51/12 51/13 53/17 57/13 57/15 58/24 59/15 59/20 62/21 63/12 64/6 65/19 65/21 67/13 67/13 69/5 71/9 72/11 74/19 75/1 75/18 76/10 79/17 79/18 79/24 81/17 81/22 82/6 82/12 83/4 83/5 83/7 83/11 83/14 83/17 83/18 83/21 83/24 84/2 84/8 84/12 84/15 84/16 84/22 84/23 85/1 85/5 85/7 85/11 86/7 86/8 87/4 87/12 89/5 91/11 96/22 99/4 100/8 100/8 100/9 100/22 104/20 108/2 111/13 112/22 113/15 114/2 115/1 116/14 117/1 117/5 119/22 121/25 125/25 131/25 135/15 139/5 140/9 140/12 140/17 153/24 158/5 158/12 160/4 160/13 171/12 173/13 177/3 178/13 179/9 179/22 180/1 181/7 192/11 192/22 195/11 195/22 196/1 196/14 198/16 207/25 210/2 210/2 211/2 216/15 217/3 217/9 217/23 219/9 221/13 222/13 222/14 222/14 223/1 223/3 224/14 224/15 226/9 226/18 226/19 227/24 228/16 229/13 229/19 229/19 230/9 235/24 238/5 240/20 240/25 241/14 242/3 243/24 244/8 245/8 245/12 246/20 250/15 250/25 250/25 252/12 252/13 252/17 254/8 256/18 257/15 259/15 259/21 265/15 268/15 270/20 270/24 271/3 271/4 274/4 276/23 278/25 280/4 281/5 281/6 282/11 282/11 283/24

**theories [3]** 61/15 118/15 178/16

**theory [3]** 120/7 120/16 139/8

**there [219]** 5/12 6/25 8/20 9/6 9/10 9/12 9/13 9/13 9/14 12/19 13/4 13/7 13/18 14/6 14/8 15/15 17/10 20/2 23/15 24/15 25/15 26/19 28/9 28/21 28/21 29/9 30/5 30/25 32/19 34/1 34/18 35/2 35/12 35/17 36/14 36/16 40/19 44/6 44/23 46/10 46/17 46/17 50/22 52/2 52/5 56/23 56/25 57/22 60/15 61/8 61/9 65/18 69/1 69/9 69/13 69/16 69/23 70/10 70/11 70/12 71/11 71/18 72/21 73/7 73/8 73/20 73/22 74/16 75/24 79/22 79/22 80/12 80/24 81/20 83/18 83/19 83/23 84/3 84/3 84/4 84/7 85/15 86/16 86/24 87/24 90/7 90/11 91/17 93/5 94/4 97/2 98/20 99/15 101/9 104/19 104/20 106/1 106/23 110/1 110/19 111/1 112/6 119/5 119/20 119/20 120/14 123/18 123/19 125/13 126/10 126/22 128/17 130/5 133/9 133/12 134/8 134/20 136/2 136/12 136/12 136/13 136/22 137/25 137/25 138/1 141/6 141/12 142/7 145/7 145/15 150/4 152/24 153/15 153/20 153/20 153/24 154/5 160/6 161/6 161/24 161/25 164/3 164/15 164/21 167/19 169/5 170/23 177/5 177/25 180/12 180/13 181/9 182/1 189/23 190/11 191/23 194/25 195/19 195/23 196/14 197/6 197/9 198/11 198/11 201/18 203/15 203/23 211/4 214/19 214/22 217/6 219/24 224/18 226/4 227/20 227/23 227/23 229/22 229/23 230/2 230/2 231/12 231/20 233/15 235/22 237/7 237/10 237/12 237/13 240/4 240/11 241/2 242/15 244/2 244/16 245/11 247/16 248/14 248/17 248/19 252/22 253/15 253/24 254/4 254/14 254/19 263/3 267/4 267/21 269/19 270/9 270/24 273/22 276/24 279/10 279/11 279/20 279/21 279/23

**there'd [1]** 232/8

**there'll [1]** 63/12

**there's [67]** 5/14 13/7 15/14 18/25 19/12 21/7 23/15 29/8 31/10 31/11 34/21 36/3 45/11 45/11 46/11 54/14 55/1 64/16 67/16 69/2 69/4 69/17 77/2 80/12 87/5 91/7 91/8 92/25 94/4 96/2 99/7 100/22 103/14 107/8 120/6 124/25 137/7 137/23 141/20 142/1 145/21 148/8 149/1 184/1 184/25 203/17 224/13 225/13 227/22 227/24 228/21 229/21 231/14 231/14 234/7 234/12 236/4 242/5 244/21 244/21 248/23 254/17 254/17 264/15 266/7 266/7 271/1

**therefore [3]** 17/25 75/11 182/19

**thereupon [5]** 78/2 108/14 121/5 168/17 220/16

**these [41]** 32/11 35/22 45/2 48/14 49/6 51/8 59/17 64/23 71/23 74/5 74/7 76/22 84/14 92/16 95/12 96/16 126/21 141/5 141/7 141/22 141/22 142/25 159/15 171/6 174/5 174/20 184/1 184/3 190/9 215/22 218/11 219/18 219/21 227/9 236/7 240/13 252/22 253/4 271/22 273/23 281/16

**they [343]**

**they'll [1]** 253/7

**they're [59]** 19/22 23/8 32/2 37/11 37/12 48/10 48/11 59/24 63/17 63/19 68/6 74/10 74/10 89/25 104/20 118/24 141/2 147/8 149/4 149/6 175/15 176/23 183/4 183/5 183/5 183/11 185/19 187/11 187/17 187/19 187/20 187/22 189/2 189/2 190/17 218/4 222/22 223/4 224/16 225/14 225/23 230/13 231/20 232/9 232/9 240/6 240/12 240/12 240/20 240/25 241/22 245/1 249/24 252/10 253/17 253/18 254/9 268/4 268/4

**they've [8]** 23/8 34/4 97/7 223/2 223/5 224/9 228/25 252/16

**thing [14]** 12/4 29/16 33/6 34/21 34/25 69/8 70/3 92/15 138/10 140/22 140/25 143/18 228/1 231/14

**things [35]** 6/17 7/11 11/7 11/12 35/5 35/18 49/6 54/8 62/5 65/23 67/25 69/10 71/10 75/14 75/19 82/15 95/8 97/4 98/24 107/4 123/17 123/24 153/2 160/8 161/12 162/10 181/19 188/14 189/4 219/12 219/18 253/4 259/14 270/11 282/18

**think [167]** 8/21 10/14 10/17 11/8 11/17 12/1 15/13 17/1 18/12 18/20 18/21 19/6 19/18 20/7 20/8 20/21 21/15 22/18 22/20 23/9 23/14 23/15 24/8 24/9 24/11 24/18 24/19 25/6 25/10 25/11 25/21 27/4 27/23 28/2 28/20 30/4 33/17 34/5 34/10 34/23 35/4 36/7 36/18 36/20 39/3 39/6 40/20 40/22 42/14 43/10 43/22 45/15 45/15 46/1 46/11 46/12 46/22 47/19 50/17 50/17 54/7 54/13 55/4 56/11 57/20 63/9 63/10 63/24 67/11 68/11 70/16 70/19 72/7 73/13 75/24 76/8 77/8 80/22 82/2 86/24 87/4 93/3 93/17 93/19 93/21 94/2 94/5 94/6 94/14 94/17 94/18 95/4 96/23 97/2 99/5 99/13 104/24 106/10 106/13 107/22

**T**

**think... [67]** 109/25 112/25 114/5 118/7 118/9 119/11 120/8 120/9 130/15 137/10 138/9 139/20 142/24 152/22 153/9 154/4 154/10 163/1 163/2 166/6 166/8 167/13 178/25 184/21 186/19 189/1 190/3 194/22 194/25 205/13 210/2 210/4 212/11 215/23 216/22 217/24 219/9 219/13 219/17 226/4 229/1 236/3 237/23 240/7 242/11 251/5 255/13 255/17 256/10 270/19 271/3 271/13 272/1 272/14 272/17 273/7 273/15 273/21 274/3 277/14 279/11 281/9 281/15 282/20 283/5 283/12 283/14
**thinking [5]** 104/24 150/17 279/2 279/6 281/8
**thinks [2]** 159/9 263/16
**third [7]** 2/13 2/18 2/22 19/6 73/12 165/12 165/12
**thirteens [1]** 233/14
**this [411]**
**THOMAS [1]** 2/17
**thorough [1]** 125/17
**those [91]** 6/25 7/24 8/2 8/3 8/3 11/20 19/9 19/24 20/19 20/19 20/20 24/10 27/3 28/20 31/19 31/23 31/23 31/24 32/23 34/2 37/14 39/24 45/5 51/4 51/6 51/21 51/21 57/13 61/12 61/25 62/5 63/14 64/22 66/12 66/23 74/4 75/14 87/22 90/9 113/6 114/25 115/9 119/21 120/23 125/2 125/2 125/6 129/13 130/18 138/2 139/12 148/16 149/21 150/20 151/24 157/16 159/14 161/12 171/1 177/18 181/12 181/14 181/19 186/16 189/4 190/5 190/5 190/6 190/20 190/21 193/17 196/24 198/16 210/11 212/17 212/19 219/1 229/19 232/21 235/17 235/17 235/23 242/3 242/25 260/3 261/9 261/9 273/16 278/2 282/25 283/2
**though [8]** 15/20 17/3 122/8 125/15 184/24 253/7 256/12 271/17
**thought [14]** 68/1 75/11 80/3 81/16 82/1 82/12 91/15 143/14 156/6 181/19 210/13 263/1 272/15 273/14
**thoughts [2]** 16/21 272/5
**thread [2]** 164/11 164/13
**threats [1]** 31/21
**three [29]** 18/19 19/2 37/17 69/13 73/9 80/1 82/6 98/24 106/6 113/21 117/3 126/11 126/23 129/11 129/17 169/13 173/17 235/2 239/21 243/11 248/23 251/19 270/19 270/23 278/10 278/12 278/14 279/8 281/18
**three-dimensional [1]** 106/6
**threshold [2]** 17/10 17/21
**threw [2]** 22/11 59/22
**through [40]** 12/24 23/13 28/5 28/5 49/6 49/25 50/18 51/12 51/13 60/11 63/3 67/5 70/15 73/25 87/20 96/24 97/12 97/15 104/25 119/12 134/25 137/1 138/23 139/2 139/4 142/25 217/13 222/20 225/14 228/23 233/13 233/13 237/4 237/7 238/11 246/16 246/21 253/8 270/10 270/19
**throughout [3]** 62/7 124/13 232/16
**thrown [1]** 14/20
**Thursday [1]** 60/9
**tie [1]** 128/1
**time [153]** 4/9 6/16 6/21 6/25 8/2 8/20 8/24 9/8 18/24 20/18 22/7 24/9 25/5 26/11 28/7 33/22 34/6 38/16 40/4 43/8 43/8 47/6 47/25 48/22 51/5 55/21 57/12 57/18 60/17 62/11 66/5 70/22 77/2 85/11 86/18 86/19 88/13 93/23 97/14 102/22 104/7 106/1 106/3 106/9 110/13 111/8 111/22 114/3 114/10 114/14 114/23 116/23 116/25 120/7 120/11 123/6 123/17 123/18 125/11 133/10 136/1 139/18 139/22 140/17 148/6 148/9 150/6 151/25 153/18 157/15 165/7 170/16 172/3 172/21 175/11 175/15 176/2 176/15 176/20 177/25 178/14 179/6 179/12 181/7 191/22 193/20 196/3 197/24 199/10 200/23 202/12 203/16 204/7 204/9 205/8 205/23 206/6 206/12 207/15 207/17 207/19 207/20 207/22 210/20 214/2 214/8 214/10 214/15 215/24 217/18 218/4 223/18 223/23 226/10 230/16 232/22 236/8 237/18 238/1 238/4 238/11 241/12 242/12 242/25 243/10 243/11 245/2 245/10 245/14 246/7 246/15 246/18 246/22 249/10 251/14 251/19 252/1 252/3 252/8 252/20 256/4 267/2 267/3 267/12 270/17 272/17 275/8 277/9 280/5 282/6 282/19 282/20 283/7
**timeline [4]** 6/18 8/10 8/13 186/14
**timeliness [2]** 6/19 26/6
**timely [2]** 26/11 35/25
**times [15]** 37/24 102/14 102/17 102/19 111/24 112/2 119/5 225/4 239/20 239/21 245/25 246/1 252/16 261/14 267/17
**timing [4]** 57/2 95/19 205/15 216/17
**tinted [1]** 241/3
**title [7]** 28/15 29/2 30/13 32/21 62/17 121/19 234/23
**today [53]** 5/10 8/15 10/17 11/10 12/12 13/11 13/21 14/7 14/11 14/16 16/21 17/17 20/11 22/9 23/25 24/7 24/21 25/2 25/8 26/5 27/9 27/17 28/5 34/20 34/22 35/8 37/1 43/12 44/18 47/9 56/21 59/14 60/7 78/15 79/3 80/9 94/7 104/25 125/5 143/3 144/3 144/14 144/16 169/25 195/17 219/10 255/21 270/14 272/8 279/22 281/18 282/14 283/5
**today's [2]** 27/4 28/8
**together [4]** 8/10 14/11 19/20 273/14
**token [1]** 131/24
**told [28]** 35/12 84/4 85/2 85/8 85/21 86/2 86/17 86/17 111/12 150/11 150/12 150/15 152/25 195/11 197/7 202/15 221/20 221/21 222/15 223/16 240/2 240/12 253/10 253/10 258/22 259/10 278/19 279/19
**Tom [1]** 4/19
**tomorrow [21]** 27/15 44/19 104/21 104/23 105/1 217/5 217/6 217/13 217/22 218/5 218/15 218/24 219/7 219/9 270/21 280/24 281/4 281/16 281/21 282/9 283/23
**tonight [2]** 218/13 218/14
**too [10]** 72/16 76/23 130/25 139/8 159/21 183/23 218/22 276/25 277/21 277/22
**took [20]** 21/4 62/1 76/15 80/23 83/18 83/22 84/24 86/1 94/19 117/5 152/7 192/17 196/14 219/13 246/6 248/3 249/12 252/8 259/20 263/1
**tool [1]** 231/13
**tools [3]** 147/19 158/9 158/11
**top [2]** 76/14 234/24
**topics [1]** 95/12
**Tort [2]** 9/16 13/17
**toss [1]** 233/3
**tossed [1]** 233/1
**total [5]** 52/21 116/19 117/4 163/5 281/8
**totality [2]** 65/25 242/17
**touch [1]** 47/9
**touchy [1]** 96/12
**toward [1]** 8/17
**towards [1]** 46/13
**town [1]** 255/21
**track [2]** 143/1 239/19
**traffic [20]** 53/3 69/10 73/12 75/20 132/24 139/19 139/23 140/2 140/6 140/6 147/24 149/2 157/6 175/7 178/19 178/21 179/3 189/17 243/23 247/19
**trafficked [5]** 73/23 181/25 183/25 239/6 239/11
**trafficking [22]** 140/23 141/1 141/10 141/16 141/21 142/3 142/10 182/24 183/18 183/19 183/20 188/16 238/13 239/12 240/11 243/14 249/23 267/18 267/19 267/23 268/3 268/5
**train [1]** 156/6
**training [16]** 74/6 147/1 147/11 173/21 173/23 176/24 178/4 178/6 181/18 181/21 183/14 202/16 202/18 202/21 238/7 276/14
**TRANSCRIBER [1]** 2/21
**transcript [5]** 1/15 99/10 99/15 285/10 285/15
**transfer [4]** 116/10 116/16 116/22 117/5
**transferring [2]** 114/8 114/9
**transitions [1]** 282/17
**translation [2]** 100/18 218/15
**translator [1]** 98/18
**transparency [2]** 49/13 49/14
**transpired [2]** 46/13 267/6
**transport [14]** 174/24 182/14 182/20 182/20 198/3 198/10 198/16 198/20 198/21 199/1 199/1 199/2 240/19 240/21
**transportation [1]** 181/16
**transported [4]** 61/7 73/23 188/12 198/20
**transporting [5]** 73/24 174/21 181/23 267/19 268/5
**travel [5]** 132/22 174/5 175/15 255/20 259/20
**traveled [1]** 139/21
**traveling [2]** 60/11 137/14
**treat [1]** 257/16

**T**

**tree [1]** 278/21
**triage [2]** 158/22 158/25
**trial [2]** 10/13 138/10
**tried [5]** 69/14 81/24 83/25 249/15 252/12
**tries [1]** 158/6
**trigger [2]** 90/19 138/4
**triggered [2]** 132/1 133/5
**trip [1]** 96/17
**trouble [1]** 104/8
**truck [5]** 83/12 83/13 83/25 84/6 84/7
**trucks [1]** 83/19
**true [6]** 57/6 58/19 88/2 108/2 274/22 285/10
**Trump [2]** 53/13 55/8
**Trump's [1]** 54/20
**trust [1]** 49/14
**truth [6]** 25/19 53/12 54/16 55/2 55/2 56/10
**try [29]** 16/2 19/1 27/24 81/25 92/18 93/10 104/12 110/8 119/5 124/19 128/1 128/6 139/13 139/13 158/6 158/24 161/25 162/16 195/6 216/23 217/15 248/8 248/9 251/25 251/25 252/5 268/17 268/21 278/25
**trying [47]** 7/19 32/1 34/10 47/24 54/9 57/25 69/21 69/23 70/1 76/5 76/9 76/23 76/24 94/22 95/18 97/15 112/3 112/4 139/1 139/11 144/11 155/11 159/8 162/4 176/2 185/4 186/16 191/10 193/6 193/9 193/12 193/21 194/4 195/10 196/5 196/8 209/3 222/10 226/17 226/19 251/21 251/24 252/2 252/10 252/14 268/16 282/10
**Tucson [6]** 169/22 173/24 174/20 182/16 200/15 200/17
**Tuesday [1]** 4/1
**Tugwell [1]** 18/12
**turn [20]** 43/25 84/23 87/19 159/24 164/9 165/8 165/11 203/1 226/12 226/15 226/23 227/3 227/4 231/7 231/7 238/5 241/4 251/24 264/15 265/25
**turn-around [3]** 227/3 227/4 231/7
**turn-out [3]** 226/12 226/15 226/23
**turned [3]** 80/1 152/3 251/11
**turning [2]** 178/9 259/22
**turnover [2]** 226/21 259/23
**tweets [1]** 54/20
**twice [1]** 176/12
**twin [1]** 263/16
**Twitter [1]** 54/20
**two [61]** 6/21 11/24 11/24 20/14 23/15 29/8 36/21 37/5 37/14 40/21 41/20 43/16 45/11 51/25 58/22 59/14 59/17 60/7 71/9 75/19 75/24 80/11 98/20 98/24 117/3 121/22 122/3 124/22 126/23 148/18 148/20 151/24 152/23 152/24 165/11 165/17 170/18 170/20 175/15 181/18 195/22 195/23 203/17 203/18 218/9 218/10 218/15 233/14 238/5 244/3 247/14 248/23 249/2 253/24 254/4 259/12 259/20 270/23 272/3 277/22 278/2
**two-minute [2]** 80/11 203/17
**two-phrase [1]** 124/22
**type [5]** 82/21 149/9 176/5 177/14 202/20
**types [2]** 147/12 178/11
**typical [4]** 6/18 60/11 95/10 131/7
**typically [4]** 159/14 159/14 177/12 242/2

**U**

**U.S [11]** 2/17 54/23 70/25 71/8 71/11 75/24 109/15 132/1 187/12 257/3 279/25
**U.S. [1]** 136/19
**U.S. Attorney's [1]** 136/19
**U.S.C [2]** 20/7 63/15
**Uber [2]** 242/4 242/5
**Uh [1]** 89/16
**Uh-huh [1]** 89/16
**ultimately [1]** 57/7
**unable [4]** 43/6 85/6 179/18 285/13
**unclear [1]** 190/4
**unconventional [2]** 99/6 283/11
**uncuffed [1]** 250/4
**undecided [1]** 52/21
**under [40]** 11/1 14/20 19/10 19/13 20/25 21/4 23/17 24/1 26/1 32/11 32/24 32/24 39/6 40/18 40/21 56/19 58/7 63/15 92/24 115/1 116/3 141/2 147/8 147/9 165/21 178/12 182/2 190/12 190/12 190/12 191/4 193/18 215/16 234/14 265/9 265/20 275/17 276/19 277/15 279/24
**undermine [2]** 68/3 68/7
**understand [48]** 5/6 5/12 7/1 8/12 20/25 25/23 27/8 28/11 29/3 29/21 31/7 37/18 48/20 55/1 70/7 91/3 92/12 92/16 92/25 93/18 94/7 94/12 94/12 94/25 97/16 99/3 99/4 105/3 106/1 115/3 115/21 139/6 144/2 167/16 176/17 177/11 199/20 209/12 217/17 219/17 219/20 224/24 272/8 273/6 275/1 279/10 281/25 283/15
**understanding [26]** 26/24 27/8 38/2 38/4 39/2 39/16 48/14 54/19 56/15 79/20 92/19 93/3 106/6 125/11 127/20 134/8 146/22 160/20 190/22 197/20 197/25 213/10 217/19 272/19 273/5 282/23
**understandings [2]** 49/17 94/23
**understands [5]** 70/8 96/4 97/13 187/4 209/22
**understood [25]** 11/2 27/11 44/9 47/8 93/21 94/14 96/18 125/19 129/15 131/21 135/14 139/15 139/19 153/16 160/8 178/25 221/22 227/15 242/7 256/21 261/3 272/7 272/16 280/20 280/25
**undocumented [12]** 69/25 74/6 74/8 222/3 227/13 237/6 241/25 248/18 249/25 253/5 276/14 276/16
**unfair [2]** 8/6 70/18
**unfolded [1]** 172/10
**unfolding [1]** 24/19
**unfortunately [2]** 97/6 142/11
**uniform [3]** 82/21 82/22 149/9
**uninvolved [1]** 52/15
**unique [1]** 128/2
**unit [3]** 129/17 221/5 244/3
**UNITED [61]** 1/1 1/17 2/21 4/6 18/11 20/16 29/7 59/6 61/3 62/18 62/20 62/23 62/24 63/19 64/12 64/13 65/2 65/2 65/25 71/5 71/14 71/18 74/1 76/20 102/15 102/22 104/1 119/11 124/5 131/15 131/17 131/21 155/13 160/17 169/4 178/7 181/23 182/4 182/18 183/3 183/8 183/25 184/1 186/21 187/5 190/13 190/19 192/6 193/24 225/2 225/14 225/15 228/15 236/24 237/2 238/16 249/24 252/19 258/2 262/21 276/16
**United States [57]** 4/6 18/11 20/16 29/7 59/6 61/3 62/20 62/23 62/24 63/19 64/12 64/13 65/2 65/2 65/25 71/5 71/14 71/18 74/1 76/20 102/15 102/22 104/1 119/11 124/5 131/15 131/17 131/21 155/13 160/17 169/4 178/7 181/23 182/4 182/18 183/3 183/8 183/25 184/1 186/21 187/5 190/13 190/19 192/6 193/24 225/2 225/14 225/15 228/15 236/24 237/2 238/16 249/24 252/19 258/2 262/21 276/16
**unknown [1]** 219/19
**unlawful [11]** 5/25 6/6 6/7 16/5 16/5 19/8 19/24 20/4 21/16 22/11 282/16
**unlawfully [2]** 20/16 61/3
**unless [9]** 32/19 80/12 91/7 91/8 92/24 131/17 175/15 230/14 230/22
**unlikely [1]** 75/3
**unlock [1]** 148/23
**unmarked [2]** 173/25 240/21
**unnecessarily [2]** 48/3 96/17
**unreasonable [1]** 19/16
**unredacted [5]** 52/6 52/16 265/12 265/13 265/16
**unsealed [1]** 10/16
**until [25]** 23/20 35/20 48/22 50/10 58/19 60/12 81/1 84/23 100/17 112/25 113/17 167/15 191/12 208/11 215/22 217/5 219/9 238/3 238/14 251/13 254/22 256/18 263/19 269/11 280/23
**untimely [1]** 7/4
**unusual [3]** 33/15 177/12 241/2
**unwarranted [1]** 29/25
**unworkable [1]** 28/4
**up [142]** 9/2 11/17 12/5 13/25 14/10 14/23 15/11 16/17 16/20 16/21 16/21 19/4 21/11 24/16 27/17 27/21 27/25 28/6 32/23 34/22 34/23 35/7 35/22 43/9 47/13 47/14 47/15 47/22 50/16 51/4 51/6 52/3 52/3 54/5 57/13 58/24 59/19 72/13 73/13 73/25 74/19 77/19 79/8 79/10 79/18 79/25 81/1 81/17 82/6 82/7 83/25 86/9 87/16 99/2 101/21 103/9 103/10 104/16 104/22 105/23 108/7 118/4 119/20 120/5 120/18 120/24 122/8 122/14 123/15 125/13 129/8 130/2 131/8 132/12 135/11 135/17 135/21 138/25 140/6 141/15 141/23 145/7 147/14 149/21 153/4 157/4 158/4 161/21 161/25 168/12 169/19 169/20 170/21 174/7 174/11 176/14 176/23 178/3 178/8 178/8 183/10 188/24 189/9 195/6 196/5 196/8 198/9 209/5 210/5 210/25

## U

**up... [32]** 211/9 216/16 217/5 219/9 222/13 223/13 235/18 236/6 238/2 238/3 238/12 239/20 244/2 244/9 244/17 244/23 245/6 245/7 245/9 245/10 245/15 252/5 253/21 255/18 269/20 270/10 270/14 272/9 275/11 275/15 281/16 282/1
**UPAX [1]** 158/13
**upon [7]** 63/18 137/19 180/13 189/24 189/25 190/14 191/3
**upside [2]** 11/3 67/22
**upside-down [1]** 67/22
**us [107]** 5/22 8/20 40/1 43/12 68/7 81/5 81/18 82/1 82/3 83/5 83/5 83/10 83/18 84/13 84/13 84/16 86/1 86/17 91/13 93/4 98/20 101/25 110/20 111/9 111/12 111/19 116/15 116/21 117/8 121/15 122/18 123/25 126/5 126/7 126/20 127/1 128/6 129/24 147/24 149/6 150/15 151/10 151/21 153/25 154/8 155/25 156/1 156/11 157/22 158/10 169/3 171/21 172/10 172/13 174/2 174/5 179/8 181/17 182/24 183/18 185/1 185/1 187/21 188/22 191/20 192/25 193/16 199/8 210/3 210/25 222/6 222/15 222/16 222/18 223/1 223/19 224/7 229/11 230/12 230/15 235/17 240/18 241/20 242/25 243/23 244/24 245/22 246/2 246/3 246/11 248/10 248/10 248/11 248/21 248/24 254/16 254/16 255/12 255/12 256/8 267/2 267/16 271/3 271/18 279/19 280/5 282/8
**USAO [1]** 2/12
**use [29]** 29/18 33/4 43/5 68/25 72/4 76/15 94/16 113/16 124/23 124/24 126/6 131/14 157/23 158/2 158/3 158/9 158/11 158/12 158/12 158/17 173/24 174/4 186/16 222/23 222/24 224/16 229/13 231/13 253/5
**used [25]** 8/10 9/9 10/9 11/5 25/8 30/7 31/17 74/15 104/8 130/14 134/15 137/1 141/4 159/6 159/10 174/20 180/7 185/1 205/15 211/3 223/25 233/8 237/22 253/9 274/6
**user [1]** 159/7
**users [1]** 48/15
**uses [1]** 43/8
**using [18]** 28/10 28/15 30/17 30/18 67/1 67/19 73/9 76/5 118/15 130/12 140/13 158/5 159/15 186/17 223/3 236/24 253/14 273/25
**usually [6]** 202/5 225/8 239/12 264/8 266/4 266/7

## V

**vague [1]** 33/5
**valuable [1]** 27/4
**van [207]** 25/17 35/2 35/3 35/4 35/16 35/18 60/10 60/14 60/17 60/20 61/6 65/13 66/2 66/17 68/21 69/14 69/16 70/21 70/22 72/3 72/8 72/11 72/16 73/1 73/8 73/12 73/15 73/20 73/22 74/5 74/16 74/18 75/9 75/22 76/12 76/23 81/6 81/9 81/17 129/20 130/1 130/7 130/10 132/12 132/21 132/22 133/2 133/11 133/21 135/19 137/12 137/13 139/18 139/21 140/8 140/13 140/14 140/16 140/19 140/22 140/24 141/1 141/1 144/22 147/2 147/21 149/21 150/25 151/2 151/18 151/22 153/21 155/10 155/16 155/19 155/20 155/23 156/3 156/8 162/5 162/9 165/6 170/12 172/3 172/6 172/12 172/14 172/17 172/20 172/24 173/2 173/6 173/8 173/9 173/11 173/13 173/17 173/18 173/20 174/1 174/2 174/4 174/5 174/8 174/9 174/10 174/11 174/13 174/14 174/19 175/3 175/11 175/17 176/9 176/23 176/25 178/1 178/14 178/17 179/8 179/10 180/11 180/13 180/14 180/17 181/2 181/5 181/8 182/2 182/6 182/10 182/12 182/14 184/8 184/15 184/20 185/4 185/16 185/17 186/9 186/19 186/23 188/2 191/11 192/13 192/20 192/21 192/23 193/1 193/14 194/21 195/5 197/7 197/7 197/8 197/11 201/6 203/23 204/1 204/12 204/15 205/24 210/22 235/19 235/24 236/6 236/12 236/16 236/20 236/23 236/24 237/19 237/24 238/6 239/20 239/25 240/5 240/8 240/14 240/21 240/25 241/2 241/5 242/9 242/16 242/23 243/9 244/11 244/14 247/5 247/18 247/20 247/25 248/13 249/4 249/6 249/11 249/14 249/19 250/4 250/6 250/13 250/20 252/12 263/4 263/9 263/11
**van's [2]** 71/2 245/8
**vans [6]** 75/6 174/14 174/20 174/24 198/20 198/21
**vantage [1]** 73/14
**variable [1]** 98/22
**varied [1]** 123/9
**variety [2]** 9/6 73/17
**various [6]** 43/18 70/15 119/4 119/10 124/13 266/5
**vehicle [103]** 23/13 25/23 66/11 70/13 70/23 72/23 73/16 74/9 74/22 75/4 75/8 75/25 76/4 80/11 128/1 128/5 128/6 129/17 132/14 132/17 132/18 133/10 135/24 136/4 139/23 140/6 140/10 140/11 140/12 140/18 145/3 147/18 147/25 148/24 150/1 150/3 150/4 151/10 151/10 151/15 151/17 151/24 151/25 152/3 152/5 152/6 152/6 152/18 152/20 152/24 153/3 153/19 153/20 154/11 155/4 157/1 157/12 170/10 170/14 170/20 170/21 175/14 179/10 179/17 179/19 179/21 179/23 181/22 181/24 183/10 189/13 191/18 191/19 191/22 191/25 192/1 192/2 192/3 192/17 193/2 195/11 196/16 203/21 203/23 207/12 239/10 242/9 243/12 244/1 244/8 244/9 244/11 247/3 251/11 251/19 252/2 252/6 252/13 252/14 252/14 262/18 263/6 263/8
**vehicle's [1]** 251/12
**vehicles [24]** 60/14 73/9 75/23 75/25 76/3 126/8 126/11 129/9 149/7 164/25 170/19 173/25 174/12 174/14 198/11 198/16 198/16 213/19 239/7 239/8 244/3 244/5 251/13 261/25
**version [1]** 52/16
**versus [6]** 4/10 7/24 187/7 197/8 235/5 241/23
**very [47]** 41/4 55/7 55/12 59/16 60/11 61/25 68/7 69/19 69/20 71/1 75/3 81/4 96/10 99/6 101/15 102/16 105/25 105/25 106/17 107/4 120/20 122/17 130/13 135/1 136/23 138/12 139/5 140/22 151/11 159/23 163/10 235/1 239/15 243/13 247/17 247/20 250/4 250/4 250/20 252/15 252/15 253/9 267/17 269/17 273/4 281/23 282/7
**vest [2]** 149/10 180/24
**via [1]** 105/1
**victims [3]** 73/20 140/20 140/24
**victor [1]** 108/21
**video [43]** 37/1 45/20 47/12 47/19 52/6 52/19 69/11 80/5 80/15 80/19 80/22 81/1 81/1 104/20 179/6 203/7 203/9 204/4 204/18 205/6 205/13 206/2 206/9 206/15 206/22 207/13 207/22 207/23 209/13 209/17 209/20 210/15 210/17 214/3 214/14 214/21 270/20 270/21 270/21 270/25 279/9 279/11 281/3
**view [9]** 60/21 60/22 127/6 149/25 150/2 183/1 207/18 208/1 239/22
**vindictive [1]** 30/8
**violate [1]** 22/19
**violated [1]** 50/14
**violation [11]** 19/16 20/3 20/21 21/15 21/17 21/18 62/24 68/6 155/21 189/19 282/15
**violations [6]** 8/23 21/2 124/2 124/3 124/4 165/22
**violator [4]** 141/18 155/15 157/9 158/5
**violators [1]** 155/16
**visa [6]** 102/1 102/7 102/10 102/15 102/23 225/19
**visas [1]** 187/10
**visible [1]** 82/23
**visitation [3]** 113/13 113/15 113/23
**vital [1]** 45/17
**VO [1]** 225/22
**vocations [1]** 146/23
**voice [3]** 43/5 43/8 43/9
**volume [1]** 203/15
**volun [3]** 221/21 258/22 259/10
**volun-told [3]** 221/21 258/22 259/10
**voluntarily [5]** 85/8 225/1 225/11 236/25 239/8
**voluntary [10]** 224/4 224/7 224/10 224/24 225/6 225/16 225/23 236/10 236/20 237/3
**volunteer [2]** 122/4 221/20
**VR [3]** 223/24 224/3 236/9
**VRs [1]** 224/11

## W

**wait [7]** 48/2 110/21 111/9 112/21 243/1 243/1 243/2
**waited [2]** 84/23 110/20
**waiting [4]** 85/15 90/19 188/11 198/11
**waive [1]** 77/8
**waiver [1]** 219/8
**waiving [1]** 219/6

## W


**walking [1]** 244/7
**wall [1]** 151/23
**WAMSLEY [2]** 1/8 4/11
**wandering [1]** 89/25
**want [101]** 9/23 10/15 12/13 12/14 16/19 22/9 24/13 27/24 30/20 32/4 32/18 33/5 33/12 48/19 49/13 49/13 49/21 51/4 52/21 56/1 60/5 62/16 67/17 68/9 68/18 68/19 70/7 70/17 71/20 71/24 77/7 85/17 92/16 92/18 92/22 96/10 96/14 97/18 99/2 99/7 99/22 100/16 104/7 106/3 106/4 118/18 120/4 120/5 125/16 130/25 131/20 133/1 139/4 139/9 142/7 144/1 145/8 153/7 160/6 160/7 174/16 174/25 176/16 179/17 179/20 182/22 183/2 183/6 183/7 183/12 184/18 187/9 187/10 187/24 189/5 192/11 192/11 205/11 207/2 209/2 209/19 210/24 217/3 217/16 224/18 224/24 238/22 246/23 249/1 255/13 259/13 269/18 270/11 271/4 274/23 277/9 279/1 279/7 279/13 279/14 280/7
**wanted [23]** 7/12 11/12 11/20 12/4 33/15 41/19 60/2 60/4 85/23 86/15 111/1 111/4 112/10 112/18 113/9 119/22 185/16 185/17 186/1 191/25 210/15 211/5 250/22
**wanting [5]** 177/11 209/21 210/6 277/20 277/21
**wants [7]** 25/16 25/16 36/21 56/8 206/15 206/20 211/1
**warfare [1]** 221/14
**warnings [1]** 148/19
**warrant [26]** 20/18 62/21 62/25 63/20 63/21 64/3 65/3 65/5 65/10 65/22 69/4 69/5 77/3 114/15 115/6 189/18 189/22 192/5 204/6 211/17 234/1 234/8 234/10 235/5 252/18 254/19
**warrantless [4]** 20/15 68/11 68/25 254/13
**warrants [5]** 66/23 68/16 70/1 70/2 196/22
**was [600]**
**Washington [1]** 222/3
**Wasmley [1]** 285/3
**wasn't [20]** 35/7 60/12 104/22 112/6 112/15 116/13 117/10 155/2 216/15 219/24 236/12 238/2 243/9 245/24 252/22 259/2 264/6 271/24 273/20 275/5
**watch [1]** 48/7
**watched [2]** 115/21 130/1
**way [55]** 6/22 10/18 13/10 16/6 16/23 19/18 19/19 20/25 21/22 26/8 27/12 28/23 29/2 30/8 30/12 31/13 32/20 49/5 58/7 58/25 66/13 67/5 69/4 74/11 89/25 94/8 94/11 96/9 100/18 101/18 106/11 108/2 109/24 109/25 129/21 138/25 141/14 149/8 176/1 179/1 180/19 226/18 232/19 237/18 239/1 246/19 247/15 247/19 254/17 254/18 262/17 269/24 282/4 282/11 283/14
**ways [1]** 91/23
**we [678]**
**we'd [4]** 36/17 36/18 216/23 273/19
**we'll [30]** 12/5 25/5 26/4 27/23 47/13 52/23 58/24 60/8 60/19 63/5 89/4 89/4 100/8 100/8 100/23 103/9 104/12 133/23 135/17 136/8 136/14 138/22 168/5 243/24 255/1 257/18 269/19 282/1 283/4 283/23
**we're [107]** 7/19 7/22 8/9 8/17 9/17 9/19 9/24 17/5 17/21 19/7 21/3 22/7 24/3 28/14 29/9 29/12 30/14 30/21 31/15 32/1 32/2 32/3 33/3 33/8 33/14 34/7 34/7 34/9 34/10 34/10 34/23 35/1 35/2 35/15 35/19 38/24 41/12 45/9 49/4 53/21 54/9 54/9 60/6 61/13 61/16 62/17 63/23 66/9 66/10 67/11 67/19 71/8 71/8 74/4 76/14 77/6 91/7 95/1 95/1 97/8 97/16 98/22 99/12 101/3 103/19 104/21 106/21 106/25 107/13 118/15 124/22 125/5 126/1 126/1 135/1 136/17 137/5 137/11 138/12 169/24 170/10 174/11 177/20 203/5 204/3 218/3 218/5 218/5 219/21 221/24 223/16 223/16 232/14 235/19 243/8 250/20 250/24 251/16 255/19 255/23 269/24 270/12 271/19 274/6 277/16 278/3 283/18
**we've [28]** 6/21 7/20 7/25 11/6 11/17 11/17 22/10 23/5 30/3 30/5 30/9 35/11 37/6 45/4 47/9 57/20 67/24 108/3 217/20 217/20 217/24 224/10 235/2 263/14 267/16 270/19 270/25 279/21
**weapon [2]** 179/19 244/25
**wearing [7]** 32/4 147/18 149/8 149/10 180/19 202/23 211/19
**WebEx [1]** 105/1
**week [2]** 23/1 261/14
**weeks [3]** 122/10 241/8 241/12
**weigh [1]** 28/22
**welcome [10]** 18/6 44/10 57/17 99/8 103/8 117/21 167/7 167/20 215/15 282/7
**well [132]** 5/7 5/13 6/13 7/9 8/16 11/4 11/6 12/5 12/10 12/15 14/14 14/19 14/23 16/1 16/19 20/2 21/9 21/10 24/11 24/16 26/15 27/18 28/15 28/19 29/2 33/8 35/9 35/13 36/14 36/19 43/15 43/24 44/18 51/19 65/11 65/16 66/14 72/24 74/21 74/25 79/14 83/12 84/23 86/17 95/15 95/25 100/1 100/1 102/18 102/20 104/14 105/16 106/15 106/16 106/23 107/16 108/1 109/15 114/15 115/1 116/18 122/3 123/23 124/21 128/22 131/25 132/9 133/24 135/3 135/6 141/3 142/16 143/23 144/20 145/14 148/22 149/4 149/6 149/11 154/9 155/17 155/18 159/12 159/23 160/2 160/4 161/6 161/19 166/10 166/14 172/17 174/23 175/17 176/12 181/25 182/12 183/23 185/17 187/20 190/8 213/15 213/16 217/15 222/8 227/16 228/21 231/6 231/8 233/22 234/4 243/8 245/13 249/12 249/22 254/8 254/12 255/11 255/24 256/8 257/15 259/16 265/8 266/5 268/20 269/23 270/7 278/15 279/12 281/23 282/2 283/4 283/4
**went [22]** 72/22 73/12 79/25 79/25 83/16 112/8 112/21 135/23 138/3 155/1 171/15 193/2 226/17 230/21 232/25 235/21 244/7 244/8 246/16 247/2 248/2 283/1
**were [388]**
**weren't [12]** 12/12 73/11 104/25 116/23 156/5 156/15 212/21 212/21 213/21 233/14 247/8 277/1
**Weresch [2]** 2/21 285/21
**what [413]**
**what's [14]** 31/1 34/25 65/7 65/7 98/19 107/20 121/19 159/2 169/5 185/23 205/1 217/2 221/3 227/19
**whatever [6]** 68/17 75/6 133/14 164/10 187/11 274/6
**when [172]** 10/12 10/24 11/18 14/2 16/11 19/12 19/24 20/10 22/22 25/21 26/7 27/9 33/18 35/23 35/23 39/8 39/8 39/14 40/1 41/15 47/21 48/10 51/5 64/24 65/4 66/1 66/1 66/2 66/17 69/15 74/15 76/4 76/17 76/18 79/8 79/23 80/11 81/6 81/9 82/8 82/8 84/24 85/14 86/4 86/13 89/19 89/21 90/3 90/3 90/8 90/9 95/19 95/19 95/21 102/10 104/6 104/10 106/9 107/11 108/9 109/24 109/25 110/3 112/9 112/22 113/18 114/1 116/14 118/19 118/20 119/5 122/7 124/23 124/24 124/24 126/18 127/3 127/24 131/14 133/10 133/10 134/12 139/17 140/21 149/12 150/22 151/14 153/16 154/9 154/20 154/21 154/21 156/12 158/25 159/6 167/20 169/23 174/11 176/13 176/16 181/4 182/6 182/14 183/24 183/24 186/7 187/17 188/5 192/9 192/9 192/10 193/7 193/18 195/9 197/14 203/14 205/17 207/11 207/25 212/18 213/8 213/8 216/3 222/8 222/15 222/25 223/5 224/3 224/24 225/16 226/15 227/14 228/19 232/8 232/12 232/14 232/23 232/25 235/24 236/8 238/2 238/23 239/7 240/24 240/25 243/1 243/12 244/8 244/10 244/13 244/19 245/8 246/6 246/18 247/7 248/8 248/17 248/19 249/2 250/14 250/15 250/19 252/3 253/6 255/12 256/4 261/22 262/16 262/20 262/20 263/4 263/9
**whenever [4]** 238/11 241/3 243/10 251/5
**where [76]** 13/5 14/20 16/11 17/16 30/6 30/17 62/10 69/14 72/18 74/12 78/17 79/3 79/3 79/15 84/5 84/8 95/15 97/8 109/10 110/4 121/15 123/14 125/1 126/12 127/16 129/18 132/14 140/6 146/22 156/15 158/10 169/3 169/21 171/4 171/8 171/12 176/3 176/4 177/13 178/15 181/22 181/24 183/9 187/2 198/7 198/19 198/25 203/17 208/6 220/25 221/10 222/15 222/22 222/24 223/4 223/11 223/15 223/16 223/16 223/17 226/13 229/8 230/23 230/24 232/8 244/10 247/1 254/17 257/5 261/22 262/1 262/4 263/15 273/25 278/7 285/12
**Whereupon [1]** 4/3
**wherever [3]** 183/4 183/6 183/12
**whether [62]** 14/5 24/20 25/16 25/17

## W

**whether... [58]** 25/18 26/11 28/22 50/22 52/21 57/5 64/3 69/25 73/15 76/20 96/2 96/4 102/6 113/10 119/16 124/9 134/19 134/20 141/5 141/6 142/20 144/2 144/14 147/7 147/7 147/8 150/24 153/15 154/5 155/9 155/12 159/25 160/9 175/3 176/21 177/25 178/17 181/5 187/4 188/15 189/13 190/5 196/21 197/1 212/8 214/18 222/11 223/5 223/20 223/23 240/1 240/1 240/6 249/22 250/10 252/18 252/18 264/5
**which [56]** 6/16 8/5 10/22 15/25 16/4 17/11 20/11 26/1 37/17 39/24 40/20 40/21 41/22 42/5 42/7 43/11 46/12 49/4 62/17 63/9 64/7 66/4 69/24 74/6 83/9 84/24 94/11 94/15 101/8 107/19 118/19 125/1 125/15 125/16 137/19 142/9 145/2 151/13 152/7 154/1 180/7 216/25 219/19 219/21 226/7 226/9 232/10 232/11 234/8 234/23 234/24 238/6 246/21 253/5 253/19 257/5
**while [27]** 44/6 49/6 55/7 57/8 60/19 107/18 112/3 161/20 162/13 182/1 185/5 193/2 193/10 195/9 197/7 199/9 199/10 217/4 232/23 236/7 246/3 249/10 250/6 250/12 251/24 256/9 262/7
**Whispered [11]** 15/12 90/24 92/5 162/24 200/2 203/3 207/9 212/5 220/8 234/19 281/11
**white [12]** 87/1 129/20 133/2 139/18 165/6 172/3 173/6 173/20 235/19 236/12 236/16 236/20
**who [193]** 7/15 11/24 12/11 12/11 12/12 12/18 14/10 16/19 25/17 27/20 28/2 28/2 29/20 30/18 36/21 36/22 37/1 37/20 37/22 39/9 40/7 40/9 43/6 43/6 43/11 45/7 45/19 45/22 47/22 49/9 49/24 50/4 50/9 53/19 58/17 61/9 63/14 65/9 66/13 69/3 69/6 69/22 70/1 70/17 70/17 70/23 70/24 70/25 71/5 71/6 71/7 71/7 72/2 72/3 72/4 73/22 73/25 74/5 74/8 75/8 75/9 75/22 76/11 77/1 79/13 80/9 82/3 82/3 83/9 83/23 84/6 91/21 93/3 93/4 100/7 107/9 110/11 110/23 112/15 112/15 129/25 130/10 131/15 131/21 132/5 132/21 133/8 135/25 135/25 140/1 145/25 146/24 149/2 150/17 152/5 153/4 154/14 157/24 158/4 158/25 159/8 161/14 161/21 162/7 162/9 162/16 164/25 166/3 166/4 166/5 166/10 167/9 167/10 173/11 174/22 176/25 178/7 178/20 178/23 178/25 180/1 180/12 181/8 182/7 182/17 183/15 187/3 188/18 189/8 190/5 190/6 190/6 193/14 193/17 194/3 195/1 195/1 195/5 195/19 196/14 198/12 205/19 205/20 206/4 209/22 212/19 215/17 224/25 224/25 225/1 227/14 232/16 234/21 236/8 236/15 236/19 236/22 239/1 239/6 239/24 241/17 241/21 241/23 242/8 247/17 248/12 248/13 250/1 250/8 253/25 255/15 255/20 257/20 257/21 262/2 263/3 264/3 265/3 266/13 267/5 269/10 269/11 271/12 271/12 273/14 273/19 274/11 274/16 275/2 276/2 277/22 278/2 281/6
**who's [15]** 44/15 53/19 54/22 69/19 72/7 76/21 124/5 149/1 183/2 188/13 188/13 217/17 217/18 239/8 239/12
**whoever [1]** 111/14
**whole [4]** 46/17 65/20 67/23 158/10
**whom [3]** 31/23 59/15 72/14
**whose [8]** 47/23 70/24 140/2 201/14 249/12 255/22 270/24 271/1
**why [71]** 7/1 7/4 9/24 14/23 14/24 28/25 29/1 35/1 35/5 35/16 35/18 37/11 38/12 46/25 58/23 68/10 81/15 81/19 81/25 82/2 82/4 82/11 82/25 87/16 92/25 106/25 111/1 111/20 127/8 130/7 132/14 138/3 140/25 140/25 145/7 150/2 151/6 165/6 173/22 179/15 180/9 181/19 182/2 182/13 186/22 187/16 187/16 192/8 195/8 202/8 202/11 202/11 202/12 203/15 212/14 214/10 217/1 226/20 230/21 238/19 240/18 243/10 248/5 254/13 265/15 268/13 274/10 275/4 282/19 282/19 282/23
**widely [1]** 95/11
**will [92]** 7/8 7/10 9/10 9/10 9/14 11/18 13/24 14/8 20/9 23/9 25/12 25/22 27/4 27/9 27/10 27/14 32/18 32/19 33/22 34/12 34/18 35/24 43/12 44/7 47/8 47/18 47/19 47/20 49/14 50/14 52/3 53/2 56/21 57/2 57/4 58/13 58/13 61/5 61/7 61/11 61/23 61/24 65/23 67/20 69/9 69/18 70/10 76/18 77/20 80/9 88/14 88/16 97/1 98/13 98/13 100/19 101/15 103/7 103/15 106/18 108/10 117/20 119/1 121/1 125/17 130/5 136/10 136/12 136/13 138/14 139/13 159/23 162/20 168/13 173/24 174/7 183/21 189/10 215/14 216/2 220/7 220/14 223/10 225/17 226/9 228/22 255/4 255/9 257/2 281/4 282/9 282/17
**willing [7]** 28/14 28/14 48/12 106/25 197/21 240/6 256/9
**willingness [1]** 283/13
**win [2]** 61/14 61/16
**window [30]** 60/16 61/11 148/5 148/7 148/19 148/23 149/1 149/3 179/12 179/12 179/14 185/14 205/9 214/15 214/16 214/20 244/12 244/13 244/14 244/17 245/2 245/7 245/8 245/23 246/6 246/6 246/11 246/14 246/15 246/16
**windows [1]** 241/2
**wish [3]** 14/6 44/1 117/24
**withdrawn [1]** 17/2
**within [21]** 25/13 35/4 36/22 37/10 38/14 44/24 45/16 55/11 55/11 56/11 109/17 113/14 171/9 172/12 172/17 172/18 172/21 173/7 174/4 174/6 176/12
**without [25]** 15/17 15/18 20/12 20/12 42/16 59/20 60/17 62/21 63/19 63/20 63/20 65/22 65/25 74/13 74/13 83/16 85/6 124/10 135/3 147/14 241/1 241/22 252/19 262/21 285/16
**witness [75]** 3/7 11/19 33/12 33/18 35/10 35/14 36/12 37/1 37/3 37/8 37/17 37/17 38/11 38/14 47/9 47/12 48/4 49/1 49/1 50/4 58/17 77/7 77/20 78/2 78/20 90/21 92/12 93/8 95/7 95/14 96/11 99/3 105/7 107/14 108/4 108/6 108/7 108/14 120/21 120/25 121/5 135/11 135/20 138/14 139/1 147/20 160/3 166/23 167/10 168/10 168/12 168/17 195/17 195/18 201/19 209/21 211/3 215/8 220/5 220/16 255/20 255/20 255/22 256/15 265/16 269/4 270/1 270/24 272/20 272/24 273/19 274/14 275/9 275/12 277/5
**witness' [1]** 96/24
**witnesses [62]** 11/9 11/24 12/11 12/18 13/2 13/24 28/2 28/11 31/3 31/16 32/7 33/7 33/13 35/8 35/24 36/4 36/17 36/21 37/6 37/7 37/18 39/5 44/20 44/22 44/23 45/3 47/24 48/10 48/19 48/24 49/7 49/9 49/21 50/8 52/3 58/15 59/14 59/17 60/8 105/2 106/2 118/1 118/13 139/4 139/12 216/13 217/7 218/11 220/3 255/15 255/16 257/22 270/10 270/18 270/24 271/4 277/19 277/21 277/22 280/23 281/18 283/16
**witnesses' [1]** 49/16
**woke [1]** 79/8
**won't [5]** 14/15 16/25 138/20 167/13 283/8
**wondering [1]** 271/19
**Woodburn [23]** 22/12 38/23 39/10 39/22 44/5 59/22 60/11 78/18 79/4 79/5 110/2 123/16 124/13 126/17 146/24 171/9 171/15 213/14 227/7 228/6 230/25 241/17 241/19
**word [3]** 94/17 149/16 154/4
**words [2]** 34/18 161/16
**work [62]** 32/21 33/1 34/11 40/8 47/23 60/10 72/14 72/17 72/18 74/13 74/15 79/16 79/21 109/4 109/11 109/22 109/24 110/1 119/24 121/23 141/3 147/6 147/12 147/12 147/12 147/14 147/19 158/1 174/22 176/4 176/5 176/7 177/13 178/3 178/5 178/6 178/8 178/10 178/12 182/18 184/3 187/6 202/1 202/3 202/6 202/9 223/14 227/13 230/9 233/1 233/1 240/20 240/24 241/24 242/4 246/15 253/18 264/9 264/11 268/4 268/8 270/10
**workable [1]** 47/21
**worked [3]** 169/10 176/5 200/10
**workers [3]** 146/25 178/3 202/5
**working [17]** 34/7 83/16 123/12 126/8 163/6 170/7 171/1 175/16 213/13 219/21 228/7 232/22 232/23 240/25 241/7 241/10 241/21
**works [3]** 31/13 31/13 40/8
**worksheet [1]** 226/8
**world [1]** 67/22
**worms [1]** 283/8
**worn [6]** 52/7 80/9 179/1 279/12 279/13 279/22
**worried [3]** 8/9 184/14 247/23
**would [165]** 4/23 6/10 6/10 6/15 6/16 6/16 7/21 9/4 10/16 10/19 12/20 14/2 15/3 15/4 16/22 18/4 18/19 20/6 20/18

**W**

**would... [146]** 22/6 22/24 23/16 23/16 23/17 23/19 23/24 26/16 29/25 29/25 30/1 33/12 34/22 35/11 36/18 37/4 39/4 39/4 41/13 45/17 45/18 46/6 46/24 46/24 49/19 54/6 54/7 55/11 56/24 58/4 65/8 65/9 67/7 67/18 69/4 69/5 70/12 73/14 74/6 74/18 77/13 77/18 82/1 85/8 85/10 88/4 91/18 94/2 94/16 94/17 96/6 97/10 97/11 102/17 102/19 105/1 105/15 105/23 106/13 106/21 108/5 111/9 111/10 111/19 112/10 112/24 113/10 113/10 114/13 115/3 116/9 120/8 120/9 120/9 123/23 128/19 128/22 129/19 130/20 131/10 131/10 131/11 131/15 131/22 131/25 132/6 138/7 138/10 141/15 142/2 142/2 142/5 145/13 149/23 149/23 156/19 157/14 161/2 165/18 165/20 166/7 170/18 174/25 183/14 183/20 188/8 189/20 190/8 191/4 191/4 199/9 199/23 201/15 205/10 208/15 209/1 219/6 226/18 230/12 230/13 233/12 239/5 239/6 240/23 241/4 247/24 254/15 254/19 255/5 256/5 266/14 267/25 267/25 268/18 272/7 272/15 273/5 273/6 273/8 274/3 274/23 276/20 276/23 277/15 278/13 282/14
**would've [21]** 9/8 9/11 12/23 13/13 35/4 70/11 72/21 95/10 95/12 114/13 114/15 114/19 114/23 137/8 143/18 145/17 173/7 177/12 244/23 244/23 250/3
**wouldn't [7]** 5/16 23/19 142/20 161/1 250/21 250/24 270/17
**writ [3]** 5/11 6/7 55/18
**write [5]** 116/6 233/12 254/15 266/12 266/14
**writing [1]** 260/2
**writings [1]** 240/14
**Writs [2]** 10/22 11/1
**written [4]** 19/19 27/10 87/12 265/20
**wrong [5]** 19/6 94/23 187/21 231/12 263/2
**wrote [5]** 116/19 166/3 166/4 166/5 166/10

**Y**

**yeah [53]** 12/5 15/8 15/10 45/14 98/22 101/14 102/18 103/11 105/22 108/1 117/10 118/6 122/12 122/12 132/5 143/16 145/24 161/19 162/23 163/1 167/5 187/16 191/2 195/16 198/23 204/23 215/23 218/8 223/21 224/7 224/20 227/4 227/4 229/3 229/20 235/21 236/2 237/25 237/25 240/20 242/17 245/10 248/22 257/14 258/13 260/16 260/20 264/14 271/20 274/15 274/21 278/24 280/18
**year [3]** 31/21 123/11 222/6
**years [12]** 31/20 101/12 109/9 121/22 122/3 163/6 169/8 169/13 200/11 221/7 221/12 258/20
**yelled [2]** 193/4 205/8
**yelling [3]** 152/3 193/3 247/7
**yellow [1]** 87/5
**Yep [6]** 228/12 232/1 236/4 240/17 245/5 266/9
**yes [291]**
**yesterday [2]** 7/18 71/24
**yet [17]** 41/16 41/18 50/10 80/24 85/22 104/22 116/24 172/22 177/21 215/17 218/2 237/1 257/21 268/11 269/10 271/24 282/21
**you [1129]**
**you'd [9]** 27/20 43/21 43/24 44/11 95/4 103/8 120/24 241/3 241/7
**you'll [14]** 47/4 47/4 63/7 63/7 63/13 77/15 90/7 96/9 103/16 106/14 216/3 226/8 228/16 256/23
**you're [80]** 9/21 13/20 18/6 18/23 35/9 44/10 57/7 57/17 57/22 60/25 60/25 61/4 65/14 72/13 73/5 76/13 76/17 76/18 91/22 91/24 96/3 96/12 99/8 102/7 103/8 104/11 117/21 121/15 125/12 130/12 137/24 146/3 167/7 167/19 167/20 169/3 185/25 187/4 187/6 188/20 188/23 191/3 200/13 213/3 215/13 215/15 216/11 216/11 219/25 221/15 224/14 224/15 224/16 224/22 226/17 228/3 229/15 229/17 229/20 229/23 229/23 230/11 232/15 238/12 241/25 242/4 242/17 243/5 243/6 244/13 244/21 247/17 257/19 264/8 269/9 275/7 275/17 277/8 279/5 282/7
**you've [14]** 11/8 24/12 24/18 50/8 50/11 61/22 63/6 69/18 72/20 76/21 187/13 214/7 234/13 242/13
**young [2]** 7/13 88/20
**your [628]**
**Your Honor [350]**
**yours [2]** 167/14 248/5
**yourself [4]** 122/14 181/1 184/21 190/23
**yourselves [4]** 4/24 5/10 59/1 239/16

**Z**

**zoom [2]** 229/14 229/14
**Zusman [1]** 54/6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| M-J-M-A, an adult,<br><br>Petitioner,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"), et al.,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 6:25-cv-02011-MTK |

Evidentiary Hearing - Volume 1

FTR-RECORDED TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT JUDGE

December 3, 2025

APPEARANCES

FOR THE PETITIONER:

NELLY PAOLA GARCIA ORJUELA
Innovation Law Lab
333 S.W. 5th Avenue
Suite 200
Portland, OR 97204

FOR THE PETITIONER:

STEPHEN W. MANNING
Innovation Law Lab
333 S.W. 5th Avenue
Suite 200
Portland, OR 97204

FOR THE RESPONDENTS:

ARIANA N. GAROUSI
DOJ-USAO
Civil Division
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204

FOR THE RESPONDENTS:

THOMAS STEVEN RATCLIFFE
U.S. Attorney's Office
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204

TRANSCRIBER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, Oregon 97204
(503)326-8047

## GENERAL INDEX


| | Page No. |
|---|---|
| December 3, 2025, Proceedings | 262 |
| Reporter's Certificate | 296 |


* * *

## WITNESS INDEX


| For the Respondents | Direct | Cross | Redirect | Re-Cross |
|---|---|---|---|---|
| B.W. | 270 | | | |


* * *

(Wednesday, December 3, 2025, 9:06 a.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURTROOM DEPUTY CLERK: Please remain seated.

The United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT: Good morning.

MS. GAROUSI: Good morning.

MR. RATCLIFFE: Good morning, Your Honor.

THE COURT: Good morning.

Anything we need to take up housekeeping-wise before we continue with testimony, Mr. Manning?

MR. MANNING: Not from us, Your Honor.

MR. RATCLIFFE: No, Your Honor.

THE COURT: All right. Next witness.

Oh, well, actually, just to double-check, I think we said five witnesses remaining. Is that about the right number?

MR. RATCLIFFE: We have six, including one by video.

THE COURT: Okay. All right.

MR. RATCLIFFE: And I think each one will be appreciably shorter than the ones yesterday.

THE COURT: I think we did all -- a lot of heavy lifting yesterday.

MR. RATCLIFFE: Yes.

THE COURT: Yeah. Or you've now exhausted me, and so -- we'll see which one -- either way, the outcome might be the same. It'll be quicker.

MR. RATCLIFFE: Like an infant, we've cried ourselves to sleep.

THE COURT: Well, at least somebody got some sleep.

All right. All right. Let's -- who's your first witness?

MS. GAROUSI: The respondents will call Officer B.W.

THE COURT: All right. Thank you.

Good morning. Why don't you come on up here to the witness stand, and the courtroom deputy will swear you in.

***B.W.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your first name and last initials for the record.

THE WITNESS: Billy W.

THE COURT: Please have a seat.

THE WITNESS: Thank you.

THE COURT: So we do not have interpreters today to help us manage the pace. I note that the petitioner is not here today as well, and I -- and I'm assuming that she won't be

called as a rebuttal witness?

MR. MANNING: That's correct, Your Honor.

THE COURT: Okay. And we also don't have a court reporter to help manage the pace or to make the record. We have -- do we have FTR running?

THE COURTROOM DEPUTY CLERK: Yes, we do.

THE COURT: Okay. Usually I see the clock ticking and -- that's not an indicator of the FTR operating?

THE COURTROOM DEPUTY CLERK: I just have it minimized 'cause I don't know how to use it. So it's going.

THE COURT: Okay. All right. I'll trust that it's working.

THE COURTROOM DEPUTY CLERK: Yes.

MR. RATCLIFFE: Your Honor, I apologize. I suppose now there is one housekeeping matter. And I apologize for doing this while the witness is on the stand. But I recognize this is not a criminal case and that the same safeguards that apply in a criminal case to the absence of the interested party, in this case the petitioner, may not apply.

However, this is a case about someone's liberty. It is a quasi-criminal case. And so I think it's appropriate to have opposing counsel make a minimal record at least about why the petitioner's not here and that she has made a knowing and voluntary waiver of her right to be present during today's hearing.

THE COURT: Mr. Manning, do you want to be heard on that first question before I -- I -- I respond to whether that's required?

MR. MANNING: Thank you, Your Honor.

We disagree with the characterization this is quasi-criminal, but there's no interpreter -- there's no interpreter available. We waived the interpretation 'cause -- and without the -- in order for the hearing to be able to proceed.

She wasn't going to be testifying today. And without an interpreter, there was no meaningful way for her to participate in today's process regarding the questioning of these witnesses.

THE COURT: All right. And I think it's a partial answer to your question. Mr. Ratcliffe?

MR. RATCLIFFE: It is a partial answer, Your Honor. I did not understand yesterday that, by waiving interpretation, they were also indicating that not only would petitioner not be here -- we're fine with her not being here.

But the way it's framed, I'm concerned, makes it sound as though she can't be here because there's no interpreter as opposed to they have made a decision that they want to go forward today; they recognized, based on the information they received yesterday from the Court, that there would be no interpretation services; knowing that, the

petitioner, who was here during that discussion, made the decision to allow the proceedings to go forward today and, apparently, decided that she wasn't going to be present as a result of that.

THE COURT: Okay. And to summarize the events yesterday that led to what I understood and accepted as the waiver, the petitioner's waiver of interpreting services, is the following -- well, actually, yeah, we may need to go back several days.

I know this hearing had originally been set to begin in the afternoon yesterday. But in anticipation of just simply wanting to make sure we accommodated more time, even before I knew that there were going to be ten or so, plus, witnesses testifying, we moved it to the beginning of the day so we would potentially have the entire day to work through witnesses.

And I think it became evident early on that it was going to be an all-day hearing. If not, I think I actually mentioned sometime in the early morning that there's a good chance this is going to go into the following day.

Interpreting services were scheduled for a full day. And -- and we had two interpreters to assist in interpreting for the petitioner and to provide interpreting for her testimony yesterday.

When it became clear that we were going to continue into the -- into this day, my staff advised me that there were

no interpreters available that -- that -- that we reached out to Mr. Knaebel, who helps coordinate -- who coordinates interpreting services for cases.

And neither he was going to be available today, and none of the other available -- available interpreters -- none of the other interpreters that we -- that we work with were going to be available until -- dates were given, which were the 17th, the 18th, and, I believe, the 19th, varying afternoons -- excuse me -- 18th, 22nd, and 23rd for one of the interpreters; the 17th, 18th, and 19th, again, for half days.

And Mr. Knaebel might be able to have filled in the alternating half -- half portions of those days, but that was yet to be determined. I brought that to everyone's attention yesterday afternoon, advised everyone that we were going to run into a problem with interpreting for today, and that we might need to reschedule the evidentiary hearing -- or continue the evidentiary hearing for another day if interpreting was required.

At that time the petitioner waived, and I accepted that waiver after I understood she spoke with counsel and conferred with counsel about -- about the meaning of not having interpreting services.

And we are now here today. Petitioner is not present. I accept the representation that Mr. Manning has provided that, in the absence of interpreting, the petitioner

would not be able to meaningfully engage in or -- or be involved with the proceedings.

And so her -- her -- her personal appearance, I don't believe, would be either legally required nor necessary to ensure the continuing of this evidentiary record. I also note that she was released without conditions; is that right?

MS. GAROUSI: Yes, Your Honor.

THE COURT: All right. And -- and there's been no concern or expression of concern or showing that there's any -- any reason to believe that her nonappearance today may affect her -- may impact her status or availability in future court proceedings, and I've heard none.

To that end, with that finding, and noting, again, that I think it's a -- it's reasonable to accept the representations that Mr. Manning has made about the petitioner's nonappearance today -- waiver of appearance today as well, Mr. Manning, of your client's -- of your client's presence?

MR. MANNING: That's correct, Your Honor.

THE COURT: Okay.

MR. MANNING: While we don't think it's -- we don't understand that her presence or absence is relevant to the Government's presentation of their case or the cross-examination of --

THE COURT: Unless counsel was going to call the

petitioner as a -- as a witness in their case in chief, and we hadn't discussed that yesterday, but I -- I have remained committed to developing a full record.

So if at any time you think it's necessary, then let me know and I'll -- we'll work on accommodating that, probably not today, but at a future date, so -- so we can make sure that the record is as complete as we could possibly imagine.

MR. RATCLIFFE: Understood, Your Honor. That's not our plan, to call her. We -- we're satisfied with our cross-examination opportunity yesterday.

THE COURT: All right. Anything else that we need to address about petitioner's appearance not in person today, Mr. Ratcliffe?

MR. RATCLIFFE: No, Your Honor. Thank you for your time on this.

THE COURT: You're welcome.

Well, I always imagine that we should -- we should take up some kind of housekeeping matter before we jump into evidence. It feels like we're just warming things up a little bit.

Okay. Your initials were B?

THE WITNESS: W.

THE COURT: W. All right. Thank you, Agent B.W. Mr. Ratcliffe or Ms. Garousi will have questions for you.

MS. GAROUSI: Yes, Your Honor.

DIRECT EXAMINATION

BY MS. GAROUSI

Q. Good morning, Officer B.W.

A. Good morning.

THE COURT: Oh, I'm sorry. I think Mr. Ratcliffe had -- I was about ready to make a comment and -- and reminder. We don't have a court reporter. We don't -- but we have FTR running. And we don't have interpreters to manage our pace. So it'll be important for you to speak slowly, Agent B.W., so I can comprehend what you're saying.

Oftentimes people are using legal -- or professional terms of art that I'm going to have -- I may stop and ask you for clarification. But, more importantly, I want to make sure that the record is clear because I assume transcripts will be ordered, and they'll have to be made based on a recording -- an audio recording of -- of the testimony here today.

I will ask that everybody, before you start asking questions, double-check to make sure that you're, well, close to the mic and the mic is actually active. You will not offend me if you tap the mic head and we hear a few bumps to confirm that we're all good to go.

And also, to that end, I've noticed that people usually need to be about six inches away from the microphone head to actually amplify the voice. And I'm going to assume amplification also means that it's being clearly recorded.

If amplification isn't happening, I'm going to operate today -- since I now have to be the guardian of the audio record, if it's not -- if I don't hear amplification, then I'm going to assume that it's not being recorded, and I'll -- I'll try to politely interject to remind people. All right?

THE WITNESS: Understood.

THE COURT: All right. Thank you.

Mr. Ratcliffe.

Oh, I'm sorry. Ms. Garousi.

BY MS. GAROUSI

Q. Officer B.W., who do you work for?

A. The Department of Homeland Security.

Q. What subagency of --

A. Immigration and Customs Enforcement.

Q. And what field office do you work out of?

A. The St. Paul, Minnesota, FOD, field office, or the area of responsibility that that field office covers.

Q. Okay. And what's your title with ICE?

A. Deportation officer.

Q. How long have you served in that role?

A. For approximately 12 years.

Q. Do you have any other immigration enforcement experience?

A. Prior to that, I was in the Border Patrol.

Q. For about how long?

A. Approximately three years.
Q. So you said that your typical area of responsibility, the field office you work out of, is St. Paul. Why'd you come to Oregon?
A. I was directed to by our management.
Q. And approximately when did you arrive in Portland?
A. I don't remember the exact date, but it was on or about October 14.
Q. And do you remember when you left Portland?
A. Again, I don't remember the exact date, but it was on or about November 15th, I believe.
Q. And while you were in Portland, what were your duties?
A. Administrative processing at the ICE building.
Q. Did you do any field work?
A. No, I did not.
Q. So were you at the Portland ICE facility for your whole stay in Oregon?
A. For the duration, yes.
Q. Officer B.W., at this point in the evidentiary hearing, we've heard a lot about the arrest process. Could you orient us with the processing side of things that ICE does? What happens when an officer in the field brings someone back to the Portland facility?
A. After an arrest is made, either the arresting officers or possibly other officers, transport officers, would transport

the subject to the office.

Initially when they come into the building, they would be screened and property would be managed. Also, then a scratch 13, which would've been generated either by the arresting officers in the field, transport officers, or the initial officers that receive the subject in the building, would be generated.

Then in the software program that we used, called EAGLE, an event would be created. There were three -- and I wasn't present during this, but this was standard for -- during the time that I was there.

There was three officers. The first would create the initial software event and input data. The second would assist with that. And then the third officer in the processing area, in the detention area, would take biometrics, to include fingerprint, photo, and DNA.

Q. And once these biometrics are run, what's the next step in the process?

A. There's a file that is created, which basically only has that scratch 213, with handwritten annotations, along with a DNA packet, which is placed -- there was a couple different places, during my time there, that it was placed.

But there was a location designated that we would know, as processing officers, that we needed to check. And then we were instructed to retrieve those and then generate the

necessary legal paperwork in a different area of the building.

Q. And when you say "generate necessary legal paperwork," what do you mean by that?

A. Depending on the individual's legal status, criminal immigration history, pending petitions, there's a bunch of different things that would be taken into consideration to determine what legal process would be necessary for the subject to proceed through to relieve the issue at hand.

So the software program, EAGLE, would be utilized to input data and then to create documents, legal documents to be printed and to be reviewed and served on the individual.

Q. So I want to talk about a couple of the legal documents in this case.

MS. GAROUSI: Your Honor, may I approach with exhibits?

THE COURT: You may.

BY MS. GAROUSI

Q. Okay. Officer B.W., I'm going to ask you to turn to what's been marked Exhibit 109, please.

A. Okay.

Q. Okay. Do you know what an --

(Whispered discussion, off the record, 9:24 a.m.)

MS. GAROUSI: One second, please.

(Whispered discussion, off the record, 9:24 a.m.)

BY MS. GAROUSI
Q. Officer B.W., what is this form?
A. I-213.
Q. And did you generate an I-213 for petitioner?
A. Yes.
Q. And so I want to go through this piece by piece. So on this first page, it looks like there's a lot of biographic and background information. Where does this data come from?
A. It comes from the EAGLE software program.
Q. And the information that gets put into EAGLE comes from, based off of what you previously said, it sounds like, the biometrics, the scratch 213; is that correct?
A. Yes. It could come from any number of people. Anybody that had access to that event could input data. There was multiple people that had access to it and input the data.
Q. And so if you go to the next page of that -- of that exhibit --
THE COURT: Ms. Garousi, remind me: Which exhibit number is this?
MS. GAROUSI: 109, Your Honor.
THE COURT: Thank you.
BY MS. GAROUSI
Q. Okay. Would I be right to refer this part of the 213 as the narrative portion?
A. Yes.

Q. Okay. And so let's go through this bit by bit.
Do you see where it says "Record of Deportable/Excludable Alien"?
A. Yes.
Q. Okay. And there are two paragraphs there. Do you see that?
A. Yes.
Q. Okay. Did you write those paragraphs?
A. No, I did not. I received those from a supervisor and was instructed to copy and paste those in on the narratives that we processed.
Q. You said "narratives that we processed." Did you put this in other 213s that you had generated while you were in Portland?
A. Yes.
Q. Okay. So this wasn't unique for petitioner?
A. No, it was not.
Q. Okay.
THE COURT: I want to make some clarification. What was not unique in this narrative? What was not unique to the petitioner?
THE WITNESS: That first large paragraph that's unbroken there.
THE COURT: Under "Record of Deportable/Excludable Alien"?

THE WITNESS: Correct. Yeah.

THE COURT: Okay.

THE WITNESS: So that unbroken section, it's actually two paragraphs, but that was -- we received that by e-mail and were instructed to add that for a period of time.

THE COURT: And is that language used sort of as a template form for -- for the narrative report with -- when processing documents with other detainees?

THE WITNESS: I wouldn't refer to it as a template. And it was unique to my time -- this -- that section was unique to my time in Portland. It is very common to be instructed, for legal purposes, to add different sections -- or different language into the narrative. But this section was specific to my time in Portland. I was instructed to do so by my supervisors.

THE COURT: Your supervisors, their initials?

THE WITNESS: There were lots of supervisors.

THE COURT: Do you remember which supervisor --

THE WITNESS: My --

THE COURT: -- directed --

THE WITNESS: -- primary supervisor, no, I do not.

THE COURT: So you don't recall which supervisor instructed you to include those two paragraphs with respect to this petitioner back in -- here in Portland on October 30th?

THE WITNESS: My primary supervisor was K.K.

THE COURT: Okay.

THE WITNESS: However, there were multiple supervisors and management in the building. I do not recall who I received that e-mail from.

THE COURT: Was it likely that any one of them could've given you the instructions to include this language?

THE WITNESS: Yes.

THE COURT: So that -- it would not have been unusual for any one of the supervisors to have said, "Include this language in the narrative"?

THE WITNESS: Correct.

THE COURT: Was there other form language like this that was used or -- here in Portland around that time that you were here?

THE WITNESS: Generally speaking, we do follow a template for the narrative so that we cover all appropriate legal bases, so that the narrative is complete. So that section was copy and pasted as is. The rest of the sections that are broken up are a form of template that are changed and specified to be accurate for the person to whom it refers.

THE COURT: Okay. Ms. Garousi.

MS. GAROUSI: Thanks, Your Honor.

BY MS. GAROUSI

Q. All right. So I want to jump down to the next sort of subsection. Do you see where it says "Alienage and

Removability"?
A. Yes.
Q. Did you write that?
A. Yes.
Q. And on to the next section, it says "Encounter." Do you see that?
A. Yes.
Q. Did you write that?
A. No, I did not.
Q. Who wrote that?
A. I do not know. It is my assumption that it was the arrest team that wrote that. They would've been -- sent it to a generalized inbox, and then my supervisor would've forwarded it to the processing group for insertion into the narrative section of the 213.
Q. So when you receive this, is this the -- when you receive this encounter paragraph, is there anything else you know about the arrest?
A. The arrest from the field?
Q. Yes.
A. No, apart from that which would've been handwritten on the scratch 213.
Q. Okay. And then the next subsection looks like immigration history. Did you write that?
A. Yes.

Q. And would this have been petitioner's complete immigration history?
A. No. Only that necessary to establish legal sufficiency for immigration charges, if they were to be necessary.
Q. All right. And then I want to jump down to -- do you see the sentence that starts with "The subject claims and appears"?
A. Yes.
Q. And then there are a series of sentences that follow, that start with the same "subject claims" sort of language that go on to the next page?
A. Yes.
Q. So those look like answers that petitioner would've given you in response to questions. Did you ask petitioner questions to receive those answers?
A. Yes. After I receive the initial file, I access EAGLE to review data return from biometrics, from fingerprints, immigration history, and criminal history. I would then review other databases, immigration databases, to get a handle on the case and understand the options for the petitioner, how she would wish to proceed.
Then I go and personally interview her. And I don't recall the specific instance when I did this. I could've gone back multiple times, as necessary, but I did interview her in person to receive these answers.
Q. Okay. And so the last full sentence of the 213, it starts

with "detention." Do you see that?
A. Yes.
Q. Can you read that for us, please.
A. "Detention, arrest, and transport not conducted by signator."
Q. And what does that mean?
A. It simply meant that I did not detain, arrest, or transport the petitioner.
Q. Okay. I'm going to ask you to turn to Exhibit 108 now, please.
THE COURT: Before you go there, the paragraph -- and would you be able to scroll back to that previous page, Ms. Garousi? Thank you.
The paragraph that begins right under "encounter," do you see that one?
THE WITNESS: Immigration history?
THE COURT: Encounter, so right above the immigration history --
THE WITNESS: Oh, okay. Yes.
THE COURT: -- that paragraph.
You indicated you didn't write it, and you also didn't know who would have drafted that; is that right?
THE WITNESS: Correct. It's my assumption that it would've been officers that were involved in her arrest.
THE COURT: And what's that assumption based on, if

anything?

THE WITNESS: That they would've been the sole individuals that would have had knowledge enough to write it.

THE COURT: Okay. So this language would not have been language that was pulled from a template?

THE WITNESS: No.

THE COURT: Would it have used some kind of template format?

THE WITNESS: Officers, in general, when they write that section, are familiar with writing it. They've written it many times. And so there would be kind of a progression and a good way to go about it.

MR. RATCLIFFE: Your Honor, we'll have testimony from the person who did write this section.

THE COURT: Oh, okay. So there won't be an unknown about -- all right.

And it sounds to me like many of the paragraphs -- or some of the paragraphs flow through supervisory review before being sent to you for inclusion in this report?

THE WITNESS: The first paragraph was directly. The encounter was also. And then the other parts would've only been reviewed by K.K. after I finished and submitted it to him for review.

However, sometimes there would need -- even after it was submitted and reviewed, if there was a typographical error

that was found, a correction would be made, resubmitted; or if there was new information that came to light, or if perhaps I re-interviewed the petitioner or something like -- there could've been various versions.

THE COURT: Okay. And then the -- right under criminal history, it says "none." In that last paragraph, it refers to a "he," not a "she." Would that language have been more of a template form used, unless there was something out of the ordinary to report?

THE WITNESS: Yes. That would've been a typographical error that I did not correct -- that I did not see.

THE COURT: And any reason to believe that that paragraph, with respect to not taking any medications, was incorrect in relation to this petitioner?

Is there any way to tell whether -- whether that information, even if it was -- even if it were a template that was placed here, was true of this petitioner?

THE WITNESS: Could you direct me to what -- under what number on my handwritten notes? The -- I wrote them on a different form when I needed scratch paper.

MS. GAROUSI: Your Honor, it's not an exhibit.

MR. RATCLIFFE: Your Honor, we ask for permission to refresh the witness' recollection with another document, if you'll give us a moment to pull that up.

THE COURT: Sure, of course.

Do you have a copy for Mr. Manning to review? Or you can show the document before --

MR. RATCLIFFE: It's in discovery. I think we'll be able to provide him a Bates number.

And then, to the witness, I just want to let you know we're going to show you a document. I'll ask you to review it. If it reflects your recollection -- review it, then put it down. And if it reflects your recollection -- or I'm sorry -- refreshes your recollection, you can then testify to it. But don't just read from it.

THE WITNESS: Okay.

THE COURT: So the way that -- the way that the recollection refreshed will work is your -- you can go ahead and show the document. You can show him anything if it might refresh the recollection.

So just look at the document. Tell me if it refreshes your recollection. And then -- and then we'll address any evidentiary issues in a moment.

THE WITNESS: Thank you.

THE COURT: Does reviewing that document refresh your recollection about the -- I guess, the substance of your answer to my question about that paragraph?

THE WITNESS: It does. Those notes were handwritten notes that I took during my interview with the petitioner. So

it would -- what is in the 213 would accurately refer to the --

THE COURT: To your notes?

THE WITNESS: -- petitioner.

So, yes -- so, yes, that section is a common section from a template form. I mean, all of -- the whole document would've been; but then I would return, delete, and type. And then that is a section that I, obviously, missed that one correction.

THE COURT: Okay. And then on the next page, page three of three -- Ms. Garousi, were you done -- I think you said you were done talking about this document?

MS. GAROUSI: Yes, Your Honor.

THE COURT: So before we move on from that document, are those six sentences that start with "the subject" -- where -- how was that information derived? Where did it come from?

THE WITNESS: The first one would've been through service of forms and my interview. The second --

THE COURT: So your interview -- you interviewed the petitioner?

THE WITNESS: Yes.

THE COURT: And do you speak Spanish, or did you have an interpreter with you?

THE WITNESS: I speak Spanish.

THE COURT: Okay. And in your communications

directly with the petitioner, you indicated that she claims no fear of returning to Mexico?

THE WITNESS: Correct.

THE COURT: And that's what you reported here in this report?

THE WITNESS: Correct.

THE COURT: Okay. And --

THE WITNESS: Let me -- the third, the same.

THE COURT: And the third, "The subject requests to be returned to Mexico as soon as possible"?

THE WITNESS: Yes.

THE COURT: And that was based on your --

THE WITNESS: My interview with her.

THE COURT: Your interview with her?

THE WITNESS: Correct.

THE COURT: No other documents? I mean, were there other documents in which she indicated that?

THE WITNESS: I would have to look at the 826 to review the language in there.

THE COURT: Okay. And I think the sentence four says, "Subject was issued a I-826, requesting a VR."

THE WITNESS: Correct.

THE COURT: And that's what you were --

THE WITNESS: Yes.

THE COURT: -- just referring to now?

THE WITNESS: Yep. That form would -- had been a form that she reviewed and made selections on, which would have -- but primarily from my interview, she requested to be returned -- to not be -- to be detained for as small amount of time as possible.

THE COURT: And do you recall how long the interview that you conducted took with the petitioner?

THE WITNESS: No, I do not.

THE COURT: Do you have a sense of what -- the typical amount of time that you took with individuals that were being detained and processed at the facility here?

THE WITNESS: It depends. I offer -- I offered everybody I interacted with the opportunity to make a phone call to family, friends, and/or an attorney. Oftentimes that would include retrieving a cell phone, powering it on. I never gave any time restrictions on telephone calls. So sometimes they were long. It could be up to half an hour.

THE COURT: Did you have the sole authority to direct how long phone calls could take? Or were there other people who could also -- once you gave somebody the opportunity to make a phone call, was there anyone else who could direct how long a phone call could take, by cutting it short or even extending it beyond what you would've allowed?

THE WITNESS: Pattern and practice is -- there's a lot of pattern and practice. My pattern and practice is to not

restrict the time and -- but to give the -- the subject only one successful call to friend or family member and then one successful phone call to an attorney and then a third one successful telephone call to a consular officer, if they so desired any of those.

THE COURT: Okay.

THE WITNESS: However, anybody in the building could have offered her an additional phone call.

THE COURT: All right. At their discretion?

THE WITNESS: Yes.

THE COURT: All right. Ms. Garousi.

MS. GAROUSI: Thanks, Your Honor.

BY MS. GAROUSI

Q. Okay. Officer B.W., I'm going to ask you to go to Exhibit 108, please.

Is this a Form I-826?

A. Yes.

Q. And this is in Spanish. And the Court just asked you a question about this, but do you speak Spanish?

A. Yes.

Q. And what's your proficiency?

A. I am not a native speaker, but I am fluent.

Q. And so what is the purpose of a Form I-826?

A. The top section is an advisal of rights and notifications. The second section is where an individual would be allowed to

select their preference for proceeding through immigration proceedings. And then the third is my -- where I certify that I served the individual.

MR. RATCLIFFE: Mr. Manning, could you scroll down for us? Thank you for driving the bus here. I want to make sure that everyone has a chance to see the rest of that form, given there's been testimony about the other sections.

MS. GAROUSI: Thanks.

BY MS. GAROUSI

Q. And I believe on the 213 it indicated that you issued this form as a result of petitioner requesting a voluntary return; is that correct?

A. Yes.

Q. And so there are three options to check -- or for petitioner to have initialed in that middle box there. Do you see that?

A. Yes.

Q. You don't have to translate; but, roughly speaking, what's the first option say?

A. To proceed -- to fight her case before an immigration judge.

Q. And what's the second option say?

A. To claim fear of removal, to claim asylum.

Q. Okay. What's the third option say?

A. To admit the Government's allegations, to indicate no fear

of return, to renounce the right to enter into the immigration court process, and to return to the country of origin and an understanding that she would possibly be detained until her departure.

Q. And which option did petitioner initial next to?
A. The third.
Q. Okay. And then that last box down there says "certification of service." Is that your signature at the bottom?
A. Yes.
Q. And it looks like there's some -- that there's some check marks. There's one check box next to -- checked box next to "notice read by subject." What does that mean?
A. It indicates that she read the document.
Q. And the box below it is also checked. It says, "Notice read -- read to subject by" -- and I assume that's your officer number?
A. It is.
Q. Did you read the form to her as well?
A. Initially, when I present this document, I ask if the subject can read and understand Spanish. And then I make two marks on that first box and request the subject -- or an individual to read it. And then I ask them if they understand it.

Almost always clarification or another explanation is

needed. And I do not recall the specific instance when I served this document on the petitioner. However, as I marked the box, I must have reread it to her, I'm assuming because she had questions or needed further explanation.
Q. And you would have given her that clarification then, if you read it to her?
A. Yes.
Q. All right. Officer B.W., I'm going to ask you to turn to Exhibit 107, please.
What is this document?
A. Form I-200.
Q. And what is a Form I-200?
A. Warrant for arrest of alien.
Q. Did you generate this I-200?
A. Yes.
Q. And did you sign the I-200?
A. Yes.
Q. Do you know when the I-200 was generated?
A. Not exactly. However, if -- because I generated it, it would've been after the petitioner arrived at the office, after I received my initial packet and started inputting data and creating and printing documents.
Q. And why would you have generated an I-200 after petitioner was already at the field office?
A. As instructed by management.

THE COURT: Other than the instruction from management, is there a -- do you have an understanding as to why they're being prepared after they're already in detention?

THE WITNESS: My understanding, in practice and something that I feel is advantageous to anybody that it's served upon, is to inform them that they are under arrest for violation of the INA and that they are in immigration custody.

THE COURT: Okay.

BY MS. GAROUSI

Q. And then on this form there are a few more checks boxes. It looks like five of them, and the last one is checked. Do you see that?

A. Yes.

MR. RATCLIFFE: Can we scroll up, Mr. Manning? Thank you.

BY MS. GAROUSI

Q. And so that says -- can you read that check box for us, please.

A. "Statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or, notwithstanding, such status is removable under U.S. immigration law."

Q. And would you have checked that box?

A. Yes.

Q. And what statements or reliable evidence would've led you to check that box?
A. Immigration database queries based upon her fingerprints and other queries based upon name and date of birth search.
THE COURT: Wouldn't it have been the fourth box, biometric data? Or biometric confirmation, rather than statements made voluntarily?
THE WITNESS: It could have been. That box could have -- could have been checked. When I marked -- multiple boxes could be checked; however, that last box that says "reliable evidence" --
THE COURT: "Other reliable evidence" --
THE WITNESS: Yeah, that --
THE COURT: -- is sort of a catch-all that might include biometric data?
THE WITNESS: Yes. If you will, it's the bare minimum that is -- but is adequate.
THE COURT: Okay.
BY MS. GAROUSI
Q. And so do you present this form to your supervisor?
A. Yes.
Q. And your supervisor's K.K.?
A. Correct.
Q. And then he signs the form?
A. Yes.

Q. And then you serve this form on petitioner?
A. Yes.
Q. So other than signing the I-213, the I-826, and the I-200, did you serve petitioner with any other documents?
A. I don't believe so.
Q. Did you have any other interaction with petitioner, other than serving her these documents and asking her those interview questions we talked about earlier?
A. No.

MS. GAROUSI: No further questions, Your Honor.

THE COURT: All right. I've been notified that we do have a court reporter available today. It might ease some of the -- the folks with criminal law background and experience less anxiety that we're operating on FTR only. How about we take a recess and see -- and, Ms. Paget, I just want to confirm: Is our court reporter able to set up?

THE COURTROOM DEPUTY CLERK: She's waiting outside.

THE COURT: Okay. Well --

MR. RATCLIFFE: Your Honor, I'm not sure what the availability is of petitioner. Is she even available to -- is that --

THE COURT: Oh --

MR. MANNING: It's the court reporter.

MR. RATCLIFFE: Oh, I'm sorry. Court reporter, not --

THE COURT: Court reporter.

MR. RATCLIFFE: Sorry.

THE COURT: That's all right.

MR. RATCLIFFE: Never mind.

THE COURT: We're all there, Mr. Ratcliffe. Let's take the recess so our court reporter can set up. Ten minutes.

I want to remind you that you're still a witness, and I've excluded -- excluded witnesses. So you can't talk to anybody until your testimony is over and I've given you further instructions. Okay?

THE WITNESS: Understood.

THE COURT: So you're welcome to step down and stretch your legs for a bit.

THE WITNESS: Thank you.

THE COURT: All right. We're in recess for ten minutes. As soon as the court reporter gets set up, we'll continue.

MR. RATCLIFFE: Thank you, Your Honor.

* * *

(Court adjourned, Volume 1, 12-3-25 at 9:51 a.m.)

C E R T I F I C A T E

M-J-M-A v. Wasmley, et al.

Case No. 6:25-cv-02011-MTK

Evidentiary Hearing - Volume 1

December 3, 2025

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the FTR-recorded proceedings in the above-entitled cause. Where (indiscernible) has been indicated, the audio file was unable to be heard due to simultaneous crosstalk, fast speaking, mumbling, or other room noises overriding what was being said. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

Official Court Reporter — Signature Date: 12/17/2025
Oregon CSR No. 14-0427 — CSR Expiration Date: 6/30/2026

**MR. MANNING: [6]** 262/15 264/2 265/4 268/19 268/21 294/23
**MR. RATCLIFFE: [20]** 262/11 262/16 262/20 262/22 263/1 263/5 264/14 265/16 269/8 269/14 282/13 283/23 284/4 289/4 292/14 294/19 294/24 295/2 295/4 295/18
**MS. GAROUSI: [13]** 262/10 263/10 268/7 269/25 274/14 274/23 275/20 278/22 283/22 285/12 288/12 289/8 294/10
**THE COURT: [87]**
**THE COURTROOM DEPUTY CLERK: [6]** 262/5 263/18 264/6 264/9 264/13 294/17
**THE WITNESS: [53]**

**'**

**'cause [2]** 264/10 265/7

**/**

**/s/Lindsey [1]** 296/21

**0**

**0427 [1]** 296/23

**1**

**1000 [3]** 260/13 260/18 260/22
**107 [1]** 291/9
**108 [2]** 281/9 288/15
**109 [2]** 274/19 275/20
**12 [1]** 271/22
**12-3-25 [1]** 295/20
**12/17/2025 [1]** 296/22
**13 [1]** 273/4
**14 [1]** 272/8
**14-0427 [1]** 296/23
**15th [1]** 272/11
**17th [2]** 267/8 267/10
**18th [3]** 267/8 267/9 267/10
**19th [2]** 267/8 267/10

**2**

**200 [9]** 260/5 260/9 291/11 291/12 291/14 291/16 291/18 291/23 294/3
**2025 [5]** 259/18 261/3 262/1 296/6 296/22
**2026 [1]** 296/23
**213 [11]** 273/20 275/3 275/4 275/12 275/23 279/15 279/22 280/25 285/1 289/10 294/3
**213s [1]** 276/13
**22nd [1]** 267/9
**23rd [1]** 267/9
**25 [1]** 295/20
**262 [1]** 261/3
**270 [1]** 261/9
**296 [1]** 261/4

**3**

**301 [1]** 260/22
**30th [1]** 277/24
**326-8047 [1]** 260/23
**333 [2]** 260/5 260/9

**5**

**503 [1]** 260/23
**5th [2]** 260/5 260/9

**6**

**6/30/2026 [1]** 296/23
**600 [2]** 260/14 260/18
**6:25-cv-02011-MTK [2]** 259/7 296/4

**8**

**8047 [1]** 260/23
**826 [5]** 286/18 286/21 288/16 288/23 294/3

**9**

**97204 [5]** 260/6 260/10 260/14 260/19 260/22
**9:06 [1]** 262/1
**9:24 a.m [2]** 274/22 274/24
**9:51 [1]** 295/20

**A**

**a.m [4]** 262/1 274/22 274/24 295/20
**able [6]** 265/8 267/11 268/1 281/12 284/5 294/16
**about [24]** 262/19 264/20 264/22 267/21 267/21 268/15 269/12 270/6 270/23 271/25 272/7 272/11 272/20 274/12 279/17 282/12 282/16 284/22 284/23 285/11 288/19 289/7 294/8 294/14
**above [2]** 281/17 296/12
**above-entitled [1]** 296/12
**absence [3]** 264/18 267/25 268/22
**accept [2]** 267/24 268/14
**accepted [2]** 266/6 267/19
**access [3]** 275/14 275/15 280/15
**accommodated [1]** 266/12
**accommodating [1]** 269/5
**accurate [1]** 278/20
**accurately [1]** 285/1
**active [1]** 270/19
**actually [6]** 262/18 266/8 266/17 270/19 270/24 277/3
**add [2]** 277/5 277/12
**additional [1]** 288/8
**address [2]** 269/12 284/19
**adequate [1]** 293/17
**adjourned [1]** 295/20
**Administrative [1]** 272/13
**admit [1]** 289/25
**adult [1]** 259/5
**advantageous [1]** 292/5
**advisal [1]** 288/24
**advised [2]** 266/25 267/14
**affect [1]** 268/10
**affirmatively [1]** 292/21
**after [9]** 267/20 272/24 280/15 282/22 282/24 291/20 291/20 291/23 292/3
**afternoon [2]** 266/11 267/14
**afternoons [1]** 267/8
**again [3]** 267/10 268/13 272/10
**Agent [2]** 269/23 270/9
**ahead [1]** 284/14
**al [2]** 259/9 296/3
**alien [3]** 276/3 276/25 291/13
**Alienage [1]** 278/25
**all [28]** 262/17 262/21 262/24 263/8 263/8 263/11 264/11 265/14 266/17 268/8 269/11 269/23 270/21 271/5 271/8 278/16 278/24 280/5 282/16 285/5 288/9 288/11 291/8 293/14 294/11 295/3 295/5 295/15
**all-day [1]** 266/17
**allegations [1]** 289/25
**allow [1]** 266/2
**allowed [2]** 287/23 288/25
**Almost [1]** 290/25
**along [1]** 273/20
**already [2]** 291/24 292/3
**also [10]** 264/3 265/18 268/5 270/22 270/25 273/3 281/21 282/21 287/20 290/15
**alternating [1]** 267/12
**always [2]** 269/17 290/25
**am [2]** 288/22 288/22
**amount [2]** 287/4 287/10
**amplification [3]** 270/25 271/1 271/3
**amplify [1]** 270/24
**annotations [1]** 273/20
**another [3]** 267/17 283/24 290/25
**answer [3]** 265/15 265/16 284/22
**answers [3]** 280/12 280/14 280/24
**anticipation [1]** 266/11
**anxiety [1]** 294/14
**any [16]** 268/9 268/10 269/4 271/23 272/14 275/13 278/5 278/9 283/13 283/14 283/16 284/19 287/16 288/5 294/4 294/6
**anybody [4]** 275/13 288/7 292/5 295/9
**anyone [1]** 287/21
**anything [5]** 262/13 269/11 279/17 282/1 284/15
**apart [1]** 279/21
**apologize [2]** 264/14 264/15
**apparently [1]** 266/3
**appearance [3]** 268/3 268/16 269/12
**APPEARANCES [1]** 259/19
**appears [1]** 280/6
**apply [2]** 264/18 264/19
**appreciably [1]** 262/23
**approach [1]** 274/14
**appropriate [2]** 264/21 278/16
**approximately [3]** 271/22 272/1 272/6
**are [14]** 267/23 270/11 273/17 276/5 278/19 278/19 278/19 280/8 282/10 285/14 289/14 292/6 292/7 292/10
**area [5]** 271/17 272/2 273/14 273/15 274/1
**ARIANA [1]** 260/12
**around [1]** 278/13
**arrest [10]** 272/20 272/24 279/11 279/18 279/19 281/4 281/7 281/24 291/13 292/6
**arresting [2]** 272/24 273/5
**arrive [1]** 272/6
**arrived [1]** 291/20
**art [1]** 270/12
**as [30]** 263/15 263/17 263/25 264/1 265/21 265/22 266/3 266/6 268/17 269/1 269/1 269/7 269/7 273/24 275/23 277/6 277/9 278/18 280/23 286/10 286/10 287/4 287/5 289/11 290/19 291/2 291/25 292/2 295/16

**A**

**as... [1]** 295/16
**ask [11]** 270/12 270/17 274/18 280/13 281/9 283/23 284/7 288/14 290/20 290/23 291/8
**asked [1]** 288/18
**asking [2]** 270/17 294/7
**assist [2]** 266/21 273/13
**assume [4]** 270/14 270/24 271/4 290/16
**assuming [2]** 263/25 291/3
**assumption [3]** 279/11 281/23 281/25
**asylum [1]** 289/23
**attention [1]** 267/13
**attorney [2]** 287/14 288/3
**Attorney's [1]** 260/17
**audio [3]** 270/16 271/3 296/13
**authority [1]** 287/18
**availability [2]** 268/11 294/20
**available [8]** 265/7 267/1 267/4 267/5 267/5 267/7 294/12 294/20
**Avenue [5]** 260/5 260/9 260/13 260/18 260/22
**away [1]** 270/23

**B**

**B.W [12]** 261/9 263/10 263/14 269/23 270/3 270/9 271/12 272/19 274/18 275/2 288/14 291/8
**back [5]** 266/8 272/22 277/24 280/23 281/12
**background [2]** 275/8 294/13
**bare [1]** 293/16
**based [7]** 265/23 270/15 275/11 281/25 286/12 293/3 293/4
**bases [1]** 278/17
**basically [1]** 273/19
**Bates [1]** 284/5
**be [53]**
**became [2]** 266/16 266/24
**because [4]** 265/21 270/14 291/3 291/19
**been [26]** 263/16 266/10 268/8 273/4 274/19 278/8 279/12 279/21 280/1 281/24 282/2 282/5 282/22 283/4 283/7 283/10 285/6 285/17 287/1 289/7 291/20 293/5 293/8 293/9 294/11 296/12
**before [11]** 259/16 262/13 265/2 266/12 269/18 270/17 281/11 282/18 284/3 285/13 289/20
**begin [1]** 266/10
**beginning [1]** 266/14
**begins [1]** 281/14
**behalf [1]** 263/15
**being [7]** 265/19 270/25 271/4 282/19 287/11 292/3 296/15
**believe [7]** 267/8 268/4 268/10 272/11 283/13 289/10 294/5
**below [2]** 290/15 296/9
**beyond [1]** 287/23
**Billy [1]** 263/20
**biographic [1]** 275/7
**biometric [3]** 293/6 293/6 293/15
**biometrics [4]** 273/15 273/17 275/12 280/16
**birth [1]** 293/4
**bit [4]** 269/20 276/1 276/1 295/13
**Border [1]** 271/24
**bottom [1]** 290/9
**box [13]** 289/15 290/7 290/12 290/12 290/15 290/22 291/3 292/17 292/24 293/2 293/5 293/8 293/10
**boxes [2]** 292/10 293/10
**brings [1]** 272/22
**broken [1]** 278/19
**brought [1]** 267/13
**building [6]** 272/13 273/2 273/6 274/1 278/3 288/7
**bumps [1]** 270/20
**bunch [1]** 274/5
**bus [1]** 289/5

**C**

**call [10]** 263/10 268/25 269/9 287/14 287/21 287/22 288/2 288/3 288/4 288/8
**called [3]** 263/15 264/1 273/8
**calls [2]** 287/16 287/19
**came [1]** 283/2
**CAMILLA [1]** 259/8
**can [11]** 269/6 270/10 281/3 284/3 284/10 284/14 284/15 290/21 292/14 292/17 295/6
**can't [2]** 265/21 295/8
**case [11]** 264/17 264/18 264/19 264/20 264/21 268/23 269/1 274/13 280/19 289/20 296/4
**cases [1]** 267/3
**catch [1]** 293/14
**catch-all [1]** 293/14
**cause [1]** 296/12
**cell [1]** 287/15
**Certificate [1]** 261/4
**certification [1]** 290/8
**certified [1]** 296/17
**certify [2]** 289/2 296/9
**chance [2]** 266/19 289/6
**changed [1]** 278/19
**characterization [1]** 265/5
**charges [1]** 280/4
**check [8]** 262/18 270/18 273/24 289/14 290/11 290/12 292/17 293/2
**checked [6]** 290/12 290/15 292/11 292/24 293/9 293/10
**checks [1]** 292/10
**chief [1]** 269/1
**Civil [1]** 260/13
**claim [2]** 289/23 289/23
**claims [3]** 280/6 280/9 286/1
**clarification [4]** 270/13 276/19 290/25 291/5
**clear [2]** 266/24 270/14
**clearly [1]** 270/25
**client's [2]** 268/17 268/17
**clock [1]** 264/7
**close [1]** 270/18
**come [6]** 263/12 272/3 273/2 275/8 275/13 285/15
**comes [2]** 275/9 275/10
**comment [1]** 270/6
**committed [1]** 269/3
**common [2]** 277/11 285/4
**communications [1]** 285/25
**complete [3]** 269/7 278/17 280/1
**comprehend [1]** 270/10
**concern [2]** 268/9 268/9
**concerned [1]** 265/20
**conditions [1]** 268/6
**conducted [2]** 281/4 287/7
**conferred [1]** 267/21
**confirm [2]** 270/20 294/16
**confirmation [1]** 293/6
**conformed [1]** 296/16
**consideration [1]** 274/6
**consular [1]** 288/4
**continue [4]** 262/14 266/24 267/16 295/17
**continuing [1]** 268/5
**coordinate [1]** 267/2
**coordinates [1]** 267/2
**copy [3]** 276/10 278/18 284/2
**correct [14]** 264/2 268/19 275/12 277/1 278/11 281/23 283/11 286/3 286/6 286/15 286/22 289/12 293/23 296/10
**correction [2]** 283/1 285/8
**could [16]** 269/7 272/20 275/13 275/14 283/19 287/17 287/19 287/20 287/21 287/22 288/7 289/4 293/8 293/8 293/9 293/10
**could've [3]** 278/6 280/22 283/4
**counsel [4]** 264/22 267/20 267/21 268/25
**country [1]** 290/2
**couple [2]** 273/21 274/12
**course [1]** 284/1
**court [19]** 259/1 259/17 262/4 262/6 264/3 265/24 268/11 270/7 288/18 290/2 294/12 294/16 294/23 294/24 295/1 295/6 295/16 295/20 296/22
**Courthouse [1]** 260/21
**courtroom [1]** 263/13
**cover [1]** 278/16
**covers [1]** 271/18
**create [2]** 273/12 274/10
**created [2]** 273/9 273/19
**creating [1]** 291/22
**cried [1]** 263/5
**criminal [8]** 264/17 264/18 264/21 265/6 274/4 280/17 283/6 294/13
**cross [4]** 261/8 261/8 268/24 269/10
**cross-examination [2]** 268/24 269/10
**crosstalk [1]** 296/14
**CRR [2]** 260/21 296/21
**CSR [4]** 260/21 296/21 296/23 296/23
**custody [1]** 292/7
**Customs [2]** 259/9 271/15
**cutting [1]** 287/22
**cv [2]** 259/7 296/4

**D**

**data [9]** 273/13 274/10 275/8 275/14 275/15 280/16 291/21 293/6 293/15
**database [1]** 293/3
**databases [2]** 280/18 280/18
**date [6]** 269/6 272/7 272/10 293/4 296/22 296/23
**dates [1]** 267/7
**day [7]** 266/14 266/15 266/17 266/19 266/20 266/25 267/17

D

**days [3]** 266/9 267/10 267/12
**December [4]** 259/18 261/3 262/1 296/6
**decided [1]** 266/3
**decision [2]** 265/22 266/2
**delete [1]** 285/6
**Department [1]** 271/13
**departure [1]** 290/4
**Depending [1]** 274/4
**depends [1]** 287/12
**Deportable [2]** 276/3 276/24
**Deportable/Excludable [2]** 276/3 276/24
**Deportation [1]** 271/20
**deputy [1]** 263/13
**derived [1]** 285/15
**designated [1]** 273/23
**desired [1]** 288/5
**detain [1]** 281/7
**detained [3]** 287/4 287/11 290/3
**detainees [1]** 277/8
**detention [4]** 273/15 281/1 281/4 292/3
**determine [1]** 274/7
**determined [1]** 267/13
**developing [1]** 269/3
**did [29]** 262/24 265/17 272/6 272/14 272/15 275/4 276/8 276/9 276/12 279/3 279/8 279/9 279/24 280/13 280/22 280/23 281/7 282/14 283/11 283/11 285/15 285/22 287/18 290/5 290/19 291/14 291/16 294/4 294/6
**didn't [2]** 281/21 281/22
**different [6]** 273/21 274/1 274/6 277/12 277/12 283/21
**digitally [1]** 296/17
**direct [5]** 261/8 270/1 283/19 287/18 287/21
**directed [2]** 272/5 277/20
**directly [2]** 282/20 286/1
**Director [1]** 259/8
**disagree [1]** 265/5
**discovery [1]** 284/4
**discretion [1]** 288/9
**discussed [1]** 269/2
**discussion [3]** 266/1 274/22 274/24
**DISTRICT [6]** 259/1 259/2 259/17 260/21 262/6 262/6
**DIVISION [2]** 259/3 260/13
**DNA [2]** 273/16 273/21
**do [37]** 263/23 264/5 264/6 265/1 271/12 271/16 271/23 272/9 272/14 274/3 274/21 276/2 276/5 277/14 277/18 277/21 278/3 278/15 278/25 279/5 279/11 280/5 281/1 281/14 284/2 285/22 287/6 287/8 287/9 288/19 289/15 291/1 291/18 292/2 292/11 293/20 294/11
**document [13]** 283/24 284/3 284/7 284/15 284/17 284/21 285/5 285/11 285/13 290/14 290/20 291/2 291/10
**documents [9]** 274/10 274/10 274/12 277/8 286/16 286/17 291/22 294/4 294/7
**does [6]** 272/21 275/8 281/6 284/21 284/24 290/13
**doing [1]** 264/16
**DOJ [1]** 260/12
**DOJ-USAO [1]** 260/12
**don't [17]** 263/12 264/3 264/10 268/3 268/21 268/21 270/7 270/7 270/8 271/3 272/7 272/10 277/22 280/21 284/11 289/18 294/5
**done [2]** 285/10 285/11
**double [2]** 262/18 270/18
**double-check [2]** 262/18 270/18
**down [6]** 278/24 280/5 284/9 289/4 290/7 295/12
**drafted [1]** 281/22
**driving [1]** 289/5
**due [1]** 296/13
**duly [1]** 263/16
**duration [1]** 272/18
**during [6]** 264/24 266/1 273/10 273/10 273/22 284/25
**duties [1]** 272/12

E

**e-mail [2]** 277/4 278/4
**each [1]** 262/22
**EAGLE [5]** 273/9 274/9 275/9 275/10 280/15
**earlier [1]** 294/8
**early [2]** 266/16 266/18
**ease [1]** 294/12
**either [5]** 263/3 268/4 272/24 273/4 292/21
**else [3]** 269/11 279/17 287/21
**encounter [5]** 279/5 279/17 281/14 281/17 282/21
**end [2]** 268/13 270/22
**enforcement [3]** 259/9 271/15 271/23
**engage [1]** 268/1
**enough [1]** 282/3
**ensure [1]** 268/5
**enter [1]** 290/1
**entire [1]** 266/15
**entitled [1]** 296/12
**ERO [1]** 259/9
**error [2]** 282/25 283/11
**establish [1]** 280/3
**et [2]** 259/9 296/3
**EUGENE [1]** 259/3
**even [6]** 266/12 282/24 283/17 283/17 287/22 294/20
**event [3]** 273/9 273/13 275/14
**events [1]** 266/5
**everybody [2]** 270/17 287/13
**everyone [2]** 267/14 289/6
**everyone's [1]** 267/13
**evidence [5]** 269/19 292/20 293/1 293/11 293/12
**evident [1]** 266/16
**evidentiary [7]** 259/14 267/16 267/17 268/5 272/19 284/19 296/5
**exact [2]** 272/7 272/10
**exactly [1]** 291/19
**examination [3]** 268/24 269/10 270/1
**examined [1]** 263/16
**Excludable [2]** 276/3 276/24
**excluded [2]** 295/8 295/8
**excuse [1]** 267/9
**exhausted [1]** 263/2
**exhibit [7]** 274/19 275/17 275/18 281/9 283/22 288/15 291/9
**Exhibit 107 [1]** 291/9
**Exhibit 108 [2]** 281/9 288/15
**Exhibit 109 [1]** 274/19
**exhibits [1]** 274/15
**experience [2]** 271/23 294/13
**Expiration [1]** 296/23
**explanation [2]** 290/25 291/4
**expression [1]** 268/9
**extending [1]** 287/23

F

**facility [3]** 272/16 272/23 287/11
**familiar [1]** 282/10
**family [2]** 287/14 288/2
**fast [1]** 296/14
**fear [3]** 286/2 289/23 289/25
**feel [1]** 292/5
**feels [1]** 269/19
**few [2]** 270/20 292/10
**field [10]** 259/8 271/16 271/17 271/18 272/3 272/14 272/22 273/5 279/19 291/24
**fight [1]** 289/20
**file [3]** 273/19 280/15 296/13
**filled [1]** 267/11
**finding [1]** 268/13
**fine [1]** 265/19
**fingerprint [1]** 273/16
**fingerprints [2]** 280/16 293/3
**finished [1]** 282/22
**first [11]** 263/8 263/16 263/18 265/2 273/12 275/7 276/22 282/20 285/17 289/19 290/22
**five [2]** 262/19 292/11
**flow [1]** 282/18
**fluent [1]** 288/22
**FOD [1]** 271/17
**folks [1]** 294/13
**follow [2]** 278/15 280/8
**following [3]** 262/3 266/8 266/19
**follows [1]** 263/17
**foregoing [1]** 296/9
**form [20]** 275/2 277/7 278/12 278/19 283/8 283/21 285/5 287/1 287/2 288/16 288/23 289/6 289/11 290/19 291/11 291/12 292/10 293/20 293/24 294/1
**format [1]** 282/8
**forms [1]** 285/18
**forward [2]** 265/23 266/2
**forwarded [1]** 279/13
**found [1]** 283/1
**four [1]** 286/20
**fourth [1]** 293/5
**framed [1]** 265/20
**friend [1]** 288/2
**friends [1]** 287/14
**FTR [6]** 259/15 264/5 264/8 270/7 294/14 296/11
**FTR-RECORDED [2]** 259/15 296/11
**full [3]** 266/20 269/3 280/25
**further [3]** 291/4 294/10 295/9
**future [2]** 268/11 269/6

## G

**GAROUSI [8]** 260/12 269/24 271/10 275/18 278/21 281/13 285/10 288/11
**gave [2]** 287/16 287/20
**general [2]** 260/24 282/9
**generalized [1]** 279/13
**Generally [1]** 278/15
**generate [4]** 273/25 274/2 275/4 291/14
**generated [6]** 273/4 273/7 276/13 291/18 291/19 291/23
**get [1]** 280/18
**gets [2]** 275/10 295/16
**give [2]** 283/25 288/1
**given [6]** 267/7 278/6 280/12 289/7 291/5 295/9
**go [14]** 265/23 266/2 266/8 266/19 270/21 275/6 275/16 276/1 280/9 280/21 281/11 282/12 284/14 288/14
**going [20]** 264/10 265/10 266/3 266/13 266/17 266/19 266/24 267/4 267/7 267/14 268/25 270/12 270/24 271/1 271/4 274/18 281/9 284/7 288/14 291/8
**gone [1]** 280/22
**good [10]** 262/9 262/10 262/11 262/12 263/12 266/18 270/3 270/4 270/21 282/12
**got [1]** 263/7
**Government's [2]** 268/23 289/25
**group [1]** 279/14
**guardian [1]** 271/2
**guess [1]** 284/22

## H

**had [9]** 266/10 266/21 270/6 275/14 275/15 276/13 282/3 287/1 291/4
**hadn't [1]** 269/2
**half [4]** 267/10 267/12 267/12 287/17
**hand [1]** 274/8
**handle [1]** 280/18
**handwritten [4]** 273/20 279/21 283/20 284/24
**happening [1]** 271/1
**happens [1]** 272/22
**has [6]** 264/23 267/24 268/15 273/19 289/6 296/12
**have [50]**
**having [2]** 263/16 267/21
**he [3]** 267/4 283/7 293/24
**head [2]** 270/20 270/24
**hear [2]** 270/20 271/3
**heard [4]** 265/1 268/12 272/20 296/13
**hearing [9]** 259/14 264/25 265/8 266/10 266/17 267/16 267/17 272/19 296/5
**heavy [1]** 262/24
**held [1]** 262/3
**help [2]** 263/24 264/4
**helps [1]** 267/2
**her [27]** 264/24 265/11 265/19 266/22 268/3 268/3 268/3 268/10 268/11 268/11 268/22 269/9 280/21 280/23 281/24 286/13 286/14 288/8 289/20 290/3 290/19 291/3 291/5 291/6 293/3 294/7 294/7
**here [16]** 263/12 263/25 264/23 265/19 265/19 265/21 266/1 267/23 270/16 277/24 278/13 278/14 283/18 286/4 287/11 289/5
**him [3]** 282/22 284/5 284/15
**history [8]** 274/5 279/24 280/2 280/17 280/17 281/16 281/18 283/6
**Homeland [1]** 271/13
**Honor [23]** 262/11 262/15 262/16 264/2 264/14 265/4 265/16 268/7 268/19 269/8 269/14 269/25 274/14 275/20 278/22 282/13 283/22 283/23 285/12 288/12 294/10 294/19 295/18
**HONORABLE [2]** 259/16 262/7
**hour [1]** 287/17
**housekeeping [3]** 262/13 264/15 269/18
**housekeeping-wise [1]** 262/13
**how [9]** 264/10 271/21 271/25 280/19 285/15 287/6 287/19 287/21 294/14
**however [7]** 264/20 278/2 282/24 288/7 291/2 291/19 293/10

## I

**I'll [5]** 264/11 269/5 271/5 271/5 284/7
**I'm [16]** 263/25 265/20 270/5 270/12 270/24 271/1 271/4 271/10 274/18 281/9 284/9 288/14 291/3 291/8 294/19 294/24
**I've [5]** 268/12 270/22 294/11 295/8 295/9
**I-200 [7]** 291/11 291/12 291/14 291/16 291/18 291/23 294/3
**I-213 [3]** 275/3 275/4 294/3
**I-826 [4]** 286/21 288/16 288/23 294/3
**ICE [5]** 259/9 271/19 272/13 272/16 272/21
**ICE/ERO [1]** 259/9
**imagine [2]** 269/7 269/17
**immigration [19]** 259/8 271/15 271/23 274/5 279/23 280/1 280/4 280/17 280/18 281/16 281/17 289/1 289/20 290/1 292/7 292/20 292/21 292/23 293/3
**impact [1]** 268/11
**important [1]** 270/9
**importantly [1]** 270/13
**INA [1]** 292/7
**inbox [1]** 279/13
**inches [1]** 270/23
**include [6]** 273/15 277/23 278/6 278/9 287/15 293/15
**including [1]** 262/20
**inclusion [1]** 282/19
**incorrect [1]** 283/15
**INDEX [2]** 261/1 261/7
**indicate [2]** 289/25 292/21
**indicated [5]** 281/21 286/1 286/17 289/10 296/13
**indicates [1]** 290/14
**indicating [1]** 265/18
**indicator [1]** 264/8
**indiscernible [1]** 296/12
**individual [4]** 274/11 288/25 289/3 290/23
**individual's [1]** 274/4
**individuals [2]** 282/3 287/10
**infant [1]** 263/5
**inform [1]** 292/6
**information [6]** 265/24 275/8 275/10 283/2 283/17 285/15
**initial [5]** 273/6 273/13 280/15 290/5 291/21
**initialed [1]** 289/15
**Initially [2]** 273/2 290/20
**initials [3]** 263/19 269/21 277/16
**Innovation [2]** 260/4 260/8
**input [4]** 273/13 274/10 275/14 275/15
**inputting [1]** 291/21
**insertion [1]** 279/14
**instance [2]** 280/22 291/1
**instructed [7]** 273/25 276/10 277/5 277/11 277/14 277/23 291/25
**instruction [1]** 292/1
**instructions [2]** 278/6 295/10
**interacted [1]** 287/13
**interaction [1]** 294/6
**interested [1]** 264/18
**interject [1]** 271/5
**interpretation [3]** 265/7 265/17 265/25
**interpreter [5]** 265/6 265/7 265/11 265/22 285/23
**interpreters [7]** 263/23 266/21 267/1 267/5 267/6 267/9 270/8
**interpreting [9]** 266/7 266/20 266/21 266/22 267/3 267/15 267/17 267/22 267/25
**interview [10]** 280/21 280/23 284/25 285/18 285/19 286/13 286/14 287/3 287/6 294/7
**interviewed [2]** 283/3 285/19
**involved [2]** 268/2 281/24
**is [68]**
**isn't [1]** 271/1
**issue [1]** 274/8
**issued [2]** 286/21 289/10
**issues [1]** 284/19
**it [81]**
**it'll [2]** 263/4 270/9
**it's [19]** 264/10 264/11 264/21 265/14 265/20 268/14 268/14 268/21 269/4 270/25 271/3 271/4 277/3 281/23 283/22 284/4 292/5 293/16 294/23

## J

**judge [2]** 259/17 289/21
**jump [3]** 269/18 278/24 280/5
**just [10]** 262/18 264/9 266/11 269/19 284/6 284/11 284/17 286/25 288/18 294/15

## K

**K.K [3]** 277/25 282/22 293/22
**KASUBHAI [2]** 259/16 262/7
**kind [3]** 269/18 282/7 282/11
**Knaebel [2]** 267/2 267/11
**knew [1]** 266/13
**know [10]** 264/10 266/10 269/5 273/24 274/21 279/11 279/17 281/22 284/6 291/18
**knowing [2]** 264/23 265/25
**knowledge [1]** 282/3

## L

**Lab [2]** 260/4 260/8

## L

**lacks [1]** 292/21
**language [10]** 277/6 277/13 278/6 278/10 278/12 280/9 282/4 282/5 283/7 286/19
**large [1]** 276/22
**last [6]** 263/19 280/25 283/6 290/7 292/11 293/10
**law [4]** 260/4 260/8 292/23 294/13
**least [2]** 263/7 264/22
**led [2]** 266/6 293/1
**left [1]** 272/9
**legal [10]** 270/11 274/1 274/2 274/4 274/7 274/10 274/12 277/12 278/17 280/3
**legally [1]** 268/4
**legs [1]** 295/13
**less [1]** 294/14
**let [3]** 269/4 284/6 286/8
**let's [3]** 263/8 276/1 295/5
**liberty [1]** 264/20
**lifting [1]** 262/25
**light [1]** 283/2
**like [11]** 263/5 269/19 275/7 275/11 278/12 279/23 280/12 282/17 283/3 290/11 292/11
**likely [1]** 278/5
**Lindsey [2]** 260/21 296/21
**little [1]** 269/19
**location [1]** 273/23
**long [6]** 271/21 271/25 287/6 287/17 287/19 287/22
**look [3]** 280/12 284/17 286/18
**looks [4]** 275/7 279/23 290/11 292/11
**lot [4]** 262/24 272/20 275/7 287/25
**lots [1]** 277/17

## M

**M-J-M-A [2]** 259/5 296/3
**made [10]** 264/23 265/22 266/1 268/15 270/15 272/24 283/1 287/2 292/19 293/7
**mail [2]** 277/4 278/4
**make [12]** 264/4 264/22 266/12 269/6 270/6 270/13 270/18 276/19 287/13 287/21 289/5 290/21
**makes [1]** 265/20
**manage [3]** 263/24 264/4 270/8
**managed [1]** 273/3
**management [4]** 272/5 278/3 291/25 292/2
**MANNING [9]** 260/8 262/14 265/1 267/24 268/15 268/17 284/2 289/4 292/14
**many [2]** 282/11 282/17
**marked [3]** 274/19 291/2 293/9
**marks [2]** 290/12 290/22
**matter [2]** 264/15 269/18
**may [7]** 264/19 266/8 268/10 268/11 270/12 274/14 274/16
**me [10]** 263/2 266/25 267/9 269/5 270/20 275/18 282/17 283/19 284/17 286/8
**mean [5]** 274/3 281/6 285/5 286/16 290/13
**meaning [1]** 267/21
**meaningful [1]** 265/11
**meaningfully [1]** 268/1
**means [2]** 270/25 296/11
**meant [1]** 281/7
**medications [1]** 283/14
**member [1]** 288/2
**mentioned [1]** 266/18
**Mexico [2]** 286/2 286/10
**mic [3]** 270/19 270/19 270/20
**microphone [1]** 270/23
**middle [1]** 289/15
**might [6]** 263/3 267/11 267/15 284/15 293/14 294/12
**mind [1]** 295/4
**minimal [1]** 264/22
**minimized [1]** 264/9
**minimum [1]** 293/17
**Minnesota [1]** 271/17
**minutes [2]** 295/6 295/16
**missed [1]** 285/7
**moment [2]** 283/25 284/19
**more [4]** 266/12 270/13 283/8 292/10
**morning [8]** 262/9 262/10 262/11 262/12 263/12 266/18 270/3 270/4
**move [1]** 285/13
**moved [1]** 266/14
**Mr. [16]** 262/14 265/1 265/15 267/2 267/11 267/24 268/15 268/17 269/13 269/24 270/5 271/9 284/2 289/4 292/14 295/5
**Mr. Knaebel [2]** 267/2 267/11
**Mr. Manning [8]** 262/14 265/1 267/24 268/15 268/17 284/2 289/4 292/14
**Mr. Ratcliffe [6]** 265/15 269/13 269/24 270/5 271/9 295/5
**Ms. [8]** 269/24 271/10 275/18 278/21 281/13 285/10 288/11 294/15
**Ms. Garousi [7]** 269/24 271/10 275/18 278/21 281/13 285/10 288/11
**Ms. Paget [1]** 294/15
**MTK [2]** 259/7 296/4
**multiple [4]** 275/15 278/2 280/23 293/9
**mumbling [1]** 296/14
**must [1]** 291/3
**MUSTAFA [2]** 259/16 262/7
**my [21]** 266/25 273/22 277/10 277/11 277/14 277/14 277/19 277/25 279/11 279/13 281/23 283/20 284/23 284/25 285/18 286/13 287/3 287/25 289/2 291/21 292/4

## N

**name [2]** 263/19 293/4
**narrative [8]** 275/24 276/20 277/7 277/13 278/10 278/16 278/17 279/14
**narratives [2]** 276/10 276/12
**native [1]** 288/22
**necessary [8]** 268/4 269/4 274/1 274/2 274/7 280/3 280/4 280/23
**need [6]** 262/13 266/8 267/16 269/11 270/23 282/24
**needed [4]** 273/24 283/21 291/1 291/4
**neither [1]** 267/4
**NELLY [1]** 260/4
**never [2]** 287/15 295/4
**new [1]** 283/2
**next [11]** 262/17 273/17 275/16 278/24 279/5 279/23 280/10 285/9 290/5 290/12 290/12
**no [27]** 259/7 261/2 262/16 265/6 265/6 265/11 265/21 265/25 267/1 268/8 269/14 272/15 276/9 276/17 277/21 279/9 279/21 280/3 282/6 286/1 286/16 287/8 289/25 294/9 294/10 296/4 296/23
**noises [1]** 296/15
**nonappearance [2]** 268/10 268/16
**none [4]** 267/5 267/5 268/12 283/6
**not [48]**
**note [2]** 263/24 268/5
**notes [4]** 283/20 284/24 284/25 285/2
**notice [2]** 290/13 290/15
**noticed [1]** 270/22
**notifications [1]** 288/24
**notified [1]** 294/11
**noting [1]** 268/13
**notwithstanding [1]** 292/22
**November [1]** 272/11
**November 15th [1]** 272/11
**now [7]** 262/7 263/2 264/15 267/23 271/2 281/9 286/25
**number [6]** 262/19 275/13 275/19 283/20 284/5 290/17

## O

**obviously [1]** 285/7
**October [2]** 272/8 277/24
**October 14 [1]** 272/8
**October 30th [1]** 277/24
**off [3]** 274/22 274/24 275/11
**offend [1]** 270/19
**offer [1]** 287/12
**offered [2]** 287/12 288/8
**office [9]** 259/8 260/17 271/16 271/17 271/18 272/3 273/1 291/20 291/24
**officer [14]** 263/10 270/3 271/12 271/20 272/19 272/22 273/14 274/18 275/2 288/4 288/14 290/16 291/8 292/20
**officers [10]** 272/24 272/25 272/25 273/5 273/5 273/6 273/12 273/24 281/24 282/9
**Official [1]** 296/22
**Oftentimes [2]** 270/11 287/14
**Oh [7]** 262/18 270/5 271/10 281/19 282/15 294/22 294/24
**okay [40]**
**once [2]** 273/17 287/20
**one [16]** 262/20 262/22 263/3 264/15 267/9 274/23 278/5 278/9 281/15 285/7 285/17 288/2 288/2 288/3 290/12 292/11
**ones [1]** 262/23
**only [6]** 265/18 273/19 280/3 282/21 288/1 294/14
**open [1]** 262/4
**operate [1]** 271/2
**operating [2]** 264/8 294/14
**Operations [1]** 259/9
**opportunity [3]** 269/10 287/13 287/20
**opposed [1]** 265/22
**opposing [1]** 264/22
**option [4]** 289/19 289/22 289/24 290/5
**options [2]** 280/19 289/14

**O**

**order [1]** 265/8
**ordered [1]** 270/15
**ordinary [1]** 283/9
**OREGON [6]** 259/2 260/22 262/7 272/4 272/17 296/23
**orient [1]** 272/20
**origin [1]** 290/2
**original [1]** 296/16
**originally [1]** 266/10
**ORJUELA [1]** 260/4
**other [22]** 267/5 267/6 271/23 272/25 276/13 277/8 278/12 280/18 282/21 286/16 286/17 287/19 289/7 292/1 292/20 293/4 293/12 294/3 294/4 294/6 294/6 296/14
**our [6]** 269/9 269/9 270/8 272/5 294/16 295/6
**ourselves [1]** 263/5
**out [4]** 267/1 271/16 272/3 283/8
**outcome [1]** 263/3
**outside [1]** 294/17
**over [1]** 295/9
**overriding [1]** 296/15

**P**

**pace [3]** 263/24 264/4 270/8
**packet [2]** 273/21 291/21
**page [7]** 261/2 275/7 275/16 280/10 281/12 285/9 285/9
**Paget [1]** 294/15
**PAOLA [1]** 260/4
**paper [1]** 283/21
**paperwork [2]** 274/1 274/2
**paragraph [9]** 276/22 279/17 281/11 281/14 281/20 282/20 283/6 283/14 284/23
**paragraphs [6]** 276/5 276/8 277/4 277/23 282/17 282/18
**part [1]** 275/23
**partial [2]** 265/14 265/16
**participate [1]** 265/12
**parts [1]** 282/21
**party [1]** 264/19
**paste [1]** 276/10
**pasted [1]** 278/18
**Patrol [1]** 271/24
**pattern [3]** 287/24 287/25 287/25
**Paul [2]** 271/17 272/3
**pending [1]** 274/5
**people [6]** 270/11 270/22 271/5 275/13 275/15 287/19
**perhaps [1]** 283/2
**period [1]** 277/5
**permission [1]** 283/23
**person [4]** 269/12 278/20 280/24 282/14
**personal [1]** 268/3
**personally [1]** 280/21
**petitioner [38]** 259/6 260/3 260/7 263/24 264/19 265/18 266/1 266/22 267/19 267/23 267/25 269/1 275/4 276/16 276/21 277/24 280/12 280/13 280/19 281/8 283/3 283/15 283/18 284/25 285/3 285/20 286/1 287/7 289/11 289/15 290/5 291/2 291/20 291/23 294/1 294/4 294/6 294/20
**petitioner's [5]** 264/23 266/7 268/16 269/12 280/1
**petitions [1]** 274/5
**phone [7]** 287/13 287/15 287/19 287/21 287/22 288/3 288/8
**photo [1]** 273/16
**piece [2]** 275/6 275/6
**placed [3]** 273/21 273/22 283/18
**places [1]** 273/22
**plan [1]** 269/9
**please [10]** 262/5 263/18 263/21 274/19 274/23 281/3 281/10 288/15 291/9 292/18
**plus [1]** 266/13
**point [1]** 272/19
**politely [1]** 271/5
**portion [1]** 275/24
**portions [1]** 267/12
**Portland [15]** 260/6 260/10 260/14 260/19 260/22 272/6 272/9 272/12 272/16 272/23 276/14 277/11 277/14 277/24 278/13
**possible [2]** 286/10 287/5
**possibly [3]** 269/7 272/25 290/3
**potentially [1]** 266/15
**powering [1]** 287/15
**practice [4]** 287/24 287/25 287/25 292/4
**preference [1]** 289/1
**prepared [1]** 292/3
**presence [2]** 268/18 268/22
**present [6]** 264/24 266/3 267/24 273/10 290/20 293/20
**presentation [1]** 268/23
**presiding [1]** 262/8
**previous [1]** 281/12
**previously [1]** 275/11
**primarily [1]** 287/3
**primary [2]** 277/21 277/25
**printed [1]** 274/11
**printing [1]** 291/22
**Prior [1]** 271/24
**probably [1]** 269/5
**problem [1]** 267/15
**proceed [4]** 265/9 274/8 280/20 289/20
**proceeding [1]** 289/1
**proceedings [8]** 259/15 261/3 262/3 266/2 268/2 268/12 289/2 296/11
**process [5]** 265/12 272/20 273/18 274/7 290/2
**processed [3]** 276/11 276/12 287/11
**processing [6]** 272/13 272/21 273/14 273/24 277/8 279/14
**professional [1]** 270/11
**proficiency [1]** 288/21
**program [3]** 273/8 274/9 275/9
**progression [1]** 282/11
**property [1]** 273/3
**provide [2]** 266/22 284/5
**provided [1]** 267/25
**pull [1]** 283/25
**pulled [1]** 282/5
**purpose [1]** 288/23
**purposes [1]** 277/12
**put [3]** 275/10 276/12 284/8

**Q**

**quasi [2]** 264/21 265/6
**quasi-criminal [2]** 264/21 265/6
**queries [2]** 293/3 293/4
**question [4]** 265/2 265/15 284/23 288/19
**questioning [1]** 265/12
**questions [7]** 269/24 270/18 280/13 280/13 291/4 294/8 294/10
**quicker [1]** 263/4

**R**

**RATCLIFFE [7]** 260/17 265/15 269/13 269/24 270/5 271/9 295/5
**rather [1]** 293/6
**re [2]** 261/8 283/3
**Re-Cross [1]** 261/8
**re-interviewed [1]** 283/3
**reached [1]** 267/1
**read [11]** 281/3 284/11 290/13 290/14 290/16 290/16 290/19 290/21 290/23 291/6 292/17
**ready [1]** 270/6
**reason [2]** 268/10 283/13
**reasonable [1]** 268/14
**rebuttal [1]** 264/1
**recall [5]** 277/22 278/3 280/22 287/6 291/1
**receive [6]** 273/6 279/16 279/16 280/14 280/15 280/24
**received [5]** 265/24 276/9 277/4 278/4 291/21
**recess [3]** 294/15 295/6 295/15
**recognize [1]** 264/16
**recognized [1]** 265/23
**recollection [8]** 283/24 284/8 284/9 284/10 284/14 284/16 284/18 284/22
**record [13]** 263/19 264/4 264/22 268/5 269/3 269/7 270/14 271/3 274/22 274/24 276/2 276/24 296/10
**recorded [4]** 259/15 270/25 271/4 296/11
**recording [2]** 270/15 270/16
**Redirect [1]** 261/8
**refer [3]** 275/23 277/9 285/1
**referring [1]** 286/25
**refers [2]** 278/20 283/7
**reflects [2]** 284/8 284/9
**refresh [3]** 283/24 284/16 284/21
**refreshed [1]** 284/14
**refreshes [2]** 284/10 284/18
**regarding [1]** 265/12
**relation [1]** 283/15
**released [1]** 268/6
**relevant [1]** 268/22
**reliable [4]** 292/20 293/1 293/11 293/12
**relieve [1]** 274/8
**remain [1]** 262/5
**remained [1]** 269/2
**remaining [1]** 262/19
**remember [4]** 272/7 272/9 272/10 277/18
**remind [3]** 271/5 275/18 295/7
**reminder [1]** 270/6
**Removability [1]** 279/1
**removable [1]** 292/22

## R

**removal [2]** 259/9 289/23
**renounce [1]** 290/1
**report [4]** 277/7 282/19 283/9 286/5
**reported [1]** 286/4
**reporter [10]** 264/4 270/7 294/12 294/16 294/23 294/24 295/1 295/6 295/16 296/22
**Reporter's [1]** 261/4
**representation [1]** 267/24
**representations [1]** 268/15
**request [1]** 290/22
**requested [1]** 287/3
**requesting [2]** 286/21 289/11
**requests [1]** 286/9
**required [3]** 265/3 267/18 268/4
**reread [1]** 291/3
**reschedule [1]** 267/16
**respect [2]** 277/23 283/14
**respond [1]** 265/2
**respondents [6]** 259/10 260/11 260/16 261/8 263/10 263/16
**response [1]** 280/13
**responsibility [2]** 271/18 272/2
**rest [2]** 278/18 289/6
**restrict [1]** 288/1
**restrictions [1]** 287/16
**resubmitted [1]** 283/1
**result [2]** 266/4 289/11
**retrieve [1]** 273/25
**retrieving [1]** 287/15
**return [5]** 280/16 285/6 289/11 290/1 290/2
**returned [2]** 286/10 287/4
**returning [1]** 286/2
**review [8]** 280/16 280/17 282/18 282/23 284/2 284/7 284/8 286/19
**reviewed [4]** 274/11 282/22 282/25 287/2
**reviewing [1]** 284/21
**right [30]** 262/17 262/19 262/21 263/8 263/8 263/11 264/11 264/24 265/14 268/6 268/8 269/11 269/23 271/6 271/8 275/23 278/24 280/5 281/14 281/17 281/22 282/16 283/5 288/9 288/11 290/1 291/8 294/11 295/3 295/15
**rights [1]** 288/24
**RMR [2]** 260/21 296/21
**role [1]** 271/21
**room [2]** 260/22 296/15
**roughly [1]** 289/18
**run [2]** 267/14 273/17
**running [2]** 264/5 270/8

## S

**S.W [5]** 260/5 260/9 260/13 260/18 260/22
**safeguards [1]** 264/17
**said [7]** 262/19 272/2 275/11 276/12 278/9 285/11 296/15
**same [4]** 263/4 264/17 280/9 286/8
**satisfied [1]** 269/9
**say [4]** 274/2 289/19 289/22 289/24
**saying [1]** 270/10
**says [9]** 276/2 278/25 279/5 283/6 286/21 290/7 290/15 292/17 293/10
**scheduled [1]** 266/20
**scratch [5]** 273/4 273/20 275/12 279/22 283/21
**screened [1]** 273/3
**scroll [3]** 281/12 289/4 292/14
**search [1]** 293/4
**seat [1]** 263/21
**seated [1]** 262/5
**Seattle [1]** 259/8
**second [5]** 273/13 274/23 285/18 288/25 289/22
**section [13]** 277/3 277/10 277/13 278/18 279/5 279/15 282/10 282/14 285/4 285/4 285/7 288/24 288/25
**sections [3]** 277/12 278/18 289/7
**Security [1]** 271/13
**see [14]** 263/3 264/7 276/2 276/5 278/25 279/6 280/5 281/1 281/15 283/12 289/6 289/16 292/12 294/15
**select [1]** 289/1
**selections [1]** 287/2
**sense [1]** 287/9
**sent [2]** 279/12 282/19
**sentence [3]** 280/6 280/25 286/20
**sentences [2]** 280/8 285/14
**series [1]** 280/8
**serve [2]** 294/1 294/4
**served [5]** 271/21 274/11 289/3 291/2 292/6
**service [2]** 285/18 290/8
**services [5]** 265/25 266/7 266/20 267/3 267/22
**serving [1]** 294/7
**session [1]** 262/7
**set [4]** 266/10 294/16 295/6 295/16
**several [1]** 266/9
**she [17]** 263/25 264/23 265/10 265/21 266/3 267/20 268/6 280/19 283/7 286/1 286/17 287/2 287/3 290/3 290/14 291/3 294/20
**She's [1]** 294/17
**short [1]** 287/22
**shorter [1]** 262/23
**should [2]** 269/17 269/17
**show [4]** 284/3 284/7 284/15 284/15
**showing [1]** 268/9
**side [1]** 272/21
**sign [1]** 291/16
**signator [1]** 281/5
**signature [5]** 290/8 296/16 296/16 296/17 296/22
**signed [1]** 296/17
**signing [2]** 294/3 296/9
**signs [1]** 293/24
**simply [2]** 266/11 281/7
**simultaneous [1]** 296/14
**since [1]** 271/2
**six [3]** 262/20 270/23 285/14
**six inches [1]** 270/23
**sleep [2]** 263/6 263/7
**slowly [1]** 270/9
**small [1]** 287/4
**so [54]**
**software [4]** 273/8 273/13 274/9 275/9
**sole [2]** 282/2 287/18
**some [8]** 263/7 269/18 276/19 282/7 282/18 290/11 290/11 294/12
**somebody [2]** 263/7 287/20
**someone [1]** 272/22
**someone's [1]** 264/20
**something [3]** 283/3 283/8 292/5
**sometime [1]** 266/18
**sometimes [2]** 282/24 287/16
**soon [2]** 286/10 295/16
**sorry [5]** 270/5 271/10 284/9 294/24 295/2
**sort [4]** 277/6 278/24 280/9 293/14
**sound [1]** 265/21
**sounds [2]** 275/11 282/17
**Spanish [5]** 285/22 285/24 288/18 288/19 290/21
**speak [4]** 270/9 285/22 285/24 288/19
**speaker [1]** 288/22
**speaking [3]** 278/15 289/18 296/14
**specific [3]** 277/13 280/22 291/1
**specified [1]** 278/20
**spoke [1]** 267/20
**St [2]** 271/17 272/3
**staff [1]** 266/25
**stand [2]** 263/13 264/16
**standard [1]** 273/10
**start [3]** 270/17 280/9 285/14
**started [1]** 291/21
**starts [2]** 280/6 280/25
**state [1]** 263/18
**statements [3]** 292/19 293/1 293/7
**STATES [4]** 259/1 259/17 260/21 262/6
**status [4]** 268/11 274/4 292/22 292/22
**stay [1]** 272/17
**stenographic [1]** 296/11
**step [2]** 273/17 295/12
**STEPHEN [1]** 260/8
**STEVEN [1]** 260/17
**still [1]** 295/7
**stop [1]** 270/12
**stretch [1]** 295/13
**subagency [1]** 271/14
**subject [15]** 273/1 273/6 274/7 280/6 280/9 285/14 286/9 286/21 288/1 290/13 290/16 290/21 290/22 292/19 292/21
**submitted [2]** 282/22 282/25
**subsection [2]** 278/25 279/23
**substance [1]** 284/22
**successful [3]** 288/2 288/3 288/4
**such [1]** 292/22
**sufficiency [1]** 280/3
**Suite [4]** 260/5 260/9 260/14 260/18
**summarize [1]** 266/5
**supervisor [7]** 276/9 277/18 277/21 277/22 277/25 279/13 293/20
**supervisor's [1]** 293/22
**supervisors [5]** 277/15 277/16 277/17 278/3 278/9
**supervisory [1]** 282/18
**suppose [1]** 264/14
**sure [7]** 266/12 269/6 270/13 270/18 284/1 289/6 294/19
**swear [1]** 263/13
**sworn [1]** 263/16

## T

**take [7]** 262/13 269/18 273/15 287/19

**T**

**take... [3]** 287/22 294/15 295/6
**taken [2]** 274/6 296/10
**taking [1]** 283/14
**talk [2]** 274/12 295/8
**talked [1]** 294/8
**talking [1]** 285/11
**tap [1]** 270/20
**team [1]** 279/12
**telephone [2]** 287/16 288/4
**tell [2]** 283/16 284/17
**template [9]** 277/7 277/9 278/16 278/19 282/5 282/7 283/8 283/17 285/5
**ten [3]** 266/13 295/6 295/15
**terms [1]** 270/12
**testified [1]** 263/17
**testify [1]** 284/10
**testifying [2]** 265/10 266/14
**testimony [6]** 262/14 266/23 270/16 282/13 289/7 295/9
**than [5]** 262/23 292/1 293/6 294/3 294/7
**Thank [13]** 263/11 263/22 265/4 269/14 269/23 271/8 275/21 281/13 284/20 289/5 292/14 295/14 295/18
**Thanks [3]** 278/22 288/12 289/8
**that [205]**
**that's [10]** 264/2 264/8 265/3 268/19 269/8 276/22 286/4 286/23 290/16 295/3
**their [5]** 268/23 269/1 277/16 288/9 289/1
**them [5]** 278/5 283/20 290/23 292/6 292/11
**then [34]** 269/4 271/4 273/3 273/8 273/14 273/25 273/25 274/10 279/13 279/23 280/5 280/8 280/17 280/21 282/21 283/5 284/6 284/8 284/10 284/18 284/18 285/6 285/7 285/9 288/2 288/3 289/2 290/7 290/21 290/23 291/5 292/10 293/24 294/1
**there [39]**
**there's [14]** 265/6 265/6 265/21 266/18 268/8 268/9 273/19 274/5 275/7 287/24 289/7 290/11 290/11 290/12
**thereupon [1]** 263/15
**these [4]** 265/13 273/17 280/24 294/7
**they [16]** 265/18 265/22 265/22 265/23 265/24 273/2 273/2 279/12 280/4 282/2 282/9 287/17 288/4 290/23 292/6 292/7
**they'll [1]** 270/15
**they're [2]** 292/3 292/3
**They've [1]** 282/10
**things [3]** 269/19 272/21 274/6
**think [14]** 262/18 262/22 262/24 264/21 265/14 266/16 266/17 268/14 268/21 269/4 270/5 284/4 285/10 286/20
**third [10]** 260/13 260/18 260/22 273/14 286/8 286/9 288/3 289/2 289/24 290/6
**third one [1]** 288/3
**this [53]**
**THOMAS [1]** 260/17
**those [12]** 267/12 273/25 276/8 276/9 276/10 277/23 280/12 280/14 284/24 285/14 288/5 294/7
**though [1]** 265/21
**three [6]** 272/1 273/9 273/12 285/10 285/10 289/14
**through [7]** 266/15 274/8 275/6 276/1 282/18 285/17 289/1
**ticking [1]** 264/7
**time [15]** 266/12 267/19 269/4 269/15 273/11 273/22 277/5 277/10 277/11 277/14 278/13 287/5 287/10 287/16 288/1
**times [2]** 280/23 282/11
**title [1]** 271/19
**today [16]** 263/23 263/25 265/10 265/23 266/2 267/4 267/15 267/23 268/10 268/16 268/16 269/6 269/12 270/16 271/2 294/12
**today's [2]** 264/24 265/12
**took [3]** 284/25 287/7 287/10
**top [1]** 288/24
**TRANSCRIBER [1]** 260/21
**transcript [3]** 259/15 296/10 296/15
**transcripts [1]** 270/14
**translate [1]** 289/18
**transport [5]** 272/25 272/25 273/5 281/4 281/8
**true [2]** 283/18 296/10
**trust [1]** 264/11
**try [1]** 271/5
**turn [3]** 274/18 281/9 291/8
**two [5]** 266/21 276/5 277/4 277/23 290/21
**type [1]** 285/6
**typical [2]** 272/2 287/10
**typographical [2]** 282/25 283/11

**U**

**U.S [2]** 260/17 292/22
**unable [1]** 296/13
**unbroken [2]** 276/23 277/3
**under [6]** 276/24 281/14 283/5 283/19 292/6 292/22
**understand [5]** 265/17 268/22 280/19 290/21 290/23
**understanding [3]** 290/3 292/2 292/4
**understood [5]** 266/6 267/20 269/8 271/7 295/11
**unique [5]** 276/16 276/20 276/20 277/10 277/10
**UNITED [4]** 259/1 259/17 260/21 262/6
**United States [1]** 262/6
**unknown [1]** 282/15
**unless [2]** 268/25 283/8
**until [3]** 267/7 290/3 295/9
**unusual [1]** 278/8
**up [11]** 262/13 263/12 269/18 269/19 278/19 283/25 287/17 292/14 294/16 295/6 295/16
**upon [3]** 292/6 293/3 293/4
**us [7]** 262/15 263/24 272/21 281/3 283/25 289/5 292/17
**USAO [1]** 260/12
**use [1]** 264/10
**used [5]** 273/8 277/6 278/13 282/7 283/8
**using [1]** 270/11
**usually [2]** 264/7 270/23
**utilized [1]** 274/9

**V**

**various [1]** 283/4
**varying [1]** 267/8
**versions [1]** 283/4
**very [1]** 277/11
**video [1]** 262/20
**violation [1]** 292/7
**voice [1]** 270/24
**Volume [3]** 259/14 295/20 296/5
**voluntarily [2]** 292/19 293/7
**voluntary [2]** 264/24 289/11
**VR [1]** 286/21

**W**

**waiting [1]** 294/17
**waived [2]** 265/7 267/19
**waiver [5]** 264/24 266/7 266/7 267/20 268/16
**waiving [1]** 265/17
**WAMSLEY [1]** 259/8
**want [12]** 265/1 265/23 270/13 274/12 275/6 276/19 278/24 280/5 284/6 289/5 294/15 295/7
**wanting [1]** 266/12
**warming [1]** 269/19
**Warrant [1]** 291/13
**was [57]**
**Wasmley [1]** 296/3
**wasn't [4]** 265/10 266/3 273/10 276/16
**way [7]** 263/3 265/11 265/20 282/12 283/16 284/13 284/13
**we [54]**
**we'll [6]** 263/3 269/5 282/13 284/4 284/18 295/16
**we're [8]** 265/19 269/9 269/19 270/21 284/7 294/14 295/5 295/15
**we've [2]** 263/5 272/20
**Wednesday [1]** 262/1
**welcome [2]** 269/16 295/12
**well [9]** 262/18 263/7 263/25 266/8 268/17 269/17 270/18 290/19 294/18
**were [32]** 262/3 265/18 266/13 266/20 266/24 266/25 267/6 267/7 267/7 267/14 269/21 272/12 272/12 272/16 273/9 273/25 276/13 277/5 277/17 278/2 278/14 280/4 281/24 283/17 284/24 285/10 285/11 286/16 286/23 287/10 287/17 287/19
**Weresch [2]** 260/21 296/21
**what [28]** 266/6 270/10 271/14 271/16 272/12 272/21 274/3 274/7 274/21 275/2 275/11 276/19 276/20 281/6 283/19 283/20 285/1 286/4 286/23 287/9 287/23 288/23 290/13 291/10 291/12 293/1 294/19 296/15
**what's [8]** 271/19 273/17 274/19 281/25 288/21 289/18 289/22 289/24
**when [16]** 266/24 272/6 272/9 272/22 273/2 274/2 277/7 279/16 279/16 280/22 282/9 283/12 290/20 291/1 291/18 293/9
**where [8]** 275/8 276/2 278/25 285/15 285/15 288/25 289/2 296/12

W

**Whereupon [1]** 262/3
**whether [3]** 265/2 283/16 283/16
**which [12]** 263/3 267/7 273/4 273/19 273/21 275/18 277/18 277/22 279/21 286/17 287/2 290/5
**while [4]** 264/16 268/21 272/12 276/13
**Whispered [2]** 274/22 274/24
**who [10]** 266/1 267/2 267/2 271/12 278/4 279/10 281/22 282/14 287/20 287/21
**who's [1]** 263/8
**whole [2]** 272/16 285/5
**whom [1]** 278/20
**why [4]** 263/12 264/22 291/23 292/3
**Why'd [1]** 272/3
**will [9]** 262/22 263/10 263/13 269/24 270/14 270/17 270/19 284/14 293/16
**wise [1]** 262/13
**wish [1]** 280/20
**without [4]** 265/8 265/10 268/6 296/16
**witness [10]** 261/7 262/17 263/9 263/13 263/15 264/1 264/16 269/1 284/6 295/7
**witness' [1]** 283/24
**witnesses [5]** 262/19 265/13 266/13 266/15 295/8
**won't [2]** 263/25 282/15
**work [8]** 266/15 267/6 269/5 271/12 271/16 272/3 272/14 284/14
**working [1]** 264/12
**would [43]**
**would've [14]** 273/4 279/12 279/13 279/21 280/12 281/24 282/2 282/21 283/10 285/6 285/17 287/23 291/20 293/1
**wouldn't [2]** 277/9 293/5
**write [8]** 276/8 279/3 279/8 279/24 281/21 282/3 282/9 282/14
**writing [1]** 282/10
**written [1]** 282/10
**wrote [3]** 279/10 279/12 283/20

Y

**yeah [4]** 263/2 266/8 277/1 293/13
**years [2]** 271/22 272/1
**Yep [1]** 287/1
**yes [45]**
**yesterday [10]** 262/23 262/25 265/17 265/24 266/6 266/11 266/23 267/14 269/2 269/10
**yet [1]** 267/13
**you [132]**
**you'll [1]** 283/25
**you're [5]** 269/16 270/10 270/18 295/7 295/12
**you've [1]** 263/2
**your [54]**
**Your Honor [23]** 262/11 262/15 262/16 264/2 264/14 265/4 265/16 268/7 268/19 269/8 269/14 269/25 274/14 275/20 278/22 282/13 283/22 283/23 285/12 288/12 294/10 294/19 295/18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| M-J-M-A, an adult,<br><br>Petitioner,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"), et al.,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 6:25-cv-02011-MTK |

Evidentiary Hearing - Volume 2

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT JUDGE

December 3, 2025

APPEARANCES

FOR THE PETITIONER:

NELLY PAOLA GARCIA ORJUELA
Innovation Law Lab
333 S.W. 5th Avenue
Suite 200
Portland, OR 97204

FOR THE PETITIONER:

STEPHEN W. MANNING
Innovation Law Lab
333 S.W. 5th Avenue
Suite 200
Portland, OR 97204

FOR THE RESPONDENTS:

ARIANA N. GAROUSI
DOJ-USAO
Civil Division
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204

FOR THE RESPONDENTS:

THOMAS STEVEN RATCLIFFE
U.S. Attorney's Office
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204

COURT REPORTER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, Oregon 97204
(503)326-8047

## GENERAL INDEX


| | Page No. |
|---|---|
| December 3, 2025, Proceedings | 273 |
| Reporter's Certificate | 461 |


* * *

## WITNESS INDEX


| For the Respondents | Direct | Cross | Redirect | Re-Cross |
|---|---|---|---|---|
| B.W. | | 273 | | |
| K.K. | 320 | 329 | 334 | |
| A.A. | 339 | 346 | | |
| R.F. | 386 | 405 | 416 | |
| M.K. | 419 | 437 | 443 | |


* * *

(Wednesday, December 3, 2025, 10:01 a.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURTROOM DEPUTY CLERK: Court is back in session.

THE COURT: All right. Mr. Manning, will you be conducting cross?

MR. MANNING: I will be, Your Honor.

THE COURT: All right. Let's begin.

MR. MANNING: Thank you.

CROSS-EXAMINATION

BY MR. MANNING

Q. Sir, before you began testifying today and took the stand, had you spoken with any of the other witnesses in this case?

A. Yes.

Q. And did you -- you didn't speak about your testimony?

A. No.

Q. Or their testimony?

A. No.

Q. You indicated you received an e-mail about some narrative that you had copy and pasted into this -- I'm sorry. Let me come back to that in a second.

You were part of an operation that brought you here to Portland; is that right?

A. Yes.
Q. What is the name of that operation?
A. I don't know.
Q. And why did you come to Portland for that operation?
A. Because my supervisor instructed me to.
Q. I'm going to show you -- I think you were looking at the document a little bit earlier -- Petitioner's Exhibit 109. Could you pull up that document before you?
And we just, on -- you were testifying and explaining what this document was just a moment ago; is that right?
A. Yes.
Q. And you had indicated that this is your signature, that you had signed this document?
A. Yes.
Q. Okay. And so you're responsible for the contents of this document?
A. Yes.
Q. And when you write documents, generally, you write accurate reports?
A. Yes.
Q. And this is an accurate report?
A. There are some mistakes.
Q. And so is this an accurate report?
A. There are some mistakes in it.
Q. What would be the mistake?

A. I may miss some, but the -- on the third page -- excuse me -- on the second page where -- "The subject stated that he does not take any medications," that should be "she."

And then the first paragraphs that -- the first two paragraphs, that first section could have been rewritten to more accurately reflect the petitioner's immigration status.

Q. Can you describe to me which paragraphs you're referring to?

A. The first two, the unbroken -- that first unbroken section under "Record of Deportable and Excludable Alien."

Q. So beginning with the line, "The subject has displayed," and then continuing on until what point?

A. 'Til there's a break.

Q. Which break?

A. The first break after the sentence ending in "immigration laws of the United States."

Q. And so that is accurate?

A. That was a section that I was instructed by management to include. The petitioner was admitted, and some of the language in here indicates an unlawful entry. However, if the petitioner's purpose for immigrating was contrary to the visa on which she entered, if she had -- if she was intending to immigrate, it -- but that would be for an attorney to decide.

THE COURT: That second paragraph says "unlawful entries of this nature." What is your understanding of what

"this nature" refers to?

Generally speaking, because I think I understand your testimony to mean that that second paragraph really doesn't apply to this petitioner?

Let's do it this way because I kind of threw a bunch of salad at you, word salad. Does this second paragraph factually and accurately apply to petitioner?

THE WITNESS: It does.

THE COURT: And in what ways?

THE WITNESS: The -- that her -- possibly her entry; but, more specifically, her violation of the INA in relation to her visa is -- is a violation of the INA. So --

THE COURT: And where does the second paragraph refer to the violation of the INA?

THE WITNESS: "Of this nature," I would translate that to be in violation of U.S. law.

THE COURT: Got you. Because "of this nature" -- and that goes to the second -- well, the first question I wanted to ask you; but we'll take that up now, which is "of this nature" refers back to the violations associated with the INA in the first paragraph?

THE WITNESS: That would be my understanding.

THE COURT: Okay.

THE WITNESS: So --

THE COURT: And was there anything about the history

of -- that you obtained either from the petitioner or from her records that indicated that she was associated from -- with foreign terrorists, transnational criminal organizations, and other threats to national security and public safety?

THE WITNESS: I did not directly ask her those questions.

THE COURT: And is there anything in the record, that you're aware of, in her records that suggests her association with any of those considerations?

And the reason I ask is the last sentence says, "The subject's actions contribute to these ongoing national concerns," referring back to those four things that I just recited.

THE WITNESS: From my professional experience, I could make inferences that when individuals are breaking immigration law, they're often breaking other laws or supporting other criminal organizations to be able to work and reside in the United States. So I could make inferences; however, I did not go into any depth or ask her any of those questions.

THE COURT: What would be the percentage of cases that you've processed in which you would make that inference?

THE WITNESS: Which inference? That they're also involved in other criminal activities?

THE COURT: Correct.

THE WITNESS: A lot. Most.
THE COURT: Okay.
THE WITNESS: An extremely large percentage.
THE COURT: So more than 50 percent?
THE WITNESS: Yes.
THE COURT: All right. Mr. Manning.
MR. MANNING: Thank you, Your Honor.
BY MR. MANNING
Q. The two paragraphs we've been talking about, sort of this one unbroken block, this was cut and pasted from an e-mail you received?
A. Yes.
Q. And do you still have that e-mail?
A. I assume it could be retrieved.
Q. And did you produce that e-mail to the lawyers in this case?
A. I did not.
Q. Who did that e-mail come from?
A. I do not know.
Q. And when did you receive that e-mail?
A. I do not know.
Q. What were the other contents of that e-mail directing you to cut and paste this into this document?
A. I'm sorry?
Q. What were the other contents of that e-mail? So, as I

understand -- as I understand, this e-mail directed you to cut and paste this information from that e-mail into this document?
A. Correct.
Q. And so what were the other indications in that e-mail that that is what you were to do, that you were going to cut and paste from that e-mail into this document?
A. I do not remember.
Q. And you cut and pasted this information from that e-mail into this document. Did you also cut and paste that information from that e-mail, so identical information, into multiple documents?
A. Yes.
Q. Okay. And you did that between the period of -- and that was just for here in Portland; is that right?
A. Yes.
Q. And you did that between the period of approximately October 14th to November 15th?
A. Not that whole time. If I recall, it was well after I arrived. And I don't remember if I did it all the way through that time. I was -- I received the e-mail. That's how I got the text. But there was also verbal discussion, in-person discussion, regarding this section.
Q. There were other people on that e-mail chain?
A. Yes. Well, I don't remember, but I assume so.
Q. And you replied to that e-mail chain?

A. I don't remember.
Q. So this -- you've pointed out one error, the -- the "he" with "she." Otherwise, this is an accurate report?
A. There may be other typographical errors. If you could direct me to a section that you're -- wish to question, I could clarify.
Q. I'm asking you about the document you prepared. And you've had an opportunity to review the document?
A. I could read it quick.
The narrative only section? Or are you referring to the first page also?
Q. The document you -- this is the document I'm asking -- you created this document. I'm asking you about this document. So you can review the document.
A. I wasn't the sole individual who created this document.
Q. You had indicated earlier in your testimony that you were responsible for the content of the document?
A. Yes.
Q. And so are there other errors in this document?
A. It will take me a fair amount of time to review.
THE COURT: You're welcome to take the time, if you'd like.
THE WITNESS: Well, just for example, her -- her entry time -- everything is -- when I signed it, was true and accurate and complete to the best of my knowledge. I could --

I would be happy to go line by line and review it again, to check it, to say the I-94 or -- but at the time I created it, it was accurate and complete. I see now that there are -- there is the typographical error of her -- that -- the pronoun and then also those -- the first paragraph that we've discussed.

BY MR. MANNING

Q. Was the inaccuracy in -- sorry.

Can you direct -- which first paragraph are you describing?

A. The one we were just talking about, the record of deportable alien.

Q. The one that begins with "The subject has displayed"?

A. Yes.

Q. Continuing through "immigration laws of the United States"?

A. Yes.

Q. And you've indicated that's not correct?

MR. RATCLIFFE: Asked and answered, Your Honor.

THE COURT: Overruled.

So is there something not correct about that paragraph?

THE WITNESS: Well, the -- her entry, she was -- the petitioner was admitted. And there is language in here that refers to unlawful entry, which could or could not apply,

depending on the petitioner's purpose.

THE COURT: So we're talking about the second sentence where -- "The individual's unauthorized entry into the United States constitutes a violation"? That's what's incorrect factually?

THE WITNESS: I don't -- I mean, that's a complicated question. There are basically two types of entries: People who are admitted and people who are not.

THE COURT: Well, she had a valid -- was it a B-2 visa that she overstayed? Or at least that's what the --

THE WITNESS: Correct. So her entry -- she entered on a visa; however, an attorney with better knowledge of immigration law might be able to argue that that entry was not legal because her purpose was not for tourism; her purpose was to immigrate. And that would be a question better argued by an attorney.

THE COURT: At the time that this language was included in the report, was there any evidence that her intent, when applying for that B-2 visa, suggested something other than visiting?

THE WITNESS: I did not review her application.

THE COURT: In your -- you mentioned that you interviewed her. Did she -- did she say anything that indicated something of a different intent, other than for staying for a visit, when she applied for a B-2 visa?

THE WITNESS: Absolutely. She overstayed by a large margin and appears to have been residing in Oregon as an immigrant, not as a nonimmigrant.

THE COURT: And I'm not really -- yeah, we won't -- this isn't the time for us to get into sort of the legal issues, and I'm not going to expect you to answer the legal issues.

I just notice that there's a -- there might be a legal -- important legal distinction between what was intended at the time of the application, in obtaining the B-2 visa, and then what people's actions are once they are here.

And I imagine that arguments can be made that actions after the receipt of the visa may be evidence of intent when applying for it, but that's -- that may not be -- I'm not going to ask you about any of that at this time.

THE WITNESS: Yes.

THE COURT: I'll ask Mr. Ratcliffe about his thoughts on it and Mr. Manning, but not you.

THE WITNESS: I could make guesses. But, in general, these two paragraphs in question, I was directed to put them in. In hindsight, I could've made small modifications to make it more accurate to the petitioner.

BY MR. MANNING

Q. This report -- sorry.

The e-mail that you received, did it indicate why

this information needed to be added to the reports generated here in Portland?

A. I do not remember.

THE COURT: And you're referring to an e-mail. It's not an e-mail that you have in discovery?

MR. MANNING: That's correct, Your Honor.

THE COURT: Counsel, do you know if this e-mail exists, Ms. Garousi?

MR. RATCLIFFE: Your Honor, the witness has said that he doesn't recall the e-mail, doesn't --

THE COURT: I know, but I was asking Ms. Garousi. Tag teaming only happens under certain limited circumstances, but --

MS. GAROUSI: No, I'm not aware of this e-mail, Your Honor.

THE COURT: All right.

BY MR. MANNING

Q. You created -- this report was created on October 30th, 2025?

A. Yes.

Q. And you created this report while the petitioner was here in Portland; is that right?

A. I printed the document. Creation -- the document is printed from a subsection of the software under forms. So I selected the list of values, selected this form and printed it.

However, the information on this document is drawn from a software system called EAGLE, which multiple individuals had input.

Q. And that includes the arresting officers?

A. I don't know. Any -- anybody with access to that program, knowledge of any number of biographical or case information data, could have accessed this program and made additions, deletions, or corrections.

Q. When this form was signed by you, the form had reached its final stage?

A. In that moment. However, corrections, additions, and subtractions can be made.

Q. So your signature on this form, when you signed this form, was this the final form?

A. It is my assumption, yes.

Q. There are other versions of this form?

A. As I draft it -- it's extremely common to draft a form, print it, review it, and notice a mistake, correct it. For example, on the first page, on the bottom where it says "disposition" and then it says "voluntary return," I remember, during my time in Portland, making a mistake on that multiple times even after I had signed it. There was a shred bin that was -- that was used quite a bit. If there was a mistake that was made and a correction was needed, that was done.

Q. So is this form, that we're looking at now, the final

form?

A. It is my assumption that it is. I don't know where this -- I assume this form came from the petitioner's A-File. And I assume that it is the most up-to-date copy.

Q. So after you would've signed this form, additional forms could've been generated?

A. Yes, of course.

THE COURT: Is it likely that -- after K.K. signed off on it, that there would've been another -- an updated version?

THE WITNESS: Not to my knowledge.

BY MR. MANNING

Q. So this form -- just to make sure I understand, is this form, that we're looking at now -- so this is Petitioner's Exhibit 109. On page one it lists "Deportation Officer 2816" redacted. That's your signature; is that right?

A. Yes.

Q. Okay. And then to the left of that, it says, "Alien has been advised of communication privileges." And it says "B.W.," and it says "10-30-2025." That's your handwriting?

A. Yes.

Q. Okay. And then if we look at page two, it says -- at the bottom there's this box that says "signature." And it says "2816" redacted. And that's your signature?

A. Yes.

Q. Okay. And then if we look at page 109 -- page three of Exhibit 109, at the bottom there's a box that says "2816" redacted. And that's your signature?

A. Yes.

Q. Okay. And so at the time you signed these documents, the petitioner was with you in Portland?

A. With me might be a stretch. Where -- she was in a detention area. We were in the same building.

Q. You wrote this report the same morning as her arrest?

A. Yes.

Q. And so this report was generated only a few hours after her arrest?

A. Yes.

Q. And when you created this report, you did not mention any concern about harboring of noncitizens or harboring of aliens?

A. I'm sorry. Could you repeat the question?

Q. So when you generated this report, a few hours after her arrest, you did not mention any concern in this report of any harboring of illegal aliens?

A. I did not directly, no.

Q. And in this report, when you created it, you --

THE COURT: Mr. Manning, I'm not sure I understood your question. Are you saying that this report -- was your question to suggest that there's nothing in this report that describes that M-J-M-A was harboring undocumented people?

MR. MANNING: That's correct, Your Honor.

THE COURT: Okay.

THE WITNESS: I personally didn't question with criminal law intent. However, the document in its entirety, which I signed, does speak to possible criminal activity.

BY MR. MANNING

Q. Does the word -- the word "harboring" does not appear anywhere in this document?

A. What's the question?

Q. The word "harboring" does not appear anywhere in this document; is that right?

A. I don't know. I would have to read it.

THE COURT: It's in the record.

MR. RATCLIFFE: Your Honor, we'll stipulate to the fact that it does not appear in the record.

THE WITNESS: When you --

THE COURT: I -- my review of this document indicates the same. So I'm not sure this witness can offer any more.

MR. MANNING: Thank you, Your Honor.

BY MR. MANNING

Q. And when you created this report, you did not mention any concerns about any victims of human trafficking, either the petitioner being a victim of human trafficking or the petitioner involved in human trafficking?

A. Again, I did not go into any criminal questions.

Q. But it's fair to say that it's not in this report?

MR. RATCLIFFE: We'll stipulate to that, Your Honor.

MR. MANNING: Thank you --

THE COURT: It would appear as much --

MR. MANNING: -- Your Honor.

THE COURT: Mr. Manning.

BY MR. MANNING

Q. I'm going to go to the top of page one of this Petitioner's Exhibit 109. And you had explained to Ms. Garousi the -- sort of you walked through the very top of this. And her name, age, and date of birth appear here at the top of the form; is that right?

They're redacted, I realize, but the -- and I have unredacted versions, if you'd like to see them. But in the normal course, if you were able to see the -- I can show you the -- would you like to see the unredacted version?

A. No.

Q. Okay. But her name -- her full name, her date of birth, and her age appear up here; is that right?

A. Yes.

Q. And so her identity was known to you; is that right?

A. Yes.

Q. Okay. And then it says "immigration record." It says "negative"; is that right? About midway down, in that first box?

A. Yes.
Q. And then beside that box is a box that says "criminal record," and that's blank; is that right?
A. It is blank.
Q. And if we scroll down, I'm going to go to the second page -- sorry, I'm scrolling on the screen. You can turn the page.
Near the bottom of the document, it says above -- so there's a -- underneath "encounter," then it says "immigration history." And then there's a section that says "criminal history." And this says none; is that right?
A. Yes.
Q. So she has no criminal record at the time this document was prepared?
A. That's what I wrote. I -- she could have criminal history that was not known to me. My basis for writing no criminal history, as I recall, would have been from a rap sheet that did not detail any criminal history.
However, sometimes a rap sheet is incomplete. And I did not conduct any local, county, state, or any other databases that could've revealed additional criminal history. It was -- I -- it was solely based on the NGI, the rap sheet.
Q. So this -- okay. Thank you.
This -- this report you generated, there's no indication of -- that the petitioner had previously escaped

from ICE custody before?
A. No.
Q. And in this report you generated, there's no indication of a prior attempted escape from ICE custody?
A. Prior to the encounter on October 30?
Q. That's correct.
A. Correct.
Q. And in this report you generated, there's no indication of a prior flight from an ICE officer?
MR. RATCLIFFE: Your Honor, we'll stipulate to these things. I'm happy to handle these with a stipulation in order to keep moving.
MR. MANNING: I have one more question, Your Honor.
THE COURT: So I understand that the Government doesn't dispute that the answers to your questions will be that this report doesn't include references to such things. So is there something else that you wanted to inquire?
MR. MANNING: I do, Your Honor.
BY MR. MANNING
Q. This report doesn't indicate that this arrest of the petitioner was a warrantless arrest?
A. If I could read the -- reread the encounter.
THE COURT: Mr. Ratcliffe, does the Government agree that the report doesn't identify this as a warrantless arrest?
MS. GAROUSI: I believe so, Your Honor.

MR. RATCLIFFE: So that's correct. We stipulate it does not.

THE COURT: You started tag teaming.

MS. GAROUSI: We share one mind.

THE COURT: You got me on that one. All right.

THE WITNESS: If I may, this document, as any document, under the utmost extreme scrutiny, as -- which is being applied today, could have been more complete. There could've been more data entered, further record checks made, Miranda warning given, criminal questions asked.

It could be better. However, when I signed it, there were no blatant factual errors; and it was true and correct to the best of my ability under the circumstances, which were rushed. And I didn't anticipate this level -- I could've done better; however, it was done to the best of my ability at the time.

BY MR. MANNING

Q. You weren't expecting someone to check your work?

A. On the contrary, I appreciate it when it's checked. My supervisor checked it. However, there are -- for example, there are boxes that are empty. Further data input could've filled those boxes and provided a more complete record, but are -- were not necessary, so they were left blank.

The -- at the time it was drafted, the arresting --

THE COURT: May I ask: Why were they not necessary?

When you said they were not necessary to check, but I also understand your testimony to suggest that they could have been checked. So can you answer why were they not necessary? For what purpose were they not necessary?

THE WITNESS: Because the legal mechanism of alienage and removability under the INA had been satisfied. There could have been -- on a broader scope, there are many additional things that could've been addressed. But the document, as it appears, was sufficient for -- for her voluntary return.

If I may continue --

MR. RATCLIFFE: I would instruct the witness that we have a time limit here. We have only until 1 o'clock today. And we have other witnesses who, if they can't testify today, are going to have to travel back to Portland. So I'd like you to answer the questions and not --

THE COURT: So hold on a minute, Mr. Ratcliffe. I appreciate the time concerns. Your objection with respect to nonresponsive is sustained.

Focus on just answering the question. If Mr. Manning wants to follow up, we'll let him do the heavy lifting on that.

MR. MANNING: Thank you, Your Honor.

BY MR. MANNING

Q. So in the document you prepared, there was no statement explaining why a warrant could not be obtained?

MR. RATCLIFFE: We'll stipulate to that, Your Honor.

BY MR. MANNING
Q. You're familiar with Section 236A of the Immigration and Nationality Act; also, for the federal courts, 8 U.S.C. 1226?
A. I would have to review a law book.
Q. For individuals who are -- so Section -- when -- what was the authority which she was detained under?
A. 287 of the INA.
Q. So there's a declaration in this case indicating she was detained under Section 236A of the INA. Do you think that's correct?
MR. RATCLIFFE: Objection. Calls for speculation.
THE COURT: Overruled, but maybe lay a foundation. I think Mr. -- well, B.W. has indicated that he would need to look at a law book. So speculation, no. But I think a foundation needs to be established.
BY MR. MANNING
Q. When an individual is taken into custody, is there a determination whether they'll be maintained in custody?
A. Yes.
Q. I want to draw your attention to the top of this form, Petitioner's Exhibit 109, page one.
You described that the first boxes have her name, country of citizenship. And then it says "U.S. address." Is there a box that says "U.S. address"?
A. Yes.

Q. And the address that's listed there is 1623 East J Street, Apartment, Ste., Suite 5, Tacoma, Washington"; is that right?
A. Yes.
Q. What is that address?
A. The detention facility.
Q. So that's not her actual address? That's not her residence address?
A. Correct.
Q. So at the time this form was prepared, she was never -- had never been considered for release?
MR. RATCLIFFE: Objection. Calls for speculation.
THE COURT: Overruled.
You can answer.
THE WITNESS: Could you restate the question?
BY MR. MANNING
Q. So at the time this form was prepared, she had not been considered for release?
A. I don't know which way, yes or no, to answer that. I could just say that every individual is considered for release.
THE COURT: I take it this report hadn't been -- was not generated when -- after she had already been transferred to Tacoma. It was here in Portland; is that right?
THE WITNESS: Correct.
THE COURT: Okay.

BY MR. MANNING
Q. Are you familiar with an immigration form called the I-286?
A. Yes.
Q. Can you tell me what that Form I-286 is?
A. I would need a copy of it in front of me to read the title. It's -- if I remember correctly -- I can't --
THE COURT: I don't want you to have to --
THE WITNESS: I'd prefer not to --
THE COURT: -- guess --
THE WITNESS: -- guess.
THE COURT: -- if you don't know.
THE WITNESS: Detention -- I can't remember.
BY MR. MANNING
Q. If I were to describe it as a notice of custody determination, would that sound accurate?
A. Yes.
Q. And there's no Form I-286 that you created in this case; is that right?
A. Correct.
Q. And there's no form -- and that's the form that would indicate if someone was being released; is that right?
A. It could, one of many.
THE COURT: Were there any forms that were completed -- any forms that relate to release or would've

authorized release completed in M-J-M-A's case?

THE WITNESS: On the contrary, to not be released, the -- the third section that she initialed on the 826 states that she understands that she may -- may stay in detention until her departure, which she initialed, so she understood that she would be detained.

THE COURT: So if someone had --

THE WITNESS: And then also my explanation of the I-200 would've explained that she was currently detained.

THE COURT: So if someone had checked that box, is that considered a voluntary return? Is that a -- is that the box that --

THE WITNESS: That is the box that indicates that her desire is to return without the option of going in front of an immigration judge.

THE COURT: Got it. And now we're talking about --

THE WITNESS: Form 826.

THE COURT: -- Exhibit 108?

THE WITNESS: Correct.

THE COURT: And in the third sort of dialogue box, there's three places where initials are to be made and --

THE WITNESS: The second dialogue box.

THE COURT: Yes, you're right, the second. And because her initials are placed on that third -- third line, you -- because that -- that happened, would you have -- would

you have then filled out any other forms relating to release if -- if she had initialed this box?

THE WITNESS: I also generated a Form I-94, which could be used to -- for her to return to Mexico, which, to do that, she would've been released from custody. So that form maybe.

THE COURT: Okay. Go ahead, Mr. Manning.

MR. MANNING: Thank you.

BY MR. MANNING

Q. I'd like to turn your attention to Petitioner's Exhibit 108. We've talked about this document a little bit earlier, and this is the document that the judge was just describing. I'm just going to pull it up on the screen.

So you're familiar with this form. You've just been describing this form to us. And, now, this form, is it fair to say, is used to record an individual's waiver of rights in the -- in that -- the middle section that we've been talking about where M-J-M-A's -- the initials appear?

A. Certain rights, not all rights.

Q. And you presented this form to the petitioner?

A. Yes.

Q. Okay. And when you presented this form to the petitioner, you did not then explain the eligibility grounds for asylum?

A. No.

Q. And you did not explain the eligibility grounds for

withholding of removal?
A. No.
Q. And you did not explain eligibility for relief under the Convention against Torture?
A. If I may --
Q. It's just -- you'll have an opportunity on redirect for -- to offer additional information. But this will just help us get through the testimony very quickly.
A. I want to be clear that it's a -- when I dialogue with somebody, when I interview somebody, I would explain many things. I would explain the option for them to become -- to go in front of an immigration judge, and I would also explain that the immigration judge would explain possibilities that they could remain in the United States.
And I would also explain to the subject that there is a possibility that if they request a hearing before an immigration judge, they may receive benefits, generic, which would include everything you've stated. However, I didn't go line by line through all of them and explain them to her.
Q. And so you didn't -- so, just to confirm then, you didn't explain eligibility for a T nonimmigrant visa for an individual who was a victim of human trafficking?
A. I explained to her that --
Q. It would be just a yes --
A. -- if she went in front of an immigration judge, the judge

would be able to explain to her possible benefits.
Q. And you did not then -- just to make sure, so you did not explain eligibility for a T nonimmigrant visa; is that --
A. Not specifically.
Q. And then you did not explain eligibility benefit for a U nonimmigrant visa, for status of a victim of a crime in the United States, including human trafficking?
A. I did not specifically. However, I also afforded her the option to contact an attorney, if she so desired, which could have -- an attorney has better knowledge of all those types of relief and benefit, which she chose not to avail.
Q. Can you turn to page -- sorry. Can you turn to Petitioner's Exhibit 111?
Are you familiar with this form?
A. Yes.
Q. Okay. Can you describe what this form is?
A. Legal service aid notification.
Q. And this is a form that is provided to individuals who are in immigration custody?
A. Yes.
Q. Okay. And this is for the -- this is for the Portland Immigration Court; is that right?
A. Yes.
Q. And this was from October 2025. And so this would've been the form in effect at the time of the petitioner's arrest and

detention and, in particular, the form in effect at the time that you were interviewing her and producing the forms?

A. I don't know.

Q. I'm going to go back to Exhibit 108, Petitioner's 108.

MS. GARCIA ORJUELA: Your Honor, just to -- briefly, the -- on this exhibit, we have --

THE COURT: Which exhibit?

MS. GARCIA ORJUELA: It's Exhibit 108. If it's easier for -- I'm sorry -- for the Court, we have provided a translated version on one of our prior declarations, if the -- if the Court wants that from -- translated already. It's on ECF 38, Exhibit 5.

THE COURT: Ms. Garousi, with respect to referring to an English translation of 108, any objection?

MS. GARCIA ORJUELA: It's already on the docket.

THE COURT: And that was ECF 38?

MS. GARCIA ORJUELA: 38, Exhibit 5.

I can show you the screen.

MS. GAROUSI: Oh, yeah, no, we have it.

That's fine, Your Honor.

THE COURT: And let me see if I can pull that up here as well. Hold on a moment.

You can go ahead and ask questions.

Were you intending on giving the witness the English translation, or was that just for the -- my benefit?

MS. GARCIA ORJUELA: It was just for your benefit. The witness has stated that he speaks Spanish.

THE COURT: All right. Go ahead. Continue.

MR. MANNING: Thank you, Your Honor.

BY MR. MANNING

Q. So, sir, on this -- so this is a petitioner's exhibit. This is in Spanish. You've indicated you speak Spanish. I've highlighted a portion. Do you see the highlighting on your screen?

A. Yes.

Q. Can you tell us what that says?

A. In English?

Q. Please.

A. "The official that has given this notification has provided" -- or, I'm sorry, I don't know if that's future or -- the English would be helpful -- "has provided a list of legal services that the respondent may -- or for free or low cost."

Q. Would it be fair to say that that indicates that the petitioner -- that you provided the petitioner the notice of the list of pro bono legal service providers?

A. They were -- they were available in the processing area.

Q. And so would it be fair to say that this says that you provided that list to her?

A. This says, yes.

Q. You didn't provide that list to her?

A. I'm sorry.
Q. You did not provide that list to her; is that right?
A. I don't remember.
THE COURT: Are you referring to the pro bono services list?
MR. MANNING: That's correct, Your Honor.
BY MR. MANNING
Q. You testified on direct examination that there were two documents you provided and no other documents to the petitioner. And you did not mention the list of pro bono legal service providers. Is that a fair summation of your testimony?
A. I don't know.
MR. RATCLIFFE: Your Honor, I'm going to object to this. Asked and answered. The witness just testified that he does not recall.
THE COURT: Sustained.
MR. MANNING: Thank you.
BY MR. MANNING
Q. Between her arrest, so the -- this document indicates she was arrested sometime at 5:30 that morning, on October 30th. And the time that you provided this notice, this waiver of rights to her, she had not spoken to a lawyer in between those two periods of time; is that right?
A. I don't know.
Q. And you did not allow her to speak to a lawyer prior to

the presentation of this document; is that right?
A. I would have allowed her to speak to an attorney. I was not the only -- I was not in the room with her for the majority of the time, and I was not the only officer present in the building.
Q. You don't recall whether you allowed her to speak to an attorney, this particular petitioner?
A. My 213 states that the subject does not have an attorney.
Q. You didn't advise her, let her know, that there were pro bono lawyers outside waiting to speak with her and available to speak with her?
A. I didn't know anything about that. I would've offered her the opportunity. One of my first questions is to offer them phone calls to friends, family members, attorneys, or consular officers. So I would have offered her the opportunity if she would have wanted to. Apparently, she did not have an attorney and did not request -- to me, I -- to -- to get an attorney for her.
(Whispered discussion, off the record, 10:50 a.m.)
BY MR. MANNING
Q. Sir, I'm going to show -- I'm going to ask you to turn to Petitioner's Exhibit 107.
You had described this form before as a warrant for arrest of alien, called an I-200; is that right?
A. Yes.

Q. There's -- on one spot in here -- I've pulled it up on the screen -- there's a signature of authorized immigration officer, K.K., who was -- we're going to be talking to shortly, I understand. And then below that is this other box, "Certificate of Service." And you've indicated that's your signature; is that right?

A. Yes.

Q. And you did not sign where it says "signature of authorized immigration officer" 'cause you're not authorized to sign the warrants for arrests; is that right?

A. Unless I was designated as an acting supervisor.

Q. And at the time this warrant was produced, you were not authorized to sign that; is that right?

A. Correct.

Q. You produced -- how many warrants of arrest would you say you produced between October 14th and November 15th?

A. I have no idea.

MR. RATCLIFFE: Objection. Relevance.

THE COURT: What's the relevance?

MR. MANNING: Your Honor, our understanding -- there's -- the relevance is whether there was a pattern and practice to develop warrants for arrest after the fact.

THE COURT: And that relevance in this case is?

MR. MANNING: The relevance in this case, it goes to an ongoing violation of what we think is the Nava broadcast

policy, as well as --

THE COURT: The settlement agreement?

MR. MANNING: That's right.

THE COURT: Overruled.

Go ahead and finish your answer to the question.

THE WITNESS: I have no idea.

BY MR. MANNING

Q. Would it be a couple, a few, many?

A. I have no idea.

Q. Would you do it in a routine basis?

A. Do what?

Q. Produce -- if a report -- if you -- if you encountered a file that did not have a warrant for arrest, an I-200, would you create that I-200?

A. Yes.

Q. And that would occur whether it was a warrantless arrest or if the -- even if the arrest had already been -- had already -- had been completed?

A. As I fill out an A-File, an I-200 is a requirement. So if one has not previously been generated, then one is later generated if -- if required by the -- the type of immigration proceeding that is being sought.

Q. So there was a policy in place to generate the I-200 forms for arrest even after the arrest had been conducted?

MR. RATCLIFFE: Objection. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: The I-200 is required for -- for an individual to be processed as a VR, as I understand it.

THE COURT: Is it -- is it typical to prepare or complete a -- the I-200 after people have been brought into the field office here in Portland?

THE WITNESS: No. It could be generated. Throughout my career, this -- the usage of this document has changed.

THE COURT: And I appreciate that.

THE WITNESS: Our policy --

THE COURT: Your experience may be a longer history of time that you have in mind; but I'm interested in, at least for now, the issue associated with -- the incident involving the petitioner and your experience here in Portland.

Was it -- was it more or less typical to have these I-200s completed -- prepared and completed after they were brought to the facility?

THE WITNESS: Sometimes they were; sometimes they weren't.

THE COURT: And in those times in which the I-200 was not prepared and completed at the facility, under what circumstances were they prepared? Where else -- how -- where were they -- where and when were they prepared if they weren't at the facility?

THE WITNESS: They're dated. So each form, if you

had it, you could look at the date and see when it was signed. It could be signed anywhere. It could be signed in the field. It could be signed years prior.

THE COURT: Well -- and in Portland, during the time that you were here, do you have any knowledge -- personal knowledge of I-200s being prepared in the field?

THE WITNESS: They -- I don't know where they -- I can't --

THE COURT: And this is --

THE WITNESS: -- testify to where they -- I mean, I received I-200s that I didn't generate, which I would assume -- obviously, somebody did, but I don't know where they would've done that.

THE COURT: All right. So when people were brought in after being detained, were there times in which I-200s came with the arresting officers and -- and then they were -- they were given to you to -- to include in the A-File?

THE WITNESS: Exactly.

THE COURT: And how often would that be the case, compared to the times that you had to prepare them once people were brought into the facility?

THE WITNESS: I don't know. I couldn't say. There was multiple on both sides.

THE COURT: And do you know if I-200s were prepared prior to arresting -- detaining -- or detaining and arresting

somebody, as opposed to after they were detained and arrested in the field?

THE WITNESS: I would have no way to know.

THE COURT: Okay.

MR. MANNING: Just a moment, Your Honor.

(Whispered discussion, off the record, 10:57 a.m. - 10:58 a.m.)

MR. MANNING: Just a few more questions, Your Honor. And I appreciate your patience with me.

THE COURT: Were you making that last statement to me or to the witness?

MR. MANNING: To both, I guess.

THE COURT: All right.

MR. MANNING: 'Cause I realize folks have flown in from afar and want to get on with their days. I just want to make sure that I get the -- this is kind of our chance to ask some questions. I just want to make sure we get that chance.

BY MR. MANNING

Q. You had indicated in your -- is this a fair summation of your direct testimony, that the -- you said the petitioner had indicated to you that she wanted to be detained as a small amount of time?

A. Yes.

Q. And that you interpreted that to mean that she wanted voluntary return?

A. No.
Q. That is not a fair summation of your testimony?
A. No.
MR. MANNING: We don't have any other questions, Your Honor.
THE COURT: Ms. Garousi.
MS. GAROUSI: No, Your Honor, no other questions.
THE COURT: Can this witness be excused?
MS. GAROUSI: Yes, Your Honor.
THE COURT: Any objections?
MR. MANNING: We may ask for the witness to be recalled after speaking with K.K. They're --
THE COURT: Now, is K.K. coming up next?
MR. RATCLIFFE: Your Honor, we were planning to do that, but at this point our priority is to get the two --
THE COURT: And I apologize for the interruption, but this may be relevant for planning purposes. The sentencing that I had scheduled, parties advised they were not ready to proceed today, and so that's been taken out of the calendar. And the remaining matter is a CAPS status conference hearing. You're familiar with them.
MR. RATCLIFFE: Yes, Your Honor. We could do that on the side during a break, if you'd like.
THE COURT: I mean, you could, but we're actually -- that one isn't -- is flex enough that we were going to move

that later into the afternoon.

So, because all of you have been so wonderfully professional and cordial and indulgent with me, I want to extend the courtesy by making sure that we have all the time that we need to try to get this done before the end of the day. So I'm going to be here. So if you can coordinate with your witnesses, let's try to get them all done today.

MR. RATCLIFFE: Does that mean we have until 5 o'clock, Your Honor?

THE COURT: If that's what it takes, but I'd really like to try to get it done even earlier.

MR. RATCLIFFE: Of course.

THE COURT: So ideally, in my perfect world, 3:00. But, look, I started -- I started this. You took up the challenge. And I can't drop the ball because I'm -- you know, I'm too meek to carry it on. So we're going to keep walking through this. Let's get it done.

MR. RATCLIFFE: All right. Knowing that, we are, yes, happy to revert to what was our original plan to put K.K. on next.

THE COURT: All right. And before -- so you're not released yet because you may be recalled after K.K. has testified. So you'll have to wait out in the lobby or wherever it is that you're waiting to be called back.

While you're waiting, you are not to discuss your

testimony with anyone -- with anyone and especially anyone who has not yet testified and -- and -- or coordinating any testimony with any other officials or -- or people that you come into contact with.

THE WITNESS: Understood.

THE COURT: All right. And I do have one or two questions.

With respect to completing the forms, you indicated that -- that oftentimes things were pretty rushed?

THE WITNESS: Yes.

THE COURT: All right. What was it about the circumstances at the facility that caused things to be rushed? Was it just the volume of people that have to be --

THE WITNESS: Yes.

THE COURT: -- processed through? Or was there something else?

THE WITNESS: Just there was a lot of -- on some days there was a lot of work to be done. Other days, there were not. And we have to stay until the work is done, so we tried to -- if it's a busy day, there is incentive to progress through. Every day, seven days a week, we got to get the work done.

THE COURT: And, on average, how long would it take to interview an individual and complete paperwork for them, so you had the package completed and -- and then the person --

you've completed your work with that individual?

THE WITNESS: Impossible to -- I mean, it could take as little as an hour. It could take all day.

THE COURT: Okay.

THE WITNESS: It depends how complicated the case is.

THE COURT: And on the day that the petitioner, M-J-M-A, was brought to the facility, do you have a recollection of -- of whether it was a busy day or a slow day?

THE WITNESS: No.

THE COURT: All right. Any -- Ms. Garousi, any questions flow from what I asked?

MS. GAROUSI: No, Your Honor.

THE COURT: Mr. Manning?

Noting that you're going to have an opportunity to follow up after K.K. testifies, I mean --

MR. MANNING: Well, I'll bring it up at that time, Your Honor.

THE COURT: All right.

MR. RATCLIFFE: Well, that assumes then that, for sure, we're calling this witness back to the stand. I thought the understanding was that based on the testimony of K.K., we would decide -- Mr. Manning would decide and the Court decide whether it was appropriate to call this witness back. So if there are questions, I think we should handle them now.

THE COURT: And I appreciate your focus on that.

Let's try -- if you have questions based on what I just asked, Mr. Manning, please do that now. I'd hate to have him called back because of something I did and not something K.K. said.

BY MR. MANNING

Q. For this particular petitioner, you had indicated -- you indicated you were -- it was -- you were rushed in producing the papers. Is that a fair summation?

A. I may have been. I don't remember specifically creating these documents, processing her. However, as a general rule, I tried to expedite the process during my time here.

Q. And why is that?

A. As I just said, to get the work done.

MR. MANNING: No other questions at this time, Your Honor.

THE COURT: Any follow-up, Ms. Garousi?

MS. GAROUSI: No, Your Honor.

THE COURT: All right. And let's define the scope, and I'll turn to Mr. Ratcliffe to refine whatever definition I'm trying to apply here.

So, Mr. Manning, you won't be able to recall B.W. to follow up on any questions relating to the subject matter about the timing or workload or -- or the rushing description unless, for some reason, K.K. brings it up as well. But, otherwise, you won't be able to revisit this subject area, okay?

MR. MANNING: Understand, Your Honor.

THE COURT: Mr. Ratcliffe, any other asterisks and footnotes to that, that you'd like to offer up?

MR. RATCLIFFE: No, Your Honor. Thank you.

THE COURT: All right. B.W., you're welcome to step down and go wait where you're supposed to stay.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. And you can leave that binder right there on the desk. Thank you.

And how are we proceeding with K.K.?

MR. RATCLIFFE: By video, Your Honor.

THE COURT: All right. And I take it --

(Whispered discussion, off the record, 11:05 a.m.)

MR. RATCLIFFE: Your Honor, we're just wondering: Are we going to see him on our screens or just on the overhead projector?

THE COURT: You know, I don't know the answer to that.

And maybe, Ms. Paget, you're able to tell us: Will --

THE COURTROOM DEPUTY CLERK: He should be on here. And then if you show exhibits, your exhibits can remain on --

MS. GAROUSI: Okay. But he can't see us?

THE COURTROOM DEPUTY CLERK: Only if I sit here and move the camera around.

MS. GAROUSI: That's okay. Don't worry about it.

No, we won't make you do that.

MR. RATCLIFFE: Your Honor, it's my understanding that we have advised him to sign into the link that he already received; so I think that's what we're waiting for at this point, is the connection.

THE COURT: All right.

MR. MANNING: Can I ask a clarifying question, Your Honor? He will be able to see you, but not the individuals questioning him?

THE COURTROOM DEPUTY CLERK: (Courtroom deputy nods head.)

MR. MANNING: Okay. Thank you.

THE COURT: I don't know for a fact, but we can always ask him.

THE COURTROOM DEPUTY CLERK: I've asked IT to come up and do the camera stuff.

(Technological discussion, off the record, 11:06 a.m. - 11:07 a.m.)

THE COURT: And do we know if K.K. has already logged in?

THE COURTROOM DEPUTY CLERK: He is on. Let me start the video here.

THE COURT: And then we'll just be waiting for IT to come here to help manage the tech.

THE COURTROOM DEPUTY CLERK: Yeah, I can -- let me

try -- it looks like he's muted.

THE COURT: So it appears to you, Ms. Paget, that K.K. has muted his end of the line?

THE COURTROOM DEPUTY CLERK: Right. And I don't know that he has camera on because we should be able to see -- K.K., this is the court. Can you hear me?

(Technological discussion, off the record, 11:08 a.m. - 11:11 a.m.)

THE COURT: Were you going to ask K.K. any questions about documents, Ms. Garousi?

MS. GAROUSI: We were, Your Honor.

THE COURT: And so it would've been necessary -- or it would be necessary to show the exhibits that we have through the --

MS. GAROUSI: Yes.

THE COURT: -- our web connection?

THE COURTROOM DEPUTY CLERK: He doesn't have a hard copy?

MS. GAROUSI: Not this hard copy, no. But I can send him hard copies, if that's easier.

THE COURT: Well, so it would seem that we could conduct this by telephone through the same system and it may not drop off. But the problem is -- is reference to documents. So we just -- I'm okay with you submitting a copy to him, so he can review them, as long as they're marked in the same way and

that we take extra precautions to identify what it is he's actually looking at before asking questions.

MR. RATCLIFFE: Your Honor, if we could confer with opposing counsel, then we could come up with -- make sure that we know the universe of documents that he would need, exhibits he would need, and then get those by e-mail.

I think it may make sense also then for us to go ahead, while we're doing that and he's getting his homework sent to him by e-mail, to -- with our next live witness, who I think is a short witness. That's C.S.W. But if we could have a few minutes to confer regarding which documents need to be sent.

THE COURT: Sure. Five, ten? What do you think?

MR. RATCLIFFE: Let's do five minutes.

THE COURT: All right. Let's take five minutes. I'll step off the bench. You can confer. When you're ready, after you've conferred and hopefully agreed to send whatever it is you need to send to K.K., we'll take up C.S.W. and then take up K.K. right after.

MR. RATCLIFFE: Great. Thank you.

THE COURT: All right. Five minutes.

(Recess taken, 11:13 a.m. - 11:25 a.m.)

THE COURTROOM DEPUTY CLERK: Court is back in session.

THE COURT: All right. Counsel, I understand C.S.W.

is going to be called as a witness?

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: All right. And I also understand that K.K. was successfully provided the documents and is not on the call right now, so they won't be able to -- they won't be in the courtroom while C.S.W.'s testifying.

MR. RATCLIFFE: Correct. Not in the courtroom. Connected successfully by telephone. We have transmitted the documents, I believe, the exhibits, but we don't have -- I'm not sure if we have confirmation yet that he's received them. But that's to be determined during the pendency of C.S.W.'s testimony.

THE COURT: Very good. Well, then how about we call C.S.W. and get that underway.

MR. RATCLIFFE: Thank you. The Government calls C.S.W.

THE COURT: All right. C.S.W., if you'd be kind enough to come up to and stand in the witness box. And the courtroom deputy will swear you in.

MR. RATCLIFFE: And, Your Honor, I'm sorry, it occurred to me just now: Yesterday, during the swearing in, we were only using initials. And earlier this morning, Ms. Paget used the first name of a witness. I'm wondering if we can limit it to just the initials.

THE COURT: Yes. And I think B.W. offered --

THE COURTROOM DEPUTY CLERK: I asked.
THE COURT: Oh, you asked. Okay.
THE COURTROOM DEPUTY CLERK: Yeah.
THE COURT: Yes, yes, yes.
All right. So let's -- we'll just stick with the initials: First, middle, or last -- and last, rather.
THE COURTROOM DEPUTY CLERK: Okay. Please raise your right hand.

***C.S.W.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please use your initials and have a seat.
THE WITNESS: Thank you.
THE COURT: Your initials?
THE WITNESS: C.S.W.
THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. RATCLIFFE
Q. Good afternoon, Officer. I'm sorry. Good morning.
Can you tell us where you work?
A. I'm -- I work for Enforcement and Removal Operations in Portland, Oregon.
Q. Is that part of ICE?

A. Yes.
Q. And how long have you worked for ICE?
A. About eight years.
Q. And what's your current position?
A. I'm a supervisory detention and deportation officer.
Q. Were you working on October 30th of this year?
A. I was.
Q. And were you -- are you aware, based on the information that my office has shared with you, about who petitioner is and the general facts of her involvement that day?
A. Yes.
Q. I'd like to show you what's been admitted as Respondent's Exhibit 110.
MR. MANNING: I don't think I have access to it 'cause it's showing -- to be able to display.
MS. GARCIA ORJUELA: But she's got the folder there.
MR. RATCLIFFE: Sure. We'll do that in the meantime, but we do want the Court and the gallery to be able to view Exhibit 110 when we can toggle over.
MS. GARCIA ORJUELA: The Court has also a folder.
THE COURT: I do have a copy of it, but I also want it to be able to be visible for everybody here.
And what was the challenge with getting it --
MR. MANNING: It has now been switched over, Your Honor.

MR. RATCLIFFE: Toggling between the systems.
BY MR. RATCLIFFE
Q. Officer, are you looking at Exhibit 110?
A. Yes.
Q. Is that commonly known as a scratch 213?
A. Yes.
Q. I'd like to direct your attention to the bottom of that form. I know it's redacted on the version shown on the screen. Is the version that you have redacted as well?
A. Yes.
Q. Did you have a chance to look at this earlier in my office?
A. I did.
Q. And do you know if your e-mail address is one of the two e-mail addresses at the bottom?
A. It is.
Q. And without using names, but just using two initials, the first and last name initial, can you tell us the initials of the other person whose e-mail address is at the bottom?
A. S.S.
Q. And --
THE COURT: I didn't hear the answer.
THE WITNESS: S.S., as in Sierra, Sierra.
BY MR. RATCLIFFE
Q. And if you could move the mic a little closer. I know

it's a fixed microphone, and it's not very convenient.

A. That better?

Q. Yes.

A. Too loud?

THE COURT: No, no. Rarely will it ever be too loud.

THE WITNESS: Okay.

BY MR. RATCLIFFE

Q. Is S.S. a co-supervisor with you?

A. He is an acting supervisor.

Q. And why is your e-mail address and why is his e-mail address on the bottom of this form?

A. To be sent the narratives from the field so that we can forward them onto the officers processing cases.

Q. And did you and S.S. forward on those forms on October 30th?

A. Yes.

Q. Did you have any substantive involvement or reason to review the forms before forwarding them?

A. No.

THE COURT: What -- did you ask what forms?

MR. RATCLIFFE: This is the scratch 302, Your Honor.

MS. GAROUSI: 213.

MR. RATCLIFFE: I'm sorry. 213. Not an FBI case. Scratch 213.

THE COURT: So the scratch 213 was forwarded to --

MR. RATCLIFFE: To C.S.W. and to SS.

THE COURT: Okay.

THE WITNESS: That's actually not what was forwarded to us.

BY MR. RATCLIFFE

Q. Oh, I'm sorry. Help me understand.

A. So the encounter portion of the narrative is what was forwarded to us. So the scratch 213 went to the processing department.

Q. Okay. And the Court has previously seen, as Exhibit 109, the 213 in this case and the paragraph labeled "encounter." We'll look at the 213, that other exhibit, in a moment.

But, just to clarify then, because I did ask you incorrectly, so it's not this whole form, Exhibit 110, that got sent to you, but just the encounter portion of what ends up on the 213?

A. Yes, that is correct.

Q. And I know you said before that you did not have a reason to review the narrative that came in through this process. Let me ask you: Did you review the narrative that came in for this case before forwarding it on?

A. I don't believe so.

Q. And why is that?

A. We received multiples. And I'm not going to make any changes 'cause I wasn't at the scene of the arrest.

Q. And so what's another way to think of your role that day and the role of SS after receiving these narratives electronically?

A. Just like a transmitter in lieu of a group mailbox.

THE COURT: I'm sorry. A transmitter in --

THE WITNESS: Just, like, in lieu of a group mailbox. We're currently using a group mailbox instead of our current personal e-mails right now.

THE COURT: So you weren't -- you weren't engaged in the supervisory review of the content of the narrative when it's forwarded to you?

THE WITNESS: No.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. You were just passing --

THE COURT: I'm sorry. I'll yield the floor in just a moment, Counsel.

You mentioned multiples. You used the word "multiples" to describe these narrative encounter portions?

THE WITNESS: Yeah.

THE COURT: Was it the same language in this encounter portion that was forwarded for multiple detainees?

THE WITNESS: I couldn't speak on that. I -- I received them from multiple officers in, like, all the cases that were arrested that day.

THE COURT: Okay. And are we talking about different encounters, not just the one that the petitioner was involved in that day?

THE WITNESS: Yes. Yes.

THE COURT: Okay. Thank you, Counsel.

BY MR. RATCLIFFE

Q. So is it correct that on that day either you or SS were receiving the encounter narratives from everyone who was arrested and doing nothing except passing those on to the folks who were processing?

A. Yes, that is correct.

Q. I don't want to be insulting. Is it fair to say that you were acting as -- essentially as a mailbox?

A. That's correct.

Q. And you indicated, I think, a couple minutes ago that you now have a different procedure where there is a mailbox. Tell us how that works.

A. So instead of us having to forward the e-mails on, we just set up a mailbox that everybody that is in processing will receive a narrative through.

Q. And why couldn't whoever drafted the encounter narrative send it directly that day to the person in processing who needed to use the information?

A. They could've, but we didn't identify early on who that person would be. Like, it's kind of an assembly line process.

So it wasn't until later that it was identified as to who it would need to be. And that person changes on a daily basis.

THE COURT: Like B.W. was one of the processing agents?

THE WITNESS: Correct.

THE COURT: But you wouldn't have known, when these came in, if he would've been the processing agent for that -- for that individual until later?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. All right. I'd like to show you Exhibit 109.

MR. RATCLIFFE: And, Mr. Manning, if you could just show us the first page when you have a chance. Thank you.

BY MR. RATCLIFFE

Q. So on the right side, roughly six or seven boxes down, there is a box that says "by" and then shows the number C 8103, the letter W, and then a redacted box. Do you see that?

A. Yes.

Q. And is the redacted box covering the rest of your last name?

A. That's correct.

Q. That box seems to indicate, because it says "by," that you were somehow the author or preparer of that form. Was that the case?

A. No.
Q. How did your name get on this form in that spot?
A. I'm not 100 percent certain, but I would speculate that the person who created the event put my name in as a placeholder because they couldn't put the actual arresting officers in.
Q. Why not?
A. So EAGLE, the system used to process, limits the arresting officers to the office where you are -- the arrest was conducted. So because I'm assigned in that office, it shows me. But sometimes other agents that aren't -- aren't available in the system.
Q. So am I correct that, at least on this date, on October 30th, there were a lot of your colleagues in from out of town?
A. That's correct.
Q. And were they in the EAGLE system as people to choose from as possible arresting officers?
A. I believe they were not.
Q. Because they were from out of town?
A. Right. They would have to reassign themselves to Portland in the system.
Q. So there were only a limited number of officers who could be selected from the system, from those in Portland, to place in this box?

A. Correct.

THE COURT: So we could also surmise that if you were not the arresting officer, but your initials are in the "by" portion, that the arresting officer was somebody who came from -- at a special assignment?

THE WITNESS: Yes.

THE COURT: All right.

MR. RATCLIFFE: Nothing further, Your Honor.

THE COURT: Mr. Manning or --

MS. GARCIA ORJUELA: I will.

THE COURT: -- Ms. Garcia Orjuela.

MS. GARCIA ORJUELA: I will deal with this cross-examination. Thank you.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA

Q. C.S.W., you mentioned that you're a supervisor deportation officer, correct?

A. Yes.

Q. What are your responsibilities?

A. I have a variety of responsibilities. Like -- so I'm responsible for teams, like administrative stuff, as well as review of charging documents and assignments.

Q. Were you responsible for any of the teams that were out in the field --

A. No.

Q. -- on October 30th?
A. No, I was not.
Q. Why were you the placeholder then?
A. Because I'm -- I was assigned to processing that day, and I was able to be located in the Portland AOR.
THE COURT: The Portland what?
THE WITNESS: AOR, like area of operations. So in the system I'm assigned to Portland.
BY MS. GARCIA ORJUELA
Q. Were you the supervising officer for any of the arresting officers that day?
MR. RATCLIFFE: Objection. Asked and answered.
THE COURT: Overruled.
THE WITNESS: No.
BY MS. GARCIA ORJUELA
Q. You were not the supervisor for either J.B. or J.A.?
MR. RATCLIFFE: Objection. Asked and answered.
THE COURT: Sustained.
BY MS. GARCIA ORJUELA
Q. Okay. You were part of the Operation Portland Sweep, correct?
A. Can you repeat that?
Q. You were part of the Operation Portland Sweep, correct?
A. Yes.
Q. And you have -- you mentioned that you received multiple

arrests from that day. How many encounter narratives for petitioner did you receive?

A. I am not sure.

Q. One, two?

A. I --

MR. RATCLIFFE: Objection. Asked and answered.

THE COURT: Sustained.

BY MS. GARCIA ORJUELA

Q. Do you recall at all who would send you those narratives?

A. It varies. Either a supervisor or an officer from the field team.

Q. Okay. And you do not review at all any of those narrative portions?

A. Generally, no.

Q. You do not see if they're repetitive or anything like that?

MR. RATCLIFFE: Objection. Asked and answered.

THE COURT: I'm not sure I understood the question. Repeat the question.

MS. GARCIA ORJUELA: Oh, I'm sorry. I'm having microphone issues, it seems, again. I'm sorry.

I was just asking if she did not review for repetition or any other mistakes of the narrative portion of an encounter.

THE COURT: And your objection was asked and

answered?

MR. RATCLIFFE: Well, that's a question I did not object to. Then counsel asked, "So you did not review these to determine if they are repetitive?" And that's the question that I said was asked and answered already because she already indicated she didn't review them at all.

THE COURT: So you're not objecting to the second question that was asked?

MR. RATCLIFFE: I'm not objecting to the question she just stated to the Court. I'm objecting to the question that I thought was pending, which was the second of two questions.

THE COURT: Let's reset.

Ask the question, the one that you were intending on asking before we had this colloquy, and then we'll see if there's an objection.

BY MS. GARCIA ORJUELA

Q. I'm sorry. The first question was you don't review the encounter for repetition, correct? You don't review them at all?

A. Generally, no.

Q. Okay.

(Whispered discussion, off the record, 11:41 a.m.)

BY MS. GARCIA ORJUELA

Q. And you mentioned that you received this by e-mail?

A. Yes.

Q. Where is that e-mail?
A. What do you mean?
Q. Is this e-mail still in your inbox?
A. Yeah.
Q. Would it be available?
A. Yeah, it could be available.
Q. Did your counsel advise you to produce any documents that were related to this particular person's arrest?
A. It was not requested of me.
Q. Okay. Would you be able to produce it, if requested?
A. I believe so.
THE COURT: And what was the answer?
THE WITNESS: I believe so.
BY MS. GARCIA ORJUELA
Q. Did you receive --
MR. RATCLIFFE: Your Honor -- I'm sorry. Withdrawn.
BY MS. GARCIA ORJUELA
Q. Did you receive any additional e-mails regarding Operation Portland Sweep?
A. I'm sure.
Q. How many?
A. I couldn't tell you.
Q. Would you be able to produce those e-mails, if requested?
A. Yes.
MS. GARCIA ORJUELA: Okay. No further questions,

Your Honor.

MR. RATCLIFFE: Your Honor, may we have a moment?

THE COURT: Yes.

(Whispered discussion, off the record, 11:42 a.m.)

REDIRECT EXAMINATION

BY MR. RATCLIFFE

Q. C.S.W., you testified earlier that this procedure of having your e-mail address and S.S.'s e-mail address as the pass-throughs was later changed so that there is a -- a general e-mail box that's used for this purpose. Do you recall that?

A. Yes.

Q. Can you tell us approximately when that changed so there's a general e-mail box that's used as a pass-through?

A. I think about a couple weeks ago.

MR. RATCLIFFE: No further questions, Your Honor.

THE COURT: Okay. Is this witness excused?

MR. RATCLIFFE: Yes.

THE COURT: Any objections?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: No objections?

MS. GARCIA ORJUELA: No.

THE COURT: All right. You're excused. That means you can leave, and you won't be recalled as a witness in these evidentiary proceedings. However, my order excluding witnesses remains in place, which is do not speak with anyone who has yet

to testify about the case who might be called as a witness -- or who has been identified as a witness that hasn't testified yet.

If you do, you know, sanctions could be striking your testimony and preventing somebody -- the people with whom you've discussed the case from being able to testify as well. Okay?

THE WITNESS: Yes. Thank you, Your Honor.

THE COURT: All right. And one last point. I know there were questions about e-mails. And I don't know where this case is going; but, in the interest of avoiding any problems down the road, I'm instructing and ordering you to retain all the e-mails that are associated with Operation Portland Sweep --

MS. GARCIA ORJUELA: Correct.

THE COURT: -- or any of the other operations during the time period in October. Okay?

THE WITNESS: Okay.

THE COURT: And I'm going to turn to Mr. Ratcliffe to clarify.

MR. RATCLIFFE: Your Honor, I guess I -- the narrative -- the draft narrative that was passed through C.S.W.'s mailbox has been produced in discovery, is our understanding. I say "draft narrative." The narrative, the encounter narrative.

I don't believe it has been produced as an e-mail showing that it is -- that it entered C.S.W.'s mailbox. In other words, it's not printed as showing C.S.W. as the recipient or showing she forwarded it on. But the draft narrative has been produced. And we're also going to have testimony from the person who created that narrative later today.

THE COURT: Okay. Thank you.

And none of that was -- and I appreciate that clarification, but I don't read that to modify my instruction regarding retention of e-mails. But I wanted to give you the opportunity to clarify the retention instructions that I just provided.

MR. RATCLIFFE: Correct, Your Honor. I was not trying to modify the retention instructions. I did want to let the Court know in case there was any question about the completeness of our production at this point.

And, as I understand it, the Court has directed the witness -- and maybe this is worth repeating, since I was thinking about my previous point when you were giving the instructions about preservation -- the Court has instructed the witness to retain e-mails related to Operation Portland Sweep that she may have.

THE COURT: That's correct. And I don't know how long Operation Portland Sweep lasted or if it's still in

effect.

Can you tell me that?

THE WITNESS: There's still an operation being conducted.

THE COURT: Okay. I think it's safe to say then any e-mails that -- I mean, they don't need to necessarily reference Operation Portland Sweep. I don't know if that would be part of a subject heading or not. But if they're related to operations associated with Operation Portland Sweep, retain them.

THE WITNESS: Okay.

THE COURT: All right. All right. You may leave. Thank you.

THE WITNESS: Thank you, sir.

MR. RATCLIFFE: Thank you, Your Honor.

I believe we're ready to have K.K. call in to our radio show.

THE COURTROOM DEPUTY CLERK: Did you confirm he got everything?

MR. RATCLIFFE: We did.

THE COURT: And, Mr. Ratcliffe, you'll be inquiring?

Ms. Garousi, how long do you think your direct will be?

MS. GAROUSI: My direct will be 15 minutes.

THE COURT: Okay. And, Mr. Manning, Ms. Garcia

Orjuela, I know you -- do you have a sense of what your cross-examination might involve?

Well, let me ask you: Is it going to be similar to B.W.'s in length?

MR. MANNING: It will not be as long, I --

THE COURT: Okay. I'm just trying to manage when we take our break for -- for the lunch period. So I'd like to see if we can break at 12:30 for some time to grab a bite.

If K.K. is on the line, let's go ahead and swear K.K. in.

THE COURTROOM DEPUTY CLERK: He's not yet.

THE COURT: Okay.

MR. RATCLIFFE: We have e-mailed K.K. to let him know. I'm going to step out and call just in case he has not received the e-mail.

THE COURTROOM DEPUTY CLERK: Witness K.K., can you hear me? This is the Court.

THE WITNESS: I can hear you.

THE COURTROOM DEPUTY CLERK: Excellent. I will swear you in. Please raise your right hand.

***K.K.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please say your first

and last initials for the record.

THE WITNESS: K.K.

THE COURTROOM DEPUTY CLERK: Thank you.

THE COURT: Thank you.

And, K.K., this is Judge Kasubhai speaking. I'm going to turn this over to attorneys for -- for the Government. Ms. Garousi, she'll be asking questions of you first. Please do not disconnect the line after she says she's done with questions because attorneys for the petitioner will need to ask you questions. After they're done, please do not disconnect because Ms. Garousi may have some follow-up questions for you. Okay?

THE WITNESS: Understood.

THE COURT: All right. Thank you.

Ms. Garousi.

DIRECT EXAMINATION

BY MS. GAROUSI

Q. I'm going to say good afternoon, Officer K.K., 'cause I know you're ahead of us in time. So good afternoon.

A. Good afternoon.

Q. Who do you work for?

A. Immigration and Customs Enforcement.

Q. And what's your area of responsibility?

A. Omaha, Nebraska.

Q. What is your title?

A. Supervisory detention and deportation officer.
Q. How long have you served in that role?
A. Since December of 2024.
Q. Have you had any other positions with ICE?
A. Yes. I was a deportation officer previous to this, and I was an immigration enforcement agent prior to that.
Q. So about how many years of immigration enforcement experience do you have?
A. A little over 17.
Q. Okay. Officer K.K., I'm going to ask you some questions about your time in Oregon. Why did you -- why did you come to Oregon?
A. It was a last-minute temporary detail that our AOR was tasked with assisting.
Q. And about when did you arrive in Oregon?
A. It would've been, I believe, October 15th.
Q. And do you remember when you left Portland?
A. I believe November 14th.
Q. And while you were here, while you were in Portland, what were your duties?
A. I was assisting with processing at the ERO.
Q. Did you do any field work while you were here?
A. I did not.
Q. So you just did processing the whole time; is that right?
A. Correct.

Q. And, just to be clear, that processing, it took place at the Portland ICE facility; is that correct?
A. Correct.
Q. Okay. Could you give us a brief overview of what occurs when an individual is arrested by ICE and brought to the Portland facility?
A. Sure. So once they're brought to the facility, they're -- they're brought in, patted down and searched. The guys on the floor were receiving the scratch 213 and I-200 from the field team and then taking fingerprints.
And then, once all that was completed, that information would go in a packet, which would come to my team, who would verify record checks and propose a final disposition for the case.
Q. And so you said it came to your team. Were you the supervisor of your team, given that you're an SDDO?
A. Yeah. I was supervising like four DOs that went on this temporary detail with me, and I oversaw them.
Q. And what were your duties as a supervisor of this processing team?
A. To review their work and answer any questions that they might have.
Q. You said reviewing their work. What would that typically entail?
A. They were doing the paperwork on the processing side of

things. So they would take any of the -- they would take the packet that came with the fingerprints in it and -- and field 213 and input them into the system, determine the disposition for that particular case, and print out the proper paperwork and then serve it.

Q. And so were you involved in creating any of the forms -- let me rephrase that.

A. I would not.

Q. Oh, go ahead.

A. I would not create the forms, no.

Q. Okay. Thank you.

A. I reviewed them.

Q. Okay. Officer K.K., do you have those exhibits that I sent you in front of you?

A. I do.

Q. Okay. Do you see Exhibit 109?

A. Yes.

Q. Okay. And is that -- what document is that, the form number?

A. It's an I-213.

Q. And what is an I-213?

A. The record of deportable and inadmissible alien.

THE COURT: I didn't catch your response. Can you say that again?

THE WITNESS: It's the record of the deportable or

inadmissible alien.

BY MS. GAROUSI

Q. And so did you sign, petitioner in this case, her Form I-213?

A. Yes.

Q. And did you sign that 213 because, as a supervisor, you reviewed Officer B.W.'s work?

A. Correct.

Q. And if you remember, what did you do when you -- when you reviewed this I-213?

A. When I reviewed I-213s, I was just making sure they put in pertinent information and that we had probable cause that the petitioner was removable or amenable to removal proceedings.

Q. And so when you say "amenable to removal proceedings," what would you be looking at for this petitioner?

A. For this petitioner, I looked at the fact that she was admitted to the United States and overstayed her visa.

Q. Okay. So if you look at the first page of Exhibit 109, in the bottom right corner, there's a box with your signature and a few other lines. Do you see that?

A. Yes.

Q. And so do you see the line that says "disposition"?

A. Yes.

Q. What does it say next to that?

A. "Voluntary return."

Q. And what does that mean?
A. So we offer anyone that's eligible, typically noncriminals, the opportunity to just return to their country. If they want to admit they're out of status or illegal, they -- they can have the opportunity to go back, and it's not a formal deportation. They will not go in front of an IJ.
Q. Would it be fair to characterize a voluntary return as a benefit?
A. In this particular case, yes.
Q. And I want to be clear. When I say "benefit," I don't mean an immigration benefit that you apply for, like a visa or a Form I-589. Is that how you understand the term?
A. Yes, I understand what you mean. And I interpret it as this person easily could've been put in front of an immigration judge, and I believe she would've got an order of removal.
Q. Okay. So when this Form I-213 comes to you, it's already filled out and you review it; is that right?
A. Yes.
Q. You -- I think you mentioned earlier that your team would have run records checks. Does the processing team write the encounter narrative for a 213?
A. No, we did not. We were not there. We don't -- we don't -- we make sure that there was an encounter narrative placed in the 213. Typically that would come later, as the field teams were extremely busy, obviously. So we would get

the encounter narrative pasted into our 213 as soon as we received it from the field team.

Q. Okay. Officer K.K., I'm going to ask you to turn to Exhibit 107. Do you see that exhibit?

A. Yes.

MR. RATCLIFFE: And, Your Honor, for the benefit of the gallery, I don't remember where we left things with whether we're able to display exhibits while also doing this call, but I note that this exhibit is not shown.

THE COURTROOM DEPUTY CLERK: If you put them up.

MR. RATCLIFFE: I think we have the ability then, Mr. Manning, if you could put that up. And thank you.

BY MS. GAROUSI

Q. So, Officer K.K., is Exhibit 107 in front of you?

A. Yes.

Q. And what is the form number of this exhibit?

A. I-200.

Q. And what is an I-200?

A. Warrant for arrest of alien.

Q. Did you sign petitioner's I-200?

A. I did.

Q. And did you review petitioner's I-200?

A. Yes.

Q. When you review an I-200, what are you looking at -- or what are you looking for?

A. Probable cause that this person is removable.
Q. And, as you mentioned earlier, that was because petitioner overstayed her B-2 visa and had no other status; is that correct?
A. Correct.
Q. And so once you know that she's a B-2 overstay and has no status, you sign the form?
A. Correct.
Q. And Officer B.W. then would've served the form on petitioner?
A. Correct.
Q. Other than signing the I-213 and I-200 in this case, did you have any interaction with petitioner?
A. I did not.
Q. Did you ever speak to her?
A. Not that I recall, no. I very rarely went down to the floor.
MS. GAROUSI: No further questions, Your Honor.
THE COURT: Counsel.
MR. MANNING: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. MANNING
Q. Agent K.K., can you hear me okay?
A. Yes.
Q. You have not spoken with any of the other witnesses that

have -- either have already -- have already testified or may testify in this case?

A. I have not.

Q. And you haven't spoken to them about your testimony or their testimony?

A. I have not.

Q. You were part of this operation -- this detail here in Portland; is that right?

A. Correct.

Q. What was the name of the operation, as you understand it, or this detail?

A. I don't necessarily recall. I believe it is in the 213.

Q. In the I-213 it's listed as Operation Fortifying the Border. Does that sound accurate to you?

A. I believe it was referred to as a couple of different operations while I was there; but that is one of them, yes.

Q. And what were the other operations, the other references?

A. If I remember correctly, I want to say that it was Operation Black Rose.

THE COURT: Operation what?

THE WITNESS: Black Rose.

THE COURT: Black Rose? As in R-o-s-e?

THE WITNESS: Correct.

THE COURT: All right.

THE WITNESS: And, again, I'm just trying to remember

off the top of my head.

BY MR. MANNING

Q. And you would've received e-mails or instructions about Operation Fortifying the Border or Operation Black Rose; is that right?

A. I don't know if the operation name was ever in our e-mails.

Q. Would it be fair to say you would've received e-mails or other guidance documents related to -- whether or not they mentioned those names, but related to this detail here in Portland?

A. Yeah.

Q. You were considered part of -- were you -- you were considered part of the operation, whatever -- whichever name it may be referred to, here in Portland during your time here; is that right?

A. Repeat that, please.

Q. Yeah. It wasn't a very nicely worded question. Let me ask you a question before that. And you may have stated this during your direct, and I apologize.

When did you arrive in Portland?

A. October 15th, I believe.

Q. And then how long were you in Portland?

A. 'Til like November 14th, I believe.

Q. And so during your time here, you were part of a

processing team. That's right?

A. Correct.

Q. You were not part of an arrest team; is that right?

A. Correct.

Q. How many processing teams were there?

MR. RATCLIFFE: Objection. Relevance.

THE COURT: Relevance, Mr. Manning, for this case.

MR. MANNING: We've -- there's a question that there was rushing, and there were multiple individuals the day in question. There were -- we have asserted that there are 28 individuals that were detained. And so I'm interested in understanding how the processing played out to understand the question of rushing.

THE COURT: Overruled.

Answer the question, please, K.K.

THE WITNESS: There would have been -- there was a team that did fingerprinting. And then there was a few local officers that did processing with the local SDDOs, and then there was my team. At one point another team came in to assist us, as it was still a lot of work. But I don't recall what date that was. I don't believe we had them on this date.

BY MR. MANNING

Q. You, as part of your -- so you're a supervisory detention and deportation officer. And as part of your -- your role, your training and your time in the service, I imagine you've

attended courses on immigration law; is that right?
A. Yes.
Q. And I imagine you've learned about the INA, the Immigration and Nationality Act; is that right?
A. Yes.
Q. And you would have also learned about the CFRs, so the regulations, Title 8 Code of Federal Regulations related to immigration?
A. Correct.
Q. And so you're familiar with -- if I refer to INA 236, you would be familiar with that reference?
A. Yeah. I know how to find it.
Q. Okay. You created this I-200 -- sorry, could you -- do you have before you Petitioner's Exhibit 107? If you could pull that before you.
A. I do.
Q. Okay. And you're the one who -- you signed this document; is that right?
A. Yes.
Q. And that is your actual signature that appears on the document midway down, where it says "Signature of Authorized Immigration Officer"?
A. Yes.
Q. This is a -- you would agree that this is an official government document?

A. Yes.
Q. And your understanding of this document is that it acts to restrain an individual's liberty; is that right?
A. Yes.
Q. When you created this document, it indicates at the top that "I have determined that there is probable cause." Do you understand that to mean -- the word "I" to mean you, that K.K. has determined that there's probable cause?
A. Yes.
Q. And then at the midpoint, just above your signature line, if you have the document still in front of you, it says, "You are commanded to arrest and take into custody for removal proceedings under the Immigration and Nationality Act," comma, "the above-named alien."
Do you understand that the words "You are commanded" to be coming from you, that -- that the "you" is K.K., is commanding that -- that authorized officers arrest and take into custody this individual?
A. Yes.
Q. Now, this -- this determination that you made and this command that you issued to arrest and take into custody, is it -- this was made after the petitioner in this case had already been arrested; is that right?
A. Correct.
Q. Now, on this -- this determination and this command, you

did not indicate that she had already been arrested; is that correct?
A. Correct.
Q. Because the arrest had already been made, this document would serve no other practical purpose for officers in the field; is that right?
A. Correct.
Q. Do you understand, through your learning and your training on Section 236 of the INA, that it authorized discretionary detention for purposes of removal proceedings?
A. Yes.
Q. And you're familiar, in particular, with 8 CFR -- and here's the code -- 236.1(b)?
A. I don't have it memorized, no.
Q. You're familiar that then that 236.1(b) would require a notice to appear must be issued at the same time that an I-200 administrative warrant of arrest is issued?
MR. RATCLIFFE: Objection. The witness has just testified that he does not have it memorized. He's indicated that he does not know that specific CFR cite.
THE COURT: Sustained for lack of foundation.
(Whispered discussion, off the record, 12:10 p.m.)
BY MR. MANNING
Q. Based on your experience -- that's okay.
THE COURT: K.K., this is the judge. Are you aware

if there's any notice to appear that has to be provided with the warrant for arrest of alien?

THE WITNESS: So some sort of a charge, in my -- in my knowledge, has to be provided with it, correct.

THE COURT: And is that part of a notice to appear?

THE WITNESS: Typically, yes.

THE COURT: And are you aware of what other content of a notice to appear must be included in that notice to appear?

THE WITNESS: I don't know if I understand your question.

THE COURT: Yeah. What else must be -- what else needs to be included in a notice to appear, in addition to statement of charges?

THE WITNESS: (Indiscernible).

THE COURT: Say again?

THE WITNESS: Charges and allegations.

THE COURT: Okay. Anything else?

THE WITNESS: Yeah, I don't know if I'm tracking what you're going for here. No, I don't think so.

THE COURT: Yeah, I'm just -- I'm kind of just looking to -- for a laundry list of what you might understand a notice to appear includes.

I haven't looked at the regulation. My experience suggests that notices to appear often include a date and a

place to show up for something. Is that your understanding of this kind of notice to appear that is supposed to come along with a warrant for arrest of alien?

THE WITNESS: A notice to appear would have a court hearing location and date, yes.

THE COURT: Okay. Thank you.

Mr. Manning may still have some questions for you.

MR. MANNING: I just have a few more, Your Honor and Officer K.K.

BY MR. MANNING

Q. Just to make sure I understand, there was -- no notice to appear was ever issued by you against the petitioner; is that correct?

A. Correct.

Q. And there has been, to your knowledge, no notice to appear issued against the petitioner?

A. Correct.

THE COURT: And, K.K., this is Judge Kasubhai. Do you have any understanding as to why a notice to appear was not provided to this petitioner?

MR. RATCLIFFE: Your Honor, I'm going to object --

THE WITNESS: Because she opted --

THE COURT: Hold on a minute, K.K.

Go ahead.

MR. RATCLIFFE: I'm going to object to instruct the

witness that if his answer relates to advice that he got from the Office of Principal Legal Advisor that he should not answer the judge's question because that information could be privileged.

THE COURT: So, K.K., I'll repeat the question with the understanding that you're not to disclose any communications that you've received from counsel.

And I'm interested in just what you understand in terms of the work that you were performing as a supervisor in Portland, in October and November, whether notices -- a notice to appear was provided to this petitioner either by you or anyone under your supervision.

THE WITNESS: To my knowledge, no notice to appear was ever issued.

THE COURT: Okay. Mr. Manning, anything else?

MR. MANNING: Just a few more questions, Your Honor.

BY MR. MANNING

Q. You -- you were here in -- here in Portland for 30-some days. Does that sound accurate?

A. Yes.

Q. And of those 30-some days, say -- I don't know -- 25 of those days, would you have been actively working in the Portland field office processing paperwork, similar to the paperwork we've just -- you've just --

A. Yes.

Q. -- gone over?

And during that time you would produce paperwork for whole -- different people, different noncitizens who were presented through this system that has been described to us, from the arrest teams to these -- I'm not sure the -- sort of this triage team, then eventually to your processing team. Does that sound accurate?

A. That sounds accurate.

Q. And for any case that was presented to you that did not already have an I-200 in the file, you then produced and created an I-200; is that right?

A. That's correct.

Q. And so that would be -- whether or not the arrest had been a warrantless arrest, you would then still create a warrant for the arrest after the fact?

A. Correct.

Q. And you did that across several cases?

A. Correct.

Q. You had indicated that you're responsible for making a proposed disposition for a particular case. Now, does that mean you were -- you were making the recommendation; you were proposing the disposition of the individual's detention status; is that correct?

A. In the disposition, I was regarding to whether or not there's an NTA issue, a reinstatement, or a voluntary return.

Q. And in your proposed disposition for this particular petitioner, respecting the notice to appear, what was your proposed disposition?

A. We recommended a voluntary return based on her request.

Q. During your detail here in Portland, did you receive guidance on how to render dispositions regarding to detention?

A. No. I -- we were detaining everyone we arrested. As far as I understand, anything that was -- any time we had something that came up otherwise, it would go to the local SDDOs, as far as I understood.

Q. So the practice or the policy was that everyone who was arrested, there had been a decision made that everyone shall be detained; is that right?

MR. RATCLIFFE: Objection as to the policy. He has not testified to any policy, nor has he testified to a practice beyond that which --

THE COURT: Mr. Ratcliffe, just state the objection and a very brief basis under the FRE.

MR. RATCLIFFE: Objection. Mischaracterizing his testimony.

THE COURT: Rephrase. Sustained. Rephrase.

BY MR. MANNING

Q. You would -- Agent K.K., you understood that there was -- that everyone who was being arrested was to be detained; is that correct?

A. Correct. Not everyone that -- well, not everyone that was arrested, no. Everyone that I processed was going to be detained until they got to the detention facility. There may have been other determinations made there.

Anyone that needed another determination made at that moment, it would've went to the local SDDOs. I would not have made that decision.

THE COURT: Would've gone to the local what?

THE WITNESS: SDDO or --

THE COURT: What does that mean?

THE WITNESS: -- or management.

THE COURT: Okay.

MR. RATCLIFFE: Supervisory detention and deportation --

THE WITNESS: Local supervisors.

BY MR. MANNING

Q. Your --

MR. MANNING: May I proceed, Your Honor?

THE COURT: Yes.

BY MR. MANNING

Q. So your understanding that everyone who came to you was to be detained, that was based on information and guidance you were provided?

MR. RATCLIFFE: Objection. Mischaracterizing the testimony and the evidence. That's not his testimony.

THE COURT: I'm sustaining to the form of the question.

How about you just ask what the source of his understanding is?

BY MR. MANNING

Q. Agent K.K., could you describe the source of your understanding for -- that every individual who you processed was to be detained?

MR. RATCLIFFE: That's -- again, objection. Mischaracterizing his testimony.

THE COURT: Overruled.

THE WITNESS: Was that overruled? I'm sorry.

THE COURT: Yes. Thank you, K.K. Answer the question, please.

THE WITNESS: Okay. Can you repeat the question, please.

MR. MANNING: If I can remember the question now. I can't remember my question right now.

BY MS. GARCIA ORJUELA

Q. Could you describe any guidance or any reference that -- that informs your prior statement that every time that you encountered someone -- or that you had to process someone, that person needed to be arrested?

MR. RATCLIFFE: Detained.

MS. GARCIA ORJUELA: Detained. I'm sorry. Detained.

MR. RATCLIFFE: Objection.

MS. GARCIA ORJUELA: I'm trying to --

THE WITNESS: Yeah. So --

THE COURT: Hold on a minute, K.K.

I can appreciate Mr. Ratcliffe's concern about ensuring an accurate brief summary of what this witness has testified before expanding it or narrowing it or redirecting it to some other focus.

As I understand his previous testimony -- and, K.K., please correct me if I'm wrong -- that you understood that -- and I'm going to look to Mr. Ratcliffe to let me know if I'm -- if I'm summarizing it accurately enough -- that, K.K., it was your experience that people who were brought to the facility were ultimately detained.

I told you it was a summary, so I was hedging my bet.

MR. RATCLIFFE: Your Honor, my notes indicate that he testified in response to the question, "So everyone who was brought to you should be -- was to be detained?" The answer was something to the effect of, no, everyone who he processed was held at least until they got to the detention facility; or if there was a determination needed to be made, I thought regarding detention, they could be sent to the local supervisory detention and deportation officer. So it does not mean that everyone brought to him was detained.

MS. GARCIA ORJUELA: May I interject, your Honor?

Earlier in that testimony, he also said --

THE COURT: I want to revisit this. And let's just try to make sure it's right now, so we don't have to -- we'll have a record to refer to, though, later.

K.K. -- and this is the judge speaking -- when people were brought to the field office in Portland to be processed, what was your understanding about what would happen to these individuals? Were they to be detained and sent to the facility in Tacoma?

THE WITNESS: Unless there was exigent circumstances, medical or family or something like that. But, again, that decision had to be run up through local supervisors and local management.

THE COURT: The exigent circumstance consideration would be run up through other supervisors; is that right?

THE WITNESS: Correct.

THE COURT: Otherwise, once they were brought to the field office in Portland, they were transported to the -- to the Tacoma facility?

THE WITNESS: Correct.

THE COURT: And was there instruction or understanding among the supervisors about that fact, that people who were brought to the facility -- the field office, would be transported to Tacoma?

THE WITNESS: I believe so, yes.

THE COURT: Mr. Manning.

BY MR. MANNING

Q. Where would that instruction come from?

MR. RATCLIFFE: Objection. Mischaracterizing the evidence. It wasn't -- the Court just asked whether there was an understanding among supervisors that they would be transported to Tacoma, not that there was an instruction from supervisors.

THE COURT: Sustained.

MR. MANNING: No other questions at this time, Your Honor.

MS. GAROUSI: No other questions, Your Honor.

THE COURT: So I'm going to follow up.

I did ask you about an understanding. Did that understanding come from any instructions, written or oral?

THE WITNESS: During the temporary detail?

THE COURT: Correct.

THE WITNESS: Not during the temporary detail, no.

THE COURT: All right. Well, then outside of the temporary detail, was there some instruction by supervisors, either written or oral, about transporting people who were brought to the field office in Portland to Tacoma -- to be taken to Tacoma?

THE WITNESS: I'm sorry. I don't know if I'm understanding everything, I guess. Could you --

THE COURT: Yeah. So I'm interested --

THE WITNESS: Are we talking about transportation or detention?

THE COURT: I'm talking about detention. So was there -- my last set of questions involved was it an understanding on the part of supervisors that people who were brought to the facility in Portland would be transported to the detention facility in Tacoma. I understood your answer to be yes. Is my understanding correct?

THE WITNESS: Yes.

THE COURT: All right. Now I want to move beyond just simply that you had an understanding. I want to understand what the source of your understanding was about people being brought to the facility in Portland would be then transported to Tacoma. Was that a direction, instruction that came from other people directed to you or any of your subordinates?

THE WITNESS: No. The -- people were transported to Tacoma because there's no -- there's no other detention -- that's the closest detention facility. That's the detention facility they use.

THE COURT: Well -- and I appreciate that nuance here in Oregon, since we don't have a facility -- a detention facility in the District of Oregon. Was there an understanding -- well, was there instruction or direction about

detention of -- of those people who did not have exigent circumstances for release, once they were brought to the facility in Portland, that they would be detained?

THE WITNESS: The local direction during the operation, my answer was no.

THE COURT: All right. Any follow-up, Ms. Garousi?

MS. GAROUSI: No, Your Honor.

THE COURT: Mr. Manning.

MR. MANNING: If I could have just a moment, Your Honor.

THE COURT: Sure.

(Pause in proceedings, 12:27 p.m.)

BY MR. MANNING

Q. Agent K.K., what I'm trying to understand -- and I am -- forgive me that I'm not fully following -- is -- I'm trying to understand, is that -- was there -- individuals who are brought to the Portland facility, the ICE facility, where you were at, was there -- were people considered for release here in Portland prior to transport under the regulations that govern custody?

A. Outside of the exigent circumstances, the major medical issues, no, I don't believe so.

MR. MANNING: We're good, Your Honor.

THE COURT: Ms. Garousi.

MS. GAROUSI: No, Your Honor.

THE COURT: Can this witness be excused?

MS. GAROUSI: Yes, Your Honor.

THE COURT: Any objections, Mr. Manning?

MR. MANNING: No, Your Honor.

THE COURT: All right. K.K., you are free to disconnect. You're released as a witness, so you won't be called back for this evidentiary hearing. I do want to continue to instruct you that you are not to discuss your testimony or the proceedings during your testimony with anybody who has not yet testified as a witness in this case. Do you understand?

THE WITNESS: Understood.

THE COURT: All right. Thank you so much, K.K. And you're free to disconnect.

THE WITNESS: All right.

THE COURT: Have a good day.

THE WITNESS: Thank you.

THE COURT: 12:29.

MR. RATCLIFFE: 12:29, Your Honor.

THE COURT: This is the first time we kind of hit the mark. But it was a moving mark.

MR. RATCLIFFE: Well, there is something that might gum up the works here, which is I want to ask now whether -- based on that testimony, whether B.W. needs to return to the stand. I recognize we could still do that after lunch if he

needs to, but hopefully we can resolve that issue now.

THE COURT: Sorry. B.W. was being held in the event that he needed to be recalled after K.K.'s testimony?

MR. RATCLIFFE: Yes, for the limited reasons that the Court gave, which I can go back and look at in my notes, if you'd like.

THE COURT: Do you take shorthand?

MR. RATCLIFFE: No, I take sore hand. But it's -- it works -- generally works.

THE COURT: You're getting a workout then today.

Do you need B.W. to come back?

MR. MANNING: No, Your Honor. We were just discussing we don't have any -- our questioning of B.W. is concluded.

THE COURT: All right. So you can communicate to him that he is released.

All right. It's 12:30. Check in on number of witnesses left. By my count, two or three.

MR. RATCLIFFE: Three, Your Honor.

THE COURT: All right. And can you tell me their initials?

MR. RATCLIFFE: Yes.

THE COURT: Or, actually, their initials won't matter to me. Can you tell me what -- oh, can you tell me --

MR. RATCLIFFE: Yes, the order remains the same --

THE COURT: Okay.

MR. RATCLIFFE: -- as the one -- as the order given to your courtroom deputy this morning.

THE COURT: A.A., R.F., and M.K.?

MR. RATCLIFFE: Yes.

THE COURT: And what's your sense of the amount of time each of them will be testifying?

MR. RATCLIFFE: I believe A.A. is maybe ten minutes of direct. I believe R.F. is more like 20 or 30 minutes of direct. And same thing for M.K.

THE COURT: Okay. So we might be looking at maybe another two hours perhaps?

MR. MANNING: Your Honor, there's an additional witness that the Court had held over, J.A., who we would like to ask questions of.

THE COURT: And is J.A. still in and around -- oh, do you have access to J.A.?

MR. RATCLIFFE: He's -- last I saw him, he was out in the penalty box waiting, yes.

THE COURT: I think "up at bat" is just -- sounds like a --

MR. RATCLIFFE: We were using that analogy yesterday. I agree. That's the on-deck circle, and that's the batter's box.

THE COURT: Well, is there any witness that might

have other time constraints that we would want to get J.A. in and out? Or do you want to just stick with the three first and then take up J.A. at the end?

MR. RATCLIFFE: I am -- we are not planning to take up J.A. We believe that's a witness for the rebuttal case, to the extent they want to put one on.

THE COURT: All right. So we'll take it up as rebuttal then. Let's -- how about a 45-minute break? I'd like to keep them a little on the tighter side; but, again, I realize that nothing can be done in 30 minutes when looking for food in Portland.

MR. RATCLIFFE: Especially because the vending machines downstairs have not been restocked since at least last week. I know that from experience over several nights recently. Yeah, 45 minutes is fine.

THE COURT: Yeah, one cannot live on granola bars alone.

So let's take 45 minutes. The courtroom will be locked in the meantime, opened about 15 minutes before that. So 45.

And you're going to make sure I get it right, Ms. Garousi, 'cause you gave me that look yesterday.

It will be 1:15 that we're returning for testimony. All right. Thank you. We're in recess.

* * *

(Noon Recess taken at 12:33 p.m.)

***AFTERNOON SESSION***

(Open court, 1:20 p.m.:)

THE COURTROOM DEPUTY CLERK: Court is back in session.

THE COURT: Please be seated.

And, Counsel, so we have three witnesses in your case?

MR. RATCLIFFE: Yes.

THE COURT: Are you ready to call your next witness?

MR. RATCLIFFE: Yes. The Government calls A.A.

THE COURT: All right. Sir, please come up to the witness stand over here. And my courtroom deputy will swear you in.

THE COURTROOM DEPUTY CLERK: Raise your right hand.

***A.A.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please have a seat.

And state your first and last initial.

THE WITNESS: A.A.

THE COURT: Thank you.

Mr. Ratcliffe.

MR. RATCLIFFE: Your Honor, I apologize for not bringing this up before. It just occurred to me that the Court should know that this witness was a court security officer in this building for two years, ending earlier this year. I want to make the Court aware -- I recognize that the Court usually sits in Eugene -- that the Court may have interacted with this witness before in that capacity, in case -- not just for the Court's curiosity, but in case the Court needs to make anything -- any findings or any statements on the record regarding that.

THE COURT: I appreciate you bringing that to my attention.

I -- while I am the fact-finder here, I don't recall having any direct experience or interactions with you, A.A.

THE WITNESS: No.

THE COURT: And under the circumstances if -- I'm happy to hear from petitioner as well if there's any issues with respect to the description of A.A.'s prior work and whether that may pose some -- some challenge that you'd like to clarify on the record.

MR. MANNING: No, Your Honor.

THE COURT: All right. And then, Mr. Ratcliffe, any issues for the Government?

MR. RATCLIFFE: No, Your Honor. Thank you.

THE COURT: All right. Thank you for bringing it to

my attention. You may proceed.

DIRECT EXAMINATION

BY MR. RATCLIFFE

Q. A.A., could you tell us where you're currently employed?

A. With ICE in Portland.

Q. And how long have you been with ICE in the most recent time of employment?

A. Three months.

Q. And for how many years did you work for ICE before that?

A. I started with the INS in 2000, so about 23 years.

Q. So am I correct that you worked for ICE for 23 years and then became a court security officer for roughly two years in this building?

A. Correct.

Q. And then went back to ICE about three months ago?

A. Correct.

Q. Were you -- and, I'm sorry, what -- within the last three months, what has your title and position been with ICE?

A. Deportation officer.

Q. And could you move a little closer to the microphone? I want to make sure that everybody can hear you with the amplification.

Thank you.

Were you working on October 30th of this year?

A. I was.

Q. Were you working at the ICE facility in Portland?
A. Yes.
Q. What were your -- before we get into what you ended up doing that day, what were your assigned duties that day?
A. I was part of the processing team. So that could mean processing the case, writing up the file. It could mean working in the control room, basically any duty that would be at the office regarding the processing. But I was in the control room on that day.
Q. And were you -- were your duties a little different that day in that they took you out of the control room at some point?
A. Yes.
Q. Tell us about that and what happened.
A. Well, I was tasked on that day for the control room and -- but with the amount of people that came in, detainees, and we had the Guatemalan consulate -- and I believe we had the Mexican consulate as well -- and then the attorney visits, it took me completely away. So for four or five hours, all I did was shuttle people back and forth.
Q. And when you say "shuttle people back and forth," does that include attorneys who were there to meet with potential clients?
A. Just the potential clients to the attorney visitation or to the consulate visitation.

Q. And was that a busy day or a very busy day?
A. It was a very busy day.
Q. Roughly, how many folks came through processing there or came through the facility that day in some form of detention?
A. It was over 50.
Q. So are you familiar with the petitioner in this case?
A. I am.
Q. You've had a chance to meet with my office and to talk with us about the case?
A. Yes.
Q. And are you aware of the allegation that you were involved in essentially ending an attorney visitation with her earlier than the attorneys wanted?
A. Yes.
Q. I want to be clear here. Are you aware that one of the attorneys testified in this case as a witness?
A. Yes.
Q. And did you view her testimony?
A. No.
Q. Did --
THE COURT: Excuse me. You have a bit of a soft-spoken voice. And that mic tends to only pick up between six and eight inches from the mic head. So if you could lean -- thank you -- lean in closer like that, and we'll see how it works.

BY MR. RATCLIFFE
Q. Are you aware that she also filed in this case a declaration under oath regarding her version of the events that day?
A. Yes.
Q. And have you reviewed that declaration?
A. No.
Q. Did you meet with me and my co-counsel earlier today to -- for us to share with you a couple sentences from Paragraph 22 of that declaration related to what you allegedly did at the end of that day?
A. Yes.
Q. Is that the extent of your knowledge about that witness' testimony or declaration in this case?
A. Yes.
Q. Okay. What was going -- tell us what the logistics were that day for transport from folks brought to the Portland office to being sent up to the facility in Tacoma, which is the NWIPC, but we can just call it Tacoma. Tell us about those logistics and what arrangements were in place.
A. Well, every day there are usually two runs. There's an earlier run, and that's usually a van. And the later run would be sometimes a bus, sometimes a van. But the fact that there were multiple females there, just a number of them, that the logistics with the van needed to be figured out because there's

only so many seats.
And so the transport company, they need to figure out how they want to do it because they also have to figure out how many they could take in the afternoon run. So if they need to take more females, they need to take males out, and vice versa.
Q. And so is it your understanding that there's an appropriate ratio of men to women in these transport vehicles?
A. Yes, because of the available seats. I don't know -- I don't know the -- like, what the numbers are, but I know that's the reason.
Q. So the private transport company has some set of rules in place. Is it your understanding that those are for safety reasons, in terms of the mix of men and women in the vehicles?
A. Yes. You -- there's dividers in the bus and the vans. And, like -- and I don't know how many seats, you know, are between each divider. But males and females need to be separated, so --
Q. Okay. And you said there's an -- is there an early afternoon run and then a later-in-the-day run?
A. Correct. There is one that's somewhere close to 1:00 and then somewhere close to 5:00-ish.
Q. And in terms of the other -- to your knowledge, the other limitations in place regarding the private company's transport abilities, what do those other limitations relate to, in terms of rules and regulations that you're aware of?

A. So they run -- they have CDLs, and I know they're --
Q. Meaning commercial drivers?
A. Commercial driver's licenses. There's certain Department of Transportation rules they have to follow. There's also -- I know there are rules regarding the contract with ICE about how many hours they can work, how many miles they can drive, stuff like that.
Q. And so, in your experience, these limitations that you've just described, what do those mean in terms of a practical effect on a busy day at the ICE facility in terms of when these vehicles need to leave?
A. Well, on a busy day especially, but any day if -- they need to get the -- whatever bodies, whatever files are ready, they need to get them out, whichever ratio fits at that point. So if -- you know, depending on who's left in the facility, they may wait for another -- you know, if we could fit a couple more males in here or something like that. But the -- on a busy day, the transport needs to happen as soon as -- as soon as they have the files ready.
Q. And you've referred to, a couple times now, "files ready." What does that mean for particular detainees, for lack of a better term?
A. So there are A-Files or T-Files, which are, like, temporary files if we don't have the A-File. And if they're ready, that means they've been fingerprinted; the case has been

written up, and they've been served charging documents. And once those are done, then they are ready to go on a -- on the manifest to be transported.

Q. To the best of your recollection, what happened with petitioner that day and your interaction with her attorneys in terms of the timing of the meeting and the time available for the meeting, I should say?

A. So my memory is that they -- her file was one of the ones that was ready. And I believe there were three females ready to go. And they were actually standing outside of the cell ready to go. And I believe they asked me specifically --

Q. Who's "they"?

A. -- meaning the attorneys asked me specifically for this name because they -- they originally gave me a list with priority cases that they wanted to see. And then --

Q. And was petitioner's name on that case of priority cases?

A. I don't believe she was. I think they -- I think they asked me right -- like, right around that time, "Hey, we need to -- can you get her real quick?"

Q. Okay.

A. And I think I went to the cell and asked for that name. And they said, "She's right there, standing there," so I went and got her. And I believe I told them, "She's about ready to go."

Q. And did you deliver petitioner then to a room so that the

attorneys could interview?
A. I did.
Q. And what happened next in terms of anything significant with your interactions with them?
A. I think I just, after -- right about the time they were saying, "We need to go," I got her out and said she has to go.
Q. Okay. So you're using the term "they."
A. The transport -- the supervisors, like my supervisors, and the transport company, they were loading the van. They were getting -- the males were already getting chained up and stuff, so they were about ready to go. And -- and, actually, they left about two minutes after I got her out of the room. So there wasn't much time left anyways.
Q. All right. So at some point after you were able to put petitioner into a room so that she could have a conversation with her attorneys, are you saying that that's when you learned that the -- from a supervisor and the transport folks that they were ready to go with that first afternoon transport?
A. Well, I knew they were pretty close to ready 'cause she was standing outside with the other two females getting ready to go. So, I mean, I knew -- I'm not sure, but I may have told them that she's ready to go, so --
Q. Okay. So --
A. -- they knew it was not going to be a long meeting.
Q. Yeah. Again, when you say "they" -- I don't want you to

use the term "they," please.
A. Okay.
Q. Either refer to the attorneys, the transport company, or whoever else, because I want to make sure the record's clear.
So let me back up. Are you saying that when you were first asked by the attorneys to find the petitioner and bring the petitioner to the attorneys, you found the petitioner already standing in a line, indicating that she was being ready to be put on the transport vehicle?
A. Correct.
Q. Okay. And then you were able to get her out of that line, put her into a room so that she could meet with the attorneys?
A. Correct.
Q. And that she then had some time to meet with the attorneys?
A. Correct.
Q. And then you learned from the transport company --
MS. GARCIA ORJUELA: Objection. Counsel testifying.
THE COURT: The objection, to the extent it's leading, it's suggestive, so -- I also think it's helpful for me to move this part along because I'm not -- I don't know how critical -- I mean, this appears to be just some context.
MR. RATCLIFFE: Yes, Your Honor. I thought I was just restating the testimony.
THE COURT: You may have been going beyond that, but

go ahead and start up again and -- and if you need to lay a little bit of introductory testimony to get to wherever you're going, I'll allow some leeway.

BY MR. RATCLIFFE

Q. So after you put the petitioner in the room with her attorneys, what happened next?

A. Approximately nine minutes later, I went back to the room and informed them that it was time for the petitioner to leave on the transport, that the transport was about to leave.

Q. Okay. And did they ask you for additional time?

A. I don't recall that.

Q. I'm sorry. Did the attorneys ask you for additional time? I've made my own mistake.

A. I don't recall that, but it's possible or probable.

Q. Were you able to provide -- do you recall whether you were able to provide the attorneys and the petitioner more time after your advising them, "Hey, she needs to leave"?

A. I don't -- I don't recall.

Q. And then do you recall actually then taking petitioner and either putting her back in the line for transport or giving her to someone else to be transported?

A. I do.

Q. Tell us about that.

A. I just took her out of the room and told her to go stand where she was before.

Q. And how soon after that, if you recall, did the transport leave?
A. Two minutes.
Q. So let's go to the end of the day now. You testified earlier that we reviewed earlier today a portion of the declaration regarding an allegation about what happened at the end of the day. Do you recall that?
A. Yes.
Q. And so, just to frame the issue, are you aware that the declaration says that -- that you interrupted a meeting between this same attorney and a different client near the end of the day or around 3 o'clock?
A. Yes.
Q. Do you recall that happening?
A. I do.
Q. Tell us why it happened.
A. I believe one of the guards came, the -- the guards at the front of the building, and told us the building's closed. So we need to stop all visitations basically; it's time -- time to close the building.
Q. And was that a normal closing time?
THE COURT: Sorry. You were going to -- I think you were going to ask the same question I was. Go ahead, Mr. Ratcliffe.

BY MR. RATCLIFFE
Q. Is that a normal closing time, around 3 o'clock?
A. 3 o'clock, yes, it is.
(Whispered discussion, off the record, 1:37 p.m. - 1:38 p.m.)
MR. RATCLIFFE: Nothing further, Your Honor.
THE COURT: Counsel.
MS. GARCIA ORJUELA: Thank you.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA
Q. In -- based on your three months experience, are agents allowed to drive petitioners up to Tacoma? I mean, detained people up to Tacoma?
A. Yes.
Q. While you have been there, has transportation happened after 5:00 of any --
A. After 5:00?
Q. After 5:00 p.m.
A. I would probably say yes.
MS. GARCIA ORJUELA: All right. No further questions, Your Honor.
MR. RATCLIFFE: Nothing further, Your Honor. This witness can be excused.
THE COURT: I may have a couple follow-ups, sir.
The -- it appeared from your testimony that -- that

the transport schedule sort of directed how people needed to -- how people who were being detained and sent to Tacoma were going to be moved from the field office to Tacoma. Is that --

THE WITNESS: Yes, that's our main transportation, is -- is that transport company, the two runs.

THE COURT: And how is it decided when these transports leave? At what time -- how is it decided what times they're supposed to leave?

THE WITNESS: I believe that's determined by -- by the transport company and the -- the contract. I would say the -- I -- sometimes the morning -- the officers on that morning run may start early. And, like -- as I said prior, they have certain Department of Transportation policies and rules that they have to follow. They can't -- that -- the transports cannot wait and be over the allowed -- allotted driving hours for the day.

THE COURT: Is waiting counted against their driving hours? Do you know?

THE WITNESS: I believe it's the entire day. If they start at 5:00 a.m. and finish the day at a certain time, then -- I don't know what the hours are.

THE COURT: Okay. I mean, in one of my past lives, thinking about logging -- logging hours, usually it's the hours driven that -- that are in play. But it's a combination? Do you know anything about whether they were keeping that kind of

a CDL requirement for hours logged driving?

THE WITNESS: I'm not sure about that. But they also have certain restrictions based on the contract, I believe, not just the transportation laws and rules, but the contract with ICE.

THE COURT: All right. Do any of the supervisors at the field office have authority to say, "Hey, we got to hold up the transport. We've got a few issues to take up, and we're not ready to move one or -- one or more of the detainees"?

THE WITNESS: They do sometimes; however, a day when there's 50-plus, I'm not sure how much leeway that works when you just have a van leaving and a -- you know, the numbers, I'm not sure how they would work on a busy day like that.

THE COURT: Are there any other considerations, that you're aware of, that are taken into account, other than, you know, the driver's time, contract with the transport company, and, you know, getting people to Tacoma?

In terms of timing-wise, are there any other considerations that are -- that are made or accounted for when deciding when to leave and how many people you're transporting?

THE WITNESS: If they were going to -- a couple more -- a few more files maybe are almost finished, they might wait just to get those on.

THE COURT: And do you know --

THE WITNESS: Depending on how late the afternoon bus

is.

THE COURT: And do you know how much longer they're able to wait for some of the files to be completed?

THE WITNESS: I'm not sure.

THE COURT: From your experience, sir, are you aware of how much time sometimes they've waited for these files to be completed?

THE WITNESS: I couldn't say. I'd just be guessing.

THE COURT: Okay. And we don't want you to guess.

All right. Thank you.

Mr. Ratcliffe, any other questions?

MR. RATCLIFFE: No, Your Honor.

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. I know you asked this witness to be excused, Mr. Ratcliffe.

Any objections, Counsel?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. A.A., you are free to step down. You're released from being a witness here in this case, so you don't have to come back for this evidentiary hearing. However, I would like to continue to admonish you not to discuss your testimony with anyone who has not yet testified. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

Next witness.

MR. RATCLIFFE: Your Honor, the Government calls R.F. I will step out and get her.

THE COURT: Thank you.

R.F., if you'd be kind enough to come up to the witness stand. And once you take the witness stand, the courtroom deputy will swear you in.

THE COURTROOM DEPUTY CLERK: Please raise your right hand.

***R.F.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please have a seat.

State your first and last initial.

THE WITNESS: R.F.

THE COURT: And, R.F., it's going to likely happen, so I think I'll just advise you now. A lot of folks are sitting further away from the microphone than they should. So if you would be kind enough to actually move up closer. Between six and eight inches of the microphone head is where the audio will be picked up properly.

THE WITNESS: Okay.

THE COURT: Thank you.

You may proceed.

DIRECT EXAMINATION

BY MS. GAROUSI
Q. Good afternoon, Officer R.F. Who do you work for?
A. Immigration and Customs Enforcement.
Q. And what is your typical area of responsibility?
A. I work on the -- it's called alternatives to detention.
Q. And what geographic location do you --
A. Oh, Denver.
Q. Thank you.
And what's your title?
A. Supervisory detention and deportation officer.
Q. How long have you been an SDDO?
A. Seven years.
Q. And have you held any other positions with ICE?
A. I was a deportation officer prior to that, and then the other title was immigration enforcement agent.
Q. How long were you a DO for?
A. About 13 years.
Q. And then --
A. Or, well, let's see. I got to -- math. About six years as an IEA and then about another six or seven years as a deportation officer.
Q. You're going to do a lot of math here on the fly. So how long have you been doing immigration enforcement?
A. 19 -- over 19 years.

Q. Okay. Officer R.F., did you come to Portland on a TDY?
A. Yes.
Q. And what does TDY stand for?
A. Temporary -- I'm drawing a blank. Just the -- like a long-term deployment.
Q. Duty assignment?
A. Yeah, duty. Yes.
Q. Okay. Cool. And do you remember when you came to Oregon?
A. Around October 14th.
Q. And do you remember when you left Oregon?
A. November 12th.
Q. Do you recall if you were told what you would be doing in Portland?
A. Not until the day I got out here. They said that we would be on the streets making arrests.
Q. Okay. And did you understand that just to be plain old immigration enforcement activities?
A. Yes.
Q. Were you on duty on October 30th of this year?
A. Yes.
Q. And do you remember where you were told to report for duty that day?
A. It was in Woodburn.
Q. Did you go anywhere before you went to Woodburn?
A. I was sitting at an address. I don't remember the

address.
Q. What did you do at that address?
A. Sitting there waiting. I think we had a target there.
Q. Okay. Okay. So were you part of Arrest Team 7?
A. Yes.
Q. On the morning of the 30th, did all of Arrest Team 7 go to the same location?
A. The first location?
Q. So, yeah, tell me where the first location you went to when you -- you left Portland, what was the first location?
A. I believe it was Hazelwood Estates.
Q. And --
A. I don't -- I don't know the exact -- in Woodburn, yeah.
Q. And that first location, the entire team went to that first location?
A. I believe so.
Q. Did you receive any briefing that morning?
A. Not that I can remember.
Q. So you went straight from Portland to the Hazelwood Estates maybe, in Woodburn?
A. Correct.
Q. Was the entirety of the team together for the enforcement operation you conducted in Woodburn or --
A. For the most part, yes.
Q. Were you a part of the team -- were you a part of the

immediate officers who arrested petitioner in this case --
A. No.
Q. -- who stopped petitioner in this case?
A. No, I was not.
Q. So where were you while that stop was occurring?
A. I was sitting at a different address.
Q. Okay. And so when did you go to where the other officers had stopped the van that petitioner was in?
A. I don't remember the exact time. I know we got a text message saying that there was individuals in custody. I had asked where the location was. And then after that is when I drove over there.
THE COURT: Were you waiting at another address because you were attempting to identify a target?
THE WITNESS: Yes.
THE COURT: Okay. All right. And how -- who advised you or how did you come about identifying a potential target that morning?
THE WITNESS: Sometimes they would upload targets into our folder, and I can't remember if we had a -- the -- a target. We'd usually go to a target location. I believe we were -- they wanted us in Woodburn, so that's where we ended up at. And they -- I think we had a target at a certain location, and then they also wanted us out.
THE COURT: And that target had a name? Was it an

actual identified individual?

THE WITNESS: I don't remember.

THE COURT: But was it -- was it a name of -- of a person?

THE WITNESS: I -- possibly. I --

THE COURT: How else is a target identified, if not by name?

THE WITNESS: Sometimes if it's -- if they give us a name, we'll go to that location, or they would want us out with -- running plates.

THE COURT: Okay. And do you remember if your target focus was a plate number?

THE WITNESS: I -- it was an area.

THE COURT: Okay. All right. So -- fascinating. Oftentimes, maybe in the context of how I've been thinking about the evidence, targets have typically been identified people. But they -- a target could be plates or -- and targets could be locations?

THE WITNESS: Correct.

THE COURT: And so was your target that morning a location? Or you don't know?

THE WITNESS: I don't remember.

THE COURT: And that's okay.

THE WITNESS: Sorry.

THE COURT: Are there other kinds of targets, other

than the three we just described?

THE WITNESS: Not that I can think of right now.

THE COURT: And do you know how location targets are determined?

THE WITNESS: From what I remember is we would usually have -- sometimes have -- would have a name for -- at a certain place, and then we would run plates at that point.

THE COURT: So a target could evolve --

THE WITNESS: Correct.

THE COURT: -- from a name to a plate and maybe even to an area, in any particular order?

THE WITNESS: Yes.

THE COURT: Okay. All right. All right. Thank you. Thank you. Thank you.

(Whispered discussion, off the record, 1:51 p.m.)

BY MS. GAROUSI

Q. Is there a folder in front of you?

A. Yes.

Q. Okay. Cool. Officer R.F., can you turn to --

MS. GAROUSI: Sorry, Stephen, I didn't give you a heads-up.

BY MS. GAROUSI

Q. -- Exhibit 102?

A. Yes.

Q. Okay. And so you mentioned the Hazelwood Estates, right?

A. Correct.
Q. Okay. And then --
MS. GAROUSI: Can you scroll down one more, please.
BY MS. GAROUSI
Q. And so you see that address, 1601 North Front Street?
A. Yes.
Q. Okay. Is that the address that the rest of your team would've been at?
A. It seems like, yes.
(Whispered discussion, off the record, 1:52 p.m.)
BY MS. GAROUSI
Q. Okay. So when -- and remind me of your testimony. I got lost for a second. When did you go to the site that the rest of your team was at?
A. I was -- I don't have the exact time, but it was after that they were -- called out saying they had seven.
Q. Okay. And then when you arrived to that site, what did you see?
A. They had individuals out, and they were putting them in vehicles. And then I was double-checking on one of my officers that had hurt himself, so I was making sure that he was okay.
Q. Did you interact with any of the individuals who had been in the car at the arrest site?
A. Not at that time, no.
Q. And did you talk to any of the officers about what

occurred during their arrest when you arrived to that site?
A. Not at that time, no.
Q. Was everyone in the -- were all of the people who had been stopped in ICE vehicles when you had gotten there?
A. I think they were trying to figure out who was going to go into what vehicle at that time.
Q. But eventually everyone got loaded into cars?
A. Yes.
Q. Okay. And then -- so what happened once everyone was loaded into the vehicles?
A. It was -- a lot of people were -- like, from the public were starting to show up, so it was a safety aspect for -- for the officers and the people that were in our vehicles to get off -- get out of that location and rally to our transportation location.
Q. And so when you got to the transportation location, what did you do?
A. We were trying to coordinate, like, who was going to take our individuals. And we were trying to talk to people -- so we have scratch 213s -- so we can figure out more information why they were temporarily detained.
Q. Did you assist with filling out any scratch 213s?
A. Yes.
Q. And can you just -- I think we've all heard the term a number of times now, but can you just briefly describe what a

scratch 213 is, please.
A. It's the basic information where it has their name, their date of birth, who -- I'm trying to think -- their country of birth, their address in the United States, address outside of the United States, what -- their status, how and when they entered.
Q. How would you -- if you weren't at the arrest, how would you get the information for these scratch 213s?
A. Most of the time, I would send a text message in our group and ask, like, "How did this happen? Do you have a picture? Do you" -- ask for all the information.
Q. Do you recall doing that for the petitioner in this case?
A. I did not send a text message, no.
Q. Okay. So how would you have gotten -- let me back up for a second.
Did you fill out the scratch 213 for petitioner in this case?
A. Oh, I had asked our officers, you know, kind of basic information, as much as I could. And then, again, we were trying to coordinate transportation. And more people started to show up at that point; so, again, more of a safety aspect for everyone involved to -- we'll get the information once we get to the facility.
Q. But -- so it sounds like, based on your answer, you did fill out a scratch 213 for petitioner?

A. Yes.
Q. Okay. All right. And so from the transport location -- you get there; you're trying to coordinate where to put the individuals that have been detained at this point; you're filling out scratch 213s. What happens next?
A. We tried to see if the transportation van would take them. They couldn't. They were full. We were waiting on another van. The other van never showed up. So we -- other people, the public started showing up, so we just loaded everybody into our vehicles and left.
Q. You said other people from the public started showing up. Would it be fair to say that the processing that you typically would do at the transportation location was interrupted based on safety concerns?
A. Yes.
Q. Okay. Okay. So what happened once everyone was loaded into vehicles?
A. We went back to our facility.
Q. And "our facility," where does that --
A. The ICE facility in Portland.
Q. Thank you.
When you got to the ICE facility in Portland, what would you have done?
A. We fill out the rest of our -- the basic information for everybody that we could, that we had at the time. Sometimes we

would assist other teams. At that point we again started filling out the rest of the 213s for our arrests.

Q. In addition to the scratch 213, would you have provided any other information about the arrest?

A. I would. After we would do that and we would leave the facility, depending on what we would do, either go back out to the streets or I would go back to a hotel and fill out the basic information on a basic e-mail and a basic encounter.

Q. And would it be fair to characterize the information as -- about the encounter, like, as a description of the arrest?

A. Yes.

Q. And who would you get that information from?

A. Our officers.

Q. And, as an SDDO, was that part of your responsibility to --

A. Yes.

Q. Okay.

THE COURT: Responsibilities to do what? Get the encounters from the officers?

THE WITNESS: Yes.

THE COURT: Okay.

BY MS. GAROUSI

Q. Do you -- and I'm going to refer to it as an encounter narrative. Do you remember writing an encounter narrative for the petitioner in this case?

A. Yes.
Q. Okay. I'm going to ask you to turn to Exhibit 109. And go to the second page, please.
Do you see that place, about halfway down the page, that says "encounter"?
A. Yes.
Q. I'll give you a second to look at that. And then, when you're ready, can you tell me if that is the description that you wrote?
A. Yes.
Q. Okay. So the encounter narrative says that petitioner was encountered as a part of Operation Fortifying the Border. What's your understanding of Operation Fortifying the Border?
A. Every operation that we do has a name, and that's what this one was called.
THE COURT: Who designates these operation names?
THE WITNESS: Headquarters.
THE COURT: Does the name in any way suggest the -- the objective or mission?
THE WITNESS: No.
THE COURT: Okay. So Operation Black Rose, was that also an operation name?
THE WITNESS: Yeah, I've heard that also.
THE COURT: Do you know if that was an official designation or sort of an alternative nickname designation for

this operation?
THE WITNESS: I don't -- I didn't -- I didn't actually hear that name until not very long ago, Black Rose.
THE COURT: In preparation for this testimony?
THE WITNESS: Yes.
THE COURT: Okay. And were there -- was there another name, alternative name for this operation?
THE WITNESS: Not that I know of.
THE COURT: Okay.
BY MS. GAROUSI
Q. Officer R.F., based on your understanding, did Operation Fortifying the Border have any specific parameters regarding arrests?
A. No.
Q. And, like I mentioned earlier, when you -- or, like you stated earlier, you understood your assignment in Portland to be simple immigration enforcement activities; is that right?
A. Correct.
Q. Okay. So can you tell us why you put that petitioner was encountered as a part of Operation Fortifying the Border?
A. That was just a simple sentence that I put in every single one of the encounters that I did.
Q. Okay. That encounter narrative also mentions that -- the sentence reads, "ICE officers walked up to individual with clear markings and verbally identified themselves and did a

consensual encounter." Can you tell us what a consensual law enforcement encounter is, please.

A. Usually we just walk up to somebody, and we start talking to them.

Q. And at the time you wrote this paragraph, what did you think had occurred at the arrest?

A. That they were all coming out of the building, getting into a van, and they walked up and started talking to them.

Q. And what made you think that?

A. 'Cause the basic information that I got at first is, like, that's kind of how it happened and -- and we didn't have a whole lot of time at either location to talk about it. And so I -- from the information that I had gotten, that they were saying that they were coming out of this building and -- and they --

THE COURT: Without giving the full names, can you provide the initials of the officers who provided the information to you for this narrative?

THE WITNESS: Officer J.B., D.R., C.M. I believe those are the only ones that I spoke with.

MR. RATCLIFFE: Your Honor, may we have a moment?

THE COURT: Yes.

(Whispered discussion, off the record, 2:05 p.m. - 2:06 p.m.)

THE COURT: Was -- was the information that was

provided by one or the three of those officers to you similar in kind or -- or -- relating to the other people that were detained?

THE WITNESS: They -- yes, that, like, they had encountered them. Some were walking out of this -- the building, encountered them there -- or getting into the van there and -- yeah.

THE COURT: And my question was incredibly unfocused. So if we were to look at the narrative or this -- this sheet for the other people that -- that were also detained in that same setting --

THE WITNESS: It would read the same.

THE COURT: -- it would be the same?

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

BY MS. GAROUSI

Q. You mentioned that you thought that the individuals had come out of a building and they were encountered on the street, right? Is that correct?

A. Yes.

Q. Okay. Can you tell us a little bit more about the area in which they were encountered, such that you would think that they were coming out of a building and just getting into the car?

A. I thought it was an apartment building, like where they

had lofts up in -- like in a downtown area, coming down.

(Whispered discussion, off the record, 2:07 p.m. - 2:08 p.m.)

BY MS. GAROUSI

Q. Officer R.F., when you arrived to the scene of where the van had been stopped, did you know that there had been a traffic stop?

A. No.

Q. If you had known that what had occurred was a vehicle stop, would you --

MS. GARCIA ORJUELA: Objection. Sorry.

THE COURT: I haven't heard the whole question yet.

Before you answer the question, let's hear the whole question.

And if you want to renew an objection, we can take it up.

BY MS. GAROUSI

Q. I was going to say: If you had known this was a vehicle stop, would you have written that it was a consensual encounter?

MS. GARCIA ORJUELA: Objection. Speculation.

THE COURT: Overruled.

THE WITNESS: No.

BY MS. GAROUSI

Q. Why not?

A. I would've put down exactly what happened. I would've wrote it as a vehicle stop. That's -- because that's what happened.

THE COURT: Is today the first time that you've understood that it might have been a vehicle stop?

THE WITNESS: No.

THE COURT: Okay. So how long ago did you learn that it was a vehicle stop instead of a coming down -- coming out of the apartment?

THE WITNESS: Probably a few days after --

THE COURT: Okay.

THE WITNESS: -- it happened.

THE COURT: All right.

MS. GAROUSI: You beat me to my question, Your Honor.

(Whispered discussion, off the record, 2:10 p.m.)

BY MS. GAROUSI

Q. Officer R.F., I know I'm showing you an I-213, but when did you realize that what you had written had made it into this I-213?

A. Not yesterday. The day before yesterday.

Q. So you didn't know it was -- you answered the question.

Would you have corrected the mistake if you had known sooner?

A. Absolutely.

Q. Did you personally interact with petitioner at all?

A. Yes.
Q. How did you interact with her?
A. At the transportation site, I was -- got her out of the vehicle to take her over to one of the vans. They said, "No, we don't have the room." So I took her back to one of our vehicles and placed her with another individual back in a car. The person that was riding with me at the time was trying to help, you know, identify her.
Q. Was that your only interaction with petitioner?
A. Back at the ICE facility, I spoke with her again.
Q. Let me go back for a second. You said someone was riding with you and petitioner; is that correct? An --
A. An officer was riding with me, yes.
Q. And what are the initials of that agent or officer?
A. M.K.
Q. And then you said you spoke with petitioner at the Portland facility; is that correct?
A. Yes.
Q. And what did you say to her?
A. I just asked her again, you know, what her name was and that "We're going to take you over to be fingerprinted."
Q. Did she say anything to you?
A. No.
Q. Okay. So outside of transporting her and that brief conversation --

A. I did not transport her.
Q. Oh, sorry. Excuse me. So outside that -- that brief encounter at the facility, did you interact with her at all?
A. No.
(Whispered discussion, off the record, 2:12 p.m.)
BY MS. GAROUSI
Q. Officer R.F., do you know who did transport petitioner?
A. I do not remember.
MS. GAROUSI: Okay. No further questions, Your Honor.
MS. GARCIA ORJUELA: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA
Q. Who was the officer that told you where to report for duty? Do you remember?
A. I believe -- I don't. We would have meetings kind of -- brief meetings in the morning with our team.
Q. Would those meetings happen at the Portland office or --
A. Just at the hotel lobby.
Q. The hotel lobby. Okay.
And those meetings were with your whole team, other teams?
A. Our whole team.
Q. Your whole team. So that would only be Team 7?
A. Yes.

Q. All right. Okay. And who provided you the addresses that you were going to?
A. Our -- another SDDO. We would put it into our group chat.
Q. Was it a local?
A. No. He was part of Team 7.
Q. Part of Team 7. Okay.
And that was the text message that gave the Hazelwood Estates address, correct?
A. Correct.
Q. Okay. You mentioned that sometimes you got targets uploaded to a folder. What folder are you referring to?
A. It's a Teams folder, a Microsoft Teams --
Q. A Microsoft Teams folder --
A. Yeah.
Q. -- in your computer?
A. Yes.
Q. And would you have this for the entire time that you were deployed in Portland?
A. Yes. I've never had access to it, though.
Q. You never had access?
A. Yeah.
Q. Who had access?
A. The other SDDO.
Q. And can you identify his initials?
A. Officer C.H.

Q. Officer C.H. Okay.
And he was the one who indicated where to go --
A. Correct.
Q. -- from the things on this folder, correct?
A. Correct.
Q. Okay. You also mentioned that targets could be an area. Can you explain a little bit more? What would that signify in practice?
A. It depends on if -- like, we would have a target, and we would go into that area. And if it has been known to have other individuals within an area with any type of, like, criminal history, we would go into that area and -- to see what we can do.
Q. And "to see what we can do" would mean running plates --
A. Running plates, yes.
Q. Okay. What other methods would you use, alternative to running plates?
A. Running plates and have a target.
Q. And have a target. Okay.
You also mentioned that there was a transportation location, correct?
A. Correct.
Q. Is that a normal occurrence as to --
A. Yes.
Q. -- how operations -- yeah.

And was this transportation [sic] a public parking lot?

A. Possibly. I don't remember.

Q. You don't remember?

A. I don't know the exact address.

Q. Okay. Did it look like an enclosed, like, private location?

A. It's not a -- it wasn't, like, gated.

Q. It was not gated. Okay.

You also mentioned that you assisted on filling out the scratch 213. So let's -- and on the folder there, you can access. It's Exhibit 110, I believe. And this was the document that you assisted filling out, correct?

A. Correct.

Q. There are two handwritings there. Would you agree?

A. Yes.

Q. One is yours. And then who would be the other?

A. I do not know.

Q. You do not know. Okay. Who did --

THE COURT: Which writing is yours?

THE WITNESS: It's -- I -- it's the black handwriting. I don't know if you can really tell, but the other writing is in blue. Does that -- that doesn't help at all. I guess it's not the -- the less blocked one, if that makes sense. I can give you the exact areas, if you'd like me

to do that.

THE COURT: Well, I'll -- it may not be critical, so I'll let Ms. Garcia Orjuela continue with her questions.

MS. GARCIA ORJUELA: Thank you, Your Honor.

BY MS. GARCIA ORJUELA

Q. And this was provided later on at the Portland office to the processing team, correct?

A. Yes.

Q. Do you remember who you provided this to for further processing?

A. No. I handed it into the processing team.

Q. You just, like, leave it in a bin or something?

A. Yes.

Q. Okay. And after you fill -- you fill it out, you continue to assist talking to all the other detainees, correct?

A. I don't know about that day.

Q. Okay.

A. But if --

Q. But usually?

A. Yeah.

Q. Okay. I'm trying to, like, go through your testimony, the order, so it's on the same -- easier to follow.

So you said after work, when you were back at the hotel, you worked on the narrative, correct?

A. Correct.

Q. And you said that this was kind of like a sentence that you used for all the encounters?
A. Which sentence?
Q. The -- for the -- I'm sorry. For the narrative portion that was to be sent out. On -- it's Exhibit 109.
A. 109.
Q. The encounter narrative.
A. Referring to "As the subject was encountered by ICE" --
Q. Exactly.
A. Okay. Yes.
Q. Was that a sort of -- I'm using this term loosely -- a sort of template that you created?
A. Yes.
Q. Okay. This was not provided to you by anybody?
A. No.
Q. Okay. And then you mentioned that it was in speaking with the -- your officers, the arresting officers, that you came up with the following narrative --
A. Correct.
Q. -- correct?
And you then provided the -- this narrative over e-mail to somebody else?
A. Correct.
Q. Do you remember who you sent it to?
A. It was a Black Rose e-mail address.

Q. Black Rose e-mail address.

And were you advised by your counsel that you needed to provide this for -- in preparation for --

MR. RATCLIFFE: Objection.

MS. GARCIA ORJUELA: I'm sorry.

MR. RATCLIFFE: She asked --

THE COURT: What's the objection?

MR. RATCLIFFE: Privilege. She asked, "Were you advised by your counsel whether you need to provide this?"

THE COURT: Sustained.

MS. GARCIA ORJUELA: I'll rephrase.

BY MS. GARCIA ORJUELA

Q. Did you know that you had to provide -- did you provide this -- this e-mail that you sent to -- in production of discovery?

A. This --

Q. The e-mail.

A. The e-mail? Yes.

Q. Yes. Okay.

MS. GARCIA ORJUELA: No further questions, Your Honor.

THE COURT: R.F., I was looking at the text threads that are in the -- in the exhibit binder. I think 201 is one of them. Excuse me. 102. And are you the R.F. in those threads?

THE WITNESS: Yes.

THE COURT: So you're familiar with these threads?

THE WITNESS: Yes.

THE COURT: All right. And this is the Team 7 thread that I think had been described earlier?

THE WITNESS: Yes.

THE COURT: All right. And the target for -- for the target that morning, at least for the part of Team 7 that was with you, was Hazelwood Estates?

THE WITNESS: Yes.

THE COURT: And can you tell me what -- all of the factors that were considered in -- in identifying that as a -- as a target for the -- for your work that morning?

THE WITNESS: I had no -- it's -- it was provided to me, and that's where we went.

THE COURT: Now, somebody by the -- with the letter B -- I don't want to get -- don't give me any full names -- was that -- was that someone with you -- was that a Team 7 member?

THE WITNESS: Yes.

THE COURT: And was that person -- was that person placed with you to focus on Hazelwood Estates?

THE WITNESS: Yes.

THE COURT: What does "target rich" -- do you -- do you have an understanding of what -- what B meant by "target rich here"?

THE WITNESS: I -- maybe they were running plates.

THE COURT: Say that again?

THE WITNESS: I said, "Maybe they were running plates."

THE COURT: Okay. And this is about, what, 4:21 in the morning? Is that --

THE WITNESS: Yes.

THE COURT: Do you think -- any reason to believe that time is incorrect?

THE WITNESS: No.

THE COURT: What does "just assisted with ten apps" mean, if you know?

THE WITNESS: After speaking with him, he was assisting with another team, helping fill out information.

THE COURT: And then right after that, you describe -- or you type, "Phone call," question mark, "We can call out plates." What were you -- was it a question you were asking or an instruction?

THE WITNESS: Well, most of the time when we go sit somewhere, we get on a phone call. And I was asking if they had started a phone call yet.

THE COURT: And what was going to happen on the phone call?

THE WITNESS: If we needed to call out any type of license plates.

THE COURT: Okay. So you didn't have the technology where you were stationed to run license plates?

THE WITNESS: Correct.

THE COURT: So you'd make that phone call, and then on that phone call you'd convey license plates?

THE WITNESS: Correct.

THE COURT: And who would -- not the name, but who would be running those license plates for you? Was it another Team 7 member?

THE WITNESS: One of our officers that had access or a computer up.

THE COURT: Got it. And what information would be produced when you -- when plates were run?

THE WITNESS: The plate would be called out. We would try to run the plate to see who it came back to. And we would find out the information of who the individual is.

THE COURT: And so you get a name?

THE WITNESS: Yes.

THE COURT: Okay. And anything else?

THE WITNESS: Name, date of birth. Then we can run them in our other systems and find more information about them.

THE COURT: And what other information would you be able to capture from those other systems?

THE WITNESS: FBI number, if they had one; their status here in the United States.

THE COURT: Okay. Anything else? Criminal history?

THE WITNESS: And criminal history, too, yes. Once we get the FBI number or --

THE COURT: Oh, okay.

THE WITNESS: -- then we can run their name.

THE COURT: Okay. And then once you had that information, what would you do with it while you were waiting there?

THE WITNESS: Just run, you know, everything that -- about them, their history, finding if they are here legally or not.

THE COURT: All of this would be based off the license plate on a car?

THE WITNESS: Correct.

THE COURT: But there's no human being yet attached to this information?

THE WITNESS: Not until we get the name.

THE COURT: And then once you do, then what do you do once you get the name?

THE WITNESS: Then we run them in our databases.

THE COURT: Right. And then once you do all of that and you've got all this information and -- are you -- are you -- are you waiting in a vehicle?

THE WITNESS: Correct.

THE COURT: Okay. So while you're waiting in the

vehicle, you get all this information. Then what do you do with it, now that you've got sort of a full package to work with?

THE WITNESS: Just see if somebody comes out to that vehicle or -- or not.

THE COURT: Okay. And are there any photographs that come up with the information that --

THE WITNESS: Sometimes, yes.

THE COURT: And about how often would photographs come up?

THE WITNESS: I -- I don't really know 'cause usually I have somebody do that for me.

THE COURT: Okay. Are you aware if there's any sort of inaccuracies about the photographs that come up associated with -- with other information, like the license plate or the other database information?

THE WITNESS: I mean, they could always come back to somebody different. We try to run checks on everybody that it could come back to.

THE COURT: Okay. All right. Thank you.

Ms. Garousi, any questions from that?

MS. GAROUSI: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. GAROUSI

Q. Officer R.F., you mentioned you didn't have access to the

target folder; is that correct?
A. Correct.
Q. And so, because you didn't have access, would you have known if targets were always pulled from that folder for your operations?
A. No.
MS. GAROUSI: No further questions, Your Honor.
THE COURT: Counsel, any other questions?
MS. GARCIA ORJUELA: Sure.
BY MS. GARCIA ORJUELA
Q. Just -- sorry. Sorry. I didn't realize it had turned off.
You -- just briefly, you mentioned you arrived later at the scene, correct?
A. Correct.
Q. Were -- how many officers' cars were there still at the scene?
MR. RATCLIFFE: Your Honor, we're going to object to this being beyond the scope of the Court's examination. We passed the witness. There was cross-examination. The Court then inquired. And this is beyond the scope of that, we believe.
THE COURT: It is. But, in the interest of getting this completed and not have any stone unreasonably not unturned, let's -- let's just get it done.

Yeah, I know you were working the math on that one.

MR. RATCLIFFE: Yes. I give my co-counsel credit for that objection, Your Honor.

THE COURT: Repeat the question. The objection's overruled. Go ahead.

BY MS. GARCIA ORJUELA

Q. How many officer vehicles were still at the scene when you arrived?

A. I can't say for sure. Maybe three.

Q. Were they parked around the vehicle -- around the vehicle? Were they --

A. Mostly behind, yes.

Q. Okay. Was there an indication, that you could see -- you could tell, that there had been a traffic stop?

A. No.

THE COURT: Ms. Garousi, anything else from that?

MS. GAROUSI: No, Your Honor.

THE COURT: Can this witness be excused?

MS. GAROUSI: From the Government's perspective, yes, Your Honor.

THE COURT: Any objections, Ms. Garcia Orjuela?

MS. GARCIA ORJUELA: No, Your Honor. That'll be all.

THE COURT: R.F., that means I can excuse you from the -- this evidentiary hearing. You're free to go. However, the admonition about discussing your testimony or any of the

proceedings in the courtroom still applies. Please do not discuss it with anybody who has yet to testify. Okay?

THE WITNESS: Yes, sir.

THE COURT: All right. Be well.

THE WITNESS: Thank you.

(Whispered discussion, off the record, 2:29 p.m.)

MR. RATCLIFFE: The Government calls M.K., Your Honor, and we're getting her right now.

THE COURT: Thank you so much.

Good afternoon, the courtroom deputy will swear you in, if you'd be kind enough to raise your hand.

***M.K.***

Was thereupon called as a witness on behalf of the Respondents; and, having been first duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please have a seat.

State your first and last initial.

THE WITNESS: I'm M.K., M.D.K.

DIRECT EXAMINATION

BY MR. RATCLIFFE

Q. Officer, where are you employed?

A. I come from the San Ysidro port of entry.

Q. For what agency?

A. I work for the Customs and Border Protection.

Q. And how long have you worked for CBP?

A. I've worked there for 14 years.
Q. What's your current position?
A. I'm currently a task force officer assigned to the Homeland Security investigation team.
Q. And have you held a variety of different positions over your 14 years with -- with your agency?
A. I have.
Q. I'm not going to ask you to list those, but what cities have you worked in?
A. I've worked at the Otay Mesa port of entry, the San Ysidro port of entry, and then I've come out here to Portland, Oregon. And that's -- that's all I could recall.
Q. And then, as an additional background question, do you speak Spanish?
A. I do.
Q. How did you come about your Spanish?
A. I'm first generation Mexican, and my parents spoke with me at home. I've tested with the agency. I've scored three out of five in the CBP; and then two out of five, I think, for the military, Army Reserves.
Q. And I should ask you then, since you mentioned it: Tell us about your military background.
A. I have a little over 17 years in the Army Reserves. I'm a civil affairs officer. And I think my -- my unit's based out of Honolulu, Hawaii.

Q. And I'll tell you that you're the only officer who has come in uniform, and we appreciate that.
A. I can't help it, sir.
Q. Can you tell us: Did you come to Portland on a temporary assignment?
A. I was assigned here as a TDY.
Q. Roughly how long?
A. For 30 days.
Q. And starting roughly when?
A. October 14th, my -- oh, okay.
Q. Okay. October 14th. Sure.
Were you working on October 30th?
A. I was.
Q. Were you involved in the actual traffic stop or arrest -- were you involved in the traffic stop of the petitioner?
A. No.
Q. Were you involved in taking her out of the van?
A. No.
Q. Did you arrive on scene later, after everyone was out?
A. Yes.
Q. And in order to try to determine when you arrived on scene, I want to ask you if -- did you arrive on scene before or after someone from that scene took off running?
A. I'm not even sure when that person took off running. I -- I was unaware on scene that that person took off running.

Q. So does that mean you think you arrived after that happened?
A. I believe so.
Q. All right. Where was the petitioner when you arrived?
A. She was sitting on -- it was, like, the sidewalk or next to a planter. It was the street.
Q. And who was around her?
A. There was one other male near her.
Q. And what was your -- when you got to that area, were you trying to speak with the petitioner or the man?
A. I was trying to speak to a male that was in a vehicle first.
Q. All right. So not on the ground?
A. Negative, no.
Q. Tell us about that.
A. When I arrived on scene, I was a passenger in a vehicle with R.F. When we arrived, I got out of the car and I went to -- I went on scene because I wanted to help. So the first person that drew my attention was a male sitting in a vehicle. And he kind of told me, "Hey, I have a visa. (Speaking Spanish.)" And I said, "Okay." And then I yelled to the rest of my crew, like, "Who has his visa?" And I was engaged with that man alone.
Q. And I think one of the words you just used was the Spanish word for "I have." Are you indicating that you spoke with him

in Spanish?
A. I did. It was all Spanish.
Q. Tell us how that unfolded, your conversation with him then.
MS. GARCIA ORJUELA: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: So I was talking to him, and he was telling me he had a visa. I was trying to make sure that he had the right documentation to be here. And we kept getting interjected by the petitioner. She -- she was saying (speaking Spanish), which is "Don't talk to them. Don't say anything." And she kept interrupting my conversation.
BY MR. RATCLIFFE
Q. Hold on. I'm indicating you got to slow down --
A. Yes.
Q. -- for the court reporter.
A. Yes.
Q. Okay. Go ahead. She indicated, "Don't say anything"?
A. "Don't say anything. (Speaking Spanish)", which is "Don't talk. Don't say anything." But I was trying to deal with the male with the visa issue.
Q. And was it your understanding that he wanted to speak with you?
A. Yes. He drew my attention to him because he said that he had a valid visa to be in the United States. So then I asked,

"Who has a visa? What's he talking about?" And someone gave me his Border Crossing Card.

Q. And, in your training and experience, when you encounter people in your official role and there is an issue of whether they are in the United States legally, are folks who have status and are in the United States legally more or less likely to get your attention in order to advise you of that fact?

A. Right. I believe that's why he drew my attention to him, because he was kind of indicating that he had legal status to be in the United States and he didn't want to be part of our apprehension.

So I took it upon myself to figure out what type of visa he had because if it was, like, an employment visa or, like, a fiance visa or something of that sort, then I would have to, like, notify everybody that we're -- we're apprehending someone that has legal stay or legal rights to be here.

So when he gave me the Border Crossing Card, I remember I looked at the -- at the male; and I said, "Hey, this visa is for visitors only."

Q. Let me stop you there. I don't need you to get into the rest of your conversation with him.

A. Got it.

Q. Thank you. Sorry to interrupt. I want to go back to what I was getting at in sort of a longer question, see if I can

simplify it.

When you're encountering someone and they do or don't have status, and that's what you're trying to determine --

A. Right.

Q. -- if someone has status, how do they act versus someone who doesn't have status? How do they act or interact with you?

A. In my experience, in my -- what? -- 14 years of experience, the people that have status and have a right to be here reacted just like that male did, which is, "Hey, I have legal right to be here."

They want to tell you their name. They want to tell you their date of birth. They want to present their document that -- if they have it, because they don't want to be roped up into a -- you know, an apprehension. That's -- that's -- that's the answer I have.

Q. They want to -- they want to get through the end of your encounter as quickly as they can?

A. Correct. "I'm a U.S. citizen. I was born here. I was born this date." They want to -- they want to tell me who I -- who they are.

Q. So, skipping ahead then, without getting into the details of your conversation with the other gentleman, did you have a chance to observe anything that was in or had been in the van that's relevant to our discussion?

A. When I was cleaning up the scene, as we were trying to

exit, I picked up a bag on the floor that I assumed fell out of the van. I didn't witness it falling out of the van or anything like that. But I -- but it was in the near vicinity where I knew it came from the van.

So I picked it up. And it had, like, a lunch -- a lunch pail, I assumed, and I put it back in the van. So I had reason to believe they were going to work. Plus, the encounter that I had with the -- with the other people we were transporting, they -- they advised me they were going to work. So I knew it had relevance to the van.

Q. Yeah. Tell us about that and -- and the Spanish word that someone may have used to describe where they were going to work.

A. Right. So when I spoke to the male, like I said, I was explaining to him that the visa, the Border Crossing Card he had, was not meant for him to work in the United States. And he contradicted me. He said, "I'm going sightseeing." And I told him, "Really? At 6:00 in the morning?"

And so then I said, "You know what, we're going to interview everybody here at some point. And they're going to tell us that you're going to work." And he said, "Ask anyone. I promise. I'm not going -- I'm going sightseeing."

So then I walked over to another vehicle that had an elderly woman and an elderly man, and I asked -- I didn't say, like -- I asked (speaking Spanish), which is "Where are you

going to work?" And she said (speaking Spanish), which is "Agriculture. I'm going to work agriculture."

And then I said, "Where are you going?" And then she kind of stopped talking to me. That's fine. And I said, "Who's going with you?" And she kind of stopped talking to me. I think she was worried that I was going to go to, like, another work site.

So I let it go. I just -- I walked back over to the male, and I said, "They just told me that you're going to work agriculture." And he kind of, like, had this -- like a laugh. It wasn't a laugh. It was more like a -- like a "I got caught" kind of laugh. It was very small, like, "Okay. You caught me." And that was the end of it. That was the end of our conversation.

Q. Let me ask you also: Did any of the people you spoke with use the word "el campo"?

A. No, not with me.

Q. Okay. And what is the translation of "el campo," by the way?

A. "El campo" is like the field, working the field.

Q. So all of this that you've just described for us and the conversations you had and the investigation you did on scene, was this before you interacted with petitioner directly and intentionally, as opposed to her just saying -- interrupting your conversation with the other guy?

A. I'm sorry. Can you say the question again?
Q. Sure. It was a complicated question. I know you've told us about how you had, what I'll call, unintentional interactions with the petitioner when you first arrived. She was interrupting your conversation with the gentleman?
A. Correct.
Q. But everything that you just told us about, did that happen before you turned your attention to actually trying to speak with her and intending to speak with her?
A. Right. I had no idea that she didn't provide her name and date of birth while I was talking to that gentleman. And I can't recall when I found out that she wasn't providing her name and date of birth. It was somewhere in between after I finished talking to that man and then the transport site.
Q. So at that point is it fair to say that you were still trying to determine her status and whether there was --
MS. GARCIA ORJUELA: Objection. Leading.
THE COURT: I need to hear the whole question.
Start over and finish the question, and then I'll rule.
BY MR. RATCLIFFE
Q. Is it fair to say that at that point you were still trying to determine her status?
THE COURT: Objection sustained.
THE WITNESS: Yes.

MR. RATCLIFFE: Objection sustained?

THE COURT: Objection sustained.

THE WITNESS: Oh, sorry.

BY MR. RATCLIFFE

Q. At that point did you know her status yet?

A. No, I did not. We were still trying to figure it out.

Q. Tell us what you did, in terms of your interactions with her, to try to figure it out.

A. So it wasn't until the transport site -- we -- we exited off the scene 'cause we were getting too many -- we were getting -- we were beginning to be noticed by the community. So we transferred over to the transportation site, trying to get help with the transport.

And at the transportation site, I saw the -- sometimes, you know, when they're on scene and the way she was visibly upset, they don't answer questions right away, right? I mean, your emotions are running high. You were just apprehended. I can understand that.

So I took the -- the ICE biographical sheet that they have, and I was trying to help fill it out. Sometimes I've noticed that if you don't ask them their name and date of birth, something that they were refusing to give at the beginning; and you just ask, like, simpler questions, "Are you married? Are you single? Do you have kids?" they start talking.

They start to respond because at that point she wasn't -- she wasn't answering any questions. So I asked her -- I remember asking her if she was single or married. And she, like, pursed her lips at me, like "I'm not talking," and then she looked away. She didn't want to talk.

I said, "Okay." And then I told her, "You know that they're going to take the fingerprints, and they're going to find out your name and date of birth, right?" And she again looked at me and then turned away.

So then, in order to -- to use another tool that I had to identify her, I took my government cell phone out of my pocket. It has the little facial recognition mobile query for CBP. And I took a photo -- I tried to take a photo of her face, and she looked down.

So then I remember I moved her shoulder back. And she complained because I did forget she had handcuffs on and -- like, behind her back. And she kind of, like, yelped, like if I had caused pain, like a lot of pain. So then I apologized. I said (speaking Spanish), which is "I'm sorry," (speaking Spanish).

And I said (speaking Spanish). I said, "I need to take your photo." So I took her photo, where she kind of looked at me. And then when I looked down at my mobile query, it came up to a very -- like, a similar person. I wasn't sure if it was her or not.

It matched to someone -- I remember saying, "Maria? Like, is this Maria?" And then at that point there was other ICE agents around me. So they were like "Maria, Maria," to see if she would respond because, again, she was refusing to talk to us, which is her right.

So she wouldn't -- she didn't articulate -- like, she didn't show any facial features or nonverbal -- nonverbally she didn't show us that it was her. So we told her, "Is this you? Like, are you Maria?" And she wouldn't respond. Well, we weren't sure 'cause it was like a -- it was like a maybe.

And then I tried taking her photo again, and this time it came up to someone else. I can't recall the name, but we used that name as well, "Are you this person?" She looked at us. Like, I remember her eyebrows kind of like -- like, "Who are you talking about?" She gave us that look.

But, again, it was all nonverbal. We couldn't determine what she was saying or what she was thinking 'cause she wasn't saying anything. She just kind of crunched her eyebrows. And so then we were like, "Well, I don't know. Possible."

And the reason why that's significant is because that mobile query, it kind of gives us, like, earlier apprehensions or DHS interactions with someone that could potentially be out of status or have some kind of immigration violation in the system. So we believed, like, it was a possible match to

someone in that -- in those pictures.

Q. Thank you.

At that point, since you had been on scene, had you heard any of the folks who were in that van speaking anything other than Spanish?

A. No.

Q. And then at that point, after your multiple attempts to get information from the petitioner and your two attempts -- or the two results at least, possible results from the mobile application you were using, what was in your mind regarding whether there was probable cause for you to believe that she was in the country illegally?

A. I believe she was in the country illegally because, one, the primary language she used -- that I heard her use was Spanish, and then to interact with everyone else was Spanish. She became a possible match on my facial recognition system.

THE COURT: That system, does it say possible, likely, highly likely? Or is it a number?

THE WITNESS: So it's just an image, Your Honor. And you kind of have to look at the eyes and the nose and the mouth and the lips. But nothing will give you 100 percent unless the subject is -- is fingerprinted.

THE COURT: Okay. But does that app that you were using or that mobile --

THE WITNESS: It doesn't give you a percentage,

Your Honor.

THE COURT: But it returns a photograph?

THE WITNESS: It returns a photograph.

THE COURT: And then you have to determine if that -- if that photograph matches and how confident you are that it matches the person in front of you?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. You were continuing with your list. So, so far, you said --

A. Spanish.

Q. -- she's speaking Spanish, possible match in Mobile Fortify?

A. And she was in a vehicle where everyone seemed to be out of status.

THE COURT: Is the man who had -- was it a border --

THE WITNESS: Border crossing card.

THE COURT: What was it? A Border Crossing Card?

THE WITNESS: BCC, Border Crossing Card.

THE COURT: Does the Border Crossing Card authorize somebody to be in the United States?

THE WITNESS: It authorizes legal entry, but does not authorize employment. And he was violating those terms of his Border Crossing Card by working in the United States.

THE COURT: Were you able to determine that the Border Crossing Card was valid?

THE WITNESS: It had the right issuing date, but that was another issue that I was querying, Your Honor. Going into that story, was that --

THE COURT: Yeah, we don't need to go too much into that story.

THE WITNESS: Right.

THE COURT: I just want to understand that -- was he also detained?

THE WITNESS: He was. His visa was canceled because of the employment and the lack of the I-94 as a permit to be more than 75 miles from the port of entry, where he said. And then on the permit --

THE COURT: I have to ask a question. So does the Border Crossing Card require you to be within a certain distance of that border crossing?

THE WITNESS: Unless you have an I-94 permit.

THE COURT: And were you able to determine --

THE WITNESS: We found the permit, but it did not list that he was going to be in Portland, Oregon.

THE COURT: Okay.

BY MR. RATCLIFFE

Q. So, so far, your list for probable cause at that time is she was speaking Spanish; there was a possible match for her in

the database; she was in a vehicle where everyone seemed to be out of status. And then what about your interactions with her that day added to your probable cause to believe that she was in the country without permission?

A. Well, like I mentioned before, even the person who had the Border Crossing Card said, "Hey, I have documentation to be here." And she was refusing to answer any of our questions. She was refusing to answer her name, her date of birth.

And, in my experience, when someone's a United States citizen, they say, "Hey, I was born in California. Hey, I was born in Wisconsin. Hey, I'm a U.S. citizen by birth or family member," or, "Hey, I'm getting my paperwork fixed. I'm marrying a United States citizen and have a petition in the system."

So that's my experience, that they are willing, able, and immediately trying to -- trying to notify you of what their status is because they don't want to be part of the apprehension.

Q. Anything else that gave you cause to believe that you had probable cause at that point to transport her to the Portland ICE facility?

A. At this time, no, I cannot think of anything else.

Q. And what happened to her then? Do you know, in terms of where she went?

A. So the next time I saw her, I saw her at the ICE facility.

And she was getting fingerprinted. Again, I was dealing with the male who had the Border Crossing Card. So I was interviewing him about some other stuff.

And I was filling out his paperwork, but then I noticed that they were fingerprinting her at the machine. And I did have curiosity to find out what her status was with the fingerprints. So I walked over there, and I saw they were fingerprinting her.

And it came out that she was a border crossing -- she had a valid -- sorry, excuse me -- she had a Border Crossing Card, but it had expired. She was an overstay. And then I didn't see her after that. I just walked away because it was resolved.

Q. And what did you think when you realized -- or when you learned what the result was, what did you think about the rest of your investigation?

A. I thought it was a closed case. She didn't have status to be in the United States.

Q. A closed case?

A. Yeah, well, you know, like I had nothing to do with it. It was -- it was done.

Q. When you were on scene, you mentioned, of course, that she told the gentleman, who you were trying to speak with, not to talk. Do you recall saying that?

A. Yes, I do say that -- I did say that.

Q. And did you see her instructing or indicating in some way, signaling anyone else not to speak?
A. That's the only time, was when I was trying to talk to someone and she kept interjecting.
Q. So keeping in mind what you had seen on the scene about her trying to stop that gentleman from speaking, then when you were at the ICE facility and you learned that she was actually out of status, after she was fully identified with the prints, did anything click for you or did you have any realization then?
A. It just all made sense that she was out of status. She didn't want to tell us who she was. She was avoiding our questions. So it made sense. But, to me, I just -- yeah, it just made sense.

MR. RATCLIFFE: No further questions, Your Honor.

MS. GARCIA ORJUELA: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. GARCIA ORJUELA

Q. You have testified before, during this questioning, you were traveling in the same car with R.F., correct?
A. Correct.
Q. And that you arrived to the scene later?
A. Yes.
Q. But you realized that it had been a traffic stop, correct?
A. I saw a vehicle, and I saw people outside of the vehicle

in handcuffs. I am not -- I didn't know --

Q. But you were referring to --

THE COURT: Hold on. Hold on. I don't want any talking over. So we'll let the witness finish answering the question; and then you can follow up, Counsel.

MS. GARCIA ORJUELA: Yes.

THE WITNESS: So when I walked in, I knew I was going to help, but I don't think that information was relayed to me. I was a passenger in that vehicle. And I remember there being a lot of confusion about where we were supposed to go and what we were supposed to do. So apologies, but I -- I did not know.

BY MS. GARCIA ORJUELA

Q. But you were referring this entire time as a traffic stop and the -- about the van and about the bag you recovered, correct?

A. The bag I -- yes.

MR. RATCLIFFE: Hold on a second. Sorry, Your Honor. I think that's -- I need to object for mischaracterizing the evidence. I don't think she was referring to -- I don't think it's fair to say that the witness was referring to, during her testimony, a traffic stop.

THE COURT: How about this: Just object mischaracterization. If I need additional information, I'll follow up because, otherwise, then you've injected something that might be construed as coaching the witness. And I'd just

as soon not go there.

All right. So the objection is under advisement, and I want you to rephrase the question to make it less objectionable. Give it a shot.

BY MS. GARCIA ORJUELA

Q. You have referred during your testimony as this -- let's call it incident -- as a traffic stop, correct?

A. Yes, I guess. Yes.

MS. GARCIA ORJUELA: No further questions, Your Honor.

THE COURT: You described several -- several considerations that led you to -- to conclude you had probable cause that -- that the petitioner had been in this country unlawfully. I think you described that.

THE WITNESS: Yes.

THE COURT: You described those factors to a question Mr. Ratcliffe asked you. Do you remember them?

THE WITNESS: Yes.

THE COURT: Did you communicate any of that -- those observations or considerations to anyone else on your team or -- or to anyone back at the field office here in Portland?

THE WITNESS: I was very verbal with everything that I found out loud.

THE COURT: Meaning you communicated it verbally to --

THE WITNESS: For -- for the -- for the Border Crossing Card, you're talking about, Your Honor?

THE COURT: No. So this is relating to the petitioner now.

THE WITNESS: Okay. The petitioner.

THE COURT: M-J-M-A.

THE WITNESS: Okay.

THE COURT: You've described some observations or -- or some considerations that you made in concluding that -- that she may have been unlawfully in this country. Do you remember the testimony you just --

THE WITNESS: Right.

THE COURT: Did you communicate any of those -- those observations to any of your team members or to anyone back at the field office here in Portland, when you arrived here, about the petitioner and your belief that she was -- she was unlawfully here?

THE WITNESS: The Spanish language, I don't think I verbally said it out loud. The facial recognition, absolutely. They were surrounding me, even trying to help me say her name. The fact that she was in the vehicle with everyone without status, we -- we knew that.

THE COURT: And being in a vehicle with other people without status is a consideration that you -- you make when determining if there's probable cause to arrest?

THE WITNESS: It's more of, like, reasonable suspicion, right, that we -- it's a lower level, I understand. But it's more like we -- we -- we suspect.

THE COURT: Okay. And the questions that I -- the question that I understood that Mr. Ratcliffe posed to you was probable cause. Is there a distinction in your mind between probable cause and reasonable suspicion when you're in the field, you know, addressing circumstances like the ones you -- you were addressing on October 30th?

THE WITNESS: I would say yes, Your Honor, all those give me probable cause to believe she was out of status.

THE COURT: Okay.

THE WITNESS: Accumulated, right? Accumulated.

THE COURT: Sure, sure, sure, sure. So I'm just -- I'm simply trying to understand maybe the system's processes here.

Individual officers in their investigations, like your investigation during this stop, when you got there and talked to the people, is there a formal process where you communicate to somebody more formally, who can then document your observations and include them in any of the paperwork that's generated when somebody's being processed?

THE WITNESS: I'm sorry, Your Honor. I don't know the answer to that question. It's not -- we don't normally help with that area of -- because I'm not ICE, right? I'm --

THE COURT: Are officers --

THE WITNESS: It's really hard for me to answer the question.

THE COURT: Are officers interviewed by other agents or officers to get their -- get their information to -- to help further the investigation?

THE WITNESS: Yes, Your Honor. After they've been arrested, they get an interview with someone who writes the --

THE COURT: I may have -- I may have misstated my question. Are officers -- or do you talk to other officers so they can get your information about your observations about -- about what you were doing in the field to help them develop the paperwork?

THE WITNESS: It should happen, Your Honor.

THE COURT: And in this instance on that day, were you able to convey the information that you gathered from the scene or were -- and -- to officers, or did other officers also contact you to gather that information?

THE WITNESS: Your Honor, I was mostly focused on that Border Crossing Card, the gentleman, and I relayed my findings about him to the facility. Because she was not someone I was directly interviewing --

THE COURT: So you were not tasked to deal with her?

THE WITNESS: No, I was not, Your Honor.

MR. RATCLIFFE: Your Honor, may I continue my direct

examination, in light of your questions, before passing the witness?

THE COURT: Yes, please.

MR. RATCLIFFE: I'm sorry. This will be a redirect, I believe, because I believe my colleague was done with her cross-examination and then the Court began its direct.

THE COURT: Whatever you want to call it. By any other name, a rose smells just as sweet, Mr. Ratcliffe.

MR. RATCLIFFE: Whether black or pink.

THE COURT: Yes.

REDIRECT EXAMINATION

BY MR. RATCLIFFE

Q. When we were discussing this incident and the scene, I may have used the term "traffic stop." I'd like to ask when you -- approximately when did you realize that this was all a result of a traffic stop as opposed to anything else?

A. I didn't. I -- I still have a hard time accepting the word "traffic stop" because I -- I don't know what happened at the beginning. I showed up after they were already in handcuffs and sitting on the sidewalk. I didn't -- I wasn't part of the apprehension. I wasn't part of the arrest. I wasn't in the vehicle that was first on site. It was after the fact.

MR. RATCLIFFE: Thank you. Nothing further, Your Honor.

THE COURT: Ms. Garcia Orjuela.

MS. GARCIA ORJUELA: I think we're good on this side, Your Honor.

THE COURT: Can this witness be excused, Mr. Ratcliffe?

MR. RATCLIFFE: Yes, Your Honor.

THE COURT: Any objections, Ms. Garcia Orjuela?

MS. GARCIA ORJUELA: No, Your Honor.

THE COURT: All right. M.K., you're free to go. I'm releasing you as a witness. However, because the evidentiary hearing is continuing, the order requiring witnesses not to speak with any other witnesses until after the record is closed is still in place.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

THE WITNESS: Thank you.

THE COURT: Mr. Ratcliffe, any other witnesses? I know we have to deal with J.A., but in terms of your case in chief.

MR. RATCLIFFE: No other witnesses, Your Honor; but if J.A. is going to be called, I'd like to be heard on an issue.

THE COURT: All right. Mr. Manning, Ms. Garcia Orjuela?

MR. MANNING: We're not calling J.A., Your Honor.

MR. RATCLIFFE: I'm sorry. I missed that. You are or are not?

MR. MANNING: We are not.

THE COURT: All right. Then I -- the Government's case is -- you rest, Mr. Ratcliffe?

MR. RATCLIFFE: Yes, Your Honor. I'd like to note that we have, of course, a preadmitted single exhibit. It's Exhibit R1. I know we mentioned this yesterday. This is the unredacted full video from the body cam.

The Court will recall, but now has more context, the Court will recall yesterday I mentioned that the video submitted by petitioner ends at approximately seven minutes and 35 seconds.

There are another maybe 12 or 13 minutes in the video, but we believe that the relevant material after their version stops is from roughly 7:35 to 11 minutes, 30 seconds, so another four minutes essentially, Your Honor. And that's going to show -- as I said yesterday, it's corroboration evidence.

It shows the runner, the aftermath. You can hear the horn honking with the other gentleman, who was in handcuffs, trying to get out of a vehicle. So that information is not something -- we're not going to play the video now and take the Court's time, but we are going to submit it.

I still have it here on an external drive. I need to

make sure I can get it to the Court, so the Court has it, but I wanted to provide that context.

THE COURT: Thank you.

I hope that you can all trust that I will be paying attention to the record in its entirety and in as much detail as I possibly can muster, so I welcome the opportunity for -- to reviewing the entire contents of your exhibit.

Was there rebuttal, Mr. Manning, Ms. Garcia Orjuela?

MR. MANNING: In terms of a rebuttal case, Your Honor?

THE COURT: On evidence. Any rebuttal evidence?

MR. MANNING: No, Your Honor.

THE COURT: All right. The record is closed.

All right. We need to talk a little bit about scheduling and what this means in light of, Mr. Manning, your indication -- and I believe parties have conferred about a motion to certify a class; is that right?

MR. MANNING: We have -- sorry. We have conferred on our motion to supplement the complaint to bring class allegations. We have not conferred on the actual motion for class certification.

THE COURT: And the conferral regarding amending the petition to include allegations of a class?

MR. MANNING: It would, Your Honor, yes.

THE COURT: Well, is there any objection that I have

to address to that amendment, Mr. Ratcliffe?

MR. RATCLIFFE: We will object to it. We would like a chance to do that in writing. So I don't believe there's an objection that we're asking you to rule on today.

THE COURT: All right. So I'll need the formal motion to be filed for amending the petition. Once that's resolved, then we can talk about additional discovery scheduling, as well as a motion for filing -- motion for certifying a class action and -- and then going through that -- that general route for this case.

Is there any other procedural matters that we need to address? And we'll talk about the motion to amend the petition in just a minute and the briefing for that; but any other procedural matters or housekeeping matters that we need to take up, Mr. Manning?

MR. MANNING: No, Your Honor.

THE COURT: Mr. Ratcliffe?

MR. RATCLIFFE: No, Your Honor. And we may be past this point, but I wanted to inquire whether the Court wants any summary argument or closing argument, so to speak, based on the evidence the Court has heard.

THE COURT: I don't know if we're past it. I think it may be a ripe opportunity and time to discuss it. But I wonder to what extent that should be taken up before I address the certification issues. I'm open to ideas. On one level, if

I -- if I don't grant the petition, then the motion to -- well, does a motion to amend become moot?

MR. RATCLIFFE: Well, I believe it would, Your Honor. But I also think that if the Court were to decide the petition on the issues that are currently before the Court, not the issues that opposing counsel hopes to put before the Court, then the Court could resolve those issues, end this case, and there wouldn't be a need for further briefing. We believe, Your Honor, that this case is eminently resolvable on the issues that are currently before the Court.

THE COURT: As it relates to that one petitioner and -- you know, I agree that I have more than enough of a record to move forward on that matter. I just want to make sure that we're dealing with all of the other matters that, I think, the parties know about, the counsel knows about.

And if the only other issue is a motion to amend the petition for -- to make allegations regarding class -- regarding a class, then -- then I think your point is also well taken about addressing the merits of the petitioner herself and then proceeding with the motion to amend if the petition survives.

Your take on that, Mr. Manning?

MR. MANNING: Your Honor, we don't disagree with that. I mean, I'm not sure if we've segued into that sort of possible scheduling process.

THE COURT: I think it's a fair topic to bring up now.

MR. MANNING: What we are prepared to do, Your Honor, understanding that this -- that the evidence today has been presented, is we're prepared to file our motion to supplement, our motion for class certification, and a motion for preliminary injunction based on the class -- the class or the putative class.

We would get all that on the record before you on December 16th. We'll move forward to get that to you, for you then to decide. And you'll have different pathways from there, we think, to decide.

Granting the motion to -- for leave to supplement, then I think that would then open up the -- then to adjudicate the class and then the PI; as well as if you denied the motion to supplement, then the petition would be ripe for a decision, and you would have all the materials before you to adjudicate the petition.

THE COURT: Well, would one of the arguments that the Government might make on denying the motion for certification is that the named class member didn't have a case? I mean, I imagine that there has to be some validity to the named petitioner's claims to continue to proceed as a class.

MR. RATCLIFFE: That, Your Honor, as well as the fact that the Court, four minutes ago, said the record is closed.

THE COURT: I can change my mind, can't I?

MR. RATCLIFFE: Absolutely, Your Honor.

THE COURT: Well, the record is closed with respect to the petition -- the petition that is now before me. I mean, whether there's issues -- and if I were to grant the motion to amend and also grant the certification motion, I mean, that's -- that's -- we're talking about a different record at that point.

So I'm not sure there's any -- any offense to closing the record on the petition itself. But opening the record for class certification to then -- to incorporate that into a consideration of -- of -- with this record, if that's what you're suggesting, might be -- might be the offense.

MR. RATCLIFFE: And in doing so, Your Honor, in a habeas case. This is not a standard civil case.

THE COURT: Okay. So what you're welcome to do, if you think you already -- I mean, if you already have your motions to amend and the motion for a preliminary injunction, the challenge is that I may end up staying those motions until I resolve the petition on its -- on its independent and individual merits.

But having it in play, you know, I don't know tactically if that makes any difference to you or not, but at least tees it up for -- for the consideration, should -- should the -- you know, should the petition be granted. And maybe you

have arguments about if I deny the petition, whether there's any basis for a class certification; or whether there's a class certification even available on some of the grounds, outside of the -- outside of this captioned case. That's for you to decide and see where that goes so.

MR. MANNING: Thank you, Your Honor.

THE COURT: You're welcome to file them, if you want, but I don't know if you -- you know, if you think it would be an unnecessary use of resources to do so by December 17th; but I will, in all likelihood, end up staying them until I resolve the petition on the merits.

MR. RATCLIFFE: Your Honor --

THE COURT: So let's get some clarity and clear direction about what I'm now going to do, so there isn't any confusion. We're going to set a briefing schedule for the petition for the writ.

How much time, Mr. Manning, would you like to submit?

MR. MANNING: The -- we would like two weeks after the transcript would be available.

THE COURT: I don't know how long -- how long does it take for a transcript, would you say?

(Discussion held off the record, 3:14 p.m.)

THE COURT: So if we did 30 days out --

MR. MANNING: That would be fine, Your Honor.

THE COURT: -- which puts us at January -- let me

take a look at the calendar here.

THE COURTROOM DEPUTY CLERK: The 2nd is a Friday.

THE COURT: Thank you.

MR. RATCLIFFE: Are we talking about petitioner's opening brief then?

THE COURT: Yes.

MR. RATCLIFFE: You can set it on New Year's Day, Your Honor.

THE COURT: Well, then I'll have to deal with motions for extensions of time and then your objections. And while I've enjoyed the company of all of you for the last couple of days, maybe we need a break.

MR. RATCLIFFE: Totally fair, Your Honor. We should take some time apart.

THE COURT: Let's do that.

How about we set it for January 7th?

MR. MANNING: I was going to ask for January 9th.

THE COURT: That's fine. January 9th.

MR. MANNING: Thank you, Your Honor.

THE COURTROOM DEPUTY CLERK: I'm sorry. I didn't catch what that was for.

THE COURT: That was for petitioner's written arguments on the petition for the writ of habeas corpus.

THE COURTROOM DEPUTY CLERK: Okay. Thank you.

MR. RATCLIFFE: Your Honor, would the Court like a

proposed report and recommendation -- or proposed findings of fact and conclusions of law?

THE COURT: Yeah, that was one of the items that I want to discuss. And so, to the extent that the parties can stipulate to certain findings, I would much appreciate it. And then you can both submit your own -- you know, the statements that may be -- findings of fact that you think may be in dispute, so I can -- I can distinguish -- I can distinguish them and then make my decisions.

So with your closing arguments, please present that stipulation of fact, as well as your -- your -- your disputed facts. Mr. Ratcliffe, you're welcome to submit your disputed facts -- statement of disputed facts with your response brief, if you'd like, unless you'd like it to be sent along with the -- with the petitioner's statements. I don't really care, whenever works for you.

MR. RATCLIFFE: Well, Your Honor, I was thinking -- again, my framework is a criminal case. I was thinking if this had been a bench trial, the parties would be tasked with submitting proposed findings of fact and conclusions of law. I know that there are different ways courts do it.

Sometimes we're asked to do a joint statement of agreed facts and then submit our own facts that we can't agree on. Other times there is just -- each side submits their proposed findings of fact and conclusions of law, and they cite

to the record and -- for whatever they can.

So, of course, we're at the mercy of what the Court wants to do on this. But, in terms of timing, if the Court wants us to have an agreed set of facts before even petitioner's brief or conclusions of law is filed, then I think we need to work that in and time to negotiate that after the transcript and after the holidays.

THE COURT: I appreciate those added alternative -- alternatives to consider. However, inartfully I may have described my process. The joint statement of -- the joint statement of agreed facts can be submitted with -- with petitioner's closing argument brief.

And the petitioner can submit with the -- with the arguments the -- what your proposed facts that are in dispute might be. And then, Mr. Ratcliffe, when you submit your response, please submit your statement of facts that are in dispute.

So, yes, I think you'll all have to work together on identifying those facts that are not in dispute and have them filed on January 9th, along with closing -- the petitioner's closing arguments -- written closing arguments.

MR. RATCLIFFE: Knowing that, Mr. Manning, do you think we need additional time then to submit the first round here, given the work that we're going to have to do together?

MR. MANNING: Would you like to make a

recommendation?

MR. RATCLIFFE: I'm sorry, Your Honor. Sorry to involve you in this conversation that I've now begun with opposing counsel. I know that's bad manners.

What if we submit on the 16th? You submit on the 16th; and by then, of course, we're going to have our -- our agreed uncontested statement of facts.

THE COURT: So --

MR. MANNING: That's fine with us.

THE COURT: You're okay with that, Mr. Manning?

MR. MANNING: That's fine.

THE COURT: So let's confirm. I'm going to try to say it, hopefully clearly enough for a minute order, to -- to communicate the parties' suggestions and my adoption of those suggestions, which is by -- on or -- on or before January 16th -- that's a Friday -- petitioner will file its written closing arguments, its proposed contested facts, and the joint statement of facts upon which the parties agree.

And then how much time, Mr. Ratcliffe, would you like to file your response and your statement of contested facts?

MR. RATCLIFFE: Your Honor, we would ask for the Court's indulgence to have six months to -- no, 30 days, Your Honor.

THE COURT: You said that with such a straight poker face. I knew you were joking because you were trying to be too

serious.

MR. RATCLIFFE: I had to hurry past it because I know I'm on thin ice with too many delays here. We're trying to wrap up for the day. So, yes, 30 days. And, as I look at the calendar here, in terms of the dates they fall --

THE COURT: Is it the 13th or --

MR. RATCLIFFE: That would be --

THE COURT: -- the 16th?

MR. RATCLIFFE: -- 28 days.

THE COURT: We could do the 16th. That would be a Monday, which means you're working over the weekend.

MR. RATCLIFFE: How about the 20th? We have --

THE COURT: The 20th will be fine.

Response due the 6th.

MR. MANNING: Yes, Your Honor.

THE COURT: Excuse me. Reply.

All right. I think -- and so if you -- again, you're welcome to file any of the motions to amend and the motion for a preliminary injunction, but please understand that I'll -- I'll consider whether and how -- how to address it, but I want to make sure you understand, in all likelihood, I think it's appropriate to stay those proceedings until this is resolved.

MR. MANNING: Thank you, Your Honor.

THE COURT: And, certainly, at the risk of overstepping and entering that realm upon which -- in which

both of you are going to try to determine agreed-upon facts and disputed facts, some -- some observations, and it's not so much on the specific facts themselves.

But so much of the testimony is also exposing why we have in-person testimony, is so I can evaluate demeanor of the witnesses to also assess credibility. And my initial take -- and I will give it more thought, but I think my initial take is -- is a fair assessment.

I think, on the whole, the witnesses, particularly the law enforcement agent -- law enforcement officers, you know, at least by virtue of demeanor, testified generally credibly.

And I would offer, you know, to the extent that there was sort of a reverse descending order of credibility, the witnesses today, you know, rendered observations and described their conduct without an air of trying to hide or -- or conceal anything about what they were doing.

And so what occurs to me is that we're dealing with a system that may -- may and by -- by way of the allegations that petitioner has made, may have very well violated the law and for which habeas might very well be -- a remedy on a petition for a writ may very well be appropriate.

But I also -- and I make this comment because I think it's far too maybe convenient or easy in our -- in our day to demonize everyone in these spaces. And I think the problem is

that it's a far more complicated challenge that we're taking up; and that the systems in which we are working, and not necessarily in every instance the people who are engaged in these systems, doing what they're supposed to do, are necessarily doing things malevolently; but, nevertheless, could still end up violating the law.

I say this just simply to ease the tensions, or perhaps maybe I'm inflaming them because people disagree, but the point of this evidentiary hearing is to really try to get at the heart of what's happening within the system. I don't think any of these officers themselves are being pinpointed as -- as, you know, 1983 civil rights violators. I mean, if that were the case, we would be in a different setting and a different posture.

Maybe this is slight -- maybe some food for thought, observations that I've made it. It doesn't change necessarily what I may very well find at the end of the day that the allegations that have been pled have been proved. But I don't think you need to have bad actors as officers in these instances to prove them.

I mean, I think the systems in which they find themselves and conduct their work may very well render the -- the conduct in violation. Take it for what it's worth. But I'd also offer that probably going after the individual officers in argument will be less helpful to me than really

focusing on the discrete fact and conduct as we -- as we look at it through the lens of the law that I have to apply. That will be the most compelling and helpful as I work through the legal analysis.

MR. MANNING: Thank you, Your Honor.

THE COURT: You're welcome.

Counsel, all four of you, and I appreciate everyone else who has been helping on assisting on getting this evidentiary record completed and now closed. So I wish you all well. I'll look forward to reviewing your arguments in writing and statements of fact.

And I'll work as diligently as I can in putting it together and -- and finding -- in a finding and format that will hopefully honor what it is that I hope to set out to do and what you helped create, which was -- which was an important narrative that I'm not sure that we've had, at least on some of these fronts, in Oregon. Thank you.

MR. RATCLIFFE: Your Honor, may I raise one more issue? Sorry.

THE COURT: I was having a moment.

MR. RATCLIFFE: I know, Your Honor. I really --

THE COURT: Come on, you're ruining my moment.

MR. RATCLIFFE: Ruining the rhetorical flourish at the end.

You indicated earlier, Your Honor -- the Court

indicated -- I'm sorry -- that the Court is inclined to stay any motion to amend and motion for class certification until the other issues -- or the issues that are currently before the Court are resolved.

I'm wondering, could the Court make that official so that, despite whatever Mr. Manning and Ms. Garcia end up filing, we don't have to come back to say, "Hey, wait a second, could we please have that stayed pending the resolution of the existing issues"?

THE COURT: My representation to you is that I'm going to do that if they file it. I'm going to consider it -- consider staying, in all likelihood, if they file those papers. If I'm having second thoughts about whether to stay those motions, I'll invite the Government's response.

MR. RATCLIFFE: Thank you.

THE COURT: You're welcome.

Good day. Please leave.

MR. RATCLIFFE: Thank you, Your Honor.

* * *

(Court adjourned, Volume 2, 12-3-25 at 3:28 p.m.)

C E R T I F I C A T E

M-J-M-A v. Wasmley, et al.

Case No. 6:25-cv-02011-MTK

Evidentiary Hearing - Volume 2

December 3, 2025

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

_____________________________________

Official Court Reporter Signature Date: 12/17/2025
Oregon CSR No. 14-0427 CSR Expiration Date: 6/30/2026

**MR. MANNING: [65]** 273/9 273/11 278/7 284/6 288/1 288/19 289/3 289/5 291/13 291/18 293/21 298/8 302/4 303/6 303/17 305/20 305/24 306/3 309/5 309/8 309/12 309/14 310/4 310/11 313/16 314/13 314/25 316/7 316/12 321/14 321/24 338/5 346/20 349/8 354/8 355/16 358/18 359/17 362/10 364/9 364/23 365/4 366/12 367/13 370/21 444/25 445/3 446/9 446/12 446/18 446/24 447/16 448/23 449/3 451/6 451/18 451/24 452/17 452/19 454/25 455/9 455/11 456/15 456/23 459/5
**MR. RATCLIFFE: [132]** 281/19 284/9 288/14 289/2 291/10 292/1 293/11 293/25 294/11 295/11 303/13 305/18 306/25 310/14 310/22 311/8 311/12 311/18 313/19 315/3 315/10 315/13 316/2 318/3 318/14 318/20 319/2 319/7 319/15 319/20 321/17 322/1 323/21 323/23 324/1 327/13 329/8 330/12 330/17 331/6 331/17 332/2 332/9 333/16 334/2 334/15 334/17 335/21 336/14 337/15 337/20 338/13 345/6 345/11 349/6 352/18 354/21 354/25 357/14 357/19 358/13 358/24 359/9 359/24 360/1 360/16 362/4 365/19 365/22 366/4 366/8 366/19 366/22 366/25 367/2 367/5 367/8 367/18 367/22 368/4 368/12 369/10 369/12 370/1 370/24 379/23 382/6 382/22 385/12 386/2 400/21 411/4 411/6 411/8 417/18 418/2 419/7 429/1 437/15 438/17 442/25 443/4 443/9 443/24 444/6 444/20 445/1 445/6 447/2 447/18 448/3 449/24 450/2 450/14 451/12 452/4 452/7 452/13 452/25 453/17 454/22 455/2 455/21 456/2 456/7 456/9 456/12 459/18 459/21 459/23 460/15 460/18
**MS. GARCIA ORJUELA: [38]** 301/5 301/8 301/15 301/17 302/1 321/16 321/20 329/10 329/12 331/20 333/25 334/19 334/21 335/15 359/25 360/2 360/25 379/18 382/8 382/20 385/13 385/17 402/11 402/21 405/11 409/4 411/5 411/11 411/20 417/9 418/22 423/5 428/17 437/16 438/6 439/9 444/2 444/8
**MS. GAROUSI: [28]** 284/14 291/25 292/4 301/19 310/7 310/9 313/12 314/16 315/22 315/25 317/11 317/15 317/19 323/22 337/24 346/18 362/12 364/7 364/25 365/2 392/20 393/3 403/14 405/9 416/22 417/7 418/17 418/19
**THE COURT: [441]**
**THE COURTROOM DEPUTY CLERK: [30]** 273/5 315/20 315/23 316/10 316/15 316/21 316/25 317/4 317/17 318/23 320/1 320/3 320/7 320/13 337/18 338/11 338/16 338/19 338/25 339/3 345/10 369/5 369/16 369/21 386/8 386/14 419/16 452/2 452/20 452/24
**THE WITNESS: [226]**

**'**

**'cause [12]** 305/9 309/14 321/15 324/25 339/18 368/22 378/19 400/10 416/11 429/10 431/10 431/17
**'Til [2]** 275/13 348/24

**/**

**/s/Lindsey [1]** 461/15

**0**

**0427 [1]** 461/17

**1**

**1 o'clock [1]** 293/12
**10-30-2025 [1]** 286/20
**100 percent [2]** 328/3 432/21
**1000 [3]** 271/13 271/18 271/22
**102 [2]** 392/23 411/24
**107 [4]** 304/22 345/4 345/14 350/14
**108 [6]** 297/18 298/11 301/4 301/4 301/8 301/14
**109 [13]** 274/7 286/15 287/1 287/2 289/9 294/21 324/10 327/12 342/16 343/18 398/2 410/5 410/6
**10:01 [1]** 273/1
**10:50 a.m [1]** 304/19
**10:57 a.m [1]** 309/6
**10:58 [1]** 309/7
**11 [1]** 445/16
**110 [5]** 321/13 321/19 322/3 324/14 408/12
**111 [1]** 300/13
**11:05 a.m [1]** 315/12
**11:06 a.m [1]** 316/17
**11:07 [1]** 316/18
**11:08 a.m [1]** 317/7
**11:11 [1]** 317/8
**11:13 [1]** 318/22
**11:25 [1]** 318/22
**11:41 a.m [1]** 332/22
**11:42 a.m [1]** 334/4
**12 [1]** 445/14
**12-3-25 [1]** 460/20
**12/17/2025 [1]** 461/16
**1226 [1]** 294/3
**12:10 p.m [1]** 352/22
**12:27 [1]** 364/12
**12:29 [2]** 365/18 365/19
**12:30 [1]** 366/17
**12:30 for [1]** 338/8
**12:33 [1]** 369/1
**12th [1]** 388/11
**13 [2]** 387/18 445/14
**13th [1]** 456/6
**14 [3]** 420/1 420/6 425/7
**14-0427 [1]** 461/17
**14th [7]** 279/17 305/16 340/18 348/24 388/9 421/10 421/11
**15 [2]** 337/24 368/19
**15th [4]** 279/17 305/16 340/16 348/22
**1601 [1]** 393/5
**1623 [1]** 295/1
**16th [6]** 449/10 455/5 455/6 455/16 456/8 456/10
**17 [2]** 340/9 420/23
**17th [1]** 451/9
**19 [2]** 387/25 387/25
**1983 [1]** 458/12
**1:00 and [1]** 375/20
**1:15 that [1]** 368/23
**1:20 [1]** 369/4
**1:37 p.m [1]** 382/4
**1:38 [1]** 382/5
**1:51 p.m [1]** 392/15
**1:52 p.m [1]** 393/10

**2**

**20 [1]** 367/9
**200 [22]** 271/5 271/9 297/9 304/24 306/13 306/14 306/19 306/23 307/2 307/5 307/20 341/9 345/17 345/18 345/20 345/22 345/24 346/12 350/13 352/16 356/10 356/11
**2000 [1]** 371/10
**200s [5]** 307/16 308/6 308/11 308/15 308/24
**201 [1]** 411/23
**2024 [1]** 340/3
**2025 [8]** 270/18 272/3 273/1 284/19 286/20 300/24 461/6 461/16
**2026 [1]** 461/17
**20th [2]** 456/12 456/13
**213 [31]** 304/8 322/5 323/22 323/23 323/24 323/25 324/8 324/11 324/12 324/16 341/9 342/3 342/20 342/21 343/4 343/6 343/10 344/16 344/21 344/24 345/1 346/12 347/12 347/13 395/1 395/16 395/25 397/3 403/17 403/19 408/11
**213s [6]** 343/11 394/20 394/22 395/8 396/5 397/2
**22 [1]** 374/9
**23 [2]** 371/10 371/11
**236 [2]** 350/10 352/9
**236.1 [2]** 352/13 352/15
**236A [2]** 294/2 294/9
**25 [2]** 355/21 460/20
**273 [2]** 272/3 272/9
**28 [2]** 349/10 456/9
**2816 [3]** 286/16 286/24 287/2
**286 [3]** 296/3 296/5 296/18
**287 [1]** 294/7
**2:05 p.m [1]** 400/23
**2:06 [1]** 400/24
**2:07 p.m [1]** 402/2
**2:08 [1]** 402/3
**2:10 p.m [1]** 403/15
**2:12 p.m [1]** 405/5
**2:29 p.m [1]** 419/6
**2nd [1]** 452/2

**3**

**3 o'clock [3]** 381/12 382/2 382/3
**30 [8]** 291/5 367/9 368/10 421/8 445/16 451/23 455/22 456/4
**30-some [2]** 355/18 355/21
**301 [1]** 271/22
**302 [1]** 323/21
**30th [11]** 284/18 303/20 321/6 323/15 328/14 330/1 371/24 388/19 389/6 421/12 441/9
**320 [1]** 272/10

**3**

**326-8047 [1]** 271/23
**329 [1]** 272/10
**333 [2]** 271/5 271/9
**334 [1]** 272/10
**339 [1]** 272/11
**346 [1]** 272/11
**35 [1]** 445/13
**38 [3]** 301/12 301/16 301/17
**386 [1]** 272/12
**3:00 [1]** 311/13
**3:14 p.m [1]** 451/22
**3:28 [1]** 460/20

**4**

**405 [1]** 272/12
**416 [1]** 272/12
**419 [1]** 272/13
**437 [1]** 272/13
**443 [1]** 272/13
**45 [3]** 368/15 368/18 368/20
**45-minute [1]** 368/8
**461 [1]** 272/4
**4:21 in [1]** 413/5

**5**

**5 o'clock [1]** 311/9
**50 [1]** 373/5
**50 percent [1]** 278/4
**50-plus [1]** 384/11
**503 [1]** 271/23
**589 [1]** 344/12
**5:00 [2]** 382/17 382/18
**5:00 a.m [1]** 383/20
**5:00 of [1]** 382/16
**5:00-ish [1]** 375/21
**5:30 that [1]** 303/20
**5th [2]** 271/5 271/9

**6**

**6/30/2026 [1]** 461/17
**600 [2]** 271/14 271/18
**6:00 [1]** 426/18
**6:25-cv-02011-MTK [2]** 270/7 461/4
**6th [1]** 456/14

**7**

**75 miles [1]** 434/13
**7:35 to [1]** 445/16
**7th [1]** 452/16

**8**

**8047 [1]** 271/23
**8103 [1]** 327/17
**826 [2]** 297/3 297/17

**9**

**94 [4]** 281/2 298/3 434/12 434/18
**97204 [5]** 271/6 271/10 271/14 271/19 271/22
**9th [3]** 452/17 452/18 454/20

**A**

**A's [2]** 297/1 298/18
**A.A [9]** 272/11 367/4 367/8 369/12 369/17 369/23 370/14 371/4 385/18
**A.A.'s [1]** 370/18
**a.m [14]** 273/1 304/19 309/6 309/7 315/12 316/17 316/18 317/7 317/8 318/22 318/22 332/22 334/4 383/20
**abilities [1]** 375/24
**ability [3]** 292/13 292/15 345/11
**able [28]** 277/17 282/13 289/15 300/1 314/20 314/24 315/18 316/8 317/5 319/5 321/15 321/18 321/22 330/5 333/10 333/23 335/6 345/8 378/14 379/11 380/15 380/16 385/3 414/23 434/1 434/19 435/15 442/16
**about [123]** 273/17 273/21 276/25 278/9 280/7 280/13 281/11 281/21 282/2 283/15 283/17 287/15 288/22 289/24 297/16 298/11 298/18 304/12 312/11 314/21 315/25 317/10 319/13 321/3 321/9 326/1 334/14 335/1 335/10 336/16 336/20 336/21 340/7 340/11 340/15 347/4 348/3 350/3 350/6 359/3 360/5 361/7 361/22 362/14 362/21 363/2 363/4 363/13 363/25 368/8 368/19 371/10 371/15 372/14 373/9 374/13 374/19 376/5 377/23 378/5 378/11 378/12 380/9 380/23 381/6 383/23 383/25 384/2 387/18 387/20 387/21 390/17 391/16 393/25 397/4 397/10 398/4 400/12 401/21 409/16 413/5 414/21 415/10 416/9 416/14 418/25 420/16 420/22 422/15 424/1 426/11 428/3 428/7 431/15 435/2 436/3 436/15 437/5 438/10 438/14 438/14 438/22 440/2 440/15 442/11 442/11 442/12 442/21 446/14 446/16 447/7 447/12 448/15 448/15 448/19 450/7 451/1 451/14 452/4 452/16 456/12 457/17 460/13
**above [4]** 290/8 351/10 351/14 461/10
**above-entitled [1]** 461/10
**above-named [1]** 351/14
**absolutely [4]** 283/1 403/24 440/19 450/2
**accepting [1]** 443/17
**access [10]** 285/5 321/14 367/17 406/19 406/20 406/22 408/12 414/10 416/25 417/3
**accessed [1]** 285/7
**account [1]** 384/15
**accounted [1]** 384/19
**Accumulated [2]** 441/13 441/13
**accurate [14]** 274/19 274/21 274/23 275/17 280/3 280/25 281/3 283/22 296/16 347/14 355/19 356/7 356/8 360/6
**accurately [3]** 275/6 276/7 360/12
**across [1]** 356/17
**act [5]** 294/3 350/4 351/13 425/5 425/6
**acting [3]** 305/11 323/9 326/13
**action [1]** 447/9
**actions [3]** 277/11 283/11 283/12
**actively [1]** 355/22
**activities [3]** 277/24 388/17 399/17
**activity [1]** 288/5
**actors [1]** 458/19
**acts [1]** 351/2
**actual [6]** 295/6 328/5 350/20 391/1 421/14 446/20
**actually [11]** 310/24 318/2 324/3 366/23 377/10 378/11 380/19 386/20 399/3 428/8 437/7
**added [3]** 284/1 435/3 454/8
**addition [2]** 353/13 397/3
**additional [12]** 286/5 290/21 293/7 299/7 333/18 367/13 380/10 380/12 420/13 438/23 447/7 454/23
**additions [2]** 285/7 285/11
**address [29]** 294/23 294/24 295/1 295/4 295/6 295/7 322/14 322/19 323/10 323/11 334/8 334/8 388/25 389/1 389/2 390/6 390/13 393/5 393/7 395/4 395/4 406/8 408/5 410/25 411/1 447/1 447/12 447/24 456/20
**addressed [1]** 293/8
**addresses [2]** 322/15 406/1
**addressing [3]** 441/8 441/9 448/19
**adjourned [1]** 460/20
**adjudicate [2]** 449/14 449/17
**administrative [2]** 329/21 352/17
**admit [1]** 344/4
**admitted [5]** 275/19 281/24 282/8 321/12 343/17
**admonish [1]** 385/21
**admonition [1]** 418/25
**adoption [1]** 455/14
**adult [1]** 270/5
**advice [1]** 355/1
**advise [4]** 304/9 333/7 386/18 424/7
**advised [7]** 286/19 310/18 316/3 390/16 411/2 411/9 426/9
**advisement [1]** 439/2
**advising [1]** 380/17
**Advisor [1]** 355/2
**afar [1]** 309/15
**affairs [1]** 420/24
**afforded [1]** 300/8
**after [60]** 275/15 279/18 283/13 285/22 286/5 286/8 287/11 287/17 295/21 305/22 306/24 307/5 307/16 308/15 309/1 310/12 311/22 313/15 318/17 318/19 325/2 339/8 339/10 351/22 356/15 365/25 366/3 378/5 378/12 378/14 380/5 380/17 381/1 382/16 382/17 382/18 390/11 393/15 397/5 403/10 409/14 409/23 413/13 413/15 421/19 421/23 422/1 428/13 432/7 436/12 437/8 442/7 443/19 443/22 444/12 445/15 451/18 454/6 454/7 458/24
**aftermath [1]** 445/20
**afternoon [12]** 311/1 320/21 339/18 339/19 339/20 369/3 375/4 375/19 378/18 384/25 387/3 419/10
**again [25]** 281/1 288/25 331/21 342/24 347/25 353/16 359/9 361/11 368/9 378/25 380/1 395/19 395/21 397/1 404/10 404/20 413/2 428/1 430/8 431/4 431/11 431/16 436/1 453/18 456/17
**against [4]** 299/4 354/12 354/16 383/17
**age [2]** 289/11 289/19
**agency [3]** 419/23 420/6 420/18
**agent [9]** 327/7 340/6 346/23 357/23 359/6 364/14 387/16 404/14 457/10
**agents [5]** 327/4 328/11 382/11 431/3

## A


**agents... [1]** 442/4
**ago [7]** 274/10 326/15 334/14 371/15 399/3 403/7 449/25
**agree [7]** 291/23 350/24 367/23 408/15 448/12 453/23 455/18
**agreed [6]** 318/17 453/23 454/4 454/11 455/7 457/1
**agreed-upon [1]** 457/1
**agreement [1]** 306/2
**agriculture [3]** 427/2 427/2 427/10
**ahead [14]** 298/7 301/23 302/3 306/5 318/8 338/9 339/19 342/9 354/24 380/1 381/23 418/5 423/18 425/21
**aid [1]** 300/17
**air [1]** 457/16
**al [2]** 270/9 461/3
**alien [10]** 275/10 281/12 286/18 304/24 342/22 343/1 345/19 351/14 353/2 354/3
**alienage [1]** 293/5
**aliens [2]** 287/15 287/19
**all [126]** 273/7 273/10 278/6 279/19 284/16 292/5 298/19 299/19 300/10 302/3 308/14 309/13 311/2 311/4 311/7 311/18 311/21 312/6 312/11 313/3 313/10 313/18 314/17 315/4 315/11 316/6 318/15 318/21 318/25 319/3 319/17 320/5 325/24 327/12 329/7 331/9 331/12 332/6 332/19 334/22 335/9 335/13 337/12 337/12 339/14 341/11 347/24 362/19 363/11 364/6 365/5 365/13 365/15 366/15 366/17 366/20 368/7 368/24 369/13 370/22 370/25 372/19 378/14 381/19 382/20 384/6 385/10 385/14 385/18 385/25 389/6 390/16 391/14 392/13 392/13 394/3 394/24 395/11 396/2 400/7 403/13 403/25 405/3 406/1 408/24 409/15 410/2 412/4 412/7 412/11 415/12 415/21 415/22 416/1 416/20 418/22 419/4 420/12 422/4 422/13 423/2 427/21 431/16 437/11 439/2 441/10 443/15 444/9 444/15 444/23 445/4 446/4 446/13 446/14 447/5 448/14 449/9 449/17 451/10 452/11 454/18 456/17 456/21 459/7 459/9 460/12
**allegation [2]** 373/11 381/6
**allegations [6]** 353/17 446/20 446/23 448/17 457/19 458/18
**allegedly [1]** 374/10
**allotted [1]** 383/15
**allow [2]** 303/25 380/3
**allowed [4]** 304/2 304/6 382/12 383/15
**almost [1]** 384/22
**alone [2]** 368/17 422/23
**along [4]** 354/2 379/21 453/14 454/20
**already [21]** 295/21 301/11 301/15 306/17 306/18 316/3 316/19 332/5 332/5 344/16 347/1 347/1 351/23 352/1 352/4 356/10 378/10 379/8 443/19 450/17 450/17
**also [44]** 277/23 279/9 279/21 280/11 281/5 293/1 294/3 297/8 298/3 299/12 299/15 300/8 318/7 319/3 321/20 321/21 329/2 336/5 345/8 350/6 361/1 374/2 375/3 376/4 379/20 384/2 390/24 398/22 398/23 399/23 401/10 407/6 407/20 408/10 427/15 434/10 442/17 448/4 448/18 450/6 457/4 457/6 457/23 458/24
**alternative [4]** 398/25 399/7 407/16 454/8
**alternatives [2]** 387/6 454/9
**always [3]** 316/14 416/17 417/4
**am [8]** 328/13 331/3 364/14 368/4 370/13 371/11 373/7 438/1
**amenable [2]** 343/13 343/14
**amend [8]** 447/12 448/2 448/16 448/20 450/6 450/18 456/18 460/2
**amending [2]** 446/22 447/6
**amendment [1]** 447/1
**among [2]** 361/22 362/6
**amount [4]** 280/20 309/22 367/6 372/16
**amplification [1]** 371/22
**analogy [1]** 367/22
**analysis [1]** 459/4
**another [20]** 286/9 325/1 349/19 358/5 367/12 376/16 387/21 390/13 396/7 399/7 404/6 406/3 413/14 414/8 426/23 427/7 430/10 434/4 445/14 445/17
**answer [25]** 283/6 293/3 293/15 295/13 295/18 306/5 315/16 322/22 333/12 341/21 349/15 355/1 355/2 359/13 360/18 363/8 364/5 395/24 402/13 425/15 429/16 435/7 435/8 441/24 442/2
**answered [9]** 281/19 303/14 330/12 330/17 331/6 331/17 332/1 332/5 403/21
**answering [3]** 293/19 430/2 438/4
**answers [1]** 291/15
**anticipate [1]** 292/14
**any [130]** 273/15 275/3 277/9 277/19 277/19 282/18 283/15 285/5 285/6 287/14 287/18 287/18 288/18 288/21 288/22 288/25 290/18 290/20 290/20 292/6 296/24 296/25 298/1 301/14 308/5 310/4 310/10 312/2 312/3 313/10 313/10 314/15 314/21 315/1 317/9 323/17 324/24 329/23 330/10 331/12 331/23 333/7 333/18 334/18 335/11 335/16 336/16 337/5 340/4 340/22 341/21 342/1 342/6 346/13 346/25 353/1 354/19 355/6 356/9 357/8 357/15 359/20 359/20 362/15 363/16 364/6 365/3 366/13 367/25 370/9 370/9 370/14 370/17 370/22 372/7 376/12 382/16 384/6 384/14 384/18 385/11 385/16 387/14 389/17 392/11 393/22 393/25 394/22 397/4 398/18 399/12 407/11 412/17 413/8 413/24 416/6 416/13 416/21 417/8 417/24 418/21 418/25 427/15 430/2 431/7 432/4 435/7 437/9 438/3 439/19 440/13 440/14 441/21 443/7 444/7 444/12 444/17 446/11 446/25 447/11 447/13 447/19 450/9 450/9 450/23 451/2 451/14 456/18 458/11 460/2
**anybody [4]** 285/5 365/9 410/14 419/2
**anyone [13]** 312/1 312/1 312/1 334/25 344/2 355/12 358/5 385/22 426/21 437/2 439/20 439/21 440/14
**anything [28]** 276/25 277/7 282/23 304/12 331/15 353/18 355/15 357/8 370/9 378/3 383/25 404/22 414/19 415/1 418/16 423/11 423/18 423/19 423/20 425/23 426/3 431/18 432/4 435/19 435/22 437/9 443/16 457/17
**anyways [1]** 378/13
**anywhere [4]** 288/8 288/10 308/2 388/24
**AOR [3]** 330/5 330/7 340/13
**apart [1]** 452/14
**apartment [3]** 295/2 401/25 403/9
**apologies [1]** 438/11
**apologize [3]** 310/16 348/20 370/1
**apologized [1]** 430/18
**app [1]** 432/23
**Apparently [1]** 304/16
**appear [23]** 288/7 288/10 288/15 289/4 289/11 289/19 298/18 352/16 353/1 353/5 353/8 353/9 353/13 353/23 353/25 354/2 354/4 354/12 354/15 354/19 355/11 355/13 357/2
**APPEARANCES [1]** 270/19
**appeared [1]** 382/25
**appears [5]** 283/2 293/9 317/2 350/20 379/22
**application [3]** 282/21 283/10 432/10
**applied [2]** 282/25 292/8
**applies [1]** 419/1
**apply [6]** 276/4 276/7 281/25 314/19 344/11 459/2
**applying [2]** 282/19 283/14
**appreciate [13]** 292/19 293/17 307/9 309/9 313/25 336/9 360/5 363/22 370/11 421/2 453/5 454/8 459/7
**apprehended [1]** 429/18
**apprehending [1]** 424/16
**apprehension [4]** 424/11 425/14 435/18 443/21
**apprehensions [1]** 431/22
**appropriate [4]** 313/23 375/7 456/22 457/22
**approximately [5]** 279/16 334/12 380/7 443/15 445/12
**apps [1]** 413/11
**are [135]** 274/22 274/24 277/15 280/10 280/19 281/3 281/9 282/7 282/8 282/8 283/11 283/11 285/16 287/23 292/20 292/21 292/21 292/23 293/7 293/14 294/5 296/2 297/21 297/24 300/14 300/18 303/4 311/18 311/25 313/24 315/9 315/14 321/8 322/3 326/1 328/9 329/3 329/19 332/4 335/13 345/24 345/25 349/10 351/12 351/15 352/25 353/7 363/2 364/16 365/5 365/8 368/4 369/11 373/6 373/11 373/15 374/2 374/21 375/9 375/12 375/15 376/5 376/13 376/23 376/23 377/2 377/2 378/16 379/5 381/9 382/11 383/21 383/24 384/14 384/15 384/18 384/19 384/19 384/22 385/5 385/18 386/18 391/25 392/3 400/20 404/14 406/11 408/15 411/23 411/24 415/10 415/22 415/22 415/23 416/6 416/13 419/21 422/25 424/5 424/5 424/6 425/20

## A

are... [33] 426/25 427/3 429/17 429/23 429/24 431/9 431/13 431/15 433/5 435/15 442/1 442/4 442/10 445/1 445/2 445/3 445/14 445/24 448/5 448/10 449/3 452/4 453/21 454/14 454/16 454/19 457/1 458/2 458/3 458/4 458/11 460/3 460/4
area [16] 287/8 302/21 314/24 330/7 339/23 387/5 391/13 392/11 401/21 402/1 407/6 407/10 407/11 407/12 422/9 441/25
areas [1] 408/25
aren't [2] 328/11 328/11
argue [1] 282/13
argued [1] 282/15
argument [4] 447/20 447/20 454/12 458/25
arguments [10] 283/12 449/19 451/1 452/23 453/10 454/14 454/21 454/21 455/17 459/10
ARIANA [1] 271/12
Army [2] 420/20 420/23
around [10] 315/24 367/16 377/18 381/12 382/2 388/9 418/10 418/10 422/7 431/3
arrangements [1] 374/20
arrest [43] 287/9 287/12 287/18 291/20 291/21 291/24 300/25 303/19 304/24 305/15 305/22 306/13 306/16 306/17 306/24 306/24 324/25 328/9 333/8 345/19 349/3 351/12 351/17 351/21 352/4 352/17 353/2 354/3 356/5 356/13 356/14 356/15 389/4 389/6 393/23 394/1 395/7 397/4 397/10 400/6 421/14 440/25 443/21
arrested [14] 303/20 309/1 325/25 326/9 341/5 351/23 352/1 357/7 357/12 357/24 358/2 359/23 390/1 442/8
arresting [12] 285/4 292/24 308/16 308/25 308/25 328/5 328/8 328/18 329/3 329/4 330/10 410/17
arrests [5] 305/10 331/1 388/15 397/2 399/13
arrive [4] 340/15 348/21 421/19 421/22
arrived [14] 279/19 393/17 394/1 402/5 417/13 418/8 421/21 422/1 422/4 422/16 422/17 428/4 437/22 440/15
articulate [1] 431/6
as [154] 278/25 279/1 283/2 283/3 285/17 287/9 289/4 290/17 291/24 292/6 292/7 293/8 296/15 301/22 304/23 305/11 306/1 306/1 306/19 307/3 307/3 309/1 309/21 313/3 313/3 314/9 314/12 314/23 317/25 317/25 319/1 320/10 320/12 321/12 322/5 322/9 322/23 324/10 326/13 326/13 327/1 328/4 328/17 328/18 329/21 329/21 334/8 334/13 334/23 335/1 335/2 335/6 336/1 336/3 336/3 336/18 338/5 338/22 338/24 341/19 343/6 344/7 344/13 344/24 345/1 345/1 346/2 347/10 347/13 347/15 347/22 349/20 349/23 349/24 354/19 355/9 357/7 357/8 357/9 357/10 357/14 360/9 365/6 365/10 367/2 367/2 368/7 369/18 369/20 370/17 372/18 373/16 376/18 376/18 376/18 376/19 383/12 386/11 386/13 387/21 387/21 395/19 395/19 397/9 397/10 397/14 397/23 398/12 399/20 403/2 407/23 410/8 412/12 412/13 419/13 419/15 420/13 421/6 425/17 425/17 425/25 427/24 431/13 434/12 438/13 438/25 439/1 439/6 439/7 443/8 443/16 444/10 445/18 446/5 446/6 447/8 447/8 448/11 449/15 449/15 449/23 449/24 449/24 453/11 453/11 456/4 458/12 458/12 458/19 459/1 459/1 459/3 459/12 459/12
ask [44] 276/19 277/5 277/10 277/19 283/15 283/17 292/25 301/23 304/21 309/16 310/11 316/7 316/14 317/9 323/20 324/13 324/20 332/13 338/3 339/9 340/10 345/3 348/19 359/3 362/14 365/23 367/15 380/10 380/12 381/23 395/10 395/11 398/2 420/8 420/21 421/22 426/21 427/15 429/21 429/23 434/15 443/14 452/17 455/21
asked [34] 281/19 292/10 303/14 313/11 314/1 316/15 320/1 320/2 330/12 330/17 331/6 331/17 331/25 332/3 332/5 332/8 362/5 377/11 377/13 377/18 377/21 379/6 385/14 390/11 395/18 404/20 411/6 411/8 423/25 426/24 426/25 430/2 439/17 453/22
asking [12] 280/7 280/12 280/13 284/11 318/2 331/22 332/14 339/7 413/18 413/20 430/3 447/4
aspect [2] 394/12 395/21
assembly [1] 326/25
asserted [1] 349/10
assess [1] 457/6
assessment [1] 457/8
assigned [6] 328/10 330/4 330/8 372/4 420/3 421/6
assignment [4] 329/5 388/6 399/16 421/5
assignments [1] 329/22
assist [4] 349/19 394/22 397/1 409/15
assisted [3] 408/10 408/13 413/11
assisting [4] 340/14 340/21 413/14 459/8
associated [6] 276/20 277/2 307/13 335/13 337/9 416/14
association [1] 277/8
assume [5] 278/14 279/24 286/3 286/4 308/11
assumed [2] 426/1 426/6
assumes [1] 313/19
assumption [2] 285/15 286/2
asterisks [1] 315/1
asylum [1] 298/23
attached [1] 415/15
attempted [1] 291/4
attempting [1] 390/14
attempts [2] 432/7 432/8
attended [1] 350/1
attention [11] 294/20 298/10 322/7 370/12 371/1 422/19 423/24 424/7 424/8 428/8 446/5
attorney [14] 275/23 282/12 282/16 300/9 300/10 304/2 304/7 304/8 304/16 304/17 372/18 372/24 373/12 381/11
Attorney's [1] 271/17
attorneys [18] 304/14 339/6 339/9 372/22 373/13 373/16 377/5 377/13 378/1 378/16 379/3 379/6 379/7 379/12 379/15 380/6 380/12 380/16
audio [1] 386/22
author [1] 327/24
authority [2] 294/6 384/7
authorize [2] 433/21 433/24
authorized [8] 297/1 305/2 305/9 305/9 305/13 350/21 351/17 352/9
authorizes [1] 433/23
avail [1] 300/11
available [9] 302/21 304/11 328/11 333/5 333/6 375/8 377/6 451/3 451/19
Avenue [5] 271/5 271/9 271/13 271/18 271/22
average [1] 312/23
avoiding [2] 335/11 437/12
aware [14] 277/8 284/14 321/8 352/25 353/7 370/5 373/11 373/15 374/2 375/25 381/9 384/15 385/5 416/13
away [6] 372/19 386/19 429/16 430/5 430/9 436/12

## B

B-2 [6] 282/9 282/19 282/25 283/10 346/3 346/6
B.W [12] 272/9 286/19 294/13 314/20 315/4 319/25 327/3 346/9 365/24 366/2 366/11 366/13
B.W.'s [2] 338/4 343/7
back [43] 273/5 273/23 276/20 277/12 293/14 301/4 311/24 313/20 313/23 314/3 318/23 344/5 365/7 366/5 366/11 369/5 371/15 372/20 372/21 379/5 380/7 380/20 385/20 395/14 396/18 397/6 397/7 404/5 404/6 404/10 404/11 409/23 414/15 416/17 416/19 424/24 426/6 427/8 430/15 430/17 439/21 440/14 460/7
background [2] 420/13 420/22
bad [2] 455/4 458/19
bag [3] 426/1 438/14 438/16
ball [1] 311/15
bars [1] 368/16
based [17] 290/22 313/21 314/1 321/8 352/24 357/4 358/22 365/24 382/11 384/3 395/24 396/13 399/11 415/12 420/24 447/20 449/7
basic [7] 395/2 395/18 396/24 397/8 397/8 397/8 400/10
basically [3] 282/7 372/7 381/19
basis [5] 290/16 306/10 327/2 357/18 451/2
bat [1] 367/20
batter's [1] 367/23
BCC [1] 433/20
be [236]
beat [1] 403/14
became [2] 371/12 432/16
because [61] 274/5 276/2 276/5

## B


**because... [58]** 276/17 282/14 293/5 297/24 297/25 311/2 311/15 311/22 314/3 317/5 324/13 327/23 328/5 328/10 328/20 330/4 332/5 339/9 339/11 343/6 346/2 352/4 354/22 355/3 363/19 368/12 374/25 375/3 375/8 377/14 379/4 379/21 390/14 403/2 417/3 422/18 423/24 424/9 424/13 425/13 430/1 430/16 431/4 431/21 432/13 434/11 435/17 436/12 438/24 441/25 442/21 443/5 443/18 444/10 455/25 456/2 457/23 458/8
**become [2]** 299/11 448/2
**been [87]** 275/5 278/9 283/2 286/6 286/9 286/19 290/17 292/8 292/9 293/2 293/6 293/7 293/8 295/10 295/16 295/20 295/21 298/5 298/14 298/17 300/24 306/17 306/18 306/20 306/24 307/5 310/19 311/2 314/8 317/12 320/11 321/12 321/24 327/7 335/2 335/23 336/1 336/5 338/23 340/16 344/14 349/16 351/23 352/1 352/4 354/15 355/22 356/4 356/13 357/12 358/4 368/13 369/19 371/6 371/18 376/25 376/25 377/1 379/25 382/15 386/12 387/12 387/24 391/15 391/16 393/8 393/22 394/3 396/4 402/6 402/6 403/5 407/10 412/5 418/14 419/14 425/23 432/3 437/24 439/13 440/10 442/7 449/4 453/19 458/18 458/18 459/8
**before [42]** 270/16 273/14 274/8 291/1 299/16 304/23 311/5 311/21 318/2 323/18 324/18 324/21 332/14 348/19 350/14 350/15 360/7 368/19 370/2 370/7 371/9 372/3 380/25 388/24 402/13 403/20 421/22 427/23 428/8 435/5 437/19 443/1 447/24 448/5 448/6 448/10 449/9 449/17 450/4 454/4 455/15 460/3
**began [2]** 273/14 443/6
**begin [1]** 273/10
**beginning [4]** 275/11 429/11 429/23 443/19
**begins [1]** 281/13
**begun [1]** 455/3
**behalf [5]** 320/10 338/22 369/18 386/11 419/13
**behind [2]** 418/12 430/17
**being [21]** 288/23 292/8 296/22 306/22 308/6 308/15 335/6 337/3 357/24 363/14 366/2 374/18 379/8 383/2 385/19 415/15 417/19 438/9 440/23 441/22 458/11
**belief [1]** 440/16
**believe [53]** 291/25 319/9 324/22 328/19 333/11 333/13 336/1 337/16 340/16 340/18 344/15 347/12 347/15 348/22 348/24 349/21 361/25 364/22 367/8 367/9 368/5 372/17 377/9 377/11 377/17 377/23 381/17 383/9 383/19 384/3 389/11 389/16 390/21 400/19 405/16 408/12 413/8 417/22 422/3 424/8 426/7 432/11 432/13 435/3 435/19 441/11 443/5 443/5 445/15 446/16 447/3 448/3 448/8
**believed [1]** 431/25
**below [2]** 305/4 461/8
**bench [2]** 318/16 453/19
**benefit [8]** 300/5 300/11 301/25 302/1 344/8 344/10 344/11 345/6
**benefits [2]** 299/17 300/1
**beside [1]** 290/2
**best [4]** 280/25 292/13 292/15 377/4
**bet [1]** 360/15
**better [7]** 282/12 282/15 292/11 292/15 300/10 323/2 376/22
**between [13]** 279/13 279/16 283/9 303/19 303/22 305/16 322/1 373/22 375/16 381/10 386/21 428/13 441/6
**beyond [5]** 357/16 363/11 379/25 417/19 417/21
**bin [2]** 285/22 409/12
**binder [2]** 315/7 411/23
**biographical [2]** 285/6 429/19
**birth [12]** 289/11 289/18 395/3 395/4 414/20 425/12 428/11 428/13 429/22 430/8 435/8 435/11
**bit [8]** 274/7 285/23 298/11 373/21 380/2 401/21 407/7 446/14
**bite [1]** 338/8
**black [10]** 347/19 347/21 347/22 348/4 398/21 399/3 408/21 410/25 411/1 443/9
**blank [4]** 290/3 290/4 292/23 388/4
**blatant [1]** 292/12
**block [1]** 278/10
**blocked [1]** 408/24
**blue [1]** 408/23
**bodies [1]** 376/13
**body [1]** 445/9
**bono [4]** 302/20 303/4 303/10 304/10
**book [2]** 294/4 294/14
**border [25]** 347/14 348/4 398/12 398/13 399/12 399/20 419/24 424/2 424/18 426/15 433/17 433/18 433/19 433/20 433/21 433/25 434/2 434/16 434/17 435/6 436/2 436/9 436/10 440/1 442/20
**born [4]** 425/18 425/19 435/10 435/11
**both [4]** 308/23 309/12 453/6 457/1
**bottom [9]** 285/19 286/23 287/2 290/8 322/7 322/15 322/19 323/11 343/19
**box [24]** 286/23 287/2 289/25 290/2 290/2 294/24 297/10 297/12 297/13 297/20 297/22 298/2 305/4 319/18 327/17 327/18 327/20 327/23 328/25 334/10 334/13 343/19 367/19 367/24
**boxes [4]** 292/21 292/22 294/22 327/16
**break [8]** 275/13 275/14 275/15 310/23 338/7 338/8 368/8 452/12
**breaking [2]** 277/15 277/16
**brief [10]** 341/4 357/18 360/6 404/24 405/2 405/17 452/5 453/13 454/5 454/12
**briefing [4]** 389/17 447/13 448/8 451/15
**briefly [4]** 301/5 394/25 416/22 417/13
**bring [4]** 313/16 379/6 446/19 449/1
**bringing [3]** 370/2 370/11 370/25
**brings [1]** 314/23
**broadcast [1]** 305/25
**broader [1]** 293/7
**brought [21]** 273/24 307/5 307/17 308/14 308/21 313/7 341/5 341/7 341/8 360/13 360/18 360/24 361/6 361/17 361/23 362/22 363/7 363/14 364/2 364/16 374/17
**building [12]** 287/8 304/5 370/4 371/13 381/18 381/20 400/7 400/14 401/6 401/18 401/23 401/25
**building's [1]** 381/18
**bunch [1]** 276/5
**bus [3]** 374/23 375/14 384/25
**busy [10]** 312/20 313/8 344/25 373/1 373/1 373/2 376/10 376/12 376/18 384/13


## C


**C 8103 [1]** 327/17
**C.H [2]** 406/25 407/1
**C.M [1]** 400/19
**C.S.W [12]** 318/10 318/18 318/25 319/14 319/16 319/17 320/9 320/17 324/1 329/16 334/7 336/3
**C.S.W.'s [4]** 319/6 319/11 335/23 336/2
**calendar [3]** 310/19 452/1 456/5
**California [1]** 435/10
**call [19]** 313/23 319/5 319/13 337/16 338/14 345/8 369/11 374/19 413/16 413/17 413/20 413/21 413/23 413/24 414/4 414/5 428/3 439/7 443/7
**called [18]** 285/2 296/2 304/24 311/24 314/2 319/1 320/10 335/1 338/22 365/7 369/18 386/11 387/6 393/16 398/15 414/14 419/13 444/21
**calling [2]** 313/20 444/25
**calls [8]** 294/11 295/11 304/14 306/25 319/15 369/12 386/2 419/7
**cam [1]** 445/9
**came [23]** 286/3 308/15 324/19 324/20 327/7 329/4 341/15 342/2 349/19 357/9 358/21 363/16 372/16 373/3 373/4 381/17 388/8 410/17 414/15 426/4 430/24 431/12 436/9
**camera [3]** 315/24 316/16 317/5
**CAMILLA [1]** 270/8
**campo [3]** 427/16 427/18 427/20
**can [113]** 275/7 280/14 281/9 283/12 285/12 288/18 289/15 290/6 293/3 295/13 296/5 300/12 300/12 300/16 301/18 301/21 301/23 302/11 310/8 311/6 315/7 315/21 316/7 316/13 316/25 317/6 317/19 317/25 318/16 319/23 320/22 321/19 322/18 323/12 330/22 334/12 334/23 337/2 338/8 338/16 338/18 342/23 344/5 346/23 359/15 359/17 360/5 365/1 366/1 366/5 366/15 366/20 366/24 366/24 368/10 371/21 374/19 376/6 376/6 377/19 382/23 389/18 392/2 392/19 393/3 394/20 394/24 394/25 398/8 399/19 400/1 400/16 401/21 402/15 406/24 407/7 407/13 407/14 408/11 408/22 408/25 412/11 413/16 414/20 415/5 418/18 418/23 421/4 424/25 425/17 428/1 429/18 438/5 441/20 442/11 444/4 445/20 446/1 446/4

**C**


**can... [14]** 446/6 447/7 450/1 452/7 453/4 453/6 453/8 453/8 453/8 454/1 454/11 454/13 457/5 459/12
**can't [15]** 293/13 296/7 296/13 308/8 311/15 315/22 359/18 383/14 390/20 418/9 421/3 428/12 431/12 450/1 453/23
**canceled [1]** 434/11
**cannot [3]** 368/16 383/15 435/22
**capacity [1]** 370/7
**CAPS [1]** 310/20
**captioned [1]** 451/4
**capture [1]** 414/23
**car [6]** 393/23 401/24 404/6 415/13 422/17 437/20
**card [15]** 424/2 424/18 426/15 433/18 433/19 433/20 433/21 433/25 434/2 434/16 435/6 436/2 436/11 440/2 442/20
**care [1]** 453/15
**career [1]** 307/8
**carry [1]** 311/16
**cars [2]** 394/7 417/16
**case [63]** 273/15 278/16 285/6 294/8 296/18 297/1 305/23 305/24 308/19 313/5 323/23 324/11 324/21 327/25 335/1 335/6 335/11 336/16 338/14 341/14 342/4 343/3 344/9 346/12 347/2 349/7 351/22 356/9 356/20 365/10 368/5 369/9 370/7 370/8 372/6 373/6 373/9 373/16 374/2 374/14 376/25 377/16 385/19 390/1 390/3 395/12 395/17 397/25 436/17 436/19 444/18 445/5 446/9 447/10 448/7 448/9 449/21 450/15 450/15 451/4 453/18 458/13 461/4
**cases [6]** 277/21 323/13 325/24 356/17 377/15 377/16
**catch [2]** 342/23 452/21
**caught [2]** 427/11 427/12
**cause [15]** 343/12 346/1 351/6 351/8 432/11 434/24 435/3 435/19 435/20 439/13 440/25 441/6 441/7 441/11 461/11
**caused [2]** 312/12 430/18
**CBP [3]** 419/25 420/19 430/13
**CDL [1]** 384/1
**CDLs [1]** 376/1
**cell [3]** 377/10 377/21 430/11
**certain [11]** 284/12 298/19 328/3 376/3 383/13 383/20 384/3 390/23 392/7 434/16 453/5
**certainly [1]** 456/24
**Certificate [2]** 272/4 305/5
**certification [9]** 446/21 447/25 449/6 449/20 450/6 450/11 451/2 451/3 460/2
**certified [1]** 461/13
**certify [2]** 446/17 461/8
**certifying [1]** 447/9
**CFR [2]** 352/12 352/20
**CFRs [1]** 350/6
**chain [2]** 279/23 279/25
**chained [1]** 378/10
**challenge [5]** 311/15 321/23 370/19 450/19 458/1
**chance [7]** 309/16 309/17 322/11 327/14 373/8 425/23 447/3
**change [2]** 450/1 458/16
**changed [3]** 307/8 334/9 334/12
**changes [2]** 324/25 327/2
**characterize [2]** 344/7 397/9
**charge [1]** 353/3
**charges [2]** 353/14 353/17
**charging [2]** 329/22 377/1
**chat [1]** 406/3
**check [4]** 281/2 292/18 293/1 366/17
**checked [4]** 292/19 292/20 293/3 297/10
**checking [1]** 393/20
**checks [4]** 292/9 341/13 344/20 416/18
**chief [1]** 444/19
**choose [1]** 328/17
**chose [1]** 300/11
**circle [1]** 367/23
**circumstance [1]** 361/14
**circumstances [9]** 284/12 292/13 307/22 312/12 361/10 364/2 364/21 370/16 441/8
**cite [2]** 352/20 453/25
**cities [1]** 420/8
**citizen [4]** 425/18 435/10 435/11 435/13
**citizenship [1]** 294/23
**civil [4]** 271/13 420/24 450/15 458/12
**claims [1]** 449/23
**clarification [1]** 336/10
**clarify [5]** 280/6 324/13 335/20 336/12 370/20
**clarifying [1]** 316/7
**clarity [1]** 451/13
**class [18]** 446/17 446/19 446/21 446/23 447/9 448/17 448/18 449/6 449/7 449/7 449/8 449/15 449/21 449/23 450/11 451/2 451/2 460/2
**cleaning [1]** 425/25
**clear [7]** 299/9 341/1 344/10 373/15 379/4 399/25 451/13
**clearly [1]** 455/13
**click [1]** 437/9
**client [1]** 381/11
**clients [2]** 372/23 372/24
**close [4]** 375/20 375/21 378/19 381/20
**closed [8]** 381/18 436/17 436/19 444/12 446/13 449/25 450/3 459/9
**closer [4]** 322/25 371/20 373/24 386/20
**closest [1]** 363/20
**closing [10]** 381/21 382/2 447/20 450/9 453/10 454/12 454/20 454/21 454/21 455/17
**co [3]** 323/8 374/8 418/2
**co-counsel [2]** 374/8 418/2
**co-supervisor [1]** 323/8
**coaching [1]** 438/25
**code [2]** 350/7 352/13
**colleague [1]** 443/5
**colleagues [1]** 328/14
**colloquy [1]** 332/14
**combination [1]** 383/24
**come [33]** 273/23 274/4 278/18 312/4 316/15 316/24 318/4 319/18 340/11 341/12 344/24 354/2 362/3 362/15 366/11 369/13 385/20 386/5 388/1 390/17 401/18 416/7 416/10 416/14 416/17 416/19 419/22 420/11 420/16 421/2 421/4 459/22 460/7
**comes [2]** 344/16 416/4
**coming [8]** 310/13 351/16 400/7 400/14 401/23 402/1 403/8 403/8
**comma [1]** 351/13
**command [2]** 351/21 351/25
**commanded [2]** 351/12 351/15
**commanding [1]** 351/17
**comment [1]** 457/23
**commercial [2]** 376/2 376/3
**common [1]** 285/17
**commonly [1]** 322/5
**communicate [5]** 366/15 439/19 440/13 441/20 455/14
**communicated [1]** 439/24
**communication [1]** 286/19
**communications [1]** 355/7
**community [1]** 429/11
**company [9]** 375/2 375/11 378/9 379/3 379/17 383/5 383/10 384/16 452/11
**company's [1]** 375/23
**compared [1]** 308/20
**compelling [1]** 459/3
**complained [1]** 430/16
**complaint [1]** 446/19
**complete [6]** 280/25 281/3 292/8 292/22 307/5 312/24
**completed [13]** 296/25 297/1 306/18 307/16 307/16 307/21 312/25 313/1 341/11 385/3 385/7 417/24 459/9
**completely [1]** 372/19
**completeness [1]** 336/17
**completing [1]** 312/8
**complicated [4]** 282/6 313/5 428/2 458/1
**computer [2]** 406/15 414/11
**conceal [1]** 457/16
**concern [3]** 287/15 287/18 360/5
**concerns [4]** 277/12 288/22 293/17 396/14
**conclude [1]** 439/12
**concluded [1]** 366/14
**concluding [1]** 440/9
**conclusions [4]** 453/2 453/20 453/25 454/5
**conduct [6]** 290/20 317/22 457/16 458/22 458/23 459/1
**conducted [4]** 306/24 328/10 337/4 389/23
**conducting [1]** 273/8
**confer [3]** 318/3 318/11 318/16
**conference [1]** 310/20
**conferral [1]** 446/22
**conferred [4]** 318/17 446/16 446/18 446/20
**confident [1]** 433/5
**confirm [3]** 299/20 337/18 455/12
**confirmation [1]** 319/10
**conformed [1]** 461/12
**confusion [2]** 438/10 451/15
**Connected [1]** 319/8
**connection [2]** 316/5 317/16

## C


**consensual [3]** 400/1 400/1 402/19
**consider [4]** 454/9 456/20 460/11 460/12
**consideration [4]** 361/14 440/24 450/12 450/24
**considerations [6]** 277/9 384/14 384/19 439/12 439/20 440/9
**considered [8]** 295/10 295/17 295/19 297/11 348/13 348/14 364/18 412/12
**constitutes [1]** 282/4
**constraints [1]** 368/1
**construed [1]** 438/25
**consular [1]** 304/14
**consulate [3]** 372/17 372/18 372/25
**contact [3]** 300/9 312/4 442/18
**content [3]** 280/17 325/10 353/7
**contents [4]** 274/15 278/22 278/25 446/7
**contested [2]** 455/17 455/20
**context [4]** 379/22 391/15 445/10 446/2
**continue [8]** 293/10 302/3 365/8 385/21 409/3 409/14 442/25 449/23
**continuing [4]** 275/12 281/15 433/10 444/11
**contract [5]** 376/5 383/10 384/3 384/4 384/16
**contradicted [1]** 426/17
**contrary [3]** 275/21 292/19 297/2
**contribute [1]** 277/11
**control [4]** 372/7 372/9 372/11 372/15
**convenient [2]** 323/1 457/24
**Convention [1]** 299/4
**conversation [10]** 378/15 404/25 423/3 423/12 424/22 425/22 427/14 427/25 428/5 455/3
**conversations [1]** 427/22
**convey [2]** 414/5 442/16
**Cool [2]** 388/8 392/19
**coordinate [4]** 311/6 394/18 395/20 396/3
**coordinating [1]** 312/2
**copies [1]** 317/20
**copy [7]** 273/22 286/4 296/6 317/18 317/19 317/24 321/21
**cordial [1]** 311/3
**corner [1]** 343/19
**corpus [1]** 452/23
**correct [115]** 277/25 279/3 281/18 281/21 282/11 284/6 285/18 288/1 291/6 291/7 292/1 292/12 294/10 295/8 295/23 296/20 297/19 303/6 305/14 319/7 324/17 326/7 326/11 326/14 327/5 327/22 328/13 328/16 329/1 329/17 330/21 330/23 332/18 335/15 336/14 336/24 340/25 341/2 341/3 343/8 346/4 346/5 346/8 346/11 347/9 347/23 349/2 349/4 350/9 351/24 352/2 352/3 352/7 353/4 354/13 354/14 354/17 356/12 356/16 356/18 356/23 357/25 358/1 360/10 361/16 361/20 362/17 363/9 371/11 371/14 371/16 375/20 379/10 379/13 379/16 389/21 391/19 392/9 393/1 399/18 401/19 404/12 404/17 406/8 406/9 407/3 407/4 407/5 407/21 407/22 408/13 408/14 409/7 409/15 409/24 409/25 410/19 410/20 410/23 414/3 414/6 415/14 415/24 417/1 417/2 417/14 417/15 425/18 428/6 437/20 437/21 437/24 438/15 439/7 461/9
**corrected [1]** 403/22
**correction [1]** 285/24
**corrections [2]** 285/8 285/11
**correctly [2]** 296/7 347/18
**corroboration [1]** 445/18
**cost [1]** 302/17
**could [84]** 274/8 275/5 277/15 277/18 278/14 280/4 280/5 280/9 280/25 281/25 281/25 283/19 285/7 287/16 290/15 291/22 292/8 292/11 293/2 293/6 293/24 295/14 295/19 296/23 298/4 299/14 300/9 307/7 308/1 308/2 308/2 308/3 310/22 310/24 313/2 313/3 317/21 318/3 318/4 318/10 322/25 327/13 328/23 329/2 333/6 335/4 341/4 345/12 350/13 350/14 355/3 359/6 359/20 360/22 362/25 364/9 365/25 371/4 371/20 372/5 372/6 373/23 375/4 376/16 378/1 378/15 379/12 391/17 391/18 392/8 395/19 396/25 407/6 416/17 416/19 418/13 418/14 420/12 431/23 448/7 456/10 458/5 460/5 460/8
**could've [9]** 283/21 286/6 290/21 292/9 292/14 292/21 293/8 326/24 344/14
**couldn't [8]** 308/22 325/23 326/21 328/5 333/22 385/8 396/7 431/16
**counsel [23]** 284/17 318/4 318/25 325/17 326/5 332/3 333/7 346/19 355/7 369/8 374/8 379/18 382/7 385/16 411/2 411/9 417/8 418/2 438/5 448/6 448/15 455/4 459/7
**count [1]** 366/18
**counted [1]** 383/17
**country [8]** 294/23 344/3 395/3 432/12 432/13 435/4 439/13 440/10
**county [1]** 290/20
**couple [10]** 306/8 326/15 334/14 347/15 374/9 376/16 376/20 382/24 384/21 452/11
**course [7]** 286/7 289/15 311/12 436/22 445/7 454/2 455/6
**courses [1]** 350/1
**court [56]** 270/1 270/17 271/21 273/4 273/5 300/22 301/9 301/11 313/22 317/6 318/23 321/18 321/20 324/10 332/10 336/16 336/18 336/21 338/17 354/4 362/5 366/5 367/14 369/4 369/5 370/2 370/3 370/5 370/5 370/6 370/8 371/12 417/20 423/16 443/6 445/10 445/11 446/1 446/1 447/19 447/21 448/4 448/5 448/6 448/7 448/10 449/25 452/25 454/2 454/3 459/25 460/1 460/4 460/5 460/20 461/16
**Court's [4]** 370/8 417/19 445/24 455/22
**courtesy [1]** 311/4
**Courthouse [1]** 271/21
**courtroom [10]** 316/10 319/6 319/7 319/19 367/3 368/18 369/14 386/7 419/1 419/10
**courts [2]** 294/3 453/21
**covering [1]** 327/20
**create [4]** 306/14 342/10 356/14 459/15
**created [16]** 280/13 280/15 281/2 284/18 284/18 284/21 287/14 287/21 288/21 296/18 328/4 336/6 350/13 351/5 356/11 410/12
**creating [2]** 314/8 342/6
**Creation [1]** 284/23
**credibility [2]** 457/6 457/14
**credibly [1]** 457/12
**credit [1]** 418/2
**crew [1]** 422/22
**crime [1]** 300/6
**criminal [18]** 277/3 277/17 277/24 288/4 288/5 288/25 290/2 290/10 290/13 290/15 290/16 290/18 290/21 292/10 407/12 415/1 415/2 453/18
**critical [2]** 379/22 409/2
**cross [13]** 272/8 272/8 273/8 273/12 329/13 329/14 338/2 346/21 382/9 405/12 417/20 437/17 443/6
**cross-examination [10]** 273/12 329/13 329/14 338/2 346/21 382/9 405/12 417/20 437/17 443/6
**crossing [17]** 424/2 424/18 426/15 433/18 433/19 433/20 433/21 433/25 434/2 434/16 434/17 435/6 436/2 436/9 436/10 440/2 442/20
**CRR [2]** 271/21 461/15
**crunched [1]** 431/18
**CSR [4]** 271/21 461/15 461/17 461/17
**curiosity [2]** 370/8 436/6
**current [3]** 321/4 325/7 420/2
**currently [7]** 297/9 325/7 371/4 420/3 448/5 448/10 460/3
**custody [12]** 291/1 291/4 294/17 294/18 296/15 298/5 300/19 351/12 351/18 351/21 364/20 390/10
**Customs [4]** 270/9 339/22 387/4 419/24
**cut [6]** 278/10 278/23 279/1 279/5 279/8 279/9
**cv [2]** 270/7 461/4


## D


**D.R [1]** 400/19
**daily [1]** 327/2
**data [3]** 285/7 292/9 292/21
**database [2]** 416/16 435/1
**databases [2]** 290/21 415/20
**date [21]** 286/4 289/11 289/18 308/1 328/13 349/21 349/21 353/25 354/5 395/3 414/20 425/12 425/19 428/11 428/13 429/21 430/8 434/3 435/8 461/16 461/17
**dated [1]** 307/25
**dates [1]** 456/5
**day [56]** 311/5 312/20 312/21 313/3 313/6 313/8 313/8 321/10 325/1 325/25 326/3 326/7 326/22 330/4 330/11 331/1 349/9 365/16 372/4 372/4 372/9 372/11 372/15 373/1 373/1 373/2 373/4 374/4 374/11 374/17 374/21 375/19 376/10 376/12

D

**day... [22]** 376/12 376/18 377/5 381/4 381/7 381/12 383/16 383/19 383/20 384/10 384/13 388/14 388/22 403/20 409/16 435/3 442/15 452/7 456/4 457/24 458/17 460/17
**days [14]** 309/15 312/17 312/18 312/21 355/19 355/21 355/22 403/10 421/8 451/23 452/12 455/22 456/4 456/9
**deal [5]** 329/12 423/20 442/23 444/18 452/9
**dealing [3]** 436/1 448/14 457/18
**December [7]** 270/18 272/3 273/1 340/3 449/10 451/9 461/6
**December 16th [1]** 449/10
**December 17th [1]** 451/9
**decide [8]** 275/23 313/22 313/22 313/22 448/4 449/11 449/12 451/5
**decided [2]** 383/6 383/7
**deciding [1]** 384/20
**decision [4]** 357/12 358/7 361/12 449/16
**decisions [1]** 453/9
**deck [1]** 367/23
**declaration [7]** 294/8 374/3 374/6 374/10 374/14 381/6 381/10
**declarations [1]** 301/10
**define [1]** 314/17
**definition [1]** 314/18
**delays [1]** 456/3
**deletions [1]** 285/8
**deliver [1]** 377/25
**demeanor [2]** 457/5 457/11
**demonize [1]** 457/25
**denied [1]** 449/15
**Denver [1]** 387/8
**deny [1]** 451/1
**denying [1]** 449/20
**department [3]** 324/9 376/3 383/13
**departure [1]** 297/5
**depending [4]** 282/1 376/15 384/25 397/6
**depends [2]** 313/5 407/9
**deployed [1]** 406/18
**deployment [1]** 388/5
**deportable [4]** 275/10 281/12 342/22 342/25
**deportation [13]** 286/15 321/5 329/16 340/1 340/5 344/6 349/24 358/14 360/23 371/19 387/11 387/15 387/22
**depth [1]** 277/19
**deputy [6]** 316/10 319/19 367/3 369/14 386/7 419/10
**descending [1]** 457/14
**describe [9]** 275/7 296/15 300/16 325/19 359/6 359/20 394/25 413/16 426/12
**described [13]** 294/22 304/23 356/4 376/9 392/1 412/5 427/21 439/11 439/14 439/16 440/8 454/10 457/15
**describes [1]** 287/25
**describing [3]** 281/10 298/13 298/15
**description [4]** 314/22 370/18 397/10 398/8
**designated [1]** 305/11
**designates [1]** 398/16
**designation [2]** 398/25 398/25
**desire [1]** 297/14
**desired [1]** 300/9
**desk [1]** 315/8
**despite [1]** 460/6
**detail [11]** 290/18 340/13 341/18 347/7 347/11 348/10 357/5 362/16 362/18 362/20 446/5
**details [1]** 425/21
**detained [28]** 294/6 294/9 297/6 297/9 308/15 309/1 309/21 349/11 357/13 357/24 358/3 358/22 359/8 359/24 359/25 359/25 360/14 360/18 360/24 361/8 364/3 382/12 383/2 394/21 396/4 401/3 401/10 434/10
**detainees [5]** 325/22 372/16 376/21 384/9 409/15
**detaining [3]** 308/25 308/25 357/7
**detention [27]** 287/8 295/5 296/13 297/4 301/1 321/5 340/1 349/23 352/10 356/22 357/6 358/3 358/13 360/20 360/22 360/23 363/3 363/4 363/8 363/19 363/20 363/20 363/23 364/1 373/4 387/6 387/11
**determination [6]** 294/18 296/16 351/20 351/25 358/5 360/21
**determinations [1]** 358/4
**determine [11]** 332/4 342/3 421/21 425/3 428/16 428/23 431/17 433/4 434/1 434/19 457/1
**determined [5]** 319/11 351/6 351/8 383/9 392/4
**determining [1]** 440/25
**develop [2]** 305/22 442/12
**DHS [1]** 431/23
**dialogue [3]** 297/20 297/22 299/9
**did [159]** 273/17 274/4 277/5 277/19 278/15 278/17 278/18 278/20 279/9 279/13 279/16 279/19 282/21 282/23 282/23 283/25 287/14 287/18 287/20 288/21 288/25 290/17 290/20 298/23 298/25 299/3 300/2 300/2 300/5 300/8 303/2 303/10 303/25 304/16 304/17 305/8 306/13 308/12 314/3 322/11 322/13 323/14 323/17 323/20 324/13 324/18 324/20 328/2 331/2 331/22 332/2 332/3 333/7 333/15 333/18 336/15 337/18 337/20 340/11 340/11 340/15 340/22 340/23 340/24 343/3 343/6 343/9 344/22 345/20 345/21 345/22 346/12 346/14 346/15 348/21 349/17 349/18 352/1 356/9 356/17 357/5 362/14 362/14 364/1 371/9 372/19 373/18 373/20 374/8 374/10 377/25 378/2 380/10 380/12 381/1 388/1 388/16 388/24 389/2 389/6 389/17 390/7 390/17 393/13 393/17 393/22 393/25 394/17 394/22 395/10 395/13 395/16 395/24 399/11 399/22 399/25 400/5 402/6 403/7 403/18 403/25 404/2 404/19 404/22 405/1 405/3 405/7 408/6 408/19 411/13 411/13 420/16 421/4 421/19 421/22 423/2 425/9 425/22 427/15 427/22 428/7 429/5 429/6 429/7 430/16 434/20 436/6 436/14 436/15 436/25 437/1 437/9 437/9 438/11 439/19 440/13 442/17 443/15 451/23
**didn't [39]** 273/17 288/3 292/14 299/18 299/20 299/20 302/25 304/9 304/12 308/11 322/22 326/24 332/6 342/23 392/20 399/2 399/2 400/11 403/21 414/1 416/25 417/3 417/11 424/10 426/2 426/24 428/10 430/5 431/6 431/7 431/8 436/12 436/17 437/12 438/1 443/17 443/20 449/21 452/20
**difference [1]** 450/23
**different [16]** 282/24 326/1 326/16 347/15 356/3 356/3 372/10 381/11 390/6 416/18 420/5 449/11 450/7 453/21 458/13 458/14
**digitally [1]** 461/12
**diligently [1]** 459/12
**direct [19]** 272/8 280/5 281/9 303/8 309/20 320/19 322/7 337/22 337/24 339/16 348/20 367/9 367/10 370/14 371/2 387/1 419/19 442/25 443/6
**directed [5]** 279/1 283/20 336/18 363/16 383/1
**directing [1]** 278/22
**direction [4]** 363/15 363/25 364/4 451/14
**directly [5]** 277/5 287/20 326/22 427/23 442/22
**Director [1]** 270/8
**disagree [2]** 448/23 458/8
**disclose [1]** 355/6
**disconnect [4]** 339/8 339/10 365/6 365/14
**discovery [4]** 284/5 335/23 411/15 447/7
**discrete [1]** 459/1
**discretionary [1]** 352/9
**discuss [6]** 311/25 365/8 385/22 419/2 447/23 453/4
**discussed [2]** 281/6 335/6
**discussing [3]** 366/13 418/25 443/13
**discussion [20]** 279/21 279/22 304/19 309/6 315/12 316/17 317/7 332/22 334/4 352/22 382/4 392/15 393/10 400/23 402/2 403/15 405/5 419/6 425/24 451/22
**display [2]** 321/15 345/8
**displayed [2]** 275/11 281/13
**disposition [9]** 285/20 341/13 342/3 343/22 356/20 356/22 356/24 357/1 357/3
**dispositions [1]** 357/6
**dispute [5]** 291/15 453/8 454/14 454/17 454/19
**disputed [4]** 453/11 453/12 453/13 457/2
**distance [1]** 434/17
**distinction [2]** 283/9 441/6
**distinguish [2]** 453/8 453/8
**DISTRICT [5]** 270/1 270/2 270/17 271/21 363/24
**divider [1]** 375/16
**dividers [1]** 375/14
**DIVISION [2]** 270/3 271/13
**do [157]** 276/5 278/13 278/19 278/21 279/5 279/7 284/3 284/7 291/18 293/20 294/9 298/4 302/8 306/10

## D

**do... [143]** 306/11 308/5 308/24 310/14 310/22 312/6 313/7 314/2 316/1 316/16 316/19 318/13 318/14 321/17 321/18 321/21 322/14 327/18 331/9 331/12 331/15 333/2 334/10 334/25 335/4 337/22 338/1 339/8 339/10 339/21 340/8 340/17 340/22 342/13 342/15 342/16 343/9 343/20 343/22 345/4 350/13 350/16 351/6 351/15 352/8 354/18 365/7 365/10 365/25 366/7 366/11 367/16 368/2 375/3 375/24 376/9 380/15 380/19 380/22 381/7 381/14 381/15 383/18 383/24 384/6 384/10 384/24 385/2 387/3 387/7 387/17 387/23 388/8 388/10 388/12 388/21 389/2 391/11 392/3 394/17 395/10 395/11 395/12 396/13 397/5 397/6 397/18 397/23 397/24 398/4 398/14 398/24 405/7 405/8 405/15 407/13 407/14 408/18 408/19 409/1 409/9 410/24 412/23 412/23 413/8 415/7 415/18 415/18 415/18 415/21 416/1 416/1 416/12 419/1 420/13 420/15 425/2 425/5 425/6 429/24 435/23 436/20 436/24 436/25 438/11 439/17 440/10 442/10 447/3 449/3 450/16 451/9 451/14 452/15 453/21 453/22 454/3 454/22 454/24 456/10 458/4 459/14 460/11
**docket [1]** 301/15
**document [48]** 274/7 274/8 274/10 274/13 274/16 278/23 279/2 279/6 279/9 280/7 280/8 280/12 280/12 280/13 280/13 280/14 280/15 280/17 280/19 284/23 284/23 285/1 288/4 288/8 288/11 288/17 290/8 290/13 292/6 292/7 293/8 293/23 298/11 298/12 303/19 304/1 307/8 342/18 350/17 350/21 350/25 351/2 351/5 351/11 352/4 408/13 425/12 441/20
**documentation [2]** 423/9 435/6
**documents [16]** 274/18 279/11 287/5 303/9 303/9 314/9 317/10 317/23 318/5 318/11 319/4 319/9 329/22 333/7 348/9 377/1
**does [41]** 275/3 276/6 276/8 276/13 288/5 288/7 288/7 288/10 288/15 291/23 292/2 303/15 304/8 311/8 343/24 344/1 344/20 347/14 352/19 352/20 355/19 356/7 356/20 358/10 360/23 372/21 376/21 388/3 396/19 398/18 408/23 412/23 413/11 422/1 432/17 432/23 433/21 433/23 434/15 448/2 451/20
**doesn't [12]** 276/3 284/10 284/10 291/15 291/16 291/20 291/24 317/17 408/23 425/6 432/25 458/16
**doing [13]** 318/8 326/9 341/25 345/8 372/4 387/24 388/12 395/12 442/12 450/14 457/17 458/4 458/5
**DOJ [1]** 271/12
**DOJ-USAO [1]** 271/12
**don't [123]** 274/3 279/19 279/24 280/1 282/6 285/5 286/2 288/12 295/18 296/8 296/12 301/3 302/15 303/3 303/12 303/24 304/6 308/7 308/12 308/22 310/4 314/8 315/16 315/25 316/13 317/4 319/9 321/14 324/22 326/12 332/17 332/18 335/10 336/1 336/10 336/24 337/6 337/7 344/10 344/22 344/23 345/7 347/12 348/6 349/20 349/21 352/14 353/10 353/19 353/20 355/21 361/3 362/24 363/23 364/22 366/13 370/13 375/8 375/9 375/15 376/24 377/17 378/25 379/21 380/11 380/14 380/18 380/18 383/21 385/9 385/20 388/25 389/13 389/13 390/9 391/2 391/21 391/22 393/15 399/2 404/5 405/16 408/3 408/4 408/5 408/22 409/16 412/17 412/17 416/11 423/11 423/11 423/18 423/19 423/19 423/20 424/21 425/2 425/13 429/16 429/21 431/19 434/6 435/17 438/3 438/8 438/19 438/19 440/18 441/23 441/24 443/18 447/3 447/22 448/1 448/23 450/22 451/8 451/20 453/15 458/10 458/18 460/7
**done [20]** 285/24 292/14 292/15 308/13 311/5 311/7 311/11 311/17 312/18 312/19 312/22 314/12 339/8 339/10 368/10 377/2 396/23 417/25 436/21 443/5
**DOs [1]** 341/17
**double [1]** 393/20
**double-checking [1]** 393/20
**down [17]** 289/24 290/5 315/5 327/16 335/12 341/8 346/16 350/21 385/19 393/3 398/4 402/1 403/1 403/8 423/14 430/14 430/23
**downstairs [1]** 368/13
**downtown [1]** 402/1
**draft [5]** 285/17 285/17 335/22 335/24 336/4
**drafted [2]** 292/24 326/21
**draw [1]** 294/20
**drawing [1]** 388/4
**drawn [1]** 285/1
**drew [3]** 422/19 423/24 424/8
**drive [3]** 376/6 382/12 445/25
**driven [1]** 383/24
**driver's [2]** 376/3 384/16
**drivers [1]** 376/2
**driving [3]** 383/16 383/17 384/1
**drop [2]** 311/15 317/23
**drove [1]** 390/12
**due [1]** 456/14
**duly [5]** 320/11 338/23 369/19 386/12 419/14
**during [21]** 285/21 308/4 310/23 314/10 319/11 319/21 335/16 348/15 348/20 348/25 356/2 357/5 362/16 362/18 364/4 365/9 394/1 437/19 438/20 439/6 441/18
**duties [4]** 340/20 341/19 372/4 372/10
**duty [6]** 372/7 388/6 388/7 388/19 388/21 405/15

## E

**e-mail [46]** 273/21 278/10 278/13 278/15 278/18 278/20 278/22 278/25 279/1 279/2 279/4 279/6 279/8 279/10 279/20 279/23 279/25 283/25 284/4 284/5 284/7 284/10 284/14 318/6 318/9 322/14 322/15 322/19 323/10 323/10 332/24 333/1 333/3 334/8 334/8 334/10 334/13 336/1 338/15 397/8 410/22 410/25 411/1 411/14 411/17 411/18
**e-mailed [1]** 338/13
**e-mails [12]** 325/8 326/18 333/18 333/23 335/10 335/13 336/11 336/22 337/6 348/3 348/7 348/8
**each [4]** 307/25 367/7 375/16 453/24
**EAGLE [3]** 285/2 328/8 328/17
**earlier [21]** 274/7 280/16 298/12 311/11 319/22 322/11 334/7 344/19 346/2 361/1 370/4 373/12 374/8 374/22 381/5 381/5 399/15 399/16 412/5 431/22 459/25
**early [3]** 326/24 375/18 383/12
**ease [1]** 458/7
**easier [3]** 301/9 317/20 409/22
**easily [1]** 344/14
**East [1]** 295/1
**easy [1]** 457/24
**ECF [2]** 301/12 301/16
**effect [5]** 300/25 301/1 337/1 360/19 376/10
**eight [3]** 321/3 373/23 386/21
**eight inches [2]** 373/23 386/21
**either [12]** 277/1 288/22 326/7 330/16 331/10 347/1 355/11 362/21 379/3 380/20 397/6 400/12
**el [3]** 427/16 427/18 427/20
**el campo [2]** 427/18 427/20
**elderly [2]** 426/24 426/24
**electronically [1]** 325/3
**eligibility [6]** 298/23 298/25 299/3 299/21 300/3 300/5
**eligible [1]** 344/2
**else [22]** 291/17 307/22 312/16 353/12 353/12 353/18 355/15 379/4 380/21 391/6 410/22 414/19 415/1 418/16 431/12 432/15 435/19 435/22 437/2 439/20 443/16 459/8
**eminently [1]** 448/9
**emotions [1]** 429/17
**employed [2]** 371/4 419/21
**employment [4]** 371/7 424/13 433/24 434/12
**empty [1]** 292/21
**enclosed [1]** 408/6
**encounter [32]** 290/9 291/5 291/22 324/7 324/11 324/15 325/19 325/22 326/8 326/21 331/1 331/24 332/18 335/25 344/21 344/23 345/1 397/8 397/10 397/23 397/24 398/5 398/11 399/23 400/1 400/2 402/20 405/3 410/7 424/3 425/17 426/7
**encountered [9]** 306/12 359/22 398/12 399/20 401/5 401/6 401/18 401/22 410/8
**encountering [1]** 425/2
**encounters [4]** 326/2 397/19 399/22 410/2
**end [17]** 311/5 317/3 368/3 374/11 381/4 381/7 381/11 425/16 427/13 427/13 448/7 450/19 451/10 458/6 458/17 459/24 460/6
**ended [2]** 372/3 390/22

E

ending [3] 275/15 370/4 373/12
ends [2] 324/15 445/12
enforcement [14] 270/9 320/23 339/22 340/6 340/7 387/4 387/16 387/24 388/17 389/22 399/17 400/2 457/10 457/10
engaged [3] 325/9 422/22 458/3
English [4] 301/14 301/24 302/12 302/16
enjoyed [1] 452/11
enough [8] 310/25 319/18 360/12 386/5 386/20 419/11 448/12 455/13
ensuring [1] 360/6
entail [1] 341/24
entered [5] 275/22 282/11 292/9 336/2 395/6
entering [1] 456/25
entire [5] 383/19 389/14 406/17 438/13 446/7
entirety [3] 288/4 389/22 446/5
entitled [1] 461/10
entries [2] 275/25 282/7
entry [13] 275/20 276/10 280/24 281/23 281/25 282/3 282/11 282/13 419/22 420/10 420/11 433/23 434/13
ERO [2] 270/9 340/21
error [2] 280/2 281/4
errors [3] 280/4 280/19 292/12
escape [1] 291/4
escaped [1] 290/25
especially [3] 312/1 368/12 376/12
essentially [3] 326/13 373/12 445/17
established [1] 294/15
Estates [6] 389/11 389/20 392/25 406/8 412/9 412/21
et [2] 270/9 461/3
EUGENE [2] 270/3 370/6
evaluate [1] 457/5
even [10] 285/22 306/17 306/24 311/11 392/10 421/24 435/5 440/20 451/3 454/4
event [2] 328/4 366/2
events [1] 374/3
eventually [2] 356/6 394/7
ever [5] 323/5 346/15 348/6 354/12 355/14
every [8] 295/19 312/21 359/7 359/21 374/21 398/14 399/21 458/3
everybody [8] 321/22 326/19 371/21 396/9 396/25 416/18 424/15 426/20
everyone [24] 326/8 357/7 357/11 357/12 357/24 358/1 358/1 358/2 358/21 360/17 360/19 360/24 394/3 394/7 394/9 395/22 396/16 421/19 432/15 433/15 435/1 440/21 457/25 459/7
everything [7] 280/24 299/18 337/19 362/25 415/9 428/7 439/22
evidence [11] 282/18 283/13 358/25 362/5 391/16 438/19 445/19 446/11 446/11 447/21 449/4
evidentiary [9] 270/14 334/24 365/7 385/20 418/24 444/10 458/9 459/9 461/5
evolve [1] 392/8
exact [5] 389/13 390/9 393/15 408/5 408/25
exactly [3] 308/18 403/1 410/9
examination [21] 273/12 303/8 320/19 329/13 329/14 334/5 338/2 339/16 346/21 371/2 382/9 387/1 405/12 416/23 417/19 417/20 419/19 437/17 443/1 443/6 443/11
examined [5] 320/11 338/23 369/19 386/12 419/14
example [3] 280/23 285/19 292/20
Excellent [1] 338/19
except [1] 326/9
Excludable [1] 275/10
excluding [1] 334/24
excuse [7] 275/1 373/21 405/2 411/24 418/23 436/10 456/16
excused [8] 310/8 334/16 334/22 365/1 382/23 385/15 418/18 444/4
exhibit [39] 274/7 286/15 287/2 289/9 294/21 297/18 298/11 300/13 301/4 301/6 301/7 301/8 301/12 301/17 302/6 304/22 321/13 321/19 322/3 324/10 324/12 324/14 327/12 342/16 343/18 345/4 345/4 345/9 345/14 345/16 350/14 392/23 398/2 408/12 410/5 411/23 445/7 445/8 446/7
Exhibit 102 [1] 392/23
Exhibit 107 [2] 345/4 345/14
Exhibit 108 [4] 297/18 298/11 301/4 301/8
Exhibit 109 [8] 274/7 287/2 324/10 327/12 342/16 343/18 398/2 410/5
Exhibit 110 [4] 321/19 322/3 324/14 408/12
Exhibit 5 [2] 301/12 301/17
exhibits [7] 315/21 315/21 317/13 318/5 319/9 342/13 345/8
exigent [4] 361/10 361/14 364/1 364/21
existing [1] 460/9
exists [1] 284/8
exit [1] 426/1
exited [1] 429/9
expanding [1] 360/7
expect [1] 283/6
expecting [1] 292/18
expedite [1] 314/10
experience [17] 277/14 307/11 307/14 340/8 352/24 353/24 360/13 368/14 370/14 376/8 382/11 385/5 424/3 425/7 425/8 435/9 435/15
Expiration [1] 461/17
expired [1] 436/11
explain [14] 298/23 298/25 299/3 299/10 299/11 299/12 299/13 299/15 299/19 299/21 300/1 300/3 300/5 407/7
explained [3] 289/9 297/9 299/23
explaining [3] 274/9 293/24 426/15
explanation [1] 297/8
exposing [1] 457/4
extend [1] 311/4
extensions [1] 452/10
extent [6] 368/6 374/13 379/19 447/24 453/4 457/13
external [1] 445/25
extra [1] 318/1
extreme [1] 292/7
extremely [3] 278/3 285/17 344/25
eyebrows [2] 431/14 431/19
eyes [1] 432/20

F

face [2] 430/14 455/25
facial [4] 430/12 431/7 432/16 440/19
facility [44] 295/5 307/17 307/21 307/24 308/21 312/12 313/7 341/2 341/6 341/7 358/3 360/13 360/20 361/8 361/19 361/23 363/7 363/8 363/14 363/20 363/21 363/23 363/24 364/3 364/17 364/17 372/1 373/4 374/18 376/10 376/15 395/23 396/18 396/19 396/20 396/22 397/6 404/10 404/17 405/3 435/21 435/25 437/7 442/21
fact [19] 288/15 305/22 316/13 343/16 356/15 361/22 370/13 374/23 424/7 440/21 443/23 449/24 453/2 453/7 453/11 453/20 453/25 459/1 459/11
fact-finder [1] 370/13
factors [2] 412/12 439/16
facts [18] 321/10 453/12 453/13 453/13 453/23 453/23 454/4 454/11 454/14 454/16 454/19 455/7 455/17 455/18 455/20 457/1 457/2 457/3
factual [1] 292/12
factually [2] 276/7 282/5
fair [20] 280/20 289/1 298/15 302/18 302/22 303/11 309/19 310/2 314/7 326/12 344/7 348/8 396/12 397/9 428/15 428/22 438/20 449/1 452/13 457/8
fall [1] 456/5
falling [1] 426/2
familiar [11] 294/2 296/2 298/14 300/14 310/21 350/10 350/11 352/12 352/15 373/6 412/2
family [3] 304/14 361/11 435/11
far [6] 357/7 357/9 433/10 434/24 457/24 458/1
fascinating [1] 391/14
FBI [3] 323/23 414/24 415/3
features [1] 431/7
federal [2] 294/3 350/7
fell [1] 426/1
females [5] 374/24 375/5 375/16 377/9 378/20
few [12] 287/11 287/17 306/8 309/8 318/11 343/20 349/17 354/8 355/16 384/8 384/22 403/10
fiance [1] 424/14
field [27] 270/8 307/6 308/2 308/6 309/2 323/12 329/24 331/11 340/22 341/9 342/2 344/25 345/2 352/6 355/23 361/6 361/18 361/23 362/22 383/3 384/7 427/20 427/20 439/21 440/15 441/8 442/12
figure [7] 375/2 375/3 394/5 394/20 424/12 429/6 429/8
figured [1] 374/25
file [15] 286/3 306/13 306/19 308/17 356/10 372/6 376/24 377/8 449/5 451/7 455/16 455/20 456/18 460/11 460/12

## F

**filed [4]** 374/2 447/6 454/5 454/20
**files [9]** 376/13 376/19 376/20 376/23 376/23 376/24 384/22 385/3 385/6
**filing [2]** 447/8 460/7
**fill [9]** 306/19 395/16 395/25 396/24 397/7 409/14 409/14 413/14 429/20
**filled [3]** 292/22 298/1 344/17
**filling [6]** 394/22 396/5 397/2 408/10 408/13 436/4
**final [4]** 285/10 285/14 285/25 341/13
**find [8]** 350/12 379/6 414/16 414/21 430/8 436/6 458/17 458/21
**finder [1]** 370/13
**finding [3]** 415/10 459/13 459/13
**findings [7]** 370/9 442/21 453/1 453/5 453/7 453/20 453/25
**fine [8]** 301/20 368/15 427/4 451/24 452/18 455/9 455/11 456/13
**fingerprinted [4]** 376/25 404/21 432/22 436/1
**fingerprinting [3]** 349/17 436/5 436/8
**fingerprints [4]** 341/10 342/2 430/7 436/7
**finish [4]** 306/5 383/20 428/19 438/4
**finished [2]** 384/22 428/14
**first [48]** 275/4 275/4 275/5 275/9 275/9 275/15 276/18 276/21 280/11 281/5 281/9 285/19 289/24 294/22 304/13 319/23 320/6 320/11 322/18 327/14 332/17 338/23 338/25 339/7 343/18 365/20 368/2 369/19 369/22 378/18 379/6 386/12 386/15 389/8 389/9 389/10 389/14 389/15 400/10 403/4 419/14 419/17 420/17 422/12 422/18 428/4 443/22 454/23
**fit [1]** 376/16
**fits [1]** 376/14
**five [7]** 318/13 318/14 318/15 318/21 372/19 420/19 420/19
**fixed [2]** 323/1 435/12
**flex [1]** 310/25
**flight [1]** 291/9
**floor [4]** 325/16 341/9 346/17 426/1
**flourish [1]** 459/23
**flow [1]** 313/11
**flown [1]** 309/14
**fly [1]** 387/23
**focus [5]** 293/19 313/25 360/8 391/12 412/21
**focused [1]** 442/19
**focusing [1]** 459/1
**folder [12]** 321/16 321/20 390/20 392/17 406/11 406/11 406/12 406/13 407/4 408/11 417/1 417/4
**folks [8]** 309/14 326/9 373/3 374/17 378/17 386/18 424/5 432/4
**follow [13]** 293/20 313/15 314/15 314/21 339/11 362/13 364/6 376/4 382/24 383/14 409/22 438/5 438/24
**follow-up [3]** 314/15 339/11 364/6
**follow-ups [1]** 382/24
**following [3]** 273/3 364/15 410/18
**follows [5]** 320/12 338/24 369/20 386/13 419/15
**food [2]** 368/11 458/15
**footnotes [1]** 315/2
**force [1]** 420/3
**foregoing [1]** 461/8
**foreign [1]** 277/3
**forget [1]** 430/16
**forgive [1]** 364/15
**form [52]** 284/25 285/9 285/9 285/13 285/13 285/14 285/16 285/17 285/25 286/1 286/3 286/5 286/13 286/14 289/12 294/20 295/9 295/16 296/2 296/5 296/18 296/21 296/21 297/17 298/3 298/5 298/14 298/15 298/15 298/20 298/22 300/14 300/16 300/18 300/25 301/1 304/23 307/25 322/8 323/11 324/14 327/24 328/2 342/18 343/3 344/12 344/16 345/16 346/7 346/9 359/1 373/4
**formal [3]** 344/5 441/19 447/5
**formally [1]** 441/20
**format [1]** 459/13
**forms [13]** 284/24 286/5 296/24 296/25 298/1 301/2 306/23 312/8 323/14 323/18 323/20 342/6 342/10
**forth [2]** 372/20 372/21
**Fortify [1]** 433/14
**Fortifying [6]** 347/13 348/4 398/12 398/13 399/12 399/20
**forward [6]** 323/13 323/14 326/18 448/13 449/10 459/10
**forwarded [6]** 323/25 324/3 324/8 325/11 325/22 336/4
**forwarding [2]** 323/18 324/21
**found [4]** 379/7 428/12 434/20 439/23
**foundation [3]** 294/12 294/15 352/21
**four [6]** 277/12 341/17 372/19 445/17 449/25 459/7
**frame [1]** 381/9
**framework [1]** 453/18
**FRE [1]** 357/18
**free [6]** 302/17 365/5 365/14 385/18 418/24 444/9
**Friday [2]** 452/2 455/16
**friends [1]** 304/14
**front [13]** 296/6 297/14 299/12 299/25 342/14 344/6 344/14 345/14 351/11 381/18 392/17 393/5 433/6
**fronts [1]** 459/17
**full [6]** 289/18 396/7 400/16 412/17 416/2 445/9
**fully [2]** 364/15 437/8
**further [19]** 292/9 292/21 329/8 333/25 334/15 346/18 382/6 382/20 382/22 386/19 405/9 409/9 411/20 417/7 437/15 439/9 442/6 443/24 448/8
**future [1]** 302/15

## G

**gallery [2]** 321/18 345/7
**GARCIA [10]** 271/4 329/11 337/25 409/3 418/21 444/1 444/7 444/23 446/8 460/6
**GAROUSI [18]** 271/12 284/8 284/11 289/9 301/13 310/6 313/10 314/15 317/10 337/22 339/7 339/11 339/15 364/6 364/24 368/22 416/21 418/16
**gated [2]** 408/8 408/9
**gather [1]** 442/18
**gathered [1]** 442/16
**gave [8]** 366/5 368/22 377/14 406/7 424/1 424/18 431/15 435/19
**general [7]** 271/24 283/19 314/9 321/10 334/9 334/13 447/10
**generally [6]** 274/18 276/2 331/14 332/20 366/9 457/11
**generate [2]** 306/23 308/11
**generated [13]** 284/1 286/6 287/11 287/17 290/24 291/3 291/8 295/21 298/3 306/20 306/21 307/7 441/22
**generation [1]** 420/17
**generic [1]** 299/17
**gentleman [7]** 425/22 428/5 428/11 436/23 437/6 442/20 445/21
**geographic [1]** 387/7
**get [58]** 283/5 299/8 304/17 309/15 309/16 309/17 310/15 311/5 311/7 311/11 311/17 312/21 314/12 318/6 319/14 328/2 344/25 368/1 368/21 372/3 376/13 376/14 377/19 379/11 380/2 384/23 386/3 394/13 394/14 395/8 395/22 395/23 396/3 397/12 397/18 412/17 413/20 414/17 415/3 415/17 415/19 416/1 417/25 424/7 424/21 425/16 429/13 432/8 442/5 442/5 442/8 442/11 445/22 446/1 449/9 449/10 451/13 458/9
**getting [20]** 318/8 321/23 366/10 378/10 378/10 378/20 384/17 400/7 401/6 401/23 417/23 419/8 423/9 424/25 425/21 429/10 429/11 435/12 436/1 459/8
**give [14]** 336/11 341/4 391/8 392/20 398/7 408/25 412/17 418/2 429/22 432/21 432/25 439/4 441/11 457/7
**given [6]** 292/10 302/14 308/17 341/16 367/2 454/24
**gives [1]** 431/22
**giving [4]** 301/24 336/20 380/20 400/16
**go [62]** 277/19 281/1 288/25 289/8 290/5 298/7 299/11 299/18 301/4 301/23 302/3 306/5 315/5 318/7 338/9 341/12 342/9 344/5 344/6 354/24 357/9 366/5 377/2 377/10 377/11 377/24 378/6 378/6 378/11 378/18 378/21 378/22 380/1 380/24 381/4 381/23 388/24 389/6 390/7 390/21 391/9 393/13 394/5 397/6 397/7 398/3 404/11 407/2 407/10 407/12 409/21 413/19 418/5 418/24 423/18 424/24 427/6 427/8 434/6 438/10 439/1 444/9
**goes [3]** 276/18 305/24 451/5
**going [93]** 274/6 279/5 283/6 283/14 289/8 290/5 293/14 297/14 298/13 301/4 303/13 304/21 304/21 305/3 310/25 311/6 311/16 313/14 315/14 317/9 319/1 324/24 335/11 335/19 336/5 338/3 338/14 339/6 339/18 340/10 345/3 353/20 354/21 354/25 358/2 360/11 362/13 368/21 374/16 378/24 379/25 380/3 381/22 381/23 383/3 384/21 386/17 387/23 394/5 394/18 397/23 398/2 402/18 404/21 406/2 413/22 417/18 420/8 426/7 426/9 426/12 426/17 426/19 426/20

## G


**going... [29]** 426/21 426/22 426/22 427/1 427/2 427/3 427/5 427/6 427/9 430/7 430/7 434/4 434/21 438/7 444/21 445/18 445/23 445/24 447/9 451/14 451/15 452/17 454/24 455/6 455/12 457/1 458/24 460/11 460/11
**gone [2]** 356/1 358/8
**good [12]** 319/13 320/21 320/21 339/18 339/19 339/20 364/23 365/16 387/3 419/10 444/2 460/17
**got [36]** 276/17 279/20 292/5 297/16 312/21 321/16 324/14 337/18 344/15 355/1 358/3 360/20 377/23 378/6 378/12 384/7 384/8 387/20 388/14 390/9 393/12 394/7 394/16 396/22 400/10 404/3 406/10 414/12 415/22 416/2 422/9 422/17 423/14 424/23 427/11 441/18
**gotten [3]** 394/4 395/14 400/13
**govern [1]** 364/19
**government [11]** 291/14 291/23 319/15 339/6 350/25 369/12 370/23 386/2 419/7 430/11 449/20
**Government's [3]** 418/19 445/4 460/14
**grab [1]** 338/8
**granola [1]** 368/16
**grant [3]** 448/1 450/5 450/6
**granted [1]** 450/25
**Granting [1]** 449/13
**Great [1]** 318/20
**ground [1]** 422/13
**grounds [3]** 298/23 298/25 451/3
**group [5]** 325/4 325/6 325/7 395/9 406/3
**guards [2]** 381/17 381/17
**Guatemalan [1]** 372/17
**guess [8]** 296/10 296/11 309/12 335/21 362/25 385/9 408/24 439/8
**guesses [1]** 283/19
**guessing [1]** 385/8
**guidance [4]** 348/9 357/6 358/22 359/20
**gum [1]** 365/23
**guy [1]** 427/25
**guys [1]** 341/8


## H


**habeas [3]** 450/15 452/23 457/21
**had [129]** 273/15 273/22 274/12 274/13 275/22 280/8 280/16 282/9 285/2 285/9 285/22 289/9 290/25 293/6 295/10 295/16 295/21 297/7 297/10 298/2 303/22 304/23 306/17 306/17 306/18 306/24 308/1 308/20 309/19 309/20 310/18 312/25 314/5 332/14 340/4 343/12 346/3 349/21 351/22 352/1 352/4 356/13 356/19 357/8 357/12 359/22 361/12 363/12 367/14 372/17 372/17 373/8 379/14 389/3 390/8 390/10 390/20 390/23 390/25 393/16 393/19 393/21 393/22 394/3 394/4 395/18 396/25 400/6 400/13 401/4 401/17 402/1 402/6 402/6 402/9 402/9 402/18 403/18 403/18 403/22 406/19 406/20 406/22 411/13 412/5 412/14 413/21 414/10 414/24 415/6 417/11 418/14 423/8 423/9 423/25 424/9 424/13 425/23 426/5 426/6 426/8 426/10 426/16 426/23 427/10 427/22 428/3 428/10 430/11 430/16 430/18 432/3 432/3 433/17 434/3 435/5 435/19 436/2 436/10 436/10 436/11 436/20 437/5 437/24 439/12 439/13 453/19 456/2 459/16
**hadn't [1]** 295/20
**halfway [1]** 398/4
**hand [6]** 320/8 338/20 366/8 369/16 386/9 419/11
**handcuffs [4]** 430/16 438/1 443/20 445/21
**handed [1]** 409/11
**handle [2]** 291/11 313/24
**handwriting [2]** 286/20 408/22
**handwritings [1]** 408/15
**happen [8]** 361/7 376/18 386/17 395/10 405/18 413/22 428/8 442/14
**happened [17]** 297/25 372/14 377/4 378/3 380/6 381/6 381/16 382/15 394/9 396/16 400/11 403/1 403/3 403/12 422/2 435/23 443/18
**happening [2]** 381/14 458/10
**happens [2]** 284/12 396/5
**happy [4]** 281/1 291/11 311/19 370/17
**harboring [6]** 287/15 287/15 287/19 287/25 288/7 288/10
**hard [5]** 317/17 317/19 317/20 442/2 443/17
**has [64]** 275/11 281/13 284/9 286/18 290/13 294/13 300/10 302/2 302/14 302/14 302/16 306/20 307/8 311/22 312/2 316/19 317/3 317/5 321/9 321/20 321/24 324/10 334/25 335/2 335/23 336/1 336/5 336/18 336/21 338/14 346/6 351/8 352/18 353/1 353/4 354/15 356/4 357/14 357/15 360/6 365/10 371/18 375/11 376/25 378/6 382/15 385/22 395/2 398/14 407/10 419/2 421/1 422/22 424/1 424/16 425/5 430/12 445/10 446/1 447/21 449/4 449/22 457/20 459/8
**hasn't [1]** 335/2
**hate [1]** 314/2
**have [251]**
**haven't [3]** 347/4 353/24 402/12
**having [12]** 320/11 326/18 331/20 334/8 338/23 369/19 370/14 386/12 419/14 450/22 459/20 460/13
**Hawaii [1]** 420/25
**Hazelwood [6]** 389/11 389/19 392/25 406/7 412/9 412/21
**he [62]** 275/2 280/2 284/10 294/13 302/2 303/14 315/20 315/22 316/3 316/8 316/21 317/5 317/17 317/24 318/5 318/6 323/9 327/7 337/18 338/14 352/19 352/20 355/1 355/2 357/14 357/15 360/16 360/19 361/1 365/25 366/3 366/16 367/18 393/21 406/5 407/2 413/13 422/20 423/7 423/8 423/8 423/22 423/24 423/24 423/24 424/1 424/8 424/9 424/9 424/10 424/13 424/18 426/15 426/17 426/17 426/21 427/10 433/24 434/9 434/11 434/13 434/21
**he's [7]** 317/1 318/1 318/8 319/10 338/11 352/19 367/18
**head [4]** 316/11 348/1 373/23 386/21
**heading [1]** 337/8
**Headquarters [1]** 398/17
**heads [1]** 392/21
**heads-up [1]** 392/21
**hear [11]** 317/6 322/22 338/17 338/18 346/23 370/17 371/21 399/3 402/13 428/18 445/20
**heard [7]** 394/24 398/23 402/12 432/4 432/14 444/21 447/21
**hearing [10]** 270/14 299/16 310/20 354/5 365/7 385/20 418/24 444/11 458/9 461/5
**heart [1]** 458/10
**heavy [1]** 293/20
**hedging [1]** 360/15
**held [7]** 273/3 360/20 366/2 367/14 387/14 420/5 451/22
**help [14]** 299/7 316/24 324/6 404/8 408/23 421/3 422/18 429/13 429/20 438/8 440/20 441/25 442/5 442/12
**helped [1]** 459/15
**helpful [4]** 302/16 379/20 458/25 459/3
**helping [2]** 413/14 459/8
**her [144]** 276/10 276/10 276/11 276/12 277/1 277/5 277/8 277/8 277/19 280/23 280/23 281/4 281/23 282/11 282/14 282/14 282/18 282/21 282/23 287/9 287/12 287/17 289/11 289/18 289/18 289/18 289/19 289/21 293/9 294/22 295/6 295/6 297/5 297/13 297/24 298/4 299/19 299/23 300/1 300/8 301/2 302/23 302/25 303/2 303/19 303/22 303/25 304/2 304/3 304/6 304/9 304/9 304/10 304/11 304/12 304/15 304/18 314/9 321/10 343/3 343/17 346/3 346/15 357/4 373/12 373/18 374/3 377/5 377/8 377/19 377/23 378/6 378/12 378/16 379/11 379/12 380/5 380/20 380/20 380/24 380/24 386/3 404/2 404/3 404/4 404/5 404/6 404/8 404/10 404/19 404/20 404/20 404/24 405/1 405/3 409/3 419/8 421/17 422/7 422/8 427/24 428/9 428/9 428/10 428/12 428/16 428/23 429/5 429/8 430/3 430/3 430/4 430/6 430/11 430/13 430/15 430/17 430/22 430/25 431/5 431/8 431/8 431/11 431/14 431/18 432/14 434/25 435/2 435/8 435/8 435/20 435/23 435/25 435/25 436/5 436/6 436/8 436/12 437/1 437/6 438/20 440/20 442/23 443/5
**here [67]** 273/24 275/20 279/14 281/24 283/11 284/2 284/21 289/11 289/19 293/12 295/22 301/21 305/1 307/6 307/14 308/5 311/6 314/10 314/19 315/20 315/23 316/22 316/24 321/22 340/19 340/22 347/7 348/10 348/15 348/15 348/25 353/20 355/18 355/18 357/5 363/22 364/18 365/23 369/14 370/13 373/15 376/17 385/19

## H


**here... [24]** 387/23 388/14 412/25 414/25 415/10 420/11 421/6 423/9 424/17 425/9 425/10 425/18 426/20 435/7 439/21 440/15 440/15 440/17 441/16 445/25 452/1 454/24 456/3 456/5
**here's [1]** 352/13
**herself [1]** 448/19
**Hey [12]** 377/18 380/17 384/7 422/20 424/19 425/9 435/6 435/10 435/10 435/11 435/12 460/7
**hide [1]** 457/16
**high [1]** 429/17
**highlighted [1]** 302/8
**highlighting [1]** 302/8
**highly [1]** 432/18
**him [25]** 293/20 314/2 315/14 316/3 316/9 316/14 317/20 317/24 318/9 338/13 360/24 366/15 367/18 413/13 422/25 423/3 423/7 423/24 424/8 424/22 426/15 426/16 426/18 436/3 442/21
**himself [1]** 393/21
**hindsight [1]** 283/21
**his [16]** 283/17 317/3 318/8 323/10 355/1 357/19 358/25 359/3 359/10 360/9 406/24 422/22 424/2 433/24 434/11 436/4
**history [12]** 276/25 290/10 290/11 290/15 290/17 290/18 290/21 307/11 407/12 415/1 415/2 415/10
**hit [1]** 365/20
**hold [9]** 293/16 301/22 354/23 360/4 384/7 423/14 438/3 438/3 438/17
**holidays [1]** 454/7
**home [1]** 420/18
**Homeland [1]** 420/4
**homework [1]** 318/8
**honking [1]** 445/21
**Honolulu [1]** 420/25
**honor [161]** 273/9 278/7 281/19 284/6 284/9 284/15 288/1 288/14 288/19 289/2 289/5 291/10 291/13 291/18 291/25 293/21 293/25 301/5 301/20 302/4 303/6 303/13 305/20 309/5 309/8 310/5 310/7 310/9 310/14 310/22 311/9 313/12 313/17 314/14 314/16 314/25 315/3 315/6 315/10 315/13 316/2 316/8 317/11 318/3 319/2 319/20 321/25 323/21 329/8 333/16 334/1 334/2 334/15 334/19 335/8 335/21 336/14 337/15 345/6 346/18 346/20 354/8 354/21 355/16 358/18 360/16 360/25 362/11 362/12 364/7 364/10 364/23 364/25 365/2 365/4 365/19 366/12 366/19 367/13 370/1 370/21 370/24 379/23 382/6 382/21 382/22 385/12 385/13 385/17 385/24 386/2 400/21 403/14 405/10 405/11 409/4 411/21 416/22 417/7 417/18 418/3 418/17 418/20 418/22 419/8 432/19 433/1 433/7 434/4 437/15 437/16 438/17 439/10 440/2 441/10 441/23 442/7 442/14 442/19 442/24 442/25 443/25 444/3 444/6 444/8 444/14 444/20 444/25 445/6 445/17 446/10 446/12 446/24 447/16 447/18 448/3 448/9 448/23 449/3 449/24 450/2 450/14 451/6 451/12 451/24 452/8 452/13 452/19 452/25 453/17 455/2 455/21 455/23 456/15 456/23 459/5 459/14 459/18 459/21 459/25 460/18
**HONORABLE [1]** 270/16
**hope [2]** 446/4 459/14
**hopefully [4]** 318/17 366/1 455/13 459/14
**hopes [1]** 448/6
**horn [1]** 445/21
**hotel [4]** 397/7 405/19 405/20 409/24
**hour [1]** 313/3
**hours [11]** 287/11 287/17 367/12 372/19 376/6 383/16 383/18 383/21 383/23 383/23 384/1
**housekeeping [1]** 447/14
**how [83]** 279/20 305/15 307/22 308/19 312/23 313/5 315/9 319/13 321/2 326/17 328/2 331/1 333/21 336/24 337/22 340/2 340/7 344/12 348/23 349/5 349/12 350/12 357/6 359/3 368/8 371/6 371/9 373/3 373/25 375/3 375/3 375/15 376/5 376/6 379/21 381/1 383/1 383/2 383/6 383/7 384/11 384/13 384/20 384/25 385/2 385/6 387/12 387/17 387/23 390/16 390/17 391/6 391/15 392/3 395/5 395/7 395/7 395/10 395/14 400/11 403/7 404/2 407/25 416/9 417/16 418/7 419/25 420/16 421/7 423/3 425/5 425/6 428/3 433/5 438/22 451/17 451/20 451/20 452/16 455/19 456/12 456/20 456/20
**however [19]** 275/20 277/19 282/12 285/1 285/11 288/4 290/19 292/11 292/15 292/20 299/18 300/8 314/9 334/24 384/10 385/21 418/24 444/10 454/9
**human [6]** 288/22 288/23 288/24 299/22 300/7 415/15
**hurry [1]** 456/2
**hurt [1]** 393/21


## I


**I'd [16]** 293/14 296/9 298/10 311/10 314/2 321/12 322/7 327/12 338/7 368/8 385/8 438/25 443/14 444/21 445/6 458/24
**I'll [23]** 283/17 313/16 314/18 318/16 325/16 355/5 380/3 386/18 398/7 409/2 409/3 411/11 421/1 428/3 428/19 438/23 447/5 452/9 456/19 456/20 459/10 459/12 460/14
**I'm [148]** 273/22 274/6 278/24 280/7 280/12 280/13 283/4 283/6 283/14 284/14 287/16 287/22 288/18 289/8 290/5 290/6 291/11 298/13 301/4 301/9 302/15 303/1 303/13 304/21 304/21 307/12 311/6 311/15 311/16 314/19 317/24 319/9 319/20 319/23 320/21 320/23 321/5 323/23 324/6 324/24 325/5 325/16 328/3 328/10 329/20 330/4 330/8 331/18 331/20 331/20 331/21 332/9 332/10 332/17 333/16 333/20 335/12 335/19 338/6 338/14 339/5 339/18 340/10 345/3 347/25 349/11 353/19 353/21 353/21 354/21 354/25 355/8 356/5 359/1 359/12 359/25 360/2 360/10 360/11 360/11 360/12 362/13 362/24 362/24 363/1 363/4 364/14 364/15 364/15 370/16 371/17 378/21 379/21 380/12 384/2 384/11 384/12 385/4 388/4 395/3 397/23 398/2 403/17 409/21 410/4 410/11 411/5 419/18 420/3 420/8 420/17 420/23 421/24 423/14 425/18 426/17 426/22 426/22 427/2 428/1 430/4 430/19 435/11 435/12 435/12 441/14 441/15 441/23 441/25 441/25 443/4 444/9 445/1 447/25 448/24 450/9 451/14 452/20 455/2 455/12 456/3 458/8 459/16 460/1 460/5 460/10 460/11 460/13
**I've [16]** 302/7 305/1 316/15 380/13 391/15 398/23 406/19 420/1 420/10 420/11 420/18 420/18 429/20 452/11 455/3 458/16
**I-200 [20]** 297/9 304/24 306/13 306/14 306/19 306/23 307/2 307/5 307/20 341/9 345/17 345/18 345/20 345/22 345/24 346/12 350/13 352/16 356/10 356/11
**I-200s [5]** 307/16 308/6 308/11 308/15 308/24
**I-213 [9]** 342/20 342/21 343/4 343/10 344/16 346/12 347/13 403/17 403/19
**I-213s [1]** 343/11
**I-286 [3]** 296/3 296/5 296/18
**I-589 [1]** 344/12
**I-94 [4]** 281/2 298/3 434/12 434/18
**ice [34]** 270/9 291/1 291/4 291/9 320/25 321/2 340/4 341/2 341/5 364/17 371/5 371/6 371/9 371/11 371/15 371/18 372/1 376/5 376/10 384/5 387/14 394/4 396/20 396/22 399/24 404/10 410/8 429/19 431/3 435/21 435/25 437/7 441/25 456/3
**ICE/ERO [1]** 270/9
**idea [4]** 305/17 306/6 306/9 428/10
**ideally [1]** 311/13
**ideas [1]** 447/25
**identical [1]** 279/10
**identified [7]** 327/1 335/2 391/1 391/6 391/16 399/25 437/8
**identify [7]** 291/24 318/1 326/24 390/14 404/8 406/24 430/11
**identifying [3]** 390/17 412/12 454/19
**identity [1]** 289/21
**IEA [1]** 387/21
**IJ [1]** 344/6
**illegal [2]** 287/19 344/4
**illegally [2]** 432/12 432/13
**image [1]** 432/19
**imagine [4]** 283/12 349/25 350/3 449/22
**immediate [1]** 390/1
**immediately [1]** 435/16
**immigrant [1]** 283/3
**immigrate [2]** 275/23 282/15
**immigrating [1]** 275/21
**immigration [36]** 270/8 275/6 275/15 277/16 281/15 282/13 289/23 290/9

## I


**immigration... [28]** 294/2 296/2 297/15 299/12 299/13 299/17 299/25 300/19 300/22 305/2 305/9 306/21 339/22 340/6 340/7 344/11 344/14 350/1 350/4 350/8 350/22 351/13 387/4 387/16 387/24 388/17 399/17 431/24
**important [2]** 283/9 459/15
**Impossible [1]** 313/2
**INA [10]** 276/11 276/12 276/14 276/20 293/6 294/7 294/9 350/3 350/10 352/9
**inaccuracies [1]** 416/14
**inaccuracy [1]** 281/8
**inadmissible [2]** 342/22 343/1
**inartfully [1]** 454/9
**inbox [1]** 333/3
**incentive [1]** 312/20
**inches [2]** 373/23 386/21
**incident [3]** 307/13 439/7 443/13
**inclined [1]** 460/1
**include [8]** 275/19 291/16 299/18 308/17 353/25 372/22 441/21 446/23
**included [3]** 282/18 353/8 353/13
**includes [2]** 285/4 353/23
**including [1]** 300/7
**incomplete [1]** 290/19
**incorporate [1]** 450/11
**incorrect [2]** 282/5 413/9
**incorrectly [1]** 324/14
**incredibly [1]** 401/8
**independent [1]** 450/20
**INDEX [2]** 272/1 272/7
**indicate [6]** 283/25 291/20 296/22 327/23 352/1 360/16
**indicated [22]** 273/21 274/12 277/2 280/16 281/18 282/24 294/13 302/7 305/5 309/19 309/21 312/8 314/5 314/6 326/15 332/6 352/19 356/19 407/2 423/18 459/25 460/1
**indicates [6]** 275/20 288/17 297/13 302/18 303/19 351/5
**indicating [6]** 294/8 379/8 422/25 423/14 424/9 437/1
**indication [5]** 290/25 291/3 291/8 418/13 446/16
**indications [1]** 279/4
**Indiscernible [1]** 353/15
**individual [18]** 280/15 294/17 295/19 299/21 307/3 312/24 313/1 327/8 341/5 351/18 359/7 391/1 399/24 404/6 414/16 441/17 450/21 458/24
**individual's [4]** 282/3 298/16 351/3 356/22
**individuals [16]** 277/15 285/2 294/5 300/18 316/9 349/9 349/11 361/8 364/16 390/10 393/19 393/22 394/19 396/4 401/17 407/11
**indulgence [1]** 455/22
**indulgent [1]** 311/3
**inference [2]** 277/22 277/23
**inferences [2]** 277/15 277/18
**inflaming [1]** 458/8
**information [49]** 279/2 279/8 279/10 279/10 284/1 285/1 285/6 299/7 321/8 326/23 341/12 343/12 355/3 358/22 394/20 395/2 395/8 395/11 395/19 395/22 396/24 397/4 397/8 397/9 397/12 400/10 400/13 400/18 400/25 413/14 414/12 414/16 414/21 414/22 415/7 415/16 415/22 416/1 416/7 416/15 416/16 432/8 438/8 438/23 442/5 442/11 442/16 442/18 445/22
**informed [1]** 380/8
**informs [1]** 359/21
**initial [6]** 322/18 369/22 386/15 419/17 457/6 457/7
**initialed [3]** 297/3 297/5 298/2
**initials [17]** 297/21 297/24 298/18 319/22 319/24 320/6 320/13 320/16 322/17 322/18 329/3 339/1 366/21 366/23 400/17 404/14 406/24
**injected [1]** 438/24
**injunction [3]** 449/7 450/18 456/19
**Innovation [2]** 271/4 271/8
**input [3]** 285/3 292/21 342/3
**inquire [2]** 291/17 447/19
**inquired [1]** 417/21
**inquiring [1]** 337/21
**INS [1]** 371/10
**instance [2]** 442/15 458/3
**instances [1]** 458/20
**instead [3]** 325/7 326/18 403/8
**instruct [3]** 293/11 354/25 365/8
**instructed [3]** 274/5 275/18 336/21
**instructing [2]** 335/12 437/1
**instruction [8]** 336/10 361/21 362/3 362/7 362/20 363/15 363/25 413/18
**instructions [5]** 336/12 336/15 336/21 348/3 362/15
**insulting [1]** 326/12
**intended [1]** 283/9
**intending [4]** 275/22 301/24 332/13 428/9
**intent [4]** 282/18 282/24 283/13 288/4
**intentionally [1]** 427/24
**interact [6]** 393/22 403/25 404/2 405/3 425/6 432/15
**interacted [2]** 370/6 427/23
**interaction [3]** 346/13 377/5 404/9
**interactions [6]** 370/14 378/4 428/4 429/7 431/23 435/2
**interest [2]** 335/11 417/23
**interested [4]** 307/12 349/11 355/8 363/1
**interject [1]** 360/25
**interjected [1]** 423/10
**interjecting [1]** 437/4
**interpret [1]** 344/13
**interpreted [1]** 309/24
**interrupt [1]** 424/24
**interrupted [2]** 381/10 396/13
**interrupting [3]** 423/12 427/24 428/5
**interruption [1]** 310/16
**interview [5]** 299/10 312/24 378/1 426/20 442/8
**interviewed [2]** 282/23 442/4
**interviewing [3]** 301/2 436/3 442/22
**introductory [1]** 380/2
**investigation [5]** 420/4 427/22 436/16 441/18 442/6
**investigations [1]** 441/17
**invite [1]** 460/14
**involve [2]** 338/2 455/3
**involved [10]** 277/24 288/24 326/2 342/6 363/5 373/11 395/22 421/14 421/15 421/17
**involvement [2]** 321/10 323/17
**involving [1]** 307/13
**is [334]**
**ish [1]** 375/21
**isn't [3]** 283/5 310/25 451/14
**issue [10]** 307/13 356/25 366/1 381/9 423/21 424/4 434/4 444/22 448/16 459/19
**issued [6]** 351/21 352/16 352/17 354/12 354/16 355/14
**issues [16]** 283/6 283/7 331/21 364/22 370/17 370/23 384/8 447/25 448/5 448/6 448/7 448/10 450/5 460/3 460/3 460/9
**issuing [1]** 434/3
**it [375]**
**it's [69]** 284/4 285/17 288/13 289/1 289/1 292/19 296/7 299/6 299/9 301/8 301/8 301/11 301/15 312/20 316/2 321/15 322/8 323/1 323/1 324/14 325/11 326/25 336/3 336/25 337/5 342/20 342/25 344/5 344/16 347/13 361/3 366/8 366/17 379/19 379/20 379/20 380/14 381/19 383/19 383/23 383/24 386/17 387/6 391/8 395/2 406/12 408/8 408/12 408/21 408/21 408/24 409/22 410/5 412/14 432/19 438/20 441/1 441/2 441/3 441/24 442/2 445/7 445/18 449/1 456/21 457/2 457/24 458/1 458/23
**items [1]** 453/3
**its [8]** 285/9 288/4 443/6 446/5 450/20 450/20 455/16 455/17
**itself [1]** 450/10


## J


**J.A [10]** 330/16 367/14 367/16 367/17 368/1 368/3 368/5 444/18 444/21 444/25
**J.B [2]** 330/16 400/19
**January [6]** 451/25 452/16 452/17 452/18 454/20 455/16
**January 16th [1]** 455/16
**January 7th [1]** 452/16
**January 9th [3]** 452/17 452/18 454/20
**joint [4]** 453/22 454/10 454/10 455/18
**joking [1]** 455/25
**judge [13]** 270/17 297/15 298/12 299/12 299/13 299/17 299/25 299/25 339/5 344/15 352/25 354/18 361/5
**judge's [1]** 355/3
**just [135]** 274/9 274/10 277/12 279/14 280/23 281/11 283/8 286/13 293/19 295/19 298/12 298/13 298/14 299/6 299/7 299/20 299/24 300/2 301/5 301/25 302/1 303/14 309/5 309/8 309/15 309/17 312/13 312/17 314/1 314/12 315/13 315/14 316/23 317/24 319/21 319/24 320/5 322/17 324/13 324/15 325/4 325/6 325/15 325/16 326/2 326/18 327/13 331/22 332/10 336/12 338/6 338/14 340/24 341/1 343/11 344/3 347/25 351/10 352/18 353/21 353/21 354/8 354/11 355/8

## J

**just... [71]** 355/16 355/24 355/24 357/17 359/3 361/2 362/5 363/12 364/9 366/12 367/20 368/2 370/2 370/7 372/24 374/19 374/24 376/9 378/5 379/22 379/24 380/24 381/9 384/4 384/12 384/23 385/8 386/18 388/4 388/16 392/1 394/24 394/25 396/9 399/21 400/3 401/23 404/20 405/19 409/12 413/11 415/9 416/4 417/11 417/13 417/25 422/24 425/9 427/8 427/9 427/21 427/24 428/7 429/17 429/23 431/18 432/19 434/9 436/12 437/11 437/13 437/14 438/22 438/25 440/11 441/14 443/8 447/13 448/13 453/24 458/7

## K

**K.K [51]** 272/10 286/8 305/3 310/12 310/13 311/19 311/22 313/15 313/21 314/3 314/23 315/9 316/19 317/3 317/5 317/9 318/18 318/19 319/4 337/16 338/9 338/9 338/13 338/16 338/21 339/2 339/5 339/18 340/10 342/13 345/3 345/14 346/23 349/15 351/7 351/16 352/25 354/9 354/18 354/23 355/5 357/23 359/6 359/13 360/4 360/9 360/12 361/5 364/14 365/5 365/13
**K.K.'s [1]** 366/3
**KASUBHAI [3]** 270/16 339/5 354/18
**keep [3]** 291/12 311/16 368/9
**keeping [2]** 383/25 437/5
**kept [3]** 423/9 423/12 437/4
**kids [1]** 429/24
**kind [29]** 276/5 309/16 319/17 326/25 353/21 354/2 365/20 383/25 386/5 386/20 395/18 400/11 401/2 405/16 410/1 419/11 422/20 424/9 427/4 427/5 427/10 427/12 430/17 430/22 431/14 431/18 431/22 431/24 432/20
**kinds [1]** 391/25
**knew [8]** 378/19 378/21 378/24 426/4 426/10 438/7 440/22 455/25
**know [128]** 274/3 278/19 278/21 284/7 284/11 285/5 286/2 288/12 295/18 296/12 301/3 302/15 303/12 303/24 304/9 304/12 308/7 308/12 308/22 308/24 309/3 311/15 315/16 315/16 316/13 316/19 317/4 318/5 322/8 322/14 322/25 324/18 335/4 335/9 335/10 336/16 336/24 337/7 338/1 338/14 339/19 346/6 348/6 350/12 352/20 353/10 353/19 355/21 360/11 362/24 368/14 370/3 375/8 375/9 375/9 375/15 375/15 376/1 376/5 376/15 376/16 379/21 383/18 383/21 383/25 384/12 384/16 384/17 384/24 385/2 385/14 389/13 390/9 391/21 392/3 395/18 398/24 399/8 402/6 403/17 403/21 404/8 404/20 405/7 408/5 408/18 408/19 408/22 409/16 411/13 413/12 415/9 416/11 418/1 425/14 426/19 428/2 429/5 429/15 430/6 431/19 435/23 436/20 438/1 438/11 441/8 441/23 443/18 444/18 445/8 447/22 448/12 448/15 450/22 450/22 450/25 451/8 451/8 451/20 453/6 453/21 455/4 456/2 457/11 457/13 457/15 458/12 459/21
**Knowing [2]** 311/18 454/22
**knowledge [12]** 280/25 282/12 285/6 286/11 300/10 308/5 308/6 353/4 354/15 355/13 374/13 375/22
**known [9]** 289/21 290/16 322/5 327/6 402/9 402/18 403/22 407/10 417/4
**knows [1]** 448/15

## L

**Lab [2]** 271/4 271/8
**labeled [1]** 324/11
**lack [3]** 352/21 376/21 434/12
**language [6]** 275/19 281/24 282/17 325/21 432/14 440/18
**large [2]** 278/3 283/1
**last [17]** 277/10 309/10 320/6 320/6 322/18 327/20 335/9 339/1 340/13 363/5 367/18 368/13 369/22 371/17 386/15 419/17 452/11
**last-minute [1]** 340/13
**lasted [1]** 336/25
**late [1]** 384/25
**later [15]** 306/20 311/1 327/1 327/8 334/9 336/6 344/24 361/4 374/22 375/19 380/7 409/6 417/13 421/19 437/22
**laugh [3]** 427/10 427/11 427/12
**laundry [1]** 353/22
**law [19]** 271/4 271/8 276/16 277/16 282/13 288/4 294/4 294/14 350/1 400/1 453/2 453/20 453/25 454/5 457/10 457/10 457/20 458/6 459/2
**laws [4]** 275/16 277/16 281/15 384/4
**lawyer [2]** 303/22 303/25
**lawyers [2]** 278/15 304/10
**lay [2]** 294/12 380/1
**leading [2]** 379/20 428/17
**lean [2]** 373/24 373/24
**learn [1]** 403/7
**learned [6]** 350/3 350/6 378/16 379/17 436/15 437/7
**learning [1]** 352/8
**least [10]** 282/10 307/12 328/13 360/20 368/13 412/8 432/9 450/24 457/11 459/16
**leave [15]** 315/7 334/23 337/12 376/11 380/8 380/9 380/17 381/2 383/7 383/8 384/20 397/5 409/12 449/13 460/17
**leaving [1]** 384/12
**led [1]** 439/12
**leeway [2]** 380/3 384/11
**left [11]** 286/18 292/23 340/17 345/7 366/18 376/15 378/12 378/13 388/10 389/10 396/10
**legal [17]** 282/14 283/5 283/6 283/9 283/9 293/5 300/17 302/16 302/20 303/10 355/2 424/9 424/16 424/16 425/10 433/23 459/4
**legally [3]** 415/10 424/5 424/6
**length [1]** 338/4
**lens [1]** 459/2
**less [5]** 307/15 408/24 424/6 439/3 458/25
**let [22]** 273/22 293/20 301/21 304/9 316/21 316/25 324/19 336/15 338/3 338/13 342/7 348/18 360/11 379/5 395/14 404/11 409/3 424/21 427/8 427/15 438/4 451/25
**let's [24]** 273/10 276/5 311/7 311/17 314/1 314/17 318/14 318/15 320/5 332/12 338/9 361/2 368/8 368/18 381/4 387/20 402/13 408/11 417/25 417/25 439/6 451/13 452/15 455/12
**letter [2]** 327/18 412/16
**level [3]** 292/14 441/2 447/25
**liberty [1]** 351/3
**license [6]** 413/25 414/2 414/5 414/8 415/13 416/15
**licenses [1]** 376/3
**lieu [2]** 325/4 325/6
**lifting [1]** 293/20
**light [2]** 443/1 446/15
**like [120]** 280/22 289/14 289/16 293/14 298/10 310/23 311/11 315/2 317/1 321/12 322/7 325/4 325/6 325/24 326/25 327/3 327/12 329/20 329/21 330/7 331/15 338/7 341/17 344/11 348/24 361/11 366/6 367/9 367/14 367/21 368/8 370/19 373/24 375/9 375/15 376/7 376/17 376/23 377/18 378/8 383/12 384/13 385/21 388/4 393/9 394/11 394/18 395/10 395/24 397/10 399/15 399/15 400/10 401/4 401/25 402/1 407/9 407/11 408/6 408/6 408/8 408/25 409/12 409/21 410/1 416/15 422/5 422/22 424/13 424/14 424/15 425/9 426/3 426/5 426/14 426/25 427/6 427/10 427/10 427/11 427/11 427/12 427/20 429/23 430/4 430/4 430/17 430/17 430/17 430/18 430/24 431/2 431/3 431/6 431/9 431/10 431/10 431/14 431/14 431/14 431/19 431/22 431/25 435/5 436/20 441/1 441/3 441/8 441/17 443/14 444/21 445/6 447/2 451/17 451/18 452/25 453/14 453/14 454/25 455/19
**likelihood [3]** 451/10 456/21 460/12
**likely [5]** 286/8 386/17 424/6 432/18 432/18
**limit [2]** 293/12 319/24
**limitations [3]** 375/23 375/24 376/8
**limited [3]** 284/12 328/23 366/4
**limits [1]** 328/8
**Lindsey [2]** 271/21 461/15
**line [15]** 275/11 281/1 281/1 297/24 299/19 299/19 317/3 326/25 338/9 339/8 343/22 351/10 379/8 379/11 380/20
**lines [1]** 343/20
**link [1]** 316/3
**lips [2]** 430/4 432/21
**list [14]** 284/25 302/16 302/20 302/23 302/25 303/2 303/5 303/10 353/22 377/14 420/8 433/10 434/21 434/24
**listed [2]** 295/1 347/13
**lists [1]** 286/15
**little [14]** 274/7 298/11 313/3 322/25 340/9 368/9 371/20 372/10 380/2 401/21 407/7 420/23 430/12 446/14
**live [2]** 318/9 368/16

L


**lives [1]** 383/22
**loaded [4]** 394/7 394/10 396/9 396/16
**loading [1]** 378/9
**lobby [3]** 311/23 405/19 405/20
**local [12]** 290/20 349/17 349/18 357/9 358/6 358/8 358/15 360/22 361/12 361/12 364/4 406/4
**located [1]** 330/5
**location [22]** 354/5 387/7 389/7 389/8 389/9 389/10 389/14 389/15 390/11 390/21 390/23 391/9 391/21 392/3 394/14 394/15 394/16 396/2 396/13 400/12 407/21 408/7
**locations [1]** 391/18
**locked [1]** 368/19
**lofts [1]** 402/1
**logged [2]** 316/19 384/1
**logging [2]** 383/23 383/23
**logistics [3]** 374/16 374/20 374/25
**long [20]** 312/23 317/25 321/2 336/25 337/22 338/5 340/2 348/23 371/6 378/24 387/12 387/17 387/24 388/5 399/3 403/7 419/25 421/7 451/20 451/20
**long-term [1]** 388/5
**longer [3]** 307/11 385/2 424/25
**look [20]** 286/22 287/1 294/14 308/1 311/14 322/11 324/12 343/18 360/11 366/5 368/22 398/7 401/9 408/6 431/15 432/20 452/1 456/4 459/1 459/10
**looked [9]** 343/16 353/24 424/19 430/5 430/9 430/14 430/23 430/23 431/13
**looking [12]** 274/6 285/25 286/14 318/2 322/3 343/15 345/24 345/25 353/22 367/11 368/10 411/22
**looks [1]** 317/1
**loosely [1]** 410/11
**lost [1]** 393/13
**lot [12]** 278/1 312/17 312/18 328/14 349/20 386/18 387/23 394/11 400/12 408/2 430/18 438/10
**loud [4]** 323/4 323/5 439/23 440/19
**low [1]** 302/17
**lower [1]** 441/2
**lunch [4]** 338/7 365/25 426/5 426/6


M


**M-J-M-A [5]** 270/5 287/25 313/7 440/6 461/3
**M-J-M-A's [2]** 297/1 298/18
**M.D.K [1]** 419/18
**M.K [8]** 272/13 367/4 367/10 404/15 419/7 419/12 419/18 444/9
**machine [1]** 436/5
**machines [1]** 368/13
**made [25]** 283/12 283/21 285/7 285/12 285/24 292/9 297/21 351/20 351/22 352/4 357/12 358/4 358/5 358/7 360/21 380/13 384/19 400/9 403/18 437/11 437/13 437/14 440/9 457/20 458/16
**mail [46]** 273/21 278/10 278/13 278/15 278/18 278/20 278/22 278/25 279/1 279/2 279/4 279/6 279/8 279/10 279/20 279/23 279/25 283/25 284/4 284/5 284/7 284/10 284/14 318/6 318/9 322/14 322/15 322/19 323/10 323/10 332/24 333/1 333/3 334/8 334/8 334/10 334/13 336/1 338/15 397/8 410/22 410/25 411/1 411/14 411/17 411/18
**mailbox [8]** 325/4 325/6 325/7 326/13 326/16 326/19 335/23 336/2
**mailed [1]** 338/13
**mails [12]** 325/8 326/18 333/18 333/23 335/10 335/13 336/11 336/22 337/6 348/3 348/7 348/8
**main [1]** 383/4
**maintained [1]** 294/18
**major [1]** 364/21
**majority [1]** 304/3
**make [34]** 277/15 277/18 277/22 283/19 283/21 286/13 300/2 309/16 309/17 316/1 318/4 318/7 324/24 344/23 354/11 361/3 368/21 370/5 370/8 371/21 379/4 414/4 423/8 439/3 440/24 446/1 448/13 448/17 449/20 453/9 454/25 456/21 457/23 460/5
**makes [2]** 408/25 450/23
**making [8]** 285/21 309/10 311/4 343/11 356/19 356/21 388/15 393/21
**male [9]** 422/8 422/11 422/19 423/21 424/19 425/9 426/14 427/9 436/2
**males [4]** 375/5 375/16 376/17 378/10
**malevolently [1]** 458/5
**man [5]** 422/10 422/23 426/24 428/14 433/17
**manage [2]** 316/24 338/6
**management [3]** 275/18 358/11 361/13
**manifest [1]** 377/3
**manners [1]** 455/4
**MANNING [31]** 271/8 273/7 278/6 283/18 287/22 289/6 293/19 298/7 313/13 313/22 314/2 314/20 327/13 329/9 337/25 345/12 349/7 354/7 355/15 362/1 364/8 365/3 444/23 446/8 446/15 447/15 448/22 451/17 454/22 455/10 460/6
**many [21]** 293/7 296/23 299/10 305/15 306/8 331/1 333/21 340/7 349/5 371/9 373/3 375/1 375/4 375/15 376/6 376/6 384/20 417/16 418/7 429/10 456/3
**margin [1]** 283/2
**Maria [5]** 431/1 431/2 431/3 431/3 431/9
**mark [3]** 365/21 365/21 413/16
**marked [1]** 317/25
**markings [1]** 399/25
**married [2]** 429/24 430/3
**marrying [1]** 435/13
**match [4]** 431/25 432/16 433/13 434/25
**matched [1]** 431/1
**matches [2]** 433/5 433/6
**material [1]** 445/15
**materials [1]** 449/17
**math [3]** 387/20 387/23 418/1
**matter [4]** 310/20 314/21 366/23 448/13
**matters [4]** 447/11 447/14 447/14 448/14
**may [60]** 275/1 280/4 283/13 283/14 292/6 292/25 293/10 297/4 297/4 299/5 299/17 302/17 307/11 310/11 310/17 311/22 314/8 317/22 318/7 334/2 336/23 337/12 339/11 347/1 348/15 348/19 354/7 358/3 358/18 360/25 370/6 370/19 371/1 376/16 378/21 379/25 382/24 383/12 386/25 400/21 409/2 426/12 440/10 442/9 442/9 442/25 443/13 447/18 447/23 450/19 453/7 453/7 454/9 457/19 457/19 457/20 457/22 458/17 458/22 459/18
**maybe [22]** 294/12 298/6 315/18 336/19 367/8 367/11 384/22 389/20 391/15 392/10 413/1 413/3 418/9 431/10 441/15 445/14 450/25 452/12 457/24 458/8 458/15 458/15
**me [95]** 273/22 274/5 275/2 275/7 280/5 280/20 287/7 290/16 292/5 296/5 296/6 301/21 304/17 309/9 309/10 311/3 316/21 316/25 317/6 319/21 324/6 324/20 328/11 333/9 337/2 338/3 338/17 341/18 342/7 346/23 348/18 360/10 360/11 364/15 366/20 366/24 366/24 366/24 368/22 370/2 372/19 373/21 374/8 377/11 377/13 377/14 377/18 379/5 379/21 389/9 393/12 395/14 398/8 403/14 404/7 404/11 404/13 405/2 408/25 411/24 412/11 412/15 412/17 416/12 420/17 422/20 423/8 424/2 424/18 424/21 425/19 426/9 426/17 427/4 427/5 427/9 427/13 427/15 427/17 430/4 430/9 430/23 431/3 436/10 437/13 438/8 440/20 440/20 441/11 442/2 450/4 451/25 456/16 457/18 458/25
**mean [38]** 276/3 282/6 308/10 309/24 310/24 311/8 313/2 313/15 333/2 337/6 344/1 344/11 344/13 351/7 351/7 356/21 358/10 360/24 372/5 372/6 376/9 376/21 378/21 379/22 382/12 383/22 407/14 413/12 416/17 422/1 429/17 448/24 449/21 450/4 450/6 450/17 458/12 458/21
**meaning [3]** 376/2 377/13 439/24
**means [6]** 334/22 376/25 418/23 446/15 456/11 461/10
**meant [2]** 412/24 426/16
**meantime [2]** 321/17 368/19
**mechanism [1]** 293/5
**medical [2]** 361/11 364/21
**medications [1]** 275/3
**meek [1]** 311/16
**meet [5]** 372/22 373/8 374/8 379/12 379/14
**meeting [4]** 377/6 377/7 378/24 381/10
**meetings [4]** 405/16 405/17 405/18 405/21
**member [4]** 412/18 414/9 435/12 449/21
**members [2]** 304/14 440/14
**memorized [2]** 352/14 352/19
**memory [1]** 377/8

## M


**men [2]** 375/7 375/13
**mention [4]** 287/14 287/18 288/21 303/10
**mentioned [23]** 282/22 325/18 329/16 330/25 332/24 344/19 346/2 348/10 392/25 399/15 401/17 406/10 407/6 407/20 408/10 410/16 416/25 417/13 420/21 435/5 436/22 445/8 445/11
**mentions [1]** 399/23
**mercy [1]** 454/2
**merits [3]** 448/19 450/21 451/11
**Mesa [1]** 420/10
**message [4]** 390/10 395/9 395/13 406/7
**methods [1]** 407/16
**Mexican [2]** 372/18 420/17
**Mexico [1]** 298/4
**mic [3]** 322/25 373/22 373/23
**microphone [5]** 323/1 331/21 371/20 386/19 386/21
**Microsoft [2]** 406/12 406/13
**middle [2]** 298/17 320/6
**midpoint [1]** 351/10
**midway [2]** 289/24 350/21
**might [18]** 282/13 283/8 287/7 335/1 338/2 341/22 353/22 365/22 367/11 367/25 384/22 403/5 438/25 449/20 450/13 450/13 454/15 457/21
**miles [2]** 376/6 434/13
**military [2]** 420/20 420/22
**mind [6]** 292/4 307/12 432/10 437/5 441/6 450/1
**minute [7]** 293/16 340/13 354/23 360/4 368/8 447/13 455/13
**minutes [20]** 318/11 318/14 318/15 318/21 326/15 337/24 367/8 367/9 368/10 368/15 368/18 368/19 378/12 380/7 381/3 445/12 445/14 445/16 445/17 449/25
**Miranda [1]** 292/10
**mischaracterization [1]** 438/23
**mischaracterizing [5]** 357/19 358/24 359/10 362/4 438/18
**miss [1]** 275/1
**missed [1]** 445/1
**mission [1]** 398/19
**misstated [1]** 442/9
**mistake [6]** 274/25 285/18 285/21 285/23 380/13 403/22
**mistakes [3]** 274/22 274/24 331/23
**mix [1]** 375/13
**mobile [6]** 430/12 430/23 431/22 432/9 432/24 433/13
**modifications [1]** 283/21
**modify [2]** 336/10 336/15
**moment [12]** 274/10 285/11 301/22 309/5 324/12 325/17 334/2 358/6 364/9 400/21 459/20 459/22
**Monday [1]** 456/11
**months [5]** 371/8 371/15 371/18 382/11 455/22
**moot [1]** 448/2
**more [38]** 275/6 276/11 278/4 283/22 288/18 291/13 292/8 292/9 292/22 307/15 309/8 354/8 355/16 367/9 375/5 376/17 380/16 384/9 384/22 384/22 393/3 394/20 395/20 395/21 401/21 407/7 414/21 424/6 427/11 434/13 441/1 441/3 441/20 445/10 448/12 457/7 458/1 459/18
**morning [16]** 287/9 303/20 319/22 320/21 367/3 383/11 383/12 389/6 389/17 390/18 391/20 405/17 412/8 412/13 413/6 426/18
**most [7]** 278/1 286/4 371/6 389/24 395/9 413/19 459/3
**mostly [2]** 418/12 442/19
**motion [23]** 446/17 446/19 446/20 447/6 447/8 447/8 447/12 448/1 448/2 448/16 448/20 449/5 449/6 449/6 449/13 449/15 449/20 450/5 450/6 450/18 456/18 460/2 460/2
**motions [5]** 450/18 450/19 452/9 456/18 460/14
**mouth [1]** 432/20
**move [10]** 310/25 315/24 322/25 363/11 371/20 379/21 384/9 386/20 448/13 449/10
**moved [2]** 383/3 430/15
**moving [2]** 291/12 365/21
**Mr [1]** 294/13
**Mr. [56]** 273/7 278/6 283/17 283/18 287/22 289/6 291/23 293/16 293/19 298/7 313/13 313/22 314/2 314/18 314/20 315/1 327/13 329/9 335/19 337/21 337/25 345/12 349/7 354/7 355/15 357/17 360/5 360/11 362/1 364/8 365/3 369/25 370/22 381/24 385/11 385/15 439/17 441/5 443/8 444/5 444/17 444/23 445/5 446/8 446/15 447/1 447/15 447/17 448/22 451/17 453/12 454/15 454/22 455/10 455/19 460/6
**Mr. Manning [30]** 273/7 278/6 283/18 287/22 289/6 293/19 298/7 313/13 313/22 314/2 314/20 327/13 329/9 337/25 345/12 349/7 354/7 355/15 362/1 364/8 365/3 444/23 446/8 446/15 447/15 448/22 451/17 454/22 455/10 460/6
**Mr. Ratcliffe [25]** 283/17 291/23 293/16 314/18 315/1 335/19 337/21 357/17 360/11 369/25 370/22 381/24 385/11 385/15 439/17 441/5 443/8 444/5 444/17 445/5 447/1 447/17 453/12 454/15 455/19
**Mr. Ratcliffe's [1]** 360/5
**Ms [1]** 418/21
**Ms. [28]** 284/8 284/11 289/9 301/13 310/6 313/10 314/15 315/18 317/2 317/10 319/22 329/11 337/22 337/25 339/7 339/11 339/15 364/6 364/24 368/22 409/3 416/21 418/16 444/1 444/7 444/23 446/8 460/6
**Ms. Garcia [8]** 329/11 337/25 409/3 444/1 444/7 444/23 446/8 460/6
**Ms. Garousi [17]** 284/8 284/11 289/9 301/13 310/6 313/10 314/15 317/10 337/22 339/7 339/11 339/15 364/6 364/24 368/22 416/21 418/16
**Ms. Paget [3]** 315/18 317/2 319/22
**MTK [2]** 270/7 461/4
**much [15]** 289/4 365/13 378/13 384/11 385/2 385/6 395/19 419/9 434/6 446/5 451/17 453/5 455/19 457/2 457/4
**multiple [10]** 279/11 285/2 285/21 308/23 325/22 325/24 330/25 349/9 374/24 432/7
**multiples [3]** 324/24 325/18 325/19
**must [3]** 352/16 353/8 353/12
**MUSTAFA [1]** 270/16
**muster [1]** 446/6
**muted [2]** 317/1 317/3
**my [87]** 274/5 276/22 277/14 280/25 285/15 285/21 286/2 286/11 288/17 290/16 292/13 292/15 292/19 297/8 301/25 304/8 304/13 307/8 311/13 314/10 316/2 321/9 322/11 328/4 334/24 336/10 336/20 337/24 341/12 348/1 349/19 353/3 353/4 353/24 355/13 359/18 360/15 360/16 363/5 363/9 364/5 366/5 366/18 369/14 370/11 371/1 373/8 374/8 377/8 378/8 380/13 383/22 393/20 401/8 403/14 418/2 420/17 420/24 420/24 421/10 422/19 422/22 423/12 423/24 424/8 425/7 425/7 430/11 430/11 430/23 432/16 435/9 435/12 435/15 442/9 442/20 442/25 443/5 450/1 453/9 453/18 454/10 455/14 457/6 457/7 459/22 460/10
**myself [1]** 424/12


## N


**name [46]** 274/2 289/11 289/18 289/18 294/22 319/23 322/18 327/21 328/2 328/4 347/10 348/6 348/14 377/14 377/16 377/21 390/25 391/3 391/7 391/9 392/6 392/10 395/2 398/14 398/18 398/22 399/3 399/7 399/7 404/20 414/7 414/17 414/20 415/5 415/17 415/19 425/11 428/10 428/13 429/21 430/8 431/12 431/13 435/8 440/20 443/8
**named [3]** 351/14 449/21 449/22
**names [5]** 322/17 348/10 398/16 400/16 412/17
**narrative [33]** 273/21 280/10 324/7 324/19 324/20 325/10 325/19 326/20 326/21 331/12 331/23 335/22 335/22 335/24 335/24 335/25 336/5 336/6 344/21 344/23 345/1 397/24 397/24 398/11 399/23 400/18 401/9 409/24 410/4 410/7 410/18 410/21 459/16
**narratives [5]** 323/12 325/2 326/8 331/1 331/9
**narrowing [1]** 360/7
**national [2]** 277/4 277/11
**Nationality [3]** 294/3 350/4 351/13
**nature [5]** 275/25 276/1 276/15 276/17 276/19
**Nava [1]** 305/25
**near [4]** 290/8 381/11 422/8 426/3
**Nebraska [1]** 339/24
**necessarily [5]** 337/6 347/12 458/3 458/5 458/16
**necessary [7]** 292/23 292/25 293/1 293/3 293/4 317/12 317/13
**need [39]** 294/13 296/6 311/5 318/5

## N

**need... [35]** 318/6 318/11 318/18 327/2 337/6 339/9 366/11 375/2 375/4 375/5 375/16 376/11 376/13 376/14 377/18 378/6 380/1 381/19 411/9 424/21 428/18 430/21 434/6 438/18 438/23 445/25 446/14 447/5 447/11 447/14 448/8 452/12 454/6 454/23 458/19
**needed [11]** 284/1 285/24 326/23 358/5 359/23 360/21 366/3 374/25 383/1 411/2 413/24
**needs [7]** 294/15 353/13 365/24 366/1 370/8 376/18 380/17
**negative [2]** 289/24 422/14
**negotiate [1]** 454/6
**NELLY [1]** 271/4
**never [5]** 295/9 295/10 396/8 406/19 406/20
**nevertheless [1]** 458/5
**New [1]** 452/7
**next [11]** 310/13 311/20 318/9 343/24 369/11 378/3 380/6 386/1 396/5 422/5 435/25
**NGI [1]** 290/22
**nicely [1]** 348/18
**nickname [1]** 398/25
**nights [1]** 368/14
**nine [1]** 380/7
**no [137]** 270/7 272/2 273/18 273/20 284/14 287/20 289/17 290/13 290/16 290/24 291/2 291/3 291/8 292/12 293/23 294/14 295/18 296/18 296/21 298/24 299/2 301/19 303/9 305/17 306/6 306/9 307/7 309/3 310/1 310/3 310/7 310/7 313/9 313/12 314/13 314/16 315/3 316/1 317/19 323/5 323/5 323/19 325/12 328/1 329/25 330/2 330/14 331/14 332/20 333/25 334/15 334/19 334/20 334/21 342/10 344/22 346/3 346/6 346/16 346/18 352/5 352/14 353/20 354/11 354/15 355/13 357/7 358/2 360/19 362/10 362/12 362/18 363/18 363/19 363/19 364/5 364/7 364/22 364/25 365/4 366/8 366/12 370/15 370/21 370/24 373/19 374/7 382/20 385/12 385/13 385/17 390/2 390/4 393/24 394/2 395/13 398/20 399/14 402/8 402/23 403/6 404/4 404/23 405/4 405/9 406/5 409/11 410/15 411/20 412/14 413/10 415/15 417/6 417/7 418/15 418/17 418/22 421/16 421/18 422/14 427/17 428/10 429/6 432/6 435/22 437/15 439/9 440/3 442/24 444/8 444/20 446/12 447/16 447/18 455/22 461/4 461/17
**nods [1]** 316/10
**noncitizens [2]** 287/15 356/3
**noncriminals [1]** 344/3
**none [2]** 290/11 336/9
**nonimmigrant [4]** 283/3 299/21 300/3 300/6
**nonresponsive [1]** 293/18
**nonverbal [2]** 431/7 431/16
**nonverbally [1]** 431/7
**Noon [1]** 369/1
**normal [4]** 289/15 381/21 382/2 407/23
**normally [1]** 441/24
**North [1]** 393/5
**nose [1]** 432/20
**not [243]**
**note [2]** 345/9 445/6
**notes [2]** 360/16 366/5
**nothing [9]** 287/24 326/9 329/8 368/10 382/6 382/22 432/21 436/20 443/24
**notice [20]** 283/8 285/18 296/15 302/19 303/21 352/16 353/1 353/5 353/8 353/8 353/13 353/23 354/2 354/4 354/11 354/15 354/19 355/10 355/13 357/2
**noticed [3]** 429/11 429/21 436/5
**notices [2]** 353/25 355/10
**notification [2]** 300/17 302/14
**notify [2]** 424/15 435/16
**Noting [1]** 313/14
**November [6]** 279/17 305/16 340/18 348/24 355/10 388/11
**November 12th [1]** 388/11
**November 14th [2]** 340/18 348/24
**November 15th [2]** 279/17 305/16
**now [40]** 276/19 281/3 285/25 286/14 297/16 298/15 307/13 310/13 313/24 314/2 319/5 319/21 321/24 325/8 326/16 351/20 351/25 356/20 359/17 359/18 361/3 363/11 365/23 366/1 376/20 381/4 386/18 392/2 394/25 412/16 416/2 419/8 440/4 445/10 445/23 449/2 450/4 451/14 455/3 459/9
**NTA [1]** 356/25
**nuance [1]** 363/22
**number [12]** 285/6 327/17 328/23 342/19 345/16 366/17 374/24 391/12 394/25 414/24 415/3 432/18
**numbers [2]** 375/9 384/12
**NWIPC [1]** 374/19

## O

**o'clock [5]** 293/12 311/9 381/12 382/2 382/3
**oath [1]** 374/3
**object [8]** 303/13 332/3 354/21 354/25 417/18 438/18 438/22 447/2
**objecting [3]** 332/7 332/9 332/10
**objection [37]** 293/17 294/11 295/11 301/14 305/18 306/25 330/12 330/17 331/6 331/17 331/25 332/15 349/6 352/18 357/14 357/17 357/19 358/24 359/9 360/1 362/4 379/18 379/19 402/11 402/15 402/21 411/4 411/7 418/3 423/5 428/17 428/24 429/1 429/2 439/2 446/25 447/4
**objection's [1]** 418/4
**objectionable [1]** 439/4
**objections [8]** 310/10 334/18 334/20 365/3 385/16 418/21 444/7 452/10
**objective [1]** 398/19
**observations [8]** 439/20 440/8 440/14 441/21 442/11 457/2 457/15 458/16
**observe [1]** 425/23
**obtained [2]** 277/1 293/24
**obtaining [1]** 283/10
**obviously [2]** 308/12 344/25
**occur [1]** 306/16
**occurred [5]** 319/21 370/2 394/1 400/6 402/9
**occurrence [1]** 407/23
**occurring [1]** 390/5
**occurs [2]** 341/4 457/18
**October [21]** 279/17 284/18 291/5 300/24 303/20 305/16 321/6 323/15 328/14 330/1 335/17 340/16 348/22 355/10 371/24 388/9 388/19 421/10 421/11 421/12 441/9
**October 14th [5]** 279/17 305/16 388/9 421/10 421/11
**October 15th [2]** 340/16 348/22
**October 2025 [1]** 300/24
**October 30 [1]** 291/5
**October 30th [10]** 284/18 303/20 321/6 323/15 328/14 330/1 371/24 388/19 421/12 441/9
**off [28]** 286/9 304/19 309/6 315/12 316/17 317/7 317/23 318/16 332/22 334/4 348/1 352/22 382/4 392/15 393/10 394/14 400/23 402/2 403/15 405/5 415/12 417/12 419/6 421/23 421/24 421/25 429/10 451/22
**offense [2]** 450/9 450/13
**offer [7]** 288/18 299/7 304/13 315/2 344/2 457/13 458/24
**offered [3]** 304/12 304/15 319/25
**office [22]** 270/8 271/17 307/6 321/9 322/12 328/9 328/10 355/2 355/23 361/6 361/18 361/23 362/22 372/8 373/8 374/18 383/3 384/7 405/18 409/6 439/21 440/15
**officer [51]** 286/16 291/9 304/4 305/3 305/9 320/21 321/5 322/3 329/3 329/4 329/17 330/10 331/10 339/18 340/1 340/5 340/10 342/13 343/7 345/3 345/14 346/9 349/24 350/22 354/9 360/23 370/3 371/12 371/19 387/3 387/11 387/15 387/22 388/1 392/19 399/11 400/19 402/5 403/17 404/13 404/14 405/7 405/14 406/25 407/1 416/25 418/7 419/21 420/3 420/24 421/1
**officers [40]** 285/4 304/15 308/16 323/13 325/24 328/6 328/9 328/18 328/23 330/11 349/18 351/17 352/5 383/11 390/1 390/7 393/20 393/25 394/13 395/18 397/13 397/19 399/24 400/17 401/1 410/17 410/17 414/10 441/17 442/1 442/4 442/5 442/10 442/10 442/17 442/17 457/10 458/11 458/19 458/25
**officers' [1]** 417/16
**official [6]** 302/14 350/24 398/24 424/4 460/5 461/16
**officials [1]** 312/3
**often [4]** 277/16 308/19 353/25 416/9
**oftentimes [2]** 312/9 391/15
**oh [13]** 301/19 320/2 324/6 331/20 342/9 366/24 367/16 387/8 395/18 405/2 415/4 421/10 429/3
**okay [166]** 274/15 276/23 278/2 279/13 286/18 286/22 287/1 287/5 288/2 289/18 289/23 290/23 295/24

## O


**okay... [153]** 298/7 298/22 300/16 300/21 309/4 313/4 314/24 315/22 315/25 316/12 317/24 320/2 320/7 323/6 324/2 324/10 325/13 326/1 326/5 327/10 330/20 331/12 332/21 333/10 333/25 334/16 335/7 335/17 335/18 336/8 337/5 337/11 337/25 338/6 338/12 339/12 340/10 341/4 342/11 342/13 342/16 342/18 343/18 344/16 345/3 346/23 350/13 350/17 352/24 353/18 354/6 355/15 358/12 359/15 367/1 367/11 374/16 375/18 377/20 378/7 378/23 379/2 379/11 380/10 383/22 385/9 385/23 386/23 388/1 388/8 388/16 389/4 389/4 390/7 390/16 391/11 391/14 391/23 392/13 392/19 392/25 393/2 393/7 393/12 393/17 393/21 394/9 395/14 396/2 396/16 396/16 397/17 397/21 398/2 398/11 398/21 399/6 399/9 399/19 399/23 401/15 401/21 403/7 403/11 404/24 405/9 405/20 406/1 406/6 406/10 407/1 407/6 407/16 407/19 408/6 408/9 408/19 409/14 409/17 409/21 410/10 410/14 410/16 411/19 413/5 414/1 414/19 415/1 415/4 415/6 415/25 416/6 416/13 416/20 418/13 419/2 421/10 421/11 422/21 423/18 427/12 427/18 430/6 432/23 433/8 434/22 440/5 440/7 441/4 441/12 450/16 452/24 455/10
**old [1]** 388/16
**Omaha [1]** 339/24
**once [18]** 283/11 308/20 341/7 341/11 346/6 361/17 364/2 377/2 386/6 394/9 395/22 396/16 415/2 415/6 415/18 415/19 415/21 447/6
**one [59]** 278/10 280/2 281/11 281/13 286/15 289/8 291/13 292/4 292/5 294/21 296/23 301/10 304/13 305/1 306/20 306/20 310/25 312/6 322/14 326/2 327/3 331/4 332/13 335/9 347/16 349/19 350/17 367/2 368/6 368/16 373/15 375/20 377/8 381/17 383/22 384/9 384/9 393/3 393/20 398/15 399/22 401/1 404/4 404/5 407/2 408/17 408/24 411/23 414/10 414/24 418/1 422/8 422/24 432/13 447/25 448/11 449/19 453/3 459/18
**ones [3]** 377/8 400/20 441/8
**ongoing [2]** 277/11 305/25
**only [18]** 280/10 284/12 287/11 293/12 304/3 304/4 315/23 319/22 328/23 373/22 375/1 400/20 404/9 405/24 421/1 424/20 437/3 448/16
**open [4]** 273/4 369/4 447/25 449/14
**opened [1]** 368/19
**opening [2]** 450/10 452/5
**operation [33]** 273/24 274/2 274/4 330/20 330/23 333/18 335/13 336/22 336/25 337/3 337/7 337/9 347/7 347/10 347/13 347/19 347/20 348/4 348/4 348/6 348/14 364/5 389/23 398/12 398/13 398/14 398/16 398/21 398/22 399/1 399/7 399/11 399/20
**operations [9]** 270/9 320/23 330/7 335/16 337/9 347/16 347/17 407/25 417/5
**opportunity [10]** 280/8 299/6 304/13 304/15 313/14 336/12 344/3 344/5 446/6 447/23
**opposed [3]** 309/1 427/24 443/16
**opposing [3]** 318/4 448/6 455/4
**opted [1]** 354/22
**option [3]** 297/14 299/11 300/9
**oral [2]** 362/15 362/21
**order [13]** 291/11 334/24 344/15 366/25 367/2 392/11 409/22 421/21 424/7 430/10 444/11 455/13 457/14
**ordering [1]** 335/12
**OREGON [15]** 270/2 271/22 283/2 320/24 340/11 340/12 340/15 363/23 363/24 388/8 388/10 420/11 434/21 459/17 461/17
**organizations [2]** 277/3 277/17
**original [2]** 311/19 461/11
**originally [1]** 377/14
**ORJUELA [9]** 271/4 329/11 338/1 409/3 418/21 444/1 444/7 444/24 446/8
**Otay [1]** 420/10
**other [104]** 273/15 277/4 277/16 277/17 277/24 278/22 278/25 279/4 279/23 280/4 280/19 282/19 282/24 285/16 290/20 293/13 298/1 303/9 305/4 310/4 310/7 312/3 312/18 314/13 315/1 322/19 324/12 328/11 331/23 335/16 336/3 340/4 343/20 346/3 346/12 346/25 347/17 347/17 348/9 352/5 353/7 358/4 360/8 361/15 362/10 362/12 363/16 363/19 368/1 375/22 375/22 375/24 378/20 384/14 384/15 384/18 385/11 387/14 387/16 390/7 391/25 391/25 396/8 396/8 396/11 397/1 397/4 401/2 401/10 405/21 406/23 407/11 407/16 408/17 408/23 409/15 414/21 414/22 414/23 416/15 416/16 417/8 422/8 425/22 426/8 427/25 431/2 432/5 436/3 440/23 442/4 442/10 442/17 443/8 444/12 444/17 444/20 445/21 447/11 447/13 448/14 448/16 453/24 460/3
**otherwise [5]** 280/3 314/23 357/9 361/17 438/24
**our [52]** 301/10 305/20 307/10 309/16 310/15 311/19 315/14 317/16 318/9 325/7 335/23 336/17 337/16 338/7 340/13 345/1 348/6 366/13 383/4 390/20 394/13 394/14 394/19 395/9 395/18 396/10 396/18 396/19 396/24 397/2 397/13 404/5 405/17 405/23 406/3 406/3 414/10 414/21 415/20 424/10 425/24 427/13 435/7 437/12 446/19 449/5 449/6 453/23 455/6 455/6 457/24 457/24
**out [89]** 280/2 298/1 306/19 310/19 311/23 328/14 328/20 329/23 338/14 342/4 344/4 344/17 349/12 367/18 368/2 372/11 374/25 375/2 375/3 375/5 376/14 378/6 378/12 379/11 380/24 386/3 388/14 390/24 391/9 393/16 393/19 394/5 394/14 394/20 394/22 395/16 395/25 396/5 396/24 397/2 397/6 397/7 400/7 400/14 401/5 401/18 401/23 403/8 404/3 408/10 408/13 409/14 410/5 413/14 413/17 413/24 414/14 414/16 416/4 420/11 420/18 420/19 420/24 421/17 421/19 422/17 424/12 426/1 426/2 428/12 429/6 429/8 429/20 430/8 430/11 431/23 433/15 435/2 436/4 436/6 436/9 437/8 437/11 439/23 440/19 441/11 445/22 451/23 459/14
**outside [11]** 304/10 362/19 364/21 377/10 378/20 395/4 404/24 405/2 437/25 451/3 451/4
**over [24]** 321/19 321/24 339/6 340/9 356/1 367/14 368/14 369/14 373/5 383/15 387/25 390/12 404/4 404/21 410/21 420/5 420/23 426/23 427/8 428/19 429/12 436/7 438/4 456/11
**overhead [1]** 315/14
**overruled [12]** 281/20 294/12 295/12 306/4 307/1 330/13 349/14 359/11 359/12 402/22 418/5 423/6
**oversaw [1]** 341/18
**overstay [2]** 346/6 436/11
**overstayed [4]** 282/10 283/1 343/17 346/3
**overstepping [1]** 456/25
**overview [1]** 341/4
**own [3]** 380/13 453/6 453/23


## P


**p.m [18]** 352/22 364/12 369/1 369/4 382/4 382/5 382/18 392/15 393/10 400/23 400/24 402/2 402/3 403/15 405/5 419/6 451/22 460/20
**package [2]** 312/25 416/2
**packet [2]** 341/12 342/2
**page [18]** 272/2 275/1 275/2 280/11 285/19 286/15 286/22 287/1 287/1 289/8 290/6 290/7 294/21 300/12 327/14 343/18 398/3 398/4
**Paget [3]** 315/18 317/2 319/22
**pail [1]** 426/6
**pain [2]** 430/18 430/18
**PAOLA [1]** 271/4
**papers [2]** 314/7 460/12
**paperwork [10]** 312/24 341/25 342/4 355/23 355/24 356/2 435/12 436/4 441/21 442/13
**paragraph [11]** 275/24 276/3 276/6 276/13 276/21 281/5 281/9 281/22 324/11 374/9 400/5
**paragraphs [5]** 275/4 275/5 275/7 278/9 283/20
**parameters [1]** 399/12
**parents [1]** 420/17
**parked [1]** 418/10
**parking [1]** 408/1
**part [30]** 273/24 320/25 330/20 330/23 337/8 347/7 348/13 348/14 348/25 349/3 349/23 349/24 353/5 363/6 372/5 379/21 389/4 389/24 389/25 389/25 397/14 398/12 399/20 406/5 406/6 412/8 424/10 435/17 443/21 443/21
**particular [11]** 301/1 304/7 314/5 333/8 342/4 344/9 352/12 356/20

**P**

**particular... [3]** 357/1 376/21 392/11
**particularly [1]** 457/9
**parties [6]** 310/18 446/16 448/15 453/4 453/19 455/18
**parties' [1]** 455/14
**pass [2]** 334/9 334/13
**pass-through [1]** 334/13
**pass-throughs [1]** 334/9
**passed [2]** 335/22 417/20
**passenger [2]** 422/16 438/9
**passing [3]** 325/15 326/9 443/1
**past [4]** 383/22 447/18 447/22 456/2
**paste [4]** 278/23 279/2 279/6 279/9
**pasted [4]** 273/22 278/10 279/8 345/1
**pathways [1]** 449/11
**patience [1]** 309/9
**patted [1]** 341/8
**pattern [1]** 305/21
**Pause [1]** 364/12
**paying [1]** 446/4
**penalty [1]** 367/19
**pendency [1]** 319/11
**pending [2]** 332/11 460/8
**people [49]** 279/23 282/7 282/8 287/25 307/5 308/14 308/20 312/3 312/13 328/17 335/5 356/3 360/13 361/5 361/23 362/21 363/6 363/14 363/16 363/18 364/1 364/18 372/16 372/20 372/21 382/13 383/1 383/2 384/17 384/20 391/17 394/3 394/11 394/13 394/19 395/20 396/8 396/11 401/2 401/10 424/4 425/8 426/8 427/15 437/25 440/23 441/19 458/3 458/8
**people's [1]** 283/11
**percent [3]** 278/4 328/3 432/21
**percentage [3]** 277/21 278/3 432/25
**perfect [1]** 311/13
**performing [1]** 355/9
**perhaps [2]** 367/12 458/8
**period [4]** 279/13 279/16 335/17 338/7
**periods [1]** 303/23
**permission [1]** 435/4
**permit [4]** 434/12 434/14 434/18 434/20
**person [23]** 279/21 312/25 322/19 326/22 326/25 327/2 328/4 336/6 344/14 346/1 359/23 391/4 404/7 412/20 412/20 421/24 421/25 422/19 430/24 431/13 433/6 435/5 457/5
**person's [1]** 333/8
**personal [2]** 308/5 325/8
**personally [2]** 288/3 403/25
**perspective [1]** 418/19
**pertinent [1]** 343/12
**petition [20]** 435/13 446/23 447/6 447/12 448/1 448/4 448/17 448/20 449/16 449/18 450/4 450/4 450/10 450/20 450/25 451/1 451/11 451/16 452/23 457/21
**petitioner [85]** 270/6 271/3 271/7 275/19 276/4 276/7 277/1 281/24 283/22 284/21 287/6 288/23 288/24 290/25 291/21 298/20 298/22 302/19 302/19 303/10 304/7 307/14 309/20 313/6 314/5 321/9 326/2 331/2 339/9 343/3 343/13 343/15 343/16 346/2 346/10 346/13 351/22 354/12 354/16 354/20 355/11 357/2 370/17 373/6 377/5 377/25 378/15 379/6 379/7 379/7 380/5 380/8 380/16 380/19 390/1 390/3 390/8 395/12 395/16 395/25 397/25 398/11 399/19 403/25 404/9 404/12 404/16 405/7 421/15 422/4 422/10 423/10 427/23 428/4 432/8 439/13 440/4 440/5 440/16 445/12 448/11 448/19 454/13 455/16 457/20
**petitioner's [25]** 274/7 275/6 275/21 282/1 286/3 286/15 289/9 294/21 298/10 300/13 300/25 301/4 302/6 304/22 345/20 345/22 350/14 377/16 449/23 452/4 452/22 453/15 454/5 454/12 454/20
**petitioner's exhibit [7]** 286/15 289/9 294/21 300/13 302/6 304/22 350/14
**petitioners [1]** 382/12
**phone [8]** 304/14 413/16 413/20 413/21 413/22 414/4 414/5 430/11
**photo [5]** 430/13 430/13 430/22 430/22 431/11
**photograph [3]** 433/2 433/3 433/5
**photographs [3]** 416/6 416/9 416/14
**PI [1]** 449/15
**pick [1]** 373/22
**picked [3]** 386/22 426/1 426/5
**picture [1]** 395/10
**pictures [1]** 432/1
**pink [1]** 443/9
**pinpointed [1]** 458/11
**place [11]** 306/23 328/24 334/25 341/1 354/1 374/20 375/12 375/23 392/7 398/4 444/13
**placed [4]** 297/24 344/24 404/6 412/21
**placeholder [2]** 328/5 330/3
**places [1]** 297/21
**plain [1]** 388/16
**plan [1]** 311/19
**planning [3]** 310/14 310/17 368/4
**planter [1]** 422/6
**plate [6]** 391/12 392/10 414/14 414/15 415/13 416/15
**plates [15]** 391/10 391/17 392/7 407/14 407/15 407/17 407/18 413/1 413/4 413/17 413/25 414/2 414/5 414/8 414/13
**play [3]** 383/24 445/23 450/22
**played [1]** 349/12
**please [31]** 302/13 314/2 320/7 320/13 338/20 338/25 339/7 339/10 348/17 349/15 359/14 359/16 360/10 369/7 369/13 369/21 379/1 386/8 386/14 393/3 395/1 398/3 400/2 419/1 419/16 443/3 453/10 454/16 456/19 460/8 460/17
**pled [1]** 458/18
**plus [2]** 384/11 426/7
**pocket [1]** 430/12
**point [27]** 275/12 310/15 316/5 335/9 336/17 336/20 349/19 372/12 376/14 378/14 392/7 395/21 396/4 397/1 426/20 428/15 428/22 429/5 430/1 431/2 432/3 432/7 435/20 447/19 448/18 450/8 458/9
**pointed [1]** 280/2
**poker [1]** 455/24
**policies [1]** 383/13
**policy [6]** 306/1 306/23 307/10 357/11 357/14 357/15
**port [4]** 419/22 420/10 420/11 434/13
**portion [8]** 302/8 324/7 324/15 325/22 329/4 331/23 381/5 410/4
**portions [2]** 325/19 331/13
**Portland [74]** 271/6 271/10 271/14 271/19 271/22 273/25 274/4 279/14 284/2 284/22 285/21 287/6 293/14 295/22 300/21 307/6 307/14 308/4 320/24 328/21 328/24 330/5 330/6 330/8 330/20 330/23 333/19 335/14 336/22 336/25 337/7 337/9 340/17 340/19 341/2 341/6 347/8 348/11 348/15 348/21 348/23 355/10 355/18 355/23 357/5 361/6 361/18 362/22 363/7 363/14 364/3 364/17 364/19 368/11 371/5 372/1 374/17 388/1 388/13 389/10 389/19 396/20 396/22 399/16 404/17 405/18 406/18 409/6 420/11 421/4 434/21 435/20 439/21 440/15
**pose [1]** 370/19
**posed [1]** 441/5
**position [3]** 321/4 371/18 420/2
**positions [3]** 340/4 387/14 420/5
**possibilities [1]** 299/13
**possibility [1]** 299/16
**possible [12]** 288/5 300/1 328/18 380/14 431/20 431/25 432/9 432/16 432/17 433/13 434/25 448/25
**possibly [4]** 276/10 391/5 408/3 446/6
**posture [1]** 458/14
**potential [3]** 372/22 372/24 390/17
**potentially [1]** 431/23
**practical [2]** 352/5 376/9
**practice [4]** 305/22 357/11 357/15 407/8
**preadmitted [1]** 445/7
**precautions [1]** 318/1
**prefer [1]** 296/9
**preliminary [3]** 449/7 450/18 456/19
**preparation [2]** 399/4 411/3
**prepare [2]** 307/4 308/20
**prepared [13]** 280/7 290/14 293/23 295/9 295/16 307/16 307/21 307/22 307/23 308/6 308/24 449/3 449/5
**preparer [1]** 327/24
**present [3]** 304/4 425/12 453/10
**presentation [1]** 304/1
**presented [5]** 298/20 298/22 356/4 356/9 449/5
**preservation [1]** 336/21
**pretty [2]** 312/9 378/19
**preventing [1]** 335/5
**previous [3]** 336/20 340/5 360/9
**previously [3]** 290/25 306/20 324/10
**primary [1]** 432/14
**Principal [1]** 355/2
**print [2]** 285/18 342/4
**printed [4]** 284/23 284/24 284/25 336/3
**prints [1]** 437/8

## P


**prior [13]** 291/4 291/5 291/9 301/10 303/25 308/3 308/25 340/6 359/21 364/19 370/18 383/12 387/15
**priority [3]** 310/15 377/15 377/16
**private [3]** 375/11 375/23 408/6
**Privilege [1]** 411/8
**privileged [1]** 355/4
**privileges [1]** 286/19
**pro [4]** 302/20 303/4 303/10 304/10
**pro bono [4]** 302/20 303/4 303/10 304/10
**probable [14]** 343/12 346/1 351/6 351/8 380/14 432/11 434/24 435/3 435/20 439/12 440/25 441/6 441/7 441/11
**probably [3]** 382/19 403/10 458/24
**problem [2]** 317/23 457/25
**problems [1]** 335/12
**procedural [2]** 447/11 447/14
**procedure [2]** 326/16 334/7
**proceed [5]** 310/19 358/18 371/1 386/25 449/23
**proceeding [3]** 306/22 315/9 448/20
**proceedings [13]** 270/15 272/3 273/3 334/24 343/13 343/14 351/13 352/10 364/12 365/9 419/1 456/22 461/10
**process [8]** 314/10 324/19 326/25 328/8 359/22 441/19 448/25 454/10
**processed [8]** 277/22 307/3 312/15 358/2 359/7 360/19 361/6 441/22
**processes [1]** 441/15
**processing [30]** 302/21 314/9 323/13 324/8 326/10 326/19 326/22 327/3 327/7 330/4 340/21 340/24 341/1 341/20 341/25 344/20 349/1 349/5 349/12 349/18 355/23 356/6 372/5 372/6 372/8 373/3 396/12 409/7 409/10 409/11
**produce [6]** 278/15 306/12 333/7 333/10 333/23 356/2
**produced [8]** 305/12 305/15 305/16 335/23 336/1 336/5 356/10 414/13
**producing [2]** 301/2 314/6
**production [2]** 336/17 411/14
**professional [2]** 277/14 311/3
**program [2]** 285/5 285/7
**progress [1]** 312/20
**projector [1]** 315/15
**promise [1]** 426/22
**pronoun [1]** 281/4
**proper [1]** 342/4
**properly [1]** 386/22
**propose [1]** 341/13
**proposed [9]** 356/20 357/1 357/3 453/1 453/1 453/20 453/25 454/14 455/17
**proposing [1]** 356/22
**Protection [1]** 419/24
**prove [1]** 458/20
**proved [1]** 458/18
**provide [11]** 302/25 303/2 380/15 380/16 400/17 411/3 411/9 411/13 411/13 428/10 446/2
**provided [25]** 292/22 300/18 301/9 302/15 302/16 302/19 302/23 303/9 303/21 319/4 336/13 353/1 353/4 354/20 355/11 358/23 397/3 400/17 401/1 406/1 409/6 409/9 410/14 410/21 412/14
**providers [2]** 302/20 303/11
**providing [1]** 428/12
**public [5]** 277/4 394/11 396/9 396/11 408/1
**pull [4]** 274/8 298/13 301/21 350/15
**pulled [2]** 305/1 417/4
**purpose [7]** 275/21 282/1 282/14 282/14 293/4 334/10 352/5
**purposes [2]** 310/17 352/10
**pursed [1]** 430/4
**put [20]** 283/20 311/19 328/4 328/5 343/11 344/14 345/10 345/12 368/6 378/14 379/9 379/12 380/5 396/3 399/19 399/21 403/1 406/3 426/6 448/6
**putative [1]** 449/8
**puts [1]** 451/25
**putting [3]** 380/20 393/19 459/12


## Q


**query [3]** 430/12 430/23 431/22
**querying [1]** 434/4
**question [64]** 276/18 280/5 282/7 282/15 283/20 287/16 287/23 287/24 288/3 288/9 291/13 293/19 295/14 306/5 316/7 331/18 331/19 332/2 332/4 332/8 332/9 332/10 332/13 332/17 336/16 348/18 348/19 349/8 349/10 349/13 349/15 353/11 355/3 355/5 359/2 359/14 359/15 359/17 359/18 360/17 381/23 401/8 402/12 402/13 402/14 403/14 403/21 413/16 413/17 418/4 420/13 424/25 428/1 428/2 428/18 428/19 434/15 438/5 439/3 439/16 441/5 441/24 442/3 442/10
**questioning [3]** 316/9 366/13 437/19
**questions [54]** 277/6 277/20 288/25 291/15 292/10 293/15 301/23 304/13 309/8 309/17 310/4 310/7 312/7 313/11 313/24 314/1 314/13 314/21 317/9 318/2 332/11 333/25 334/15 335/10 339/7 339/9 339/10 339/11 340/10 341/21 346/18 354/7 355/16 362/10 362/12 363/5 367/15 382/21 385/11 405/9 409/3 411/20 416/21 417/7 417/8 429/16 429/23 430/2 435/7 437/13 437/15 439/9 441/4 443/1
**quick [2]** 280/9 377/19
**quickly [2]** 299/8 425/17
**quite [1]** 285/23


## R


**R-o-s-e [1]** 347/22
**R.F [21]** 272/12 367/4 367/9 386/2 386/5 386/10 386/16 386/17 387/3 388/1 392/19 399/11 402/5 403/17 405/7 411/22 411/24 416/25 418/23 422/17 437/20
**R1 [1]** 445/8
**radio [1]** 337/17
**raise [6]** 320/7 338/20 369/16 386/8 419/11 459/18
**rally [1]** 394/14
**rap [3]** 290/17 290/19 290/22
**rarely [2]** 323/5 346/16
**RATCLIFFE [26]** 271/17 283/17 291/23 293/16 314/18 315/1 335/19 337/21 357/17 360/11 369/25 370/22 381/24 385/11 385/15 439/17 441/5 443/8 444/5 444/17 445/5 447/1 447/17 453/12 454/15 455/19
**Ratcliffe's [1]** 360/5
**rather [1]** 320/6
**ratio [2]** 375/7 376/14
**Re [1]** 272/8
**Re-Cross [1]** 272/8
**reached [1]** 285/9
**reacted [1]** 425/9
**read [6]** 280/9 288/12 291/22 296/6 336/10 401/12
**reads [1]** 399/24
**ready [21]** 310/18 318/16 337/16 369/11 376/13 376/19 376/20 376/25 377/2 377/9 377/11 377/23 378/11 378/18 378/19 378/20 378/22 379/8 384/9 398/8
**real [1]** 377/19
**realization [1]** 437/9
**realize [6]** 289/13 309/14 368/10 403/18 417/11 443/15
**realized [2]** 436/14 437/24
**really [11]** 276/3 283/4 311/10 408/22 416/11 426/18 442/2 453/15 458/9 458/25 459/21
**realm [1]** 456/25
**reason [8]** 277/10 314/23 323/17 324/18 375/10 413/8 426/7 431/21
**reasonable [2]** 441/1 441/7
**reasons [2]** 366/4 375/13
**reassign [1]** 328/21
**rebuttal [5]** 368/5 368/8 446/8 446/9 446/11
**recall [28]** 279/18 284/10 290/17 303/15 304/6 314/20 331/9 334/10 346/16 347/12 349/20 370/13 380/11 380/14 380/15 380/18 380/19 381/1 381/7 381/14 388/12 395/12 420/12 428/12 431/12 436/24 445/10 445/11
**recalled [4]** 310/12 311/22 334/23 366/3
**receipt [1]** 283/13
**receive [8]** 278/20 299/17 326/20 331/2 333/15 333/18 357/5 389/17
**received [16]** 273/21 278/11 279/20 283/25 308/11 316/4 319/10 324/24 325/24 330/25 332/24 338/15 345/2 348/3 348/8 355/7
**receiving [3]** 325/2 326/8 341/9
**recent [1]** 371/6
**recently [1]** 368/15
**recess [3]** 318/22 368/24 369/1
**recipient [1]** 336/4
**recited [1]** 277/13
**recognition [3]** 430/12 432/16 440/19
**recognize [2]** 365/25 370/5
**recollection [2]** 313/8 377/4
**recommendation [3]** 356/21 453/1 455/1
**recommended [1]** 357/4

R


**record [49]** 275/10 277/7 281/11 288/13 288/15 289/23 290/3 290/13 292/9 292/22 298/16 304/19 309/6 315/12 316/17 317/7 332/22 334/4 339/1 341/13 342/22 342/25 352/22 361/4 370/9 370/20 382/4 392/15 393/10 400/23 402/2 403/15 405/5 419/6 444/12 446/5 446/13 448/13 449/9 449/25 450/3 450/7 450/10 450/10 450/12 451/22 454/1 459/9 461/9
**record's [1]** 379/4
**records [3]** 277/2 277/8 344/20
**recovered [1]** 438/14
**redacted [8]** 286/16 286/24 287/3 289/13 322/8 322/9 327/18 327/20
**redirect [6]** 272/8 299/6 334/5 416/23 443/4 443/11
**redirecting [1]** 360/7
**refer [5]** 276/13 350/10 361/4 379/3 397/23
**reference [4]** 317/23 337/7 350/11 359/20
**references [2]** 291/16 347/17
**referred [4]** 347/15 348/15 376/20 439/6
**referring [12]** 275/7 277/12 280/10 284/4 301/13 303/4 406/11 410/8 438/2 438/13 438/19 438/20
**refers [3]** 276/1 276/20 281/25
**refine [1]** 314/18
**reflect [1]** 275/6
**refusing [4]** 429/22 431/4 435/7 435/8
**regarding [18]** 279/22 318/11 333/18 336/11 356/24 357/6 360/22 370/10 372/8 374/3 375/23 376/5 381/6 399/12 432/10 446/22 448/17 448/18
**regulation [1]** 353/24
**regulations [4]** 350/7 350/7 364/19 375/25
**reinstatement [1]** 356/25
**relate [2]** 296/25 375/24
**related [7]** 333/8 336/22 337/8 348/9 348/10 350/7 374/10
**relates [2]** 355/1 448/11
**relating [4]** 298/1 314/21 401/2 440/3
**relation [1]** 276/11
**relayed [2]** 438/8 442/20
**release [8]** 295/10 295/17 295/19 296/25 297/1 298/1 364/2 364/18
**released [7]** 296/22 297/2 298/5 311/22 365/6 366/16 385/19
**releasing [1]** 444/10
**relevance [9]** 305/18 305/19 305/21 305/23 305/24 349/6 349/7 423/5 426/10
**relevant [3]** 310/17 425/24 445/15
**relief [2]** 299/3 300/11
**remain [2]** 299/14 315/21
**remaining [1]** 310/20
**remains [2]** 334/25 366/25
**remedy [1]** 457/21
**remember [43]** 279/7 279/19 279/24 280/1 284/3 285/20 296/7 296/13 303/3 314/8 340/17 343/9 345/7 347/18 347/25 359/17 359/18 388/8 388/10 388/21 388/25 389/18 390/9 390/20 391/2 391/11 391/22 392/5 397/24 405/8 405/15 408/3 408/4 409/9 410/24 424/19 430/3 430/15 431/1 431/14 438/9 439/17 440/10
**remind [1]** 393/12
**removability [1]** 293/6
**removable [2]** 343/13 346/1
**removal [8]** 270/9 299/1 320/23 343/13 343/14 344/15 351/12 352/10
**render [2]** 357/6 458/22
**rendered [1]** 457/15
**renew [1]** 402/15
**repeat [7]** 287/16 330/22 331/19 348/17 355/5 359/15 418/4
**repeating [1]** 336/19
**repetition [2]** 331/23 332/18
**repetitive [2]** 331/15 332/4
**rephrase [5]** 342/7 357/21 357/21 411/11 439/3
**replied [1]** 279/25
**Reply [1]** 456/16
**report [28]** 274/21 274/23 280/3 282/18 283/24 284/18 284/21 287/9 287/11 287/14 287/17 287/18 287/21 287/23 287/24 288/21 289/1 290/24 291/3 291/8 291/16 291/20 291/24 295/20 306/12 388/21 405/14 453/1
**reporter [3]** 271/21 423/16 461/16
**Reporter's [1]** 272/4
**reports [2]** 274/19 284/1
**representation [1]** 460/10
**request [3]** 299/16 304/17 357/4
**requested [3]** 333/9 333/10 333/23
**require [2]** 352/15 434/16
**required [2]** 306/21 307/2
**requirement [2]** 306/19 384/1
**requiring [1]** 444/11
**reread [1]** 291/22
**Reserves [2]** 420/20 420/23
**reset [1]** 332/12
**reside [1]** 277/18
**residence [1]** 295/7
**residing [1]** 283/2
**resolution [1]** 460/8
**resolvable [1]** 448/9
**resolve [4]** 366/1 448/7 450/20 451/10
**resolved [4]** 436/13 447/7 456/22 460/4
**resources [1]** 451/9
**respect [5]** 293/17 301/13 312/8 370/18 450/3
**respecting [1]** 357/2
**respond [3]** 430/1 431/4 431/9
**respondent [1]** 302/17
**Respondent's [1]** 321/12
**Respondents [9]** 270/10 271/11 271/16 272/8 320/11 338/23 369/19 386/12 419/14
**response [7]** 342/23 360/17 453/13 454/16 455/20 456/14 460/14
**responsibilities [3]** 329/19 329/20 397/18
**responsibility [3]** 339/23 387/5 397/14
**responsible [5]** 274/15 280/17 329/21 329/23 356/19
**rest [9]** 327/20 393/7 393/13 396/24 397/2 422/21 424/22 436/15 445/5
**restate [1]** 295/14
**restating [1]** 379/24
**restocked [1]** 368/13
**restrain [1]** 351/3
**restrictions [1]** 384/3
**result [2]** 436/15 443/15
**results [2]** 432/9 432/9
**retain [3]** 335/13 336/22 337/9
**retention [3]** 336/11 336/12 336/15
**retrieved [1]** 278/14
**return [12]** 285/20 293/9 297/11 297/14 298/4 309/25 343/25 344/3 344/7 356/25 357/4 365/24
**returning [1]** 368/23
**returns [2]** 433/2 433/3
**revealed [1]** 290/21
**reverse [1]** 457/14
**revert [1]** 311/19
**review [24]** 280/8 280/14 280/20 281/1 282/21 285/18 288/17 294/4 317/25 323/18 324/19 324/20 325/10 329/22 331/12 331/22 332/3 332/6 332/17 332/18 341/21 344/17 345/22 345/24
**reviewed [6]** 342/12 343/7 343/10 343/11 374/6 381/5
**reviewing [3]** 341/23 446/7 459/10
**revisit [2]** 314/24 361/2
**rewritten [1]** 275/5
**rhetorical [1]** 459/23
**rich [2]** 412/23 412/25
**riding [3]** 404/7 404/11 404/13
**right [161]** 273/7 273/10 273/25 274/10 278/6 279/14 284/16 284/22 286/16 288/11 289/12 289/19 289/21 289/24 290/3 290/11 292/5 295/2 295/22 296/19 296/22 297/23 300/22 302/3 303/2 303/23 304/1 304/24 305/6 305/10 305/13 306/3 308/14 309/13 311/18 311/21 312/6 312/11 313/10 313/18 314/17 315/4 315/8 315/11 316/6 317/4 318/15 318/19 318/21 318/25 319/3 319/5 319/17 320/5 320/8 325/8 327/12 327/16 328/21 329/7 334/22 335/9 337/12 337/12 338/20 339/14 340/24 343/19 344/17 347/8 347/24 348/5 348/16 349/1 349/3 350/1 350/4 350/18 351/3 351/23 352/6 356/11 357/13 359/18 361/3 361/15 362/19 363/11 364/6 365/5 365/13 365/15 366/15 366/17 366/20 368/7 368/21 368/24 369/13 369/16 370/22 370/25 377/18 377/18 377/22 378/5 378/14 382/20 384/6 385/10 385/14 385/18 385/25 386/8 390/16 391/14 392/2 392/13 392/13 392/25 396/2 399/17 401/19 403/13 406/1 412/4 412/7 413/15 415/21 416/20 419/4 419/8 422/4 422/13 423/9 424/8 425/4 425/8 425/10 426/14 428/10 429/16 429/16 430/8 431/5 434/3 434/8 439/2 440/12 441/2 441/13 441/25 444/9 444/15 444/23 445/4 446/13 446/14 446/17 447/5 456/17
**rights [6]** 298/16 298/19 298/19

## R


**rights... [3]** 303/22 424/16 458/12
**ripe [2]** 447/23 449/16
**risk [1]** 456/24
**RMR [2]** 271/21 461/15
**road [1]** 335/12
**role [5]** 325/1 325/2 340/2 349/24 424/4
**room [14]** 271/22 304/3 372/7 372/9 372/11 372/15 377/25 378/12 378/15 379/12 380/5 380/7 380/24 404/5
**roped [1]** 425/13
**rose [9]** 347/19 347/21 347/22 348/4 398/21 399/3 410/25 411/1 443/8
**roughly [6]** 327/16 371/12 373/3 421/7 421/9 445/16
**round [1]** 454/23
**route [1]** 447/10
**routine [1]** 306/10
**ruining [2]** 459/22 459/23
**rule [3]** 314/9 428/20 447/4
**rules [6]** 375/11 375/25 376/4 376/5 383/14 384/4
**run [19]** 344/20 361/12 361/15 374/22 374/22 375/4 375/19 375/19 376/1 383/12 392/7 414/2 414/13 414/15 414/20 415/5 415/9 415/20 416/18
**runner [1]** 445/20
**running [12]** 391/10 407/14 407/15 407/17 407/18 413/1 413/3 414/8 421/23 421/24 421/25 429/17
**runs [2]** 374/21 383/5
**rushed [4]** 292/14 312/9 312/12 314/6
**rushing [3]** 314/22 349/9 349/13


## S


**S.S [4]** 322/20 322/23 323/8 323/14
**S.S.'s [1]** 334/8
**S.W [5]** 271/5 271/9 271/13 271/18 271/22
**safe [1]** 337/5
**safety [5]** 277/4 375/12 394/12 395/21 396/14
**said [44]** 284/9 293/1 309/20 314/3 314/12 324/18 332/5 341/15 341/23 361/1 375/18 377/22 378/6 383/12 388/14 396/11 404/4 404/11 404/16 409/23 410/1 413/3 422/21 423/24 424/19 426/14 426/17 426/19 426/21 427/1 427/3 427/4 427/9 430/6 430/19 430/21 430/21 433/11 434/13 435/6 440/19 445/18 449/25 455/24
**salad [2]** 276/6 276/6
**same [17]** 287/8 287/9 288/18 317/22 317/25 325/21 352/16 366/25 367/10 381/11 381/23 389/7 401/11 401/12 401/13 409/22 437/20
**San [2]** 419/22 420/10
**sanctions [1]** 335/4
**satisfied [1]** 293/6
**saw [7]** 367/18 429/14 435/25 435/25 436/7 437/25 437/25
**say [54]** 281/2 282/23 289/1 295/19 298/16 302/18 302/22 305/15 308/22 326/12 335/24 337/5 338/25 339/18 342/24 343/14 343/24 344/10 347/18 348/8 353/16 355/21 372/21 377/7 378/25 382/19 383/10 384/7 385/8 396/12 402/18 404/19 404/22 413/2 418/9 423/11 423/18 423/19 423/20 426/24 428/1 428/15 428/22 432/17 435/10 436/25 436/25 438/20 440/20 441/10 451/21 455/13 458/7 460/7
**saying [13]** 287/23 378/6 378/16 379/5 390/10 393/16 400/14 423/10 427/24 431/1 431/17 431/18 436/24
**says [33]** 275/24 277/10 285/19 285/20 286/18 286/19 286/20 286/22 286/23 286/23 287/2 289/23 289/23 290/2 290/8 290/9 290/10 290/11 294/23 294/24 302/11 302/22 302/24 305/8 327/17 327/23 339/8 343/22 350/21 351/11 381/10 398/5 398/11
**scene [22]** 324/25 402/5 417/14 417/17 418/7 421/19 421/22 421/22 421/23 421/25 422/16 422/18 425/25 427/22 429/10 429/15 432/3 436/22 437/5 437/22 442/17 443/13
**schedule [2]** 383/1 451/15
**scheduled [1]** 310/18
**scheduling [3]** 446/15 447/8 448/25
**scope [4]** 293/7 314/17 417/19 417/21
**scored [1]** 420/18
**scratch [15]** 322/5 323/21 323/24 323/25 324/8 341/9 394/20 394/22 395/1 395/8 395/16 395/25 396/5 397/3 408/11
**screen [6]** 290/6 298/13 301/18 302/9 305/2 322/8
**screens [1]** 315/14
**scroll [2]** 290/5 393/3
**scrolling [1]** 290/6
**scrutiny [1]** 292/7
**SDDO [6]** 341/16 358/9 387/12 397/14 406/3 406/23
**SDDOs [3]** 349/18 357/9 358/6
**searched [1]** 341/8
**seat [4]** 320/14 369/21 386/14 419/16
**seated [1]** 369/7
**seats [3]** 375/1 375/8 375/15
**Seattle [1]** 270/8
**second [21]** 273/23 275/2 275/24 276/3 276/6 276/13 276/18 282/2 290/5 297/22 297/23 332/7 332/11 393/13 395/15 398/3 398/7 404/11 438/17 460/7 460/13
**seconds [2]** 445/13 445/16
**section [13]** 275/5 275/9 275/18 279/22 280/5 280/10 290/10 294/2 294/5 294/9 297/3 298/17 352/9
**security [4]** 277/4 370/3 371/12 420/4
**see [36]** 281/3 289/14 289/15 289/16 301/21 302/8 308/1 315/14 315/22 316/8 317/5 327/18 331/15 332/14 338/7 342/16 343/20 343/22 345/4 373/24 377/15 387/20 393/5 393/18 396/6 398/4 407/12 407/14 414/15 416/4 418/13 424/25 431/3 436/12 437/1 451/5
**seem [1]** 317/21
**seemed [2]** 433/15 435/1
**seems [3]** 327/23 331/21 393/9
**seen [2]** 324/10 437/5
**segued [1]** 448/24
**selected [3]** 284/25 284/25 328/24
**send [7]** 317/19 318/17 318/18 326/22 331/9 395/9 395/13
**sense [7]** 318/7 338/1 367/6 408/25 437/11 437/13 437/14
**sent [13]** 318/9 318/12 323/12 324/15 342/14 360/22 361/8 374/18 383/2 410/5 410/24 411/14 453/14
**sentence [7]** 275/15 277/10 282/3 399/21 399/24 410/1 410/3
**sentences [1]** 374/9
**sentencing [1]** 310/17
**separated [1]** 375/17
**serious [1]** 456/1
**serve [2]** 342/5 352/5
**served [3]** 340/2 346/9 377/1
**service [5]** 300/17 302/20 303/11 305/5 349/25
**services [2]** 302/17 303/5
**session [4]** 273/6 318/24 369/3 369/6
**set [8]** 326/19 363/5 375/11 451/15 452/7 452/16 454/4 459/14
**setting [2]** 401/11 458/13
**settlement [1]** 306/2
**seven [6]** 312/21 327/16 387/13 387/21 393/16 445/12
**several [4]** 356/17 368/14 439/11 439/11
**shall [1]** 357/12
**share [2]** 292/4 374/9
**shared [1]** 321/9
**she [134]** 275/3 275/22 275/22 275/22 277/2 280/3 281/23 282/9 282/10 282/11 282/23 282/23 282/25 283/1 287/7 290/13 290/15 294/6 294/8 295/9 295/16 295/21 297/3 297/4 297/4 297/5 297/6 297/9 298/2 298/5 299/25 300/9 300/11 303/19 303/22 304/15 304/16 309/21 309/24 331/22 332/5 332/6 332/9 336/4 336/23 339/8 343/16 344/15 352/1 354/22 374/2 377/17 378/6 378/15 378/19 379/8 379/12 379/14 380/17 380/25 404/22 411/6 411/8 422/5 423/10 423/10 423/12 423/18 427/1 427/3 427/5 427/6 428/4 428/10 428/12 429/15 430/1 430/2 430/3 430/4 430/5 430/5 430/8 430/14 430/16 430/16 430/17 430/22 431/4 431/4 431/6 431/6 431/6 431/7 431/9 431/13 431/15 431/17 431/17 431/18 431/18 432/11 432/13 432/14 432/16 433/15 434/25 435/1 435/3 435/7 435/8 435/24 436/1 436/9 436/9 436/10 436/11 436/17 436/22 437/4 437/7 437/8 437/11 437/11 437/12 437/12 438/19 440/10 440/16 440/16 440/21 441/11 442/21
**she'll [1]** 339/7
**she's [7]** 321/16 339/8 346/6 377/22 377/23 378/22 433/13
**sheet [5]** 290/17 290/19 290/22 401/9 429/19
**short [1]** 318/10
**shorthand [1]** 366/7
**shortly [1]** 305/3
**shot [1]** 439/4

S

**should [16]** 275/3 313/24 315/20 317/5 355/2 360/18 370/3 377/7 386/19 420/21 442/14 447/24 450/24 450/24 450/25 452/13
**shoulder [1]** 430/15
**show [16]** 274/6 289/15 301/18 304/21 315/21 317/13 321/12 327/12 327/14 337/17 354/1 394/12 395/21 431/7 431/8 445/18
**showed [2]** 396/8 443/19
**showing [7]** 321/15 336/2 336/3 336/4 396/9 396/11 403/17
**shown [2]** 322/8 345/9
**shows [3]** 327/17 328/10 445/20
**shred [1]** 285/22
**shuttle [2]** 372/20 372/21
**sic [1]** 408/1
**side [6]** 310/23 327/16 341/25 368/9 444/2 453/24
**sides [1]** 308/23
**sidewalk [2]** 422/5 443/20
**Sierra [2]** 322/23 322/23
**sightseeing [2]** 426/17 426/22
**sign [8]** 305/8 305/10 305/13 316/3 343/3 343/6 345/20 346/7
**signaling [1]** 437/2
**signature [17]** 274/12 285/13 286/16 286/23 286/24 287/3 305/2 305/6 305/8 343/19 350/20 350/21 351/10 461/11 461/12 461/12 461/16
**signed [16]** 274/13 280/24 285/9 285/13 285/22 286/5 286/8 287/5 288/5 292/11 308/1 308/2 308/2 308/3 350/17 461/12
**significant [2]** 378/3 431/21
**signify [1]** 407/7
**signing [2]** 346/12 461/8
**similar [4]** 338/3 355/23 401/1 430/24
**simple [2]** 399/17 399/21
**simpler [1]** 429/23
**simplify [1]** 425/1
**simply [3]** 363/12 441/15 458/7
**since [6]** 336/19 340/3 363/23 368/13 420/21 432/3
**single [4]** 399/21 429/24 430/3 445/7
**sir [9]** 273/14 302/6 304/21 337/14 369/13 382/24 385/5 419/3 421/3
**sit [2]** 315/23 413/19
**site [11]** 393/13 393/17 393/23 394/1 404/3 427/7 428/14 429/9 429/12 429/14 443/22
**sits [1]** 370/6
**sitting [7]** 386/19 388/25 389/3 390/6 422/5 422/19 443/20
**six [6]** 327/16 373/23 386/21 387/20 387/21 455/22
**skipping [1]** 425/21
**slight [1]** 458/15
**slow [2]** 313/8 423/14
**small [3]** 283/21 309/21 427/12
**smells [1]** 443/8
**so [325]**
**soft [1]** 373/22
**soft-spoken [1]** 373/22
**software [2]** 284/24 285/2
**sole [1]** 280/15
**solely [1]** 290/22
**some [42]** 273/21 274/22 274/24 275/1 275/19 309/17 312/17 314/23 338/8 339/11 340/10 353/3 354/7 355/18 355/21 360/8 362/20 370/19 370/19 372/11 373/4 375/11 378/14 379/14 379/22 380/3 385/3 401/5 426/20 431/24 436/3 437/1 440/8 440/9 449/22 451/3 451/13 452/14 457/2 457/2 458/15 459/16
**somebody [14]** 299/10 299/10 308/12 309/1 329/4 335/5 400/3 410/22 412/16 416/4 416/12 416/18 433/22 441/20
**somebody's [1]** 441/22
**somehow [1]** 327/24
**someone [23]** 292/18 296/22 297/7 297/10 359/22 359/22 380/21 404/11 412/18 421/23 424/1 424/16 425/2 425/5 425/5 426/12 431/1 431/12 431/23 432/1 437/4 442/8 442/22
**someone's [1]** 435/9
**something [18]** 281/21 282/19 282/24 291/17 312/16 314/3 314/3 354/1 357/8 360/19 361/11 365/22 376/17 409/12 424/14 429/22 438/24 445/23
**sometime [1]** 303/20
**sometimes [18]** 290/19 307/18 307/18 328/11 374/23 374/23 383/11 384/10 385/6 390/19 391/8 392/6 396/25 406/10 416/8 429/15 429/20 453/22
**somewhere [4]** 375/20 375/21 413/20 428/13
**soon [5]** 345/1 376/18 376/18 381/1 439/1
**sooner [1]** 403/23
**sore [1]** 366/8
**sorry [51]** 273/22 278/24 281/8 283/24 287/16 290/6 300/12 301/9 302/15 303/1 319/20 320/21 323/23 324/6 325/5 325/16 331/20 331/21 332/17 333/16 350/13 359/12 359/25 362/24 366/2 371/17 380/12 381/22 391/24 392/20 402/11 405/2 410/4 411/5 417/11 417/11 424/24 428/1 429/3 430/19 436/10 438/17 441/23 443/4 445/1 446/18 452/20 455/2 455/2 459/19 460/1
**sort [16]** 278/9 283/5 289/10 297/20 353/3 356/5 383/1 398/25 410/11 410/12 416/2 416/13 424/14 424/25 448/24 457/14
**sought [1]** 306/22
**sound [4]** 296/16 347/14 355/19 356/7
**sounds [3]** 356/8 367/20 395/24
**source [3]** 359/3 359/6 363/13
**spaces [1]** 457/25
**Spanish [24]** 302/2 302/7 302/7 420/14 420/16 422/21 422/24 423/1 423/2 423/11 423/19 426/11 426/25 427/1 430/19 430/20 430/21 432/5 432/15 432/15 433/12 433/13 434/25 440/18
**speak [21]** 273/17 288/5 302/7 303/25 304/2 304/6 304/10 304/11 325/23 334/25 346/15 420/14 422/10 422/11 423/22 428/9 428/9 436/23 437/2
444/12 447/20
**speaking [18]** 276/2 310/12 339/5 361/5 410/16 413/13 422/20 423/10 423/19 426/25 427/1 430/19 430/19 430/21 432/4 433/13 434/25 437/6
**speaks [1]** 302/2
**special [1]** 329/5
**specific [3]** 352/20 399/12 457/3
**specifically [6]** 276/11 300/4 300/8 314/8 377/11 377/13
**speculate [1]** 328/3
**speculation [5]** 294/11 294/14 295/11 306/25 402/21
**spoke [7]** 400/20 404/10 404/16 420/17 422/25 426/14 427/15
**spoken [5]** 273/15 303/22 346/25 347/4 373/22
**spot [2]** 305/1 328/2
**SS [3]** 324/1 325/2 326/7
**stage [1]** 285/10
**stand [9]** 273/14 313/20 319/18 365/25 369/14 380/24 386/6 386/6 388/3
**standard [1]** 450/15
**standing [4]** 377/10 377/22 378/20 379/8
**start [8]** 316/21 380/1 383/12 383/20 400/3 428/19 429/24 430/1
**started [10]** 292/3 311/14 311/14 371/10 395/20 396/9 396/11 397/1 400/8 413/21
**starting [2]** 394/12 421/9
**state [5]** 290/20 357/17 369/22 386/15 419/17
**stated [6]** 275/2 299/18 302/2 332/10 348/19 399/16
**statement [12]** 293/23 309/10 353/14 359/21 453/13 453/22 454/10 454/11 454/16 455/7 455/18 455/20
**statements [4]** 370/9 453/6 453/15 459/11
**states [25]** 270/1 270/17 271/21 275/16 277/18 281/16 282/4 297/3 299/14 300/7 304/8 343/17 395/4 395/5 414/25 423/25 424/5 424/6 424/10 426/16 433/22 433/25 435/9 435/13 436/18
**stationed [1]** 414/2
**status [29]** 275/6 300/6 310/20 344/4 346/3 346/7 356/22 395/5 414/25 424/6 424/9 425/3 425/5 425/6 425/8 428/16 428/23 429/5 431/24 433/16 435/2 435/17 436/6 436/17 437/8 437/11 440/22 440/24 441/11
**stay [7]** 297/4 312/19 315/5 424/16 456/22 460/1 460/13
**stayed [1]** 460/8
**staying [4]** 282/25 450/19 451/10 460/12
**Ste [1]** 295/2
**stenographic [1]** 461/10
**step [5]** 315/4 318/16 338/14 385/18 386/3
**STEPHEN [2]** 271/8 392/20
**STEVEN [1]** 271/17
**stick [2]** 320/5 368/2
**still [20]** 278/13 333/3 336/25 337/3

## S


**still... [16]** 349/20 351/11 354/7 356/14 365/25 367/16 417/16 418/7 419/1 428/15 428/22 429/6 443/17 444/13 445/25 458/6
**stipulate [6]** 288/14 289/2 291/10 292/1 293/25 453/5
**stipulation [2]** 291/11 453/11
**stone [1]** 417/24
**stop [21]** 381/19 390/5 402/7 402/10 402/19 403/2 403/5 403/8 418/14 421/14 421/15 424/21 437/6 437/24 438/13 438/21 439/7 441/18 443/14 443/16 443/18
**stopped [6]** 390/3 390/8 394/4 402/6 427/4 427/5
**stops [1]** 445/16
**story [2]** 434/5 434/7
**straight [2]** 389/19 455/24
**street [4]** 295/1 393/5 401/18 422/6
**streets [2]** 388/15 397/7
**stretch [1]** 287/7
**striking [1]** 335/4
**stuff [5]** 316/16 329/21 376/6 378/10 436/3
**subject [10]** 275/2 275/11 281/13 299/15 304/8 314/21 314/24 337/8 410/8 432/22
**subject's [1]** 277/11
**submit [11]** 445/24 451/17 453/6 453/12 453/23 454/13 454/15 454/16 454/23 455/5 455/5
**submits [1]** 453/24
**submitted [2]** 445/12 454/11
**submitting [2]** 317/24 453/20
**subordinates [1]** 363/17
**subsection [1]** 284/24
**substantive [1]** 323/17
**subtractions [1]** 285/12
**successfully [2]** 319/4 319/8
**such [3]** 291/16 401/22 455/24
**sufficient [1]** 293/9
**suggest [3]** 287/24 293/2 398/18
**suggested [1]** 282/19
**suggesting [1]** 450/13
**suggestions [2]** 455/14 455/15
**suggestive [1]** 379/20
**suggests [2]** 277/8 353/25
**Suite [5]** 271/5 271/9 271/14 271/18 295/2
**summarizing [1]** 360/12
**summary [3]** 360/6 360/15 447/20
**summation [4]** 303/11 309/19 310/2 314/7
**supervising [2]** 330/10 341/17
**supervision [1]** 355/12
**supervisor [13]** 274/5 292/20 305/11 323/8 323/9 329/16 330/16 331/10 341/16 341/19 343/16 355/9 378/17
**supervisors [11]** 358/15 361/12 361/15 361/22 362/6 362/8 362/20 363/6 378/8 378/8 384/6
**supervisory [7]** 321/5 325/10 340/1 349/23 358/13 360/23 387/11
**supplement [4]** 446/19 449/5 449/13 449/16
**supporting [1]** 277/17
**supposed [6]** 315/5 354/2 383/8 438/10 438/11 458/4
**sure [49]** 286/13 287/22 288/18 300/2 309/16 309/17 311/4 313/20 318/4 318/13 319/10 321/17 331/3 331/18 333/20 341/7 343/11 344/23 354/11 356/5 361/3 364/11 368/21 371/21 378/21 379/4 384/2 384/11 384/13 385/4 393/21 417/9 418/9 421/11 421/24 423/8 428/2 430/24 431/10 441/14 441/14 441/14 441/14 446/1 448/14 448/24 450/9 456/21 459/16
**surmise [1]** 329/2
**surrounding [1]** 440/20
**survives [1]** 448/21
**suspect [1]** 441/3
**suspicion [2]** 441/2 441/7
**sustained [11]** 293/18 303/16 330/18 331/7 352/21 357/21 362/9 411/10 428/24 429/1 429/2
**sustaining [1]** 359/1
**swear [6]** 319/19 338/9 338/19 369/14 386/7 419/10
**swearing [1]** 319/21
**Sweep [8]** 330/20 330/23 333/19 335/14 336/22 336/25 337/7 337/9
**sweet [1]** 443/8
**switched [1]** 321/24
**sworn [5]** 320/11 338/23 369/19 386/12 419/14
**system [16]** 285/2 317/22 328/8 328/12 328/17 328/22 328/24 330/8 342/3 356/4 431/25 432/16 432/17 435/14 457/19 458/10
**system's [1]** 441/15
**systems [6]** 322/1 414/21 414/23 458/2 458/4 458/21


## T


**T-Files [1]** 376/23
**Tacoma [18]** 295/2 295/22 361/9 361/19 361/24 362/7 362/22 362/23 363/8 363/15 363/19 374/18 374/19 382/12 382/13 383/2 383/3 384/17 363/4 400/3 400/8 409/15 423/7 424/1 427/4 427/5 428/11 428/14 429/25 430/4 431/15 438/4 440/2 450/7 452/4
**tactically [1]** 450/23
**tag [2]** 284/12 292/3
**take [47]** 275/3 276/19 280/20 280/21 295/20 312/23 313/2 313/3 315/11 318/1 318/15 318/18 318/18 338/7 342/1 342/1 351/12 351/17 351/21 366/7 366/8 368/3 368/4 368/7 368/18 375/4 375/5 375/5 384/8 386/6 394/18 396/6 402/15 404/4 404/21 430/7 430/13 430/22 445/23 447/14 448/22 451/21 452/1 452/14 457/6 457/7 458/23
**taken [9]** 294/17 310/19 318/22 362/23 369/1 384/15 447/24 448/19 461/9
**takes [1]** 311/10
**taking [5]** 341/10 380/19 421/17 431/11 458/1
**talk [14]** 373/8 393/25 394/19 400/12 423/11 423/20 430/5 431/4 436/24 437/3 442/10 446/14 447/7 447/12
**talked [2]** 298/11 441/19
**talking [25]** 278/9 281/11 282/2 297/16 298/17 305/3 326/1 363/2
**target [21]** 389/3 390/14 390/17 390/21 390/21 390/23 390/25 391/6 391/11 391/17 391/20 392/8 407/9 407/18 407/19 412/7 412/8 412/13 412/23 412/24 417/1
**targets [8]** 390/19 391/16 391/17 391/25 392/3 406/10 407/6 417/4
**task [1]** 420/3
**tasked [4]** 340/14 372/15 442/23 453/19
**TDY [3]** 388/1 388/3 421/6
**team [41]** 331/11 341/10 341/12 341/15 341/16 341/20 344/19 344/20 345/2 349/1 349/3 349/17 349/19 349/19 356/6 356/6 372/5 389/4 389/6 389/14 389/22 389/25 393/7 393/14 405/17 405/21 405/23 405/24 405/24 406/5 406/6 409/7 409/11 412/4 412/8 412/18 413/14 414/9 420/4 439/20 440/14
**Team 7 [7]** 389/4 389/6 406/6 412/4 412/8 412/18 414/9
**teaming [2]** 284/12 292/3
**teams [10]** 329/21 329/23 344/25 349/5 356/5 397/1 405/22 406/12 406/12 406/13
**tech [1]** 316/24
**Technological [2]** 316/17 317/7
**technology [1]** 414/1
**tees [1]** 450/24
**telephone [2]** 317/22 319/8
**tell [38]** 296/5 302/11 315/18 320/22 322/18 326/16 333/22 334/12 337/2 366/20 366/24 366/24 371/4 372/14 374/16 374/19 380/23 381/16 389/9 398/8 399/19 400/1 401/21 408/22 412/11 418/14 420/21 421/1 421/4 422/15 423/3 425/11 425/11 425/19 426/11 426/21 429/7 437/12
**telling [1]** 423/8
**template [1]** 410/12
**temporarily [1]** 394/21
**temporary [8]** 340/13 341/18 362/16 362/18 362/20 376/24 388/4 421/4
**ten [3]** 318/13 367/8 413/11
**tends [1]** 373/22
**tensions [1]** 458/7
**term [8]** 344/12 376/22 378/7 379/1 388/5 394/24 410/11 443/14
**terms [16]** 355/9 375/13 375/22 375/24 376/9 376/10 377/6 378/3 384/18 429/7 433/24 435/23 444/18 446/9 454/3 456/5
**terrorists [1]** 277/3
**tested [1]** 420/18
**testified [23]** 303/8 303/14 311/23 312/2 320/12 334/7 335/2 338/24 347/1 352/19 357/15 357/15 360/7 360/17 365/10 369/20 373/16 381/4 385/22 386/13 419/15 437/19 457/11
**testifies [1]** 313/15
**testify [6]** 293/13 308/10 335/1 335/6 347/2 419/2
**testifying [5]** 273/14 274/9 319/6

## T


**testifying... [2]** 367/7 379/18
**testimony [43]** 273/17 273/19 276/3 280/16 293/2 299/8 303/11 309/20 310/2 312/1 312/3 313/21 319/12 335/5 336/6 347/4 347/5 357/20 358/25 358/25 359/10 360/9 361/1 365/9 365/9 365/24 366/3 368/23 373/18 374/14 379/24 380/2 382/25 385/22 393/12 399/4 409/21 418/25 438/21 439/6 440/11 457/4 457/5
**text [6]** 279/21 390/9 395/9 395/13 406/7 411/22
**than [12]** 278/4 282/19 282/24 346/12 373/13 384/15 386/19 392/1 432/5 434/13 448/12 458/25
**thank [73]** 273/11 278/7 288/19 289/3 290/23 293/21 298/8 302/4 303/17 315/3 315/6 315/7 315/8 316/12 318/20 319/15 320/15 320/18 326/5 327/14 329/13 335/8 336/8 337/13 337/14 337/15 339/3 339/4 339/14 342/11 345/12 354/6 359/13 365/13 365/17 368/24 369/24 370/24 370/25 371/23 373/24 382/8 385/10 385/25 386/4 386/24 387/9 392/13 392/14 392/14 396/21 401/15 405/11 409/4 416/20 419/5 419/9 424/24 432/2 437/16 443/24 444/15 444/16 446/3 451/6 452/3 452/19 452/24 456/23 459/5 459/17 460/15 460/18
**that [1055]**
**That'll [1]** 418/22
**that's [91]** 279/20 281/18 282/4 282/6 282/10 283/14 284/6 286/16 286/20 286/24 287/3 288/1 290/3 290/15 291/6 292/1 294/9 295/1 295/6 295/6 296/21 301/20 302/15 303/6 305/5 306/3 310/19 311/10 315/25 316/4 317/20 318/10 319/11 324/3 326/14 327/22 328/16 332/2 332/4 334/10 334/13 336/24 344/2 349/1 352/24 356/12 358/25 359/9 363/20 363/20 367/23 367/23 368/5 374/22 375/9 375/20 378/16 383/4 383/9 390/22 391/23 398/14 400/11 403/2 403/2 412/15 420/12 420/12 424/8 425/3 425/14 425/14 425/15 425/24 427/4 431/21 435/15 437/3 438/18 441/22 445/17 447/6 450/7 450/7 450/12 451/4 452/18 455/4 455/9 455/11 455/16
**their [30]** 273/19 309/15 341/21 341/23 344/3 347/5 366/20 366/23 383/17 394/1 395/2 395/3 395/4 395/5 414/24 415/5 415/10 425/11 425/12 425/12 429/21 435/16 441/17 442/5 442/5 445/15 453/24 457/16 458/22
**them [57]** 283/20 289/14 299/11 299/19 299/19 304/13 308/20 310/21 311/7 312/24 313/24 317/25 319/10 323/13 323/18 325/24 332/6 332/18 337/10 341/18 342/3 342/12 345/10 347/4 347/16 349/21 367/7 368/9 374/24 376/14 377/23 378/4 378/22 380/8 380/17 393/19 396/6 400/4 400/8 401/5 401/6 411/24 414/21 414/21 415/10 415/20 423/11 429/21 439/17 441/21 442/12 451/7 451/10 453/9 454/19 458/8 458/20
**themselves [5]** 328/21 399/25 457/3 458/11 458/22
**then [163]** 275/4 275/12 281/5 283/11 285/20 286/18 286/22 287/1 289/23 290/2 290/9 290/10 294/23 297/8 298/1 298/23 299/20 300/2 300/5 305/4 306/20 308/16 312/25 313/19 315/21 316/23 318/4 318/6 318/7 318/18 319/13 324/13 327/17 327/18 330/3 332/3 332/14 337/5 341/10 341/11 342/5 345/11 346/9 348/23 349/17 349/18 351/10 352/15 356/6 356/10 356/14 362/19 363/14 366/10 368/3 368/8 370/22 371/12 371/15 372/18 375/19 375/21 377/2 377/15 377/25 379/11 379/14 379/17 380/19 380/19 383/21 387/15 387/19 387/21 390/11 390/24 392/7 393/2 393/17 393/20 394/9 395/19 398/7 404/16 408/17 410/16 410/21 413/15 414/4 414/20 415/5 415/6 415/18 415/18 415/20 415/21 416/1 417/21 420/11 420/13 420/19 420/21 422/21 423/4 423/25 424/14 425/21 426/19 426/23 427/3 427/3 428/14 428/19 430/5 430/6 430/9 430/10 430/15 430/18 430/23 431/2 431/11 431/19 432/7 432/15 433/4 434/14 435/2 435/23 436/4 436/11 437/6 437/10 438/5 438/24 441/20 443/6 445/4 447/7 447/9 448/1 448/7 448/18 448/18 448/20 449/11 449/14 449/14 449/14 449/15 449/16 450/11 452/5 452/9 452/10 453/6 453/9 453/23 454/5 454/15 454/23 455/6 455/19
**there [149]** 274/22 274/24 276/25 277/7 279/21 279/23 280/4 280/19 281/3 281/4 281/21 281/24 282/7 282/18 283/8 285/16 285/22 285/23 286/9 291/17 292/8 292/11 292/20 292/21 293/6 293/7 293/23 294/17 294/24 295/1 296/24 299/15 303/8 304/9 305/21 306/23 308/15 308/22 312/15 312/17 312/18 312/18 312/20 313/24 315/8 321/16 326/16 327/17 328/14 328/23 334/9 335/10 336/16 344/22 344/23 347/16 349/5 349/8 349/9 349/10 349/10 349/16 349/16 349/17 349/19 351/6 354/11 354/15 357/12 357/23 358/3 358/4 360/21 361/10 361/21 362/5 362/7 362/20 363/5 363/24 363/25 364/16 364/18 365/22 367/25 372/22 373/3 374/21 374/23 374/24 375/18 375/20 376/5 376/23 377/9 377/22 377/22 378/13 382/15 384/14 384/18 389/3 389/3 390/10 390/12 391/25 392/17 394/4 396/3 399/6 399/6 401/6 401/7 402/6 407/20 408/11 408/15 408/15 415/8 416/6 417/16 417/20 418/13 418/14 420/1 422/8 424/4 424/21 428/16 431/2 432/11 434/25 436/7 438/9 439/1 441/6 441/18 441/19 445/14 446/8 446/25 447/11 448/8 449/11 449/22 451/14 453/21 453/24 457/13
**there's [45]** 275/13 283/8 286/23 287/2 287/24 290/9 290/10 290/24 291/3 291/8 294/8 296/18 296/21 297/21 305/1 305/2 305/21 332/15 334/12 337/3 343/19 349/8 351/8 353/1 356/25 363/19 363/19 367/13 370/17 374/21 374/25 375/6 375/14 375/18 376/3 376/4 384/11 415/15 416/13 440/25 447/3 450/5 450/9 451/1 451/2
**thereupon [5]** 320/10 338/22 369/18 386/11 419/13
**these [27]** 277/11 283/20 287/5 291/10 291/11 307/15 314/9 325/2 325/19 327/6 332/3 334/23 356/5 361/7 375/7 376/8 376/10 383/6 385/6 395/8 398/16 412/2 457/25 458/4 458/11 458/19 459/17
**they [189]** 283/11 292/23 292/25 293/1 293/2 293/3 293/4 293/13 299/13 299/16 299/17 302/21 302/21 307/16 307/18 307/18 307/22 307/23 307/23 307/23 308/7 308/7 308/10 308/12 308/16 308/16 309/1 310/18 319/5 319/5 326/24 328/5 328/17 328/19 328/20 328/21 332/4 337/6 341/21 341/25 342/1 342/1 343/11 344/4 344/4 344/5 344/6 348/9 358/3 360/20 360/22 361/8 361/17 361/18 362/6 363/21 364/2 364/3 368/6 372/11 375/2 375/3 375/3 375/4 375/4 375/5 376/1 376/1 376/4 376/6 376/6 376/12 376/14 376/16 376/19 377/2 377/8 377/10 377/11 377/12 377/14 377/14 377/15 377/17 377/17 377/22 378/5 378/7 378/9 378/9 378/11 378/11 378/17 378/19 378/24 378/25 379/1 380/10 383/13 383/14 383/14 383/19 383/25 384/2 384/10 384/13 384/21 384/22 386/19 388/14 390/19 390/22 390/23 390/24 391/8 391/9 391/17 393/16 393/16 393/19 393/19 394/5 394/21 395/5 396/7 396/7 400/7 400/8 400/13 400/14 400/15 401/4 401/4 401/18 401/22 401/23 401/25 404/4 413/1 413/3 413/20 414/24 415/10 416/17 418/10 418/11 424/5 425/2 425/5 425/6 425/11 425/11 425/12 425/13 425/13 425/16 425/16 425/17 425/19 425/19 425/20 426/7 426/9 426/9 426/9 426/12 427/9 429/16 429/19 429/22 429/24 430/1 431/3 435/10 435/15 435/17 436/5 436/7 440/20 442/8 442/11 443/19 453/25 454/1 456/5 457/17 458/21 460/11 460/12
**they'll [1]** 294/18
**they're [22]** 277/16 277/23 289/13 307/25 310/12 317/25 331/15 337/8 339/10 341/7 341/7 341/8 344/4 376/1 376/24 383/8 385/2 426/20 429/15 430/7 430/7 458/4
**they've [4]** 376/25 377/1 385/6 442/7
**thin [1]** 456/3
**thing [1]** 367/10

## T


**things [11]** 277/12 291/11 291/16 293/8 299/11 312/9 312/12 342/1 345/7 407/4 458/5
**think [78]** 274/6 276/2 294/9 294/13 294/14 305/25 313/24 316/4 318/7 318/10 318/13 319/25 321/14 325/1 326/15 334/14 337/5 337/22 344/19 345/11 353/20 367/20 377/17 377/17 377/21 378/5 379/20 381/22 386/18 389/3 390/23 392/2 394/5 394/24 395/3 400/6 400/9 401/22 411/23 412/5 413/8 420/19 420/24 422/1 422/24 427/6 435/22 436/14 436/15 438/8 438/18 438/19 438/19 439/14 440/18 444/2 447/22 448/4 448/15 448/18 449/1 449/12 449/14 450/17 451/8 453/7 454/5 454/18 454/23 456/17 456/21 457/7 457/9 457/23 457/25 458/11 458/19 458/21
**thinking [6]** 336/20 383/23 391/15 431/17 453/17 453/18
**third [8]** 271/13 271/18 271/22 275/1 297/3 297/20 297/24 297/24
**this [341]**
**THOMAS [1]** 271/17
**those [50]** 277/5 277/9 277/12 277/19 281/5 292/22 300/10 303/22 307/20 318/6 323/14 326/9 328/24 331/9 331/12 333/23 342/13 348/10 355/21 355/22 364/1 374/19 375/12 375/24 376/9 377/2 384/23 400/20 401/1 405/18 405/21 411/24 414/8 414/23 420/8 432/1 433/24 439/16 439/19 440/13 440/13 441/10 448/7 450/19 454/8 454/19 455/14 456/22 460/12 460/13
**though [2]** 361/4 406/19
**thought [9]** 313/20 332/11 360/21 379/23 401/17 401/25 436/17 457/7 458/15
**thoughts [2]** 283/17 460/13
**thread [1]** 412/4
**threads [3]** 411/22 411/25 412/2
**threats [1]** 277/4
**three [15]** 287/1 297/21 366/18 366/19 368/2 369/8 371/8 371/15 371/17 377/9 382/11 392/1 401/1 418/9 420/18
**threw [1]** 276/5
**through [25]** 279/19 281/15 289/10 299/8 299/19 311/17 312/15 312/21 317/13 317/22 324/19 326/20 334/13 335/22 352/8 356/4 361/12 361/15 373/3 373/4 409/21 425/16 447/9 459/2 459/3
**Throughout [1]** 307/7
**throughs [1]** 334/9
**tighter [1]** 368/9
**time [95]** 279/18 279/20 280/20 280/21 280/24 281/2 282/17 283/5 283/10 283/15 285/21 287/5 290/13 292/16 292/24 293/12 293/17 295/9 295/16 300/25 301/1 303/21 303/23 304/4 305/12 307/12 308/4 309/22 311/4 313/16 314/10 314/13 335/17 338/8 339/19 340/11 340/24 348/15 348/25 349/25 352/16 356/2 357/8 359/21 362/10 365/20 367/7 368/1 371/7 377/6 377/18 378/5 378/13 379/14 380/8 380/10 380/12 380/16 381/19 381/19 381/21 382/2 383/7 383/20 384/16 385/6 390/9 393/15 393/24 394/2 394/6 395/9 396/25 400/5 400/12 403/4 404/7 406/17 413/9 413/19 431/12 434/24 435/22 435/25 437/3 438/13 443/17 445/24 447/23 451/17 452/10 452/14 454/6 454/23 455/19
**times [8]** 285/22 307/20 308/15 308/20 376/20 383/7 394/25 453/24
**timing [4]** 314/22 377/6 384/18 454/3
**timing-wise [1]** 384/18
**title [6]** 296/7 339/25 350/7 371/18 387/10 387/16
**today [14]** 273/14 292/8 293/12 293/13 310/19 311/7 336/7 366/10 374/8 381/5 403/4 447/4 449/4 457/15
**together [4]** 389/22 454/18 454/24 459/13
**toggle [1]** 321/19
**Toggling [1]** 322/1
**told [16]** 360/15 377/23 378/21 380/24 381/18 388/12 388/21 405/14 422/20 426/18 427/9 428/2 428/7 430/6 431/8 436/23
**too [9]** 311/16 323/4 323/5 415/2 429/10 434/6 455/25 456/3 457/24
**took [15]** 273/14 311/14 341/1 372/11 372/19 380/24 404/5 421/23 421/24 421/25 424/12 429/19 430/11 430/13 430/22
**tool [1]** 430/10
**top [6]** 289/8 289/10 289/11 294/20 348/1 351/5
**topic [1]** 449/1
**Torture [1]** 299/4
**Totally [1]** 452/13
**tourism [1]** 282/14
**town [2]** 328/15 328/20
**tracking [1]** 353/19
**traffic [11]** 402/7 418/14 421/14 421/15 437/24 438/13 438/21 439/7 443/14 443/16 443/18
**trafficking [5]** 288/22 288/23 288/24 299/22 300/7
**training [3]** 349/25 352/8 424/3
**transcript [6]** 270/15 451/19 451/21 454/7 461/9 461/11
**transferred [2]** 295/21 429/12
**translate [1]** 276/15
**translated [2]** 301/10 301/11
**translation [3]** 301/14 301/25 427/18
**transmitted [1]** 319/8
**transmitter [2]** 325/4 325/5
**transnational [1]** 277/3
**transport [30]** 364/19 374/17 375/2 375/7 375/11 375/23 376/18 378/8 378/9 378/17 378/18 379/3 379/9 379/17 380/9 380/20 381/1 383/1 383/5 383/10 384/8 384/16 396/2 405/1 405/7 428/14 429/9 429/13 435/20
**transportation [16]** 363/2 376/4 382/15 383/4 383/13 384/4 394/14 394/16 395/20 396/6 396/13 404/3 407/20 408/1 429/12 429/14
**transported [8]** 361/18 361/24 362/7 363/7 363/15 363/18 377/3 380/21
**transporting [4]** 362/21 384/20 404/24 426/9
**transports [2]** 383/7 383/15
**travel [1]** 293/14
**traveling [1]** 437/20
**triage [1]** 356/6
**trial [1]** 453/19
**tried [5]** 312/19 314/10 396/6 430/13 431/11
**true [3]** 280/24 292/12 461/9
**trust [1]** 446/4
**try [13]** 311/5 311/7 311/11 314/1 317/1 361/3 414/15 416/18 421/21 429/8 455/12 457/1 458/9
**trying [38]** 314/19 336/15 338/6 347/25 360/2 364/14 364/15 394/5 394/18 394/19 395/3 395/20 396/3 404/7 409/21 422/10 422/11 423/8 423/20 425/3 425/25 428/8 428/16 428/22 429/6 429/12 429/20 435/16 435/16 436/23 437/3 437/6 440/20 441/15 445/22 455/25 456/3 457/16
**turn [11]** 290/6 298/10 300/12 300/12 304/21 314/18 335/19 339/6 345/3 392/19 398/2
**turned [3]** 417/11 428/8 430/9
**two [28]** 275/4 275/9 278/9 282/7 283/20 286/22 303/8 303/23 310/15 312/6 322/14 322/17 331/4 332/11 366/18 367/12 370/4 371/12 374/21 378/12 378/20 381/3 383/5 408/15 420/19 432/8 432/9 451/18
**type [5]** 306/21 407/11 413/16 413/24 424/12
**types [2]** 282/7 300/10
**typical [3]** 307/4 307/15 387/5
**typically [6]** 341/23 344/2 344/24 353/6 391/16 396/12
**typographical [2]** 280/4 281/4


## U


**U.S [6]** 271/17 276/16 294/23 294/24 425/18 435/11
**U.S.C [1]** 294/3
**ultimately [1]** 360/14
**unauthorized [1]** 282/3
**unaware [1]** 421/25
**unbroken [3]** 275/9 275/9 278/10
**uncontested [1]** 455/7
**under [17]** 275/10 284/12 284/24 292/7 292/13 293/6 294/6 294/9 299/3 307/21 351/13 355/12 357/18 364/19 370/16 374/3 439/2
**underneath [1]** 290/9
**understand [37]** 276/2 279/1 279/1 286/13 291/14 293/2 305/4 307/3 314/25 318/25 319/3 324/6 336/18 344/12 344/13 347/10 349/12 351/7 351/15 352/8 353/10 353/22 354/11 355/8 357/8 360/9 363/13 364/14 364/16 365/11 388/16 429/18 434/9 441/2 441/15 456/19 456/21

## U

**understanding [32]** 275/25 276/22 305/20 313/21 316/2 335/24 349/12 351/2 354/1 354/19 355/6 358/21 359/4 359/7 361/7 361/22 362/6 362/14 362/15 362/25 363/6 363/9 363/12 363/13 363/25 375/6 375/12 398/13 399/11 412/24 423/22 449/4
**understands [1]** 297/4
**understood [13]** 287/22 297/5 312/5 331/18 339/13 357/10 357/23 360/10 363/8 365/12 399/16 403/5 441/5
**underway [1]** 319/14
**undocumented [1]** 287/25
**unfocused [1]** 401/8
**unfolded [1]** 423/3
**uniform [1]** 421/2
**unintentional [1]** 428/3
**unit's [1]** 420/24
**UNITED [23]** 270/1 270/17 271/21 275/16 277/18 281/16 282/4 299/14 300/7 343/17 395/4 395/5 414/25 423/25 424/5 424/6 424/10 426/16 433/22 433/25 435/9 435/13 436/18
**United States [20]** 275/16 277/18 281/16 282/4 299/14 300/7 343/17 395/4 395/5 414/25 423/25 424/5 424/6 424/10 426/16 433/22 433/25 435/9 435/13 436/18
**universe [1]** 318/5
**unlawful [3]** 275/20 275/24 281/25
**unlawfully [3]** 439/14 440/10 440/17
**unless [6]** 305/11 314/22 361/10 432/21 434/18 453/14
**unnecessary [1]** 451/9
**unreasonably [1]** 417/24
**unredacted [3]** 289/14 289/16 445/9
**until [18]** 275/12 293/12 297/5 311/8 312/19 327/1 327/8 358/3 360/20 388/14 399/3 415/17 429/9 444/12 450/19 451/10 456/22 460/2
**unturned [1]** 417/25
**up [92]** 274/8 276/19 286/4 289/19 293/20 298/13 301/21 305/1 310/13 311/14 313/15 313/16 314/15 314/21 314/23 315/2 316/15 318/4 318/18 318/19 319/18 324/15 326/19 339/11 345/10 345/12 354/1 357/9 361/12 361/15 362/13 364/6 365/23 367/20 368/3 368/5 368/7 369/13 370/2 372/3 372/6 373/22 374/18 377/1 378/10 379/5 380/1 382/12 382/13 384/7 384/8 386/5 386/20 386/22 390/22 392/21 394/12 395/14 395/21 396/8 396/9 396/11 399/24 400/3 400/8 402/1 402/16 410/17 414/11 416/7 416/10 416/14 425/13 425/25 426/1 426/5 430/24 431/12 438/5 438/24 443/19 447/15 447/24 449/1 449/14 450/19 450/24 451/10 456/4 458/2 458/6 460/6
**updated [1]** 286/9
**upload [1]** 390/19
**uploaded [1]** 406/11
**upon [4]** 424/12 455/18 456/25 457/1
**ups [1]** 382/24
**upset [1]** 429/16
**us [54]** 283/5 298/15 299/7 302/11 315/18 315/22 318/7 320/22 322/18 324/4 324/8 326/17 326/18 327/14 334/12 339/19 341/4 349/20 356/4 371/4 372/14 373/9 374/9 374/16 374/19 380/23 381/16 381/18 390/22 390/24 391/8 391/9 399/19 400/1 401/21 420/22 421/4 422/15 423/3 426/11 426/21 427/21 428/3 428/7 429/7 431/5 431/8 431/14 431/15 431/22 437/12 451/25 454/4 455/9
**usage [1]** 307/8
**USAO [1]** 271/12
**use [9]** 320/13 326/23 363/21 379/1 407/16 427/16 430/10 432/14 451/9
**used [14]** 285/23 298/4 298/16 319/23 325/18 328/8 334/10 334/13 410/2 422/24 426/12 431/13 432/14 443/14
**using [9]** 319/22 322/17 322/17 325/7 367/22 378/7 410/11 432/10 432/24
**usually [9]** 370/5 374/21 374/22 383/23 390/21 392/6 400/3 409/19 416/11
**utmost [1]** 292/7

## V

**valid [4]** 282/9 423/25 434/2 436/10
**validity [1]** 449/22
**values [1]** 284/25
**van [21]** 374/22 374/23 374/25 378/9 384/12 390/8 396/6 396/8 396/8 400/8 401/6 402/6 421/17 425/23 426/2 426/2 426/4 426/6 426/10 432/4 438/14
**vans [2]** 375/14 404/4
**varies [1]** 331/10
**variety [2]** 329/20 420/5
**vehicle [26]** 379/9 394/6 402/9 402/18 403/2 403/5 403/8 404/4 415/23 416/1 416/5 418/10 418/10 422/11 422/16 422/19 426/23 433/15 435/1 437/25 437/25 438/9 440/21 440/23 443/22 445/22
**vehicles [11]** 375/7 375/13 376/11 393/20 394/4 394/10 394/13 396/10 396/17 404/6 418/7
**vending [1]** 368/12
**verbal [2]** 279/21 439/22
**verbally [3]** 399/25 439/24 440/19
**verify [1]** 341/13
**versa [1]** 375/5
**version [7]** 286/10 289/16 301/10 322/8 322/9 374/3 445/16
**versions [2]** 285/16 289/14
**versus [1]** 425/5
**very [18]** 289/10 299/8 319/13 323/1 346/16 348/18 357/18 373/1 373/2 399/3 427/12 430/24 439/22 457/20 457/21 457/22 458/17 458/22
**vice [1]** 375/5
**vicinity [1]** 426/3
**victim [3]** 288/23 299/22 300/6
**victims [1]** 288/22
**video [6]** 315/10 316/22 445/9 445/11 445/15 445/23
**view [2]** 321/18 373/18
**violated [1]** 457/20
**violating [2]** 433/24 458/6
**violation [8]** 276/11 276/12 276/14 276/16 282/4 305/25 431/24 458/23
**violations [1]** 276/20
**violators [1]** 458/12
**virtue [1]** 457/11
**visa [26]** 275/21 276/12 282/10 282/12 282/19 282/25 283/10 283/13 299/21 300/3 300/6 343/17 344/11 346/3 422/20 422/22 423/8 423/21 423/25 424/1 424/13 424/13 424/14 424/20 426/15 434/11
**visible [1]** 321/22
**visibly [1]** 429/16
**visit [1]** 282/25
**visitation [3]** 372/24 372/25 373/12
**visitations [1]** 381/19
**visiting [1]** 282/20
**visitors [1]** 424/20
**visits [1]** 372/18
**voice [1]** 373/22
**volume [4]** 270/14 312/13 460/20 461/5
**voluntary [8]** 285/20 293/9 297/11 309/25 343/25 344/7 356/25 357/4
**VR [1]** 307/3

## W

**wait [7]** 311/23 315/5 376/16 383/15 384/23 385/3 460/7
**waited [1]** 385/6
**waiting [13]** 304/10 311/24 311/25 316/4 316/23 367/19 383/17 389/3 390/13 396/7 415/7 415/23 415/25
**waiver [2]** 298/16 303/21
**walk [1]** 400/3
**walked [8]** 289/10 399/24 400/8 426/23 427/8 436/7 436/12 438/7
**walking [2]** 311/16 401/5
**WAMSLEY [1]** 270/8
**want [54]** 294/20 296/8 299/9 309/15 309/15 309/17 311/3 321/18 321/21 326/12 336/15 344/4 344/10 347/18 361/2 363/11 363/12 365/7 365/23 368/1 368/2 368/6 370/4 371/21 373/15 375/3 378/25 379/4 385/9 391/9 402/15 412/17 421/22 424/10 424/24 425/11 425/11 425/12 425/13 425/16 425/16 425/19 425/19 430/5 434/9 435/17 437/12 438/3 439/3 443/7 448/13 451/7 453/4 456/20
**wanted [14]** 276/18 291/17 304/16 309/21 309/24 336/11 373/13 377/15 390/22 390/24 422/18 423/22 446/2 447/19
**wants [5]** 293/20 301/11 447/19 454/3 454/4
**warning [1]** 292/10
**warrant [9]** 293/24 304/23 305/12 306/13 345/19 352/17 353/2 354/3 356/14
**warrantless [4]** 291/21 291/24 306/16 356/14
**warrants [3]** 305/10 305/15 305/22
**was [460]**
**Washington [1]** 295/2
**Wasmley [1]** 461/3

## W


**wasn't [17]** 280/15 324/25 327/1 348/18 362/5 378/13 408/8 427/11 428/12 429/9 430/2 430/2 430/24 431/18 443/20 443/21 443/22
**way [11]** 276/5 279/19 295/18 309/3 317/25 325/1 398/18 427/19 429/15 437/1 457/19
**ways [2]** 276/9 453/21
**we [241]**
**We'd [1]** 390/21
**we'll [20]** 276/19 288/14 289/2 291/10 293/20 293/25 316/23 318/18 320/5 321/17 324/12 332/14 361/3 368/7 373/24 391/9 395/22 438/4 447/12 449/10
**we're [41]** 282/2 285/25 286/14 297/16 305/3 310/24 311/16 313/20 315/13 316/4 318/8 325/7 336/5 337/16 345/8 364/23 368/23 368/24 384/8 404/21 417/18 419/8 424/15 424/15 426/19 444/2 444/25 445/23 447/4 447/22 448/14 449/5 450/7 451/15 453/22 454/2 454/24 455/6 456/3 457/18 458/1
**we've [10]** 278/9 281/5 298/11 298/17 349/8 355/24 384/8 394/24 448/24 459/16
**web [1]** 317/16
**Wednesday [1]** 273/1
**week [2]** 312/21 368/14
**weekend [1]** 456/11
**weeks [2]** 334/14 451/18
**welcome [9]** 280/21 315/4 446/6 450/16 451/7 453/12 456/18 459/6 460/16
**well [59]** 276/18 279/18 279/24 280/23 281/23 282/9 294/13 301/22 306/1 308/4 313/16 313/19 314/23 317/21 319/13 322/9 329/21 332/2 335/6 338/3 358/1 362/19 363/22 363/25 365/22 367/25 370/17 372/15 372/18 374/21 376/12 378/19 387/20 409/2 413/19 419/4 431/9 431/13 431/19 435/5 436/20 446/25 447/8 448/1 448/3 448/18 449/15 449/19 449/24 450/3 452/9 453/11 453/17 457/20 457/21 457/22 458/17 458/22 459/10
**went [18]** 299/25 324/8 341/17 346/16 358/6 371/15 377/21 377/22 380/7 388/24 389/9 389/14 389/19 396/18 412/15 422/17 422/18 435/24
**were [265]**
**weren't [7]** 292/18 307/19 307/23 325/9 325/9 395/7 431/10
**Weresch [2]** 271/21 461/15
**what [192]** 274/2 274/10 274/25 275/12 275/25 275/25 276/9 277/21 278/22 278/25 279/4 279/5 282/10 283/9 283/11 290/15 293/4 294/5 295/4 296/5 300/16 302/11 305/25 306/11 307/21 311/10 311/19 312/11 313/11 314/1 316/4 318/1 318/13 321/23 323/20 323/20 324/3 324/7 324/15 329/19 330/6 333/2 333/12 338/1 339/25 340/19 341/4 341/19 341/23 342/18 342/21 343/9 343/15 343/24 344/1 344/13 345/16 345/18 345/24 345/25 347/10 347/17 347/20 349/20 353/7 353/12 353/12 353/19 353/22 355/8 357/2 358/8 358/10 359/3 360/6 361/7 361/7 363/13 364/14 366/24 371/17 371/18 372/3 372/3 372/4 372/14 374/10 374/16 374/16 374/20 375/9 375/24 376/9 376/21 377/4 378/3 380/6 381/6 383/7 383/7 383/21 387/5 387/7 388/3 388/12 389/2 389/10 392/5 393/17 393/25 394/6 394/9 394/16 394/25 395/5 396/5 396/16 396/22 397/6 397/18 398/14 400/1 400/5 400/9 402/9 403/1 403/2 403/18 404/14 404/19 404/20 406/11 407/7 407/12 407/14 407/16 412/11 412/23 412/24 412/24 413/5 413/11 413/17 413/22 414/12 414/22 415/7 415/18 416/1 419/23 420/8 422/9 424/12 424/24 425/3 425/7 426/19 427/18 428/3 429/7 431/17 431/17 432/10 433/19 435/2 435/16 435/23 436/6 436/14 436/15 436/15 437/5 438/10 442/12 443/18 446/15 447/24 449/3 450/12 450/16 451/14 452/21 454/2 454/14 455/5 457/17 457/18 458/4 458/17 458/23 459/14 459/15
**what's [14]** 282/4 288/9 305/19 321/4 321/12 325/1 339/23 367/6 387/10 398/13 411/7 420/2 424/1 458/10
**whatever [8]** 314/18 318/17 348/14 376/13 376/13 443/7 454/1 460/6
**when [112]** 274/18 277/15 278/20 280/24 282/19 282/25 283/13 285/9 285/13 287/14 287/17 287/21 288/16 288/21 292/11 292/19 293/1 294/5 294/17 295/21 298/22 299/9 299/10 307/23 308/1 308/14 318/16 321/19 325/10 327/6 327/14 334/12 336/20 338/6 340/15 340/17 341/5 343/9 343/9 343/11 343/14 344/10 344/16 345/24 348/21 351/5 361/5 368/10 372/21 376/10 378/16 378/25 379/5 383/6 384/10 384/11 384/19 384/20 388/8 388/10 389/10 390/7 390/11 393/12 393/13 393/17 394/1 394/4 394/16 395/5 396/22 398/7 399/15 402/5 403/17 409/23 413/19 414/13 414/13 418/7 421/9 421/21 421/24 422/4 422/9 422/16 422/17 424/3 424/18 425/2 425/25 426/14 428/4 428/12 429/15 430/23 435/9 436/14 436/14 436/22 437/3 437/6 438/7 440/15 440/24 441/7 441/18 441/22 443/13 443/14 443/15 454/15
**whenever [1]** 453/16
**where [57]** 275/2 276/13 282/3 285/19 286/2 287/7 297/21 298/18 305/8 307/22 307/22 307/23 308/7 308/10 308/12 315/5 320/22 326/16 328/9 333/1 335/10 345/7 350/21 362/3 364/17 371/4 380/25 386/21 388/21 389/9 390/5 390/7 390/11 390/22 395/2 396/3 396/19 401/25 402/5 405/14 407/2 412/15 414/2 419/21 422/4 426/4 426/12 426/25 427/3 430/22 433/15 434/13 435/1 435/24 438/10 441/19 451/5
**Whereupon [1]** 273/3
**wherever [2]** 311/23 380/2
**whether [28]** 294/18 304/6 305/21 306/16 313/8 313/23 345/7 348/9 355/10 356/13 356/24 362/5 365/23 365/24 370/19 380/15 383/25 411/9 424/4 428/16 432/11 443/9 447/19 450/5 451/1 451/2 456/20 460/13
**which [54]** 275/7 275/14 275/22 276/19 277/22 277/23 281/9 281/25 285/2 288/5 292/7 292/13 294/6 295/18 297/5 298/3 298/4 299/17 300/9 300/11 301/7 307/20 308/11 308/15 318/11 332/11 334/25 341/12 357/16 365/23 366/5 374/18 376/23 401/22 408/20 410/3 423/11 423/19 425/9 426/25 427/1 430/19 431/5 451/25 455/15 455/18 456/11 456/25 456/25 457/21 458/2 458/21 459/15 459/15
**whichever [2]** 348/14 376/14
**while [16]** 284/21 311/25 318/8 319/6 340/19 340/19 340/22 345/8 347/16 370/13 382/15 390/5 415/7 415/25 428/11 452/10
**Whispered [14]** 304/19 309/6 315/12 332/22 334/4 352/22 382/4 392/15 393/10 400/23 402/2 403/15 405/5 419/6
**who [92]** 278/18 280/15 282/8 282/8 293/13 294/5 299/22 300/18 305/3 312/1 318/9 321/9 326/8 326/10 326/22 326/24 327/1 328/4 328/23 329/4 331/9 334/25 335/1 335/2 336/6 339/21 341/13 350/17 356/3 357/11 357/24 358/21 359/7 360/13 360/17 360/19 361/23 362/21 363/6 364/1 364/16 365/10 367/14 372/22 383/2 385/22 387/3 390/1 390/3 390/16 393/22 394/3 394/5 394/18 395/3 397/12 398/16 400/17 405/7 405/14 406/1 406/22 407/2 408/17 408/19 409/9 410/24 414/7 414/7 414/15 414/16 419/2 421/1 422/7 422/22 424/1 424/5 425/6 425/19 425/20 431/15 432/4 433/17 435/5 436/2 436/23 437/12 441/20 442/8 445/21 458/3 459/8
**who's [3]** 376/15 377/12 427/5
**whoever [2]** 326/21 379/4
**whole [12]** 279/18 324/14 340/24 356/3 400/12 402/12 402/13 405/21 405/23 405/24 428/18 457/9
**whom [1]** 335/5
**whose [1]** 322/19
**why [22]** 274/4 283/25 292/25 293/3 293/24 314/11 323/10 323/10 324/23 326/21 328/7 330/3 340/11 340/11 354/19 381/16 394/20 399/19 402/25 424/8 431/21 457/4
**will [39]** 273/7 273/9 280/20 291/15 299/7 315/19 316/8 319/19 323/5 326/19 329/10 329/12 337/22 337/24 338/5 338/19 339/9 344/6 367/7 368/18 368/23 369/14 386/3 386/7

## W


**will... [15]** 386/22 419/10 432/21 443/4 445/10 445/11 446/4 447/2 451/10 455/16 456/13 457/7 458/25 459/3 459/14
**willing [1]** 435/15
**Wisconsin [1]** 435/11
**wise [1]** 384/18
**wish [2]** 280/5 459/9
**Withdrawn [1]** 333/16
**withholding [1]** 299/1
**within [4]** 371/17 407/11 434/16 458/10
**without [9]** 297/14 322/17 400/16 425/21 435/4 440/21 440/24 457/16 461/11
**witness [58]** 272/7 284/9 288/18 293/11 301/24 302/2 303/14 309/11 310/8 310/11 313/20 313/23 318/9 318/10 319/1 319/18 319/23 320/10 334/16 334/23 335/1 335/2 336/19 336/22 338/16 338/22 352/18 355/1 360/6 365/1 365/6 365/10 367/14 367/25 368/5 369/11 369/14 369/18 370/3 370/7 373/16 382/23 385/14 385/19 386/1 386/6 386/6 386/11 417/20 418/18 419/13 426/2 438/4 438/20 438/25 443/2 444/4 444/10
**witness' [1]** 374/13
**witnesses [14]** 273/15 293/13 311/7 334/24 346/25 366/18 369/8 444/11 444/12 444/17 444/20 457/6 457/9 457/15
**woman [1]** 426/24
**women [2]** 375/7 375/13
**won't [9]** 283/4 314/20 314/24 316/1 319/5 319/5 334/23 365/6 366/23
**wonder [1]** 447/24
**wonderfully [1]** 311/2
**wondering [3]** 315/13 319/23 460/5
**Woodburn [6]** 388/23 388/24 389/13 389/20 389/23 390/22
**word [10]** 276/6 288/7 288/7 288/10 325/18 351/7 422/25 426/11 427/16 443/18
**worded [1]** 348/18
**words [3]** 336/3 351/15 422/24
**work [41]** 277/17 292/18 312/18 312/19 312/21 313/1 314/12 320/22 320/23 339/21 340/22 341/21 341/23 343/7 349/20 355/9 370/18 371/9 376/6 384/13 387/3 387/6 409/23 412/13 416/2 419/24 426/7 426/9 426/13 426/16 426/21 427/1 427/2 427/7 427/9 454/6 454/18 454/24 458/22 459/3 459/12
**worked [7]** 321/2 371/11 409/24 419/25 420/1 420/9 420/10
**working [11]** 321/6 355/22 371/24 372/1 372/7 418/1 421/12 427/20 433/25 456/11 458/2
**workload [1]** 314/22
**workout [1]** 366/10
**works [7]** 326/17 365/23 366/9 366/9 373/25 384/11 453/16
**world [1]** 311/13
**worried [1]** 427/6
**worry [1]** 315/25
**worth [2]** 336/19 458/23
**would [185]** 274/25 275/23 276/15 276/22 277/21 277/22 281/1 282/15 288/12 289/4 289/16 290/17 293/11 294/4 294/13 296/6 296/16 296/21 297/6 297/25 297/25 299/10 299/11 299/12 299/13 299/15 299/18 299/24 300/1 302/16 302/18 302/22 304/2 304/15 304/16 305/15 306/8 306/10 306/13 306/16 308/11 308/19 309/3 312/23 313/22 313/22 317/13 317/21 318/5 318/6 326/25 327/2 328/3 328/21 331/9 333/5 333/10 333/23 337/7 341/12 341/12 341/13 341/23 342/1 342/1 342/8 342/10 343/15 344/7 344/19 344/24 344/25 348/8 349/16 350/6 350/11 350/24 352/5 352/15 354/4 355/22 356/2 356/13 356/14 357/9 357/23 358/6 361/7 361/15 361/24 362/3 362/6 363/7 363/14 364/3 367/14 368/1 372/7 374/22 382/19 383/10 384/13 385/21 386/20 388/12 388/14 390/19 391/9 392/5 392/6 392/7 395/7 395/7 395/9 395/14 396/6 396/12 396/13 396/23 397/1 397/3 397/5 397/5 397/5 397/6 397/7 397/9 397/12 401/12 401/13 401/22 402/10 402/19 403/22 405/16 405/18 405/24 406/3 406/17 407/7 407/9 407/10 407/12 407/14 407/16 408/15 408/17 414/7 414/8 414/12 414/14 414/15 414/16 414/22 415/7 415/12 416/9 417/3 424/14 431/4 441/10 446/24 447/2 448/3 449/9 449/14 449/16 449/17 449/19 451/8 451/17 451/18 451/19 451/21 451/24 452/25 453/5 453/19 454/25 455/19 455/21 456/7 456/10 457/13 458/13
**would've [20]** 286/5 286/9 296/25 297/9 298/5 300/24 304/12 308/12 317/12 327/7 340/16 344/15 346/9 348/3 348/8 358/6 358/8 393/8 403/1 403/1
**wouldn't [4]** 327/6 431/6 431/9 448/8
**wrap [1]** 456/4
**writ [3]** 451/16 452/23 457/22
**write [3]** 274/18 274/18 344/20
**writes [1]** 442/8
**writing [7]** 290/16 372/6 397/24 408/20 408/23 447/3 459/10
**written [8]** 362/15 362/21 377/1 402/19 403/18 452/22 454/21 455/17
**wrong [1]** 360/10
**wrote [5]** 287/9 290/15 398/9 400/5 403/2


## Y


**yeah [34]** 283/4 301/19 316/25 320/3 325/20 333/4 333/6 341/17 348/12 348/18 350/12 353/12 353/19 353/21 360/3 363/1 368/15 368/16 378/25 388/7 389/9 389/13 398/23 401/7 406/14 406/21 407/25 409/20 418/1 426/11 434/6 436/20 437/13 453/3
**year [4]** 321/6 370/4 371/24 388/19
**Year's [1]** 452/7
**years [17]** 308/3 321/3 340/7 370/4 371/9 371/10 371/11 371/12 387/13 387/18 387/20 387/21 387/25 420/1 420/6 420/23 425/7
**yelled [1]** 422/21
**yelped [1]** 430/17
**yes [219]**
**yesterday [8]** 319/21 367/22 368/22 403/20 403/20 445/8 445/11 445/18
**yet [13]** 311/22 312/2 319/10 334/25 335/3 338/11 365/10 385/22 402/12 413/21 415/15 419/2 429/5
**yield [1]** 325/16
**you [1031]**
**you'd [14]** 280/21 289/14 310/23 315/2 319/17 366/6 370/19 386/5 408/25 414/4 414/5 419/11 453/14 453/14
**you'll [5]** 299/6 311/23 337/21 449/11 454/18
**you're [68]** 274/15 275/7 277/8 280/5 280/21 284/4 294/2 297/23 298/14 305/9 310/21 311/21 311/24 311/25 313/14 315/4 315/5 315/18 318/16 329/16 332/7 334/22 339/19 341/16 349/23 350/10 350/17 352/12 352/15 353/20 355/6 356/19 365/6 365/14 366/10 368/21 371/4 375/25 378/7 380/2 384/15 384/20 385/19 387/23 396/3 396/4 398/8 412/2 415/25 418/24 421/1 425/2 425/3 426/21 427/9 440/2 441/7 444/9 450/13 450/16 451/7 453/12 455/10 456/11 456/17 459/6 459/22 460/16
**you've [25]** 277/22 280/2 280/8 281/18 298/14 299/18 302/7 305/5 313/1 318/17 335/6 349/25 350/3 355/7 355/24 373/8 376/8 376/20 403/4 415/22 416/2 427/21 428/2 438/24 440/8
**your [370]**
**your Honor [155]** 273/9 278/7 281/19 284/6 284/9 284/15 288/1 288/14 288/19 289/2 291/10 291/13 291/18 291/25 293/21 293/25 301/5 301/20 302/4 303/6 303/13 305/20 309/5 309/8 310/5 310/7 310/9 310/14 310/22 313/12 313/17 314/14 314/16 314/25 315/3 315/6 315/10 315/13 316/2 316/8 317/11 318/3 319/2 319/20 321/25 323/21 329/8 333/16 334/1 334/2 334/15 334/19 335/8 335/21 336/14 337/15 345/6 346/18 346/20 354/8 354/21 355/16 358/18 360/16 360/25 362/11 362/12 364/7 364/10 364/23 364/25 365/2 365/4 365/19 366/12 366/19 367/13 370/1 370/21 370/24 379/23 382/6 382/21 382/22 385/12 385/13 385/17 385/24 386/2 400/21 403/14 405/10 405/11 409/4 411/21 416/22 417/7 417/18 418/3 418/17 418/22 419/8 432/19 433/1 433/7 434/4 437/15 437/16 438/17 439/10 440/2 441/10 441/23 442/7 442/14 442/19 442/24 442/25 443/25 444/3 444/6 444/8 444/14 444/20 444/25 445/6 445/17 446/10

**Y**

**your Honor... [27]** 446/12 446/24 447/16 447/18 448/3 448/9 448/23 449/3 449/24 450/2 450/14 451/6 451/12 451/24 452/8 452/13 452/25 453/17 455/2 455/21 455/23 456/15 456/23 459/5 459/18 459/21 460/18
**yours [2]** 408/17 408/20
**Ysidro [2]** 419/22 420/10