**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| J.C.R.D. and Y.L.H.A.,<br><br>Plaintiffs,<br><br>v.<br><br>HABERSHAM COUNTY, GEORGIA, et al.,<br>Defendants. | Civil Action No. 2:26-cv-00284-RWS<br><br>**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER** |

# I. INTRODUCTION

**Question Presented**

Whether local officers may continue detaining a motorist beyond the time reasonably necessary to complete the traffic mission in order to facilitate civil immigration verification, records checks, questioning, or custody transfer absent independent constitutional justification.

This case concerns a narrow constitutional question: whether local law-enforcement officers may prolong a completed or reasonably completable traffic stop in order to facilitate a civil immigration investigation and custody transfer without independent constitutional justification. Plaintiffs do not seek to halt removal proceedings, terminate federal supervision, prohibit lawful communication between local and federal authorities, or interfere with legitimate criminal investigations. Rather, Plaintiffs seek a narrowly tailored order preserving the status quo and preventing future unconstitutional prolongation of traffic stops while this action proceeds.

On February 20, 2026, Defendant Sergeant Adam Ivester stopped Plaintiff Jose Carlos Rivas Diaz while Plaintiff was driving home from construction work in Habersham County, Georgia. According to the present record, after obtaining Plaintiff's identification, local officers requested federal immigration verification, federal officers conducted records checks, dispatch entered a "Delay 10 Minutes" status, and federal personnel arrived while the traffic stop remained open. The stop ultimately closed with a verbal-warning disposition and no traffic citation, state arrest, warrant, or criminal prosecution. Plaintiff was thereafter transferred into federal immigration custody.

The Supreme Court has made clear that a traffic stop is a seizure whose permissible duration is tied to its traffic-related mission. The Fourth Amendment permits ordinary tasks associated with roadway safety and enforcement of traffic laws, but it does not permit detention to be initiated or extended for unrelated investigative objectives absent separate constitutional justification. Plaintiffs contend that Defendants crossed that constitutional line when the stop was prolonged to facilitate civil immigration screening, records checks, and custody-transfer activities unrelated to the traffic mission. Plaintiffs further contend that the current record demonstrates a substantial likelihood of success on that claim.

Plaintiffs also seek limited preservation and discovery relief. The available evidence includes communications allegedly occurring through personally owned devices, later-created reports, and records reflecting coordination among local and federal participants. Plaintiffs seek preservation of those materials so that the Court may evaluate the facts on a complete record rather than after potentially relevant evidence has been deleted, altered, or lost. The requested preservation provisions are narrowly directed to materials relevant to the detention practices challenged in this case.

Finally, Plaintiffs seek prospective relief because the alleged practices are not limited to a single historical event. The Complaint alleges evidence of recurring stops involving construction vehicles, recurring immigration-related inquiries, recurring federal involvement, and continuing exposure to the challenged practices. Plaintiff Jose Carlos Rivas Diaz continues to reside and work in northeast Georgia. He no longer drives; his wife drives him, and he regularly travels as her passenger to construction and remodeling jobs and other necessary destinations, including through Habersham County and the same patrol area. Like the other passengers encountered during the same-evening stops, Jose remains susceptible to requests for identification, immigration-related questioning, detention, restraint, and transfer during future vehicle stops. Accordingly, legal remedies alone cannot adequately prevent future injury.

For these reasons, and for the reasons set forth more fully below, Plaintiffs respectfully request that the Court enter the proposed Temporary Restraining Order, preserve relevant evidence, authorize narrowly tailored expedited discovery, and set this matter for an expedited preliminary-injunction hearing.

## II. FACTUAL BACKGROUND

Plaintiffs incorporate by reference, as though fully set forth herein, the entirety of their Complaint for Damages and Declaratory and Injunctive Relief under 42 U.S.C. § 1983, filed concurrently with this Motion, including all allegations, claims, exhibits, and requests for relief contained therein.

## III. SUMMARY OF ARGUMENT

First, Plaintiffs are likely to succeed because the current record supports a substantial likelihood that Defendants prolonged a traffic stop to facilitate civil

immigration investigation and transfer without independent constitutional justification.

Second, Plaintiffs satisfy Article III because Jose continues to reside and work in northeast Georgia, regularly travels as a passenger in construction-related vehicles driven by his wife, and remains exposed to the alleged recurring detention practices directed at both drivers and passengers.

Third, preservation and expedited discovery are independently warranted because critical evidence resides within Defendants' possession, including electronic communications, metadata, personal-device records, and information concerning currently unidentified participants.

Fourth, the requested relief is narrowly tailored because it preserves lawful traffic enforcement, lawful criminal investigations, and lawful communication with federal authorities while prohibiting only unconstitutional prolongation of traffic stops.

## IV. THE COURT HAS AUTHORITY TO ENTER THE REQUESTED RELIEF

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs assert claims arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court may grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists concerning Defendants' allegedly ongoing detention practices and Plaintiffs seek prospective relief directed to those practices.

Federal Rule of Civil Procedure 65 authorizes the Court to issue temporary and preliminary injunctive relief necessary to prevent immediate and irreparable injury, preserve the status quo, and permit meaningful adjudication of Plaintiffs' request for prospective relief. The requested provisions are tailored to the

constitutional detention practices, evidence-preservation risks, and preliminary-injunction proceedings presented here.

## V. STANDARD FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy never awarded as of right. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020). Under ***Winter v. Natural Resources Defense Council, Inc.***, a movant must establish that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. 555 U.S. 7, 20 (2008). The same substantive framework governs the requested temporary and preliminary relief.

## VI. PLAINTIFFS HAVE ARTICLE III STANDING TO SEEK PROSPECTIVE RELIEF

### A. Governing Standing Principles

A plaintiff seeking prospective equitable relief must show a concrete and particularized threat of future injury that is real and immediate, fairly traceable to the challenged conduct, and likely to be redressed by the requested relief. Past injury alone is insufficient. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–06 (1983). In a pre-enforcement constitutional challenge, injury may be established by a realistic danger of injury arising from enforcement, including a credible threat of application; a plaintiff need not first expose himself to actual arrest or prosecution. *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1257–58 (11th Cir. 2012).

**B. Plaintiff Faces a Real and Immediate Threat of Future Injury**

Plaintiff's risk is not based solely on the February 20 encounter. The Complaint alleges a continuing practice of transmitting motorists' information to federal immigration authorities, keeping traffic events open during immigration-related records checks, and maintaining roadside detention pending federal response. It further alleges that these practices arise from policies, customs, referral procedures, training deficiencies, supervisory failures, or coordinated local-federal enforcement activity that remain operative. Those continuing practices create a credible threat that Jose, as a passenger during future vehicle stops, will again be subjected to the challenged detention procedures.

Plaintiff remains personally exposed because he continues to reside and work in northeast Georgia, performs the same construction work, and travels as a passenger in construction-related vehicles through the same patrol area. He no longer drives; his wife drives him to jobsites, suppliers, and other necessary destinations. The same-evening comparison stops reflect that Defendants' alleged practices extended beyond drivers to passengers, from whom identification was requested, whose nationality or immigration status was discussed, and who were counted, restrained, or prepared for transfer. Those stops, while not offered for final adjudication at this stage, further support the allegation that the challenged conduct was recurring rather than accidental or unique.

