**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| J.C.R.D. and Y.L.H.A., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:26-cv-00284-RWS |
| | ) | |
| HABERSHAM COUNTY, GEORGIA, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**SHERIFF ROBIN KROCKUM'S, SERGEANT ADAM IVESTER'S AND HABERSHAM COUNTY, GEORGIA'S JOINT BRIEF IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Come now the following named defendants, Sheriff Robin Krockum, in his official capacity (the "Sheriff"), Sergeant Adam Ivester, in his individual capacity and in his official capacity only for prospective relief ("Sgt. Ivester"), and Habersham County, Georgia (the "County") (collectively, the "Responding Defendants"), without waiver of any defenses including but not limited to any and all official immunity, qualified immunity, sovereign immunity, Eleventh Amendment immunity and jurisdictional defenses[1], and file this, their Joint Brief in

[1] Waivers of Service on behalf of the Responding Defendants were filed on September 4, 2026, and as a result, the Responding Defendants' deadline to respond to the Complaint is November 3, 2026.

Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction (the "Emergency Motion")[2], and show the Court as follows.

## I. FACT ALLEGATIONS

The Emergency Motion incorporates by reference Plaintiffs' Complaint including all allegations, claims, exhibits and requests for relief contained therein. Responding Defendants do not admit to the incorporated allegations or concede to the relevance, authenticity, and/or admissibility of any of the exhibits to the Complaint, and expressly preserve any and all objections and defenses to the Complaint allegations and exhibits incorporated into the Emergency Motion.

The Emergency Motion's requested relief stems from a February 20, 2026 incident whereby Sgt. Ivester initiated a traffic stop of Plaintiff Jose Carlos Rivas Diaz ("Plaintiff Diaz"). It is alleged that after Plaintiff Diaz provided his license to Sgt. Ivester following the stop, federal immigration personnel were contacted to verify Plaintiff Diaz's identity. It is alleged that federal immigration personnel conducted records checks, traveled to the roadside, performed a field interview concerning Plaintiff Diaz's identity, alienage, and removability, and ultimately assumed civil immigration custody of Plaintiff Diaz. It is alleged that the duration

[2] Plaintiffs filed the Emergency Motion twice (Doc. 2; Doc. 4), with the duplicate second filing of the Emergency Motion also including a 44-page Brief in Support (Doc. 4-4). This response is in opposition to both Emergency Motion filings and all sub-filings under Doc. 2 and Doc. 4.

of the traffic stop was approximately 11 minutes and was cleared by dispatch with a "Verbal Warning" disposition. It is alleged that Sgt. Ivester's incident report of the stop that also described suspected license fraud was not created until approximately six months after the stop. Plaintiffs allege that following the stop, Plaintiff Diaz ceased driving and his wife began transporting him to construction and remodeling jobs throughout the same patrol area in the County.

Plaintiffs argue that the traffic stop was unlawfully prolonged in violation of the Fourth Amendment when Plaintiff Diaz's detention was extended beyond the time reasonably necessary to complete the traffic mission in order to facilitate civil immigration verification, federal records checks, and custody transfer, without any independent constitutional justification. The Emergency Motion requests a proposed injunction that includes prohibiting Responding Defendants from prolonging traffic stops to facilitate civil immigration activity absent independent lawful grounds, plus further relief related to evidence preservation and limited discovery.

## II. STANDARD OF REVIEW

The purpose of a temporary restraining order ("TRO"), like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits. Schiavo ex rel v. Schindler v. Schiavo, 403 F. 3d 1223, 1231 (11th Cir. 2005). A plaintiff seeking a TRO or preliminary injunction must establish: (1) that he is likely to succeed on

the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, (2008). Preliminary injunctions are never granted as of right, even if a plaintiff can show a likelihood of success on the merits. Benisek v. Lamone, 585 U.S. 155, 158 (2018). In the Eleventh Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' " as to each of the four prerequisites. Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000); see also Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir.1975) (grant of preliminary injunction "is the exception rather than the rule," and plaintiff must clearly carry the burden of persuasion).