Jose's declaration establishes that his future exposure is regular, predictable, and tied to the ordinary course of his employment rather than to a speculative intention to return. He continues to reside and work in northeast Georgia and performs construction and remodeling work that requires recurring travel through Habersham County and the surrounding patrol area. Jose no longer drives; his wife transports him, and he regularly travels as her passenger while carrying or accompanying tools, ladders, materials, and equipment to jobsites. Because those

roads provide practical access between his residence, clients, suppliers, and worksites, avoiding the area would materially interfere with his employment. The same-evening recordings show that passengers, not just drivers, were exposed to the alleged identification, immigration-questioning, counting, restraint, and transfer practices. Jose therefore faces a concrete and continuing risk of encountering the challenged practices as a passenger under ordinary travel conditions; that risk does not depend on his personally driving, violating the traffic laws, or voluntarily placing himself in danger.

## C. This Case Is Distinguishable From *Lyons* And The Requested Relief Is Redressable

This case is distinguishable from *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983), which rejected prospective relief based on a past police encounter where recurrence depended on speculation that the plaintiff would again encounter police and again be subjected to the same allegedly unlawful conduct. Jose's asserted future exposure does not rest on a bare intention to return or on a sequence of individually improbable events. He alleges an ongoing detention practice, multiple substantially similar same-evening encounters affecting drivers and passengers, and regular work-related travel as a passenger through the same patrol area and operating conditions. As the Eleventh Circuit explained in *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, a plaintiff need not expose himself to actual arrest or prosecution where there exists a realistic danger of direct injury and a credible threat of enforcement. 691 F.3d 1250, 1257–60 (11th Cir. 2012). Jose's recurring travel through the same patrol area as a passenger in construction-related vehicles presents that kind of realistic, non-speculative exposure. The requested relief addresses the allegedly recurring local conduct

directly; it does not seek to halt removal proceedings, terminate federal supervision, or regulate federal immigration adjudication.

An order prohibiting officers from prolonging traffic stops to facilitate civil immigration investigation, screening, referral, or custody transfer absent independent lawful grounds would materially reduce Plaintiff's threatened future injury. The proposed order preserves lawful traffic enforcement, criminal investigations supported by reasonable suspicion or probable cause, execution of criminal warrants, and communication with federal authorities that does not add time to a traffic seizure. Plaintiffs therefore satisfy injury, causation, and redressability requirements.

Under Georgia's governmental structure, a sheriff's status must be analyzed function by function. *Manders v. Lee*, 338 F.3d 1304, 1308–09 (11th Cir. 2003) (en banc). *Manders* held only that a Georgia sheriff acted as an arm of the State when establishing use-of-force policy at a county jail and training and disciplining deputies concerning that specific function. The en banc court repeatedly emphasized that its analysis was function-specific and expressly declined to determine whether Georgia sheriffs act for the State when performing other duties. *Id.* at 1328–29. Accordingly, *Manders* does not itself resolve the status of the traffic-stop, roadside-detention, supervisory, training, or operational practices challenged in this case. That determination must turn on the precise function challenged and the governing sources of authority and control.

To the extent the Sheriff is treated as an arm of the State for the challenged function, sovereign immunity does not bar properly pleaded prospective relief against an official enforcing allegedly unconstitutional conduct. *Ex parte Young*, 209 U.S. 123, 155–56 (1908). The official must have some connection with enforcement of the challenged conduct; naming an official solely because he holds a general supervisory office is insufficient. *Id.* at 157–58. The necessary

connection may arise from general law or from the specific enactment or authority at issue, provided that it actually exists. *Id.* at 160–61. Plaintiffs therefore seek operational relief against Sheriff Robin Krockum only to the extent that he possesses legal authority to direct, implement, supervise, train concerning, or discontinue the traffic-stop practices challenged here. Preservation obligations likewise should be assigned defendant by defendant according to possession, custody, control, or authority to direct reasonable preservation steps. Plaintiffs do not seek to bind unidentified or unserved persons beyond Rule 65(d)(2) and actual notice.

**Defendant-Specific Scope of Relief**

| Requested Relief | Habersham County | Sheriff Krockum | Sergeant Ivester |
|---|---|---|---|
| **Operational prohibition against prolonging traffic stops** | Only if Plaintiffs establish that the County possesses legal authority over, implements, or directly participates in the challenged function; geographic location and county funding alone are insufficient. | Subject to proof that Sheriff Krockum possesses legal authority over the challenged traffic-stop function and therefore has the connection to enforcement required by *Ex parte Young*. *Manders* does not | Bound as an individual officer with actual notice and, where applicable, as an officer, agent, or employee acting for or in concert with the Sheriff. Any personal command should concern conduct he can perform or refrain from performing. |

| | | | |
|---|---|---|---|
| | | decide that distinct function. | |
| **Preservation of official records** | Only for responsive material within the County's possession, custody, or control. | Yes, for Sheriff's Office records, systems, recordings, directives, and materials the Sheriff has authority to preserve. | Yes, for responsive information within his possession, custody, or control. |
| **Preservation of work-related content on Sergeant Ivester's personal device or accounts** | No, absent proof of a legal right or practical authority to direct preservation of that content. | Only to the extent the Sheriff possesses lawful authority to direct preservation of work-related information; the order should not assume control over all private content. | Yes, limited to work-related communications and data concerning the specified events and practices. Preservation does not require immediate collection, inspection, imaging, or production. |
| **Litigation-hold notice and suspension of** | Only for County custodians, systems, or repositories | Yes, for Sheriff's Office custodians and systems | Yes, as to responsive information within his possession, custody, or control. |

| | | | |
|---|---|---|---|
| **automatic deletion** | containing responsive information. | within the Sheriff's authority. | |

The order should assign each command to the defendant legally capable of complying with it and should not treat Habersham County, the Sheriff, and the Sheriff's Office as interchangeable. *Manders v. Lee*, 338 F.3d 1304, 1308–09, 1328–29 (11th Cir. 2003) (en banc), requires a function-specific analysis and does not decide the distinct traffic-stop, roadside-detention, training, supervision, or operational functions challenged here. If Sheriff Krockum is treated as a state official for any such function, prospective relief remains available only if he has the enforcement connection required by *Ex parte Young*, 209 U.S. 123, 155–58, 160–61 (1908), and possesses authority to provide the relief ordered.

## VII. PLAINTIFF JOSE CARLOS RIVAS DIAZ IS SUBSTANTIALLY LIKELY TO SUCCEED ON HIS FOURTH AMENDMENT PROLONGATION CLAIM

Count II alleges that the detention continued after the traffic mission had been completed or reasonably should have been completed.

### A. The Fourth Amendment Prohibits Unrelated Activity From Adding Time to a Traffic Stop Without Independent Justification

A traffic stop is a seizure, and its lawful duration is determined by the mission that justified the stop. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The traffic mission ordinarily includes addressing the suspected traffic violation, deciding whether to issue a citation or warning, checking the driver's license, determining whether outstanding warrants exist, inspecting registration

and proof of insurance, and attending to related roadway-safety concerns. *Id.* at 354–55. Those ordinary inquiries serve the same objective as enforcement of the traffic code: ensuring that vehicles are operated safely and responsibly. *Id.*
An officer may conduct inquiries unrelated to the traffic mission during an otherwise lawful stop, but only if those inquiries do not prolong the seizure. *Id.* at 355; *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Thus, the Fourth Amendment does not categorically prohibit unrelated questioning, database inquiries, or communication with another agency. It prohibits using the traffic seizure to obtain additional time for an unrelated investigative purpose without a separate constitutional justification. See *Rodriguez*, 575 U.S. at 354–57; *Illinois v. Caballes*, 543 U.S. 405, 407–08 (2005).