## III. ARGUMENT AND CITATION TO AUTHORITY

Plaintiffs' Emergency Motion should be denied on multiple grounds. First, the requested extraordinary injunctive relief should be denied as impermissibly seeking a broad and vague injunction commanding Responding Defendants to "obey the law" or "obey the Constitution" in the absence of the necessary precision and specificity required by Rule 65(d). Further, Plaintiffs fail to demonstrate substantial likelihood of success on the merits. Additionally, there is a lack of standing because Plaintiffs do not sufficiently allege an actual case or controversy involving actual and imminent injury. Further, there is a failure to sufficiently demonstrate

irreparable harm. Moreover, the balance of equities and public interest do not favor injunctive relief. Finally, no case or controversy exists between Plaintiffs and the County.

### A. **The Motion Does Not Identify With Sufficient Precision What Plaintiffs Want This Court to Enjoin.**

Plaintiffs' Emergency Motion should be denied because it does not describe the conduct to be enjoined with the precision required by Rule 65(d). An injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). Accordingly, the Eleventh Circuit has repeatedly rejected injunctions that merely command a defendant to "obey the law" or "obey the Constitution" without providing an objective standard identifying the prohibited conduct. See SEC v. Smyth, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005); Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531–32 (11th Cir. 1996). An injunction must instead provide an "operative command capable of enforcement" and fair notice of what conduct will subject the restrained party to contempt. Hughey, 78 F.3d at 1531-32.

Plaintiffs seek to prohibit Responding Defendants from prolonging a traffic stop beyond the time reasonably necessary to complete its traffic mission for specified immigration-related purposes, "absent independent lawful authority supporting the continued detention." They further provide that the injunction would not prohibit inquiries or communications with federal authorities when those

activities "do not add time to the stop." Although more detailed than a general command to obey the Constitution, these provisions still leave the central constitutional determinations to the officers subject to the injunction: whether a particular inquiry "adds time," when the traffic mission reasonably should have concluded, and whether "independent lawful authority" exists to support continued detention.

Those determinations are inherently fact-specific and, in many instances, can only be made retrospectively. Whether a communication "adds time," for example, requires comparison to the hypothetical time at which the stop otherwise would have ended. Likewise, whether reasonable suspicion or other lawful authority supports continued detention depends upon the totality of circumstances confronting the officer. The proposed injunction therefore would subject officers to potential contempt based upon a later judicial determination that their assessment of these constitutional questions was incorrect.

The Eleventh Circuit has rejected comparable injunctions. In Walker v. City of Calhoun, 682 F. App'x 721, 724–25 (11th Cir. 2017), the court vacated an injunction requiring a municipality to implement procedures that "comply with the Constitution" because the command did not sufficiently identify what conduct was required. Similarly, Hughey vacated an injunction prohibiting discharges "if such discharge would be in violation of the Clean Water Act," explaining that "[b]road,

non-specific language that merely enjoins a party to obey the law . . . does not give the restrained party fair notice of what conduct will risk contempt." 78 F.3d at 1531. Rule 65(d) instead requires an injunction to leave those bound by it able to determine from the order itself what conduct is forbidden. See Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1203–05 (11th Cir. 2001).

Plaintiffs' proposed injunction suffers from the same defect. Its operative limitations ultimately turn upon whether an officer's conduct constitutes an unconstitutional prolongation under the Fourth Amendment – the very legal and factual question disputed in this action. Rule 65(d) does not permit an injunction that leaves officers to resolve that constitutional question in the field under threat of contempt. Because the proposed injunction fails to provide the objective and specific notice required by Rule 65(d), Plaintiffs' Emergency Motion should be denied.