That distinction reconciles *Illinois v. Caballes*, *Muehler v. Mena*, and *Rodriguez v. United States*. In *Caballes*, the Court permitted a dog sniff conducted during the time reasonably required to complete a traffic stop because the sniff did not prolong the seizure. 543 U.S. 405, 407–09 (2005). In *Muehler*, the Court held that no additional Fourth Amendment justification was required for immigration-status questioning during an independently lawful detention because "[t]he Court of Appeals did not hold that the detention was prolonged by the questioning." 544 U.S. 93, 101 (2005). The holding therefore turned on the absence of any additional detention attributable to the inquiry, not on a rule that immigration questioning is part of every detention's mission or categorically exempt from Fourth Amendment limits. *Rodriguez* later incorporated that same distinction: unrelated inquiries require no additional justification when they do not extend the detention, but an officer may not add time to a traffic stop to pursue an unrelated objective absent independent constitutional justification. 575 U.S. 348, 354–57 (2015).

The constitutional issue is therefore not whether officers asked immigration-related questions in the abstract. *Muehler* expressly confirms that such questions

may be asked during an otherwise lawful detention when they do not extend the seizure. Plaintiffs instead challenge the alleged use of the traffic stop itself to obtain additional time for immigration verification, investigation, federal response, interviewing, and custody-transfer activity.

The Eleventh Circuit applies the same time-focused rule. In *United States v. Campbell*, the en banc court explained that an officer unlawfully prolongs a stop when the officer, without reasonable suspicion, conducts an unrelated inquiry that adds time to the seizure. 26 F.4th 860, 884–85 (11th Cir. 2022) (en banc). The constitutional question is not simply whether the stop's total duration appears reasonable in the abstract. The question is whether unrelated conduct caused the stop to last longer than reasonably necessary to complete its traffic mission. *Id.* at 884–86.

An unrelated activity may add time in at least two ways. First, traffic tasks may have been completed, yet the officer may continue detaining the motorist to pursue another investigation. Second, the officer may interrupt or divert from unfinished traffic tasks so that the unrelated investigation delays the point at which the traffic mission reasonably should have ended. See *Rodriguez*, 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs,' i.e., adds time to, 'the stop.'"). An officer therefore cannot control the constitutional endpoint simply by postponing issuance of a warning while pursuing an unrelated objective.

The Court also rejected the Government's theory that an officer who completes traffic tasks efficiently may "earn bonus time to pursue an unrelated criminal investigation." *Rodriguez*, 575 U.S. at 357. The same principle governs here. Defendants may not transform time reasonably required for a traffic stop into "bonus time" for civil immigration screening, federal records checks, federal

response, or custody-transfer arrangements. Whether the warning remained formally unissued is not dispositive; the Fourth Amendment turns on whether those unrelated activities prolonged the seizure.

This rule does not require officers to complete traffic stops at the fastest conceivable speed. Officers may take the time reasonably required to perform legitimate traffic and safety tasks diligently. See *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985). But the stop may not be lengthened because the officer abandons, pauses, or defers those tasks to pursue an unrelated investigation. *Rodriguez*, 575 U.S. at 354–57; *Campbell*, 26 F.4th at 884–86.

If an unrelated investigation adds time, continued detention requires an independent constitutional basis. Reasonable suspicion may justify further detention when supported by specific and articulable facts that, considered together, reasonably indicate separate criminal activity. See *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). The justification must be sufficient at the time the separate detention begins. The validity of the extension therefore must be assessed from the objective information available when the continued detention occurred.

**B. Civil Immigration Screening and Custody Transfer Were Not Ordinary Incidents of This Traffic Stop**

Defendants may rely on *Muehler v. Mena*, which held that officers did not violate the Fourth Amendment by asking immigration-related questions during an otherwise lawful detention. 544 U.S. 93, 100–02 (2005). Plaintiffs do not dispute that limited proposition and do not challenge questioning, information sharing, or communication with federal immigration officials in the abstract. But *Muehler*'s reasoning turned on the absence of added detention: because the questioning did not prolong the independently lawful seizure, no additional Fourth Amendment justification was required. *Id.* at 101.

The conduct alleged here went materially further than the concurrent questioning addressed in *Muehler*. Plaintiffs allege immigration-verification requests, federal records checks, federal response activity, immigration interviewing, and custody-transfer arrangements that added time to the traffic seizure. The federal Form I-213 allegedly states that federal personnel performed records checks and a field interview to determine Jose's identity, alienage, and removability. The record further reflects that federal personnel traveled to the roadside, questioned Jose about immigration matters, removed and handcuffed him, and assumed civil immigration custody while the local traffic event remained open. The resulting question therefore falls within the prolongation framework later articulated in *Rodriguez* and *United States v. Campbell*, rather than the limited no-added-time facts of *Muehler*.

That civil character is legally significant. Removal is a civil process, not punishment for a criminal offense. *Arizona v. United States*, 567 U.S. 387, 396 (2012). Plaintiffs do not contend that local officers may never communicate with federal immigration authorities or request immigration-status information. *Arizona* recognizes that consultation between federal and state officials is an important feature of the immigration system and that Congress has encouraged the sharing of immigration-status information. *Id.* at 411–13. The constitutional issue is whether the traffic stop was prolonged to facilitate immigration-status verification, removability inquiries, federal response, or custody-transfer activity. On that point, the Court warned: "Detaining individuals solely to verify their immigration status would raise constitutional concerns." *Id.* at 413.

*Arizona* also explained that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). And it cautioned that "it would disrupt the

federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Id.* Thus, *Arizona* permits communication and information sharing, but it does not authorize local officers to create or extend custody while possible unlawful presence, removability, or civil-custody eligibility is investigated outside the limits imposed by federal and constitutional law.

The distinction is concrete. Local officers may call federal authorities, transmit a photograph or identifiers, request database information, share information, and receive a response when those acts do not add time to an independently lawful detention. But they may not keep a traffic stop open while awaiting federal verification, federal records work, federal arrival, an immigration interview, a removability determination, or acceptance into civil custody unless an independent lawful basis supports the continued seizure.

That is the issue presented here. Plaintiffs allege a federal verification request initiated less than one minute after Jose's identification was obtained, a dispatch entry reflecting "Delay 10 Minutes," federal records checks, federal travel to the roadside, immigration questioning, and eventual federal custody, all while the local traffic event remained open. Unlike the facial challenge in *Arizona*, where the Court construed the state law as potentially requiring a status check only during an otherwise authorized detention or after release, this as-applied record permits the Court to determine whether immigration activity actually prolonged Jose's seizure. See 567 U.S. at 413–15. The controlling question remains whether those activities added time after the traffic mission was, or reasonably should have been, completed.

Ordinary verification that the individual presenting a license is the licensed driver may be related to the traffic mission. Investigation of whether that individual is removable, is the subject of an administrative immigration record, or will be

accepted into civil immigration custody is analytically different. The latter objectives do not become ordinary traffic tasks merely because the investigation begins with a driver's license. At minimum, any time added to conduct those activities required an independent lawful basis for continued seizure.

### C. The Present Record Supports a Substantial Likelihood That Immigration Activity Added Time to Jose's Stop

The presently available chronology supports two related paths to the same conclusion.