A review of Eleventh Circuit jurisprudence related to prolonged traffic stops demonstrates the ambiguity inherent in the injunction Plaintiffs seek. See e.g., United States v. Braddy, 11 F.4th 1298, 1310 (11th Cir. 2021) (explaining that the Eleventh Circuit measures the reasonableness of a stop's duration under the totality of the circumstances and rigid time limitations and bright line rules are generally inappropriate); United States v. Chavez, No. 1:23-CR-346-SDG-JKL, 2024 WL 3057372, at *7-9 (N.D. Ga. June 3, 2024) (engaging in lengthy, fact-intensive analysis of the Campbell factors in making a close-call determination that pat-

down/frisk conducted by officer unlawfully prolonged the stop by nine seconds); Baxter v. Roberts, 54 F.4th 1241, 1259-1263 (11th Cir. 2022) (evaluating whether the five core tasks that were part of the stop's traffic mission were completed or should have been completed in determining the existence of a genuine dispute of material fact about whether Deputy Lee unlawfully prolonged the traffic stop when he ordered Baxter out of his truck to conduct a dog sniff); Simmons v. Viar, No. 1:23-CV-03300-JPB, 2024 WL 6980606, at *5 (N.D. Ga. Dec. 27, 2024), reconsideration denied, No. 1:23-CV-03300-JPB, 2025 WL 4058252 (N.D. Ga. Apr. 14, 2025) (determining that K-9 sniff did not prolong the stop in any manner under the circumstances); Smith v. Sohn, No. 23-13566, 2024 WL 3688335, at *2 (11th Cir. Aug. 7, 2024) (disagreeing with the district court's conclusion that the officers unconstitutionally prolonged the stop by conducting a dog sniff when the particular facts reflected that the dog sniff occurred during a period of time when one of the officers was still writing up Smith's citations); United States v. Anguiano, 791 F. App'x 841, 849-851 (11th Cir. 2019) (evaluating whether traffic stop was unlawfully prolonged by four different departures from the traffic mission that extended the stop by a total of 16 minutes, determining that the officers prolonged the stop by about 4½ minutes during one of the four departures from the mission to discuss possible options to search the truck to determine if it was being used for drug trafficking, but ultimately concluding that this departure did not unlawfully prolong the stop because

the officers had reasonable suspicion of criminal activity). As is evident from these cases, a determination of whether a traffic stop has been unlawfully prolonged is dependent upon a detailed, and often nuanced factual analysis that even Courts often struggle with. An injunction that would require an officer to make an immediate determination of whether a decision to prolong a traffic stop would withstand this detailed judicial review, under threat of contempt if he decided wrongly, is unreasonably and impermissibly vague and fails to satisfy the specified requirement of 65(d).

**B. Plaintiffs Cannot Demonstrate a Substantial Likelihood Of Success on the Merits.**

In order to be entitled to a preliminary injunction, Plaintiffs must show that they have a substantial likelihood of success on the merits of their claims. Plaintiffs' principal claim upon which the proposed injunction rests is the contention that Plaintiff Diaz's Fourth Amendment rights were violated by an unlawfully prolonged traffic stop beyond the time reasonably necessary to complete the traffic mission. Here, Plaintiffs' relied upon record submission, including the Complaint, fails to sufficiently demonstrate a substantial likelihood of success on the merits as to that Fourth Amendment prolongation claim.

In making a traffic stop, an officer must have reasonable suspicion (i.e., "a particularized and objective basis for suspecting the person stopped of criminal activity"), and even minor traffic violations qualify as criminal activity. United

States v. Campbell, 26 F.4th 860, 880 (11th Cir. 2022). (internal citations omitted). When determining whether reasonable suspicion exists, the totality of the circumstances are reviewed to ascertain whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Thomas, 817 F. App'x 902, 905 (11th Cir. 2020) (internal citations omitted). Due weight is given to an officer's experience and "[f]actors that may contribute to the formation of reasonable suspicion include a suspect's nervous and evasive behavior, inconsistent answers regarding travel plans, and refusal to comply with an officer's lawful orders." Id. (internal citations omitted). However, even where there is reasonable suspicion to make a traffic stop, the police do not have unfettered authority to detain a person indefinitely and cannot unlawfully prolong a stop. Campbell, 26 F.4th at 881.