#### *1. The immigration activity diverted the stop from diligent completion of its traffic mission.*

Sergeant Ivester activated his emergency lights at approximately 6:30:18 p.m. At approximately 6:31:41 p.m., he returned to his patrol vehicle with Jose's identification. Less than one minute later, at approximately 6:32 p.m., a Habersham County deputy requested federal immigration identity verification. According to the Form I-213, federal immigration personnel began conducting records checks before traveling to the roadside. At 6:33:44 p.m., dispatch changed the CAD status to "Delay 10 Minutes." Apparent federal personnel arrived at approximately 6:37:15 p.m., while the local traffic stop remained open. Dispatch did not close the stop until 6:41:18 p.m., when it entered the disposition "Verbal Warning." Significantly, the federal identity-verification request occurred less than one minute after Sergeant Ivester returned to his patrol vehicle with Plaintiff's identification, and before any citation, arrest, warning, or documented state criminal investigation existed in the contemporaneous record. And there is no corroborating evidence on record that any definitive verbal warning was actually issued.

The sequence supports a reasonable inference that the immigration investigation displaced or delayed completion of the traffic mission. The federal

request was made almost immediately after Ivester obtained Jose's identification. The delay status followed shortly thereafter. Federal officers then arrived before the warning disposition was entered. Jose remained seized throughout that interval. This chronology fits the precise concern identified in *Rodriguez*. The fact that the stop remained formally open cannot create "bonus time" in which officers may pursue unrelated civil immigration objectives while deferring completion of a warning-only disposition. The federal verification request, federal records checks, recorded delay, federal travel to the roadside, immigration questioning, and custody-transfer activity support the inference that civil immigration activity added time to the seizure rather than merely occurring alongside diligently pursued traffic tasks. See *Rodriguez*, 575 U.S. at 357.

The CAD delay entry does not, standing alone, establish who requested the delay or why. Nor does the present record conclusively establish precisely when every legitimate license, registration, insurance, warrant, or warning-related task was completed. But the Rule 65 standard requires a substantial likelihood of success, not final proof after full discovery. The temporal and sequential relationship among the federal request, records checks, delay entry, federal arrival, immigration interview, and warning disposition supports a substantial likelihood that immigration-related activity caused the stop to last longer than it otherwise would have lasted.

Defendants may contend that traffic tasks remained underway throughout the interval and that the immigration-related activity occurred concurrently. That factual assertion requires a task-by-task explanation. Relevant questions include when ordinary license and registration responses returned, whether a warning was being prepared, whether Ivester continued traffic-related work while federal checks occurred, whether release depended on federal arrival, and what caused the "Delay 10 Minutes" entry. Those facts are largely documented in records and

communications controlled by Defendants and are proper subjects of the expedited discovery Jose requests.

***2. Even if some traffic work remained at 6:32 p.m., the traffic mission reasonably should have ended before Jose was held for federal arrival and civil custody transfer.***

Alternatively, the record supports a substantial likelihood that the traffic mission reasonably should have been completed before the immigration investigation and custody transfer concluded.

The local stop resulted only in a verbal warning. No contemporaneous record identifies a traffic citation, a state arrest, an outstanding criminal warrant, or a separate Georgia charge. Federal personnel nevertheless conducted immigration records checks, traveled to the roadside, performed a field interview concerning identity, alienage, and removability, and assumed custody while Jose remained detained. The local CAD event stayed open until the custody-transfer sequence was underway.

The formal closing time does not establish that all preceding detention was constitutionally necessary. Under *Rodriguez*, the relevant question is not when the officer elected to enter or communicate the warning. It is whether unrelated conduct added time to the seizure. 575 U.S. at 357. If ordinary traffic tasks reasonably could have been completed before federal officers arrived, continued detention to permit federal records checks, roadside immigration questioning, or custody transfer was an unrelated extension.

*Rodriguez* therefore forecloses any contention that Sergeant Ivester could preserve authority over Jose merely by leaving the warning unfinished while federal personnel completed civil immigration screening and arranged custody. Efficient or delayed completion of the traffic tasks does not generate discretionary

time for an unrelated investigation; the constitutional endpoint is when those tasks were, or reasonably should have been, completed. *Id.* at 354, 357.

The overall duration, approximately eleven minutes from activation of emergency lights to the CAD closing entry, does not create a categorical safe harbor. A relatively brief stop may still be unlawfully prolonged if unrelated activity adds time. Conversely, a longer stop may be lawful when legitimate traffic tasks reasonably require the additional time. The duration is relevant evidence, but causation and diligent pursuit remain the controlling questions.

**D. The Later Assertion of Suspected License Fraud Does Not Defeat Likelihood of Success on the Present Record**

Defendants will likely rely on Ivester's later incident report, which states that Jose appeared nervous, fumbled with the license, had shaking hands, and presented a Maryland license whose photograph did not appear to match him. According to the report, Ivester contacted an immigration officer because federal agents possessed additional identification resources. Those allegations may support an argument that independent reasonable suspicion justified some additional identity verification, but must first be properly evaluated for credibility. The circumstances of the arrest, and the ad-hoc and post-hoc creation of the report justifying the stop, along with Sgt. Ivester's initial refusal to provide related records on his phone, call the report into question as to accuracy of memory and credibility.

They do not conclusively defeat Jose's prolongation claim.

First, the presently available records provide materially different accounts. Jose recalls being told that the stop concerned a lighting problem. The contemporaneous CAD record identifies no suspected fraudulent license, false-identification offense, criminal-impersonation investigation, state charge, warrant, or arrest. The account

concerning suspected fraud appeared in an incident report prepared approximately six months after the stop and after open-records requests had been made.

Second, the relevant question is not merely whether some suspicion existed, but suspicion of what and whether the detention actually undertaken remained reasonably directed to that suspected offense. Suspicion that a driver's license is fraudulent, if objectively supported, may justify steps reasonably calculated to confirm or dispel document fraud. It does not automatically justify detention to investigate alienage, civil removability, eligibility for federal immigration custody, or the logistics of a civil custody transfer. The Court must therefore compare the asserted basis for the extension with what officers actually did: what information was requested, which databases were consulted, what questions were asked, whether ordinary document-authentication methods were pursued, and whether release was delayed for federal immigration response or custody acceptance.

Third, reasonable suspicion must rest on the totality of the objective circumstances known when the additional detention begins. General nervousness during a traffic stop is ordinarily of limited weight. The precise nature of the alleged photographic mismatch, the availability of ordinary motor-vehicle or criminal databases, the timing and content of the federal request, and the purpose of the records checks therefore matter. Those subjects remain appropriate for expedited discovery.

At this stage, the later report creates a factual issue, but it does not eliminate the substantial likelihood that the immigration investigation prolonged the stop without an adequate independent basis.

**E. Federal Assumption of Custody Did Not Retroactively Justify Any Preceding Local Prolongation**

Defendants may also argue that federal officers independently assumed lawful immigration custody and that any later detention is attributable solely to those officers. But lawful federal authority at the moment of custody transfer would not establish that an earlier local extension used to keep Jose at the roadside until federal officers arrived was independently justified.

The relevant periods must be analyzed separately. Ivester initiated the traffic seizure, obtained Jose's identification, remained at the roadside, and retained control of the open local traffic event while federal records checks and response activity occurred. Federal personnel arrived before dispatch closed the local stop. Thus, even if federal officers later possessed independent authority to arrest Jose, the Court must still determine whether the preceding local detention was extended to facilitate that transition without a separate lawful basis.