In Rodriguez v. United States, 575 U.S. 348 (2015), the Supreme Court addressed prolongation of a traffic stop in resolving a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. 575 U.S. at 353. In Rodriguez, the Supreme Court reiterated that a traffic stop was more closely analogous to a *Terry* stop rather than a formal arrest and explained that the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to

related safety concerns. 575 U.S. at 354 (internal citations omitted). The Supreme Court explained that the officer's traffic mission goes beyond determining whether to issue a traffic ticket, and includes "ordinary inquiries incident to [the traffic] stop[]", with such inquiries typically involving checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. 575 U.S. at 355 (internal citations and quotations omitted). The Supreme Court explained that "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. Ultimately, the Supreme Court held that a dog sniff to detect crime in general or drug trafficking in particular was different from highway and officer safety interests that are typically included as part of the traffic mission attendant to a stop, and remanded the case for a determination of whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation. 575 U.S. at 358.

In looking to Supreme Court precedent including Rodriguez in comparing related and unrelated tasks to the traffic mission, the Eleventh Circuit has concluded that related tasks are the "ordinary inquiries incident to a traffic stop," while unrelated tasks are "other measures aimed at detecting criminal activity more generally." Campbell, 26 F.4th at 882. The Eleventh Circuit held in Campbell that

the proper standard for addressing an unlawfully prolonged stop is as follows: "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes", or "[i]n other words, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion. Campbell, 26 F.4th at 884 (internal citations omitted).

Here, Plaintiffs' presented chronology and Complaint allegations and exhibits do not demonstrate substantial likelihood of success of an unlawfully prolonged stop of Plaintiff Diaz in violation of the Fourth Amendment. In particular, Plaintiffs do not establish that the traffic mission was complete or should have been complete at any point before the stop was alleged to be reflected as closed per a CAD report at 6:41:18 p.m. In this case, Sgt. Ivester had reasonable suspicion of a failure to maintain lane violation[3] to initiate the February 20, 2026 stop as reflected in his incident report ("I observed a grey in color Nissan Frontier truck fail to maintain its lane with both right side tires crossing the right hand white line in the area of 365 and Level Grove. I activated my emergency blue lights and conducted a traffic stop in the area of 365 and Kudzu Hill.") (Doc. 1-3). He then made ordinary and related

---

[3] A failure to maintain lane is prohibited under O.C.G.A. § 40-6-48.

inquiries of Plaintiff Diaz incident to the stop that included a driver's license check. Through that ordinary and related inquiry, Sgt. Ivester then had reasonable suspicion that Plaintiff Diaz had provided a fraudulent license[4] based on observations that included: Diaz seeming nervous when talking to Ivester, Diaz fumbled for his license, Diaz's hands were shaking, and the picture on the provided Maryland license did not look like or seem to be the same person as Plaintiff Diaz. (Doc. 1-3). Based on his past experience of being provided fake identification and his knowledge that federal ICE agents with more access to identification programs were in the area to check on his reasonable suspicion of being provided a fake identification, Sgt. Ivester contacted a federal ICE agent to provide assistance. (Doc. 1-3).

Under Rodriguez, the constitutional question is whether unrelated conduct in the absence of reasonable suspicion caused the stop to last longer than reasonably necessary to complete its traffic mission, not whether immigration-related activity occurred during the stop. With respect to the subject stop, Sgt. Ivester was actively and diligently pursuing the traffic mission throughout the entirety of the approximate eleven-minute stop, including investigating a suspected fraudulent or mismatched

[4] Displaying a fraudulent driver's license is a criminal offense in Georgia under the following statutes: O.C.G.A. § 40-5-125 (prohibiting an individual's display or representation of a driver's license or identification card as his that was not issued to him) and O.C.G.A. § 16-9-4(b)(1) (prohibiting any person to knowingly possess, display, or use any false, fictitious, fraudulent, or altered identification document, including but not limited to a driver's license or identification card).

driver's license, which is itself a traffic and safety task within the traffic mission. Checking whether the person presenting a license is the licensed driver is expressly recognized in Rodriguez as part of the ordinary traffic mission.