The requested order is carefully limited to that local prolongation question. It does not adjudicate the validity of federal immigration custody, halt removal proceedings, or restrict lawful non-time-adding communication between local and federal authorities.

**F. The Comparison Stops Corroborate Purpose and Recurrence but Need Not Be Adjudicated at This Stage**

The same-evening comparison stops are not necessary to prove the precise unconstitutional increment in Jose's stop. They are nevertheless relevant circumstantial evidence concerning what activity the participants were conducting and why federal personnel arrived.

The recordings allegedly depict at least three additional stops of construction-related trucks or vans, followed by collection of identification,

cellular communications, arrival of masked personnel or a white passenger van, discussion of nationality or immigration status, counting of occupants, and restraint or transfer activity. During a later encounter, Ivester allegedly described identification documents as Mexican or Guatemalan and stated words to the effect that the occupants were "admitting illegals."

Jose does not ask the Court to determine at the TRO stage whether each comparison stop lacked reasonable suspicion or probable cause. Those recordings instead reinforce the reasonable inference that Jose's stop involved an immigration-related operational objective rather than an isolated request to authenticate a driver's license. They also support preservation and expedited discovery into the communications, policies, participants, and practices connecting the recorded encounters.

**G. Jose Has Therefore Demonstrated a Substantial Likelihood of Success**

Even assuming for present purposes that Ivester lawfully initiated the traffic stop, the current record supports a substantial likelihood that the seizure was unlawfully prolonged. The immigration-verification request began almost immediately after Ivester obtained Jose's identification. Federal personnel conducted records checks and traveled to the roadside while the stop remained open. A delay entry appeared shortly after the request. Federal personnel arrived before the warning disposition was entered, questioned Jose concerning alienage and removability, and assumed custody. The local stop then closed with only a verbal warning and no documented state arrest, criminal warrant, or separate state charge.

Those circumstances support either of two applications of *Rodriguez*. The immigration activity may have diverted Ivester from diligently completing the traffic mission, or the mission may reasonably have been complete before Jose was

held for federal arrival, immigration interviewing, and custody transfer. Under either theory, any time added for civil immigration purposes required independent constitutional justification.

The claimed license mismatch warrants factual development, but the later report does not conclusively establish that the detention actually undertaken was directed toward a Georgia document offense rather than civil immigration screening, and the subsequent pattern of behavior raises serious doubts about an investigation into criminal rather than civil immigration matters. Because the objective timestamps, federal records, personal-device communications, later-created report, and disposition collectively support Jose's prolongation claim, he has demonstrated the requisite likelihood of success for temporary relief.

At the temporary-relief stage, Plaintiffs need not conclusively prove the exact number of minutes attributable to the challenged prolongation, nor resolve every factual dispute concerning the stop. Plaintiffs need only demonstrate a substantial likelihood of success on the merits. The present record satisfies that standard.

## VIII. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT TEMPORARY RELIEF

### A. Ongoing and Future Constitutional Violations Constitute Irreparable Harm

Plaintiffs seek prospective relief to prevent future constitutional violations, not merely to remedy completed past injuries. Plaintiff Jose Carlos Rivas Diaz continues to reside and work in northeast Georgia. He no longer drives; his wife drives him, and he regularly travels as her passenger to construction and remodeling jobs and other necessary destinations within the same patrol area. The Complaint alleges that the challenged conduct did not arise from a single isolated

encounter but from recurring practices, customs, referral procedures, training deficiencies, and coordinated local-federal enforcement activity affecting drivers and passengers alike and continuing to create a risk of future injury.

The asserted irreparable injury must be neither remote nor speculative, but actual and imminent. *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020). Jose therefore relies on concrete future-exposure facts: he continues to travel within the same patrol area in which the February 20, 2026 detention occurred, performs the same construction work, and regularly rides as a passenger in construction-related vehicles driven by his wife. The comparison stops show that the alleged practices included obtaining identification from passengers, discussing their nationality or immigration status, counting occupants, and restraining or preparing passengers for transfer. The Complaint also alleges that the challenged conduct reflected recurring practices rather than an isolated completed event. Those facts support imminence through Jose's recurring routes, destinations, work-related travel, and continuing exposure as a passenger.

**B. The Threatened Injury Is Immediate Rather Than Hypothetical**

The Complaint alleges that the February 20 stop was one of multiple same-evening stops involving construction vehicles, collection of identifying information, use of cellular communications, arrival of apparent federal personnel, immigration-related questioning, and eventual restraint or transfer activity. Plaintiffs rely on those recurring features not merely as historical evidence, but as evidence that the challenged practices remain capable of repetition.

Unlike a plaintiff challenging only a completed encounter from the distant past, Jose remains situated where future injury could occur: he continues to live in the area, perform the same construction work, and travel through the same patrol jurisdiction as a passenger in construction-related vehicles driven by his wife. The

same-evening record reflects alleged enforcement activity directed not only at drivers but also at vehicle passengers. The alleged threat is therefore concrete, ongoing, and prospective.

**C. Targeted Preservation Relief Is Necessary to Prevent Loss of Material Evidence**

Even apart from the risk of future detention, immediate equitable relief is necessary to preserve evidence central to the claims and defenses in this case. The Complaint alleges that communications concerning the February 20 operation occurred through privately owned devices and that identifying information and operational communications were transmitted through personal-cell-phone exchanges. The Complaint further alleges that the Sheriff's Office indicated that Sergeant Ivester would not voluntarily surrender his personal cellular telephone and that additional information would need to be obtained through compulsory process, and that the screen shots now on record were not provided until after consultation with the attorney for Habersham County. Plaintiffs also challenge a report created months after the underlying event and seek discovery concerning communications, metadata, extraction records, and document-creation history.

Electronic communications, metadata, location information, application data, and other electronically stored information may be susceptible to deletion, alteration, overwriting, loss, or routine retention practices. Plaintiffs therefore seek targeted preservation relief limited to the particular devices, communications, and later-created records alleged here. The requested order preserves the status quo: it requires reasonable preservation but does not compel immediate surrender, forensic imaging, inspection, or production of personal devices or privileged material.

**D. Legal Remedies Are Inadequate**

The prospective injuries alleged here cannot be fully redressed by a later award of damages. Money damages cannot prevent a future unconstitutional detention. Nor can they recreate deleted communications, missing metadata, overwritten recordings, or destroyed electronic records after those materials have been lost. Likewise, legal relief following final judgment cannot protect Plaintiffs from the risk of recurrence during the pendency of this litigation. Indeed, should Plaintiff happen onto another operation like the one he encountered on February 20, 2026, he could once again be separated from his family and be placed into immigration detention due to the quotas that one federal agent testified under oath has existed under the current administration.

For those reasons, Plaintiffs have demonstrated that they face irreparable injury absent temporary injunctive relief and preservation measures designed to maintain the status quo until the Court can conduct a full preliminary-injunction hearing.

## IX. THE BALANCE OF EQUITIES FAVORS TEMPORARY RELIEF

The balance of equities strongly favors the limited relief requested here. Plaintiffs do not seek an order halting removal proceedings, terminating federal supervision, restricting lawful communication with federal authorities, or preventing Defendants from conducting otherwise lawful traffic enforcement. Instead, Plaintiffs seek a narrowly tailored order preserving the status quo, preventing the prolongation of traffic stops for civil immigration purposes absent independent lawful grounds, preserving evidence, and allowing expedited discovery. The proposed order expressly preserves lawful arrests, lawful investigative detentions supported by independent reasonable suspicion or probable cause, execution of criminal warrants, and lawful communication with

federal authorities that does not prolong a detention beyond the time reasonably necessary to complete the traffic mission.