Ivester's incident report reflects that Plaintiff Diaz appeared nervous, fumbled with the license, had shaking hands, and presented a Maryland license whose photograph did not appear to match him (Doc. 1-3), all of which are objective circumstances that would justify extended document verification. The federal verification request made one minute after obtaining the license is consistent with using available federal resources to authenticate a potentially fraudulent document, a task within or closely related to the traffic mission. The "Delay 10 Minutes" CAD entry Plaintiffs fixate on does not establish who requested it or that it was requested to facilitate immigration activity rather than to await document authentication results. The total duration of approximately eleven minutes for a stop involving a potentially fraudulent license is not unreasonable. Because the traffic mission was not yet complete when the immigration-related activity occurred, Plaintiffs cannot establish that any time was unlawfully added to the stop beyond what the traffic mission itself required. See e.g., United States v. Vargas, 848 F.3d 971, 974 (11th Cir. 2017) (concluding that stop for following too closely where neither of the occupants including the driver were licensed drivers was not prolonged given the fact that the safe disposition of the car had yet to be determined and the mission of

the stop now included lawful enforcement of the law rather than unlawful detention in preventing the occupants from driving the car without a license); Shaw v. Carson, No. 4:21-CV-204, 2025 WL 2723425, at *5 (S.D. Ga. Sept. 24, 2025) ("Throughout the stop, Defendant's only inquiries aimed to investigate the incident which led to Plaintiff's car being partially on the curb and partially in the road and investigating Plaintiff's driver's license. To the extent that Defendant's waiting for back up and continued request for Plaintiff's driver's license constituted 'unrelated inquiries aimed at investigating other crimes' adding time to the stop, Defendant had reasonable suspicion to prolong the stop, thus she did not do so unlawfully."); United States v. Reyes, No. 1:11-CR-00009-ODE, 2011 WL 7070980, at *7 (N.D. Ga. Aug. 29, 2011), report and recommendation adopted, No. 1:11-CR-00009-ODE, 2012 WL 176488 (N.D. Ga. Jan. 19, 2012) (Officer Sipple was justified in prolonging the detention in order to confirm or dispel his articulable suspicion that Reyes violated Georgia law by providing him with a false name and date of birth); United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) (holding that the officer may prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check); United States v. McIntosh, No. 1:18-CR-00431, 2019 WL 7184540, at *5-7 (N.D. Ga. Dec. 26, 2019) (emphasizing that officers may permissibly prolong a detention while awaiting results of a criminal history check that is part of routine traffic investigation, and that the officer did not

conduct an inquiry unrelated to the traffic stop by confirming the driver's identity and criminal history).

The Eleventh Circuit's decision in Meshal v. Commissioner, Georgia Department of Public Safety, 117 F.4th 1273 (11th Cir. 2024), is also instructive in distinguishing between ordinary inquiries incident to a traffic stop applicable in this case to calls to federal agencies that are not plausibly related to the mission of the stop. In Meshal, the Eleventh Circuit found that a call to the FBI following discovery of a driver's presence on a federal "No Fly List" document (where the document included specific instructions to officers not to detain Meshal based on his presence on the list) was not an ordinary inquiry incident to a traffic stop premised on following too closely and resulted in the stop being extended by 90 minutes beyond what the Fourth Amendment permitted. Meshal, 117 F.4th at 1283-1286. In stark contrast to the 90-plus minute detention in Meshal resulting from an unrelated federal inquiry where there was no reasonable suspicion of commission of any crime other than the minor traffic violation, this case involves a call to and use of federal resources in the context of an inquiry related to the traffic mission in attempting to authenticate a potentially fraudulent driver's license presented following the stop.

Notwithstanding the above authority, to the extent the call for federal agents to come to the scene to inquire into Plaintiff Diaz's supplied identification may arguably be characterized as an investigation into criminal conduct unrelated to the

traffic mission that resulted in prolongation of the stop, any prolongation of the stop was not violative of the Fourth Amendment because Sgt. Ivester's report reflects independent reasonable suspicion of a fraudulent license being tendered incident to the stop. The presence of independent reasonable suspicion of display of a fraudulent license following reasonable suspicion for the initial purpose of the stop prevents any prolongation from being violative of the Fourth Amendment in the aftermath of Rodriguez and Campbell. See, e.g., United States v. Siller, No. 118CR234TWTJKL2, 2022 WL 4130764, at *3 (N.D. Ga. Sept. 9, 2022) (holding that stop for faulty brake lights was not unlawfully prolonged in violation of Fourth Amendment when officer subsequently questioned truck driver about illegal hauling of narcotics based on reasonable suspicion from receipt of a tip from a Homeland Security Investigation's confidential informant).