By contrast, the harm to Plaintiffs from denial of relief is substantial. Plaintiffs allege that Jose remains exposed to the same detention practices because he continues to reside and work in northeast Georgia and regularly travels as a passenger in construction-related vehicles driven by his wife within the same patrol area in which the challenged detention occurred. Furthermore, the busy highway 365, on which Plaintiff was travelling on February 20, is practically impossible to avoid, and there is no evidence that the alleged operation was limited to that one spot. The comparison stops allegedly show that passengers were subjected to identification demands, immigration-related inquiry, counting, restraint, and transfer activity. Plaintiffs further allege that the challenged conduct arose from recurring practices rather than a single completed historical event. Absent temporary relief, Plaintiffs remain subject to the risk of future constitutional injury before the Court can adjudicate the merits of their claims.

The equities also favor preservation relief. Plaintiffs have identified communications allegedly occurring through personally owned cellular telephones, records reflecting local-federal coordination, and a later-created incident report that differs in significant respects from the contemporaneous CAD and dispatch materials. Plaintiffs further allege that responsive personal-device communications may not be maintained within ordinary governmental preservation systems. Once electronic communications, metadata, location data, or application records are deleted or overwritten, those materials may be impossible to recover. Preservation therefore protects both parties by ensuring that the case is decided on the basis of the best available evidence. Indeed, a preservation order may avoid a misunderstanding on the Defendants' part, who might mistakenly believe that such information is not subject to discovery or Open Records Act requests, and may

incur a negative presumption or adverse credibility by deleting information based on a misunderstanding of the law.

The requested injunction imposes only minimal burdens on Defendants. Defendants are not required to alter ordinary traffic-enforcement operations except to avoid conduct that Plaintiffs contend is already prohibited by the Fourth Amendment, and though already prohibited, the conduct of defendants demonstrates that clarification with specificity is needed for the benefit of all parties. Likewise, the preservation provisions do not require immediate forensic imaging, surrender of personal devices, or production of privileged materials. They merely require Defendants to preserve potentially relevant evidence and suspend deletion practices while the litigation proceeds. The expedited-discovery provisions are similarly limited to identification of participants, preservation of communications, interagency coordination, detention practices, and related policy materials.

Moreover, Defendants have no legitimate equitable interest in continuing practices that violate constitutional limitations. If Plaintiffs ultimately prove that the challenged detention was prolonged beyond the point reasonably necessary to complete its traffic mission, then the requested injunction merely requires compliance with existing constitutional requirements rather than imposing any new substantive obligation. The proposed relief is therefore carefully tailored to minimize burdens while preventing potentially ongoing constitutional harm by providing needed clarity to local law enforcement.

Accordingly, the threatened injury to Plaintiffs substantially outweighs any burden imposed on Defendants by the requested temporary relief, and the balance of equities weighs decisively in favor of granting the Motion.

## X. THE PUBLIC INTEREST STRONGLY FAVORS TEMPORARY RELIEF

If the government defendants oppose the requested relief, the balance-of-harms and public-interest inquiries merge. *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020). The Court should therefore assess the public consequences of relief together with the operational burdens asserted by the government.

The public interest strongly favors entry of the limited relief requested here. Plaintiffs do not ask this Court to alter federal immigration policy, halt removal proceedings, terminate federal supervision, or prohibit lawful communication between local and federal authorities. Instead, Plaintiffs seek an order ensuring that local traffic-stop detentions remain subject to existing constitutional limitations and that relevant evidence is preserved while this litigation proceeds. The requested relief therefore promotes, rather than disrupts, the orderly administration of law at the same time as it protects Plaintiff's interests in ordered liberty.

The public has a compelling interest in ensuring that traffic stops comply with the Fourth Amendment. Traffic stops are among the most common forms of police-citizen encounter, and confidence in law enforcement depends upon adherence to constitutional limits governing the initiation, duration, and scope of those encounters. The evidence provided here shows that these prolonged traffic stops caused real danger to both the public, who was travelling on a busy road on a Friday night, and to the officers, who ran across traffic in the dark to pursue 2 of the fugitives, and to the immigrants who form part of the public. If Plaintiffs are correct that traffic stops were prolonged beyond their lawful mission in order to facilitate unrelated civil immigration activity, then temporary relief serves the public interest by preventing similar constitutional violations while the Court considers the merits.

The requested order is also narrowly tailored. It does not prevent officers from conducting lawful traffic enforcement. It does not prevent officers from investigating criminal offenses supported by independent reasonable suspicion or probable cause. It does not prohibit execution of criminal warrants. It does not prohibit lawful communication with federal immigration authorities that does not prolong a detention. Rather, it requires only that Defendants comply with existing constitutional limitations governing the duration of traffic stops. Because the order preserves lawful enforcement authority while preventing potentially unconstitutional conduct, the public interest weighs heavily in favor of relief.

The specificity requirements of Federal Rule of Civil Procedure 65(d) are not mere technical requirements. The Supreme Court has explained that Rule 65(d) exists to prevent uncertainty and confusion and to ensure that those bound by an injunction receive explicit notice of the conduct required or prohibited. *Schmidt v. Lessard*, 414 U.S. 473, 476–77 (1974). Plaintiffs' proposed order satisfies that standard because it identifies the specific detention practices, preservation obligations, custodians, and categories of information at issue rather than imposing a generalized command to obey the law.

The proposed order does not merely direct Defendants to obey the Constitution. It identifies the prohibited purpose, the triggering event, the specific categories of immigration activity covered, the mission-related tasks that remain lawful, and the independent grounds that permit continued detention. It further identifies the officials and persons bound and preserves lawful non-dilatory communication with federal authorities. Those concrete terms provide notice of what conduct is restrained and permit objective judicial administration without requiring the order to incorporate the Complaint or memorandum by reference.

**Proposed Operational Provision**

Defendant Sheriff Robin Krockum, in his official capacity and to the extent he possesses legal authority over the challenged traffic-stop function, and the Sheriff's officers, deputies, agents, employees, successors in office, and other persons acting in active concert or participation with them who receive actual notice of this Order shall not extend the duration of a traffic stop beyond the time reasonably required to complete the traffic mission for the purpose of obtaining civil immigration screening, civil immigration-status or removability checks, a civil immigration custody decision, the arrival of federal civil immigration personnel, or transfer to civil immigration custody.

This prohibition applies when the identified immigration-related activity adds time to the traffic stop, including when an officer pauses, diverts from, or delays diligent completion of mission-related tasks to facilitate that activity.

This provision does not prohibit:

1. completing tasks reasonably related to the traffic mission, including addressing the suspected traffic violation; checking the driver's license, registration, proof of insurance, and criminal warrants; determining whether the person presenting a driver's license is the licensed driver; preparing a citation or warning; and attending to roadway and officer safety;
2. asking questions, making inquiries, or communicating with federal authorities when those activities do not add time to the stop;
3. extending a detention based on independent reasonable suspicion of criminal activity supported by specific and articulable facts existing when the extension begins;
4. arresting or detaining a person based on probable cause of a criminal offense;
5. executing a valid criminal warrant;

6. acting pursuant to voluntary consent that is not the product of an unlawfully prolonged detention; or
7. exercising other detention authority expressly recognized by governing law and identified contemporaneously in the officer's records.