Because Plaintiffs cannot demonstrate a substantial likelihood of success on the merits with regard to the Fourth Amendment unlawful prolongation claim that is the heart and soul of the Emergency Motion, the Emergency Motion should be denied. Bloedorn v. Grube, 631 F.3d 1218, 1242 (11th Cir. 2011) (upholding denial of preliminary injunction based on failure to establish a substantial likelihood of success on the merits, and stating it need not and does not examine the other factors for granting a preliminary injunction).

### C. Plaintiffs Lack Standing to Seek Prospective Relief Based on Failure to Sufficiently Allege an Actual Case or Controversy Involving Actual and Imminent Injury.

The Emergency Motion should also be denied for lack of standing because Plaintiffs' allegations fall short of alleging an actual case or controversy involving actual and imminent harm to Plaintiff Diaz. In the context of a preliminary injunction, "the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal citations omitted). While Plaintiffs attempt to distinguish the requested relief from the Supreme Court's decision in City of Los Angeles v. Lyons, 461 U.S. 95, 105-106 (1983), Plaintiffs' requested relief based on a past police encounter is not meaningfully distinguishable from the prospective relief rejected in Lyons.

In Lyons, the plaintiff sought to enjoin the entire Los Angeles police department from using a chokehold technique that police officers allegedly used to restrain arrestee should he ever be stopped again at some unknown time in the future. Lyons, 461 U.S. at 97-98. However, in order to be subject to the chokehold at issue, the Court explained that Lyons would have to allege a future police encounter along with "the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner." Id. at 106. The Court further

noted that "assuming that [the plaintiff] would again be stopped for a traffic or other violation in the reasonably near future, it is untenable to assert ... that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped." Id. at 108. The Court further explained that "the 'odds,' that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever" were not sufficiently high to support equitable relief. Id. at 108. The Lyons Court concluded it was "no more than speculation to assert ... that Lyons himself will again be involved in one of those unfortunate instances." Id. at 108.

Consistent with Lyons, this case also presents allegations of claimed threat of future recurrence of alleged unlawful police conduct that is highly remote, speculative, and dependent on a highly attenuated chain of events following a past police encounter. Here, Plaintiff Diaz alleges that he is no longer a driver subject to traffic stops in his own right, but is now a passenger. The alleged prolongation practice at issue was triggered by a traffic stop of a driver, and Plaintiff Diaz's claimed future exposure as a mere passenger depends on the following chain of contingencies: (1) his wife must be stopped; (2) the stop must involve the same officer or same alleged practices as the February 20th stop of Plaintiff Diaz , and (3) those alleged practices must then extend to passengers in the same manner alleged. This sequence (which is not alleged to have recurred in the nearly seven months

between the subject stop and the filing of the Complaint and Emergency Motion) remains speculative and dependent on multiple individually improbable events, and is precisely the kind of attenuated chain found insufficient in Lyons.

Plaintiffs' reliance on the Eleventh Circuit's decision in Georgia Latino Alliance for Human Rights v. Governor of Georgia in support of Article III standing is misplaced. In assessing standing, that case involved a pre-enforcement facial challenge to a state statute that created a direct and certain legal obligation to enforce, whereas here the alleged practice is an informal operational custom whose future application to Plaintiff Diaz as a passenger is inherently speculative. Plaintiff Diaz's cessation of driving, while perhaps motivated by fear, does not transform a past completed injury into an imminent future threat sufficient to support prospective equitable relief. Abstract injury is not sufficient to establish an injury in fact. Lyons, 461 U.S. at 101. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974). A "perhaps" or "maybe" chance of suffering an injury in the future is not enough to establish standing. Johnson v. DeKalb Cnty., Georgia, 391 F. Supp. 3d 1224, 1261 (N.D. Ga. 2019) (citing Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1340 (11th Cir. 2000)). Here, Plaintiffs' allegations of actual imminent and future harm are founded upon a highly attenuated chain of events premised on

speculation and conjecture, and therefore, do not provide enough to confer standing in support of prospective equitable relief.