The fact that a citation or warning has not yet been formally issued does not, by itself, establish that continued detention remains part of the traffic mission. The controlling question is whether the unrelated immigration activity caused the stop to last longer than reasonably necessary to complete the traffic mission.
Nothing in this Order adjudicates the validity of any federal immigration arrest, prohibits lawful communication with federal authorities, restricts a criminal investigation supported by independent lawful grounds, or requires an officer to complete traffic tasks at the fastest conceivable speed.

The public likewise has a substantial interest in the preservation of evidence relevant to constitutional claims. Courts, litigants, and the public benefit when disputes are resolved on a complete factual record rather than after the loss or destruction of potentially relevant communications, metadata, recordings, or other electronically stored information. The Complaint alleges that important communications may exist on personally owned devices and accounts, that disputes already exist concerning access to those materials, and that significant factual questions remain concerning the timing and nature of communications among local and federal participants. Preservation of those materials serves the interests of both sides and promotes accurate judicial fact-finding.

The public interest further favors narrowly tailored expedited discovery. Plaintiffs allege that numerous participants remain unidentified, including federal officers and other individuals reflected in personal-device communications. The proposed discovery is limited to identifying participants, preserving communications, understanding interagency coordination, and obtaining policy and

training materials directly relevant to the challenged detention practices. Allowing expedited discovery promotes informed judicial review and reduces the risk that important evidence will be lost before the Court can evaluate Plaintiffs' request for longer-term preliminary relief.

Finally, the public interest favors maintaining constitutional safeguards while avoiding unnecessary intrusion into legitimate law-enforcement functions. The proposed order strikes that balance. It preserves Defendants' ability to perform ordinary traffic enforcement, criminal investigations supported by independent legal justification, and lawful coordination with federal authorities. At the same time, it protects the public's interest in ensuring that detentions are not extended beyond constitutional limits and that evidence necessary to evaluate those limits is preserved. Accordingly, the public-interest factor strongly favors entry of temporary relief.

## XI. THE COURT SHOULD ENTER THE REQUESTED PRESERVATION ORDER

Independent of the broader request for prospective injunctive relief, the Court should immediately enter the proposed preservation order to ensure that relevant evidence remains available during the pendency of this action. The requested preservation provisions are narrowly tailored, directly connected to the claims and defenses at issue, and necessary to prevent the loss of information uniquely within Defendants' possession, custody, or control.

### A. The Record Demonstrates A Concrete Need For Immediate Preservation Relief

Plaintiffs challenge a traffic stop that allegedly evolved into a coordinated local-federal immigration detention. The facts relevant to that claim are

documented not only in official reports and dispatch records, but also in electronic communications, personal-device records, federal records checks, and communications among local and federal participants. The Complaint specifically alleges that Plaintiff's identifying information was photographed and transmitted through a personal-device communication thread containing a location pin and operational messages concerning who would respond to the stop and whether the detained individual would leave with responding personnel.

The Complaint further alleges that, after Open Records Act requests were made, the Sheriff's Office represented that Sergeant Adam Ivester would not surrender his personally owned cellular telephone for review and that additional information would have to be obtained through subpoena or formal discovery. Plaintiffs therefore face a concrete risk that relevant communications, metadata, application data, and related electronically stored information may exist outside ordinary governmental retention systems.

Preservation relief is particularly appropriate because Plaintiffs challenge the accuracy of a report allegedly created months after the underlying stop and seek discovery concerning communications, metadata, extraction records, and document-creation history relating to the February 20 operation – particularly where there is evidence of unjustified reticence in providing public information stored there. Preservation ensures that those issues can be resolved using the best available evidence rather than through speculation after information has been lost.

Because the existence of those communications is established by records already produced, preservation does not rest upon speculation or mere possibility. The requested order is limited to preservation at this stage. It does not seek immediate collection, forensic imaging, inspection, or production of personal-device content, and it preserves appropriate objections based on privilege, privacy, burden, and the limits of possession, custody, or control.

**B. The Requested Preservation Order Is Narrowly Tailored**

The proposed order does not require immediate production of records, forcible surrender of devices, forensic imaging, disclosure of privileged information, or inspection of personal accounts. Instead, it requires only preservation of potentially relevant evidence pending ordinary discovery. The order therefore maintains the status quo while minimizing burden on Defendants.

The proposed order is also limited in subject matter. It applies only to materials relating to:

- the February 20, 2026 traffic stop, detention, and custody transfer;
- communications relating to immigration verification requests or federal response activity;
- recordings, dispatch records, CAD records, metadata, and related operational materials;
- relevant interagency communications;
- policies, training materials, and records concerning immigration-enforcement coordination; and
- personally owned devices or accounts used in connection with the events at issue.

The requested preservation obligation is therefore proportional to the claims already pleaded and does not constitute an open-ended request to preserve unrelated governmental information.

The preservation obligations are also described with the specificity required by Rule 65(d). The Supreme Court has emphasized that an injunction must be specific in its terms and describe in reasonable detail the acts required or restrained. *Schmidt v. Lessard*, 414 U.S. 473, 476–77 (1974). The proposed order does so by identifying particular custodians, systems, applications,

communications, recordings, metadata, and preservation acts, rather than relying on broad or undefined categories.

**C. Personally Owned Devices and Accounts Must Be Included**

A preservation order limited to government-owned systems would be insufficient on the current record. The Complaint expressly alleges communications occurring through personally owned devices and identifies records reflecting transmission of Plaintiff's identifying information through a personal-device exchange. The Complaint further alleges that responsive information may exist on privately owned devices that are not maintained through ordinary governmental retention systems.

For that reason, the proposed order properly extends to personally owned devices and accounts used in connection with the events and operations at issue. The order does not treat personal devices differently from government devices when those devices were used to conduct, facilitate, coordinate, document, communicate about, or transmit information concerning the February 20 detention or related operations. The proposed order therefore closes a significant preservation gap while remaining narrowly tailored to materials relevant to this litigation.

**D. Suspension Of Deletion Practices Is Necessary To Preserve The Status Quo**

Electronic communications, location data, metadata, text messages, and application-based communications are uniquely vulnerable to automatic deletion, overwriting, synchronization changes, retention limits, software updates, and ordinary daily use. Once such information is lost, later discovery orders often cannot restore it. Preservation therefore requires more than a general instruction not to destroy evidence.

The proposed order appropriately requires:

- suspension of automatic deletion and overwriting practices;
- written litigation-hold instructions;
- preservation of personally owned devices and accounts used in connection with the events at issue; and
- written certification of preservation efforts within fourteen days.

Those measures are directed solely toward preventing loss of information pending discovery and do not materially interfere with ordinary governmental operations.

**E. Preservation Relief Benefits Both Parties And The Court**

The requested relief protects not only Plaintiffs but all participants in this litigation. Preservation ensures that Defendants may rely on a complete record to defend their actions, that Plaintiffs may test competing factual accounts through discovery, and that the Court may decide disputed issues based on preserved evidence rather than incomplete documentation.

Accordingly, even if the Court reserves broader issues for a later preliminary-injunction hearing, the present record independently supports immediate entry of the proposed preservation order. The requested relief is limited, practical, minimally burdensome, and essential to the fair resolution of this action.