Moreover, Plaintiffs' reliance on alleged comparison stops later the same evening are not yet proven to reflect a formal policy or custom attributable to the Sheriff or any of the other named defendants, but are offered only as circumstantial evidence at the TRO/preliminary injunction stage. Without a formally established policy or custom, the threat of future injury to Plaintiff Diaz as a passenger is no more concrete than the threat in Lyons, where the plaintiff also alleged a pattern of police misconduct.

**D. Plaintiffs Do Not Sufficiently Demonstrate Irreparable Harm Absent Temporary or Preliminary Injunctive Relief.**

Plaintiffs' irreparable harm argument conflates two distinct categories of harm that must each independently satisfy the imminence requirement. As to future detention harm, Plaintiff Diaz's claimed future exposure as a passenger depends on the speculative chain of contingencies discussed above, and a merely possible future harm that depends on multiple contingent events does not satisfy the requirement that the harm be actual and imminent rather than remote or speculative under Eleventh Circuit authority including Swain v. Junior, 961 F.3d 1276, 1292 (11th Cir. 2020).

In terms of evidentiary harm, Plaintiffs have not demonstrated that any specific evidence is currently being destroyed or is at imminent risk of destruction.

The mere possibility that electronic records could be deleted in the future is insufficient to establish irreparable harm, particularly where Responding Defendants are already on notice of this litigation and their associated preservation obligations through service of the complaint and the instant Emergency Motion. As Courts within this Circuit have recognized, the duty to preserve existing evidence in a party's possession, custody or control arises when litigation is reasonably foreseeable or pending and extends to existing evidence that a party knows or reasonably should know is relevant to litigation or potential litigation. See, e.g., Marshall v. Dentfirst, P.C., 313 F.R.D. 691, 695-96 (N.D. Ga. 2016); Atta v. Cisco Sys., Inc., 2020 WL 7384689, at *5 (N.D. Ga. Aug. 3, 2020); O'Sullivan v. Grayhawk Leasing, LLC, No. CV421-072, 2022 WL 22891461, at *2 (S.D. Ga. July 15, 2022). Given the lack of demonstration of any destruction of evidence or imminent risk of destruction of evidence and the parties to this litigation already being under an obligation to preserve relevant existing evidence in their possession, custody or control, Plaintiffs fail to demonstrate irreparable evidentiary harm in the absence of the requested preliminary injunction.

### E. The Balance of Equities and Public Interest Do Not Favor the Requested Injunctive Relief.

The remaining preliminary-injunction factors – balancing equities and public interest – likewise weigh against the extraordinary relief Plaintiffs seek. In evaluating the balance of equities and public interest, the Court must consider the

consequences of imposing the requested restraint upon lawful law-enforcement activities. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24–26 (2008). Here, the proposed injunction would expose officers to potential contempt for prolonging a traffic stop through immigration-related inquiries while simultaneously permitting continued detention where "independent lawful authority" exists. As discussed above, officers conducting traffic stops may lawfully investigate suspected criminal activity supported by reasonable suspicion, including suspected use of fraudulent identification. An injunction whose application turns upon difficult, fact-specific distinctions concerning the permissible duration and purpose of such inquiries risks chilling lawful investigative activity and interfering with officers' ability to verify driver identity and investigate suspected criminal conduct.

By contrast, Plaintiffs have not demonstrated a substantial likelihood that Plaintiff Diaz faces an imminent recurrence of the allegedly unlawful conduct. Diaz is no longer driving, the challenged encounter occurred approximately seven months before this action was filed, and Plaintiffs have not alleged that Diaz has since experienced another comparable detention. The public undoubtedly has a substantial interest in protection against unconstitutional seizures, but it also has an interest in effective and lawful enforcement of traffic and criminal laws. Where Plaintiffs have not established either a likely constitutional violation or an imminent threat of its recurrence, the balance of equities and public interest do not favor imposing the

requested prospective restraints upon law-enforcement activity. Accordingly, these factors further weigh against entry of a temporary restraining order or preliminary injunction.