## XII. EXPEDITED DISCOVERY IS NECESSARY TO PRESERVE EVIDENCE AND FACILITATE MEANINGFUL PRELIMINARY-INJUNCTION REVIEW

The Court should authorize narrowly tailored expedited discovery because the information necessary to evaluate Plaintiffs' request for preliminary injunctive relief remains largely within Defendants' possession, custody, or control. Plaintiffs do not seek broad merits discovery. Instead, Plaintiffs seek targeted discovery directed toward identifying participants, preserving potentially transient evidence,

understanding the sequence of relevant events, and ensuring that the Court can decide the preliminary-injunction request upon a complete and accurate record.

**A. Critical Information Remains Exclusively Within Defendants' Possession**

The Complaint alleges that multiple local, federal, and yet-unidentified participants took part in the events of February 20, 2026. Although certain participants have been identified through currently available records, the identities, roles, authority, communications, and responsibilities of numerous other individuals remain unknown. Plaintiffs further allege that relevant communications, records, metadata, operational plans, supervisory communications, dispatch records, and personal-device communications remain under the control of Defendants and other participants. Without expedited discovery, Plaintiffs cannot fully identify the actors involved in the stop, determine what communications occurred, or evaluate whether the challenged detention practices reflected isolated conduct or a recurring operational practice.

**B. Expedited Discovery Is Necessary Because Important Electronic Evidence May Be Time-Sensitive**

The present record indicates that relevant communications may exist in text messages, call-detail records, application data, location-sharing records, Signal communications, WhatsApp communications, cellular metadata, personal telephones, and other electronically stored information. Such records can be altered, overwritten, deleted, or lost through ordinary retention practices. Even with a preservation order in place, expedited discovery is necessary to identify what information exists, where it is located, who controls it, and how it should be collected and preserved. Delay creates a substantial risk that critical factual questions will become more difficult to resolve.

**C. Expedited Discovery Is Necessary To Evaluate The February 20 Detention Chronology**

The merits of Plaintiffs' Fourth Amendment claim turn substantially on what occurred during the limited period between the initiation of the stop and the transfer to federal custody. Although the current record contains CAD timestamps, recordings, reports, declarations, and federal documents, significant factual questions remain unresolved. Those questions include:

- what traffic-related tasks remained after Plaintiff's identification was obtained;
- what activities were undertaken during the interval between the immigration-verification request and federal arrival;
- who requested or entered the "Delay 10 Minutes" status;
- what communications occurred between local and federal personnel;
- whether ordinary traffic tasks continued during immigration-related activity;
- whether release of Plaintiff depended upon federal response or custody acceptance; and
- what basis, if any, existed for continued detention beyond the ordinary traffic mission.

Expedited discovery is directly relevant to those questions and therefore directly relevant to the Court's preliminary-injunction analysis.

**D. Plaintiffs' Discovery Requests Are Narrowly Tailored**

The proposed order does not authorize unrestricted discovery. Rather, Plaintiffs seek expedited discovery limited to:

- identification of known and unknown participants;
- preservation and collection of electronic communications;
- interagency coordination relating to the February 20, 2026 operation;

- detention-extension practices;
- immigration-verification practices; and
- training, supervision, policy, and authorization materials directly related to the challenged conduct.

These requests are carefully tailored to the issues presently before the Court and are proportional to the needs of the preliminary-injunction proceeding.

To avoid an open-ended authorization, any expedited-discovery order should specify the local defendants subject to discovery, defined subject areas, numerical limits for written discovery and depositions, response and privilege-log deadlines, and whether third-party subpoenas require separate leave. Discovery directed to unidentified federal actors should await identification, service, and any necessary jurisdictional determination.

**E. Expedited Discovery Will Promote Efficient Resolution Of The Preliminary-Injunction Motion**

Permitting narrowly tailored discovery at the outset will reduce factual uncertainty, minimize later disputes concerning preservation and collection, and allow the Court to evaluate Plaintiffs' request for preliminary relief on the basis of a more complete evidentiary record. Expedited discovery will therefore aid both the parties and the Court and will promote efficient and accurate adjudication of the issues presented by the pending Rule 65 motion.

Without expedited discovery, Plaintiffs cannot adequately prepare for the preliminary-injunction hearing because the identities of participants, contents of relevant communications, and chronology of key events remain uniquely within Defendants' possession and control.

## XIII. SECURITY SHOULD BE WAIVED OR SET AT A NOMINAL AMOUNT

The requested relief is primarily prohibitory and preservative rather than mandatory. Plaintiffs seek compliance with existing constitutional limitations and preservation of evidence. The relief does not halt business activity, suspend contracts, restrict property use, or otherwise expose Defendants to measurable compensable losses.

Rule 65(c) requires security only in an amount the Court considers proper to cover costs and damages sustained by a party later found to have been wrongfully enjoined. The amount therefore turns on the realistic risk of compensable harm caused by the requested order, not on the mere fact that temporary relief is sought. Here, the proposed order preserves Defendants' authority to conduct lawful traffic enforcement, pursue criminal investigations supported by independent constitutional justification, execute criminal warrants, and communicate with federal authorities so long as those activities do not prolong a traffic seizure. The order would impose no cognizable monetary loss from lawful operations; it would require only compliance with existing constitutional limits, preservation of relevant evidence, and participation in narrowly tailored expedited discovery.

Moreover, the requested preservation obligations largely mirror duties that already arise under ordinary litigation-preservation principles and therefore are unlikely to generate compensable economic loss.

Plaintiffs seek public-law relief to prevent constitutional injury and preserve the Court's ability to render meaningful relief. Requiring substantial security would burden access to equitable review without protecting Defendants from any identified financial harm. The Court should therefore waive security or, alternatively, require only a nominal bond sufficient to satisfy Rule 65(c).

## XIV. CONCLUSION

The present record supports a substantial likelihood that Plaintiff's traffic stop was prolonged to facilitate civil immigration verification, questioning, and custody transfer without an independent constitutional justification. The federal identity-verification request began less than one minute after Sergeant Ivester returned to his patrol vehicle with Plaintiff's identification, before any citation, arrest, warning, or documented state criminal investigation appeared in the contemporaneous record. Federal personnel then conducted records checks, traveled to the scene, and assumed custody while the local traffic event remained open and ultimately closed with only a verbal warning.

Plaintiffs also have shown immediate and irreparable harm, favorable equities, and a strong public interest in preventing unconstitutional detention and preserving evidence. The requested order is narrow: it leaves lawful traffic enforcement, independently justified criminal investigation, execution of criminal warrants, and non-time-adding interagency communication undisturbed. Immediate preservation and expedited discovery are independently warranted because relevant communications, metadata, personal-device records, participant identities, and key chronology remain within Defendants' possession or control and may be vulnerable to loss. Those measures will preserve the status quo and permit meaningful preparation for the preliminary-injunction hearing.

For these reasons, Plaintiffs respectfully request that the Court grant the Motion, enter the proposed temporary restraining and preservation order, authorize narrowly tailored expedited discovery, set an expedited preliminary-injunction hearing, and waive security or set it at a nominal amount.

Plaintiffs further respectfully request that the Court schedule an expedited preliminary-injunction hearing at the earliest practicable date.

At minimum, even if the Court determines that broader injunctive issues should await a preliminary-injunction hearing, the Court should immediately enter the proposed preservation order and authorize expedited discovery.