### F. No Case or Controversy Exists Between Plaintiffs and the County.

Plaintiffs' Emergency Motion seeking relief against the County also fails based on lack of case or controversy between Plaintiffs and the County. Plaintiffs tellingly note that the scope of relief as to the County is "[o]nly if Plaintiffs establish that the County possesses legal authority over, implements, or directly participates in the challenged function." (Doc. 4-4, p. 9). That acknowledgment is not surprising given Eleventh Circuit authority holding that the State of Georgia – not an individual county – has authority and control over a sheriff's law enforcement functions. Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1332 (11th Cir. 2003). Sheriffs in Georgia act as agents of the State – not counties – in enforcing the laws and keeping the peace. Id. at 1333. The Eleventh Circuit recognized that while the State has supervisory authority over sheriffs, an individual county has no control over its sheriff's law enforcement activities. Id. at 1336. After Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003) and Grech, Courts in this Circuit have similarly found that sheriffs are not county policymakers under § 1983 for a sheriff's law enforcement policies and conduct and that Georgia sheriffs act as an arm of the State and not the county with regard to law enforcement functions, including hiring deputies to enforce criminal

laws, providing policies, training and supervision for such officers, searches, seizures, and detentions, and enforcing traffic and drug laws. Moon v. Rockdale Cnty., 188 F. Supp. 3d 1369, 1379 (N.D. Ga. 2016); Johnson v. Cnty. of Paulding, Georgia, No. 4:18-CV-0136-HLM, 2018 WL 10582193, at *3 (N.D. Ga. Oct. 31, 2018), aff'd, 780 F. App'x 796 (11th Cir. 2019) (collecting cases); Scollon v. Pickens Cnty., No. 2:25-CV-77-RWS, 2025 WL 3124806, at *17 (N.D. Ga. Sept. 24, 2025).

In addition to the County's lack of authority or control over the Sheriff's law enforcement functions, the Complaint also fails to properly allege that any of Plaintiffs' claims arise out of a policy, practice or custom of Habersham County. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Because the County has no authority or control over the Sheriff's law enforcement functions and Plaintiffs do not otherwise plausibly state a claim against the County, the requested equitable relief against the County is groundless and should be denied.

## CONCLUSION

For the reasons set forth above and at the Motions Hearing on the Emergency Motion, and because Plaintiffs are unable to clearly establish the burden of persuasion as to the four prerequisites of granting a TRO or preliminary injunction, Plaintiffs' Emergency Motion should be DENIED.

Respectfully submitted, this 8th day of September 2026.

**JARRAD & DAVIS, LLP**

*/s/ Kenneth P. Robin*
Kenneth P. Robin
Georgia Bar No. 609798
***Attorney for Named Defendants Sheriff Robin Krockum, in his official capacity, Sergeant Adam Ivester, in his individual capacity and in his official capacity only for prospective relief, and Habersham County, Georgia***

222 Webb Street
Cumming, Georgia 30040
(678) 455-7150 (telephone)
(678) 455-7149 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed **Sheriff Robin Krockum's, Sergeant Adam Ivester's and Habersham County, Georgia's Joint Brief in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction** with the Clerk of Court by using the Court's CM/ECF system, which will automatically send e-mail notification of such filing to all registered users in this action, including the below counsel of record for Plaintiffs:

Joshua A. McCall
The McCall Firm, LLC
201 Forrest Avenue, Suite A
Gainesville, Georgia 30501
Email: Josh@mccallatlaw.com

I further certify that the within and foregoing has been prepared in accordance with Local Rule 5.1(C) and is in a 14-point Times New Roman font.

This 8th day of September 2026.

**JARRARD & DAVIS, LLP**

*/s/ Kenneth P. Robin*
Kenneth P. Robin
Georgia Bar No. 609798
***Attorney for Named Defendants Sheriff Robin Krockum, in his official capacity, Sergeant Adam Ivester, in his individual capacity and in his official capacity only for prospective relief, and Habersham County, Georgia***

222 Webb Street
Cumming, Georgia 30040

678-455-7150 (telephone)
krobin@jarrard-davis.com